# EXHIBIT 4
# (All Relevant Filings)

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorney for Plaintiffs*

> **If you do not respond to this document within applicable time limits, judgment could be entered against you as requested.**

---

## IN THE SECOND DISTRICT COURT IN AND FOR WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br>       Plaintiffs <br><br>    v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br>       Defendants. | **COMPLAINT AND JURY DEMAND** <br><br> **(Tier 3)** <br><br> Case No. _____ <br><br> Judge _____ |

Plaintiffs assert, allege, and pray for relief as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiffs Molly M. Mulligan and John P. Mulligan each are individuals (referred to hereinafter collectively as "**Plaintiffs**" or "**Mulligans**") who together, as wife and husband

and as joint tenants, own and claim that certain real property which is the subject of this case.

2.     The real property which is the subject of this case is located in Weber County, State of Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, and is more particularly described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

3.     Defendant Alum Rock Riverside, LLC ("**Defendant**" or "**Alum Rock**"), is a California limited liability company which claims or may claim to have an interest in or to the Property.

4.     Defendants Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of The Del Valle Family Trust dated October 30, 2002 (referred to hereinafter individually and/or collectively as the "**Trust**" or the "**Del Valle Family Trust**") are co-trustees of the Trust ("**Co-Trustees**"), which Trust previously owned the Property and conveyed it by warranty deed to Plaintiffs.

5.     Jurisdiction is proper in this Court, including without limitation pursuant to Utah Code Ann. § 78B-6-401.

6.     Venue is proper in this Court, including without limitation pursuant to Utah Code Ann. § 78B-3-301(1) and § 78B-3-304 because this action involves real property located in Wasatch County, Utah.

7.      This matter is a Tier 3 case under and pursuant to Rule 26(c)(3) of the Utah Rules of Civil Procedure.

## GENERAL ALLEGATIONS

8.      The Del Valle Family Trust purchased and obtained title of record to the Property in 2007 by way of a *Special Warranty Deed* from Basinview Development, LC, which deed was recorded on May 3, 2007 as Entry No. 2261271 in the official records of the Weber County Recorder's office (the "**Special Warranty Deed**").

9.      When the Trust purchased the Property, the Trust, as borrower, obtained a loan from Wells Fargo Bank, N.A., which loan was secured by a *Short Form Deed of Trust* in the principal amount of $500,000.00, which was recorded on the Property on May 3, 2007, as Entry No. 2261272 (the Trust's "**Purchase Money Trust Deed**").

10.     The Trust further obtained a loan, as borrower, from California National Bank, which loan was secured by *a Construction Deed of Trust* in the principal amount of $1,750,000.00, which was recorded on the Property on December 31, 2007, as Entry No. 2313274 (the Trust's "**Construction Trust Deed**").

11.     On information and belief, Defendants Co-Trustees Brett H. Del Valle ("**Brett**") and Traci M. Del Valle ("**Traci**") did not contribute the Property to the Trust because the Trust purchased the Property directly from Basinview Development, LC and paid value for the Property and the residence built thereon, including as evidenced by the Purchase Money Trust Deed and the Construction Trust Deed.

12.     The Trust at all times owned the Property of record from 2007 until 2021 when the Trust, as Grantor, sold the Property to Plaintiffs, as joint tenants, conveying title by way of a

3

*Warranty Deed* recorded on May 11, 2021 as Entry No. 3151874 in the official records of the Weber County Recorder's office (the vesting "**Warranty Deed**").

13.     Plaintiffs obtained a loan for their purchase of the Property, which loan is secured by a Deed of Trust in favor of Morgan Stanley Private Bank, which was recorded on the Property on August 2, 2021 as Entry No. 3172556 (the "**Morgan Stanley Trust Deed**").

14.     When the Mulligans purchased the Property from the Trust they paid off various liens and encumbrances of record, including: (1) $712,209.92 paid in satisfaction of a mortgage loan given by BOFI Federal Bank to the Trust, as borrower, which loan was secured by a *RESPA Deed of Trust* recorded on the Property on September 20, 2017, as Entry No. 2879566 (the "**First Position Trust Deed**") ; (2) $948,000.00 paid in satisfaction of a mortgage loan given by TSS Enterprises Inc. to the Trust, which loan was secured by a *Deed of Trust with Assignment of Rents* recorded on July 6, 2020, as Entry No. 3066407 (the "**Second Position Trust Deed**"); (3) unpaid, delinquent property taxes in the amount of $46,248.89 for tax years 2018-2020 (the "**Delinquent Property Taxes**"); and, (4) delinquent homeowner association dues in the amount of $2,125.00 (the "**Delinquent HOA Dues**"), all of which liens and encumbrances appeared in the public record.

15.     Each of the Trust's Purchase Money Trust Deed and the Construction Trust Deed were reconveyed of record prior to the recording of the First Trust Deed and the Second Trust Deed.

16.     After the Mulligans purchased the Property from the Trust and their purchase proceeds paid off the First Trust Deed and the Second Trust Deed, each of those deeds of trust were subsequently reconveyed of record.

17.     Neither of the Co-Trustees appears in any individual and/or personal capacity in

4

any public record, abstract, or title search as an owner of the Property at any point in time, including not in the chain of title when Plaintiffs purchased the Property from the Trust.

18.    No judgments against either of the Co-Trustees in any individual and/or personal capacity of either of them were recorded on or against the Property in the office or records of the Weber County Recorder; no judgments against either of the Co-Trustees in any individual and/or personal capacity of either of them appear in any Weber County Recorder abstract or title search of the Property; and no judgments against either of the Co-Trustees in any individual and/or personal capacity of either of them appear in the searchable court index where the Property is located, including not during the time leading up to and including when the Mulligans purchased the Property.

19.    The claimed interests of defendant Alum Rock in or to the Property is/are based and premised upon a certain document entitled *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, which was recorded in the office and records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770, but which was not abstracted to or against the Property (the "**Alum Rock Lien**").

20.    The Alum Rock Lien relates to an underlying foreign judgment which was entered on March 18, 2020 against Brett Del Valle in his individual and personal capacity only and not in his capacity as one of the Co-Trustees of the Trust (among other judgment debtors, but not including and/or not against the Trust nor either of the Co-Trustees of the Trust including not Traci Del Valle).

21.    Defendant Alum Rock claims that the Alum Rock Lien attached to and encumbers the Property, including particularly but without limitation purportedly ahead of and with priority over Plaintiffs' interests in and ownership of the Property, it has failed and/or refused to release

5

of record the Alum Rock Lien which therefore is and constitutes a cloud upon Plaintiffs' title to the Property, and it has stated that it intends to enforce the Alum Rock Lien against the Property.

22.    On or about June 22, 2021, in a writ "proceeding" brought in the Third District Court in and for Salt Lake County, Utah, Alum Rock obtained a *Writ of Execution* against the Property to enforce its Lien (the "**Writ of Execution**").

23.    Pursuant to an appeal of the issuance of the Writ of Execution, in *Mulligan v. Alum Rock Riverside, LLC*, 2024 UT 22, ¶¶ 58, 62, 66 and n. 8, 69, the Utah Supreme Court held that Alum Rock created a judgment lien when it recorded its *Notice of Judgment* with the Weber County recorder on October 23, 2020; that its Writ of Execution was validly issued in only a writ "proceeding" in Salt Lake County (which the Utah Supreme Court expressly held was not an action, including not one to which Plaintiffs were parties); and specifically stated that it expressed "no opinion" on "whether [Co-Trustee Traci Del Valle's] joint ownership of the Property has any effect on [Alum Rock's] judgment lien". *Id.* n. 7.

24.    Utah Code Section 75-7-505(1) provides that: "If a trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution."

25.    The *Mulligan* decision did not foreclose Plaintiffs from bringing an action asserting claims and causes of action in the county where the Property is located in relation to the Alum Rock Lien.

26.    On or about December 18, 2024, Defendant Alum Rock caused to be posted on the Property a Weber County Sheriff's Office *Notice of Sale – Real Property*, which sets forth a sale date of January 16, 2024 at 12:00 p.m. (the "**Notice of Sale**").

## FIRST CAUSE OF ACTION
### (Declaratory Judgment and Quiet Title)

27.    Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

28.    An actual controversy has arisen and now exists regarding the Alum Rock Lien upon and/or against the Property which has been conveyed to and is owned by Plaintiffs, including pursuant to the Warranty Deed.

29.    The interests of the parties are adverse, concrete, and justiciable, and declaratory relief is warranted.

30.    Plaintiffs seek to quiet title to their ownership of the Property as against any claimed rights or interests to the Property asserted by Defendant Alum Rock, including pursuant to the Alum Rock Lien, in whole or in part.

31.    A judicial declaration is necessary and appropriate at this time in order that the Plaintiffs may confirm their rights with respect to ownership of the Property, including in advance of and before any attempt by Defendant Alum Rock to enforce its Lien against the Property.

32.    Utah Code Section 75-7-505(1) provides that: "If a trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution."

33.    Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that:

      a.    Brett Del Valle and Traci M. Del Valle, as apparent settlors of the Trust, did not contribute the Property, or any portion of the Property to the Trust, and that Alum

7

Rock's Lien therefore did not attach to any purported contribution interest of Brett Del Valle in or to the Property (*i.e.*, did not attach at all to the Property); or,

      b.      In the alternative only, if Brett Del Valle and Traci M. Del Valle, as apparent settlors, did contribute the Property to the Trust, then Alum Rock's Lien only attached to, encumbers, and/or affects any interest in the portion of the trust attributable to settlor Brett Del Valle's contribution, if any, and Alum Rock's Lien did not attach to the portion of the trust attributable to Traci M. Del Valle's contribution (leaving the Property free and clear of and from, and unaffected by, the Alum Rock Lien to the extent of Traci M. Del Valle's contribution); and in either event that,

      c.      Alum Rock cannot foreclose the Alum Rock Lien against and/or upon any part, portion, and/or interest whatsoever in or to the Property unless and until Alum Rock has established and proven to this Court what portion of the Property previously owned by the Trust was attributable to Brett Del Valle's contribution, if indeed any at all, and this Court has declared such portion of the Property which is therefore subject to the Alum Rock Lien.

34.      Additionally, pursuant to Utah Code Ann. §§ 78B-6-1301, *et. seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to judgment quieting title of the Property in Plaintiffs, either fully free and clear of and from, and unaffected by, any and all estates, rights, titles, and/or interests which may be held and/or claimed by and/or under the Alum Rock Lien; or, in the alternative only, Plaintiffs are entitled to judgment quieting title in that portion of the Property that is unaffected and unencumbered by any contribution interest apparent settlor Brett Del Valle, if any, and that the Alum Rock Lien can only affect and encumber at most, and only, any contribution interest of apparent settlor Brett Del Valle, if any.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## SECOND CAUSE OF ACTION
### (Equitable Subordination)

35.     Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

36.     Prior to Plaintiffs' purchase of the Property from the Trust, the Property was subject to and encumbered the First Position Trust Deed.

37.     Also prior to Plaintiffs' purchase of the Property from the Trust, the Property was subject to and encumbered by the Second Position Trust Deed.

38.     Further prior to Plaintiffs' purchase of the Property from the Trust, the Property was subject to and encumbered by a lien for the unpaid Delinquent Property Taxes (the "**Property Tax Lien**").

39.     Further prior to Plaintiffs' purchase of the Property from the Trust, the Property was subject to and encumbered by a lien for the unpaid Delinquent HOA Dues (the "**HOA Lien**").

40.     The First Position Trust Deed and the Second Position Trust Deed each were prior and superior to the later-recorded Alum Rock Lien.

41.     The Property Tax Lien and the HOA Lien each were prior and superior to the later-recorded Alum Rock Lien.

42.     As a matter of law, the Property Tax Lien had super-priority ahead of and superior to any interest of the Alum Rock Lien.

43.     Plaintiffs' proceeds for and from Plaintiffs' purchase of the Property were used to pay off the First Position Trust Deed in the amount of $712,209.92, the Second Position Trust

Deed in the amount of $948,000.00, the Property Tax Lien in the amount of $46,248.89, and the HOA Lien in the amount of $2,125.00, all having priority over, ahead of, and superior to any interest of the Alum Rock Lien, in the total cumulative amount of at least $1,708,583.81.

44. Plaintiffs paid and authorized the payment and disbursement of those proceeds of, for and from their purchase of the Property to pay off those prior and superior obligations and liens against the Property with the understanding and intent that Plaintiffs' Warranty Deed and all other rights of Plaintiffs in and to the Property would be in a first priority position ahead of and without any liens and/or encumbrances (other than those which Plaintiffs themselves may have signed and pledged), including without limitation occupying the priority places of and instead of the First Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, the HOA Lien, and ahead of and superior to all other estates, rights, titles, claims, and/or interests in, to, on, and/or against the Property (other than those which Plaintiffs themselves may have signed and pledged).

45. At the time Plaintiffs purchased the Property and disbursed and/or authorized disbursement of their purchase proceeds, Plaintiffs did not know that Defendant Alum Rock held or would claim to hold any priority position pursuant to the Alum Rock Lien, or otherwise, over, ahead of, or superior to Plaintiffs' ownership of the Property pursuant to Plaintiffs' Warranty Deed or otherwise.

46. It would be inequitable and unjust if the Alun Rock Lien were not equitably subordinated to Plaintiffs' ownership of and Warranty Deed on and to the Property.

47. By virtue of Plaintiffs' purchase proceeds having paid off the prior liens and obligations on and against the Property in at least the amount of $1,708,583.81, including, without limitation, prior liens and obligations to which the Alum Rock Lien, and any and all

10

other interests held or claimed by Defendant Alum Rock, were at all times junior, subject, and inferior, the interests of Defendant Alum Rock, should be equitably subordinated to Plaintiffs' ownership and Warranty Deed, to at least the extent that Plaintiffs' purchase proceeds paid off and reduced prior liens and obligations on and against the Property, to which any and all interests of Defendant Alum Rock, were at all times junior, subject, and inferior.

48.    Plaintiffs are entitled, pursuant to Utah Code Ann. §§ 78B-6-401 *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, to declaratory judgment that, by virtue of Plaintiffs having paid off the liens and obligations on and against the Property that were prior and superior to the Alum Rock Lien and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, and to which they always were subject and inferior, the Alum Rock Lien and any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, are equitably subordinated to and do not affect Plaintiffs' ownership, Warranty Deed, and other interests, at least to the extent that Plaintiffs' purchase proceeds paid off or reduced prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

### THIRD CAUSE OF ACTION
**(Equitable Subrogation)**

49.    Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

50.    It would be inequitable and unjust if Plaintiffs' ownership, Warranty Deed, and other interests in and to the Property were not equitably and otherwise subrogated to a position of priority ahead of and superior to the Alum Rock Lien and to any and all other estates, rights,

titles, or interests in the Property held and/or claimed by Defendant Alum Rock, due to and in light of Plaintiffs' purchase proceeds having paid off the liens and obligations on and against the Property, in at least the amount of $1,708,583.81, that were prior and superior to the Alun Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, and to which they always were subject and inferior.

51.     If Plaintiffs' ownership, Warranty Deed, and other interests were not equitably subrogated to a position of priority ahead of and superior to the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, then Defendant Alum Rock would be unjustly enriched and reap a windfall by virtue of Plaintiffs having paid off other liens and obligations to which the Alum Rock Lien, and any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, always were, and would otherwise have remained, junior, inferior and subordinate.

52.     Plaintiffs are entitled, pursuant to Utah Code Ann. §§ 78B-6-401 *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise to declaratory judgment that Plaintiffs' ownership, Warranty Deed, and other interests in and to the Property should be and are subrogated to the priority positions in, on, and to the Property of all prior liens and obligations, with priority over the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, which were paid off with Plaintiffs' purchase proceeds, in at least the amount of $1,708,583.81, including particularly but without limitation to the priority position of the First Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, the HOA Lien, and each of them, ahead of and superior to the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, at least to the extent that Plaintiffs' purchase proceeds

paid off or reduced such prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## FOURTH CAUSE OF ACTION
**(Declaratory Judgment – No Constructive Notice)**

53.     Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

54.     Leading up to and at the time that the Mulligans purchased the Property, the Alum Rock Lien did not appear of record in any Weber County Recorder abstract of title for the Property.

55.     Leading up to and at the time that the Mulligans purchased the Property, the Alum Rock Lien did not appear in any title search of the Property.

56.     Leading up to and at the time that the Mulligans purchased the Property, the Alum Rock Lien did not appear in the searchable court index in any Weber County court where the Property is located.

57.     At all times, including leading up to and at the time that the Mulligans purchased the Property, the Alum Rock Lien did not appear in the Weber County Judgment Index.

58.     The Trust was not recorded, and no other document was recorded that disclosed a claim to the Property that set forth the Trust's beneficiaries' names, specified the beneficiaries' interest on which the claim was based, and described the Property as being subject to that interest.

59.     The Warranty Deed did not disclose any claim of Alum Rock.

60.     Utah Code Section 57-3-102(4) states, in pertinent part: "The fact that a recorded

document … names the grantee as trustee, or otherwise purports to be in trust without naming beneficiaries or stating the terms of the trust does not charge any third person with notice of any interest of the grantor or of the interest of any other person not named in the document."

61.     No Trust instruments or documents are recorded on or against the Property that discloses, names, or states: (1) the name(s) of any settlor(s) and/or beneficiar(ies) of the Trust; (2) the terms of the Trust; (3) discloses any contribution interests of any settlor(s) of the Trust; or (4) discloses any claims as against the Property by, though, or under the Trust and/or its settlors.

62.     Utah Code Section 57-3-102(4) dictates that the Mulligans were not charged with any notice of any individual contribution interests of Brett H. Del Valle and Traci M. Del Valle, in their respective individual and personal capacities, in the Property to which the Alum Rock Lien could attach.

63.     Utah Code Section 57-3-102(5) states: "The grantee in a recorded document may convey the interest granted to him free and clear of all claims not disclosed in the document in which he appears as grantee or in any other document recorded in accordance with this title that sets forth the names of the beneficiaries, specifies the interest claimed, and describes the real property subject to the interest."

64.     Utah Code Section 57-3-102(5) dictates that the Warranty Deed imparted notice to Plaintiffs that the Co-Trustees of the Trust could and did convey the Property to Plaintiffs "free and clear" of all claims not disclosed in the 2007 Special Warranty Deed in which the Co-Trustees of the Trust appeared as grantees and by which the Trust acquired title, and "free and clear" of all unrecorded equitable interests in the Property held or claimed by anyone, including Alum Rock, whose interest was not disclosed in any other recorded document that sets forth the names of the beneficiaries, specifies the interest claimed by Alum Rock, and describes the real

14

property subject to the interest.

65.     Plaintiffs thus had no constructive notice of any interest of Brett Del Valle in his individual and/or personal capacity in or to the Property (including without limitation any contribution interest as a now apparent settlor of the unrecorded Trust, or otherwise).

66.     Plaintiffs also thus had no constructive notice of the Alum Rock Lien which was entered against Brett Del Valle in his individual and personal capacity only (and against other judgment debtors not relevant to this case) and not in his capacity as one of the Co-Trustees of the Trust.

67.     If and to the extent that the Alum Rock Lien attached to and/or encumbered any part, portion, or contribution interest in, to, and/or of the Property (*see* First Cause of Action hereinabove and by this reference incorporated here), then the Alum Rock Lien constituted a material defect on and against the Property that was not disclosed to Plaintiffs.

68.     Pursuant to Utah Code Ann. §§ Utah Code Section 57-3-102(4) and (5), 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien and any and all other claims of or by Defendant Alum Rock to any estate, right, title, lien, encumbrance, and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

15

## FIFTH CAUSE OF ACTION
### (Declaratory Judgment – Bona Fide Purchasers)

69.    Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

70.    An actual controversy has arisen and now exists regarding the Alum Rock Lien upon and/or against the Property which has been conveyed to and is owned by Plaintiffs, including pursuant to the Warranty Deed.

71.    Plaintiffs paid valuable consideration and acted in good faith when they purchased the Property.

72.    When Plaintiffs purchased the Property the only owner of record was, and for fourteen years only ever had been, the Trust.

73.    When Plaintiffs purchased the Property no liens of record existed against the Trust, the grantor on the Warranty Deed conveying title to Plaintiffs, other than the First Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, and the HOA Lien (each of which were prior and superior to the later-recorded Alum Rock Lien, and all of which were paid off and satisfied with Plaintiffs' proceeds for and from Plaintiffs' purchase of the Property).

74.    As a result, when Plaintiffs purchased the Property Plaintiffs had no constructive notice of, no actual knowledge of, and could not and did not discover any judgment liens on or against the Property and had no notice and/or knowledge of any adverse interest in or to the Property.

75.    Plaintiffs purchased for value, paid for, and obtained title to the Property without notice and/or knowledge of the Alum Rock Lien, which was related to a foreign judgment which was not entered against the Trust, and without notice and/or knowledge of any other claim in or

to the Property by Defendant Alum Rock.

76.     At the time the Mulligans purchased the Property, they had no notice and/or knowledge of the Alum Rock Lien, nor of any other claim by Alum Rock, in, to, and/or against the Property.

77.     At the time the Mulligans purchased the Property, nothing in the official records of the Weber County Recorder showed whether the Trust was a purportedly revocable trust, nor whether there was any contribution interest of the Property by any revocable trust settlor(s).

78.     Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing Plaintiffs are bona fide purchasers of the Property who paid valuable consideration, in good faith, without notice of any adverse claims of Defendant Alum Rock, including without notice of the Alum Rock Lien, and that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien, and any and all other claims by Defendant Alum Rock to any estate, right, title, lien, encumbrance, and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

### SIXTH CAUSE OF ACTION
**(Declaratory Judgment of, and Damages for,
Breaches of Warranty Deed – against the Trust)**

79.     Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

80.     When the Trust executed the Warranty Deed to Plaintiffs, and by executing it, the

Trust, among other things, as a matter of law (including without limitation under and pursuant to Utah Code Ann. § 57-1-12(2)), expressly covenanted and warranted, among other things, that the Trust was lawfully seised of good and marketable title of and to the Property, that the Trust had the right to and that by the Warranty Deed the Trust in fact did convey and warrant the Property to Plaintiffs, and that the Trust would defend generally the title of the Property in Plaintiffs against all adverse claims and demands (subject only to certain specified interests stated on the face of the Warranty Deed which do not apply to this case).

81.    Plaintiffs have provided, and do again hereby provide, written notice to the Trust of and regarding the claims and potential interests in the Property which are the subject of this case, and has demanded, including in writing, that the Trust release, satisfy, and otherwise discharge the same to provide and ensure the full, free, clear, and marketable title of and to the Property to Plaintiffs as the Trust is legally and statutorily required to do by virtue of the Warranty Deed.

82.    To date, however, the Trust has failed, and/or refused, to comply with the requests and demands as stated in the immediately preceding paragraph.

83.    Plaintiffs have suffered, are continuing to suffer, and otherwise will suffer and are entitled to recover from the Trust, damages as a result of the Trust's breaches of the various covenants and warranties of the Warranty Deed, regarding ownership of and title to the Property, in amounts that will be shown at trial.

84.    Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing the Trust is in breach of its covenants and warranties of title with respect to the Property contained and implied as a matter of law in and as a part of the Warranty Deed.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### (Injunctive Relief – Restraining Order)

85.     Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

86.     As a matter of express and unequivocal statutory law in Utah, Alum Rock cannot foreclose the Alum Rock Lien against and/or upon any part, portion, and/or interest whatsoever in or to the Property unless and until Alum Rock has established and proven to this Court what portion of the Property previously owned by the Trust was attributable to apparent settlor Brett Del Valle's contribution, if indeed any at all, and unless and until this Court has declared such portion of the Property which is therefore subject to the Alum Rock Lien and to any execution upon and/or foreclosure thereof and/or thereto.

87.     Defendant Alum Rock has stated to Plaintiffs that it intends to enforce its Lien against the Property and intends to proceed with a sale of the Property pursuant to its Writ of Execution.

88.     Defendant Alum Rock has scheduled a Sheriff's Sale of the Property for January 16, 2024 at 12:00 p.m., notwithstanding the Utah Supreme Court expressly having not reached the question in the *Mulligan* decision, of "whether [Co-Trustee Traci Del Valle's] joint ownership of the Property has any effect on [Alum Rock's] judgment lien" and further notwithstanding Alum Rock's failure to establish and prove to this Court what portion of the Property previously owned by the Trust was attributable to apparent settlor Brett Del Valle's contribution, if indeed any at all, and what portion of the Property is therefore subject to the Alum Rock Lien and to any execution upon and/or foreclosure thereof, if indeed any at all.

89.     The *Mulligan* decision further did not reach or consider any legal issues or claims brought by the Mulligans in any action, including not in this action.

90.     Defendant Alum Rock proceeding with any Sheriff's Sale of Plaintiffs' Property pursuant to the Alum Rock Lien and/or the Writ of Execution based thereon, including without limitation any execution upon and/or foreclosure of the Property pursuant to the Alum Rock Lien and/or the Writ of Execution based thereon, including without limitation during the pendency of this action and before Alum Rock has established and proven to this Court what portion of the Property previously owned by the Trust was attributable to apparent settlor Brett Del Valle's contribution, if indeed any at all, and before this Court has so declared such portion of the Property which is therefore subject to execution and/or foreclosure by Alum Rock, if indeed any at all, would result in immediate, great, and irreparable injury and damage to Plaintiffs who have no plain, speedy, or adequate remedy at law to protect their Property unless Defendant Alum Rock is restrained from taking such action.

91.     Defendant Alum Rock proceeding with any Sheriff's Sale of Plaintiffs' Property pursuant to the Alum Rock Lien and/or the Writ of Execution based thereon, including without limitation any execution upon and/or foreclosure of the Property pursuant to the Alum Rock Lien and/or the Writ of Execution based thereon, including without limitation during the pendency of this action and before Plaintiffs' claims have been adjudicated (Plaintiffs' claims and causes of action for declaratory judgment and quiet title, equitable subrogation, equitable subordination, declaratory judgment – no constructive notice, declaratory judgment – bona fide purchasers, and declaratory judgment – breaches of warranty deed), would result in immediate, great, and irreparable injury and damage to Plaintiffs who have no plain, speedy, or adequate remedy at law to protect their Property unless Defendant Alum Rock is restrained from taking such action.

92.     These determinations present serious issues on the merits which should be the subject of further litigation.

93.     Without these determinations Plaintiffs cannot adequately protect their interests.

94.     Without these determinations neither Alum Rock, nor any other potential bidders at any execution and/or foreclosure sale under or relating to Alum Rock's Lien and/or Alum Rock's Writ of Execution can even know whether and/or how much to bid because nobody knows what fractional part, portion, and/or interest in the Property is subject to any execution and/or foreclosure sale, if indeed any at all.

95.     Prior to such determinations, Plaintiffs will suffer irreparable harm and potential loss or damage to their ownership interests in the Property unless Defendant Alum Rock is enjoined from proceeding with any Sheriff's Sale of the Property.

96.     The potential loss or damage to Plaintiffs' ownership interests in their Property outweighs whatever damage maintaining status quo through an injunction may cause Defendant Alum Rock and is not adverse to the public interest.  Indeed, maintaining status quo through injunctive relief is supportive of the public interest and will prevent Alum Rock and/or other potential bidders from bidding and/or paying for an unknowable fractional part, portion, and/or interest in the Property is actually subject to any execution and/or foreclosure sale, if indeed any at all, and/or would prevent chilled and/or artificially low bidding due to such unknown factors.

97.     Defendant Alum Rock proceeding with any enforcement of the Alum Rock Lien against the Property could render a final judgment for Plaintiffs ineffectual in the absence of temporary, preliminary, and permanent injunctive relief.

98.     Plaintiffs are entitled to a temporary restraining order and preliminary injunction during the pendency of this action, and thereafter to a permanent injunction, restraining and

enjoining Defendant Alum Rock from proceeding to any enforcement, execution, and/or foreclosure upon and/or against the Property pursuant to the Alum Rock Lien, and from attempting to enforce the Alum Rock Lien against the Property in any way.

**WHEREFORE**, Plaintiffs pray for relief as follows:

1.      Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that:

   a.      Brett Del Valle and Traci M. Del Valle, as apparent settlors of the Trust, did not contribute the Property, or any portion of the Property to the Trust, and that Alum Rock's Lien therefore did not attach to any purported contribution interest of Brett Del Valle in or to the Property (*i.e.*, did not attach at all to the Property); or,

   b.      In the alternative only, if Brett Del Valle and Traci M. Del Valle, as apparent settlors, did contribute the Property to the Trust, then Alum Rock's Lien only attached to, encumbers, and/or affects any interest in the portion of the trust attributable to settlor Brett Del Valle's contribution, if any, and Alum Rock's Lien did not attach to the portion of the trust attributable to Traci M. Del Valle's contribution (leaving the Property free and clear of and from, and unaffected by, the Alum Rock Lien to the extent of Traci M. Del Valle's contribution); and in either event that,

   c.      Alum Rock cannot foreclose the Alum Rock Lien against and/or upon any part, portion, and/or interest whatsoever in or to the Property unless and until Alum Rock has established and proven to this Court what portion of the Property previously owned by the Trust was attributable to Brett Del Valle's contribution, if indeed any at all, and this Court has declared such portion of the Property which is therefore subject to the Alum Rock Lien.

2.      Additionally, pursuant to Utah Code Ann. §§ 78B-6-1301, *et. seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to judgment quieting title of the Property in Plaintiffs, either fully free and clear of and from, and unaffected by, any and all estates, rights, titles, and/or interests which may be held and/or claimed by and/or under the Alum Rock Lien; or, in the alternative only, Plaintiffs are entitled to judgment quieting title in that portion of the Property that is unaffected and unencumbered by any contribution interest apparent settlor Brett Del Valle, if any, and that the Alum Rock Lien can only affect and encumber at most, and only, any contribution interest of apparent settlor Brett Del Valle, if any.

3.      Plaintiffs are entitled, pursuant to Utah Code Ann. §§ 78B-6-401 *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, to declaratory judgment that, by virtue of Plaintiffs having paid off the liens and obligations on and against the Property that were prior and superior to the Alum Rock Lien and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, and to which they always were subject and inferior, the Alum Rock Lien and any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, are equitably subordinated to and do not affect Plaintiffs' ownership, Warranty Deed, and other interests, at least to the extent that Plaintiffs' purchase proceeds paid off or reduced prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

4.      Plaintiffs are entitled, pursuant to Utah Code Ann. §§ 78B-6-401 *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise to declaratory judgment that Plaintiffs' ownership, Warranty Deed, and other interests in and to the Property should be and are subrogated to the priority positions in, on, and to the Property of all prior liens and obligations, with priority over the Alum Rock Lien, and to any and all other estates, rights, titles, or interests

in the Property held and/or claimed by Defendant Alum Rock, which were paid off with Plaintiffs' purchase proceeds, in at least the amount of $1,708,583.81, including particularly but without limitation to the priority position of the First Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, the HOA Lien, and each of them, ahead of and superior to the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, at least to the extent that Plaintiffs' purchase proceeds paid off or reduced such prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

5.      Pursuant to Utah Code Ann. §§ Utah Code Section 57-3-102(4) and (5), 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien and any and all other claims of or by Defendant Alum Rock to any estate, right, title, lien, encumbrance, and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

6.      Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing Plaintiffs are bona fide purchasers of the Property who paid valuable consideration, in good faith, without notice of any adverse claims of Defendant Alum Rock, including without notice of the Alum Rock Lien, and that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien, and any and all other claims by Defendant Alum Rock to any estate, right, title, lien, encumbrance,

24

and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

7.      Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing the Trust is in breach of its covenants and warranties of title with respect to the Property contained and implied as a matter of law in and as a part of the Warranty Deed.

8.      Plaintiffs are entitled to a temporary restraining order and preliminary injunction during the pendency of this action, and thereafter to a permanent injunction, restraining and enjoining Defendant Alum Rock from proceeding to any enforcement, execution, and/or foreclosure upon and/or against the Property pursuant to the Alum Rock Lien, and from attempting to enforce the Alum Rock Lien against the Property in any way.

9.      For such other and further relief to which Plaintiffs are entitled at law or equity.

DATED December 20, 2024.


 */s/Felicia B Canfield*
Felicia B. Canfield
*Attorneys for Plaintiffs*

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **NOTICE OF ENTRY OF APPEARANCE OF COUNSEL FOR PLAINTIFFS** <br><br><br> Case No. 240908957 <br><br> Judge CAMILLE NEIDER |

The undersigned Bradley L. Tilt, of Freeman Lovell, PLLC, hereby enters his appearance as legal counsel of record herein for Plaintiffs Molly J. Mulligan and John P. Mulligan.

Pursuant to Rule 5 of the Utah Rules of Civil Procedure, all pleadings, papers, materials, and filings relating to the above-captioned action should be sent to and served upon:

Bradley L. Tilt
FREEMAN LOVELL, PLLC

4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Office: 385-355-4826
bradley.tilt@freemanlovell.com

DATED December 20, 2024.

FREEMAN LOVELL, PLLC

*/s/ Bradley L. Tilt*
Bradley L. Tilt
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, I caused a true and correct copy of the foregoing **NOTICE OF ENTRY OF APPEARANCE OF COUNSEL FOR PLAINTIFFS** to be served in the manner indicated to the following parties at the addresses listed below:

| Felicia B. Canfield<br>CANFIELD LAW LLC<br>2413 Newton Avenue<br>Cody, WY 82414<br>canfieldlawllc@gmail.com<br>*Attorneys for Plaintiffs* | _____ Hand Delivery<br>_____ First Class, United States Mail, Postage Prepaid<br>___X___ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>_____ Email<br>_____ Other: |
|---|---|

*/s/Bradley L. Tilt*
Bradley L. Tilt

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Tax ID No. 20-119-0007

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **LIS PENDENS** <br><br> Case No. 240908957 <br><br> Judge CAMILLE NEIDER |

Pursuant to Utah Code Ann. § 78B-6-1303, and otherwise, the above-named Plaintiffs, by

and through their undersigned legal counsel of record, hereby give notice of the pendency of the

above-captioned action which is pending in the above-named Court seeking, among other things,

various claims, causes of action, and forms of relief with regard to and affecting the real property

which is the subject of this case is located in Weber County, State of Utah, commonly known as

1453 South Basinview Road, Huntsville, UT 84317, and is more particularly described as

follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT,
> according to the official plat thereof on file and of record in the office of the Weber
> County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across
> Basinview Road (a private road), as shown on the official dedicated plat, to and from
> said Lot to a physically open and legally dedicated public street.
>
> Tax ID No. 20-119-0007

The claims, causes of action, and forms of relief with regard to and affecting the Property which

are asserted in and are the subject of this above-captioned action include, without limitation:

    1.    Judgment declaring that pursuant to Utah Code Ann. §§ 78B-6-401, *et seq.*, Rule

57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory

judgment that:

        a.    Brett Del Valle and Traci M. Del Valle, as apparent settlors of the Trust,

did not contribute the Property, or any portion of the Property to the Trust, and that Alum

Rock's Lien therefore did not attach to any purported contribution interest of Brett Del

Valle in or to the Property (*i.e.*, did not attach at all to the Property); or,

        b.    In the alternative only, if Brett Del Valle and Traci M. Del Valle, as

apparent settlors, did contribute the Property to the Trust, then Alum Rock's Lien only

attached to, encumbers, and/or affects any interest in the portion of the trust attributable

to settlor Brett Del Valle's contribution, if any, and Alum Rock's Lien did not attach to

the portion of the trust attributable to Traci M. Del Valle's contribution (leaving the Property free and clear of and from, and unaffected by, the Alum Rock Lien to the extent of Traci M. Del Valle's contribution); and in either event that,

      c.    Alum Rock cannot foreclose the Alum Rock Lien against and/or upon any part, portion, and/or interest whatsoever in or to the Property unless and until Alum Rock has established and proven to this Court what portion of the Property previously owned by the Trust was attributable to Brett Del Valle's contribution, if indeed any at all, and this Court has declared such portion of the Property which is therefore subject to the Alum Rock Lien.

      2.    Judgment declaring that pursuant to Utah Code Ann. §§ 78B-6-1301, *et. seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to judgment quieting title of the Property in Plaintiffs, either fully free and clear of and from, and unaffected by, any and all estates, rights, titles, and/or interests which may be held and/or claimed by and/or under the Alum Rock Lien; or, in the alternative only, Plaintiffs are entitled to judgment quieting title in that portion of the Property that is unaffected and unencumbered by any contribution interest apparent settlor Brett Del Valle, if any, and that the Alum Rock Lien can only affect and encumber at most, and only, any contribution interest of apparent settlor Brett Del Valle, if any.

      3.    Judgment declaring pursuant to Utah Code Ann. §§ 78B-6-401 *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, to declaratory judgment that, by virtue of Plaintiffs having paid off the liens and obligations on and against the Property that were prior and superior to the Alum Rock Lien and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, and to which they always were subject and inferior, the Alum Rock Lien and any and all other estates, rights, titles, or interests

in the Property held and/or claimed by Defendant Alum Rock, are equitably subordinated to and do not affect Plaintiffs' ownership, Warranty Deed, and other interests, at least to the extent that Plaintiffs' purchase proceeds paid off or reduced prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

4.    Judgment declaring that pursuant to Utah Code Ann. §§ 78B-6-401 *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise to declaratory judgment that Plaintiffs' ownership, Warranty Deed, and other interests in and to the Property should be and are subrogated to the priority positions in, on, and to the Property of all prior liens and obligations, with priority over the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, which were paid off with Plaintiffs' purchase proceeds, in at least the amount of $1,708,583.81, including particularly but without limitation to the priority position of the First Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, the HOA Lien, and each of them, ahead of and superior to the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, at least to the extent that Plaintiffs' purchase proceeds paid off or reduced such prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

5.    Judgment declaring Utah Code Ann. §§ Utah Code Section 57-3-102(4) and (5), 78B-6-401, *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien and any and all other claims of or by Defendant Alum Rock to any estate, right, title, lien, encumbrance, and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and

4

to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

6.      Judgment declaring that pursuant to Utah Code Ann. §§ 78B-6-401, *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing Plaintiffs are bona fide purchasers of the Property who paid valuable consideration, in good faith, without notice of any adverse claims of Defendant Alum Rock, including without notice of the Alum Rock Lien, and that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien, and any and all other claims by Defendant Alum Rock to any estate, right, title, lien, encumbrance, and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

7.      Judgment declaring that pursuant to Utah Code Ann. §§ 78B-6-401, *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing the Trust is in breach of its covenants and warranties of title with respect to the Property contained and implied as a matter of law in and as a part of the Warranty Deed.

8.      Issuance of a temporary restraining order and preliminary injunction during the pendency of this action, and thereafter to a permanent injunction, restraining and enjoining Defendant Alum Rock from proceeding to any enforcement, execution, and/or foreclosure upon and/or against the Property pursuant to the Alum Rock Lien, and from attempting to enforce the Alum Rock Lien against the Property in any way.

DATED December ___, 2024.

FREEMAN LOVELL, PLLC

Bradley L. Tilt
*Attorneys for Plaintiffs*

STATE OF UTAH      )
                  : ss.
COUNTY OF SALT LAKE  )

The foregoing *Lis Pendens* was acknowledged before me this 20ᵗʰ day of December, 2024, by Bradley L. Tilt, of Freeman Lovell, PLLC.

NOTARY PUBLIC
Angela Byers
733294
My Commission Expires
09/20/2027
STATE OF UTAH

NOTARY PUBLIC
Residing at: Salt Lake, Utah

6

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Office: (385) 355-4826
bradley.tilt@freemanlovell.com
*Attorney for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

> **This motion requires you to respond.
> Please see the Notice to Responding Party.**

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | ***EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION and MEMORANDUM IN SUPPORT** <br><br><br> Case No. 240908957 <br><br> Judge CAMILLE NEIDER |

Pursuant to Rule 65A of the Utah Rules of Civil Procedure, Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or "**Plaintiffs**") respectfully move this Court for issuance of a temporary restraining order ("**TRO**") and a preliminary injunction enjoining Defendant Alum Rock Riverside, LLC ("**Alum Rock**" or "**Defendant**") from holding a sale of

Mulligans' real property in Weber County, *i.e.,* their residence, which sale is based upon a *Writ of Execution* Alum Rock obtained in a writ "proceeding" which it filed in the Third Judicial District, Salt Lake County against its judgment debtor, Brett Del Valle ("**Brett**") – to which the Mulligans were not parties and which was not an action involving real property. *See Mulligan v. Alum Rock Riverside, LLC*, 2024 UT 22, ¶ 66[1].

The issuance of Alum Rock's *Writ of Execution* was upheld by the Utah Supreme Court in *Mulligan* on the grounds that Alum Rock created a judgment lien when it <u>recorded</u> its *Notice of Judgment*, generally, with the Weber County recorder on October 23, 2020 (the "**Alum Rock Lien**"); that its Writ was validly issued in the writ "proceeding" because Brett was a co-trustee of the trust that sold the Property to the Mulligans. *Id.* ¶¶ 58, 62, 66 and n. 8, 69. But the Court specifically stated that it expressed "*no opinion*" on "*whether [co-trustee Traci Del Valle's] joint ownership of the Property has any effect on [Alum Rock's] judgment lien*" (*Id.* n 7). The *Mulligan* decision did not foreclose Plaintiffs from bringing an action in Weber County, where their home is located, asserting claims and causes of action in relation to the Alum Rock Lien, and <u>did not consider or rule upon any of the claims brought by the Mulligans in this action</u>.

Defendant Alum Rock has scheduled a <u>**Sheriff's Sale of the Mulligans' home for January 16, 2025 at 12:00 p.m.,**</u> notwithstanding its failure to establish and prove what portion of the Property previously owned by the Trust was attributable to apparent settlor Brett's contribution, if indeed any at all, and what portion of the Property is therefore subject to the Alum Rock Lien and to any execution upon and/or foreclosure thereof, if indeed any at all, among other legal issues and claims asserted by the Mulligans in this action. Holding such a sale

---

[1] "Simply put, this proceeding to enforce that judgment through a writ of execution is not an action involving real property governed by the venue statute." *See* Canfield Decl., Ex. G (defined below).

prior to the judicial determination of that and other legal issues and claims, would be <u>premature and improper</u> and <u>the sale would cause immediate and irreparable injury, loss, or damage to Plaintiffs, owners of the subject irreplaceable property</u>. Plaintiffs further request an injunction barring Defendant not only from holding this Sheriff's Sale, but from holding <u>any sale</u> pursuant to the Alum Rock Lien because these determinations (and all of the claims forth in Plaintiffs' Complaint filed herein) present serious issues on the merits that <u>first must be adjudicated</u>.

The requested injunction should issue without bond. No party, or their claims, will be harmed by the requested injunction because in the event the Mulligans are unable to prove their claims, and in the event that judgment creditor Alum Rock is able to prove what portion of the Property previously owned by the Trust was attributable to apparent settlor Brett's contribution, if indeed any at all, the Property will still be there to be sold at that time. Further, Alum Rock is already secured by the adjudication that it created a lien. There is, therefore, no need for any bond during the pendency of this litigation. Thus, Alum Rock will not be harmed by any delay should it ultimately be allowed to execute upon its Writ, including since the Property will only increase in value over time.  Thus, no one will suffer any injury from the injunction. The sworn *Declaration of Felicia B. Canfield* (the "**Canfield Decl.**") is filed concurrently with this Motion.

## MATERIAL FACTS

1.    The real property which is the subject of this action is located in Weber County, State of Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across

3

Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

*See* Canfield Decl., Ex. A.

2.      The Mulligans are the owners of the Property by way of a *Warranty Deed* from Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of the Del Valle Family Trust dated October 20, 2002, as grantor, to the Mulligans, as joint tenants, as grantee, which was recorded on May 11, 2021 as Entry No. 3151874 in the official records of the Weber County Recorder's office (the "**Warranty Deed**").  *See* Canfield Decl., Ex. A.

3.      Plaintiffs obtained a loan for their purchase of the Property, which loan is secured by a Deed of Trust that was recorded on the Property on August 2, 2021 as Entry No. 3172556 (the "**Mulligans' Trust Deed**"). *See* Canfield Decl., Ex. B.

4.      When the Mulligans purchased the Property from the Trust they paid off various liens and encumbrances of record, including: (1) $712,209.92 paid in satisfaction of a mortgage loan given by BOFI Federal Bank to the Trust, as borrower, which loan was secured by a *RESPA Deed of Trust* recorded on the Property on September 20, 2017, as Entry No. 2879566 (the "**First Position Trust Deed**") ; (2) $948,000.00 paid in satisfaction of a mortgage loan given by TSS Enterprises Inc. to the Trust, which loan was secured by a *Deed of Trust with Assignment of Rents* recorded on July 6, 2020, as Entry No. 3066407 (the "**Second Position Trust Deed**"); (3) unpaid, delinquent property taxes in the amount of $46,248.89 for tax years 2018-2020 (the "**Delinquent Property Taxes**"); and, (4) delinquent homeowner association dues in the amount of $2,125.00 (the "**Delinquent HOA Dues**"), all of which liens and encumbrances appeared in the public record.  *See* Canfield Decl., Ex. C.

4

5.       Neither Co-Trustee appears in any individual and/or personal capacity in any public record, abstract, or title search as an owner of the Property at any point in time, including not in the chain of title when Plaintiffs purchased the Property from the Trust. *See* Canfield Decl., Ex. D.

6.       The claimed interests of Defendant Alum Rock in or to the Property is/are based and premised upon a certain *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770, but which was not abstracted to or against the Property (the "**Alum Rock Lien**"). *See* Canfield Decl., Ex. E; *see also* Ex. D.

7.       No judgments against either Co-Trustee were recorded on the Property; no judgments against either Co-Trustee appear in any Weber County Recorder abstract or title search of the Property; and no judgments against either Co-Trustee appear in the searchable court index where the Property is located, **including not during the time leading up to and including when the Mulligans purchased the Property**. *See* Canfield Decl., Ex. D.

8.       The Alum Rock Lien relates to an underlying foreign judgment which was entered on March 18, 2020 against Brett (among other judgment debtors) in his individual and personal capacity only and not in his capacity as one of the Co-Trustees of the Trust. *See* Canfield Decl., Ex. E (Notice of Judgment and Foreign Judgment).

9.       On June 22, 2021, in a writ "proceeding" brought in the Third District Court in and for Salt Lake County, Utah, Civil No. 206927043, Alum Rock obtained a *Writ of Execution* to enforce its Lien (the "**Writ of Execution**") against the Mulligan Property. *See* Canfield Decl., Ex. F; *see also Mulligan* ¶ 66 in Canfield Decl., Ex. G (defined below).

10.     Pursuant to an appeal, in *Mulligan v. Alum Rock Riverside, LLC*, 2024 UT 22, ¶¶ 58, 62, 66 and n. 8, 69, the Utah Supreme Court held that Alum Rock created a judgment lien when it recorded its *Notice of Judgment* <u>generally</u> with the Weber County recorder on October 23, 2020 (the "**Alum Rock Lien**"); that its Writ was validly issued in the writ "<u>proceeding</u>", including because Brett was a settlor and co-trustee of the Trust that sold the Property to the Mulligans. *Id.* n. 7. *See* Canfield Decl., Ex. G.

11.     Utah Code Section 75-7-505(1) provides that: "If a trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution." *See* Canfield Decl., Ex. H.

12.     The Trust was not recorded, and neither the Warranty Deed, nor the *Special Warranty Deed* by which the Trust obtained title to the Property, recorded on May 3, 2007 as Entry No. 2261271 in the official records of the Weber County Recorder's office (the "**Special Warranty Deed**")), discloses any claim that sets forth the names of the beneficiaries, specifies the interest claimed, and describes the real property subject to the interest. *See* Canfield Decl., Ex. I (Special Warranty Deed); *see also* Exs A and D.

13.     Utah Code Section 57-3-102(4) states, in pertinent part: "The fact that a recorded document … names the grantee as trustee, or otherwise purports to be in trust without naming beneficiaries or stating the terms of the trust does not charge any third person with notice of any interest of the grantor or of the interest of any other person not named in the document." *See* Canfield Decl., Ex. J.

14.     Utah Code Section 57-3-102(5) states: "The grantee in a recorded document may convey the interest granted to him free and clear of all claims not disclosed in the document in

which he appears as grantee or in any other document recorded in accordance with this title that sets forth the names of the beneficiaries, specifies the interest claimed, and describes the real property subject to the interest." *See* Canfield Decl., Ex. J.

15.    Plaintiffs, in their Complaint filed herein, have brought claims and causes of action against Defendant Alum Rock for:

      a. Declaratory Judgment and Quiet Title;
      b. Equitable Subordination;
      c. Equitable Subrogation;
      d. Declaratory Judgment – No Constructive Notice;
      e. Declaratory Judgment – Bona Fide Purchasers; and,
      f. Injunctive Relief – Restraining Order.

16.    The Weber County Sheriff's Office *Notice of Sale Real Property* that was posted on the Property on or about December 18, 2024, shows a scheduled Sheriff's Sale of the Property scheduled for January 16, 2025 at 12:00 p.m. (the "**Sheriff's Sale**"). *See* Canfield Decl., Ex. K.

## ARGUMENT

**I.    ALL THE ELEMENTS FOR THE ISSUANCE OF A RESTRAINING ORDER AND INJUNCTION ARE PRESENT HERE AND PLAINTIFFS' MOTION SHOULD BE GRANTED**

Rule 65A of the Utah Rules of Civil Procedure provides that courts may issue a restraining order and preliminary injunction when the applicant can show:

(a) There is a substantial likelihood that the applicant will prevail on the merits of the underlying claim;

(b) The applicant will suffer irreparable harm unless the order or injunction issues;

(c) The threatened injury to the applicant outweighs whatever damage the proposed order or injunction may cause the party restrained or enjoined; and

(d) The order or injunction, if issued, would not be adverse to the public interest.

In this case, Plaintiffs, applicants, meet each of those elements.

**Element No. 1**: **There is a substantial likelihood that the applicants will prevail on the merits of the underlying claims.**

There is a substantial likelihood that Plaintiffs' will prevail on the merits of at least one, if not every, one of their underlying claims as follow:

**Quiet Title:** Mulligans have alleged and proved from the public record that they own the Property pursuant to the Warranty Deed given by the Trust. Utah law provides: "A true quiet title action is a suit brought 'to quiet an *existing* title against an adverse or hostile claim of another,' and 'the effect of a decree quieting title is not to *vest* title but rather is to *perfect* an existing title as against other claimants.'" *Dep't of Social Servs. v. Santiago,* 590 P.2d 335, 337–38 (Utah 1979); *see also In re Hoopiiaina Tr.*, 2006 UT 53, ¶ 26, 144 P.3d 1129, 1137; *accord Gillmor v. Blue Ledge Corp.,* 2009 UT App 230, ¶ 28, 217 P.3d 723, 731. "[A]ll [a party] need do is prove prima facie that he has title which, if not overcome by [the opposing party], is sufficient." *Babcock v. Dangerfield,* 98 Utah 10, 94 P.2d 862, 863 (1939). *Gillmor v. Blue Ledge Corp.,* 2009 UT App 230, ¶ 14, 217 P.3d 723, 728. Alum Rock is a hostile judgment creditor claimant that claims an interest in the Mulligans' home such that it intends to sell the Mulligans' Property at the scheduled Sheriff's Sale on January 16, 2025.  But Alum Rock has not proved that its claimed interest *vis a vis* co-trustee/apparent settlor, Brett, defeats the Mulligans' existing title.

Further, Utah Code 75-7-505(1) provides: "If a trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution". Alum Rock has not proved what contribution interest, if any, is available for it to execute upon.

Thus, there is a substantial likelihood that Plaintiffs will prevail on their Quiet Title claim and their Motion should be granted.

8

**Equitable Subordination and Equitable Subrogation**: The doctrine of equitable subrogation hold that when a prior creditor is paid off – in this case the Mulligans and their lender paid off the First and Second Position Trust Deeds – the subsequent lender acquires the lien priority of the prior creditor. The doctrine of equitable subordination essentially is the flip side of equitable subrogation, and holds that any creditor – in this case judgment creditor Alum Rock – whose interest in the property arose between the time of the prior creditors (the beneficiaries of the First and Second Position Trust Deeds) and the subsequent lender (the Mulligans' lender), the intervening creditor (Alum Rock) is equitably subordinated to the interest of the subsequent lender to the extent of the prior creditors were paid off, whose interests were ahead of the intervening creditor's interest (*i.e.*, Alum Rock's Lien). *See e.g., Martin v. Hickenlooper*, 59 P.2d 1139 (Utah 1936); *George v. Butler*, 50 P. 1032 (Utah 1897). In other words, because the First and Second Position Trust Deeds encumbered the Property before the creation of Alum Rock's Lien, and because the Mulligans and their lender paid them off (*in addition to* the Property Tax HOA Liens), judgment creditor Alum Rock must be equitably subordinated to those paid off encumbrances and the Mulligans' lender.  Otherwise, Alum Rock would be unjustly enriched and reap a windfall by virtue of those prior encumbrances having been paid off by Mulligans and their lender – encumbrances that Alum Rock would have been subordinate to in any event and which would have otherwise burdened the Property, upon which Alum Rock now seeks to execute its judgment lien. In short, because Plaintiffs thus paid off prior liens and encumbrances on the Trust Property in the total cumulative amount of at least $1,708,583.81, Alum Rock's Lien cannot have priority over those paid off encumbrances.

Thus, there is a substantial likelihood that Plaintiffs will prevail on their Equitable Subordination and Equitable Subrogation claims and their Motion should be granted.

**Bona Fide Purchasers with No Constructive Notice**: Plaintiffs have alleged and can prove from the public record that when they purchased the Property from the Trust, no judgments against either Co-Trustee were recorded on the Property; no judgments against either Co-Trustee appear in any Weber County Recorder abstract or title search of the Property; and no judgments against either Co-Trustee appear in the searchable court index where the Property is located. *See* Canfield Decl., Ex. D (Abstract and Judgment Index). Thus, they purchased the Property from the Trust as bona fide purchasers for value with no notice of Alum Rock's Lien, constructive or otherwise. *See, e.g., Baldwin v. Burton*, 850 P.2d 1188 (Utah 1993) (purchasers who purchased property from judgment debtor's wife were bona fide purchasers whose interests in property were not affected by judgment creditor's execution on property; no liens of record existed against wife at time of purchase and there was no evidence purchasers had notice of creditors' judgment lien when they purchased property).

Furthermore, the Trust itself was not recorded, and no other document was recorded that disclosed a claim to the Property that set forth the Trust's beneficiaries' names, specified the beneficiaries' interest on which the claim was based, and described the Property as being subject to any such interest. Utah Code 57-3-102(4) states, in pertinent part: "The fact that a recorded document … names the grantee as trustee, or otherwise purports to be in trust without naming beneficiaries or stating the terms of the trust does not charge any third person with notice of any interest of the grantor or of the interest of any other person not named in the document."  Utah Code 57-3-102(4) thus dictates that the Mulligans were not charged with any notice of any individual contribution interests of Brett H. Del Valle and Traci M. Del Valle, in their respective individual and personal capacities, in the Property to which the Alum Rock Lien could attach.

The Special Warranty Deed conveying the Property to the Trust disclosed no such interest or claim by Alum Rock and neither did the Warranty Deed that conveyed the Property from the Trust to the Mulligans. Utah Code 57-3-102(5) states: "The grantee in a recorded document may convey the interest granted to him free and clear of all claims not disclosed in the document in which he appears as grantee or in any other document recorded in accordance with this title that sets forth the names of the beneficiaries, specifies the interest claimed, and describes the real property subject to the interest."  Utah Code 57-3-102(5) thus dictates that the Warranty Deed imparted notice to Plaintiffs that the Co-Trustees of the Trust could and did convey the Property to Plaintiffs "free and clear" of all claims not disclosed in the 2007 Special Warranty Deed (in which the Co-Trustees of the Trust appeared as grantees and by which the Trust acquired title), and "free and clear" of all unrecorded equitable interests in the Property held or claimed by anyone, including Alum Rock, whose interest was not disclosed in any other recorded document that sets forth the names of the beneficiaries, specifies the interest claimed by Alum Rock, and describes the real property subject to the interest.

Thus, there is a substantial likelihood that Plaintiffs will prevail on their declaratory judgment claims for Bona Fide Purchasers and No Constructive Notice; their Motion should therefore be granted.

**Element No. 2: The applicants will suffer irreparable harm unless the order or injunction issues.**

The Property is the Mulligans' home.  Each parcel of "[r]eal estate has always been regarded as unique because no two parcels can be exactly alike." *Utah Dept. of Transp. v. Jones*, 694 P.2d 1031, 1036.  Should this Court allow the Sheriff's Sale to proceed without granting Plaintiffs a full and fair opportunity to assert and prove their claims, Plaintiffs will be irreparably

11

harmed. The Mulligans will have lost their home and irreplaceable property along with their purchase money proceeds, including all amounts paid thereunder to date—and the amounts that Mulligans paid in satisfaction of various liens and encumbrances, including the Trust's First Position and Second Position Trust Deeds, the Property Tax Lien and the HOA Lien – in at least the amount of $1,708,583.81. Furthermore, Plaintiffs are innocent parties, bona fide purchasers, without any notice, constructive or otherwise, of any claims made by Alum Rock and should not be prevented from having their claims adjudicated in this action prior to any sale by Alum Rock.

Thus, since Plaintiffs would be irreparably harmed otherwise, this Court should issue a TRO and a preliminary injunction halting the Sheriff's Sale and barring Defendant Alum Rock from proceeding with any sale of the Property pending the outcome of this action.

**Element No. 3: The threatened injury to the applicant outweighs whatever damage the proposed order or injunction may cause the party restrained or enjoined.**

Defendant Alum Rock will suffer no harm by the granting of Plaintiffs' Motion for a TRO and preliminary injunction, since it is not entitled to sell the Property at all if Plaintiffs' claims and legal theories prove true. On the other hand, the Mulligans will be irreparably harmed and injured should the Trustee's Sheriff's ale proceed, as set forth in the discussion of Element No. 2 above.

**Element No. 4: The order or injunction, if issued, would not be adverse to the public interest.**

The public has no interest, whatsoever, in permitting unlawful and illegal sale of real property to occur – much less the sale of the home and residence of bona fide purchasers without any notice, constructive or otherwise, of any claims of a judgment creditor (Alum Rock) of a prior non-owner of the Property (Brett), which judgment creditor failed to provide record notice of its claims on the Property itself or to the Mulligans prior to their purchase.

Furthermore, issuing a TRO and Preliminary injunction would further the public interest

12

in allowing claims, like the ones brought herein, to be fully and fairly adjudicated before the property that is subject to those claims is sold and placed out of reach of Plaintiffs and homeowners, like the Mulligans.  There can be, therefore, no adverse effect on the public interest in stopping the Sheriff's Sale scheduled for January 16, 2025 at 2:00 p.m. pending the outcome of this case and the adjudication of Mulligans' claims and causes of action pled in this action.

A Sheriff's sale of the Property pursuant to Alum Rock's Writ of Execution prior to a ruling by this Court on Plaintiffs' claims, including for Quiet Title, Equitable Subordination, Equitable Subrogation, Declaratory Judgment of No Constructive Notice and that Mulligans are Bona Fide Purchasers, would be contrary to the public interest.

Additionally, allowing the Sheriff's Sale to proceed in the absence of any ruling on these claims would result in material chilling of the bidding due to substantial uncertainty that the sale would even be valid or effective to convey any interest in the Property to the successful bidder. Nobody would know whether or how to bid to protect their respective interests, which would still be left for this Court to have to decide after any such sale.  Additionally, any sale held before a ruling by this Court as to the claims Plaintiffs have asserted, would itself be subject to challenge and additional litigation.  And the Mulligans would be ejected from their home.

The requested TRO and Preliminary injunction therefore is actually in the public interest because it does not upset Plaintiffs home ownership while substantial issues are pending, calling into question the validity of the Sheriff's Sale, and because it will allow the Plaintiffs and any potential third party bidders to know exactly what, if any, interest is being sold, so they can make appropriate and informed decisions of whether, how, and what to bid, secure in the knowledge they will not be buying into uncertain litigation.  Public policy is to maximize the price obtained for property at a sheriff's sale.  That cannot be accomplished when the sale is chilled for lack of

certainty as to the outcome of this case.

## II.       THE COURT SHOULD NOT REQUIRE A BOND IN THIS CASE

Rule 65A allows this Court to issue the requested TRO and preliminary injunction

without a bond where:

> it appears that none of the parties will incur or suffer costs, attorney fees or damage as the
> result of any wrongful order or injunction, or unless there exists some other substantial
> reason for dispensing with the requirement of security.

Utah R. Civ. P. 65A(c)(1). Defendant Alum Rock will not incur any damages as a result of the

requested TRO and preliminary injunction in this case. Even if Alum Rock ultimately prevailed

in this case, then its claimed interest is already secured by the adjudication that it created a lien.

Therefore, the Court need not and should not require a bond. Alum Rock will only be stopped

from proceeding with the Sheriff's Sale – none of its claimed interest in the Property by way of

the its lien will be affected by the TRO and/or the preliminary injunction, and it will have the

opportunity to respond to Plaintiffs' claims in this lawsuit.

This is not a situation where Mulligans could abscond with the Property or otherwise

adversely affect Alum Rock's claimed (but erroneous) ability to sell it absent a ruling on, and

adjudication of, the substance and merits of Mulligans' claims. Furthermore, this Court's issuance

of the TRO and preliminary injunction would not be wrongful, but instead is the appropriate action

given Mulligans' claims and likelihood of success, as discussed in the Element No. 1 section

above.  If Mulligans ultimately prevail in their claims, then the requested TRO and preliminary

injunction *a fortiori* will have been proper.  Alternatively, even if judgment creditor Alum Rock

ultimately prevails in this case its claimed interest is already secured.  Either way, Alum Rock will

suffer no harm, and no additional security should be required.

Furthermore, if Alum Rock was allowed to sell the Property at the Sheriff's Sale on

January 16, 2025, the Property would not be marketable by them until the entry of a final ruling

14

by this Court on Mulligans' claims. Mulligans' *lis pendens* recorded on the title to the Property gives <u>specific notice</u> of the pendency of this lawsuit and all of their claims asserted herein. The Property is therefore unmarketable until this case is resolved. No bond, therefore, is necessary or should be required in this case.

### **CONCLUSION**

The Mulligans meet every element necessary for this Court to grant their Motion and to issue a TRO and preliminary injunction pending the outcome of this lawsuit. There is a substantial likelihood that the Mulligans will prevail on the merits of their underlying claims; they will suffer irreparable harm unless this Court issues a TRO and preliminary injunction; the threatened injury to the Mulligans outweighs whatever damage the TRO or preliminary injunction may cause judgment creditor Alum Rock; and this Court's issuance of a TRO and preliminary injunction benefit the public interest and is not adverse to it.

Mulligans therefore respectfully request the Court to issue the proposed Order granting their Motion and to issue a TRO and preliminary injunction barring Defendant Alum Rock from holding the Sheriff's Sale on January 16, 2025 and from attempting to otherwise foreclose under or pursuant to the Alum Rock Lien pending a resolution of this action. A proposed Order accompanies this Motion.

DATED December 23, 2024

CANFIELD LAW LLC

 */s/ Felicia B. Canfield*
Felicia B. Canfield
*Attorneys for Plaintiffs*

15

**Bilingual Notice to Responding Party for Motions**

(7101GEJ Approved April 16, 2018 / Revised January 21, 2021; for compliance with URCP 7)

| Notice to responding party | Aviso para la parte que responde |
|---|---|
| You have a limited amount of time to respond to this motion. In most cases, you must file a written response with the court and provide a copy to the other party: | Su tiempo para responder a esta moción es limitado. En la mayoría de casos deberá presentar una respuesta escrita con el tribunal y darle una copia de la misma a la otra parte: |
| • within 14 days of this motion being filed, if the motion will be decided by a judge, or<br>• at least 14 days before the hearing, if the motion will be decided by a commissioner. | • dentro de 14 días del día que se presenta la moción, si la misma será resuelta por un juez, o<br>• por lo menos 14 días antes de la audiencia, si la misma será resuelta por un comisionado. |
| In some situations a statute or court order may specify a different deadline. | En algunos casos debido a un estatuto o a una orden de un juez la fecha límite podrá ser distinta. |
| If you do not respond to this motion or attend the hearing, the person who filed the motion may get what they requested. | Si usted no responde a esta moción ni se presenta a la audiencia, la persona que presentó la moción podría recibir lo que pidió. |
| See the court's Motions page for more information about the motions process, deadlines and forms: utcourts.gov/motions<br><br><br>Scan QR code to visit page | Vea la página del tribunal sobre Mociones para encontrar más información sobre el proceso de las mociones, las fechas límites y los formularios:<br><br>utcourts.gov/motions-span<br><br>Para accesar esta página escanee el código QR |

**Finding help**

The court's Finding Legal Help web page (utcourts.gov/help) provides information about the ways you can get legal help, including the Self-Help Center, reduced-fee attorneys, limited legal help and free legal clinics.



Scan QR code to visit page

**Cómo encontrar ayuda legal**

La página de la internet del tribunal Cómo encontrar ayuda legal (utcourts.gov/help-span) tiene información sobre algunas maneras de encontrar ayuda legal, incluyendo el Centro de Ayuda de los Tribunales de Utah, abogados que ofrecen descuentos u ofrecen ayuda legal limitada, y talleres legales gratuitos.



Para accesar esta página escanee el código QR

17

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Office: (385) 355-4826
bradley.tilt@freemanlovell.com
*Attorney for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **DECLARATION OF FELICIA B. CANFIELD IN SUPPORT OF** *EX-PARTE* **MOTION PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> Case No. 240908957 <br><br> Judge CAMILLE NEIDER |

I, FELICIA B. CANFIELD, declare and state as follows:

1.      I am over the age of 18 years, and I have personal knowledge of and am fully

competent to testify as to all matters stated herein.  I am an attorney duly licensed to practice

law in the State of Utah, and represent Plaintiffs in this matter.  I am familiar with the contents

of all documents referenced herein.

1

2.     My law practice since 2003 has included and focused primarily upon real property related matters.  I am familiar with searching real property titles in counties located throughout the state of Utah and in reading and interpreting documents recorded on county records regarding real properties in counties throughout the State of Utah.  I am also familiar with searching and obtaining documents from Utah state courts through XChange, and federal district courts and bankruptcy courts located in Utah through PACER.

3.     I have been informed and believe that there is a currently pending Sheriff's Sale scheduled for January 16, 2025 at 12:00 p.m. based upon the subject Notice of Sale defined below.

4.     The real property which is the subject of this action is located in Weber County, State of Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

> Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

> Tax ID No. 20-119-0007

5.     The Exhibits attached hereto, corresponding to those of the subparagraphs immediately below, are and consist of the following:

A.     *Warranty Deed* from Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of the Del Valle Family Trust dated October 20, 2002, as grantor, to the Mulligans, as joint tenants, as grantee, which was recorded on May 11, 2021 as Entry No. 3151874 in the official records of the Weber County Recorder's office (the "**Warranty Deed**");

**B.**     Deed of Trust that was recorded on the Property on August 2, 2021 as Entry No. 3172556 (the "**Mulligans' Trust Deed**");

**C.**     *RESPA Deed of Trust* recorded on the Property on September 20, 2017, as Entry No. 2879566 (the **"First Position Trust Deed**") and its reconveyance; *Deed of Trust with Assignment of Rents* recorded on July 6, 2020, as Entry No. 3066407 (the **"Second Position Trust Deed**") and its reconveyance; posting summary showing delinquent property taxes paid in the amount of $46,248.89 for tax years 2018-2020 (the "**Delinquent Property Taxes**"); posting summary showing delinquent homeowner association dues paid in the amount of $2,125.00 (the "**Delinquent HOA Dues**");

**D.**     Property Abstract and Weber County Judgment Index;

**E.**     *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770, based on subject foreign judgment (the "**Alum Rock Lien**");

**F.**     *Writ of Execution* issued June 22, 2021, in Civil No. 206927043, Third District Court, Salt Lake County (the "**Writ of Execution**");

**G.**     *Mulligan v. Alum Rock Riverside, LLC*, 2024 UT 22;

**H.**     Utah Code Section 75-7-505;

**I.**     *Special Warranty Deed* by which the Trust obtained title to the Property, recorded on May 3, 2007 as Entry No. 2261271 in the official records of the Weber County Recorder's office (the "**Special Warranty Deed**");

**J.**     Utah Code Section 57-3-102; and,

**K.**    *Notice of Sale Real Property* that was posted on the Property on or about December 18, 2024, shows a scheduled Sheriff's Sale of the Property scheduled for January 16, 2025 at 12:00 p.m. (the "**Sheriff's Sale**")

I declare under criminal penalty under the law of Utah that the foregoing is true and correct.

DATED December 23, 2024.

CANFIELD LAW LLC

*/s/ Felicia B. Canfield*
Felicia B. Canfield
*Attorneys for Plaintiffs*

# EXHIBIT A

*W3151874*

Mail Tax notice to:
Grantee
51 Chestnut Avenue
Clarendon Hills, IL 60514
MNT File No.: 49967
Tax ID No.: 20-119-0007

E# 3151874  PG 1 OF 3
Leann H. Kilts, WEBER COUNTY RECORDER
11-May-21  1215 PM      FEE $40.00 DEP DM
REC FOR: METRO NATIONAL TITLE
ELECTRONICALLY RECORDED

## WARRANTY DEED

Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of the Del Valle Family Trust dated October 30, 2002

**GRANTOR** of Newport Beach, State of California, hereby CONVEYS and WARRANTS TO:

Molly J. Mulligan and John P. Mulligan, wife and husband, as joint tenants

**GRANTEE** of 51 Chestnut Avenue, Clarendon Hills, IL 60514 for the sum of TEN AND 00/100'S DOLLARS AND OTHER GOOD AND VALUABLE CONSIDERATION, the following described tract of land in Weber County, State of Utah:

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

**SUBJECT TO:** County and/or City Taxes not delinquent; Bonds and/or Special Assessments not delinquent and Covenants, Conditions, Restrictions, Rights-of-Way, Easements, Leases and Reservations now of Record.

Warranty Deed

Page 1

**M0057**

**WITNESS**, the hand(s) of said grantor(s), May _10_ 2021.

Brett H. Del Valle, Co-Trustee of the Del Valle
Family Trust dated October 30, 2002

Traci M. Del Valle, Co-Trustee of the Del Valle
Family Trust dated October 30, 2002

State of __CALIFORNIA__, County of __ORANGE__ )ss:

On __MAY 10th 2021__ personally appeared before me Brett H. Del Valle and Traci M. Del Valle, who upon being duly sworn (or affirmed) upon oath that they did sign the foregoing instrument with authority as granted in the capacity as Co-Trustees of the Del Valle Family Trust dated October 30, 2002, and that the said Brett H. Del Valle and Traci M. Del Valle, duly acknowledged to me that they executed the same.

- Please see Attached -
Notary Public

---

Warranty Deed                                                                 Page 2

M0058

E# 3151874 PG 3 OF 3

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of ORANGE )

On MAY 10th 2021 before me, Chavon Kane, NOTARY PUBLIC
    *Date*              *Here Insert Name and Title of the Officer*

personally appeared BRETT H. DEL VALLE AND TRACI M. DEL VALLE
           *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

CHAVON KANE
COMM..2213310
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. October 5, 2021

Signature _____
    *Signature of Notary Public*

*Place Notary Seal Above*

──── **OPTIONAL** ────

Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.

**Description of Attached Document**
Title or Type of Document: WARRANTY DEED    Document Date: _____
Number of Pages: 2   Signer(s) Other Than Named Above: NONE

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual   ☐ Attorney in Fact
☐ Trustee   ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual   ☐ Attorney in Fact
☐ Trustee   ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

# EXHIBIT B



E# **3172556**  PG 1 OF 25
Leann H. Kilts, WEBER COUNTY RECORDER
02-Aug-21 1105 AM      FEE $40.00 DEP DA(
REC FOR: METRO NATIONAL TITLE
ELECTRONICALLY RECORDED

After Recording Return To:
**Morgan Stanley Private Bank,**
**National Association**
**4270 Ivy Pointe Blvd., Suite 400**
**Cincinnati, OH 45245**

Prepared By:
**Morgan Stanley Private Bank,**
**National Association**
**4270 Ivy Pointe Blvd, Suite 400**
**Cincinnati, OH 45245**



[Space Above This Line For Recording Data]

## DEED OF TRUST

MIN: **1002628-6009077190-6**
Loan #: **6009077190**

Parcel Number: **20-119-0007**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)     "**Security Instrument**" means this document, which is dated **July 30, 2021**, together with all Riders to this document.
(B)     "**Borrower**" is **Molly J. Mulligan and John P. Mulligan, wife and husband, as joint tenants.** Borrower is the trustor under this Security Instrument.
(C)     "**Lender**" is **Morgan Stanley Private Bank, National Association**. Lender is a **National Bank** organized and existing under the laws of **The United States of America**. Lender's address is **4270 Ivy Pointe Blvd, Suite 400, Cincinnati, OH 45245.**
(D)     "**Trustee**" is **METRO NATIONAL TITLE, 345 E. BROADWAY, SALT LAKE CITY, UT 84111.**
(E)     "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F)     "**Note**" means the promissory note signed by Borrower and dated **July 30, 2021** . The Note states that Borrower owes Lender **ONE MILLION ONE HUNDRED SEVENTY THOUSAND AND NO/100** Dollars (U.S. $ **1,170,000.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **September 01, 2051.**
(G)     "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."
(H)     "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late



UTAH–Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3044 01/14



Form 3045 1/01 (page 1 of 14 pages,

charges due under the Note, and all sums due under this Security Instrument, plus interest;

(I)    **"Riders"** means all Riders to this Security Instrument that are executed by Borrower.    The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider    [ ] Condominium Rider    [X] Second Home Rider
[ ] Balloon Rider    [X] Planned Unit Development Rider    [ ] VA Riders
[ ] 1-4 Family Rider    [ ] Biweekly Payment Rider    [ ] Other(s) [specify]

(J)    **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)    **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)    **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)    **"Escrow Items"** means those items that are described in Section 3.

(N)    **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)    **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)    **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)    **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)    **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, conveys and warrants to Trustee, in trust, with power of sale, the following described property located in the **COUNTY** of **WEBER**:



UTAH--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3044 01/14



Form 3045 1/01 (page 2 of 14 pages)

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of **1453 Basinview Rd, Huntsville**, Utah **84317** ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant, convey and warrant the Property and that the Property is unencumbered, except for encumbrances of record. Borrower further warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all



UTAH–Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3044 01/14



Form 3045 1/01 (page 3 of 14 pages)

payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds,



UTAH--Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  © 3044 01/14



Form 3045  1/01  (page 4 of 14 pages)

annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk,



UTAH–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3044 01/14



Form 3045 1/01 (page 5 of 14 pages)

hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall



UTAH--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3044 01/14



Form 3045 1/01  (page 6 of 14 pages)

promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately



UTAH--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3044 01/14



designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or





earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any



UTAH--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3044 01/14



Form 3045 1/01 (page 9 of 14 pages)

Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable



UTAH--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3044 01/14



Form 3045 1/01 (page 10 of 14 pages)

Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.    Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address



UTAH–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3044 01/14



Form 3045 1/31 (page 11 of 14 pages)

of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.    **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice





shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the power of sale is invoked, Trustee shall execute a written notice of the occurrence of an event of default and of the election to cause the Property to be sold and shall record such notice in each county in which any part of the Property is located. Lender or Trustee shall mail copies of such notice in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. In the event Borrower does not cure the default within the period then prescribed by Applicable Law, Trustee shall give public notice of the sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines (but subject to any statutory right of Borrower to direct the order in which the Property, if consisting of several known lots or parcels, shall be sold). Trustee may in accordance with Applicable Law, postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county clerk of the county in which the sale took place.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.



UTAH--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center © 3044 01/14



Form 3045 1/01  (page 13 of 14 pages)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
Borrower - John P. Mulligan              Borrower - Molly J. Mulligan

[Space Below This Line for Acknowledgement]

State of Utah  IL
§

County of  Du Page  )

On this  30  day of  July  , in the year 20 21 , before me, Elisabeth R Tully a notary public, personally appeared John Mulligan + Molly Mulligan proved on the basis of satisfactory evidence to be the person(s) whose name(s) (is/are) subscribed to in this document, and acknowledged (he/she/they) executed the same.

Witness my hand and official seal.

_____
(notary signature)

```
ELISABETH RUTH TULLY
Official Seal
Notary Public - State of Illinois
My Commission Expires Jul 16, 2023
```

(seal)

Origination Company: **Morgan Stanley Private Bank, National Association**
   NMLSR ID: **663185**
Originator: **Ron Webb**
   NMLSR ID: **1103761**



UTAH--Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3044 01/14

Form 3045 1/01 (page 14 of 14 pages)

Exhibit "A"

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

MIN: **1002628-6009077190-6**                                    Loan #: **6009077190**

## PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **30th** day of **July, 2021**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **Morgan Stanley Private Bank, National Association** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

### 1453 Basinview Rd, Huntsville, UT 84317
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in THE COVENANTS, CONDITIONS AND RESTRICTIONS FILED OF RECORD THAT AFFECT THE PROPERTY (the "Declaration"). The Property is a part of a planned unit development known as:

### Basinview Estates Cluster Subdivision
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including





**MULTISTATE PUD RIDER**-Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  @ 3204 01/14

Form 3150 1/01
(page 1 of 3 pages)

deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.



MULTISTATE PUD RIDER–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3204 01/14



Form 3150 1/01
(page 2 of 3 pages)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

 _____ (Seal)
Borrower - **John P. Mulligan**

 _____ (Seal)
Borrower - **Molly J. Mulligan**

Origination Company: **Morgan Stanley Private Bank, National Association**
    NMLSR ID: **663185**
Originator: **Ron Webb**
    NMLSR ID: **1103761**

MULTISTATE PUD RIDER-Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3204 01/14

Form 3150 1/01
(page 3 of 3 pages)

MIN: **1002628-6009077190-6**                                          Loan #: **6009077190**

## SECOND HOME RIDER

THIS SECOND HOME RIDER is made this **30th** day of **July, 2021**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to **Morgan Stanley Private Bank, National Association** (the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at:

### 1453 Basinview Rd, Huntsville, UT 84317
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower will occupy and use the Property as Borrower's second home. Borrower will maintain exclusive control over the occupancy of the Property, including short-term rentals, and will not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property. Borrower will keep the Property available primarily as a residence for Borrower's personal use and enjoyment for at least one year after the date of this Second Home Rider, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.



**MULTISTATE SECOND HOME RIDER**—Single Family–Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
Mortgage Cadence Document Center   © 3221 04/19



Form 3890 1/01 (rev. 4/19)
(page 1 of 2)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.

 _____ (Seal)
Borrower - **John P. Mulligan**

 _____ (Seal)
Borrower - **Molly J. Mulligan**

Origination Company: **Morgan Stanley Private Bank, National Association**
  NMLSR ID: **663185**
Originator: **Ron Webb**
  NMLSR ID: **1103761**



MULTISTATE SECOND HOME RIDER—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**     Form 3890 1/01 (rev. 4/19)
Mortgage Cadence Document Center   © 3221 04/19                                                  (page 2 of 2)

MIN: **1002628-6009077190-6**

Loan #: **6009077190**

## FIXED/ADJUSTABLE RATE RIDER

(30-day Average SOFR Index (As Published by the Federal Reserve Bank of New York)–Rate Caps–Ten-Year
Interest Only Period)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **30th** day of **July, 2021**, and is
incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to
secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **Morgan Stanley Private Bank, National
Association** ("Lender") of the same date and covering the property described in the Security Instrument
and located at:

**1453 Basinview Rd, Huntsville, UT 84317**

[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE
TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT
BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

### A.    ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of **2.450**%. The Note also provides for a change
in the initial fixed rate to an adjustable interest rate, as follows:

### 4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

#### (A)    Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of
**September, 2031**, and the adjustable interest rate I will pay may change on that day every 6th month
thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each



date on which my adjustable interest rate could change, is called a "Change Date."

### (B)    The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the "Administrator"). The "Index" is a benchmark, known as the 30-day Average SOFR index. The Index is currently published by the Federal Reserve Bank of New York. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(H) below.

### (C)    Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND NO/1000** percentage points (**3.000%**) (the "Margin") to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(H)(2) below. The Note Holder will then round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

### (D)    Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **7.450%** or less than **3.000%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than ONE AND NO/1000 percentage points (1.000%) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than **7.450%** or less than **3.000%**.

### (E)    Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.



FIXED/ADJUSTABLE RATE RIDER-30-day Average SOFR Index
Ten-Year Interest Only Period-Single Family
Mortgage Cadence Document Center  © 13089 08/20

(page 2 of 5)

(F)   Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G)   Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

(H)   Replacement Index and Replacement Margin

The Index is deemed to be no longer available and will be replaced if any of the following events (each, a "Replacement Event") occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the "Replacement Index") and may also select a new margin (the "Replacement Margin"), as follows:

(1) If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.

(2) If a replacement index has not been selected or recommended for use in consumer products under Section (H)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and monthly payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1.   Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the



* 6 0 0 9 0 7 7 1 9 0 *
FIXED/ADJUSTABLE RATE RIDER-30-day Average SOFR Index
Ten-Year Interest Only Period-Single Family
Mortgage Cadence Document Center © 13089 06/20



* M C A D J R T R D R *

2/06

(page 3 of 5)

terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.    When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the



FIXED/ADJUSTABLE RATE RIDER-30-day Average SOFR Index
Ten-Year Interest Only Period-Single Family
Mortgage Cadence Document Center  © 13089 08/20



2/08

(page 4 of 5)

transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.



_____ (Seal)
Borrower - John P. Mulligan



_____ (Seal)
Borrower - Molly J. Mulligan

Origination Company: **Morgan Stanley Private Bank, National Association**
NMLSR ID: **663185**
Originator: **Ron Webb**
NMLSR ID: **1103761**

FIXED/ADJUSTABLE RATE RIDER-30-day Average SOFR Index
Ten-Year Interest Only Period-Single Family
Mortgage Cadence Document Center    © 13089 08/20

(page 5 of 5)

# EXHIBIT C

# FIRST POSITION TRUST DEED & RECONVEYANCE

"W2879566"

E# 2879566  PG 1 OF 26
Leann H. Kilts, WEBER COUNTY RECORDER
20-Sep-17  0937 AM       FEE $40.00 DEP KL
REC FOR: SERVICELINK EAST ESCROW
ELECTRONICALLY RECORDED

After Recording Return To:
BOFI FEDERAL BANK
4350 LA JOLLA VILLAGE DRIVE, 140
SAN DIEGO, CALIFORNIA 92122
Loan Number: 70184957

Tax Serial No.: 20-119-0007

——————————————— [Space Above This Line For Recording Data] ———————————————

Record and Return To:
ServiceLink
1355 Cherrington Parkway
Moon Township, PA 15108

**RESPA**

**DEED OF TRUST**

#22533882

**MIN:** 1007359-0003391921-9                          **MERS Phone: 888-679-6377**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated  SEPTEMBER 12, 2017          , together with all Riders to this document.
(B) **"Borrower"** is   BRETT H DEL VALLE AND TRACI M DEL VALLE, TRUSTEES OF THE DEL VALLE FAMILY TRUST DATED OCTOBER 30,2002

Borrower is the trustor under this Security Instrument.
(C) **"Lender"** is  BOFI FEDERAL BANK

Lender is a  FEDERALLY CHARTERED SAVINGS BANK                                   organized
and existing under the laws of  CALIFORNIA
Lender's address is  4350 LA JOLLA VILLAGE DRIVE, 140, SAN DIEGO, CALIFORNIA 92122

(D) **"Trustee"** is   GUARDIAN TITLE COMPANY OF UTAH
6975 UNION PARK CENTER, MIDVALE, UTAH 84047

(E) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) **"Note"** means the promissory note signed by Borrower and dated  SEPTEMBER 12, 2017
The Note states that Borrower owes Lender   SEVEN HUNDRED FIFTY THOUSAND AND 00/100
                          Dollars (U.S. $ 750,000.00          ) plus interest.

DocMagic *eForms*
www.docmagic.com

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than OCTOBER 1, 2047.

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| ☒ Adjustable Rate Rider | ☒ Planned Unit Development Rider |
| ☐ Balloon Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Second Home Rider |
| ☐ Condominium Rider | ☒ Other(s) [specify]  Accommodation Rider, Revocable Trust Rider |

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, conveys and warrants to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | WEBER |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 20-119-0007

which currently has the address of

1453 BASINVIEW ROAD
[Street]

HUNTSVILLE , Utah 84317 ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant, convey and warrant the Property and that the Property is unencumbered, except for encumbrances of record. Borrower further warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in

one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.

Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which

reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

UTAH - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045  1/01                           Page 6 of 15                          DocMagic *eForms*
                                                                                www.docmagic.com

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage

Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer. any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability

under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

DocMagic *eFerrmas*
www.docmagic.com

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the power of sale is invoked, Trustee shall execute a written notice of the occurrence of an event of default and of the election to cause the Property to be sold and shall record such notice in each county in which any part of the Property is located. Lender or Trustee shall mail copies of such notice in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. In the event Borrower does not cure the default within the period then prescribed by Applicable Law, Trustee shall give public notice of the sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines (but subject to any statutory right of Borrower to direct the order in which the

E# 2879566   PG 13 OF 26

Property, if consisting of several known lots or parcels, shall be sold). Trustee may in accordance with Applicable Law, postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county clerk of the county in which the sale took place.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

E# 2879566   PG 14 OF 26

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
BRETT H DEL VALLE, TRUSTEE    -Borrower
OF THE DEL VALLE FAMILY TRUST DATED
OCTOBER 30,2002

_____ (Seal)
TRACI M DEL VALLE, TRUSTEE    -Borrower
OF THE DEL VALLE FAMILY TRUST DATED
OCTOBER 30,2002

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

Witness:                      Witness:

_____ _____

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    **CIVIL CODE § 1189**

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

State of California                    )

County of _ORANGE_                    )

On _SEPTEMBER 13, 2017_ before me, _JANE E. KATNIK, NOTARY PUBLIC_ ,

     Date                    Here Insert Name and Title of the Officer

personally appeared _BRETT H. DELVALLE_ _____

                          Name(s) of Signer(s)

_TRACI M. DELVALLE_ _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

JANE E. KATNIK
Commission # 2106588
Notary Public - California
Orange County
My Comm. Expires May 2, 2019

Signature _Jane E. Katnik_

                          Signature of Notary Public

     Place Notary Seal Above

———————————— **OPTIONAL** ————————————

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _DEED OF TRUST_      Document Date: _9-13-17_

Number of Pages: _15_  Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Individual          ☐ Attorney in Fact
☐ Trustee            ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Individual          ☐ Attorney in Fact
☐ Trustee            ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

———————————————— [Space Below This Line For Acknowledgment] ————————————————

State of ___UTAH_____ )
                                 ) SS.
County of __WEBER_____ )

On this _____ day of _____ , in the year _____ , before me

_____ , a notary public,

personally appeared BRETT H DEL VALLE AND TRACI M DEL VALLE _____

_____

_____ ,

proved on the basis of satisfactory evidence to be the person(s) whose name(s) (is/are) subscribed to in this document,
and acknowledged (he/she/they) executed the same.

Notary Signature

My commission expires: _____

(Notary Seal)

Loan Originator: MELISSA R. WALLEN, NMLSR ID 1011004
Loan Originator Organization: BOFI FEDERAL BANK, NMLSR ID 524995
UTAH - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045  1/01                          Page 15 of 15

DocMagic *EForms*
www.docmagic.com

MIN: 1007359-0003391921-9

# ACCOMMODATION RIDER

Loan Number: 70184957

THIS ACCOMMODATION RIDER is made this   12th  day of   SEPTEMBER, 2017                .
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Mortgagor") to
secure Borrower's Promissory Note (the "Note") to   BOFI FEDERAL BANK, A FEDERALLY
CHARTERED SAVINGS BANK                                              (the "Lender")
of the same date and covering the property described in the Security Instrument and located at:

                    1453 BASINVIEW ROAD, HUNTSVILLE, UTAH 84317

                              [Property Address]

Mortgagor acknowledges it is a   TRUST                                and any reference in
                              [Trust/LLC/Partnership/Corporation]
Mortgage, Deed of Trust or Security Deed to an individual or borrower shall mean the
TRUST                              .
[Trust/LLC/Partnership/Corporation]

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security Instrument,
Mortgagor and Lender further covenant and agree as follows:

In exchange for a valuable and sufficient consideration, Mortgagors are executing the Security Instrument
and this Accommodation Rider to secure the above described Note. The Undersigned Mortgagors, without
affecting Lender's rights hereunder or the lien hereof, waives any right of notice or demand in the event
Lender, pursuant to the Note and this Security Instrument and any amendments thereto: (a) renews, extends,
accelerates or otherwise changes the terms of the indebtedness or any part thereof, including increases or
decreases of the rate of interest thereon; (b) takes and holds additional security for the payment of the
indebtedness guaranteed, and exchanges, enforces, waives and releases any security; (c) applies such security
and directs the order or manner of sale thereof as Lender in its discretion may determine; and (d) releases
or substitutes any one or more endorsers or guarantors. Lender may without notice assign this Security
Instrument in whole or in part.

ACCOMMODATION: The Security Instrument secures a Promissory Note executed by
BRETT H DEL VALLE, TRACI M DEL VALLE


collectively ("Borrower"), in favor of the Lender thereunder. Mortgagor is executing this Accommodation
Rider as an accommodation to Borrower and thereafter agrees as follows:

Mortgagor waives any right to require Lender to: (a) proceed against Borrower; (b) proceed against or
exhaust any security held from Borrower; or (c) pursue any other remedy in Lender's power whatsoever.
Lender may, at its election, foreclose upon any such security by judicial or non-judicial sale, without
affecting or impairing in any way the liability of Mortgagor hereunder except to the extent the indebtedness

has been paid, and Mortgagor waives any defense arising out of the absence, impairment or loss of any right or remedy of Mortgagor against Borrower, or any such security, whether resulting from such election by Lender or otherwise. Mortgagor waives any defense arising by reason of the cessation from any cause whatsoever of the liability of Borrower. Until all indebtedness of Borrower to Lender shall have been paid in full, even though such indebtedness is in excess of Mortgagor's liability hereunder, Mortgagor shall have no right of subrogation, and waives any right to enforce and remedy which Lender now has or may hereafter have against Borrower and waives any benefit of, and any right to participate in any security now or hereafter held by Lender. Mortgagor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of the Security Instrument and of the existence, creation or incurring of new or additional indebtedness. Mortgagor assumes the responsibility for being and keeping himself informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the indebtedness which diligent inquiry would reveal, and agree that absent a request for such information by Mortgagor, Lender shall have no duty to advise Mortgagor of information know to it regarding such condition or any such circumstances.

BY SIGNING BELOW, Mortgagor accepts and agrees to the terms and covenants contained in this Accommodation Rider.


_____ (Seal)
BRETT H DEL VALLE,        -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
TRACI M DEL VALLE,        -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002


_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower


_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

Loan Number: 70184957
E# 2879566  PG 19 OF 26

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this   12th  day of        SEPTEMBER      ,
2017    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower")
to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to  BOFI FEDERAL BANK, A
FEDERALLY CHARTERED SAVINGS BANK
("Lender") of the same date and covering the property described in the Security Instrument and located at:

1453 BASINVIEW ROAD, HUNTSVILLE, UTAH 84317

[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE
TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT
BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MINIMUM AND MAXIMUM RATES BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.   ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of        4.750  %. The Note also provides
for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A)  Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of
OCTOBER, 2024                            , and the adjustable interest rate I will pay may change on
that day every 12th month thereafter.  The date on which my initial fixed interest rate changes to an
adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change
Date."

### (B)  The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index.  The
"Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the
London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index value available
as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current
Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my
interest rate.

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information.  The Note Holder will give me notice of this choice.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER
US3187.BOI  10/05/16                              Page 1 of 4                      DocMagic *eForms*
                                                                                  www.docmagic.com

### (C)  Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
THREE AND 250/1000                                                percentage points (        3.250 %)
(the "Margin") to the Current Index.  The Note Holder will then round the result of this addition to the
nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this
rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to
repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my
new interest rate in substantially equal payments.  The result of this calculation will be the new amount of
my monthly payment.

### (D)  Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than
        10.750 % or less than        4.750 %.  Thereafter, my adjustable interest rate will never
be increased or decreased on any single Change Date by more than two percentage points from the rate of
interest I have been paying for the preceding 12 months.  My interest rate will never be greater than
        10.750 % or less than        4.750 %.

### (E)  Effective Date of Changes

My new interest rate will become effective on each Change Date.  I will pay the amount of my new
monthly payment beginning on the first monthly payment date after the Change Date until the amount of my
monthly payment changes again.

### (F)  Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to
an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any
change. The notice will include the amount of my monthly payment, any information required by law to be
given to me and also the title and telephone number of a person who will answer any question I may have
regarding the notice.

## B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1.    Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms
stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section
18, "Interest in the Property" means any legal or beneficial interest in the Property, including,
but not limited to, those beneficial interests transferred in a bond for deed, contract for deed,
installment sales contract or escrow agreement, the intent of which is the transfer of title by
Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or
if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred)
without Lender's prior written consent, Lender may require immediate payment in full of all
sums secured by this Security Instrument.  However, this option shall not be exercised by
Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.   When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

E# 2879566    PG 22 OF 26

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
BRETT H DEL VALLE,                -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
TRACI M DEL VALLE,                -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

MULTISTATE FIXED/ADJUSTABLE RATE RIDER
US3187.BOI  10/05/16                 Page 4 of 4                    DocMagic eForms
                                                                  www.docmagic.com

Loan Number: 70184957
E# 2879566   PG 23 OF 26

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this      12th      day of
SEPTEMBER, 2017                    , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date,
given by the undersigned (the "Borrower") to secure Borrower's Note to  BOFI FEDERAL BANK, A
FEDERALLY CHARTERED SAVINGS BANK
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

1453 BASINVIEW ROAD, HUNTSVILLE, UTAH 84317
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other
such parcels and certain common areas and facilities, as described in
COVENANTS, CONDITIONS AND RESTRICTIONS OF RECORD

(the "Declaration"). The Property is a part of a planned unit development known as

BASINVIEW ESTATES
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent
entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the
uses, benefits and proceeds of Borrower's interest.

 **PUD COVENANTS.**  In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

 **A. PUD Obligations.**  Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation,
trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or
other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and
assessments imposed pursuant to the Constituent Documents.

 **B. Property Insurance.**  So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and

which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
BRETT H DEL VALLE,                -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
TRACI M DEL VALLE,                -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

E# 2879566   PG 26 OF 26

Loan #      : 3391921

## Exhibit A

LEGAL DESCRIPTION

The following described property:

All of Lot 7, Basinview Estates Cluster Subdivision 1st Amendment, Weber County, Utah, according to the Official Plat thereof.

Assessor's Parcel No:    20-119-0007

*W3160813*

AFTER RECORDING, RETURN TO:
First American Title Insurance Company
10011 S. Centennial Parkway #340
Sandy, UT 84070
Reference Number: 70184957



E# **3160813**  PG 1 OF 1
Leann H. Kilts, WEBER COUNTY RECORDER
14-Jun-21  0322 PM      FEE $40.00 DEP TN
REC FOR: FIRST AMERICAN TITLE
ELECTRONICALLY RECORDED

MERS MIN: 100735900033919219; 888-679-MERS

**FULL RECONVEYANCE**

First American Title Insurance Company, authorized to conduct business in the State of Utah, pursuant to a written request of the Beneficiary thereunder, does hereby reconvey, without warranty, to the person or persons entitled thereto, the trust property now held by it as Trustee under said Trust Deed, which Trust Deed covers real property situated in Weber County, State of Utah, described as follows:

Trustor(s):    Brett H Del Valle and Traci M Del Valle Trustees of The Del Valle Family Trust Dated October 30 2002
Beneficiary:    Mortgage Electronic Registration Systems, Inc. as nominee for Axos Bank Formerly Known As BofI Federal Bank, its successors and assigns
Recording Date:    9/20/2017 Entry #: 2879566  Book:N/A  Page: N/A
Legal Description:

All of Lot 7, Basinview Estates Cluster Subdivision 1st Amendment, Weber County, Utah, according to the Official Plat thereof.

Tax ID Number: 20-119-0007

In Witness Whereof, First American Title Insurance Company, as Trustee, has caused its Company name to be hereto affixed this 6/14/2021.

First American Title Insurance Company

By _____
Lori Whitehead, Authorized Agent

State of UT              )
County of Salt Lake      )

On this 6/14/2021, personally appeared before me Lori Whitehead, who being duly sworn, did say that he is an Authorized Agent, and that said instrument was signed in behalf of said Company.

Courtney Payne - Notary Public
Commission Number: 714517
Commission Expires: 10/5/2024

COURTNEY PAYNE
NOTARY PUBLIC - STATE OF UTAH
My Comm. Exp. 10/05/2024
Commission #714517

Order No.

*W3066407*

EH 3066407 PG 1 OF 10
LEANN H KILTS, WEBER COUNTY RECORDER
06-JUL-20 352 PM FEE $40.00 DEP PV
REC FOR: BRETT DEVALLE

**WHEN RECORDED MAIL TO:**

Emerald Bay Capital Inc.
1200 Estelle Lane
Newport Beach, CA 92660

APN: 20-119-0007

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## DEED OF TRUST WITH ASSIGNMENT OF RENTS

This DEED OF TRUST WITH ASSIGNMENT OF RENTS, made effective as of Brett H. Del Valle (Trustee) and Traci M. Del Valle (Trustee) for the Del Valle Family Trust dated October 30, 2002 whose address is 417 29th Street , Newport Beach, CA 92663, is between TSS Enterprises Inc., a California Corporation, herein called TRUSTOR, whose address is *1200 Estelle Lane, Newport Beach, CA 92660*, **ORANGE COAST TITLE COMPANY**, herein called TRUSTEE; and , herein called BENEFICIARY, whose address is

WITNESSETH: That Trustor grants to Trustee in Trust, with Power of Sale, that property located in the County of Weber, State of Utah, described as:

### SEE EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY THIS REFERENCE

together with the rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits, for the purpose of securing (1) that certain Secured Promissory Note dated April 1, 2008, made by Trustor, as Maker, in favor of Beneficiary, as Holder; (2) the performance of each agreement of Trustor incorporated by reference or contained herein; and (3) the payment of additional sums and interest thereon which may hereafter be loaned to Trustor, or its successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust.

A.      To protect the security of this Deed of Trust, Trustor agrees:

(1)      To keep said property in good condition and repair; not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general.

(2)      If improvements are constructed on said property, to provide, maintain and deliver to Beneficiary fire insurance satisfactory to and with loss payable to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon any indebtedness secured

1

# SECOND POSITION TRUST DEED & RECONVEYANCE

and in such order as Beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(3)    To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed of Trust.

(4)    To pay: at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock; when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all costs, fees and expenses of this Trust.

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may:  make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

(5)    To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

B.    It is mutually agreed:

(1)    That any award of damages in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him in the same manner and with the same effect as above provided for disposition of proceeds other insurance.

(2)    That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his right either to require prompt payment when due of all other sums so secured or to declare default for failure so to pay.

(3)    That at any time or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed of Trust, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may:  reconvey any part of said property; consent to the making of any map or plat thereof; join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge hereof.

(4)    That upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed of Trust to Trustee for cancellation and retention or other disposition as Trustee in its sole discretion may choose and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall

EH 3066407 PG 3 OF 10

be conclusive proof of the truthfulness thereof. The Grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

(5)    That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable. Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his own name sue for or otherwise collect such rents, issues, and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorneys' fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(6)    That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

(7)    Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed of Trust is recorded and the name and address of the new Trustee.

EH 3066407 PG 4 OF 10

(8)    That this Deed of Trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including pledgees, of the obligations secured hereby, whether or not named as Beneficiary herein. In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

(9)    That Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

(10)    If there is more than one Trustor, the liability of the Trustors will be joint and several, and the reference to "Trustor" shall be deemed to refer to each Trustor and to all Trustors. The rights, options, powers and remedies granted in this Deed of Trust shall extend to the Beneficiary and to its successors and assigns, shall be binding upon the Trustor and its successors and assigns, and shall be applicable hereto and to all renewals, amendments and/or extensions hereof.

The undersigned Trustor requests that a copy of any notice of default and of any notice of sale hereunder be mailed to him at his address hereinbefore set forth.

Signature of Trustor:

By: 
Name: Brett Del Valle
Title:

4

EH 3066407 PG 5 OF 10

## CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

State of California          )
                             )
County of ORANGE             )

On MAY 8th, 2019 before me, CHAVON KANE
Notary Public, personally appeared BRETT DELVALLE
_____ who proved to me on the basis
of satisfactory evidence to be the person(s) whose name(s) are subscribed to the within instrument and
acknowledged to me that they executed the same in their authorized capacities, and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Chavon Kane_

CHAVON KANE
COMM...2213310
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. October 5, 2021

(Seal)

5

**DO NOT RECORD**

## REQUEST FOR FULL RECONVEYANCE

TO ORANGE COAST TITLE COMPANY, TRUSTEE:

The undersigned is the legal owner and holder of the obligations secured hereby, and of all other indebtedness secured by the foregoing Deed of Trust. Said obligations secured hereby, together with all other indebtedness secured by said Deed of Trust, have been fully paid and satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust, to cancel said obligations secured hereby, and all other evidences of indebtedness secured by said Deed of Trust delivered to you herewith, together with the said Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of said Deed of Trust, all the estate now held by you under the same.

Dated_____

_____

_____

Please mail Deed of Trust

and Reconveyance to _____

**Do not lose or destroy this Deed of Trust.**

EH 3066407 PG 7 OF 10

### EXHIBIT "A"

### DESCRIPTION OF REAL PROPERTY

LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, 1ST AMENDMENT, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE WEBER COUNTY RECORDING OFFICE.

APN:   20-119-0007

## RIDER TO DEED OF TRUST

This Rider to Deed of Trust (this "Rider") is by this reference made a part of, and incorporated within, that certain Deed of Trust with Assignment of Rents (the "Deed of Trust") to which this Rider is attached. Unless otherwise defined herein, each term bearing initial capital letters herein shall have the respective definition ascribed to such term under the Deed of Trust. In the event of any conflict between the provisions of this Rider, the Deed of Trust or that certain Secured Promissory Note secured by the Deed of Trust (the "Note"), the terms of this Rider shall prevail and control.

     1.    Notice of Default. In the event of any default of Trustor hereunder or under any obligation secured hereby, neither Beneficiary nor Trustee shall be entitled to exercise any right or remedy provided for herein or in any obligation secured hereby unless Trustor has failed to cure said default within twenty days after receipt by Trustor of written notice thereof from Beneficiary if said default can be cured by payment or money only, or if said default cannot be cured by payment of money only unless Trustor has not cured said default within 20 days after receipt by Trustor of such written notice, or if the default cannot be cured by payment of money only and cannot reasonably be cured within said 20 days then unless Trustor does not commence curing the default within said 20 days and does not complete such cure within diligently pursue such cure thereafter 60 days after such written notice.

     2.    Acceleration upon Transfers of Ownership. If any of the following occurs after the effective date, then Beneficiary shall have the right, at its option, to declare, without notice, all outstanding indebtedness secured hereby to be immediately due and payable: (1) Trustor voluntarily or involuntarily sells, conveys, transfers, mortgages, encumbers, assigns, hypothecates, disposes of the property described on Exhibit "A" to the Deed of Trust or any improvements constructed thereon (which real property and improvements are collectively referred to herein as the "Subject Property") or any part thereof or any interest therein (whether it is a legal or equitable interest), or enters into a contract to do any of the above; (2) as a result of the death of an individual who succeeds to Trustor's interest in the Subject Property, title to the Subject Property is transferred to one other than a surviving spouse who, by reason of executing this or any other document, is also an obligor hereof; (3) if Trustor is a corporation, more than 50% in the aggregate of the corporate stock is sold, transferred, pledged, hypothecated, assigned or otherwise disposed of, whether directly or indirectly; (4) if Trustor is a trust, there is a change or transfer of more than 50% in the aggregate of the beneficial interest therein; (5) if Trustor is a partnership or limited liability company or other legal entity, more than 50% in the aggregate of the capital interests or interests in the profits and losses of such partnership, limited liability company or other entity (as the case may be) is sold, transferred, pledged, hypothecated, assigned or otherwise disposed of, whether voluntary or involuntary.

     3.    Security Agreement. Trustor hereby grants and assigns to Beneficiary a security interest, to secure payment and performance of all of the obligations secured by the Deed of Trust, in all of the following described personal property in which Trustor now or at any time hereafter has any interest (collectively, the "Collateral"):

     All goods, building and other materials, supplies, work in process, equipment, machinery, fixtures, and signs e, wherever situated, which are or are to be incorporated into, used in connection with, or appropriated for use on the Subject Property, together with all rents, issues, deposits and profits of the Subject Property and the Collateral. Such personal property shall include, without limitation, all inventory, accounts, cash receipts, deposit accounts, accounts receivable, contract rights, general intangibles, chattel paper, instruments, documents, notes, drafts, letters of credit, insurance policies, insurance and condemnation awards and proceeds, any other rights to the payment of money, trade names, trademarks and service marks arising from or related to the Subject Property or any business now or hereafter conducted thereon by Trustor; all permits, consents, approvals, licenses,

entitlements, authorizations and other rights granted by, given by or obtained from, any governmental entity with respect to the Subject Property; all deposits or other security now or hereafter made with or given to utility companies by Trustor with respect to the Subject Property; all advance payments of insurance premiums made by Trustor with respect to the Subject Property; all plans, drawings and specifications relating to the Subject Property; all loan funds held by Secured Party, whether or not disbursed; all reserves, deferred payments, deposits, accounts, refunds, cost savings and payments of any kind related to the Subject Property or any portion thereof; together with all replacements and proceeds of, and additions and accessions to, any of the foregoing; together with all books, records and files relating to any of the foregoing.

For purposes of this Rider and the Deed of Trust, the Collateral shall be deemed a part of the "property" encumbered by the Deed of Trust. As to all of the Collateral which is or which hereafter becomes a "fixture" under applicable law, this Deed of Trust constitutes a fixture filing under Sections 9502 and 9604 of the California Uniform Commercial Code, as amended or recodified from time to time.

Trustor acknowledges and agrees that Beneficiary will file with the California Secretary of State any and all Form UCC-1 Financing Statements and any and all continuations, modifications or terminations of any such statements which Beneficiary may reasonably determine is necessary to perfect the security interest in the Collateral granted under this Rider.

    4.    <u>Hazardous Materials Covenants</u>.

        (a)    <u>Definitions</u>. As used in this Rider, the term "Hazardous Materials" shall mean and include any hazardous or toxic materials, substances or wastes as now or hereafter designated under any law, statute, ordinance, rule, regulation, order or ruling of any agency of the State of California, the United States government or any local governmental authority, including, without limitation, asbestos, petroleum, petroleum hydrocarbons and petroleum-based products, urea formaldehyde foam insulation, polychlorinated biphenyls ("PCBs"), and freon and other chlorofluorocarbons. As used in this Rider, "Environmental Law" means any federal, state, foreign and local law, statute, ordinance, rule, regulation, license, permit, approval, order, judgment or agreement with any governmental entity relating to (i) the protection, preservation or restoration of the environment or to human health or safety, or (ii) the exposure to, or the use, storage, recycling, treatment, generation, transportation, handling, production, processing, release or disposal of any Hazardous Materials, in each case as amended and as now or hereafter in effect.

        (b)    <u>No Hazardous Activities</u>. Trustor shall not cause or permit the Subject Property to be used as a site for the use, generation, manufacture, storage, treatment, release, discharge, disposal, transportation or presence of any Hazardous Materials (as defined below), other than as permitted by, and strictly in accordance with, applicable law in the ordinary course of developing, building, financing, marketing and selling a residential tract housing project.

        (c)    <u>Compliance</u>. Trustor shall comply and cause the Subject Property to comply with all Environmental Laws.

        (d)    <u>Notices</u>. Trustor shall immediately notify Beneficiary in writing of: (i) the discovery of any Hazardous Materials on, under or about the Subject Property; (ii) any knowledge by Trustor that the Subject Property does not comply with any Environmental Laws; and (iii) any claims or actions pending or threatened against Trustor or the Subject Property relating to Hazardous Materials or pursuant to any Environmental Law (each, a "Hazardous Material Claim").

        (e)    <u>Remedial Action</u>. In response to the presence of any Hazardous Materials on, under or about the Subject Property, Trustor shall immediately take, at Trustor's sole expense, all remedial

action required by all Environmental Laws or any judgment, consent decree, settlement or compromise in respect to any Hazardous Materials Claims.

5.      Hazardous Materials Indemnity.   Trustor hereby agrees to defend, indemnify and hold harmless Beneficiary and Beneficiary's representatives (the "Indemnified Parties") from and against any and all losses, damages, liabilities, claims, actions, judgments, court costs and legal or other expenses (including, without limitation, attorneys' fees and expenses) which any of them may incur as a direct or indirect consequence of the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of any Hazardous Materials in, on, under or about the Subject Property by Trustor or Trustor's representatives.  Such indemnity shall not include any of the foregoing items to the extent caused by any Indemnified Party, or first arising during the period that any Indemnified Party owned the Property.  Such indemnity shall include, without limitation: (a) the costs, whether foreseeable or unforeseeable, of any repair, cleanup or detoxification of the Subject Property which is required by any governmental authority or is otherwise necessary to render the Subject Property in compliance with all Environmental Laws; (b) all other direct or indirect consequential damages (including, without limitation, any third party tort claim or governmental claims, fines or penalties against any of the Indemnified Parties, and (c) all court costs and attorney's fees paid or incurred by any of the Indemnified Parties.  **TRUSTOR'S DUTY AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS INDEMNIFIED PARTIES SHALL SURVIVE THE CANCELLATION OF THE NOTE AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE DEED OF TRUST.**

6.      Legal Effect.  Trustor and Beneficiary agree that: (a) Section 4 of this Rider is intended as Beneficiary's written request for information (and Trustor's response) concerning the environmental condition of the real property security as required by California Code of Civil Procedure §726.5; and (b) each covenant in this Rider (together with any indemnity applicable to a breach of any such covenant) with respect to the environmental condition of the real property security is intended by Beneficiary and Trustor to be an "environmental provision" for purposes of California Code of Civil Procedure §736, and as such it is expressly understood that Trustor's duty to indemnify the Indemnified Parties hereunder shall survive: (i) any judicial or non-judicial foreclosure under the Deed of Trust, or transfer of the Subject Property in lieu thereof; (ii) the release and reconveyance or cancellation of the Deed of Trust; and (iii) the satisfaction of all Trustor's obligations under the Note and the Deed of Trust.

7.      Insurance.  Trustor shall obtain and maintain a policy of comprehensive public liability insurance and property damage insurance with limits as reasonably required by Beneficiary, insuring against liability for injury and/or death to any person and/or damage to any property occurring on the Subject Property from any cause whatsoever. Trustor shall provide to Beneficiary the originals of all required insurance policies, or other evidence of insurance acceptable to Beneficiary. All insurance policies shall provide that the insurance shall not be cancelable or materially changed without ten (10) days prior written notice to Beneficiary, and Beneficiary shall be named under a Lender's Loss Policy Endorsement on all insurance policies which Trustor actually maintains with respect to the Subject Property.  Trustor shall provide to Lender evidence of any other insurance Beneficiary may deem reasonably necessary to protect the Subject Property.

*W3156191*

WHEN RECORDED MAIL TO:
Metro National Title
1597 North Woodland Park Drive #100B
Layton, Utah 84041
MNT File No.: 49967
Tax ID No.: 20-119-0007

E# **3156191**  PG 1 OF 1
Leann H. Kilts, WEBER COUNTY RECORDER
26-May-21  0116 PM      FEE $40.00 DEP PC\
REC FOR: METRO NATIONAL TITLE
ELECTRONICALLY RECORDED

### DEED OF FULL RECONVEYANCE

METRO NATIONAL TITLE, a Utah corporation, as trustee under that certain deed of trust securing the obligations of the Trustor:

Brett H. Del Valle and Traci M. Del Valle

Recorded July 6, 2020 as Entry No. 3066407, of the records of the County Recorder of Weber County, Utah pursuant to written request of the beneficiary thereunder, does hereby reconvey, without warranty, to the persons legally entitled thereto, the trust property now held by it as trustee under said deed of trust covering real property situate in Weber County, Utah, described as follows:

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Date:  5/21/2021

Metro National Title, Trustee

By: Blake T. Heiner, Vice President

STATE OF Utah,    County of Salt Lake: ss

On  5/21/2021  personally appeared before me Blake T. Heiner, who being by me duly sworn, did say that such person is the Vice President of METRO NATIONAL TITLE, a Utah Corporation, and that said instrument was signed on behalf of said Corporation by authority of its by-laws and the said Blake T. Heiner acknowledged to me that the said Corporation executed the same.

Notary Public



Notary Public - State of Utah
CAMILLA TRILLO
Comm. #710892
My Commission Expires
March 26, 2024

# POSTING SUMMARY

**POSTING SUMMARY**

| | | | | |
|---|---|---|---|---|
| **Bank:** | US Bank - Layton Office (153195285926) | | | |
| **File Number:** | 49967 | **Sales Price:** | $1,800,000.00 | |
| **Closer:** | Sue Anthony | **Loan Number:** | | |
| **Buyer(s):** | Molly J. Mulligan and John P. Mulligan | **Underwriter:** | Title Resources Guaranty Company - Utah | |
| **Seller(s):** | Del Valle Family Trust dated October 30, 2002 | **Est Settlement:** | 5/7/2021 | |
| | | **Actual Settlement:** | 5/7/2021 | |
| | | **Property Address:** | 1453 South Basinview Road, Huntsville, UT  84317 | |

**Receipts**

| Payer | Cleared Date | Rcvd Date | Method | Status | Number | Credit | Debit |
|---|---|---|---|---|---|---|---|
| Molly J. Mulligan and John P. Mulligan | 05/06/2021 | 05/06/2021 | Wire | Received | | $1,775,896.73 | |
| | | | | | **Posted Receipts:** | **$1,775,896.73** | |

**Disbursements**

| Payee | Cleared Date | Issued Date | Method | Status | Number | Credit | Debit |
|---|---|---|---|---|---|---|---|
| Axos Bank | 05/11/2021 | 05/11/2021 | Wire | Issued | | | $712,209.92 |
| Emerald Bay Capital, Inc. | 05/11/2021 | 05/11/2021 | Wire | Issued | | | $948,000.00 |
| Metro National Title | 05/11/2021 | 05/11/2021 | Check | Issued | 24952 | | $4,753.60 |
| MNT Underwriters Trust Fund | 05/26/2021 | 05/11/2021 | Check | Issued | 24953 | | $1,033.40 |
| MNT Recon Trust | 05/26/2021 | 05/11/2021 | Check | Issued | 24954 | | $95.00 |
| Elevate Home Warranty | 05/20/2021 | 05/11/2021 | Check | Issued | 24955 | | $500.00 |
| Basinview Cluster Estates HOA | 05/14/2021 | 05/11/2021 | Check | Issued | 24956 | | $2,125.00 |
| Weber County Treasurer | 05/14/2021 | 05/11/2021 | Check | Issued | 24957 | | $46,248.89 |
| Mountain Real Estate Companies, LLC | 05/11/2021 | 05/11/2021 | Check | Issued | 24958 | | $60,930.92 |
| | | | | | **Posted Disbursements:** | | **-$1,775,896.73** |
| | | | | | **Posted Balance:** | | **$0.00** |

# EXHIBIT D



Weber County Government
Property Information System

# WEBER COUNTY RECORDER
## ABSTRACT OF TITLE

05/11/2021

**PARCEL NUMBER: 20-119-0007**

Prior Parcel Numbers:

20-108-0007

| OWNER: DEL VALLE FAMILY TRUST | ADDRESS: 1201 ESTELLE LN | TAX UNIT |
|---|---|---|
| | NEWPORT BEACH CA 92660 | 520 |

| LEGAL DESCRIPTION: 2007  ORIG | ACRES:  1.52 |
|---|---|

ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, 1ST
AMENDMENT, WEBER COUNTY, UTAH.

| Grantor/ Grantee | Kind of Document Consideration | Time Period Entry # | Book-Page Doc Date | Record Date | Time Release | Abstract Date Entry Ref |
|---|---|---|---|---|---|---|
| ZIONS FIRST NATL BANK | RECON | | 1367-1567 | | 04:08 | |
| CRAIG, E D | $0.00 | 821408 | 10/03/1980 | 06-OCT-1980 | 1343- 477 | |
| CRAIG, E D | TRUST DD | | 1367-1568 | | 04:09 | |
| ZIONS FIRST NATL BK | $35,000.00 | 821409 | 10/03/1980 | 06-OCT-1980 | - | |
| ZIONS FIRST NATIONAL BANK TR | PT RECONVEYANCE | | 1372- 532 | | 02:56 | |
| WEBBER, JOHN U & WF | $0.00 | 825575 | 12/03/1980 | 03-DEC-1980 | 1323- 52 | |
| ZIONS FIRST NATL BANK TR | RECON | | 1372- 533 | | 02:57 | |
| WEBBER, JOHN U & WF | $0.00 | 825576 | 11/07/1980 | 03-DEC-1980 | 1273- 286 | |
| FACKRELL, ANN SWENSON | RELEASE | | 1378-0065 | | 03:36 | |
| WEBBER, JOHN U & RUTH M | $0.00 | 831722 | 03/11/1981 | 11-MAR-1981 | 1003-0732 | |
| WILLOUGHBY, DAVID R | TRUST DD | | 1384-0437 | | 12:39 | |
| BROWN DISTRIBUTING CO ETAL | $15,000.00 | 838323 | 02/23/1981 | 22-JUN-1981 | - | |
| WEBBER, JOHN U | WD | | 1390-1262 | | 02:34 | |
| WADMAN, V JAY | $10.00 | 844791 | 09/18/1981 | 01-OCT-1981 | - | |
| WEBBER, JOHN U & WF | WD | | 1380-1264 | | 02:35 | |
| JOHN U WEBBER CO | $10.00 | 844792 | 09/18/1981 | 01-OCT-1981 | - | |
| WADMAN, V JAY ETAL | WD | | 1390-1265 | | 02:36 | |
| SUMMERHAWKS LTD ETAL | $10.00 | 844793 | 09/18/1981 | 01-OCT-1981 | - | |
| SUMMERHAWKS LTD | DEED OF TRST | | 1390-1268 | | 02:37 | |
| JOHN U WEBBER CO ETAL | $408,000.00 | 844794 | 09/18/1981 | 01-OCT-1981 | - | |
| BOARD OF COUNTY COMMISSIONER | ORDNCE | | 1394-1772 | | 11:57 | |
| WHOM IT MAY CONCERN | $0.00 | 849262 | 12/21/1981 | 22-DEC-1981 | - | |
| AHLBERG, WILLIAM D | RELEASE | | 1395-0054 | | 09:56 | |
| WEBBER, JOHN U & WF | $0.00 | 849304 | 12/19/1981 | 23-DEC-1981 | - | |
| WILLOUGHBY, DAVID R & JEAN G | QCD | | 1399-0363 | | 03:53 | |
| BROWN DISTRIBUTING | $10.00 | 853531 | 10/00/1981 | 09-MAR-1982 | - | |
| WEBBER, JOHN U & WF | RELEASE | | 1401-1669 | | 10:19 | |
| ADAMS, ALFRED W & WF | $0.00 | 856371 | 04/27/1982 | 28-APR-1982 | 1003-0733 | |
| ZIONS FIRST NATL BANK TR | RECON | | 1402-0074 | | 01:52 | |
| WEBBER, JOHN U & RUTH M | $0.00 | 856503 | 04/26/1982 | 29-APR-1982 | 1323-0052 | |
| WEBER BASIN WTR CONSERV DIST V | WATER CONTRACT | | 1405-1501 | | 01:17 | |
| SUMMERHAWKS LTD WTR | $0.00 | 860593 | 06/14/1982 | 13-JUL-1982 | - | |
| ZIONS FIRST NATIONAL BANK | RECON | | 1413-0821 | | 04:13 | |
| CRAIG, E D | $0.00 | 868216 | 11/18/1982 | 22-NOV-1982 | 1367-1568 | |
| WEBBER, JOHN U & WF | WD | | 1432-1327 | | 02:42 | |
| BROWN DISTRIBUTING CO | $10.00 | 890715 | 09/20/1983 | 21-SEP-1983 | - | |

Bates #000058

| Party | Instrument | | Recording Ref | Date | Date | Time / Ref |
|---|---|---|---|---|---|---|
| BANK OF UTAH | RELEASE | | 1439-1244 | | | 11:07 |
| WEBBER, JOHN U & WF | $0.00 | 899767 | 01/17/1984 | 18-JAN-1984 | | 1235-0810 |
| CARDON LAND TITLE CO TR | PT RECONVEYANCE | | 1467-1692 | | | 11:12 |
| SUMMERHAWKS LTD ETAL | $0.00 | 937356 | 05/10/1985 | 15-MAY-1985 | | 1390-1268 |
| KEITER, JOHN E TR | WD | | 1467-1756 | | | 01:10 |
| SUMMERS, CLARKE C & WF | $10.00 | 937370 | 05/15/1985 | 15-MAY-1985 | | - |
| SUMMERHAWKS LTD | WD | | 1467-1759 | | | 01:11 |
| SUMMERS, CLARKE C & WF | $10.00 | 937371 | 05/15/1985 | 15-MAY-1985 | | - |
| SUMMERS, CLARKE C & WF | DEED TRST | | 1469-0329 | | | 03:03 |
| DESERET FEDERAL SV & LN ASSN | $168,750.00 | 939126 | 06/06/1985 | 06-JUN-1985 | | - |
| WEBER BASIN WTR CONSERV DIST V | ORDER ON PETN | | 1471-1851 | | | 04:37 |
| SUMMERS, CLARKE C & WF WTR | $99.66 | 942577 | 06/28/1985 | 18-JUL-1985 | | - |
| WEBBER, JOHN U | TRUST DD | | 1480-0360 | | | 01:14 |
| ZIONS FIRST NATIONAL BANK | $111,000.00 | 953779 | 10/01/1985 | 22-NOV-1985 | | - |
| WEBBER, JOHN U | ASSIGN OF CONTRT | | 1480-0365 | | | 01:15 |
| ZIONS FIRST NATIONAL BANK | $10.00 | 953780 | 10/01/1985 | 22-NOV-1985 | | - |
| SUMMERS, CLARKE C & MARCIA H | NTC OF LIEN | | 1483-1787 | | | 08:13 |
| HUGHES, BILL | $7,923.50 | 958462 | // | 22-JAN-1986 | | - |
| SUMMERS, CLARKE C & MARCIA H | NTC OF LIEN | | 1486-2134 | | | 12:25 |
| URE, BERT | $5,000.00 | 963036 | // | 14-MAR-1986 | | - |
| CARDON LAND TITLE CO TR | PT RECONVEYANCE | | 1495-2518 | | | 09:16 |
| SUMMERHAWKS LTD ETAL | $0.00 | 977430 | 06/06/1986 | 04-AUG-1986 | | 1380-1268 |
| URE, BERT | REL OF LIEN | | 1497-0815 | | | 03:10 |
| WHOM IT MAY CONCERN | $5,000.00 | 979676 | 08/22/1986 | 22-AUG-1986 | | 1486-2134 |
| KITCHEN STUDIO | REL OF LIEN | | 1505-1673 | | | 11:40 |
| WHOM IT MAY CONCERN | $7,927.50 | 992691 | 09/02/1986 | 17-DEC-1986 | | 1483-1787 |
| ZIONS FIRST NATIONAL BANK | PT RECONVEYANCE | | 1505-1676 | | | 11:41 |
| WEBBER, JOHN U | $0.00 | 992692 | 09/11/1986 | 17-DEC-1986 | | 1480-0360 |
| ZIONS FIRST NATL BANK | PT RELEASE | | 1505-1678 | | | 11:42 |
| WEBBER, JOHN U | $0.00 | 992693 | 09/11/1986 | 17-DEC-1986 | | 1480-0365 |
| SUMMERHAWKS LTD | WD | | 1505-1681 | | | 11:42 |
| SUMMERS, CLARKE C & WF | $10.00 | 992694 | 06/11/1986 | 17-DEC-1986 | | - |
| KEITER, JOHN E TR | WD | | 1505-1681 | | | 11:43 |
| SUMMERS, CLARKE C & WF | $10.00 | 992695 | 06/11/1986 | 17-DEC-1986 | | - |
| SUMMERS, CLARKE C & WF | DEED OF TRST | | 1505-1682 | | | 11:43 |
| MOORE FINANCIAL SERVICES INC E' | $147,550.00 | 992696 | 12/11/1986 | 17-DEC-1986 | | - |
| SUMMERS, CLARKE C ETAL | TRUST DD | | 1505-1687 | | | 11:46 |
| CONTINENTAL BANK & TRUST CO | $30,000.00 | 992697 | 12/11/1986 | 17-DEC-1986 | | - |
| CLAYSON, CRAIG D | ASGNMT | | 1506-0954 | | | 03:08 |
| CITICORP HOMEOWNERS INC | $0.00 | 993964 | 12/18/1986 | 29-DEC-1986 | | 1505-1682 |
| MORGAN, TERRILYN B | REQ FOR NTC | | 1509-1280 | | | 12:58 |
| WHOM IT MAY CONCERN | $0.00 | 998977 | // | 11-FEB-1987 | | 1505-1682 |
| DESERET FED SV & LN ASSN TR | RECON | | 1523-2253 | | | 03:37 |
| SUMMERS, CLARKE C & WF | $0.00 | 1021465 | 07/17/1987 | 11-AUG-1987 | | 1469-0329 |
| CITICORP MTG INC FKA | ASGNMT | | 1539-2706 | | | 09:05 |
| LOMAS & NETTLETON CO | $0.00 | 1046898 | 01/29/1988 | 20-MAY-1988 | | 1505-1682 |
| ZIONS FIRST NATL BK | PT RELEASE ASSIGN | | 1551-2861 | | | 10:04 |
| WEBBER, JOHN U | $0.00 | 1064975 | 12/02/1988 | 07-DEC-1988 | | 1480-0365 |
| ZIONS FIRST NATL BK | PT RECONVEYANCE | | 1551-2863 | | | 10:05 |
| WEBBER, JOHN U | $0.00 | 1064976 | 12/02/1988 | 07-DEC-1988 | | 1480-0360 |
| WEBBER, JOHN U | ASSIGN INTEREST | | 1557-2264 | | | 03:20 |

Bates #000059

| Name | Type / Amount | Doc No. | Book-Page | Date | Date | Ref |
|---|---|---|---|---|---|---|
| WEBBER, JOHN U | | | 1557-2273 | | 03:24 | |
| WADMAN, V JAY | $10.00 | 1073781 | 09/21/1978 | 27-MAR-1989 | | - |
| WEBBER, JOHN U | WD | | 1557-2276 | | 03:29 | |
| WADMAN, V JAY | $0.00 | 1073782 | 09/21/1978 | 27-MAR-1989 | | - |
| SUMMERHAWKS LTD | WD | | 1565-2145 | | 11:40 | |
| WADMAN, V JAY ETAL | $10.00 | 1085860 | 07/20/1989 | 10-AUG-1989 | | - |
| WADMAN, V JAY ETAL | WD | | 1565-2148 | | 11:44 | |
| SUMMERS, CLARKE C TR ETAL | $10.00 | 1085861 | 07/20/1989 | 10-AUG-1989 | | - |
| SUMMERS, CLARKE C ETAL | TRUST DD | | 1576-0695 | | 03:49 | |
| WEST ONE BK UT | $19,529.84 | 1101910 | 02/12/1990 | 21-FEB-1990 | | - |
| SUMMERS, CLARKE C & WF | NON ASSUMP AGRMT | | 1576-0699 | | 03:50 | |
| WEST ONE BK UT | $0.00 | 1101911 | 02/12/1990 | 21-FEB-1990 | | - |
| ZIONS FIRST NATL BANK TR | RECON | | 1578-0869 | | 08:05 | |
| WEBBER, JOHN U | $0.00 | 1105213 | 03/26/1990 | 03-APR-1990 | 1480-0360 | |
| JOHN U WEBBER CO | ASGNMT | | 1588-1262 | | 01:30 | |
| PETERSEN, JERRY TR ETAL | $0.00 | 1121698 | 10/19/1990 | 19-OCT-1990 | 1390-1268 | |
| JOHN U WEBBER CO ETAL | TRUST DD | | 1590-2497 | | 04:31 | |
| AMERICA FIRST CR UN ETAL | $100,000.00 | 1125426 | 11/28/1990 | 28-NOV-1990 | | - |
| ZIONS FIRST NATL BK | REL | | 1592-1918 | | 02:29 | |
| WEBBER, JOHN U | $0.00 | 1128555 | 12/27/1990 | 07-JAN-1991 | 1480-0365 | |
| WEBBER, JOHN U | WD | | 1593-0599 | | 01:36 | |
| WADMAN, V JAY | $10.00 | 1129569 | 01/18/1991 | 22-JAN-1991 | | - |
| WADMAN, V JAY | WD | | 1593-0601 | | 01:38 | |
| WADMAN INVESTMENT | $10.00 | 1129570 | 01/18/1991 | 22-JAN-1991 | | - |
| WADMAN, V JAY | WD | | 1606-0582 | | 12:26 | |
| WADMAN INV | $10.00 | 1149606 | 08/21/1991 | 21-AUG-1991 | | - |
| WADMAN, V JAY | WD | | 1606-0585 | | 12:27 | |
| WADMAN INV | $10.00 | 1149607 | 08/21/1991 | 21-AUG-1991 | | - |
| WEST ONE BK TR | RECON | | 1610-0855 | | 08:15 | |
| SUMMERS, CLARKE C & WF | $0.00 | 1155526 | 10/17/1991 | 22-OCT-1991 | 1576-0695 | |
| SUMMERS, CLARKE C TR | QCD | | 1610-1011 | | 11:50 | |
| SUMMERS, CLARKE C & WF | $10.00 | 1155615 | 10/21/1991 | 22-OCT-1991 | | - |
| KEITER, JOHN E TR | QCD | | 1610-1012 | | 11:51 | |
| SUMMERS, CLARKE C & WF | $10.00 | 1155616 | 10/22/1991 | 22-OCT-1991 | | - |
| SUMMERS, CLARKE C & WF | TRUST DD | | 1610-1013 | | 11:52 | |
| WEST ONE BK UT | $135,000.00 | 1155617 | 10/10/1991 | 22-OCT-1991 | | - |
| WEST ONE BK UT | REQ FOR NTC | | 1610-1018 | | 11:53 | |
| WHOM IT MAY CONCERN | $0.00 | 1155618 | // | 22-OCT-1991 | 1505-1682 | |
| SUMMERS, CLARKE C & WF | NON ASSUMP AGRMNT | | 1610-1020 | | 11:54 | |
| WEST ONE BK UT | $135,000.00 | 1155619 | 10/10/1991 | 22-OCT-1991 | | - |
| WEST ONE BK TR | RECON | | 1610-2995 | | 08:15 | |
| SUMMERS, CLARKE C & WF | $0.00 | 1156485 | 10/17/1991 | 31-OCT-1991 | 1576-0695 | |
| WEST ONE BK TR | RECON | | 1611-0787 | | 08:29 | |
| SUMMERS, CLARKE C ETAL | $0.00 | 1156884 | 10/30/1991 | 05-NOV-1991 | 1505-1687 | |
| SUMMERS, CLARKE C ETAL | QCD | | 1628-0660 | | 08:52 | |
| KEITER, JOHN E TR | $10.00 | 1179922 | 05/29/1992 | 01-JUN-1992 | | - |
| CROWTHER, MARVIN | NTC ASSMNT | | 1639-2597 | | 02:34 | |
| WHOM IT MAY CONCERN | $0.00 | 1195168 | // | 01-OCT-1992 | | - |
| PETERSEN, JERRY TR ETAL | SUB TR | | 1640-1080 | | 09:59 | |
| ASSOCIATED TITLE CO | $0.00 | 1195772 | 05/14/1992 | 07-OCT-1992 | 1588-1262 | |
| ASSOCIATED TITLE CO TR | RECON | | 1640-1082 | | 10:01 | |
| KEITER, JOHN E TR ETAL | $0.00 | 1195773 | 09/25/1992 | 07-OCT-1992 | 1390-1268 | |

Bates #000060

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SUMMERS, CLARKE C | | $0.00 | | | 11/11/1993 | 29-NOV-1993 | |
| SUMMERS, CLARKE C | DEED OF TRST | | | 1691-0522 | | | 11:20 |
| WEST ONE BK UT ETAL | | $202,300.00 | 1259805 | | 11/23/1993 | 29-NOV-1993 | - |
| WEST ONE BK UT | SUBORD AGRMT | | | 1691-0530 | | | 11:22 |
| WEST ONE BK | | $0.00 | 1259806 | | 11/23/1993 | 29-NOV-1993 | 1691-0522 |
| SUMMERS, CLARKE C ETAL | QCD | | | 1696-1793 | | | 01:20 |
| CLARKE C SUMMERS PN & PR SH PL? | | $10.00 | 1266242 | | 10/00/1993 | 30-DEC-1993 | - |
| WEST ONE BK UT | ASGNMT | | | 1700-2557 | | | 12:29 |
| MORTGAGE AUTHORITY INC | | $0.00 | 1271860 | | 01/03/1994 | 31-JAN-1994 | 1691-0530 |
| MORTGAGE AUTHORITY INC | ASGNMT | | | 1732-1543 | | | 10:02 |
| SOURCE ONE MTG SERV CORP | | $1.00 | 1314006 | | 01/17/1994 | 29-SEP-1994 | 1691-0522 |
| WEBER COUNTY | RESOL #18-96 | | | 1801-0295 | | | 10:42 |
| WHOM IT MAY CONCERN | | $0.00 | 1399404 | | 04/03/1996 | 12-APR-1996 | - |
| WEBER COUNTY | RESOL #25-96 | | | 1811-2786 | | | 09:23 |
| WHOM IT MAY CONCERN | | $0.00 | 1413086 | | 05/15/1996 | 18-JUN-1996 | - |
| SOURCE ONE MTG SERV CORP | ASGNMT | | | 1930-2820 | | | 09:12 |
| CAPSTEAD INC | | $0.00 | 1547548 | | 02/01/1997 | 27-MAY-1998 | 1691-522 |
| CAPSTEAD INC | ASGNMT | | | 2007-2124 | | | 08:24 |
| GMAC MTG CORP | | $0.00 | 1631210 | | 02/01/1999 | 28-APR-1999 | 1691-522 |
| US BK NATL ASSOC TR FKA ETAL | RECON | | | 2316-0181 | | | 09:29 |
| SUMMERS, CLARKE C ETAL | | $0.00 | 1911178 | | 01/16/2003 | 06-FEB-2003 | 1610-1013 | 1155617 |
| GMAC MTG CORP | SUB TR | | | 2373-1436 | | | 08:13 |
| RIVERS, ROD | | $0.00 | 1941533 | | // | 27-MAY-2003 | 1691-522 | 1259805 |
| RIVERS, ROD TR | RECON | | | 2373-1438 | | | 08:13 |
| SUMMERS, CLARKE C | | $0.00 | 1941534 | | // | 27-MAY-2003 | 1691-522 | 1259805 |
| WEBER BASIN CONSERV DIST | ORDR ON PETN | | | 2389-0252 | | | 09:35 |
| SUMMERS, CLARKE C | | $0.00 | 1949479 | | 04/25/2003 | 20-JUN-2003 | - |
| WEBER BASIN WTR CONSERV DIST | ORD ON PETN | | | - | | | 08:45 |
| CLARKE C SUMMERS PENSION & PR( | | $0.00 | 2017007 | | 01/30/2004 | 11-MAR-2004 | - |
| WEBER BASIN WTR CONSERV DIST | ORDR ON PETN | | | - | | | 08:45 |
| CLARKE C SUMMERS PEN & PROF | | $0.00 | 2017008 | | 01/30/2004 | 11-MAR-2004 | - |
| CLARKE C SUMMERS PROFIT SHARD | QCD | | | - | | | 04:28 |
| SUMMERS, CLARKE C ETAL | | $400,000.00 | 2098267 | | 04/21/2005 | 21-APR-2005 | - |
| WEBER COUNTY | RESOL 23-2005 | | | - | | | 02:31 |
| WHOM IT MAY CONCERN | | $0.00 | 2156401 | | 07/12/2005 | 24-JAN-2006 | - |
| CLARK C SUMMERS PNSN PRFT PLN | ASGNMT | | | - | | | 09:17 |
| BASIN VIEW EST HOMEOWNERS ASS | | $0.00 | 2193577 | | 04/07/2006 | 14-JUL-2006 | 2389-252 | 2017007 |
| SUMMERS, CLARKE C ETAL | SP WD | | | - | | | 12:11 |
| BASINVIEW DEV LC | | $10.00 | 2193657 | | 07/07/2006 | 14-JUL-2006 | - |
| BASINVIEW DEV LC | DEED OF TRST | | | - | | | 12:11 |
| SUMMERS, CLARKE C & WF ETAL | | $2,990,517.95 | 2193658 | | 07/07/2006 | 14-JUL-2006 | - |
| BASINVIEW DEVL LC | DED PLAT | | | - | | | 02:26 |
| WHOM IT MAY CONCERN | | $0.00 | 2202617 | | 08/04/2006 | 22-AUG-2006 | 64-55 |
| BASINVIEW DEV LC ETAL | AGRMT | | | - | | | 02:28 | 27-JAN-2010 |
| WHOM IT MAY CONCERN | | $0.00 | 2202618 | | 08/04/2006 | 22-AUG-2006 | - |
| BASINVIEW DEV LLC | AGRMT | | | - | | | 02:31 |
| WHOM IT MAY CONCERN | | $0.00 | 2202619 | | 08/04/2006 | 22-AUG-2006 | - |
| BASINVIEW DEV LC | DECL COV REST | | | - | | | 03:45 |
| WHOM IT MAY CONCERN | | $0.00 | 2203027 | | 08/22/2006 | 23-AUG-2006 | - |
| WEBER COUNTY ETAL | AMD AGRMT | | | - | | | 11:04 | 27-JAN-2010 |
| WHOM IT MAY CONCERN | | $0.00 | 2204634 | | 08/28/2006 | 30-AUG-2006 | - |
| BASINVIEW DEVL LLC | AGRMT | | | - | | | 03:23 |

Bates #000061

| Party | Document / Amount | Entry | Date | Date | Time | Ref |
|---|---|---|---|---|---|---|
| BASINVIEW... SP WD | $10.00 | 2261271 | 04/27/2007 | 03-MAY-2007 | 03:46 | - |
| DEL VALLE FAMLY TRST | DEED OF TRST | | - | | 03:46 | |
| WELLS FARGO BK ETAL | $500,000.00 | 2261272 | 04/25/2007 | 03-MAY-2007 | | - |
| LINCOLN TTL INS TR | PT RECON | | - | | 09:05 | |
| BASINVIEW DEV LC | $0.00 | 2264396 | 05/16/2007 | 17-MAY-2007 | - | 2193658 |
| WEBER COUNTY | ORDNCE 2007-24 | | - | | 03:56 | |
| WHOM IT MAY CONCERN | $0.00 | 2290050 | 09/04/2007 | 05-SEP-2007 | - | |
| DEL VALLE FAMILY TRUST ETAL | DED PLAT | | 66-87 | | 03:58 | |
| WHOM IT MAY CONCERN | $0.00 | 2290051 | 08/13/2007 | 05-SEP-2007 | - | |
| BASINVIEW DEV LC ETAL | NTC | | - | | 04:00 | |
| WHOM IT MAY CONCERN | $0.00 | 2290052 | 08/31/2007 | 05-SEP-2007 | - | |
| VEL VALLE FMLY TRST | WD | | - | | 11:46 | |
| DEL VALLE FMLY TRST | $10.00 | 2293650 | 09/18/2007 | 24-SEP-2007 | - | |
| DEL VALLE TRST | DEED OF TRST | | - | | 12:16 | |
| CALIFORNIA NATL BK ETAL | $1,750,000.00 | 2313274 | 12/12/2007 | 31-DEC-2007 | - | |
| DEL VALLE TRST | ASGNMT | | - | | 12:16 | |
| CALIFORNIA NATL BK | $0.00 | 2313275 | 12/21/2007 | 31-DEC-2007 | - | |
| WELLS FARGO BK NW TR | RECON | | - | | 08:57 | |
| DEL VALLE TRST | $0.00 | 2319710 | 01/15/2008 | 05-FEB-2008 | - | 2261272 |
| DEL VALLE, BRETT H | NTC COMP | | - | | 10:47 | |
| WHOM IT MAY CONCERN | $0.00 | 2350137 | 06/23/2008 | 25-JUN-2008 | - | |
| CALIFORNIA NATL BK | MOD AGRMT | | - | | 12:08 | |
| DEL VALLE FAMILY TRUST | $0.00 | 2432420 | 07/01/2009 | 31-AUG-2009 | - | 2313274 |
| US BANK NATL ASSN ETAL | MOD AGRMT | | - | | 10:26 | |
| WHOM IT MAY CONCERN | $1,750,000.00 | 2453101 | 10/01/2009 | 07-JAN-2010 | - | 2313274 |
| FDIC | ASGNMT | | - | | 08:22 | 10-AUG-2010 |
| US BK NATL ASSOC | $0.00 | 2485659 | 10/30/2009 | 10-AUG-2010 | - | |
| SCHIMMELPFENNIG, TODD | REQ FOR NTC | | - | | 08:20 | 18-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527425 | 05/04/2011 | 18-MAY-2011 | - | 2261272 |
| SCHIMMELPHENNIG, TODD | REQ FOR NTC | | - | | 08:20 | 18-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527426 | // | 18-MAY-2011 | - | 2313274 |
| DEL VALLE FMLY TRST ETAL | MOD AGRMT | | - | | 08:06 | 19-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527547 | 04/26/2011 | 19-MAY-2011 | - | 2313274 |
| US BANK NATL ASSN | SUB TR | | - | | 03:06 | 29-JUN-2012 |
| WALKER, RUSSELL S | $0.00 | 2583677 | 06/27/2012 | 29-JUN-2012 | - | 2313274 |
| WALKER, RUSSELL S | NTC OF DFLT | | - | | 03:06 | 29-JUN-2012 |
| DEL VALLE FAMILY TRUST | $0.00 | 2583678 | 06/29/2012 | 29-JUN-2012 | - | 2313274 |
| CHASE BK FKA ETAL | SUB TR/RECON | | - | | 09:49 | 04-FEB-2014 |
| JPMORGAN CHASE BANK ETAL | $0.00 | 2601884 | 10/04/2012 | 23-OCT-2012 | - | 2067446 |
| WEBER COUNTY | RESOL #27-2012 | | - | | 10:38 | |
| WHOM IT MAY CONCERN | $0.00 | 2610456 | 12/11/2012 | 13-DEC-2012 | - | |
| DEL VALLE, BRETT | DEED OF TRST | | - | | 03:01 | 03-MAR-2014 |
| PRP INVESTORS FONTANA LLC ETAL | $360,009.12 | 2677120 | 12/19/2013 | 03-MAR-2014 | - | |
| US BANK | SUB TR | | - | | 01:10 | 05-JUN-2014 |
| HALLIDAY JR, PAUL M | $0.00 | 2689333 | 05/29/2014 | 05-JUN-2014 | - | 2527547 |
| HALLIDAY JR, PAUL M TR | NTC OF DFLT | | - | | 03:02 | 15-JUL-2014 |
| DEL VALLE, BRETT H ETAL | $214,000.00 | 2692310 | 06/27/2014 | 27-JUN-2014 | - | |
| STATE OF UTAH | CERT OF CREATION | | - | | 01:50 | 20-JAN-2015 |
| WHOM IT MAY CONCERN | $0.00 | 2718461 | 12/01/2014 | 20-JAN-2015 | - | |
| WEBER COUNTY | AFFT | | - | | 09:38 | |
| WHOM IT MAY CONCERN | $0.00 | 2725109 | 03/09/2015 | 09-MAR-2015 | - | |

Bates #000062

| Party | Type of Doc | Amount | Instrument | Date | Date | Time | Date |
|---|---|---|---|---|---|---|---|
| DEL V... | ... | $0.00 | 2785246 | 03/11/2016 | 11-MAR-2016 | - | 2453101 |
| STATE OF UTAH | CERT DISSOLUTION | | | - | | 11:23 | 15-JUN-2016 |
| WHOM IT MAY CONCERN | $0.00 | 2795066 | // | 25-MAY-2016 | | - | |
| WEBER COUNTY | RESOL #12-2016 | | | - | | 11:24 | 13-JUN-2016 |
| WHOM IT MAY CONCERN | $0.00 | 2795067 | 05/10/2016 | 25-MAY-2016 | | - | |
| US BANK ETAL | SUB TR/RECON | | | - | | 12:10 | 03-JUL-2017 |
| US BANK TRUST CO ETAL | $0.00 | 2866077 | 06/22/2017 | 03-JUL-2017 | | - | 2313274 |
| DEL VALLE FAMILY TRUST | DEED OF TRST | | | - | | 09:37 | 20-SEP-2017 |
| BOFI FED BANK ETAL | $750,000.00 | 2879566 | 09/13/2017 | 20-SEP-2017 | | - | |
| OGDEN VALLEY PARKS SERVICE AR | ANNEX PLAT | | | - | | 12:58 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897531 | // | 28-DEC-2017 | | - | |
| STATE OF UTAH | CERT ANEX | | | - | | 12:58 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897532 | 12/27/2017 | 28-DEC-2017 | | - | |
| OGDEN VALLEY PARKS SERVICE AR | NTC BNDRY ADJUST | | | - | | 12:59 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897533 | 12/20/2017 | 28-DEC-2017 | | - | |
| WEBER COUNTY | RESOL 43-2017 | | | - | | 12:59 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897534 | 10/17/2017 | 28-DEC-2017 | | - | |
| OGDEN VALLEY PARKS SERVICES A | RESOL BNDRY ADJUST | | | - | | 01:00 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897535 | 12/28/2017 | 28-DEC-2017 | | - | |
| PRP INVESTORS FONATNA LLC ETAL | SUB TR/RECON | | | - | | 04:20 | 17-JUL-2018 |
| PRP INVESTORS FONTANA LLC ETAL | $0.00 | 2931280 | 07/16/2018 | 17-JUL-2018 | | - | 2677120 |
| DE VALLE FAMILY TRUST | TRUST DD | | | - | | 04:20 | 17-JUL-2018 |
| SINGLE BOX CALI LP ETAL | $9,558,800.00 | 2931281 | 07/16/2018 | 17-JUL-2018 | | - | |
| BASINVIEW ESTATES HOA INC | AMD DECL COV | | | - | | 12:53 | 10-JUL-2019 |
| WHOM IT MAY CONCERN | $0.00 | 2990355 | 04/16/2019 | 10-JUL-2019 | | - | 2203027 |
| LINCOLN TTL INS AGENCY TR | NTC OF DFLT | | | - | | 10:55 | 18-JUL-2019 |
| DEL VALLE FAMILY TRUST | $0.00 | 2991776 | 07/18/2019 | 18-JUL-2019 | | - | 2931281 |
| SINGLE BOX CALI LP | ASGNMT OF TRST DD | | | - | | 10:06 | 19-JUL-2019 |
| SB FB HOUSTON LP | $0.00 | 2991983 | 07/18/2019 | 19-JUL-2019 | | - | 2931281 |
| SB FB HOUSTON LP | SUB TR | | | - | | 10:06 | 19-JUL-2019 |
| LINCOLN TTL INS AGENCY | $0.00 | 2991984 | 07/18/2019 | 19-JUL-2019 | | - | 2931281 |
| FOUNDERS TTL CO | AFFT | | | - | | 04:04 | 30-SEP-2019 |
| WHOM IT MAY CONCERN | $0.00 | 3006790 | 09/27/2019 | 30-SEP-2019 | | - | |
| LINCOLN TTL INS AGENCY TR | RECON | | | - | | 09:24 | 22-NOV-2019 |
| DEL VALLE FAMILY TRUST | $0.00 | 3018148 | 11/22/2019 | 22-NOV-2019 | | - | 2931281 |
| DEL VALLE, BRETT H ETAL | DEED OF TRST | | | - | | 03:52 | 06-JUL-2020 |
| TSS ENTERPRISES INC ETAL | $0.00 | 3066407 | 05/08/2019 | 06-JUL-2020 | | - | |
| SCHIMMELPFENNING, TODD | REQ FOR NTC | | | - | | 03:03 | 10-MAR-2021 |
| WHOM IT MAY CONCERN | $0.00 | 3133579 | 02/25/2021 | 10-MAR-2021 | | - | 2879566 |

*04-07-2021 ABSTRACTED THROUGH*

*** RUN DATE: May 11, 2021, 11:23 an ***                    *** END OF ABSTRACT ***

Bates #000063



## Weber County Fee & Entry Report

<-- Back to Kind of Intrument Search

**From 02-OCT-2020 Through 05-OCT-2020**

**Kind of Instrument: JUDGMT**                                                    **RUN DATE: 19-Sep-2024**

[Print Report]

---

Entry Nbr: 3090706    Date Recorded: 05-OCT-2020    Consideration: $9,301.28    Book-Page: -                     Parcel Nbr: --
                  Grantor: PRP MENIFEE LLC DEFT ETAL JDG                    Grantee: SB AB WEST LOOP LP PLTF
        Property Owner:                                              In Care of Address:
        Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3090722    Date Recorded: 05-OCT-2020    Consideration: $448,126.00    Book-Page: -                     Parcel Nbr: --
                  Grantor: CANNON, COLE ETAL JDG                    Grantee: UNITED STATES OF AMERICA
        Property Owner:                                              In Care of Address:
        Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3090727    Date Recorded: 05-OCT-2020    Consideration: $227,218.00    Book-Page: -                     Parcel Nbr: --
                  Grantor: SPARKS, DAVID ETAL JDG                    Grantee: UNITED STATES OF AMERICA
        Property Owner:                                              In Care of Address:
        Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3090728    Date Recorded: 05-OCT-2020    Consideration: $560,918.00    Book-Page: -                     Parcel Nbr: --
                  Grantor: SPARKS, DAVID W JDG                    Grantee: UNITED STATES OF AMERICA
        Property Owner:                                              In Care of Address:
        Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3090736    Date Recorded: 05-OCT-2020    Consideration: $227,218.00    Book-Page: -                     Parcel Nbr: --
                  Grantor: STUART, JOSHUA JDG                    Grantee: UNITED STATES OF AMERICA
        Property Owner:                                              In Care of Address:
        Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3090745    Date Recorded: 05-OCT-2020    Consideration: $86,107.00    Book-Page: -                     Parcel Nbr: --
                  Grantor: HOSKINS, KEATON JDG                    Grantee: UNITED STATES OF AMERICA
        Property Owner:                                              In Care of Address:
        Property Address:                                            Lot/Description: X , JDG

© 2024 Weber County



# Weber County Fee & Entry Report

<-- Back to Kind of Intrument Search

**From 19-OCT-2020 Through 23-OCT-2020**

**Kind of Instrument: JUDGMT**                    **RUN DATE: 19-Sep-2024**

[Print Report]

---

Entry Nbr: 3093912    Date Recorded: 19-OCT-2020    Consideration: $2,400.02    Book-Page: -    Parcel Nbr: --
        Grantor: CONNIFF, DAVID DEFT JUDG                                Grantee: PROTFOLIO RECOVERY ASSOCIATES LLC PLTF
    Property Owner:                                                In Care of Address:
    Property Address:                                            Lot/Description: X , NO DESC

---

Entry Nbr: 3094675    Date Recorded: 21-OCT-2020    Consideration: $18,345.50    Book-Page: -    Parcel Nbr: --
        Grantor: MARTINEZ, CARESSA DEFT JDG                            Grantee: SUMMIT FINL HOLDINGS LLC PLTF
    Property Owner:                                                In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3094830    Date Recorded: 21-OCT-2020    Consideration: $178,918.43    Book-Page: -    Parcel Nbr: --
        Grantor: TEAM KCM LLC DEFT ETAL JDG                            Grantee: ULTIMATE MONSTER TRUCKS PTY LTD PLTF
    Property Owner:                                                In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3094900    Date Recorded: 21-OCT-2020    Consideration: $3,089.95    Book-Page: -    Parcel Nbr: --
        Grantor: MCMAINS, SHANDA D DEFT JDG                            Grantee: RC WILLEY PLTF
    Property Owner:                                                In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3095026    Date Recorded: 21-OCT-2020    Consideration: $6,455.33    Book-Page: -    Parcel Nbr: --
        Grantor: PARISH, TAYLOR K DEFT JDG                            Grantee: HORIZON CR UN PLTF
    Property Owner:                                                In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3095051    Date Recorded: 21-OCT-2020    Consideration: $0.00    Book-Page: -    Parcel Nbr: 03-007-0050
        Grantor: GALLEGOS, A DAVID DEFT JDG                            Grantee: BRUHL, HEINZ J PLTF
    Propery Owner: STEFFEN, MARK J                                In Care of Address: 199 W 21ST ST OGDEN UT 84401
    Property Address: 199 W 21ST ST OGDEN 84401                    Lot/Description: 18&19 , REEVES ADD

---

Entry Nbr: 3095281    Date Recorded: 22-OCT-2020    Consideration: $420.00    Book-Page: -    Parcel Nbr: --
        Grantor: MEMBRENO, JULIO CESAR DEFT JDG                        Grantee: OGDEN CITY PLTF
    Property Owner:                                                In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3095282    Date Recorded: 22-OCT-2020    Consideration: $1,145.00    Book-Page: -    Parcel Nbr: --
        Grantor: MEMBRENO, JULIO C DEFT JDG                            Grantee: OGDEN CITY PLTF
    Property Owner:                                                In Care of Address:
    Property Address:                                            Lot/Description: X , NO DESC

---

© 2024 Weber County

# EXHIBIT E

The Order of the Court is stated below:

Dated: October 23, 2020                At the direction of:
          03:13:01 PM              /s/ ADAM T. MOW
                                       District Court Judge

                                by

                                /s/ SCOTT KRIM
                                    District Court Clerk

Benjamin D. Johnson (10275)
Bennett Tueller Johnson & Deere
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121-5027
Telephone: (801) 438-2000
Facsimile: (801) 438-2050
Email: ben.johnson@btjd.com
*Attorneys for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT,
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC, | **NOTICE OF JUDGMENT** |
| Plaintiff, | |
| vs. | |
| PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive, | Case No. 206927043<br><br>Judge Adam Mow |
| Defendants. | |

PLEASE TAKE NOTICE that the judgment filed from the Superior Court of California, County of Riverside, State of California, has been filed in the 3RD JUDICIAL DISTRICT COURT OF UTAH under the provisions of the UTAH FOREIGN JUDGMENT ACT (UCA 78B-5-301). Under this act, THIS JUDGMENT HAS THE SAME LEGAL FORCE AND EFFECT AS A JUDGMENT RENDERED BY THE UTAH STATE COURT.

A hearing to contest the validity of the registered determination shall be requested within 20 days after service of notice.

1

Failure to contest the registration will result in confirmation of the foreign order.

Executed on this 13th day of October, 2020.

Bennett Tueller Johnson & Deere

/s/ Benjamin D. Johnson
Benjamin D. Johnson
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE BY MAILING

STATE OF UTAH                    :
                                ss.
COUNTY OF SALT LAKE              :

_____, being first duly sworn, upon oath states that he/she has mailed a

copy of the notice of judgment to the judgment debtor:

Brett Del Valle
1803 E. Bay Avenue
Newport Beach, CA 92661

PRP Investors Madison, LLC
c/o Brett Del Valle, Reg. Agent
417 29th Street
Newport Beach, CA 92663

BDV, Inc.
c/o Brett Del Valle, Reg. Agent
417 29th Street
Newport Beach, CA 92663

BDV, LLC

2

c/o Brett Del Valle, Reg. Agent
417 29th Street
Newport Beach, CA 92663

Dated this _____ day of _____, 2020.

_____
Deputy Clerk

Bates #000014



FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUN 19 2020

Lucero Zuniga

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

PALM SPRINGS COURTHOUSE

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC, a California limited liability company | CASE NO. RIC 1601942 |
| Plaintiff, | [PROPOSED] FINAL JUDGMENT AFTER COURT TRIAL |
| v. | |
| PRP INVESTORS MADISON, LLC, a California Limited Liability Company, and BRETT DEL VALLE, an individual and DOES 1 through 50 inclusive, | Trial:   November 18, 2019 [POST] Dept:   PS1 Judge:  Hon. Kira L. Klatchko |
| Defendants. | |
| AND RELATED CROSS-COMPLAINTS | |

This matter came on for Trial on November 18, 2019 before this Court and assigned to Department PS1 of the Riverside County Superior Court, the Honorable Kira L. Klatchko presiding. Trial proceeded each day through December 11, 2019. Each case was submitted, with closing arguments on December 11, 2019 and December 18, 2019

[PROPOSED] JUDGMENT AFTER COURT TRIAL – CASE NO.: 1601942

Bates #000015

1    Kenneth R. Van Vleck, Esq. of GCA Law Partners LLP appeared for plaintiff Alum Rock

2  Riverside, LLC ("Alum Rock"). Donald J. Hamman, Esq. and Eve A. Brackmann, Esq. of Stuart

3  Kane LLP appeared for defendants Brett Del Valle, PRP Investors Madison, LLC, BDV, Inc., and

4  BDV, LLC.

5    After close of evidence, BDV, Inc., and BDV, LLC dismissed their cross-complaint and

6  Brett Del Valle and PRP Investors Madison, LLC dismissed their cross-complaint.

7    The Court reviewed and considered the testimony, evidence, demeanor, and credibility of

8  witnesses and arguments presented to the Court. On January 2, 2020, the Court filed its Tentative

9  Decision and Minute Order, which were served that day by the Clerk of the Court.  Defendants

10  timely requested a statement of decision under Cal. Code of Civil Procedure § 632. On February

11  11, 2020, the Court filed its Proposed Statement Of Decision. On February 26, 2020, Plaintiff

12  served the Proposed Statement of Decision by mail. No party objected. The Proposed Statement

13  of Decision became the Statement of Decision by operation of law.

14    The Court hereby renders its FINAL JUDGMENT:

15    On the First Cause of Action for Breach of the 2012 Settlement Agreement: JUDGMENT

16  IS HEREBY ENTERED for plaintiff Alum Rock, LLC against PRP Investors Madison, LLC and

17  its alter ego Brett Del Valle for $2,834,276.95.

18    On the Fourth Cause of Action for Breach of the 2009 Indemnity Agreement:

19  JUDGMENT IS HEREBY ENTERED for plaintiff Alum Rock, LLC against PRP Investors

20  Madison, LLC; BDV, Inc.; BDV, LLC; and Brett Del Valle for $1,504,687.50.

21    The Court found insufficient evidence to support the Second Cause of Action for Breach

22  of Fiduciary Duty and the Third Cause of Action for Unjust Enrichment.

23

24  Dated: 3/18/20

25    Hon. Kira L. Klatchko
    JUDGE OF THE SUPERIOR COURT

26

27

28

-1-

[PROPOSED] JUDGMENT AFTER COURT TRIAL - CASE NO.: 1601942

Bates #000016



This must be in red to be a
"CERTIFIED COPY"

Each document to which this certificate is attached
is certified to be a full, true and correct copy of the
original on file and of record in my office.

Superior Court of California
County of Riverside

By _____
                    DEPUTY

Dated:_____

Certification must be in red to be a
"CERTIFIED COPY"

Bates #000017

# EXEMPLIFICATION CERTIFICATE

The documents to which this certificate is attached are full, true and correct copies

of the originals on file and of record in my office. All of which we have caused by these

presents to be exemplified, and the seal of our Superior Court of California, County of

Riverside to be hereunto affixed.

IN WITNESS WHEREOF, I have hereto set my hand

and affixed the Seal of the said Court,

This _____ day of _____, _____

_____
W. Samuel Hamrick Jr., Clerk
Superior Court of California, County of Riverside

I, _____Judge Harold W. Hopp_____, Judge of the Superior

Court of the State of California, in and for the County of Riverside, do hereby certify that

W. SAMUEL HAMRICK JR., whose name is subscribed to the preceding exemplification, is

the Clerk of the said Superior Court of the State of California, in and for the County of

Riverside, and that full faith and credit are due to his official acts. I further certify, that the

seal affixed to the exemplification is the seal of our said Superior Court and that the

attestation thereof is in due form and according to the form of attestation used in this State.

Date _____11/6/20_____,   _____
Judge of the Superior Court of California
County of Riverside

28 USCA, Sec. 1738
Form No. 334 (1/90; 10/97; 2/99; 3/00; 10/00; 5/01;1/03; 4/03; 6/03)

Bates #000018

## CERTIFICATE OF NOTIFICATION

I certify that a copy of the attached document was sent to the following people for case 206927043 by the method and on the date specified.

MAIL: BRETT DEL VALLE 1803 E. BAY AVENUE NEWPORT BEACH, CA 92661

10/28/2020          /s/ SCOTT KRIM

Date: _____          _____

Signature

Bates #000019

UCW

JUN 2 3 2020

Bates #000001

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUN **1 9** 2020

Lucero **Zuniga**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

PALM SPRINGS COURTHOUSE

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC, a California limited liability company | CASE NO. RIC 1601942 |
| Plaintiff, | [PROPOSED] FINAL JUDGMENT AFTER COURT TRIAL |
| v. | |
| PRP INVESTORS MADISON, LLC, a California Limited Liability Company, and BRETT DEL VALLE, an individual and DOES 1 through 50 inclusive, | Trial: November 18, 2019 [POST] Dept: PS1 Judge: Hon. Kira L. Klatchko |
| Defendants. | |
| AND RELATED CROSS-COMPLAINTS | |

This matter came on for Trial on November 18, 2019 before this Court and assigned to

Department PS1 of the Riverside County Superior Court, the Honorable Kira L. Klatchko

presiding. Trial proceeded each day through December 11, 2019. Each case was submitted, with

closing arguments on December 11, 2019 and December 18, 2019

Bates #000002

1   Kenneth R. Van Vleck, Esq. of GCA Law Partners LLP appeared for plaintiff Alum Rock

2   Riverside, LLC ("Alum Rock"). Donald J. Hamman, Esq. and Eve A. Brackmann, Esq. of Stuart

3   Kane LLP appeared for defendants Brett Del Valle, PRP Investors Madison, LLC, BDV, Inc., and

4   BDV, LLC.

5   After close of evidence, BDV, Inc., and BDV, LLC dismissed their cross-complaint and

6   Brett Del Valle and PRP Investors Madison, LLC dismissed their cross-complaint.

7   The Court reviewed and considered the testimony, evidence, demeanor, and credibility of

8   witnesses and arguments presented to the Court. On January 2, 2020, the Court filed its Tentative

9   Decision and Minute Order, which were served that day by the Clerk of the Court. Defendants

10  timely requested a statement of decision under Cal. Code of Civil Procedure § 632. On February

11  11, 2020, the Court filed its Proposed Statement Of Decision. On February 26, 2020, Plaintiff

12  served the Proposed Statement of Decision by mail. No party objected. The Proposed Statement

13  of Decision became the Statement of Decision by operation of law.

14  The Court hereby renders its FINAL JUDGMENT:

15  On the First Cause of Action for Breach of the 2012 Settlement Agreement: JUDGMENT

16  IS HEREBY ENTERED for plaintiff Alum Rock, LLC against PRP Investors Madison, LLC and

17  its alter ego Brett Del Valle for $2,834,276.95.

18  On the Fourth Cause of Action for Breach of the 2009 Indemnity Agreement:

19  JUDGMENT IS HEREBY ENTERED for plaintiff Alum Rock, LLC against PRP Investors

20  Madison, LLC; BDV, Inc.; BDV, LLC; and Brett Del Valle for $1,504,687.50.

21  The Court found insufficient evidence to support the Second Cause of Action for Breach

22  of Fiduciary Duty and the Third Cause of Action for Unjust Enrichment.

23

24  Dated: 3/18/20

25  Hon. Kira L. Klatchko
    JUDGE OF THE SUPERIOR COURT

26

27

28

-1-

Bates #000003

This must be in red to be a
"CERTIFIED COPY"

Each document to which this certificate is attached
is certified to be a full, true and correct copy of the
original on file and of record in my office.

Superior Court of California
County of Riverside

By _____
DEPUTY
7/20/20

Dated:_____

Certification must be in red to be a
"CERTIFIED COPY"

Bates #000004

# EXEMPLIFICATION CERTIFICATE

The documents to which this certificate is attached are full, true and correct copies

of the originals on file and of record in my office. All of which we have caused by these

presents to be exemplified, and the seal of our Superior Court of California, County of

Riverside to be hereunto affixed.

IN WITNESS WHEREOF, I have hereto set my hand

and affixed the Seal of the said Court,

This _____ day of _____, _____

W. Samuel Hamrick Jr., Clerk
Superior Court of California, County of Riverside

I, _____ Judge Harold W. Hopp _____, Judge of the Superior

Court of the State of California, in and for the County of Riverside, do hereby certify that

W. SAMUEL HAMRICK JR., whose name is subscribed to the preceding exemplification, is

the Clerk of the said Superior Court of the State of California, in and for the County of

Riverside, and that full faith and credit are due to his official acts. I further certify, that the

seal affixed to the exemplification is the seal of our said Superior Court and that the

attestation thereof is in due form and according to the form of attestation used in this State.

Date _____

Judge of the Superior Court of California
County of Riverside

28 USCA, Sec. 1738
Form No. 334 (1/90; 10/97; 2/99; 3/00; 10/00; 5/01;1/03; 4/03; 6/03)

# EXHIBIT F

**The Order of the Court is stated below:**
**Dated:** June 22, 2021          /s/   KATHERINE CARLSON
              12:41:19 PM                    District Court Clerk

Benjamin D. Johnson (10275)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Facsimile: (801) 438-2050
Email: ben.johnson@btjd.com

*Attorneys for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT

## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC, | **WRIT OF EXECUTION** |
| Plaintiff, | |
| vs. | |
| PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive, | Case No. 206927043 Judge Adam Mow |
| Defendants. | |

To the SHERIFF OR CONSTABLE:

(1)    A judgment has been entered against the judgment debtor. After calculation of interest, costs and payments, the judgment debtor owes $4,339,089.45.

(2)    You are directed to seize and sell enough of the judgment debtor's non-exempt property described in Paragraphs (5) and (6) of the Application for Writ of Execution to satisfy that amount.

(3)    You are directed to serve this Writ and all attachments on the debtor and on the people named in Paragraphs (5) and (6) of the Application for Writ of Execution.

---

(4)     You are to return this Writ within 10 days after receiving it, with a signed account of your actions in executing this Writ.

## HEREBY ENTERED BY THE COURT

**Effective on the Date When the Court Stamp Is Affixed to the First Page of this Document**

Benjamin D. Johnson (10275)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Facsimile: (801) 438-2050
Email: ben.johnson@btjd.com

*Attorneys for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT

## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC,<br><br>     Plaintiff,<br><br>vs.<br><br>PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive,<br><br>Defendants. | **APPLICATION FOR WRIT OF EXECUTION**<br><br><br>Case No. 206927043<br><br>Judge Adam Mow |

Judgment Creditor, by and through counsel, states as follows:

(1)     On October 23, 2021, a judgment against debtor Brett Del Valle was entered in the amount of $4,338,964.45.

(2)     The amount due is:

| | |
|---|---|
| Amount of Original Judgment | $4,338,964.45 |
| Pre-Judgment Interest | $0.00 |
| Post-Judgment Interest | TBD |
| Cost to file Application for Writ | $50.00 |

---

| Cost to serve this Writ | $75.00 |
|---|---|
| Filing and Service Fees for other Writs (Attach receipts.) | $0.00 |
| Subtotal | $4,339,089.45 |
| Less Payments Made | $0.00 |
| Total Amount Due | $4,339,089.45 |

(3)     The judgment debtor is:

| Name | Brett Del Valle |
|---|---|
| Address | 417 29th Street<br>Newport Beach, CA 92663<br>--or--<br>1201 Estelle Lane<br>Newport Beach, CA 92660-4904 |
| Social security number (Last 4 digits only, if known) | xxx-xx-2003 |
| Driver's license number and state of issuance (Last 4 digits only, if known) | N8067219 |
| Year and month of birth (if known) | 12/1961 |

(4)     I request that a Writ of Execution be issued directing the Sheriff or Constable to seize and sell enough of the judgment debtor's property described below to satisfy the judgment. I request that the Writ be served on the debtor and on the people named in Paragraphs (5) and (6), along with the attached forms.

(5)     I request that the Writ of Execution direct the Sheriff or Constable to seize and sell the debtor's following personal property:

| Description | Location | Estimated Value | Name & address of anyone other than debtor claiming an interest |
|---|---|---|---|
|  |  |  |  |

(6)     I request that the Writ of Execution direct the Sheriff to seize and sell the debtor's following real property.

| Property Description or Address | Estimated Value | Name and address of anyone other than debtor claiming an interest |
|---|---|---|
| 1453 S. Basinview Road, Huntsville, Utah 84317<br><br>Parcel No. 20-119-0007<br><br>Legal:  Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT | $1,800,000.00 | Molly J. Mulligan<br>John P. Mulligan<br>51 Chestnut Avenue<br>Clarendon Hills, IL 60514 |

I have not included any non-public information in this document.

I declare under penalty of Utah Code Section 78B-5-705 that everything stated in this document is true and correct.

Date _____ 6/22/2021    Sign here ▶ _____ /s/ Benjamin D. Johnson

Benjamin D. Johnson, Attorneys for Plaintiff

Typed or printed name _____

Application for Writ of Execution    Approved Board of District Court Judges June 12, 2009    Page 3 of 3
Revised April 6, 2015

Bates #000045

# EXHIBIT G

2024 UT 22

556 P.3d 21
Supreme Court of Utah.

Molly J. MULLIGAN and John P. Mulligan, Appellants,
v.
ALUM ROCK RIVERSIDE, LLC, Appellee.

No. 20221024
|
Heard April 10, 2024
|
Filed July 18, 2024
|
Rehearing Denied August 21, 2024

**Synopsis**
**Background:** After domesticating California judgment against judgment debtors in Utah, judgment creditor filed application writ of execution on real property to which judgment lien attached, which was owned by family revocable trust established by judgment debtors at time of judgment but was later conveyed to subsequent purchasers. The Third District Court, Salt Lake County, Adam T. Mow, J., issued writ, and then upheld writ over purchasers' objections. Purchasers appealed.

**Holdings:** The Supreme Court, Hagen, J., held that:

[1] whether judgment creditor that domesticated California judgment obtained valid lien on real property that was owned by trust at time of judgment was subject to requirements of Judgment Act;

[2] as matter of apparent first impression, creditor was not required to file judgment in Registry of Judgments in district court of county where real property was situated, in addition to recording judgment in office of county recorder, in order to obtain valid judgment lien on real property, under Judgment Act;

[3] real property was subject to writ of execution even though judgment debtors were not record owners of property;

[4] trust for which real property was asset could not shield real property from execution;

[5] venue statute requiring that causes of action involving real property be tried in county where property was situated had no bearing on district court's jurisdiction to issue writ of execution; and

[6] district court did not lack jurisdiction to issue writ of execution of judgment on real property situated outside its judicial district.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (15)

**[1]** **Appeal and Error** 🗝 Judgment in General
**Judgment** 🗝 Nature of lien

Judgment liens are creatures of statute; accordingly, whether real property is encumbered by judgment lien raises question of statutory interpretation, which is legal question that appellate court reviews for correctness. Utah Code Ann. § 78B-5-201.

**[2]** **Appeal and Error** 🗝 Review for Correctness or Error

Court's interpretation of Utah law presents legal questions, which appellate court reviews for correctness.

**[3]** **Statutes** 🗝 Plain Language; Plain, Ordinary, or Common Meaning

The aim of statutory interpretation is to ascertain the intent of the legislature, and the best evidence of the legislature's intent is the plain language of the statute itself.

**[4]** **Statutes** 🗝 Context
**Statutes** 🗝 Statutory scheme in general

Because statutory text may not be plain when read in isolation, when interpreting a statute, the court determines the meaning of the text given the relevant context of the statute, including,

particularly, the structure and language of the statutory scheme.

**[5]    Judgment** 🔑 Enforcement in other states

To create a lien from a foreign judgment, creditors must adhere to relevant requirements under the Judgment Act as well as the Foreign Judgment Act. Utah Code Ann. §§ 78B-5-201, 78B-5-305(1).

**[6]    Judgment** 🔑 Enforcement in other states

Whether judgment creditor that domesticated California judgment in Utah obtained valid lien on real property in Utah that was owned by trust established by judgment debtors was subject to requirements of Judgment Act, where Foreign Judgment Act expressly incorporated requirements of Judgment Act by providing that "foreign judgment filed under [the Foreign Judgment Act] has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court" of Utah. Utah Code Ann. §§ 78B-5-201, 78B-5-302(3).

**[7]    Judgment** 🔑 Nature of lien

**Judgment** 🔑 Enforcement in other states

A lien is a means of enforcing a judgment; as such, a foreign judgment is subject to the same requirements for lien creation as domestic judgments. Utah Code Ann. §§ 78B-5-201, 78B-5-305(1).

**[8]    Judgment** 🔑 Enforcement in other states

Judgment creditor that domesticated 2020 California judgment in Utah was not required to file judgment in Registry of Judgments in district court of county where real property owned by trust established by judgment debtors was located, in addition to recording judgment with office of county recorder where real property was situated, in order to obtain valid

judgment lien against property, under separate provisions of Judgment Act stating that, after July 1, 1997, judgment creditor seeking to obtain judgment lien had to "file judgment in Registry of Judgments of the office of the clerk of the district court of the county in which the property is located," and that after July 1, 2002, creditor had to record judgment "in office of county recorder in which the real property of the judgment debtor is located"; statute was sequential, not cumulative, and therefore, creditor needed only to record domesticated judgment in office of county recorder. Utah Code Ann. § 78B-5-201(2), (3)(a).

**[9]    Statutes** 🔑 Reenactment or incorporation of prior statute

**Statutes** 🔑 Presumptions

When interpreting statute, where legislature amends portion of statute but leaves other portions unamended, or reenacts them without change, legislature is presumed to have been satisfied with prior judicial constructions of unchanged portions of statute and to have adopted them as consistent with its own intent.

**[10]    Creditors' Remedies** 🔑 Ownership or Possession of Subject Matter

**Judgment** 🔑 Enforcement in other states

Real property owned by revocable family trust established by husband and wife judgment debtors was subject to writ of execution obtained by judgment creditor that domesticated California judgment in Utah, under Judgment Act, which provided that real property subject to a judgment lien "includes all the real property … owned or acquired at any time by the judgment debtor during the time the judgment is effective," even if debtors never "owned" subject property; debtors were co-settlors with power to amend or revoke trust, and to transfer property from trust, and upon revocation of trust, property would be delivered to debtors, either together or individually, as part of community property, and therefore, debtors held functionally equivalent

Mulligan v. Alum Rock Riverside, LLC, 556 P.3d 21 (2024)

2024 UT 22

of ownership of property. Utah Code Ann. §
78B-5-202(7)(c)(ii).

---

**[11]    Trusts**    🔑 Nature and essentials of trusts

"Trust" is form of ownership in which legal
title to property is vested in trustee, who has
equitable duties to hold and manage it for benefit
of beneficiaries.

---

**[12]    Trusts**    🔑 Nature and essentials of trusts

One standard estate-planning practice is to form
a revocable trust in which the settlor is also
the trustee and manages the trust for their own
benefit during their lifetime, and when done
properly, this strategy serves to avoid probate
of the assets while allowing the settlor to retain
control of the trust property during his or her own
lifetime.

---

**[13]    Creditors' Remedies**    🔑 Interests under wills,
trusts, and estates

Family revocable trust established by judgment
debtors, which owned real property, could
not shield real property from execution by
judgment creditor after California judgment was
domesticated in Utah and creditor obtained
valid judgment lien on property by recording
judgment in office of county recorder in county
where property was situated. Utah Code Ann. §
78B-5-201(3)(a).

---

**[14]    Creditors' Remedies**    🔑 Jurisdiction and
authority to issue and control

Venue statute requiring that causes of action
involving real property be tried in county where
property was situated had no bearing on district
court's jurisdiction to issue writ of execution of
California judgment domesticated in Utah on
real property to which judgment lien attached
that was located in county outside district
court's judicial district, where request for writ of
execution was not cause of action. Utah Code
Ann. § 78B-3-301(1).

---

**[15]    Creditors' Remedies**    🔑 Jurisdiction and
authority to issue and control

Civil rule providing that, "if the writ directs
the seizure of real property, the court clerk will
issue the writ to the sheriff of the county in
which the real property is located," and if it
"directs the seizure of personal property, the
court may issue the writ to an officer of any
county" did not operate to divest district court
of jurisdiction to issue writ of execution on real
property situated in county outside its judicial
district on request of judgment creditor that
domesticated California judgment and obtained
judgment lien on property, despite assertion by
subsequent purchasers that court's authority to
issue writ to "officer of any county" did not
apply to seizure of real property, where rule
said nothing about which court could issue writ
and contained no requirement that district court
issuing writ be in the same county as subject real
property. Utah R. Civ. P. 64(d)(1).

---

**\*23** Third District, Salt Lake County, The Honorable Adam
T. Mow, No. 206927043

**Attorneys and Law Firms**

Bradley L. Tilt, Salt Lake City, Felicia B. Canfield, Cody,
Wyo., for appellants

Benjamin D. Johnson, KC Hooker, Salt Lake City, for
appellee

Justice Hagen authored the opinion of the Court, in which
Chief Justice Durrant, Associate Chief Justice Pearce, Justice
Petersen, and Justice Pohlman joined.

Justice Hagen, opinion of the Court:

### INTRODUCTION

¶1 This case stems from a California judgment that Alum
Rock Riverside, LLC obtained against Brett Del Valle. After
domesticating the judgment in Utah and recording it with

2024 UT 22

the county recorder, Alum Rock received a writ of execution allowing it to seize and sell a property in Weber County.

¶2 At the time Alum Rock recorded the judgment with the county recorder, the property was owned by a revocable trust that was established and administered by Brett and his wife. But the trust had sold the property by the time Alum Rock applied for the writ. And when the court issued the writ, the property's new owners—the Mulligans—objected, arguing that (1) Alum Rock failed to create a judgment lien because it did not record the judgment in the registry of judgments, (2) the writ was not available because the trust—not Brett—held title to the property when the judgment was domesticated in Utah, and (3) the district court lacked jurisdiction to issue the writ because the property was located in a different judicial district.

¶3 The district court upheld the writ over the Mulligans' objections, and we affirm. First, we hold that Alum Rock created a judgment lien when it recorded the judgment in the county recorder's office. As of July 1, 2002, a party seeking a judgment lien is not required to record the judgment in the registry of judgments. Second, we hold that the writ was available against the property, even though the title was held in the name of a revocable trust, because Brett retained all indicia of ownership over the property when the lien was created. And third, we hold that the Mulligans have not identified a relevant limitation on the district court's jurisdiction that would prevent it from issuing the writ.

## BACKGROUND

¶4 Alum Rock Riverside, LLC sued Brett Del Valle in California state court for breach of contract and other claims. Alum Rock prevailed, and the court issued a judgment in its favor totaling more than $4 million. Soon after, Alum Rock domesticated the judgment **\*24** in Utah's Third District Court. Because the Del Valle Family Trust owned property in Weber County, Utah, Alum Rock recorded the judgment in the Weber County Recorder's Office.

¶5 Brett and his wife, Traci, had formed the trust years earlier, naming themselves as trustees. Brett and Traci retained broad powers over the trust and its property, including the power to revoke the trust, amend it, and transfer property from it. In addition, the trust empowered Brett and Traci, as trustees, to hold, manage, control, lease, and encumber trust property. Several years after they created the trust, Brett and Traci,

acting as trustees, acquired the Weber County property at issue in this case.

¶6 The trust continued to hold title to the property when Alum Rock recorded its judgment against Brett in the county recorder's office. A few months after Alum Rock recorded the judgment, however, the trust conveyed the property to Molly and John Mulligan. And one month after that, Alum Rock applied for a writ of execution against the property, identifying Brett as the judgment debtor and asking the district court to "direct the sheriff to seize and sell" the property to satisfy the judgment.

¶7 When the court issued the writ as requested, the Mulligans challenged it. Acknowledging that their challenge "rises or falls" on whether a lien "was created and attached to the property," they asserted that Alum Rock did not do what the Judgment Act requires to create a judgment lien on real property. [1] Specifically, they claimed that Alum Rock did not fully comply with the following statutory requirements, found in Utah Code section 78B-5-201:

> (2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.

> (3)(a) On or after July 1, 2002, ... a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021).

¶8 The Mulligans argued that because Alum Rock obtained its judgment against Brett in 2020—after both July 1, 1997, and July 1, 2002—Alum Rock needed to comply with the requirements of both subsections: filing the judgment in the registry of judgments and recording it with the county recorder. Because Alum Rock did not file the judgment in the registry of judgments, the Mulligans reasoned, a lien was not created.

¶9 The Mulligans also claimed that, under the Judgment Act and the Utah Rules of Civil Procedure, the writ was not "available" against the property. Under the Judgment Act, real property subject to a judgment lien "includes all the real property ... owned or acquired at any time by the

Mulligan v. Alum Rock Riverside, LLC, 556 P.3d 21 (2024)

2024 UT 22

judgment debtor during the time the judgment is effective." *H§§* 78B-5-202(7)(c)(ii) (2021). And under rule 64E of the Utah Rules of Civil Procedure, "[a] writ of execution is available to seize property in the possession or under the control of the defendant following entry of a final judgment." UTAH R. CIV. P. 64E(a). According to the Mulligans, the writ was "issued improperly" because (1) Brett never owned the property (the trust did), and (2) in any event, he did not possess or control the property at the relevant time (the Mulligans did).

¶10 Finally, the Mulligans questioned the district court's jurisdiction. In their view, the court lacked jurisdiction to issue the writ because the proceedings fall within reach of a venue statute that lists actions that "shall be tried in the county in which the [property] ... is situated." *%&&*UTAH CODE § 78B-3-301(1) (2021). [2] The Mulligans also claimed  *25 that under Utah caselaw, actions in which the "main question ... involves title to real property" may be heard only by the district court where the property is located. (Quoting *'()#&* *-* *#/0#$1.23$3$*, 2 Utah 2d 309, 273 P.2d 168, 171 (1954).) Because the property here is outside the district court's geographic boundaries, the Mulligans maintained that the court lacked jurisdiction to issue the writ.

¶11 The district court upheld the writ against the Mulligans' challenge. It first concluded that the Judgment Act did not require Alum Rock to file its judgment in the registry of judgments, as the Mulligans had argued, and that Alum Rock's lien attached when the judgment was recorded with the county recorder. Next, the court determined that because the property was under Brett's control when Alum Rock domesticated the judgment, the property was subject to execution under rule 64E. Finally, the court rejected the Mulligans' challenge to its jurisdiction, explaining that it had the power to issue the writ even though the property is located outside the Third District.

¶12 The Mulligans appeal, and we have jurisdiction under Utah Code subsection 78A-3-102(3)(j).

## ISSUES AND STANDARDS OF REVIEW

[1] ¶13 The parties dispute whether Alum Rock created a judgment lien on the property. "Judgment liens are creatures of statute ...." *4.)#&( -$5 &)26(*78 9(:;< =$>$*2015 UT 11, ¶ 12, 347 P.3d 385. Accordingly, whether the property here is

encumbered by Alum Rock's purported judgment lien raises a question of statutory interpretation, a legal question that we review for correctness. *%&&( -?(*.8:  @:&7^<":B$ -$ C6/ D(:B- EF2-.G* 2011 UT 50, ¶ 12, 267 P.3d 863.

[2] ¶14 The Mulligans also contest the district court's conclusions that the property is subject to the writ and that the court had jurisdiction to issue the writ. Because these determinations were premised on the court's interpretation of Utah law, they also present legal questions, which we review for correctness. *%&&&&(; >)(*H '8$ -$%()3(;& '.3A ' 8*G$* 2010 UT 22, ¶ 16, 243 P.3d 1221.

## ANALYSIS

[3]  [4] ¶15 The Mulligans challenge three aspects of the district court's decision, each of which turns in part on statutory interpretation. "The aim of statutory interpretation is to ascertain the intent of the legislature, and the best evidence of the legislature's intent is the plain language of the statute itself." *%0:%38:&&()3.E(*3:&*J II'  -$98#&))'8:23*$'8$*, 2024 UT 9, ¶ 11, 545 P.3d 260 (cleaned up). But because "statutory text may not be plain when read in isolation," *%3(3& -$/$?$%&K": *&/$?$%%$L*2011 UT 75, ¶ 13, 280 P.3d 410 (cleaned up), "we determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)," *?BC.3*.B; -$ 4.M28*; 2021 UT 48, ¶ 19, 496 P.3d 147 (cleaned up).

[5] ¶16 We first address the Mulligans' contention that Alum Rock skipped a necessary step to create a lien on the property by not filing its judgment in the registry of judgments. We clarify that to create a lien from a foreign judgment, creditors must adhere to relevant requirements under the Judgment Act as well as the Foreign Judgment Act. But since July 1, 2002, creditors do not need to file judgments in the registry of judgments to create a lien. Thus, Alum Rock created a valid lien when it recorded its judgment in the county recorder's office.

¶17 Next, we assess whether Brett "owned" the property, allowing Alum Rock's lien to attach, even though the revocable trust that he and his wife created and administered held title to it. We conclude that he did.

¶18 Finally, we consider and reject the Mulligans' argument that limitations on the district court's jurisdiction prohibited the court from issuing the writ.

2024 UT 22

**\*26** I. ALUM ROCK CREATED A
VALID LIEN ON THE PROPERTY

¶19 To resolve this appeal, we must decide whether Alum Rock created a valid lien on the property before it was sold to the Mulligans. The answer to that question largely depends on the meaning of two provisions of the Judgment Act.

¶20 These provisions, subsections (2) and (3)(a) of Utah Code section 78B-5-201, set out actions that judgment creditors have needed to perform at different times to create a judgment lien on real property:

(2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.

(3)(a) On or after July 1, 2002, ... a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021). The Mulligans argue that these requirements—the registry-of-judgments requirement and the county-recorder requirement—"work together, cumulatively." Under their reading, because the judgment was domesticated in 2020, which is "on or after" both July 1, 1997, and July 1, 2002, *2&&#§* Alum Rock could not create a lien on the property unless it (1) filed its judgment in the registry of judgments and (2) recorded it with the county recorder.

¶21 Before interpreting these provisions, we address a threshold issue raised by Alum Rock: whether section 78B-5-201 of the Judgment Act even applies here, given that Alum Rock's judgment is a foreign judgment. After explaining why the section applies, we interpret its provisions.

>$ '*&#.38*2 18H&23.B(3.:7 68#.7: /0#7H&.:32 ?023 >#-&& 38 3-& /0#7H&.:3 >B3F2 D&&&N&.:32 O8* &(3.:7 ( I.&:

[6] ¶22 Alum Rock argues that the Judgment Act's registry-of-judgments requirement is not implicated here because

Alum Rock's judgment is governed by the Foreign Judgment Act, which makes no mention of the registry of judgments. We disagree.

¶23 As it relates to converting a foreign judgment into a lien, the Foreign Judgment Act provides:

(1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:

(a) a stay of execution has not been granted;

(b) the requirements of this chapter are satisfied; and

(c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202 [of the Judgment Act].

UTAH CODE § 78B-5-305(1).

¶24 Alum Rock points out that this section of the Foreign Judgment Act mentions section 78B-5-202 of the Judgment Act but not section 78B-5-201. And, it adds, section 202 also does not mention section 201 or its registry-of-judgments requirement, on which the Mulligans' argument turns. *%&&#§* § 78B-5-202(7)(a) (2021) ("After July 1, 2002, a judgment ... becomes a lien upon real property if ... the judgment ... is recorded in the office of the county recorder.").

¶25 These points are well taken. Still, the Foreign Judgment Act declares that foreign judgments are treated the same as domestic ones. Specifically, it provides that "[a] foreign judgment filed under [the Foreign Judgment Act] has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court of this state." *"#§§* 78B-5-302(3). Alum Rock argues that this language does not "incorporate[ ] the Judgment Act wholesale into the Foreign Judgment Act." Instead, Alum Rock urges us to parse this language and treat the phrase "for reopening, vacating, setting aside, or staying" as modifying and limiting the entire **\*27** preceding series—"procedures, defenses, enforcement, satisfaction, and proceedings."

¶26 To take one example, as Alum Rock sees it, foreign judgments are not generally "subject to the same procedures" as domestic judgments; they are merely "subject to the same procedures ... O8**%G&:..:7<+(B(3.:7<2&33.:T2.#&< 8* 23(A.:T" as domestic judgments. Alum Rock thus argues that the Judgment Act applies to foreign judgments only

when reopening, vacating, setting aside, or staying a foreign
judgment, none of which Alum Rock seeks to do here.

¶27 But Alum Rock's argument is undercut by a decision that
we issued after the briefing in this appeal was completed,
*0:%38:&D&()3AE(*3:&*2J II'   -$ 98#&)) '8:23*0B3.8:
'8$, 2024 UT 9, 545 P.3d 260. There, the parties disputed
whether, under the Foreign Judgment Act, Utah's or Hawaii's
postjudgment interest rate applied to a Hawaii judgment
that was domesticated in Utah. "#$ ¶¶ 1–2. In resolving
the dispute, we explained that the Foreign Judgment Act
"mandates that foreign judgments domesticated using the
[Foreign Judgment Act] are 'subject to the same procedures,
defenses, enforcement, satisfaction, and proceedings ... as a
judgment of a district court of this state.' " "#$ ¶ 13 (quoting
UTAH CODE § 78B-5-302(3)). In line with this principle, we
held that "[b]ecause postjudgment interest is an enforcement
mechanism," Utah's postjudgment interest rate applied. "#$ ¶
21.

¶28 In *0:%38:& we did not read the phrase "for
reopening, vacating, setting aside, or staying" as modifying
"enforcement." %&&#$ ¶ 13; 2&&)28 UTAH CODE §
78B-5-302(3). Indeed, it would be unreasonable to read the
phrase to modify terms like "enforcement" and "satisfaction"
because a judgment's enforcement or satisfaction would not
be at issue in proceedings to reopen, vacate, set aside, or
stay a judgment. This leads us to conclude that the phrase
limits and modifies only the nearest item in the series to it
—"proceedings."

¶29 We reject Alum Rock's reading for another reason as well.
Under its reading, a creditor intending to create a lien based
on a domestic judgment would be subject to all the Judgment
Act's constraints, but a foreign-judgment creditor would not.
This would result, counterintuitively, in a foreign judgment
being &(2.&& to convert into a lien than a domestic one, which
is contrary to an express purpose of the Foreign Judgment Act
—to treat foreign judgments the same as domestic ones in key
respects. %&& UTAH CODE § 78B-5-302(2)–(3).

 [7]   ¶30 Like postjudgment interest, a lien is a means of
enforcing a judgment. As such, a foreign judgment is subject
to the same requirements for lien creation as domestic
judgments. Thus, the Foreign Judgment Act incorporates the
Judgment Act's requirements for creating a judgment lien,
including those found in section 78B-5-201.

9$ >)0H D8B; 1.# =83 =&&# 38 6.)& "32 /0#7H&:3
.: 3-& D&7.23*A 8O /0#7H&:32 8&3& ( I.&:

 [8]   ¶31 Having concluded that section 201 applies, we must
interpret subsections (2) and (3)(a) and determine whether
their requirements are cumulative (as the Mulligans argue)
or sequential (as Alum Rock argues). We hold that they are
sequential, not cumulative.

¶32 Although we have yet to decisively interpret these
provisions, the court of appeals previously interpreted a
substantively similar version of the statute under analogous
circumstances and rejected the cumulative reading now
advanced by the Mulligans. In C.3B-&2P Q8*:<I$I$'$ -$
R8:7 5 88 C.H, 2005 UT App 164, 112 P.3d 1210, judgment
creditors recorded an abstract of their judgment in the county
recorder's office and applied for a writ of execution permitting
them to sell a property that was owned by the judgment debtor.
"#$ ¶¶ 2–3. But the judgment debtor deeded his interest in the
property to his wife between the time the creditors recorded
the judgment with the county recorder and the time they
applied for the writ. "#$ ¶ 2.

¶33 When the district court issued the writ, the judgment
debtor objected, claiming that the creditors did not create a
lien on the property before the debtor conveyed the property
to his wife because they "had not ... filed the Judgment in the
Registry of *28 Judgments." "#$ ¶ 4. On appeal, the debtor
argued that the registry-of-judgments and county-recorder
provisions "must be read together, thereby creating a two-step
process" that required post-2002 judgments to be filed "in
both the Registry of Judgments and the office of the county
recorder." "#$ ¶ 12.

¶34 The C.3B-&2 court rejected this cumulative reading and
held that "after July 1, 2002, a person seeking a lien on
real property need only file in the office of the county
recorder." "#$ ¶ 13. We reach the same conclusion because
it is supported by the structure of section 78B-5-201, other
sections of the Utah Code from the Judgment Act and the
Foreign Judgment Act, and the prior-construction canon of
statutory interpretation.

¶35 The structure of section 201 itself signals that the
registry-of-judgments and county-recorder requirements are
to be read sequentially, creating independent requirements
for successive time periods. For context, a district court's
entry of judgment historically "create[d] a lien upon the real

property of the judgment debtor" automatically. %&& UTAH
CODE § 78B-5-202(2) (2021) ("Prior to July 1, 1997, ... the
entry of judgment by a district court creates a lien upon the
real property of the judgment debtor ...."). But the legislature
did away with this automatic-lien regime. As recognized by
subsection (2) of section 78B-5-201, beginning July 1, 1997,
a judgment lien does not arise automatically upon a district
court's entry of judgment; such a judgment does not create a
lien "unless the judgment is filed in the Registry of Judgments
of the office of the clerk of the district court of the county in
which the property is located." "#§§ 78B-5-201(2) (2021).

¶36 As with the automatic-lien regime, the legislature
also phased out subsection (2)'s registry-of-judgments
requirement. Subsection (3)(a) of section 201 marks this
evolution in the law. Rather than allow a judgment to create a
lien automatically (before July 1, 1997) or require judgment
creditors to file the judgment in the registry of judgments (on
or after July 1, 1997), beginning July 1, 2002, a judgment
entered in the district court does not create a lien "unless
the judgment or an abstract of judgment is recorded in the
office of the county recorder in which the real property of the
judgment debtor is located." "#§§ 78B-5-201(3)(a) (2021).

¶37 This sequential reading makes sense when we zoom in on
the grammatical structure of subsections (2) and (3)(a). The
two subsections are separate, stand-alone provisions, each
punctuated with a period. Their requirements are not joined
with a conjunction such as "and" or "or." And subsection (3)
(a) does not expressly incorporate subsection (2)'s registry-
of-judgments requirement.

¶38 Contrast this with subsection (4) of the same section,
which also imposes requirements on judgment creditors,
requiring them to include certain information when filing or
recording a judgment:

(4) In addition to the requirements of Subsections (2)
and (3)(a), any judgment that is filed in the Registry
of Judgments on or after September 1, 1998, or any judgment
or abstract of judgment that is recorded in the office of a
county recorder after July 1, 2002, shall include:

(a) the information identifying the judgment debtor as
required under Subsection (4)(b) on the judgment or
abstract of judgment; or

(b) a copy of the separate information statement of the
judgment creditor that contains:

(i) the correct name and last-known address of each
judgment debtor and the address at which each
judgment debtor received service of process;

(ii) the name and address of the judgment creditor;

(iii) the amount of the judgment as filed in the Registry
of Judgments;

(iv) if known, the judgment debtor's Social Security
number, date of birth, and driver's license number if a
natural person; and

(v) whether or not a stay of enforcement has been
ordered by the court and the date the stay expires.

"#§§ 78B-5-201(4) (2021). Unlike subsections (2) and (3)(a),
subsection (4)'s requirements are unified, with the cumulative
requirements *29 indented, punctuated with semicolons,
and joined with a conjunction. And with the opening phrase
"in addition to," subsection (4) expressly incorporates the
requirements of previous subsections.

¶39 As subsection (4) demonstrates, the legislature knows
how to signal when it intends requirements to be cumulative.
But unlike subsection (4), subsection (3) does not state
that recording in the county recorder's office must be done
"[i]n addition to" the registry-of-judgments requirement in
subsection (2). And instead of listing both requirements
as indented subsections separated by semicolons and a
conjunction, the legislature listed the two requirements
as stand-alone provisions triggered on different dates.
That structure supports our reading that subsection (3)'s
requirements supplant those in subsection (2) after July 1,
2002.

¶40 Reading the subsections sequentially also makes sense
when we zoom out and look at related sections of the Utah
Code. We have a "duty to harmonize and reconcile statutory
provisions." 6.&)#<$98A& * 8§ 952 P.2d 1078, 1081 (Utah
1998) (cleaned up). Reading section 201's requirements as
being sequential harmonizes and reconciles them with section
78B-5-202 of the Judgment Act and section 78B-5-305 of the
Foreign Judgment Act. Properly understood, all three statutes
provide that, since July 1, 2002, a judgment becomes a lien
on real property if it is recorded in the office of the county
recorder. Utah Code section 78B-5-202 provides that, after
July 1, 2002, a judgment becomes a lien on real property if
it "is recorded in the office of the county recorder." UTAH

CODE § 78B-5-202(7)(a) (2021). And Utah Code section 78B-5-305, part of the Foreign Judgment Act, provides:

> (1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:
>
> (a) a stay of execution has not been granted;
>
> (b) the requirements of this chapter are satisfied; and
>
> (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202.

*Id.* §§ 78B-5-305(1).

¶41 Notice that these sections do not refer to the registry of judgments. If, as the Mulligans suggest, the legislature intended judgment creditors to continue filing in both the registry of judgments and the county recorder's office, this absence would be hard to reconcile. For example, consider how the text of section 202 squares with the Mulligans' reading of section 201. Section 202 provides, "After July 1, 2002, a judgment ... becomes a lien upon real property if ... the judgment ... is recorded in the office of the county recorder." *Id.* § 78B-5-202(7)(a) (2021). But under the Mulligans' reading of section 201, after July 1, 2002, a judgment *would not* become a lien on real property if the judgment is recorded in the office of the county recorder; the judgment must also be filed in the registry of judgments.

¶42 Historical context helps explain why sections 202 and 305 mention the county-recorder requirement but not the registry-of-judgments requirement. In 2001, the legislature passed a bill that amended the Judgment Act and the Foreign Judgment Act in significant ways. *See* Judgment Lien Amendments, H.B. 305, 2001 Leg., Gen. Sess. (Utah 2001) (available at https://le.utah.gov/~2001/bills/hbillenr/HB0305.htm). The bill—which ushered in the county-recorder regime for judgment-lien creation—provided that the statutory overhaul was to take effect July 1, 2002. *Id.* § 5. Before that date, the sections that are now codified as sections 202 and 305 did not specify the manner of recording a judgment lien. *See* UTAH CODE §§ 78-22-1, 78-22a-5 (2001). As of July 1, 2002, however, the sections recognized and reflected the incoming county-recorder requirement. *See id.* §§ 78-22-1, 78-22a-5 (July 2002). Each section was amended to specify that for a judgment to create a lien, the judgment must be "recorded in the office of the county recorder." *See id.* §§ 78B-5-202(7)(a), -305(1)(c). But the legislature did not add similar language referring to the registry-of-judgments

requirement. That omission further supports our conclusion that the outdated registry-of-judgments requirement was entirely supplanted  *30  by the county-recorder regime as of July 1, 2002.

 [9]  ¶43 The prior-construction canon of statutory interpretation also reinforces our reading of section 201. Under that canon, if a word or phrase has been uniformly interpreted in caselaw, "a later version of that act perpetuating the wording is presumed to carry forward that interpretation." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322 (2012). In other words, "where a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent." *Madsen v. Borthick*, 642 P.2d 755, 756 (Utah 1982).

¶44 In *C.3B-5*, the court of appeals interpreted the section that is now codified as section 201 to mean that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." 2005 UT App 164, ¶ 13, 112 P.3d 1210. That decision has stood as controlling law in this jurisdiction for nearly two decades, and during that time judgment creditors have presumably relied on it as such. The legislature has amended the Judgment Act—including section 201—several times since *C.3B-5* was decided, yet it has not modified the language to abrogate the case's holding.[3] We presume that by amending the statute but leaving the portions relevant here unamended, the legislature was satisfied with *C.3B-5*'s reading.

¶45 The Mulligans maintain that *C.3B-5* has not been the controlling law in Utah since 2013 because it was overtaken by the court of appeals' decision in *Bank of America, N.A. v. Adamson*, 2013 UT App 38, 299 P.3d 613. There, a creditor obtained a court judgment in 2001, at which time the judgment debtor owned property in Salt Lake County. *See id.* ¶¶ 2–3. Not long after, however, the debtor conveyed his interest in the property to a third party. *Id.* ¶ 3. And not until years later did the creditor begin efforts to execute the judgment by having the property sold. *Id.* ¶ 4.

¶46 Between the time the court entered the judgment and the time the debtor transferred the property, the creditor recorded

*Mulligan v. Alum Rock Riverside, LLC*, 556 P.3d 21 (2024)

2024 UT 22

the judgment in the registry of judgments but did not file an information statement with the judgment.[4] *¶¶ 16–17.* The issue was whether the judgment creditor created a lien on the property before the debtor conveyed it away.

*¶ 17.* To answer that question, the court interpreted the 2001 version of the Judgment Act, *¶¶ 16–28*, which, like the current version, provided that "[o]n or after July 1, 1997, a judgment ... does not create a lien upon or affect the title to real property unless the judgment is recorded in the Registry of Judgments," *2 ¶ 15* (quoting UTAH CODE § 78-22-1.5(2) (2001)). The next subsection provided, "In addition to the requirement of [the previous subsection], any judgment that is recorded in the Registry of Judgments on or after September 1, 1998, shall include a separate information statement of the judgment creditor." *(quoting UTAH CODE § 78-22-1.5(3) (2001)).

¶47 The ,S court concluded that under the 2001 version of the Judgment Act, "both requirements"—the registry-of-judgments and information-statement requirements—"must be satisfied to create a judgment lien." *¶ 19.* To support this conclusion, the court analyzed the relevant text by noting that (1) the legislature's "[u]se of the word 'shall' ... indicates that filing an information statement is mandatory," and (2) the information-statement requirement "must be completed 'in addition' to" the registry-of-judgments requirement. *(cleaned up); 2 28 ¶ 21.* **\*31** Even though the court's decision was based on the language of the 2001 version of the Judgment Act and turned on the information-statement requirement, the court added a footnote stating that "the 2002 version [of the Judgment Act] required that the judgment and the information statement be recorded in both the Registry of Judgments and in the county recorder's office." *¶ 14 n.5.*

¶48 According to the Mulligans, ,S overtook *C.3B-& 2* as controlling law interpreting the Judgment Act. We disagree. Although the ,S court included a footnote suggesting that the registry-of-judgments and county-recorder requirements of the 2002 Judgment Act are cumulative, *2 ¶* that statement was dicta because it was "unnecessary to the decision in the case and therefore not precedential," *2 TM.3 & ¶.B30H,* BLACK'S LAW DICTIONARY (12th ed. 2024). A separate panel of the court, squarely presented with

the issue, had held that those requirements are sequential and that judgments no longer need to be filed in the registry of judgments for a lien to attach. *¶¶ 32–34.* The ,S court did not even mention *C.3B-& 2* much less purport to overrule it. *C.3B-& 2* remained controlling law on the sequential nature of the recording requirements despite the footnote dicta in ,S . We therefore presume that when the legislature amended section 201 post-*C.3B-& 2* it saw no need to amend the recording requirements because it was satisfied with the prior judicial interpretation of those requirements in *C.3B-& 2*

¶49 The Mulligans also argue that the court's analysis in ,S favors a cumulative reading of the registry-of-judgments and county-recorder requirements. They maintain that ,S "involved a deep analysis" of section 201 and "laid out a roadmap for how courts should analyze [the Judgment Act's] cumulative amendments over time." Although we are not bound to follow court of appeals decisions, we often look to those decisions for their persuasive value. *@(38:C&:U(A":B$ +$ >0#.3.:7 1.+$ 8OV3(- %3(3&(W'8HHF: ,* 906 P.2d 882, 885 (Utah 1995). But we see little persuasive value in ,S relative to the issue in the present case.

¶50 The court in ,S interpreted a different provision in the 2001 version of the Judgment Act, which did not contain the county-recorder requirement. *2013 UT App 38, ¶ 15, 299 P.3d 613.* The question before the court was whether the registry-of-judgments and information-statement requirements were cumulative. *¶ 28.* Unlike the county-recorder requirement at issue here, the information-statement requirement specified that it was "[i]n addition to" the registry-of-judgments requirement found in section 201(2). *¶ 12* (quoting Utah Code § 78-22-1.5(3) (2001)). This additional language, which expressly made the registry-of-judgments and the information-statement requirements cumulative, easily distinguishes ,S from both *C.3B-& 2* and the present case.

¶51 We endorse *C.3B-& 2* holding that, since July 1, 2002, a lien on real property is created by recording the judgment, along with other required information, with the county recorder where the real property is located. Alum Rock therefore did not need to record the judgment in the registry of judgments, and it created a lien by recording the judgment in the county recorder's office.

Mulligan v. Alum Rock Riverside, LLC, 556 P.3d 21 (2024)
2024 UT 22

## II. BRETT OWNED THE PROPERTY FOR PURPOSES OF ALUM ROCK'S LIEN ATTACHING

¶52 The Mulligans argue that, under the Judgment Act, "[t]here is no basis for any judgment lien against the Property" because the trust, not Brett, held title to the property. Before explaining why we disagree, we pause to address the Mulligans' criticism of the district court's analysis.

¶53 The Mulligans criticize the district court for relying on rule 64E of the Utah Rules of Civil Procedure, rather than the Judgment Act, in concluding that the property is "subject to the execution." Rule 64E allows writs of execution to be issued against property that is "*.: 3& G822&22.88* 0:#&*3-&B8:3*) 8O*he defendant." UTAH R. CIV. P. 64E(a) (emphasis added). The Judgment Act, in contrast, sets the conditions under which a judgment lien attaches in the first instance, providing that real property subject to a judgment lien "includes all the real property ... 8U:&#8* ( BN0.*&# at any time by the **32** judgment debtor during the time the judgment is effective." UTAH CODE § 78B-5-202(7)(c)(ii) (2021) (emphasis added).

¶54 The Mulligans argue that the district court should have focused its analysis on the Judgment Act, rather than on rule 64E, which they contend "has nothing whatsoever to do with whether the Foreign Judgment against Brett personally could become a lien against Property he never owned." But because they principally relied on rule 64E, not the Judgment Act, before the district court, the court's reliance on rule 64E was understandable. In their principal filing below, the Mulligans cited rule 64E and quoted, with emphasis, the rule's language regarding possession and control. In contrast, they mentioned the Judgment Act's "owned or acquired" language only in passing in a footnote.

¶55 It is true that the Mulligans argued to the district court that the property was "never ... 8U:&#8by Brett Del Valle in his individual and personal capacity." (Emphasis added.) Yet they never tied that argument to the language of the Judgment Act, and the thrust of their argument below was that the writ "was not properly available under the express terms" of the "governing Utah Rules of Civil Procedure." In its decision, the court rejected that rule-based argument because rule 64E "does not contain any provision limiting its application to owners of property."

**[10]** ¶56 On appeal, the Mulligans distance themselves from their prior reliance on rule 64E and embrace the Judgment Act's "owned or acquired" language.[5] Under the Judgment Act, real property subject to a judgment lien "includes all the real property... owned or acquired at any time by the judgment debtor during the time the judgment is effective."[6] "#$To the Mulligans, holding title is the essence of ownership. Because Brett "was never in title," they maintain that "he never owned the Property" and the lien never attached to it.

**[11]    [12]** ¶57 When the judgment was entered against Brett, the property was held by the Del Valle Family Trust, which is a revocable trust that Brett formed with his wife, Traci. "A trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of the beneficiaries." *'8:3F) 9(:;  P , '$' 8$-$$' 80:3*A' )0M?8M.)&@32$$3#$* 632 P.2d 869, 872 (Utah 1981). A revocable trust is "[a] trust in which the settlor" (the person who creates the trust) "reserves the right to terminate the trust and recover the trust property and any undistributed income." D&+8B(M)&023 BLACK'S LAW DICTIONARY (12th ed. 2024). One standard estate-planning practice is to form "[a] revocable trust in which the settlor[s] ... are also the trustees and manage the trust for their own benefit during their lifetimes." 5 &23-$ 5 &23K": *& @238O5 &23L 948 P.2d 351, 355 (Utah 1997). When done properly, this strategy serves to "avoid probate of the assets while allowing the settlor to retain control of the trust property during his or her own lifetime." %&.#$

¶58 Under the terms of the Del Valle Family Trust, either Brett or Traci, as co-settlors, may revoke the "community estate" (community property held in trust), wholly or partially. Upon revocation, this property would be delivered to Brett and/or Traci and would continue to be their community property. Similarly, the "separate estate" (separate property and quasi-community property held in trust) may be revoked unilaterally by Brett or Traci, whichever of them contributed the property to the trust; and upon revocation, the property would be delivered to the contributor.

¶59 Brett and Traci may also amend the trust and transfer property from it. While they are both living, Brett and Traci may amend "any of the terms of [the trust] by an instrument in writing signed by [Brett and Traci] and delivered to the Trustee." And they may—acting jointly for community property, or individually for separate and quasi-community property—"transfer property **33** ... out of the trust estate

2024 UT 22

to any other person or organization." In addition, as trustees, Brett and Traci may hold, manage, control, lease, and encumber trust property. With this backdrop, the question is whether, for purposes of the Judgment Act, Brett "owned" the property when the judgment was entered against him, even though the trust held title to it. *&&*UTAH CODE § 78B-5-202(7)(c)(ii) (2021).

¶60 Because "the settlor of a revocable trust necessarily retains the functional equivalent of ownership of the trust assets," 6 AUSTIN WAKEMAN SCOTT ET AL., SCOTT AND ASCHER ON TRUSTS § 15.4.2 (6th ed. 2024), "[i]n ... substantive respects (such as creditors' rights), the property held in a revocable trust is ordinarily to be treated as if it were property of the settlor," RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. a. (AM. L. INST. 2003). Thus, in certain situations—"by reason of a power of revocation, appointment, or withdrawal"—a person may have "the equivalent of ownership of the trust property, even though the legal title to the property is held by the trustee." *&&*§§ 74 cmt. a (AM. L. INST. 2007).

 **[13]**  ¶61 In effect, the Mulligans argue that the trust shielded the property from Brett's judgment creditor, Alum Rock. But under Utah law, "[d]uring the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors." UTAH CODE § 75-7-505(1). That approach is consistent with the general rule that "property held in [a revocable] trust is subject to the claims of creditors of the settlor ... if the same property belonging to the settlor ... would be subject to the claims of the creditors." RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. e (AM. L. INST. 2003). And other courts "generally have concluded that the assets of a revocable trust are properly subject to the claims of the settlor's creditors." *E(:#A +$":#&G9(;* , 372 P.3d 1047, 1050 (Colo. 2016) (en banc) (collecting cases).

¶62 In short, because settlors of revocable trusts can access the full bundle of property-rights sticks, they cannot keep those sticks from their creditors. Here, as co-settlor and co-trustee, Brett retained the hallmarks of ownership over the property. As the district court noted, Brett and Traci could, at any time, "revoke the Trust, ... amend it, ... [or] transfer property from it." Under these circumstances, we hold that, for purposes of the Judgment Act, Brett owned the property at the time the judgment was entered against him.[7] Accordingly, Alum Rock's lien attached to the property when Alum Rock recorded the lien with the county recorder.

### III. THE MULLIGANS HAVE NOT IDENTIFIED A LIMITATION ON THE DISTRICT COURT'S AUTHORITY TO ISSUE A WRIT OF EXECUTION ON PROPERTY LOCATED IN A COUNTY OUTSIDE THE THIRD DISTRICT

¶63 The Mulligans contend that the Third District Court "lacked authority and jurisdiction" to issue the writ because the property sits in Weber County, which is outside the court's geographic boundaries. Because they have not identified a relevant limitation on the district court's jurisdiction to issue the writ, we reject that argument.

¶64 This matter arose when Alum Rock filed a notice of judgment with the Third District Court. There is no question that this was proper, because under the Foreign Judgment Act a foreign judgment like Alum Rock's California judgment "may be filed with the clerk of any district court in Utah." UTAH CODE § 78B-5-302(2). Once Alum Rock domesticated the judgment, the judgment inherited "the same effect ... as a judgment" of a Utah district court. *"#$* § 78B-5-302(3). Such a judgment may be enforced through a writ of execution. *"#$§* 78A-5-102 ("A district court judge may issue all extraordinary writs and other writs necessary to carry into effect the district court judge's orders, judgments, and decrees.").

 **[14]**  ¶65 The Mulligans have not identified any relevant law that would limit a district court's authority to issue a writ of execution to be effectuated in a county outside that court's judicial district. They first cite a venue statute, which provides that "[a]ctions" for certain "causes involving real property **\*34**  shall be tried in the county in which the subject of the action ... is situated." *"#$§* 78B-3-301(1) (2021). Those "causes" are

> for the recovery of real property, or of an estate or interest in the property; ... for the determination ... of the right or interest in the property; ... for injuries to real property; ... for the partition of real property; and ... for the foreclosure of all liens and mortgages on real property.

*"#$*

¶66 But the Mulligans' reliance on this statute is misguided because no "[a]ction[ ] ... involving real property" is at issue here. *%&&#$* Indeed, no cause of action is at issue at all. The causes of action that gave rise to Alum Rock's judgment against Brett (for breach of contract) were brought in California and, from what we can tell, had nothing to do with the Weber County property. Simply put, this proceeding to enforce that judgment through a writ of execution is not an action involving real property governed by the venue statute. [8]

[15]  ¶67 The Mulligans also cite rule 64 of the Utah Rules of Civil Procedure as an additional limitation on the district court's authority. According to them, a distinction in word choice between two sentences in rule 64(d)(1) "precludes courts in one county from ordering seizure of real property located in a different county." Rule 64(d)(1) explains how court clerks are to issue writs for real and personal property:

> If the writ directs the seizure of real property, the court clerk will issue the writ to the sheriff of the county in which the real property is located. If the writ directs the seizure of personal property, the court may issue the writ to an officer of any county.

UTAH R. CIV. P. 64(d)(1). From this language, the Mulligans glean that "the rule expressly authorizes any court in any county in Utah to direct the seizure ... of *G&*28:(JG%G&*3A* located in any county in Utah" but does not do the same for *%&) G%G&*3A*

¶68 Although the Mulligans are correct that the rule distinguishes between writs of execution for personal property versus real property and requires that the latter be directed to the "sheriff of the county in which the real property is located," *2&&#§* the rule says nothing about which court may issue the writ. Rule 64(d)(1) contains no requirement that the district court issuing the writ be in the same county as the real property. If anything, by specifying that writs involving real property must be "issue[d] ... to the sheriff of the county in which the real property is located," *2&&#§* the rule seems to presuppose that the issuing court may be located elsewhere.

¶69 The Mulligans have not established that the district court exceeded its authority by issuing the writ. Neither the venue statute nor rule 64(d)(1) prohibits a district court from issuing a writ of execution for real property located in another Utah judicial district.

### CONCLUSION

¶70 Although Alum Rock needed to comply with the Judgment Act's requirements for creating a lien, filing in the registry of judgments was not one of those requirements. The lien attached to the property once Alum Rock recorded the judgment with the Weber County Recorder's Office. When the judgment was recorded, Brett owned the property for purposes of the Judgment Act because the property's title was held in a revocable trust settled by Brett and his wife. And the Mulligans have not shown that the district court lacked authority to issue the writ. Accordingly, we affirm.

**All Citations**

556 P.3d 21, 2024 UT 22

---

### Footnotes

1    We refer to Utah Code, Title 78B, Chapter 5, Part 2 as the Judgment Act. Effective July 1, 2024, the Judgment Act was renumbered, and the legislature made minor stylistic changes. We cite the version in effect at the time the district court issued the writ.

2    This venue statute has been renumbered and slightly altered, effective July 1, 2024. *See* UTAH CODE § 78B-3a-202(1). We cite the version in effect at the time the district court issued the writ.

3    For examples of how section 201 has been amended over the years, see H.B. 46, 2011 Leg., Gen. Sess. (Utah 2011) (available at https://le.utah.gov/~2011/bills/static/HB0046.html); H.B. 315, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/hbillenr/hb0315.htm); H.B. 16, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/static/hb0016.html); H.B. 251, 2023 Leg., Gen. Sess. (Utah 2023) (available at https://le.utah.gov/~2023/bills/static/HB0251.html).

4    There was some uncertainty about whether the judgment was recorded in the registry of judgments, but the court assumed that it was. *See* ⚑ *T3 Pros., LLC v. Persimmon Invs., Inc.*, 2013 UT App 38, ¶¶ 16, 28, 299 P.3d 613.

5    Alum Rock has not challenged this issue as unpreserved.

6    The Utah Code defines "[r]eal property" as "any right, title, estate, or interest in land." UTAH CODE § 57-1-1(3).

7    Neither side has addressed whether Traci's joint ownership of the property has any effect on the judgment lien. For that reason, we express no opinion on the matter.

8    For the same reason, the caselaw that the Mulligans cite regarding "action[s]" that "involve[ ] title to real property" misses the mark. *See* ⚑ *Calder v. Third Jud. Dist. Ct.*, 2 Utah 2d 309, 273 P.2d 168, 171 (1954).

---

End of Document                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

West's Utah Code Annotated
  Title 75. Utah Uniform Probate Code (Refs & Annos)
    Chapter 7. Utah Uniform Trust Code (Refs & Annos)
      Part 5. Creditor's Claims--Spendthrift and Discretionary Trusts (Refs & Annos)

U.C.A. 1953 § 75-7-505

§ 75-7-505. Creditor's claim against settlor

Effective: September 1, 2024

Currentness

Regardless of whether the terms of a trust contain a spendthrift provision, the following rules apply:

(1) During the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors. If a revocable trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution.

(2)(a) With respect to an irrevocable trust other than an irrevocable trust that meets the requirements of Section 75B-1-302, a creditor or assignee of the settlor may reach the maximum amount that can be distributed to or for the settlor's benefit.

(b) With respect to an irrevocable trust that has more than one settlor, other than an irrevocable trust that meets the requirements of Section 75B-1-302, the amount a creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution.

(c) Notwithstanding Subsections (2)(a) and (b), a creditor of a settlor may not satisfy the creditor's claim from an irrevocable trust solely because the trustee may make a discretionary distribution reimbursing the settlor for income tax liability of the settlor attributable to the income of the irrevocable trust, when the distribution is:

(i) subject to the discretion of a trustee who is not the settlor;

(ii) subject to the consent of an advisor who is not the settlor; or

(iii) at the direction of an advisor who is not the settlor.

(3) After the death of a settlor, and subject to the settlor's right to direct the source from which liabilities will be paid, the property of a trust that was revocable at the settlor's death, but not property received by the trust as a result of the death of the settlor which is otherwise exempt from the claims of the settlor's creditors, is subject to claims of the settlor's creditors, costs of administration of the settlor's estate, the expenses of the settlor's funeral and disposal of remains, and statutory allowances to a surviving spouse and children to the extent the settlor's probate estate is inadequate to satisfy those claims, costs, expenses, and allowances.

**Credits**

Laws 2004, c. 89, § 54, eff. July 1, 2004; Laws 2017, c. 125, § 2, eff. May 9, 2017; Laws 2017, c. 204, § 31, eff. May 9, 2017; Laws 2023, c. 421, § 3, eff. May 3, 2023; Laws 2024, c. 364, § 9, eff. Sept. 1, 2024.

**Editors' Notes**

### UNIFORM LAW COMMENTS[UTC § 505]

Subsection (a)(1) states what is now a well accepted conclusion, that a revocable trust is subject to the claims of the settlor's creditors while the settlor is living. "## Restatement (Third) of Trusts Section 25 cmt. e (Tentative Draft No. 1, approved 1996). Such claims were not allowed at common law, however. "## Restatement (Second) of Trusts Section 330 cmt. o (1959). Because a settlor usually also retains a beneficial interest that a creditor may reach under subsection (a)(2), the common law rule, were it retained in this Code, would be of little significance. "## Restatement (Second) of Trusts Section 156(2) (1959).

Subsection (a)(2), which is based on Restatement (Third) of Trusts Section 58(2) and cmt. e (Tentative Draft No. 2, approved 1999), and Restatement (Second) of Trusts Section 156 (1959), follows traditional doctrine in providing that a settlor who is also a beneficiary may not use the trust as a shield against the settlor's creditors. The drafters of the Uniform Trust Code concluded that traditional doctrine reflects sound policy. Consequently, the drafters rejected the approach taken in States like Alaska and Delaware, both of which allow a settlor to retain a beneficial interest immune from creditor claims. "## Henry J. Lischer, Jr., *$%&#'()*+"#( ,- %(#*()%.-0'('1 ,2334#2-#' (%5)24)3)(* 35* Real Prop. Prob. & Tr. J. 479 (2000)*; John E. Sullivan, III, *70(().8 (9#:03# +82).'( "#3;!"#(3#≠-0'('1 =%>(9#$#32>2-#/-0'( 52> ?%&@)#(#>)(9.A.;;'9%#/-0'('* , 23 Del. J. Corp. L. 423 (1998). Under the Code, whether the trust contains a spendthrift provision or not, a creditor of the settlor may reach the maximum amount that the trustee could have paid to the settlor-beneficiary. If the trustee has discretion to distribute the entire income and principal to the settlor, the effect of this subsection is to place the settlor's creditors in the same position as if the trust had not been created. For the definition of "settlor," see Section 103(14).

This section does not address possible rights against a settlor who was insolvent at the time of the trust's creation or was rendered insolvent by the transfer of property to the trust. This subject is instead left to the State's law on fraudulent transfers. A transfer to the trust by an insolvent settlor might also constitute a voidable preference under federal bankruptcy law.

Subsection (a)(3) recognizes that a revocable trust is usually employed as a will substitute. As such, the trust assets, following the death of the settlor, should be subject to the settlor's debts and other charges. However, in accordance with traditional doctrine, the assets of the settlor's probate estate must normally first be exhausted before the assets of the revocable trust can be reached. This section does not attempt to address the procedural issues raised by the need first to exhaust the decedent's probate estate before reaching the assets of the revocable trust. Nor does this section address the priority of creditor claims or liability of the decedent's other nonprobate assets for the decedent's debts and other charges. Subsection (a)(3), however, does ratify the typical pourover will, revocable trust plan. As long as the rights of the creditor or family member claiming a statutory allowance are not impaired, the settlor is free to shift liability from the probate estate to the revocable trust. Regarding other issues associated with potential liability of nonprobate assets for unpaid claims, see Section 6-102 of the Uniform Probate Code, which was added to that Code in 1998.

Subsection (b)(1) treats a power of withdrawal as the equivalent of a power of revocation because the two powers are functionally identical. This is also the approach taken in Restatement (Third) of Trusts Section 56 cmt. b (Tentative Draft No. 2, approved 1999). If the power is unlimited, the property subject to the power will be fully subject to the claims of the power holder's creditors, the same as the power holder's other assets. If the power holder retains the power until death, the property subject to the power may be liable for claims and statutory allowances to the extent the power holder's probate estate is insufficient to satisfy those claims and allowances. For powers limited either in time or amount, such as a right to withdraw a $10,000

annual exclusion contribution within 30 days, this subsection would limit the creditor to the $10,000 contribution and require the creditor to take action prior to the expiration of the 30-day period.

Upon the lapse, release, or waiver of a power of withdrawal, the property formerly subject to the power will normally be subject to the claims of the power holder's creditors and assignees the same as if the power holder were the settlor of a now irrevocable trust. Pursuant to subsection (a)(2), a creditor or assignee of the power holder generally may reach the power holder's entire beneficial interest in the trust, whether or not distribution is subject to the trustee's discretion. However, following the lead of Arizona Revised Statutes Section 14-7705(g) and Texas Property Code Section 112.035(e), subsection (b)(2) creates an exception for trust property which was subject to a Crummey or five and five power. Upon the lapse, release, or waiver of a power of withdrawal, the holder is treated as the settlor of the trust only to the extent the value of the property subject to the power at the time of the lapse, release, or waiver exceeded the greater of the amounts specified in IRC Sections 2041(b)(2) or 2514(e) [greater of 5% or $5,000], or IRC Section 2503(b) [$10,000 in 2001].

The Uniform Trust Code does not address creditor issues with respect to property subject to a special power of appointment or a testamentary general power of appointment. For creditor rights against such interests, see Restatement (Property) Second: Donative Transfers Sections 13.1-13.7 (1986).

U.C.A. 1953 § 75-7-505, UT ST § 75-7-505
Current with laws through the 2024 Fourth Special Session. Some statutes sections may be more current, see credits for details

End of Document                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT I

File No. 014551
When recorded return to:
Lincoln Title Insurance Agency
4723 Harrison Boulevard, Suite 201
Ogden, UT 84403

Mail tax notice to:
Grantee
1201 Estelle Lane
Newport Beach, CA 92660

E# 2261271 PG 1 OF 1
ERNEST D ROWLEY, WEBER COUNTY RECORDER
03-MAY-07  346 PM  FEE $10.00 DEP VD
REC FOR: LINCOLN TITLE INSURANCE AGENCY
ELECTRONICALLY RECORDED

# SPECIAL WARRANTY DEED

Basinview Development, LC,                         "Grantor",

hereby CONVEYS and WARRANTS against all claiming by, through, or under it to:

Brett H. Del Valle and Traci M. Del Valle, Trustees of The Del Valle Family Trust Dated October 30, 2002,                "Grantees",

for the sum of TEN DOLLARS and other good and valuable consideration the following described tract of land in Weber County, State of Utah:

ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, WEBER COUNTY, UTAH, ACCORDING TO THE OFFICIAL PLAT THEREOF.

20-108-0007

SUBJECT TO: County and/or City taxes not delinquent; Bonds and/or Special Assessments not delinquent and Covenants, Conditions, Restrictions, Rights-of-Way, Easements, and Reservations now of Record or enforceable in law or equity.

WITNESS, the hand of said grantor, this 27 day of April, A.D. 2007.

Basinview Development, LC
By:

Mark A. Bates, Managing Member

STATE OF UTAH      )
            )ss.
COUNTY OF Weber      )

On the 27 day of April, 2007, personally appeared before me, Mark A. Bates, who did say that he is a Managing Member of Basinview Development, LC, that the foregoing instrument was signed on behalf of said Limited Liability Company by authority of Basinview Development, LC and that he duly acknowledged to me that said Limited Liability Company executed the same.

Denise W Page
Notary Public

My Commission Expires:

Residing at:

DENISE W PAGE
NOTARY PUBLIC - STATE OF UTAH
4723 HARRISON BLVD
OGDEN, UT 84403
COMM. EXP. 11-05-2009

Bates #000052

# EXHIBIT J

West's Utah Code Annotated
  Title 57. Real Estate
    Chapter 3. Recording of Documents (Refs & Annos)
      Part 1. General Provisions

U.C.A. 1953 § 57-3-102

§ 57-3-102. Record imparts notice--Change in interest rate--Validity
of document--Notice of unnamed interests--Conveyance by grantee

Currentness

(1) Each document executed, acknowledged, and certified, in the manner prescribed by this title, each original document or certified copy of a document complying with Section 57-4a-3, whether or not acknowledged, each copy of a notice of location complying with Section 40-1-4, and each financing statement complying with Section 70A-9a-502, whether or not acknowledged shall, from the time of recording with the appropriate county recorder, impart notice to all persons of their contents.

(2) If a recorded document was given as security, a change in the interest rate in accordance with the terms of an agreement pertaining to the underlying secured obligation does not affect the notice or alter the priority of the document provided under Subsection (1).

(3) This section does not affect the validity of a document with respect to the parties to the document and all other persons who have notice of the document.

(4) The fact that a recorded document recites only a nominal consideration, names the grantee as trustee, or otherwise purports to be in trust without naming beneficiaries or stating the terms of the trust does not charge any third person with notice of any interest of the grantor or of the interest of any other person not named in the document.

(5) The grantee in a recorded document may convey the interest granted to him free and clear of all claims not disclosed in the document in which he appears as grantee or in any other document recorded in accordance with this title that sets forth the names of the beneficiaries, specifies the interest claimed, and describes the real property subject to the interest.

**Credits**
Laws 1977, c. 272, § 54; Laws 1985, c. 159, § 7; Laws 1988, c. 155, § 14; Laws 1989, c. 88, § 8; Laws 1998, c. 61, § 2, eff. July 1, 1998; Laws 1998, c. 85, § 4, eff. May 4, 1998; Laws 2000, c. 252, § 11, eff. July 1, 2001.

**Codifications** R.S. 1898, § 2000; C.L. 1907, § 2000; C.L. 1917, § 4900; R.S. 1933, § 78-3-2; C. 1943, § 78-3-2; C. 1953, § 57-3-2.

Notes of Decisions (143)

U.C.A. 1953 § 57-3-102, UT ST § 57-3-102

Current with laws through the 2024 Fourth Special Session. Some statutes sections may be more current, see credits for details

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT K



**RYAN ARBON, SHERIFF**
AARON PERRY, CHIEF DEPUTY
PHILLIP REESE, CHIEF DEPUTY
JOSH GARD, CHIEF DEPUTY

Weber County Sheriff's Office
## Notice of Sale
## Real Property

Date of Sale: **January 16th 2025**

Time of Sale: 12:00 p.m.

Place of Sale: Ogden Second District Court – Front Steps
2525 Grant Avenue, Ogden, Utah

## Legal Description of Sale Property:

<u>Street Address</u>: 1453 S. Basinview Rd. Huntsville, Utah 84317

<u>Legal Description</u>: ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, 1ST AMENDMENT, WEBER COUNTY, UTAH

<u>Parcel No</u>. **20-119-0007**



Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Office: (385) 355-4826
bradley.tilt@freemanlovell.com
*Attorney for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, | **CERTIFICATE OF SERVICE** |
| Plaintiffs | |
| v. | Case No. 240908957 |
| ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 | Judge CAMILLE NEIDER |
| Defendants. | |

I certify that on December 23, 2024, I caused true and correct copies of the following:

1. Complaint;

2. Lis Pendens;

1

3.  *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction and Memorandum in Support*;

4.  Declaration of Felicia B. Canfield in Support of *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction*; and,

5.  Proposed Order Granting *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction*

to be served in the manner indicated below to the following-listed parties at their respective addresses listed below:

| | |
|---|---|
| Bradley L. Tilt<br>FREEMAN LOVELL, PLLC<br>4568 S Highland Drive, Suite 290<br>Salt Lake City, Utah 84117<br>Office: 385-355-4826<br>bradley.tilt@freemanlovell.com<br>*Attorneys for Plaintiffs* | _____ Hand Delivery<br>_____ First Class, United States Mail,<br>          Postage Prepaid<br>___X___ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>_____ Email<br>_____ Other: |

*/s/ Felicia B. Canfield*

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

**Tax ID No. 20-119-0007**

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

---

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **ORDER GRANTING *EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> Case No. 240908957 <br><br> Judge CAMILLE NEIDER |

The court has reviewed the *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction* (the "**Motion**") filed on December 23, 2024 and the *Declaration of Felicia B. Canfield* in support and all exhibits thereto.

Pursuant to Rule 65A of the Utah Rules of Civil Procedure and otherwise, **IT IS**

**HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1.      Plaintiffs Motion is granted.

2.      Defendant Alum Rock Riverside, LLC ("**Defendant**" or "**Alum Rock**"), and anyone acting by, with, or through Alum Rock, is **HEREBY RESTRAINED** from continuing with, allowing, and/or holding and is **ORDERED TO CANCEL** the Sheriff's Sale scheduled for January 16, 2025 at 12:00 p.m., including pursuant the *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, Civil No. 206927043, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**") and/or to the Writ of Execution issued on June 22, 2021 in the writ proceeding (the "**Writ of Execution**"), on the real property located in Weber County, Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.
>
> Tax ID No. 20-119-0007

3.      Defendant Alum Rock is further **RESTRAINED** from and **ORDERED** to immediately **CEASE** any and all efforts to foreclose on and/or sell the Property pursuant to the Alum Rock Lien or the Writ of Execution.

4.      The Court further **HEREBY ISSUES** a preliminary injunction enjoining Defendant Alum Rock from taking any further action to foreclose the Alum Rock Lien and/or

2

sell the Property pending the conclusion of this action.

5.      Copies of this **ORDER GRANTING *EX-PARTE* MOTION OF PLAINTIFFS**

**FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY**

**INJUNCTION** may be recorded in the office of the Weber County recorder in the State of Utah.

The GROUNDS for this Order, the TRO and preliminary injunction are as follows:

Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or

"**Plaintiffs**") each are individual owners of record of the Property, which is their home and

irreplaceable real property, pursuant to a *Warranty Deed* that was recorded on May 11, 2021 as

Entry No. 3151874 in the official records of the Weber County Recorder's office (the

"**Warranty Deed**").  Plaintiffs obtained a purchase money loan secured by a Deed of Trust that

was recorded on the Property on August 2, 2021 as Entry No. 3172556 (the "**Mulligans' Trust**

**Deed**").  Any foreclosure of the Alum Rock Lien would evict the Mulligans from their home and

deprive the Mulligans' Trust Deed of security for their loan.

Plaintiffs have demonstrated that based on the material facts and the applicable statutory

and case law that they meet each of the four Rule 65A elements necessary to obtain the TRO and

preliminary injunction.  Plaintiffs have demonstrated that: (1) there is a substantial likelihood

that Plaintiffs will prevail on the merits of their underlying claims; (2) Plaintiffs will suffer

irreparable harm unless this Court issues a TRO and preliminary injunction; (3) the threatened

injury to Plaintiffs outweighs whatever damage the TRO or preliminary injunction may cause

Defendant; and this (4) Court's issuance of a TRO and preliminary injunction benefit the public

interest and is not adverse to it.

Because Plaintiffs' claims in this action involve the correct application of Utah statutes

and law pertaining to Quiet Title claims, Equitable Subordination and Equitable Subrogation,

and to Declaratory Judgment that they are Bona Fide Purchasers for value without Constructive

Notice of any claims of Defendant, and the application of Utah Code Sections 75-7-505 and 57-

3-102, and the likelihood of success thereunder, Plaintiffs are entitled to a full and fair

adjudication of their claims prior to any further attempt by Defendant Alum Rock to foreclose on

and/or sell the Property pursuant to the Alum Rock Lien.

The Sheriff's Sale and any foreclosure of and/or attempt to sell the Property pursuant to

the Alum Rock Lien will cause immediate and irreparable injury, loss and damage to Plaintiffs

and is/are therefore hereby restrained and enjoined pending further order of this Court.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***

4

Benjamin D. Johnson (10275)
KC Hooker (18018)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Email: ben.johnson@btjd.com;
kchooker@btjd.com
*Attorneys for Defendant Alum Rock Riverside, LLC*

---

## IN THE SECOND JUDICIAL DISTRICT COURT, ODGEN WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN,<br><br>        Plaintiffs,<br><br>v.<br><br>ALUM ROCK RIVERSIDE, LLC, a California limited liability company; BRETT H. DEL VALLE and TRACI M. DEL VALLE as Co-Trustees of the Del Valle Family Trust dated October 30, 2002,<br><br>        Defendants. | **NOTICE OF APPEARANCE OF COUNSEL**<br><br>Case No. 240908957<br><br>Judge: Camille Neider |

TO THE COURT AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Benjamin D. Johnson and KC Hooker of the law firm

of Bennett Tueller Johnson & Deere hereby enter their appearance in the above-entitled case

as counsel for Defendant Alum Rock Riverside, LLC.  All documents, correspondence, and

court pleadings generated in this case should, until further notice, be directed to:

Benjamin D. Johnson (10275)
KC Hooker (18018)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Email: ben.johnson@btjd.com;
kchooker@btjd.com


DATED this 26th day of December, 2024.

BENNETT TUELLER JOHNSON & DEERE


/s/  *KC Hooker*
Benjamin D. Johnson
KC Hooker
*Attorneys for Defendant Alum Rock Riverside, LLC*

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of December, 2024, I caused a true and correct copy of the foregoing **NOTICE OF APPEARANCE OF COUNSEL** to be electronically filed with the Court's ECF system and served by the method indicated below to the following:

Bradley L. Tilt                                      (X)    GreenFiling ECF
FREEMAN LOVELL, PLLC                         (  )    E-Mailed
4568 S Highland Drive, Suite 290           (  )    E-Mail via GreenFiling
Salt Lake City, Utah 84117                     (  )    U.S. Mail, Postage Prepaid
bradley.tilt@freemanlovell.com              (  )    U.S. Mail via GreenFiling
*Attorney for Plaintiffs*                          (  )    Certified Mail


Felicia B. Canfield                                 (X)    GreenFiling ECF
CANFIELD LAW LLC                              (  )    E-Mailed
2413 Newton Avenue                            (  )    E-Mail via GreenFiling
Cody, WY 82414                                   (  )    U.S. Mail, Postage Prepaid
canfieldlawllc@gmail.com                     (  )    U.S. Mail via GreenFiling
*Attorneys for Plaintiffs*                        (  )    Certified Mail


*/s/ Angelica Torres*

3

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

**Tax ID No. 20-119-0007**

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

### IN THE SECOND DISTRICT COURT IN AND FOR
### WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN,<br><br>          Plaintiffs<br><br>     v.<br><br>ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002<br><br>          Defendants. | **ORDER GRANTING *EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Case No. 240908957<br><br>Judge CAMILLE NEIDER |

The court has reviewed the *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary*

1

*Restraining Order and Preliminary Injunction* (the "**Motion**") filed on December 23, 2024 and the *Declaration of Felicia B. Canfield* in support and all exhibits thereto.

Pursuant to Rule 65A of the Utah Rules of Civil Procedure and otherwise, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1.  Plaintiffs Motion is granted.

2.  Defendant Alum Rock Riverside, LLC ("**Defendant**" or "**Alum Rock**"), and anyone acting by, with, or through Alum Rock, is **HEREBY RESTRAINED** from continuing with, allowing, and/or holding and is **ORDERED TO CANCEL** the Sheriff's Sale scheduled for January 16, 2025 at 12:00 p.m., including pursuant the *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, Civil No. 206927043, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**") and/or to the Writ of Execution issued on June 22, 2021 in the writ proceeding (the "**Writ of Execution**"), on the real property located in Weber County, Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.
>
> Tax ID No. 20-119-0007

3.  Defendant Alum Rock is further **RESTRAINED** from and **ORDERED** to

December 26, 2024 02:38 PM                                                                                          2 of 4

immediately **CEASE** any and all efforts to foreclose on and/or sell the Property pursuant to the Alum Rock Lien or the Writ of Execution.

4.    The Court further **HEREBY ISSUES** a preliminary injunction enjoining Defendant Alum Rock from taking any further action to foreclose the Alum Rock Lien and/or sell the Property pending the conclusion of this action.

5.    Copies of this **ORDER GRANTING *EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** may be recorded in the office of the Weber County recorder in the State of Utah.

<u>The GROUNDS for this Order, the TRO and preliminary injunction are as follows</u>:

Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or "**Plaintiffs**") each are individual owners of record of the Property, which is their home and irreplaceable real property, pursuant to a *Warranty Deed* that was recorded on May 11, 2021 as Entry No. 3151874 in the official records of the Weber County Recorder's office (the "**Warranty Deed**"). Plaintiffs obtained a purchase money loan secured by a Deed of Trust that was recorded on the Property on August 2, 2021 as Entry No. 3172556 (the "**Mulligans' Trust Deed**"). Any foreclosure of the Alum Rock Lien would evict the Mulligans from their home and deprive the Mulligans' Trust Deed of security for their loan.

Plaintiffs have demonstrated that based on the material facts and the applicable statutory and case law that they meet each of the four Rule 65A elements necessary to obtain the TRO and preliminary injunction. Plaintiffs have demonstrated that: (1) there is a substantial likelihood

3

that Plaintiffs will prevail on the merits of their underlying claims; (2) Plaintiffs will suffer irreparable harm unless this Court issues a TRO and preliminary injunction; (3) the threatened injury to Plaintiffs outweighs whatever damage the TRO or preliminary injunction may cause Defendant; and this (4) Court's issuance of a TRO and preliminary injunction benefit the public interest and is not adverse to it.

Because Plaintiffs' claims in this action involve the correct application of Utah statutes and law pertaining to Quiet Title claims, Equitable Subordination and Equitable Subrogation, and to Declaratory Judgment that they are Bona Fide Purchasers for value without Constructive Notice of any claims of Defendant, and the application of Utah Code Sections 75-7-505 and 57-3-102, and the likelihood of success thereunder, Plaintiffs are entitled to a full and fair adjudication of their claims prior to any further attempt by Defendant Alum Rock to foreclose on and/or sell the Property pursuant to the Alum Rock Lien.

The Sheriff's Sale and any foreclosure of and/or attempt to sell the Property pursuant to the Alum Rock Lien will cause immediate and irreparable injury, loss and damage to Plaintiffs and is/are therefore hereby restrained and enjoined pending further order of this Court.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

### IN THE SECOND DISTRICT COURT IN AND FOR
### WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and<br>JOHN P. MULLIGAN,<br><br>    Plaintiffs<br><br>    v.<br><br>ALUM ROCK RIVERSIDE, LLC, a California<br>limited liability company; Brett H. Del Valle<br>and Traci M. Del Valle as Co-Trustees of the<br>Del Valle Family Trust dated October 30, 2002<br><br>    Defendants. | **REQUEST TO SUBMIT FOR<br>DECISION**<br>***EX-PARTE* MOTION OF PLAINTIFFS<br>FOR ISSUANCE OF A TEMPORARY<br>RESTRAINING ORDER AND<br>PRELIMINARY INJUNCTION**<br><br><br>Case No. 240908957<br><br>Judge CAMILLE NEIDER |

Plaintiffs Molly J. Mulligan and John P. Mulligan ("Plaintiffs") request the Clerk of the

Court to submit to the Court for decision their Ex-Parte Motion of Plaintiffs for Issuance of a

Temporary Restraining Order and Preliminary Injunction, which is listed as item number 1 in the

list below, together with all other items in the list below which are all of the filings on that

motion:

1. **Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction**, dated and filed December 24, 2024;

2. Declaration of Felicia B. Canfield, and Exhibits A-K thereto, dated and filed December 24, 2024; and,

3. Proposed Order Granting Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction, dated and filed December 24, 2024, in .rtf format.


DATED December 26, 2024.

CANFIELD LAW LLC

*/s/ Felicia B. Canfield*
Felicia B. Canfield
*Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on December 26, 2024, I caused a true and correct copy of the foregoing **REQUEST TO SUBMIT FOR DECISION EX-PARTE MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMIAY INJUNCTION** to be served in the manner indicated to the following parties at the addresses listed below:

| | |
|---|---|
| Bradley L. Tilt<br>FREEMAN LOVELL, PLLC<br>4568 S Highland Drive, Suite 290<br>Salt Lake City, Utah 84117<br>Office: 385-355-4826<br>bradley.tilt@freemanlovell.com<br>*Attorneys for Plaintiffs* | _____ Hand Delivery<br>_____ First Class, United States Mail,<br>      Postage Prepaid<br>\_\_X\_\_ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>_____ Email<br>_____ Other: |
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JONSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, Utah 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Defendant Alum Rock Riverside LLC* | _____ Hand Delivery<br>_____ First Class, United States Mail,<br>      Postage Prepaid<br>\_\_X\_\_ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>\_\_X\_\_ Email<br>_____ Other:_____ |

_/s/ Felicia B. Canfield_

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

**Tax ID No. 20-119-0007**

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

**IN THE SECOND DISTRICT COURT IN AND FOR
WEBER COUNTY, STATE OF UTAH**

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN,<br><br>Plaintiffs<br><br>v.<br><br>ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002<br><br>Defendants. | **ORDER GRANTING *EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Case No. 240908957<br><br>Judge CAMILLE NEIDER |

The court has reviewed the *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction* (the "**Motion**") filed on December 23, 2024 and the *Declaration of Felicia B. Canfield* in support and all exhibits thereto.

Pursuant to Rule 65A of the Utah Rules of Civil Procedure and otherwise, **IT IS**

**HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

    1.      1.      Plaintiffs Motion is granted.

    2.      2.      Defendant Alum Rock Riverside, LLC ("**Defendant**" or "**Alum Rock**"),

and anyone acting by, with, or through Alum Rock, is **HEREBY RESTRAINED** from

continuing with, allowing, and/or holding and is **ORDERED TO CANCEL** the Sheriff's Sale

scheduled for January 16, 2025 at 12:00 p.m., including pursuant the *Notice of Judgment* filed on

October 23, 2020 in the Third Judicial District Court, Salt Lake County, Civil No. 206927043,

which Notice was recorded in the office and general records of the Weber County Recorder on

October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**") and/or to the Writ of

Execution issued on June 22, 2021 in the writ proceeding (the "**Writ of Execution**"), on the real

property located in Weber County, Utah, commonly known as 1453 South Basinview Road,

Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT,
> according to the official plat thereof on file and of record in the office of the Weber
> County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across
> Basinview Road (a private road), as shown on the official dedicated plat, to and from
> said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

    1.      3.      Defendant Alum Rock is further **RESTRAINED** from and **ORDERED** to

immediately **CEASE** any and all efforts to foreclose on and/or sell the Property pursuant to the

Alum Rock Lien or the Writ of Execution.

    2.      4.      The Court further **HEREBY ISSUES** a preliminary injunction enjoining

Defendant Alum Rock from taking any further action to foreclose the Alum Rock Lien and/or

sell the Property pending the conclusion of this action.

3.        5.        Copies of this **ORDER GRANTING *EX-PARTE* MOTION OF**

**PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND**

**PRELIMINARY INJUNCTION** may be recorded in the office of the Weber County recorder

in the State of Utah.

The GROUNDS for this Order, the TRO and preliminary injunction are as follows:

Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or

"**Plaintiffs**") each are individual owners of record of the Property, which is their home and

irreplaceable real property, pursuant to a *Warranty Deed* that was recorded on May 11, 2021 as

Entry No. 3151874 in the official records of the Weber County Recorder's office (the

"**Warranty Deed**").   Plaintiffs obtained a purchase money loan secured by a Deed of Trust that

was recorded on the Property on August 2, 2021 as Entry No. 3172556 (the "**Mulligans' Trust**

**Deed**").   Any foreclosure of the Alum Rock Lien would evict the Mulligans from their home

and deprive the Mulligans' Trust Deed of security for their loan.

Plaintiffs have demonstrated that based on the material facts and the applicable statutory

and case law that they meet each of the four Rule 65A elements necessary to obtain the TRO and

preliminary injunction.   Plaintiffs have demonstrated that: (1) there is a substantial likelihood

that Plaintiffs will prevail on the merits of their underlying claims; (2) Plaintiffs will suffer

irreparable harm unless this Court issues a TRO and preliminary injunction; (3) the threatened

injury to Plaintiffs outweighs whatever damage the TRO or preliminary injunction may cause

Defendant; and this (4) Court's issuance of a TRO and preliminary injunction benefit the public

interest and is not adverse to it.

Because Plaintiffs' claims in this action involve the correct application of Utah statutes

and law pertaining to Quiet Title claims, Equitable Subordination and Equitable Subrogation, and to Declaratory Judgment that they are Bona Fide Purchasers for value without Constructive Notice of any claims of Defendant, and the application of Utah Code Sections 75-7-505 and 57-3-102, and the likelihood of success thereunder, Plaintiffs are entitled to a full and fair adjudication of their claims prior to any further attempt by Defendant Alum Rock to foreclose on and/or sell the Property pursuant to the Alum Rock Lien.

The Sheriff's Sale and any foreclosure of and/or attempt to sell the Property pursuant to the Alum Rock Lien will cause immediate and irreparable injury, loss and damage to Plaintiffs and is/are therefore hereby restrained and enjoined pending further order of this Court.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***

Benjamin D. Johnson (10275)
KC Hooker (18018)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Email: ben.johnson@btjd.com;
kchooker@btjd.com
*Attorneys for Defendant Alum Rock Riverside, LLC*

---

### IN THE SECOND JUDICIAL DISTRICT COURT, ODGEN
### WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and<br>JOHN P. MULLIGAN,<br><br>Plaintiffs,<br><br>v.<br><br>ALUM ROCK RIVERSIDE, LLC, a<br>California limited liability company; BRETT<br>H. DEL VALLE and TRACI M. DEL<br>VALLE as Co-Trustees of the Del Valle<br>Family Trust dated October 30, 2002,<br><br>Defendants. | **OBJECTION TO**<br><br>**ORDER GRANTING EX PARTE<br>MOTION FOR ISSUANCE OF A<br>TEMPORARY RESTRAINING<br>ORDER AND PRELIMINARY<br>INJUNCTION; AND**<br><br>**REQUEST TO SUBMIT**<br><br>Case No. 240908957<br><br>Judge: Camille Neider |

Defendant Alum Rock Riverside, LLC ("**Alum Rock**"), pursuant to Rule 7(j) and

Rule 65A of the Utah Rules of Civil Procedure, files this objection to Plaintiffs Molly J.

Mulligan and John P. Mulligan's (collectively, the "**Mulligans**") (1) Proposed Order

Granting *Ex-Parte* Motion for Issuance of a Temporary Restraining Order and Preliminary

Injunction (the "**Proposed Order**"); (2) the accompanying *Ex-Parte* Motion for Issuance of

a Temporary Restraining Order (the "**Ex Parte Motion**"); and (3) the request to submit.

## **BRIEF BACKGROUND**

The Ex Parte Motion and Proposed Order are the latest of a string of successive lawsuits the Mulligans have filed in an attempt to stop enforcement of a writ of execution that has been upheld by the Utah Supreme Court. On July 18, 2024, the Utah Supreme Court held that (1) Alum Rock has a valid lien against the Mulligans' property and (2) that Judge Mow in the Third District issued a valid writ of execution against the property. *See Mulligan v. Alum Rock Riverside LLC*, 2024 UT 22. Less than a week after the Utah Supreme Court conclusively disposed of the Mulligans' appeal, the Mulligans attempted the challenge the writ of execution a second time by adding claims against Alum Rock in Case No. 210904774, currently pending before Judge Hyde in the Second District. Judge Hyde rejected the Mulligans' proposed claims and asked them to prepare an order. But rather than prepare an order, the Mulligans filed this *third* lawsuit and are seeking to assert the very claims that Judge Hyde already rejected. The Mulligans are seeking to collaterally attack the valid judgments from other courts and are engaging in a clear pattern of forum shopping.

## **ARGUMENT**

The Mulligans ask the Court to enter a temporary restraining order *ex parte* without affording Alum Rock the opportunity to respond. The Court should no do so because the Mulligans have not even attempted to demonstrate that they are entitled to an *ex parte* order under Rule 65A of the Utah Rules of Civil Procedure, which states:

> No temporary restraining order shall be granted without notice to the adverse party or that party's attorney unless (A) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (B) the applicant or the applicant's attorney certifies to the court in writing as to the efforts, if any, that

2

have been made to give notice and the reasons supporting the claim that notice should not be required.

Utah R. Civ. P. 65A(b)(1). In other words, the Mulligans must make two showings before they can request an *ex parte* temporary restraining order. First, they must show that they will experience irreparable harm if the Court waits until Alum Rock responds before entering an order. And second, they must show that they attempted to provide Alum Rock with notice of the Ex Parte Motion and explain why Alum Rock should not receive notice.

Even a cursory review of the Ex Parte Motion shows that the Mulligans did not even attempt to meet these requirements. This is a sufficient basis for the Court to reject the Mulligans' request for entry of a restraining order without notice. In addition, there is no reason for the Court to enter an *ex parte* order. As noted in the Ex Parte Motion, the execution sale is scheduled to occur on January 21, 2025, which is several weeks away. Any alleged harm that the Mulligans might experience would not happen until that date. There is ample time between now and the execution sale for the parties to fully brief these important issues and attend a hearing on the Ex Parte Motion.

The Court should also reject the Mulligans' request for entry of a restraining order without notice because the Mulligans—without any valid justification—surreptitiously filed the Ex Parte Motion without even attempting to contact Alum Rock's counsel or provide notice. The parties have been involved in litigation for several years, and it would have taken less than five minutes for the Mulligans' counsel to give Alum Rock's counsel advanced notice. The Mulligans may not want the Court

to hear what Alum Rock has to say, but that desire is not sufficient to warrant a request for an *ex parte* temporary restraining order.

Alum Rock asks the Court to (1) reject the Mulligans' request for an *ex parte* temporary restraining order and (2) schedule a status conference so the parties can establish a briefing schedule.

DATED this 26th day of December, 2024.

BENNETT TUELLER JOHNSON & DEERE

/s/  KC Hooker
Benjamin D. Johnson
KC Hooker
*Attorneys for Defendant Alum Rock Riverside, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of December, 2024, I caused a true and correct copy of the foregoing **OBJECTION TO ORDER GRANTING EX PARTE MOTION FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; AND REQUEST TO SUBMIT** to be electronically filed with the Court's ECF system and served by the method indicated below to the following:

Bradley L. Tilt
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
bradley.tilt@freemanlovell.com
*Attorney for Plaintiffs*

(X)  GreenFiling ECF
( )  E-Mailed
( )  E-Mail via GreenFiling
( )  U.S. Mail, Postage Prepaid
( )  U.S. Mail via GreenFiling
( )  Certified Mail


Felicia B. Canfield
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

(X)  GreenFiling ECF
( )  E-Mailed
( )  E-Mail via GreenFiling
( )  U.S. Mail, Postage Prepaid
( )  U.S. Mail via GreenFiling
( )  Certified Mail


*/s/ KC Hooker*

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

**Tax ID No. 20-119-0007**

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

**IN THE SECOND DISTRICT COURT IN AND FOR
WEBER COUNTY, STATE OF UTAH**

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN,<br><br>Plaintiffs<br><br>v.<br><br>ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002<br><br>Defendants. | **ORDER GRANTING *EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Case No. 240908957<br><br>Judge CAMILLE NEIDER |

The court has reviewed the *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction* (the "**Motion**") filed on December 23, 2024 and the *Declaration of Felicia B. Canfield* in support and all exhibits thereto.

Pursuant to Rule 65A of the Utah Rules of Civil Procedure and otherwise, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1.  1.  Plaintiffs Motion is granted.

2.  2.  Defendant Alum Rock Riverside, LLC ("**Defendant**" or "**Alum Rock**"), and anyone acting by, with, or through Alum Rock, is **HEREBY RESTRAINED** from continuing with, allowing, and/or holding and is **ORDERED TO CANCEL** the Sheriff's Sale scheduled for January 16, 2025 at 12:00 p.m., including pursuant the *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, Civil No. 206927043, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**") and/or to the Writ of Execution issued on June 22, 2021 in the writ proceeding (the "**Writ of Execution**"), on the real property located in Weber County, Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

1.  3.  Defendant Alum Rock is further **RESTRAINED** from and **ORDERED** to immediately **CEASE** any and all efforts to foreclose on and/or sell the Property pursuant to the Alum Rock Lien or the Writ of Execution.

2.  4.  The Court further **HEREBY ISSUES** a preliminary injunction enjoining Defendant Alum Rock from taking any further action to foreclose the Alum Rock Lien and/or

sell the Property pending the conclusion of this action.

3.        5.        Copies of this **ORDER GRANTING *EX-PARTE* MOTION OF**

**PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND**

**PRELIMINARY INJUNCTION** may be recorded in the office of the Weber County recorder

in the State of Utah.

The GROUNDS for this Order, the TRO and preliminary injunction are as follows:

Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or

"**Plaintiffs**") each are individual owners of record of the Property, which is their home and

irreplaceable real property, pursuant to a *Warranty Deed* that was recorded on May 11, 2021 as

Entry No. 3151874 in the official records of the Weber County Recorder's office (the

"**Warranty Deed**").   Plaintiffs obtained a purchase money loan secured by a Deed of Trust that

was recorded on the Property on August 2, 2021 as Entry No. 3172556 (the "**Mulligans' Trust**

**Deed**").   Any foreclosure of the Alum Rock Lien would evict the Mulligans from their home

and deprive the Mulligans' Trust Deed of security for their loan.

Plaintiffs have demonstrated that based on the material facts and the applicable statutory

and case law that they meet each of the four Rule 65A elements necessary to obtain the TRO and

preliminary injunction.   Plaintiffs have demonstrated that: (1) there is a substantial likelihood

that Plaintiffs will prevail on the merits of their underlying claims; (2) Plaintiffs will suffer

irreparable harm unless this Court issues a TRO and preliminary injunction; (3) the threatened

injury to Plaintiffs outweighs whatever damage the TRO or preliminary injunction may cause

Defendant; and this (4) Court's issuance of a TRO and preliminary injunction benefit the public

interest and is not adverse to it.

Because Plaintiffs' claims in this action involve the correct application of Utah statutes

and law pertaining to Quiet Title claims, Equitable Subordination and Equitable Subrogation,
and to Declaratory Judgment that they are Bona Fide Purchasers for value without Constructive
Notice of any claims of Defendant, and the application of Utah Code Sections 75-7-505 and
57-3-102, and the likelihood of success thereunder, Plaintiffs are entitled to a full and fair
adjudication of their claims prior to any further attempt by Defendant Alum Rock to foreclose on
and/or sell the Property pursuant to the Alum Rock Lien.

The Sheriff's Sale and any foreclosure of and/or attempt to sell the Property pursuant to
the Alum Rock Lien will cause immediate and irreparable injury, loss and damage to Plaintiffs
and is/are therefore hereby restrained and enjoined pending further order of this Court.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF** *EX-PARTE* **MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br><br> Case No. 240908957 <br><br> Judge CAMILLE NEIDER |

Plaintiffs Molly J. Mulligan and John P. Mulligan ("**Plaintiffs**") submit to the Court the

following for judicial notice, pursuant to Rule 201, Utah Rules of Evidence, in connection with

the *Objection of Alum Rock Riverside LLC to Plaintiffs' Ex-Parte Motion of Plaintiffs for

Issuance of a Temporary Restraining Order and Preliminary Injunction* (the "**Objection**"), the

following items attached as "**Exhibit 1**":

1. *Notice of Withdraw of Motion of Plaintiffs for Leave to File a Supplemental Complaint* filed on December 24, 2024 in Civil No. 210904774; and the supporting,

2. *Declaration of Felicia B. Canfield* and Exhibit A thereto (Alum Rock's *Notice of Sale of Real Property*.

Contrary to Alum Rock's assertions in its Objection, the Mulligans are <u>not</u> parties to three lawsuits or actions pertaining to Alum Rock's Lien. As explained in the Mulligans *Ex-Parte Motion for a Temporary Restraining Order and Preliminary Injunction* (the "**TRO Motion**"), the Mulligans are homeowners who appealed from the issuance of a writ in favor of Alum Rock but <u>they were not parties to that writ "proceeding"</u> filed in the Third District Court, as stated and emphasized by the Utah Supreme Court in in *Mulligan v. Alum Rock Riverside, LLC*, 2024 UT 22, ¶ 66[1].

The Mulligans were and are parties to a separate proceeding involving a <u>different</u> creditor, and permissively sought to supplement the complaint in that action to add Alum Rock as a party; however, <u>Alum Rock opposed that motion</u> and <u>no order was ever entered granting the Milligan's motion to supplement that complaint</u>. **<u>Before Mulligans could obtain any order in that case, Alum Rock, without any notice to counsel for Mulligans whatsoever, caused to be posted to the Mulligans' home the Notice of Sheriff's Sale</u>**.

The Mulligans therefore instead filed this action naming Alum Rock as defendant, as they are entitled to do, in order to seek a Temporary Restraining Order and Preliminary Injunction, therefore ***withdrew*** that motion to supplement – which, again, is a permissive motion only. <u>There is no other *action* pending in which both Mulligans and Alum Rock are parties</u>.

---

[1] "Simply put, this proceeding to enforce that judgment through a writ of execution is not an action involving real property governed by the venue statute."

The Mulligans respectfully request the Court to enter their proposed Ex-Parte Order granting the TRO Motion and allow the parties in this action to proceed on the merits.

DATED December 26, 2024.

CANFIELD LAW LLC

/s/ Felicia B. Canfield
Felicia B. Canfield
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 26, 2024, I caused a true and correct copy of the foregoing **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF *EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** to be served in the manner indicated to the following parties at the addresses listed below:

| | |
|---|---|
| Bradley L. Tilt<br>FREEMAN LOVELL, PLLC<br>4568 S Highland Drive, Suite 290<br>Salt Lake City, Utah 84117<br>Office: 385-355-4826<br>bradley.tilt@freemanlovell.com<br>*Attorneys for Plaintiffs* | _____ Hand Delivery<br>_____ First Class, United States Mail,<br>    Postage Prepaid<br>___X___ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>_____ Email<br>_____ Other: |
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JONSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, Utah 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Defendant Alum Rock Riverside LLC* | _____ Hand Delivery<br>_____ First Class, United States Mail,<br>    Postage Prepaid<br>___X___ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>___X___ Email<br>_____ Other:_____ |

/s/ Felicia B. Canfield

EXHIBIT  1

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Phone: (385) 355-4826
bradley.tilt@freemanlovell.com
*Attorney for Plaintiffs*

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Phone: (307) 228-5986
canfieldlawllc@gmail.com
*Attorney for Plaintiffs*

---

## IN THE SECOND JUDICIAL DISTRICT COURT
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> SINGLE BOX, L.P.; SB AB WEST LOOP, L.P.; BRETT H. DEL VALLE and TRACI M. DEL VALLE, as Co-Trustees of The Del Valle Family Trust dated October 30, 2002, <br><br> Defendants. | **NOTICE OF WITHDRAWAL OF MOTION OF PLAINTIFFS FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT** <br><br> Civil No. 210904774 <br><br> Judge: Noel S. Hyde |

Plaintiffs Molly J. Mulligan and John P. Mulligan ("**Plaintiffs**"), by and through their

undersigned counsel of record, hereby withdraw the **MOTION OF PLAINTIFFS FOR**

**LEAVE TO FILE A SUPPLEMENTAL COMPLAINT** dated and filed August 27, 2024 (the

"**Motion**") and all their supportive filings (the "**Withdrawal**"). The grounds for the Withdrawal

are as follows:

1.      No order has yet been entered in connection with the Motion;

2.      On or about December 18, 2024, <u>after</u> the hearing on Plaintiffs' Motion, Alum Rock Riverside LLC ("**Alum Rock**") (which entered a limited appearance in this action and opposed Plaintiffs' Motion) caused to be posted to the subject Property, Plaintiffs' residence, a *Notice of Sale Real Property* informing Plaintiffs of a scheduled Sheriff's Sale of the Property scheduled for January 16, 2025 at 12:00 p.m. (the "**Sheriff's Sale**"[1]) which sale is based upon a certain *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**"), but which lien was not abstracted to or against the Property and against which the Mulligans have claims and defenses yet to be adjudicated;

3.      Alum Rock posted its Notice of Sheriff's Sale on the Property notwithstanding its failure to establish and prove what portion of the Property previously owned by the subject Trust was attributable to apparent settlor Brett's contribution, if indeed any at all (including pursuant to a writ "proceeding" upheld in *Mulligan v. Alum Rock Riverside, LLC*, 2024 UT 22, ¶ 66[2] and despite the Utah Supreme Court expressly stating it had "*no opinion*" on "*whether [co-trustee Traci Del Valle's] joint ownership of the Property has any effect on [Alum Rock's] judgment lien*"[3]), and what portion of the Property is therefore subject to the Alum Rock Lien and to any execution upon and/or foreclosure thereof, if indeed any at all, among other legal issues and claims asserted by the Mulligans;

---

[1] See *Declaration of Felicia B. Canfield*, filed herewith, Exhibit A.
[2] "Simply put, this proceeding to enforce that judgment through a writ of execution is not an action involving real property governed by the venue statute."
[3] *Id.* n. 7.

4.      Alum Rock is not a party to this action, no order on Plaintiffs' Motion having been entered and no Supplemental Complaint having been filed; therefore, Plaintiffs have no adequate or speedy remedy in this action to address the Sheriff's Sale or Alum Rock's Lien.

For all of these reasons, Plaintiffs therefore and hereby **withdraw their Motion.**

DATED DECEMBER 24, 2024.

CANFIELD LAW LLC


 /s/ Felicia B. Canfield
Felicia B. Canfield
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on DECEMBER 24, 2024 I caused a true and correct copy of the foregoing **NOTICE OF WITHDRAWAL OF PLAINTIFFS FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT** to be served in the manner indicated to the following parties at the addresses listed below:

| | |
|---|---|
| R. Jeremy Adamson<br>Chad S. Pehrson<br>Kunzler Bean & Adamson, PC<br>50 W. Broadway, 10th Floor<br>Salt Lake City, UT 84101<br>jadamson@kba.law<br>cpehrson@kba.law<br>*Attorneys for Single Box, L.P.*<br>*and SB AB West Loop, L.P.* | _____Hand Delivery<br>_____First Class, United States Mail,<br>　　　　Postage Prepaid<br>\_\_X\_\_\_E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>_____Email<br>_____Other:_____ |
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JONSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, Utah 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside LLC* | _____Hand Delivery<br>_____First Class, United States Mail,<br>　　　　Postage Prepaid<br>\_\_X\_\_\_E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>\_\_X\_\_\_Email<br>_____Other:_____ |
| Bradley L. Tilt<br>FREEMAN LOVELL, PLLC<br>4568 S Highland Drive, Suite 290<br>Salt Lake City, Utah 84117<br>bradley.tilt@freemanlovell.com<br>*Attorneys for Plaintiffs* | _____Hand Delivery<br>_____First Class, United States Mail,<br>　　　　Postage Prepaid<br>\_\_X\_\_\_E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>_____Email<br>_____Other:_____ |

　　　　　　　　　　　　　　　　　　_/s/Felicia B. Canfield_
　　　　　　　　　　　　　　　　　　Felicia B. Canfield

Bradley L. Tilt (07649)
Freeman Lovell, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Phone: (385) 355-4826
bradley.tilt@freemanlovell.com
*Attorney for Plaintiffs*

Felicia B. Canfield (09686)
Canfield Law LLC
2413 Newton Avenue
Cody, WY 82414
Phone: (307) 228-5986
canfieldlawllc@gmail.com
*Attorney for Plaintiffs*

---

## IN THE SECOND JUDICIAL DISTRICT COURT
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> SINGLE BOX, L.P.; SB AB WEST LOOP, L.P.; BRETT H. DEL VALLE and TRACI M. DEL VALLE, as Co-Trustees of The Del Valle Family Trust dated October 30, 2002, <br><br> Defendants. | **DECLARATION OF FELICIA B. CANFIELD** <br><br> Civil No. 210904774 <br><br> Judge: Noel S. Hyde |

I, FELICIA B. CANFIELD, declare and state as follows:

1.      I am over the age of 18 years, and I have personal knowledge of and am fully

competent to testify as to all matters stated herein.  I am an attorney duly licensed to practice

law in the State of Utah, and represent Plaintiffs in this matter. I am familiar with the contents of all documents referenced herein.

2.     My law practice since 2003 has included and focused primarily upon real property related matters. I am familiar with searching real property titles in counties located throughout the state of Utah and in reading and interpreting documents recorded on county records regarding real properties in counties throughout the State of Utah. I am also familiar with searching and obtaining documents from Utah state courts through XChange, and federal district courts and bankruptcy courts located in Utah through PACER.

3.     The real property which is the subject of this action is located in Weber County, State of Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.
>
> Tax ID No. 20-119-0007

4.     **EXHIBIT A** to this declaration is a *Notice of Sale Real Property* that was posted on the Property on or about December 18, 2024, showing a scheduled Sheriff's Sale of the Property for January 16, 2025 at 12:00 p.m. (the "**Sheriff's Sale**") which sale is based upon a certain *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**").

5.      I personally called the Weber County Sheriff's Office, which confirmed that the Sheriff's Sale posting was requested by counsel for Alum Rock.

I declare under criminal penalty under the law of Utah that the foregoing is true and correct.

DATED this 24ʰ day of December, 2024.

CANFIELD LAW LLC

/s/ Felicia B. Canfield
Felicia B. Canfield
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on DECEMBER 24, 2024 I caused a true and correct copy of the foregoing **DECLARATION OF FELICIA B. CANFIELD** to be served in the manner indicated to the following parties at the addresses listed below:

| | |
|---|---|
| R. Jeremy Adamson<br>Chad S. Pehrson<br>Kunzler Bean & Adamson, PC<br>50 W. Broadway, 10th Floor<br>Salt Lake City, UT 84101<br>jadamson@kba.law<br>cpehrson@kba.law<br>*Attorneys for Single Box, L.P.<br>and SB AB West Loop, L.P.* | _____Hand Delivery<br>_____First Class, United States Mail, Postage Prepaid<br>\_\_X\_\_E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>_____Email<br>_____Other:_____ |
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JONSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, Utah 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside LLC* | _____Hand Delivery<br>_____First Class, United States Mail, Postage Prepaid<br>\_\_X\_\_E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>\_\_X\_\_Email<br>_____Other:_____ |
| Bradley L. Tilt<br>FREEMAN LOVELL, PLLC<br>4568 S Highland Drive, Suite 290 | _____Hand Delivery<br>_____First Class, United States Mail, Postage Prepaid |

| Salt Lake City, Utah 84117<br>bradley.tilt@freemanlovell.com<br>*Attorneys for Plaintiffs* | __X__ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>_____ Email<br>_____ Other:_____ |

_/s/Felicia B. Canfield_____
Felicia B. Canfield

# EXHIBIT A



**RYAN ARBON, SHERIFF**
AARON PERRY, CHIEF DEPUTY
PHILLIP REESE, CHIEF DEPUTY
JOSH GARD, CHIEF DEPUTY

Weber County Sheriff's Office
## Notice of Sale
## Real Property

Date of Sale: **January 16th 2025**

Time of Sale: 12:00 p.m.

Place of Sale: Ogden Second District Court – Front Steps
2525 Grant Avenue, Ogden, Utah

## Legal Description of Sale Property:

**Street Address:** 1453 S. Basinview Rd. Huntsville, Utah 84317

**Legal Description:** ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, 1ST AMENDMENT, WEBER COUNTY, UTAH

**Parcel No. 20-119-0007**



801-778-6600 Enforcement / 801-778-6700 Corrections / 1400 Depot Drive, Ogden Utah 84404
www.webercountyutah.gov/Sheriff

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and<br>JOHN P. MULLIGAN,<br><br>   Plaintiffs<br><br>  v.<br><br>ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002<br><br>   Defendants. | **REQUEST TO SUBMIT FOR DECISION**<br>**The**<br>**REQUEST FOR JUDICIAL NOTICE**<br>**and**<br>***EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br><br>Case No. 240908957<br><br>Judge CAMILLE NEIDER |

Plaintiffs Molly J. Mulligan and John P. Mulligan ("Plaintiffs") request the Clerk of the

Court to submit to the Court for decision their Ex-Parte Motion of Plaintiffs for Issuance of a

Temporary Restraining Order and Preliminary Injunction, which is listed as item number 1 in the

list below, together with all other items in the list below which are all of the filings on that

motion:

1. **Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction**, dated and filed December 24, 2024;

2. Declaration of Felicia B. Canfield, and Exhibits A-K thereto, dated and filed December 24, 2024;

3. Proposed Order Granting Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction, dated and filed December 24, 2024, in .rtf format;

4. Request for Judicial Notice in Support of Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injection, dated and filed December 26, 2024l and Exhibit 1 thereto.

DATED December 26, 2024.

CANFIELD LAW LLC

*/s/ Felicia B. Canfield*
Felicia B. Canfield
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 26, 2024, I caused a true and correct copy of the foregoing **REQUEST TO SUBMIT FOR DECISION EX-PARTE MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMIAY INJUNCTION** to be served in the manner indicated to the following parties at the addresses listed below:

| | |
|---|---|
| Bradley L. Tilt<br>FREEMAN LOVELL, PLLC<br>4568 S Highland Drive, Suite 290<br>Salt Lake City, Utah 84117<br>Office: 385-355-4826<br>bradley.tilt@freemanlovell.com<br>*Attorneys for Plaintiffs* | _____ Hand Delivery<br>_____ First Class, United States Mail, Postage Prepaid<br>___X___ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>_____ Email<br>_____ Other: |

2

| | |
|---|---|
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JONSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, Utah 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Defendant Alum Rock Riverside LLC* | _____Hand Delivery<br>_____First Class, United States Mail,<br>　　　　　Postage Prepaid<br>　X\_\_\_E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>_____Email<br>_____Other:_____ |

*/s/ Felicia B. Canfield*

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
**119-0007**
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield
(09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

**Tax ID No. 20-**

---

## IN THE SECOND DISTRICT COURT IN AND FOR WEBER COUNTY, STATE OF UTAH

---

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **ORDER GRANTING *EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> Case No. 240908957 <br><br> Judge CAMILLE NEIDER |

---

December 27, 2024 08:55 AM

1 of 5

The court has reviewed the *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction* (the "**Motion**") filed on December 23, 2024 and the *Declaration of Felicia B. Canfield* in support and all exhibits thereto.

Pursuant to Rule 65A of the Utah Rules of Civil Procedure and otherwise, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1.    1.    Plaintiffs Motion is granted.

2.    2.    Defendant Alum Rock Riverside, LLC ("**Defendant**" or "**Alum Rock**"), and anyone acting by, with, or through Alum Rock, is **HEREBY RESTRAINED** from continuing with, allowing, and/or holding and is **ORDERED TO CANCEL** the Sheriff's Sale scheduled for January 16, 2025 at 12:00 p.m., including pursuant the *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, Civil No. 206927043, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**") and/or to the Writ of Execution issued on June 22, 2021 in the writ proceeding (the "**Writ of Execution**"), on the real property located in Weber County, Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of

record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

1.      3.      Defendant Alum Rock is further **RESTRAINED** from and **ORDERED** to immediately **CEASE** any and all efforts to foreclose on and/or sell the Property pursuant to the Alum Rock Lien or the Writ of Execution.

2.      4.      The Court further **HEREBY ISSUES** a preliminary injunction enjoining Defendant Alum Rock from taking any further action to foreclose the Alum Rock Lien and/or sell the Property pending the conclusion of this action.

3.      5.      Copies of this **ORDER GRANTING *EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** may be recorded in the office of the Weber County recorder in the State of Utah.

The GROUNDS for this Order, the TRO and preliminary injunction are as follows:

Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or "**Plaintiffs**") each are individual owners of record of the Property, which is their home and irreplaceable real property, pursuant to a *Warranty Deed* that was recorded on May 11, 2021 as Entry No. 3151874 in

the official records of the Weber County Recorder's office (the "**Warranty Deed**").  Plaintiffs obtained a purchase money loan secured by a Deed of Trust that was recorded on the Property on August 2, 2021 as Entry No. 3172556 (the "**Mulligans' Trust Deed**").  Any foreclosure of the Alum Rock Lien would evict the Mulligans from their home and deprive the Mulligans' Trust Deed of security for their loan.

Plaintiffs have demonstrated that based on the material facts and the applicable statutory and case law that they meet each of the four Rule 65A elements necessary to obtain the TRO and preliminary injunction.  Plaintiffs have demonstrated that: (1) there is a substantial likelihood that Plaintiffs will prevail on the merits of their underlying claims; (2) Plaintiffs will suffer irreparable harm unless this Court issues a TRO and preliminary injunction; (3) the threatened injury to Plaintiffs outweighs whatever damage the TRO or preliminary injunction may cause Defendant; and this (4) Court's issuance of a TRO and preliminary injunction benefit the public interest and is not adverse to it.

Because Plaintiffs' claims in this action involve the correct application of Utah statutes and law pertaining to Quiet Title claims, Equitable Subordination and Equitable Subrogation, and to Declaratory Judgment that they are Bona Fide Purchasers for value without Constructive Notice of any claims of Defendant, and the application of Utah Code Sections 75-7-505 and 57-3-102, and the likelihood of success thereunder, Plaintiffs are entitled to a

December 27, 2024 08:55 AM

full and fair adjudication of their claims prior to any further attempt by Defendant Alum Rock to foreclose on and/or sell the Property pursuant to the Alum Rock Lien.

The Sheriff's Sale and any foreclosure of and/or attempt to sell the Property pursuant to the Alum Rock Lien will cause immediate and irreparable injury, loss and damage to Plaintiffs and is/are therefore hereby restrained and enjoined pending further order of this Court.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***

**The Order of the Court is stated below:**
**Dated:** January 03, 2025                **/s/**  CAMILLE NEIDER
               02:25:08 PM                        District Court Judge

SECOND JUDICIAL DISTRICT - OGDEN DISTRICT COURT

WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J MULLIGAN, | RULING |
| Plaintiff, | ORDER OF RECUSAL & REASSIGNMENT |
| | |
| vs. | Case No: 240908957 |
| ALUM ROCK RIVERSIDE LLC, et al. | Judge: CAMILLE NEIDER |
| Defendant. | Date: January 3, 2025 |

I hereby recuse myself from this case for any future proceedings.  This case is reassigned to Judge Noel S Hyde.

**End Of Order - Signature at the Top of the First Page**

**CERTIFICATE OF NOTIFICATION**

I certify that a copy of the attached document was sent to the following people for case 240908957
by the method and on the date specified.

EMAIL: KYLE HOOKER KCHOOKER@BTJD.COM

EMAIL: BENJAMIN JOHNSON BEN.JOHNSON@BTJD.COM

EMAIL: FELICIA CANFIELD CANFIELDLAWLLC@GMAIL.COM

EMAIL: BRADLEY TILT BRADLEY.TILT@FREEMANLOVELL.COM

EMAIL: FELICIA CANFIELD CANFIELDLAWLLC@GMAIL.COM

EMAIL: BRADLEY TILT BRADLEY.TILT@FREEMANLOVELL.COM


       01/03/25           /s/ CYNTHIA PHILLIPS

Date: _____    _____

                                     Signature

Bradley L. (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

**IN THE SECOND DISTRICT COURT IN AND FOR
WEBER COUNTY, STATE OF UTAH**

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **REQUEST FOR EXPEDITED SCHEDULING CONFERENCE AND FOR EXPEDITED DISPOSITION OF "*EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION"** <br><br> Case No. 240908957 <br><br> Judge Noel S. Hyde |

The filing by Plaintiffs Molly J. Mulligan and John P. Mulligan ("**Plaintiffs**" or

"**Mulligans**") of this above-captioned case, and of their *EX-PARTE* MOTION OF PLAINTIFFS

FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY

INJUNCTION herein (the "**Motion for Injunctive Relief**"), was necessitated by the actions of

Defendant Alum Rock Riverside, LLC ("**Alum Rock**") which sought to circumvent the rulings

of the Honorable Judge Noel S. Hyde which were made orally from the bench at the conclusion

of a hearing involving Alum Rock on November 26, 2024 (the "**Oral Ruling**"), in the separate case of <u>Molly J. Mulligan and John P. Mulligan v. Single Box, L.P., SB AB West Loop, L.P., Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of the Del Valle Family Trust dated October 30, 2002</u>, Utah's Second District Court, Weber County, Case No. 210904774 (the "**Single Box Case**").

Mulligans respectfully request that this Court promptly restrain and enjoin Alum Rock's newly-scheduled sheriff's sale of the Mulligans' home pending litigation and resolution of the issues in this case, or schedule and hold a telephonic or online scheduling conference at the earliest possible opportunity for the purpose of setting appropriate scheduling for briefing of and for a hearing on Mulligans' Motion for Injunctive Relief (which has been filed in this case in order to restrain a purported foreclosure sale of the Mulligans' home which was scheduled by Alum Rock to occur on January 16, 2025, which it claims has been extended to January 21, 2025, to execute upon a judgment entered against Brett Del Valle in contravention and circumvention of this Court's Oral Ruling regarding the limited nature or extent of any interest which may be subject to execution by Alum Rock).

In a prior Utah Supreme Court ruling between Mulligans and Alum Rock, that Court upheld the existence of a judgment lien for Alum Rock on the real property at issue, but expressly left open the question of the extent of any interest to which Alum Rock's judgment lien attached such as may be impacted by the unspecified joint ownership interest of co-trustee Traci Del Valle. *Mulligans v. Alum Rock*, 2024 UT 22, ¶63 n.7.

Mulligans then filed a motion to supplement its pleadings in the Single Box Case including to have any such interest of Alum Rock determined by the same court as would address any such issue as to another judgment lien claimant, Single Box. On November 26,

2024, the court in the Single Box case, the Honorable Judge Noel S. Hyde presiding, entered its

Oral Ruling, from which the following all are quotations:

> THE COURT: … And the ruling of the Court is as follows.  The current motion of the plaintiffs for leave to file a supplemental complaint will be granted in part and denied in part.
> Specifically, the Court denies the motion with respect to any assertion of the invalidity of the judgment lien and tis attachment to the interest in the subject property originating from Brett Del Valle individually.

Transcript of Oral Ruling, p.49, l.16 – p.49, l.23.  Copies of all cited pages from the transcript of

the Court's Oral Ruling are submitted herewith in numerical order collectively as "**Exhibit 1**".

> THE COURT: … However, the Court is granting the motion with respect to the assertion of any claims that the judgment and the judgment lien and the writ of execution may not extend to the interest of a co-settlor in the property.  The ruling of the Court is that is not determined by the Supreme Court.  That is specifically the basis for the inclusion of the footnote 7 that has been referenced.
> And so to the extent that there is a further claim from a co-settlor—that was the qualifying language in the footnote 7 of the Supreme Court decision—the <u>interest of a co-owner in the property does not automatically become subject to a judgment against the other co-owner.  The judgment against Brett is against Brett Del Valle</u>.  And that permits the holder or successor in interest to the claimant of the co-settlor's property to preserve that interest.  <u>The judgment only applies against Brett Del Valle.  It doesn't apply to anyone else.</u>
> Therefore, the judgment lien is a lien against interest originating from Brett Del Valle.  Not necessarily against anyone else.  <u>And the execution, therefore, is also directed to that same limitation.</u>
> …
> Now, the impact of that is that the current proposed complaint is not approved.  And an alternate complaint is going to have to be filed, which is restricted to the issues which the Court has addressed.  And in granting the request, the court is making no determination on any legal or factual interest – or issues with respect to that interest.

Transcript of Oral Ruling, p.52, l.12 – p.53, l.17 (emphases added).

Attorney Benjamin Johnson, legal counsel for Alum Rock who was present for and

participated in the November 26, 2024 hearing, and who was present for the Court's Oral Ruling

stated during that hearing, even requested a "[p]oint of clarification" with regard to the Court's

Oral Ruling regarding the issue of "the effect of there being co-settlors" of the Trust which

previously owned the property (rather than Brett Del Valle personally); to which the Court

responded: "That allegation certainly is permitted by the Court's ruling."  Transcript of Oral

Ruling, p.54, l.6 – p.54, l.21.

On December 4, 2024, attorney Benjamin Johnson filed in the Single Box Case a request

for a copy of the audio recording of the hearing held on November 26, 2024, in which the Oral

Ruling was issued.  A copy of that request filed by legal counsel for Alum Rock in that Single

Box case is submitted herewith as "**Exhibit 2**".

The undersigned legal counsel for Mulligans filed in the Single Box Case a request for a

written transcript of the hearing held on November 26, 2024, in which the Oral Ruling was

issued, and that written transcript was filed in that case on December 9, 2024 – that is the

transcript submitted as Exhibit 1 hereto from which the above-quoted excerpts from the Oral

Ruling are derived.

On December 18, 2024, however, in an attempt to knowingly circumvent the Court's

Oral Ruling, and Utah statutory law, Alum Rock caused to be posted on the Mulligans' subject

real property a *Notice of Sale of Real Property* giving notice of a scheduled Sheriff's Sale of

Mulligans' property scheduled for January 16, 2025, without Alum Rock ever having established

or shown the extent of interest in the property arising from judgment debtor Brett Del Valle and

the extent of interest in the property therefore to which any execution, therefore, is expressly

limited by Judge Hyde's Oral Ruling and as a matter of express Utah statutory law.  Utah Code §

75-7-505(1) ("If a trust has more than one settlor, the amount the creditor or assignee of a

particular settlor may reach may not exceed the settlor's interest in the portion of the trust

attributable to that settlor's contribution.").

Because no order was yet entered making Alum Rock a party to the Single Box Case, on

December 20, 2024, Mulligans then filed this above-captioned action against Alum Rock, and on

December 23, 2024, also filed their Motion for Injunctive Relief.  On December 26, 2024, a notice of appearance of Benjamin Johnson and KC Hooker as legal counsel for Alum Rock was filed herein, and on that date they filed an objection to the Mulligans' Motion for Injunctive Relief.  In that objection, Alum Rock claimed without providing any evidence that the execution sale is scheduled for January 21, 2025 (rather than January 16, 2025).  Ex Parte relief on the Motion for Injunctive Relief was then denied before this Case was then transferred to The Honorable Judge Noel S. Hyde.

Whether the Alum Rock execution sale is scheduled for January 16, 2025, or January 21, 2025, it is still an improper end-run around Your Honor's Oral Ruling, and express Utah statutory law, and this matter is still time-sensitive.

The undersigned legal counsel for Mulligans therefore respectfully requests that this Court promptly restrain and enjoin Alum Rock's newly-scheduled sheriff's sale of the Mulligans' home pending litigation and resolution of the issues in this case, or schedule and hold a telephonic or online scheduling conference at the earliest possible opportunity for the purpose of setting appropriate scheduling for briefing of and for a hearing on Mulligans' Motion for Injunctive Relief.

Dated January 6, 2025.

FREEMAN LOVELL, PLLC

*/s/ Bradley L. Tilt*
Bradley L. Tilt
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on January 6, 2025 I caused true and correct copies of this **REQUEST FOR EXPEDITED SCHEDULING CONFERENCE AND FOR EXPEDITED DISPOSITION OF "*EX-PARTE* MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION"** to be served in the manner indicated below to the following-listed parties at their respective addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JOHNSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, UT 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside, LLC* | _____Hand Delivery<br>_____First Class, United States Mail,<br>_____Postage Prepaid<br>\_\_X\_\_\_E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>_____Email<br>_____Other: _____ |
| Felicia B. Canfield<br>Canfield Law LLC<br>2413 Newton Avenue<br>Cody, WY 82414<br>canfieldlawllc@gmail.com<br>*Attorneys for Plaintiffs* | _____Hand Delivery<br>_____First Class, United States Mail,<br>_____Postage Prepaid<br>\_\_X\_\_\_E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>_____Email<br>_____Other: |

/s/ Bradley L. Tilt

# EXHIBIT 1

1            SECOND JUDICIAL DISTRICT - OGDEN DISTRICT COURT

2                  WEBER COUNTY, STATE OF UTAH

3    _____
                                     )
4    MOLLY J. MULLIGAN, et al.,      )  Case No. 210904774
                                     )
5              Plaintiffs,           )
                                     )
6    v.                              )  TRANSCRIPT OF:
                                     )  ORAL ARGUMENT
7    SINGLE BOX LP, et al.,          )
                                     )
8              Defendants.           )
     _____)

9

10              BEFORE THE HONORABLE NOEL S. HYDE

11

12                   OGDEN DISTRICT COURT
                     2525 GRANT AVENUE
                      COURTROOM #3C
13                  OGDEN, UTAH 84401

14

                    NOVEMBER 26, 2024
15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

    For the Plaintiffs MOLLY MULLIGAN, et al.:
 3
             Bradley Tilt
 4           FREEMAN LOVELL PLLC
             4568 South Highland Drive
 5           Suite 290
             Salt Lake City, Utah 84117
 6

 7  For the Defendant SIX BOX LP, et al:

 8           Chad Pehrson
             KUNZLER BEAN & ADAMSON, PC
 9           3354 South 1940 East Millcreek
             Salt Lake City, Utah 84106
10

11  For the Intervenor ALUM ROCK RIVERSIDE LLC:

12           Benjamin Johnson
             BENNETT TUELLER JOHNSON & DEERE
13           3165 East Millrock Drive
             Suite 500
14           Salt Lake City, Utah 84121

15

16                        -ooOoo-

17

18

19

20

21

22

23

24

25
```

```
 1                      November 26, 2024

 2                  P R O C E E D I N G S

 3

 4          THE COURT:  All right.  And we will go next to

 5   Mulligan versus Single Box LP.  Case Number is 210904774.

 6          Parties in this matter please come forward.  And

 7   will counsel note your appearances for the record?

 8          MR. TILT:  Bradley Tilt, Your Honor, for

 9   plaintiffs, the Mulligans.

10          THE COURT:  Thank you, Mr. Tilt.

11          MR. PEHRSON:  Your Honor, I'm Chad Pehrson with the

12   K B and A law firm, here on behalf of the Single Box parties.

13          THE COURT:  Thank you.

14          MR. JOHNSON:  And Ben Johnson here for Alum Rock

15   Riverside LLC.

16          THE COURT:  Thank you.

17          All right.  This is the plaintiff's motion for a

18   leave to amend.

19          So Mr. Tilt, I will hear from you as far as the

20   opening of the argument.  I have reviewed the written

21   materials.  I am familiar, generally, with the issues.  I'm

22   also familiar with the decision that has previously been made

23   with respect to the notice of the judgment, the entry of the

24   judgment, and the validity of the recording, and those kinds of

25   issues.  So those do not need to be belabored by anyone.
```

1    the briefs, talks about how Utah applies a liberal standard to

2    Rule 15 amendments because, quote, "The purpose of Rule 15 is

3    to provide litigants the maximum opportunity for each claim to

4    be decided in its merits, rather than on procedural niceties,"

5    end quote.  Thank you, Your Honor.

6              THE COURT:  All right.  Thank you.  I'll take a

7    brief recess.

8              (Brief recess.)

9              THE COURT:  All right.  I appreciate everyone's

10   patience.  And I have had an opportunity to review both the

11   arguments and the written materials a little more closely.  And

12   I am going to strike all prior statements or rulings that may

13   have been indicated on the record to this point, and make a

14   single ruling.  Again, all prior statements or potential

15   rulings are stricken.

16             And the ruling of the Court is as follows.  The

17   current motion of the plaintiffs for leave to file a

18   supplemental complaint will be granted in part and denied in

19   part.

20             Specifically, the Court denies the motion with

21   respect to any assertion of the invalidity of the judgment lien

22   and its attachment to the interest in the subject property

23   originating from Brett Del Valle individually.  And that

24   precludes any claims that challenge the validity or

25   enforceability of that judgment lien as it originated against

```
1   declaratory judgment causes of action the plaintiffs are bona

2   fide purchasers with no constructive notice of liens and claims

3   asserted against the property by Single Box and Alum Rock.

4           And that relief is likewise denied.  The suggestion

5   that the Mulligans are bona fide purchasers of any interest as

6   it relates to Brett Del Valle are precluded.

7           And so the Court will not permit the assertion or

8   argument of any claims that would suggest a further defense to

9   either the validity or enforceability of the judgment or

10  judgment lien, or execution against any interest that

11  originated based upon the claims against Brett Del Valle.

12          However, the Court is granting the motion with

13  respect to the assertion of any claims that the judgment and

14  the judgment lien and the writ of execution may not extend to

15  the interest of a co-settlor in the property.  The ruling of

16  the Court is that is not determined by the Supreme Court.  That

17  is specifically the basis for the inclusion of the footnote 7

18  that has been referenced.

19          And to the extent that there is a further claim

20  from a co-settlor--that was the qualifying language in the

21  footnote 7 of the Supreme Court decision--the interest of a

22  co-owner in property does not automatically become subject to a

23  judgment against the other co-owner.  The judgment against

24  Brett is against Brett Del Valle.  And that permits the holder

25  or successor in interest to the claimant of the co-settlor's
```

1    property to preserve that interest.  The judgment only applies

2    against Brett Del Valle.  It doesn't apply to anyone else.

3           Therefore, the judgment lien is a lien against

4    interest originating from Brett Del Valle.  Not necessarily

5    against anyone else.  And the execution, therefore, is also

6    directed to that same limitation.

7           And so the Court does permit the supplementation of

8    the complaint to assert claims, to the extent that they may be

9    asserted arising from the purported interest of a co-settlor at

10   the time that that conveyance occurred with the trust.  So to

11   that extent, the motion to supplement is granted.

12          Now, the impact of that is that the current

13   proposed complaint is not approved.  And an alternate complaint

14   is going to have to be filed, which is restricted to the issues

15   which the Court has addressed.  And in granting the request,

16   the Court is making no determination on any legal or factual

17   interest -- or issues with respect to that interest.

18          I am not finding, for example, that there is a

19   further interest of the co-settlor.  Nor am I making a legal

20   determination that a quiet title action is the proper mechanism

21   for asserting that interest, or challenging the enforcement of

22   the writ of execution.

23          So if there is an argument that the parties wish to

24   make on the defendant's side that a quiet title action is not

25   the appropriate mechanism, that argument is still permitted.

```
 1    I'm not making any legal determinations.  I'm only permitting

 2    the amendment of the complaint to assert that

 3    narrowly-restricted body of potential claims, subject to all

 4    defenses and all ultimate determinations, both factual and

 5    legal, with respect to those claims.

 6              MR. JOHNSON:  Point of clarification.

 7              THE COURT:  Yes.

 8              MR. JOHNSON:  The -- in helping all of us

 9    understand, if we could go by causes of action.  So there's a

10    first cause of action, which addresses the issue, I believe, of

11    the effect of there being co-settlors.  I -- at least that's

12    what I understand the first cause of action.

13              THE COURT:  There were some paragraphs that raised

14    the issue.  However, I don't think it would be fair to say that

15    there is any individual cause of action that is focused

16    specifically on that issue.

17              MR. JOHNSON:  Okay.

18              THE COURT:  I know that there are paragraphs where

19    there is a recitation of the existence of a co-settlor and the

20    potential impact.  That allegation certainly is permitted by

21    the Court's ruling.  But the Court is not simply saying that

22    all the other allegations that may slop over into a potential

23    challenge of the validity or enforceability of the claim

24    against Brett Del Valle itself is appropriate, because they are

25    not appropriate.  And they are to be excised and may not be
```

```
 1   STATE OF UTAH         )
                           )
 2   COUNTY OF SALT LAKE )

 3                I, CECILEE WILSON, Certified Shorthand

 4   Reporter for the State of Utah, certify:

 5                That I received the audio recording in this

 6   matter, that I transcribed it into typewriting, and that a

 7   full, true, and correct transcription of said audio recording

 8   so recorded and transcribed is set forth in the foregoing pages

 9   inclusive, except where it is indicated that the recording was

10   inaudible.

11                I FURTHER CERTIFY that I am neither counsel

12   for nor related to any party to said action nor in anywise

13   interested in the outcome thereof.

14                Certified and dated this 9th day of December,

15   2024.

16
17                   Cecilee Wilson
                     _____
18                   CECILEE WILSON, CSR, RDR, CRR
                     Certified Shorthand Reporter
19                   for the State of Utah

20

21

22

23

24

25
```

# EXHIBIT 2

SECOND DISTRICT COURT
Request for Copy of Recording of Court Proceeding
(Recordings available for previous 9 years only)
Email Weber & Morgan County requests to: 2webermorgand@utcourts.gov
Email Davis County requests to: 2davisd@utcourts.gov

**All Fees must be paid before recording will be prepared**

Date of Request: _December 4, 2024_        Case Number: _210904774_

Court Location: ☒Ogden ☐Farmington ☐Layton ☐Bountiful ☐Morgan

Judge/Commissioner: _Noel S. Hyde_    Case Name: _Molly Mulligan_ vs./and _Single Box_

Hearing Date: _November 26, 2024_    Hearing Time: _11:00 am_

**REQUESTOR'S INFORMATION:**

Party Type: ☐Plaintiff/Petitioner ☐Defendant/Respondent ☐Private Atty ☒Other

        ☐Prosecutor (Billing will be sent to Co Atty) ☐Public Defender (Billing will be sent to PDA or City)

Name: _Benjamin D. Johnson - Bennett Tueller Johnson & Deere_

Address: _3165 Millrock Drive, Suite 500  Salt Lake City, UT 84121_

Phone No.: (_801_) _438-2029_

Email Address: _ben.johnson@btjd.com_

☐ Check if copy is to be mailed to above address
☐ Check if copy will be picked up

**PLEASE CHECK REQUESTED FORMAT BELOW**
☐ **$15.00 Windows Media Player Digital Audio/Video** *(1 CD will hold approx. 8 hours of recording)*
  Copy will be ready for pickup/delivery within ten (10) business days from the date payment is received.
☐ **$15.00 Audio CD – Plays in CD Player** *(1 CD holds 80 minutes)*
  Copy will be ready for pickup/delivery within ten (10) business days from the date payment is received.
☒ **$15.00 Emailed MP3** *(per half day of testimony)*
  Copy will be emailed within ten (10) business days from the date payment is received.
  **E-mail to:** _hollyv@btjd.com_

☐ **$15.00 Shared Audio** *(per half day of testimony)*
  Copy will be shared within five (5) business days from the date payment is received. Shared Audio to be accessed through FTR, which requires a free download. Shared audio will not be able to be downloaded and subsequently shared with others. Please list all email addresses you would like the audio shared with. Any future requests for the same recording will require a new request to be submitted and a fee to be paid.
  **Emails to Share Audio with:** _____

|  |  |  |
|---|---|---|
| **Copy Fee** | $ _____ | |
| **Mailing Costs** | $ _____ | ($4.13 for up to 3 CD's in a mailer) |
| **Total** | $ _____ | |

**NOTE: Copies will be discarded after 30 days if not picked up. Payments will not be refunded/transferred to another request.**
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
**COURT USE ONLY:**
Copied by: _____    Date: _____    Date emailed/mailed: _____

**The Order of the Court is stated below:**
**Dated:** January 09, 2025          /s/   NOEL S. HYDE
          04:53:52 PM                        District Court Judge

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826                                    **Tax ID No. 20-119-0007**
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **ORDER GRANTING MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER** <br><br> Case No. 240908957 <br><br> Judge NOEL S HYDE |

The court has reviewed the *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary*

*Restraining Order and Preliminary Injunction* (the "**Motion**") filed on December 23, 2024 and the *Declaration of Felicia B. Canfield* in support and all exhibits thereto, and has also reviewed and considered the response and objection filed by Defendant relating to the Motion.

Pursuant to Rule 65A of the Utah Rules of Civil Procedure and otherwise, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1.      Plaintiffs' Motion for a temporary restraining order is granted.

2.      Defendant Alum Rock Riverside, LLC ("**Defendant**" or "**Alum Rock**"), and anyone acting by, with, or through Alum Rock, is **HEREBY RESTRAINED** from continuing with, allowing, and/or holding and is **ORDERED TO CANCEL** the Sheriff's Sale scheduled for January 16, 2025 at 12:00 p.m., including pursuant the *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, Civil No. 206927043, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**") and/or to the Writ of Execution issued on June 22, 2021 in the writ proceeding (the "**Writ of Execution**"), on the real property located in Weber County, Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

3.      Defendant Alum Rock is further **RESTRAINED** from and **ORDERED** to immediately **CEASE** any and all efforts to foreclose on and/or sell the Property pursuant to the Alum Rock Lien or the Writ of Execution.

4.      Copies of this **ORDER GRANTING MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER** may be recorded in the office of the Weber County Recorder in the State of Utah.

5.      **This temporary restraining order will expire 14 days after the date of its issuance unless further extended by agreement of the parties or order of the court.**

6.      An in-person hearing to consider Plaintiffs' request for a preliminary injunction will be conducted in the above-entitled court on **Friday, January 17, 2025, at 1:00 p.m.,** or as soon thereafter as counsel can be heard.

The GROUNDS for this Order and the TRO are as follows:

Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or "**Plaintiffs**") each are individual owners of record of the Property, which is their home and irreplaceable real property. The potential loss of such real property constitutes irreparable harm within the meaning of Rule 65A.

Plaintiffs have demonstrated that based on the material facts and the applicable statutory and case law that they meet each of the four Rule 65A elements necessary to obtain the TRO. Plaintiffs have demonstrated that: (1) there is a substantial likelihood that Plaintiffs will prevail on

the merits of their underlying claims; (2) Plaintiffs will suffer irreparable harm unless this Court issues a TRO; (3) the threatened injury to Plaintiffs outweighs whatever damage the TRO may cause Defendant; and this (4) Court's issuance of a TRO benefit the public interest and is not adverse to it.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***

SECOND JUDICIAL DISTRICT - OGDEN DISTRICT COURT

WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J MULLIGAN    et al., | NOTICE OF |
| Plaintiff, | IN PERSON PRELIMINARY INJUN. |
| | |
| vs. | Case No: 240908957 PR |
| ALUM ROCK RIVERSIDE LLC    et al., | Judge: NOEL S HYDE |
| Defendant. | Date: January 10,2025 |

**In-person Appearance**

**IN PERSON PRELIMINARY INJUN. is scheduled.**

Date: 01/17/2025

Time: 01:00 p.m.

Location: 3rd Floor Southeast

Before Judge: NOEL S HYDE

SECOND DISTRICT COURT

2525 GRANT AVENUE

OGDEN, UT 84401

January 10,2025          /s/ AMY HARRIS

Date: _____          _____

District Court Deputy Clerk

UCJA Rule 4-401.02: court proceedings, including electronic proceedings, may NOT be recorded, photographed, or transmitted. Failure to comply with this prohibition may be treated as contempt of court, punishable by fine and time in jail.

\* The court will provide an interpreter upon request. If you need an interpreter, please notify the court at (801) 395-1022 five days before the hearing.

\* El tribunal proveerá un intérprete si lo solicita. Si usted necesita un intérprete, por favor notifíque al tribunal llamando al número (801) 395-1022 cinco días antes de la audiencia.

Individuals needing special accommodations (including auxiliary communicative aids and services) should call Shannon Treseder at 801-395-1100 three days prior to the hearing.  For TTY service call

Utah Relay at 800-346-4128.

**CERTIFICATE OF NOTIFICATION**

I certify that a copy of the attached document was sent to the following people for case 240908957 by the method and on the date specified.

EMAIL: FELICIA CANFIELD CANFIELDLAWLLC@GMAIL.COM

EMAIL: KYLE HOOKER KCHOOKER@BTJD.COM

EMAIL: BENJAMIN JOHNSON BEN.JOHNSON@BTJD.COM

EMAIL: BRADLEY TILT BRADLEY.TILT@FREEMANLOVELL.COM


01/10/2025          /s/ AMY HARRIS

Date: _____      _____

                                              Signature

SECOND JUDICIAL DISTRICT - OGDEN DISTRICT COURT

WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J MULLIGAN    et al., <br><br> Plaintiff, <br><br><br> vs. <br> ALUM ROCK RIVERSIDE LLC    et al., <br><br> Defendant. | NOTICE OF <br> TELEPHONE SCHEDULING CONF. <br><br><br> Case No: 240908957 PR <br> Judge: NOEL S HYDE <br> Date: January 10,2025 |

**In-person Appearance**

**TELEPHONE SCHEDULING CONF. is scheduled.**

Date: 01/10/2025

Time: 02:30 p.m.

Location: 3rd Floor Southeast

Before Judge: NOEL S HYDE

SECOND DISTRICT COURT

2525 GRANT AVENUE

OGDEN, UT 84401

Counsel or parties are requested to be in their respective offices at the time set for the telephone conference.  The clerk will initiate the conference call.

Please contact the clerk at 2ndhydeteam@utcourts.gov to provide the telephone number where you may be contacted at the time on the above-scheduled date.

Re-schedule preliminary injunction.


January 10,2025          /s/ AMY HARRIS

Date: _____          _____

District Court Deputy Clerk

UCJA Rule 4-401.02: court proceedings, including electronic proceedings, may NOT be recorded, photographed, or transmitted. Failure to comply with this prohibition may be treated as contempt of court, punishable by fine and time in jail.


* The court will provide an interpreter upon request. If you need an interpreter, please notify the court

at (801) 395-1022 five days before the hearing.

* El tribunal proveerá un intérprete si lo solicita. Si usted necesita un intérprete, por favor notifique al tribunal llamando al número (801) 395-1022 cinco días antes de la audiencia.

Individuals needing special accommodations (including auxiliary communicative aids and services) should call Shannon Treseder at 801-395-1100 three days prior to the hearing.  For TTY service call Utah Relay at 800-346-4128.

## CERTIFICATE OF NOTIFICATION

I certify that a copy of the attached document was sent to the following people for case 240908957 by the method and on the date specified.

EMAIL: BENJAMIN JOHNSON BEN.JOHNSON@BTJD.COM

EMAIL: BRADLEY TILT BRADLEY.TILT@FREEMANLOVELL.COM


01/10/2025          /s/ AMY HARRIS

Date: _____          _____

                                    Signature

SECOND JUDICIAL DISTRICT - OGDEN DISTRICT COURT

WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J MULLIGAN    et al., <br><br> Plaintiff, <br><br><br> vs. <br> ALUM ROCK RIVERSIDE LLC    et al., <br> Defendant. | NOTICE OF <br> IN PERSON PRELIMINARY INJUN. <br><br><br> Case No: 240908957 PR <br> Judge: NOEL S HYDE <br> Date: January 10,2025 |

**In-person Appearance**

**IN PERSON PRELIMINARY INJUN..**

Date: 01/14/2025

Time: 10:00 a.m.

Location: 3rd Floor Southeast

before Judge NOEL S HYDE

SECOND DISTRICT COURT

2525 GRANT AVENUE

OGDEN, UT 84401

The reason for the change is Conflict in attorney schedule
*Courts Website: https://legacy.utcourts.gov/cal/*

January 10,2025          /s/ AMY HARRIS

Date: _____          _____

                              District Court Deputy Clerk

UCJA Rule 4-401.02: court proceedings, including electronic proceedings, may NOT be recorded, photographed, or transmitted. Failure to comply with this prohibition may be treated as contempt of court, punishable by fine and time in jail.


\* The court will provide an interpreter upon request. If you need an interpreter, please notify the court at (801) 395-1022 five days before the hearing.

\* El tribunal proveerá un intérprete si lo solicita. Si usted necesita un intérprete, por favor notifique al tribunal llamando al número (801) 395-1022 cinco días antes de la audiencia.

Individuals needing special accommodations (including auxiliary communicative aids and services) should call Shannon Treseder at 801-395-1100 three days prior to the hearing.  For TTY service call Utah Relay at 800-346-4128.

**CERTIFICATE OF NOTIFICATION**

I certify that a copy of the attached document was sent to the following people for case 240908957 by the method and on the date specified.

EMAIL: FELICIA CANFIELD CANFIELDLAWLLC@GMAIL.COM

EMAIL: KYLE HOOKER KCHOOKER@BTJD.COM

EMAIL: BENJAMIN JOHNSON BEN.JOHNSON@BTJD.COM

EMAIL: BRADLEY TILT BRADLEY.TILT@FREEMANLOVELL.COM


01/10/2025          /s/ AMY HARRIS

Date: _____    _____

Signature

Benjamin D. Johnson (10275)
KC Hooker (18018)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Email: ben.johnson@btjd.com;
kchooker@btjd.com
*Attorneys for Defendant Alum Rock Riverside, LLC*

---

## IN THE SECOND JUDICIAL DISTRICT COURT, ODGEN
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs, <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; BRETT H. DEL VALLE and TRACI M. DEL VALLE as Co-Trustees of the Del Valle Family Trust dated October 30, 2002, <br><br> Defendants. | **OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> Case No. 240908957 <br><br> Judge: Camille Neider |

Defendant Alum Rock Riverside, LLC ("**Alum Rock**"), pursuant to Rule 7 and Rule

65A of the Utah Rules of Civil Procedure, files this opposition to Plaintiffs Molly J. Mulligan

and John P. Mulligan's (collectively, the "**Mulligans**") Motion for Issuance of a Temporary

Restraining Order and Preliminary Injunction (the "**Motion**").

### PREFERRED DISPOSITION AND SUPPORTING GROUNDS

This lawsuit represents the Mulligans' *third attempt* to stop an execution sale that has

been upheld by the Utah Supreme Court. In November 2020, Alum Rock recorded a multi-

million-dollar judgment against Brett Del Valle ("***Del Valle***") in the Weber County

Recorder's office. That judgment then became a lien on Del Valle's property located at 1453

South Basinview Road in Huntsville, Utah (the "***Property***"). Several months after Alum

Rock recorded its judgment, Del Valle sold the Property to the Mulligans. Alum Rock then

applied for a writ of execution, which Judge Mow in the Third District granted. A legal battle

then ensued, which culminated in the Utah Supreme Court affirming Alum Rock's lien rights

and upholding the writ of execution.

Only a week after losing their appeal, the Mulligans attempted to challenge the writ of

execution a second time in a case pending before Judge Hyde in the Second District. But

when Judge Hyde issued a ruling that the Mulligans didn't like, they filed this current lawsuit

instead. It is clear that the Mulligans are seeking to collaterally attack valid judgments from

other courts and are forum shopping in the hopes of obtaining a favorable decision maker.

This Court should reject the Mulligans' attempts to endlessly drag out this dispute

and litigate defenses that should have been raised in earlier proceedings. In addition, the

Mulligans' requested injunction is nothing short of incredible—they are asking this Court to

enjoin enforcement of a valid court order from the Third District. The Court should deny

the Motion for several independent reasons. First, this Court should decline to even exercise

jurisdiction over this dispute because Judge Mow in the Third District already has

jurisdiction over the case. Second, each of the Mulligans' new claims represent an

impermissible collateral attack on the Utah Supreme Court's decision. Third, the Mulligans'

new claims are barred by claim preclusion and lack merit. Fourth, the Mulligans will not

experience irreparable harm from the scheduled sheriff's sale because the writ of execution

has already been upheld by the Utah Supreme Court, and any issue about the division of sale

proceeds can be determined after the sale. Fifth, if this Court grants an injunction, Alum

Rock stands to suffer greater harm than the Mulligans would experience in the absence of an

injunction. And sixth, the Mulligans' requested injunction violates the public interest because

the Mulligans are attempting to pit this Court against the Third District and the Utah

Supreme Court.

Legal disputes should be adjudicated only once. The Mulligans believe legal disputes

should be litigated until they win. The Court should reject the Mulligans' delay tactics and

endless court filings and deny the Motion.

## OBJECTION TO EVIDENCE

Pursuant to Rule 7(d)(1)(C) of the Utah Rules of Civil Procedure, Alum Rock objects

to the following factual statements from the Mulligans' Motion:

**Mulligans' Paragraph No. 6**: "The claimed interests of Defendant Alum Rock in or
to the Property is/are based and premised upon a certain *Notice of Judgment* filed on October
23, 2020 in the Third Judicial District Court, Salt Lake County, which Notice was recorded
in the office and general records of the Weber County Recorder on October 23, 2020 as
Entry No. 3101770, but which was not abstracted to or against the Property (the "**Alum
Rock Lien**"). *See* Canfield Decl., Ex. E; *see also* Ex. D."

**Objection**: Alum Rock objects to Paragraph No. 6 because it misstates the evidence.

Alum Rock recorded the Notice of Judgment on November 16, 2020, not October 23, 2020.

*See* Notice of Judgment, attached as **Exhibit 1**.

**Mulligans' Paragraph No. 7**: "No judgments against either Co-Trustee were
recorded on the Property; no judgments against either Co-Trustee appear in any Weber
County Recorder abstract or title search of the Property; and no judgments against either
Co-Trustee appear in the searchable court index where the Property is located, including not
during the time leading up to and including when the Mulligans purchased the Property. *See*
Canfield Decl., Ex. D."

**Objection**: Alum Rock objects to Paragraph No. 7 because it misstates the evidence

contained in Exhibit D to Felicia Canfield's declaration. Exhibit D appears to contain

information regarding judgments recorded in the Weber County Recorder's office during

two different times periods in October 2020—between October 2 and October 5, and

between October 19 and October 23. Based on this information, the Mulligans' counsel

claims that no recorded judgments appear against Brett Del Valle "leading up to and

including when the Mulligans purchased the Property." But the Mulligans have no

foundation to make this statement for two reasons. *See* Utah R. Evid. 602. First, the

Mulligans purchased the Property on May 11, 2021, but the information in Exhibit D only

contains information from October 2020. The Mulligans cannot claim that because

judgments purportedly did not appear in October 2020, they did not appear seven months

later in May 2021. And second, Alum Rock did not record its Notice of Judgment until

November 16, 2020. A judgment search limited to October 2020 would not identify a

judgment recorded in November 2020, so the Mulligans' statement that the judgment does

not appear in a search is misleading.

Alum Rock also objects because Paragraph No. 7 as irrelevant. *See* Utah R. Evid. 402.

As explained below, whether Alum Rock's judgment appears in a public search is irrelevant

because, under Utah's recording statutes, the Mulligans had constructive notice of the

judgment as soon as Alum Rock recorded it. It is undisputed that Alum Rock recorded the

judgment on November 16, 2020, so whether the Mulligans had actual knowledge of the

judgment is irrelevant—regardless of any alleged mistakes by the Weber County Recorder

while indexing the judgment.

4

## RELEVANT FACTS

### *Alum Rock Obtains a Writ of Execution*

1. Several years ago, Alum Rock sued Brett Del Valle ("**Del Valle**") in California Superior Court for various claims. Alum Rock prevailed in that suit, and in June 2020, the California court entered a multi-million-dollar judgment. *See* Ruling and Order on Mulligans' Reply to Writ of Execution, attached as **Exhibit 2**; *Mulligan v. Alum Rock Riverside LLC*, 2024 UT 22, attached as **Exhibit 3**.[1]

2. Alum Rock domesticated the judgment in the Third District Court on October 23, 2020 and recorded it in the Weber County Recorder's office on November 16, 2020. *See id.*

3. Proceedings relating to the judgment are currently pending before Judge Mow in the Third District Court as Case No. 206927043 (the "**First Lawsuit**").

4. On May 11, 2021 (after Alum Rock recorded the judgment), Del Valle transferred the Property the Mulligans. *See id.*

5. The Mulligans' purchase of the Property is covered by a $1.8 million dollar title insurance policy, which covers the risk of a "judgment, state or federal tax lien" on the Property. *See* Title Insurance Policy, attached as **Exhibit 4**.

6. In June 2021, Alum Rock applied for and obtained a writ of execution for the Property (the "**Writ of Execution**"). *See* **Exhibit 8**.

---

[1] Unless otherwise noted, Alum Rock cites to Judge Mow's decision in Case No. 206927043 and the Utah Supreme Court's decision on appeal for the factual and procedural history between Alum Rock and the Mulligans.

7.      A few weeks later, the Mulligans filed a reply to the Writ of Execution (the
"**Reply**"). In that Reply, the Mulligans argued that (1) a writ was not available because Del
Valle owned the Property through his trust (the "**Trust**"), not in his individual capacity, and
(2) Alum Rock had no judgment lien because it did not file the judgment in the registry of
judgments. *See* Reply to Writ of Execution, attached as **Exhibit 5**.

8.      Importantly, the Reply contained a section where the Mulligans were required
to list all reasons why "the Writ of Execution was issued improperly." *See id.*

9.      In September 2021—two months after filing the Reply—the Mulligans filed a
lawsuit against Single Box, L.P. ("**Single Box**"), an alleged judgment lien creditor who filed a
judgment lien on the Property, arguing that the alleged lien was invalid because (1) Del Valle
never owned the property in an individual capacity and (2) the Mulligans' interests were
superior to the judgment creditor's lien under the doctrines of equitable
subordination/subrogation (the "**Second Lawsuit**"). *See* Complaint (Case No. 210904774),
attached as **Exhibit 6**.

10.      In other words, the Mulligans knew about their equitable subordination and
equitable subrogation defenses against Alum Rock since at least September 2021.

11.      Nearly a year after filing the Second Lawsuit, Judge Mow in the First Lawsuit
asked Alum Rock and the Mulligans to file supplemental briefs on the validity of Alum
Rock's lien and the Writ of Execution. *See* Minutes from Scheduling Conference, Docket
No. 28 (Case No. 206927043).

12.      In the Mulligans' supplemental brief, they added a new argument that the Third
District Court did not have authority to issue a writ for property located outside the district.

But despite the fact that the Mulligans knew about their equitable subrogation/subordination arguments at that time (because they had asserted those claims against Single Box a year earlier), the Mulligans chose not to raise them in their supplemental brief. *See* Mulligan's Supplemental Brief, attached as **Exhibit 7**.

13.    After considering supplemental briefing, Judge Mow issued a 10-page order rejecting each of the Mulligans' arguments. Specifically, Judge Mow held that (1) Alum's Rock's "judgment is a valid lien on the Property" and (2) the "Property . . . was subject to execution under rule 64E." *See* Ruling and Order at 2, 10, Exhibit 2.

### The Utah Supreme Court Upholds the Writ of Execution

14.    The Mulligans appealed to the Utah Supreme Court and asked Judge Mow to stay enforcement of the Writ of Execution during the appeal. After holding a hearing, Judge Mow stayed enforcement of the Writ of Execution "pending the outcome of the appeal" because, among other things, the case presented "serious issues on the merits warranting appellate review." In other words, the Mulligans already delayed the sheriff's sale of the Property so a court could adjudicate their defenses against Alum Rock.

15.    On July 17, 2024, the Utah Supreme Court issued an opinion and affirmed Judge Mow in all respects. Specifically, the Court held that (1) Alum Rock had a valid judgment lien on the Property and (2) the Writ of Execution was properly issued and enforceable. *See* Exhibit 3.

16.    Undeterred, on August 1, 2024, the Mulligans filed a petition for reconsideration that essentially reiterated the arguments the Utah Supreme Court had already

rejected. The Court denied the petition for rehearing on August 21, without asking Alum Rock to respond.

### *After Losing the Appeal, the Mulligans Attempt to Add Alum Rock to a Second Lawsuit*

17.     On August 27—less than a week after the Utah Supreme Court denied the petition for rehearing—the Mulligans filed a motion to supplement their complaint in the Second Lawsuit against Single Box (the "***Motion to Amend***"). *See* Case No. 210904774, Docket No. 184.

18.     In the Motion to Amend, the Mulligans asked Judge Hyde from the Second District for permission to add Alum Rock as a party and challenge the Writ of Execution (in addition to challenging Single Box's alleged lien). *See* Case No. 210904774, Declaration of Felcia Canfield (Exhibit 7), Docket No. 185.

19.     The claims the Mulligans sought to assert against Alum Rock in the Second Lawsuit are identical to this lawsuit—just in a different order:

| Second Lawsuit | | Current Lawsuit | |
|---|---|---|---|
| First Cause of Action | Quiet Title | First Cause of Action | Quiet Title |
| Second Cause of Action | Equitable Subordination | Second Cause of Action | Equitable Subordination |
| Third Cause of Action | Equitable Subrogation | Third Cause of Action | Equitable Subrogation |
| Sixth Cause of Action | Bona Fide Purchasers | Fifth Cause of Action | Bona Fide Purchasers |
| Seventh Cause of Action | No Constructive Notice | Fourth Cause of Action | No Constructive Notice |
| Fifth Cause of Action | Injunctive Relief | Seventh Cause of Action | Injunctive Relief |

20.     Alum Rock intervened in the Second Lawsuit and opposed the Mulligans'

Motion to Amend. Judge Hyde held a hearing on the Motion to Amend on November 26,

2024.

21.     Judge Hyde instructed the Mulligans' counsel to prepare an order reflecting his

oral ruling. Seemingly not pleased with the ruling, rather than follow Judge Hyde's

instructions, the Mulligans withdrew the Motion to Amend and filed this identical lawsuit

instead.[2] *See* Notice of Withdrawal of Motion to Amend, Docket No. 21.

### The Del Valle Family Trust

22.     At all relevant times, Del Valle and his wife, Traci M. Del Valle served as Co-

Trustees of The Del Valle Family Trust. *See generally* The Del Valle Family Trust (the "**Trust**

**Agreement**"), attached as **Exhibit 9**.

23.     Pursuant to the Trust, either Trustee had the power to "convey, encumber or

otherwise dispose of community, real and personal property held [in the Trust] without the

consent of or prior notice to either husband or wife." *See id.* at 2–3, § 2.3(b).

### ARGUMENT

To be entitled to a preliminary injunction, the Mulligans must make four showings: (1)

there is a substantial likelihood they will prevail on their claims; (2) they will suffer irreparable

harm without an injunction; (3) their threatened injury is greater than the harm Alum Rock

---

[2]  In their Request for Judicial Notice (Docket No. 21), the Mulligans' counsel said that Alum
Rock scheduled a sheriff's sale for the Property before they "could obtain any order" on
their "motion to supplement." But the Mulligans' counsel failed to tell the Court that Judge
Hyde did, in fact, rule on the Motion to Amend a month before they filed this lawsuit. The
only reason Judge Hyde had not entered a written order was because the Mulligans ignored
Judge Hyde's request for them to draft one.

would experience from an injunction; and (4) the requested injunction is not adverse to the

public interest. Utah R. Civ. P. 65A(e). The Mulligans do not even come close to satisfying

any of these elements. The Court should accordingly deny the Motion.

## I.     The Mulligans Improperly Ask the Court to Interfere with a Pending Case.

At the outset, the Court should deny the Motion because the Mulligans' new lawsuit

suffers from two significant procedural defects. First, this dispute is already pending before

Judge Mow in the Third District, and this Court has strong grounds to decline jurisdiction.

And second, this lawsuit represents an impermissible collateral attack on the First Lawsuit and

the Utah Supreme Court's decision. The Court can, and should, deny the Motion on these

grounds alone.

### a.     This Court Should Not Enjoin Enforcement of the Third District's Writ of Execution.

The Court should summarily deny the Motion because this dispute is already pending

before Judge Mow in the Third District. In other words, because a coordinate and co-equal

court already has jurisdiction over this dispute and has decided critical legal issues—decisions

that have been upheld by the Utah Supreme Court—this Court has strong reasons to decline

jurisdiction. The Mulligans are indisputably (and improperly) forum shopping in the hopes of

drawing a more favorable decision-maker, and this Court should not allow them to do so.

Encountering the same kind of litigation tactics the Mulligans have employed, "federal

courts long have recognized that the principle of comity requires federal district courts—

courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with

each other's affairs." *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th

Cir. 1985).[3] This rule is particularly strong when a plaintiff seeks an injunction. *See Bergh v. State of Wash.*, 535 F.2d 505, 507 (9th Cir. 1976) ("When an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases."). In other words, when "two federal courts are of coordinate jurisdiction, and their decisions are reviewed by the same Court of Appeals, the issuance of such an injunction is rarely, if ever, justified." *Id.*; *see also Brittingham v. U.S. C.I.R.*, 451 F.2d 315, 318 (5th Cir. 1971) ("[C]omity dictates that courts of coordinate jurisdiction not review, enjoin or otherwise interfere with one another's jurisdiction."); *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981) ("Generally, principles of comity and judicial economy make courts reluctant to exercise jurisdiction over claims involving the orders of coordinate courts."); *Exxon Corp. v. U.S. Dept. of Energy*, 594 F. Supp. 84, 89 (D. Del. 1984) ("[T]his Court is convinced that it should not, based on the notion of comity and the orderly administration of justice, become involved in a phase of this litigation that could seriously interfere with the continuing jurisdiction of a coordinate court.").

In this case, Alum Rock and the Mulligans have been litigating the Writ of Execution in the Third District for more than three years. And the Writ of Execution has been confirmed and upheld by the Utah Supreme Court. The Writ of Execution is an enforceable court order, and any issues relating to that order must be adjudicated in the Third District. What the Mulligans

---

[3] "Because the Utah Rules of Civil Procedure are patterned after the Federal Rules of Civil Procedure, where there is little Utah law interpreting a specific rule, we may look to the Federal Rules of Civil Procedure for guidance." *Bichler v. DEI Systems, Inc.*, 2009 UT 63, ¶ 24 n.2, 220 P.3d 1203

are asking of this Court is nothing short of incredible: they want a judge in the Second District
to enjoin enforcement of an order from the Third District. The Mulligans' request seriously
interferes with the Third District's continuing jurisdiction over this dispute and its ability to
enforce its own orders. This Court should decline to "trench upon the authority of [a] sister
court[]" and rebuke the Mulligans for attempting to cause an internal conflict between this
Court and the Third District. *West Gulf Maritime Ass'n*, 751 F.2d 721, 728.

  b. <u>This Lawsuit is an Impermissible Collateral Attack on the Utah Supreme
Court's Decision.</u>

  The Mulligans' efforts to assert new defenses against Alum Rock also constitute an
impermissible collateral attack on the First Lawsuit. "With rare exception, when a court with
proper jurisdiction enters a final judgment, that judgment can only be attacked on direct
appeal." *Moss v. Parr Waddoups Brown Gee & Loveless*, 2010 UT App 170, ¶ 9, 237 P.3d 899
(cleaned up). In Utah, "[t]he general rule of law is that a judgment may not be drawn in
question in a collateral proceeding." *Tolle v. Fenley*, 2006 UT App 78, ¶ 15, 132 P.3d 63. A
proceeding is considered a collateral attack when "a judgment is attacked in other ways than
by proceedings in the original action to have it vacated or revised or modified or by a
proceeding in equity to prevent its enforcement." *Ostler v. Retirement Bd.*, 2017 UT App 96,
¶ 22, 400 P.3d 1099.

  In this case, the Mulligans attempt to (1) attack the validity of Alum Rock's judgment
lien and (2) prevent enforcement of the Writ of Execution. But Judge Mow determined that
Alum Rock has a valid judgment lien and that the Writ of Execution is proper. What's more,
these conclusions have been upheld by the Utah Supreme Court—the final and definitive
arbiter of Utah law. The Mulligans appear determined to collaterally attack and delay the Writ

of Execution by any means necessary. Within a week of losing their appeal, the Mulligans attempted to bring Alum Rock into the Second Lawsuit. And when Judge Hyde made a decision that the Mulligans didn't like, the Mulligans withdrew their motion and decided to try their luck with a new lawsuit. But because a judgment can only be "attacked on direct appeal," the Mulligans are barred from directly or indirectly challenging Judge Mow's or the Utah Supreme Court's decision in this separate proceeding. *Moss*, 2010 UT App 170, ¶ 9.

## II.    The Mulligans Have No Chance of Prevailing on the Merits.

In addition to the serious procedural defects discussed above, the Mulligans will not prevail on the merits of their claims because (1) those claims are barred by claim preclusion and (2) the claims lack merit. Because the Mulligans' chances of prevailing in this dispute are slim to none, they are not entitled to an injunction.

### a.    The Mulligans' Claims are Barred by Claim Preclusion.

"The doctrine of res judicata embraces two distinct branches: claim preclusion and issue preclusion. Claim preclusion corresponds to causes of action; issue preclusion corresponds to the facts and issues underlying causes of action." *Mack v. Utah State Dep't of Com., Div. of Sec.*, 2009 UT 47, ¶ 29, 221 P.3d 194 (cleaned up). An important purpose of claim preclusion is to "prevent litigants from getting a second bite at the apple." *Daz Mgmt., LLC v. Honnen Equip. Co.*, 2022 UT 15, ¶ 46, 508 P.3d 84. Claim preclusion has three elements: "[f]irst, both cases must involve the same parties or their privies. Second, the claim that is alleged to be barred must have been presented in the first suit or be one that could and should have been raised in the first action. Third, the first suit must have resulted in a final judgment on the

merits." *Mack*, 2009 UT 47, ¶ 29 (quoting *Snyder v. Murray City Corp.*, 2003 UT 13, ¶ 34, 73 P.3d 325).

Because Alum Rock and the Mulligans were parties to, and participated fully in, the First Lawsuit, the first element is satisfied. And because the Mulligans could have and should have raised their new defenses in the First Lawsuit and ultimately litigated that case to a final judgment, their new claims are barred by claim preclusion.

     i.     *The Mulligans Could Have and Should Have Raised Their Claims in the First Proceeding.*

Claim preclusion bars not only claims that were adjudicated in a prior dispute, it also bars claims that should have been raised, but were not. "The Utah Supreme Court has fully embraced the Restatement's transactional test for analyzing whether the claims in two cases are the same under the second requirement of the claim preclusion branch of res judicata." *Van Leeuwen v. Bank of Am. NA*, 2016 UT App 212, ¶ 9, 387 P.3d 521 (cleaned up). This same test applies "[i]n determining whether a claim should have been brought in the first action." *Daz Mgmt.*, 2022 UT 15, ¶ 57. "Under the transactional test, the claims are the same if they arise from the same operative facts, or in other words from the same transaction." *Gillmor v. Fam. Link, LLC*, 2012 UT 38, ¶ 12, 284 P.3d 622 (cleaned up). "There are a variety of considerations in the transactional test because, rather than resting on the specific legal theory invoked, claim preclusion generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims." *Van Leeuwen*, 2016 UT App 212, ¶ 9 (cleaned up). These considerations include "whether the facts are related in time, space, origin, or motivation." *Gillmor,* 2012 UT 38, ¶ 14. In sum, if a new claim arises from the same

14

transaction as a prior lawsuit, then the plaintiff is barred from asserting the new claim in a subsequent lawsuit.

In this case, the "underlying events" that gave rise to the First Lawsuit are (1) Alum Rock's judgment against Del Valle; (2) Alum Rock's domestication of that judgment in Utah; (3) Alum Rock's lien on the Property; (4) Del Valle's transfer of the Property to the Mulligans; and (5) Alum Rock's writ of execution. *See Van Leeuwen*, 2016 UT App 212, ¶ 9. These same events form the basis of the Mulligans' new claims and defenses, and it appears that the Mulligans are simply attempting to delay Alum Rock's right to execute on the Property (for the third time). Alum Rock addresses each of the Mulligans' new claims in turn:

1.    <u>Quiet Title</u>: This claim seeks a declaration that Alum Rock's lien only attaches to that portion of the Property stemming from Del Valle's contribution and that Alum Rock must prove what that contribution was. This claim arises from the same transaction as the First Lawsuit—Alum Rock's judgment lien and Del Valle's transfer of the Property to the Mulligans. The Mulligans could have and should have raised this claim in the First Lawsuit.

2.    <u>Equitable Subordination and Equitable Subrogation</u>: The Mulligans claim that because they allegedly paid off senior liens when they purchased the Property, they can claim a priority position over Alum Rock's lien. Again, this claim is based on the same set of events as the First Lawsuit, i.e., the Mulligan's purchase of the Property from Del Valle and Alum Rock's judgment lien. There is no reason why the Mulligans could not have brought this defense in the First Lawsuit. What's more, by the time the parties engaged in supplemental briefing in the First Lawsuit, the Mulligans had already asserted claims of equitable subordination and equitable subrogation against Single Box. The fact that the

15

Mulligans had already asserted these claims against Single Box means that they were fully aware that they could have asserted the claims against Alum Rock as well. The Mulligans simply chose to withhold this defense and only assert it if they lost their appeal. And based on the Mulligans' reaction to Judge Hyde's decision in the Second Lawsuit, the Mulligans apparently plan to refile their claims and try their luck with a different judge any time they receive an adverse ruling.

3.    <u>Bona Fide Purchasers with No Constructive Notice</u>: The Mulligans claim that because they were bona fide purchasers with no constructive notice, they took the Property without any encumbrances they didn't know about. This claim is based on the same events as the First Lawsuit—Alum Rock's judgment lien and the Mulligans' purchase of the Property from Del Valle. If the Mulligans really are bona fide purchasers with no constructive notice, they were as much so three years ago as they are now. The Mulligans could have and should have asserted this claim earlier, and they are barred from doing so now.

"Claim preclusion is premised on the principle that a controversy should be adjudicated only once." *Nelson v. Nelson*, 2023 UT App 38, ¶ 30, 529 P.3d 370 (cleaned up). This lawsuit is the Mulligans' *third attempt* to litigate the Writ of Execution, and they seem intent on endlessly dragging out this dispute by filing successive lawsuits. Because the Mulligans could have and should have brought each of their claims in the First Lawsuit, the claims are barred.

      *ii.*      <u>*The First Proceedings Resulted in a Final Judgment on the Merits.*</u>

"A judgment is upon the merits when it amounts to a declaration of the law as to the respective rights and duties of the parties based on facts and evidence upon which the rights

of recovery depend, irrespective of formal, technical, or dilatory objections or contentions." *Peterson v. Armstrong*, 2014 UT App 247, ¶ 14, 337 P.3d 1058 (cleaned up). "To be on the merits, a judgment does not have to proceed to trial. Rather, a judgment on the merits may be made at any stage of the litigation, so long as the judgment rendered is based upon a proper application of the relevant law to the facts of the case." *State v. Sommerville*, 2013 UT App 40, ¶ 32, 297 P.3d 665. Under the Utah Rules of Civil Procedure, the definition of "judgment" is broad and includes "a decree or order that adjudicates all claims and the rights and liabilities of all parties or any other order from which an appeal of right lies." Utah R. Civ. P. 54(a).

Applied here, the issue is (1) whether an order was entered "from which an appeal of right lies" and (2) whether the First Lawsuit resulted in a ruling based on the law and facts of the case. On the first issue, it is clear that Judge Mow's ruling on the Writ of Execution was an appealable order because the Mulligans, in fact, appealed that decision to the Utah Supreme Court (and lost). And on the second issue, the First Lawsuit was substantively resolved on the merits and resulted in a declaration that Alum's Rock's "judgment is a valid lien on the Property" and that the "Property . . . [is] subject to execution under rule 64E." *See* Ruling and Order at 2, 10, Exhibit 2. Accordingly, the First Lawsuit resulted in a final judgment on the merits and has preclusive effects.[4]

---

[4] What's more, many cases have held that res judicata can apply to supplemental proceedings like executions. *See Eckhaus v. Blauner*, No. 94 CIV. 5635(CSH), 1997 WL 362166, *5 (S.D.N.Y. June 26, 1997) ("There is authority for the proposition that supplemental proceedings may lay the foundation for application of res judicata."); *Leslie v. Laprade*, 726 A.2d 1228 (D.C. Ct. App. 1999) (finding that a party could not challenge a writ of execution in a separate action when the party moved to "strike the writ of execution," "was denied that relief," and "took no appeal").

Because all elements of claim preclusion are satisfied, the Mulligans' new claims are

barred. Because the claims are barred, the Mulligans will not prevail, and they are not entitled

to an injunction.

      b.    <u>The Mulligans' Claims Fail on the Merits</u>

While the Mulligans' new claims fail for a host of procedural reasons, they also fail for

substantive reasons. The Mulligans base their claim for injunctive relief on three claims: (1)

quiet title; (2) equitable subrogation/subordination; and (3) bona fide purchaser/constructive

notice. *See* Motion at 8-11. Alum Rock will discuss the weakness of each claim in turn:

**<u>Quiet Title:</u>** For this claim, the Mulligans rely on Utah Code § 75-7-505(1), which says

that "[i]f a revocable trust has more than one settlor, the amount the creditor or assignee of a

particular settlor may reach may not exceed the settlor's interest in the portion of the trust

attributable to that settlor's contribution." The Mulligans' argument that they will prevail on

their quiet title claim consists of a single sentence: "Alum Rock has not proved what

contribution interest, if any, is available for it to execute upon." *See* Motion at 8. But the

Mulligans get it backwards. Because the Mulligans bear the burden of proof on their quiet title

claim, they must put forth evidence on this issue in order to prevail. Indeed, to show a

substantial likelihood of success, the Mulligans must "make a prima facie case showing that

the elements of its underlying claim can be proved." *See Water & Energy Systems Technology, Inc.*

*v. Keil*, 974 P.2d 821, 822 (Utah 1999). Even in a generic lawsuit where a party is not subjected

to the heightened standards imposed by Rule 65A the plaintiff bears the burden of proof. *See*

*Pioneer Centres Holding Company v. Alerus Fin., N.A.*, 858 F.3d 1324, 1335 (10th Cir. 2017).

"Where a statute is silent on burden allocation, the 'ordinary default rule [is] that plaintiffs bear

the risk of failing to prove their claims.'" *Id.* (quoting another source).[5] The reason for this general rule is "because the burdens of pleading and proof with regard to most facts have been and should be assigned to the plaintiff who generally seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion." *Id.* (quoting 2 McCormick on Evid. § 337 (7th ed. 2013). The Mulligans cannot point to Alum Rock (a party that does not bear the burden of proof) and claim that because Alum Rock has not disproved their claim, they are substantially likely to prevail. Because the Mulligans have failed to put forth any evidence to support their quiet title claim, they have not shown that they are substantially likely to prevail on the merits.

Even if the Mulligans had made the required prima facia case to show a substantial likelihood of success (they have not), the Trust Agreement cuts against their argument. *Cutter v. Seror* is instructive. *See* 398 B.R. 6 (B.A.P. 9th Cir. 2008). In *Cutter*, the court held that when the debtor is able to exercise control over that property, regardless of who contributed to the property, the "creditor" (in that case, the bankruptcy estate) is entitled to "the maximum amount" of the property that the debtor had power over. *See id; see also In re Kiesewetter*, Civil Action No. 11-109, 2011 WL 4527365, at *5 (W.D. Pa. Sep. 28, 2011) (holding that where debtor exercises dominion and control over trust assets, creditors may reach those assets). Because the debtor in *Cutter* had "unfettered access to and dominion and control over the

---

[5] The Supreme Court has likewise held in a number of circumstances that plaintiffs bear the burden of proof when the statute or Constitution is silent. *See, e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (Title VII); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (Endangered Species Act); *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (Americans with Disabilities Act); *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 593, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001) (Rule 10b-5 securities fraud); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (preliminary injunctions); *Hunt v. Cromartie*, 526 U.S. 541, 553, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (Equal Protection Clause); *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (First Amendment).

Trust and its assets," the creditor was able to reach those assets. *Cutter*, 398 B.R. at 22. Here, Del Valle was similarly granted "unfettered access to and dominion and control over the" Property. The Trust Agreement provides that Del Valle—as trustee—could alone make the decision to convey the Property. Indeed, the Trust Agreement makes clear that he could convey the Property "without the consent of or prior notice to either husband or wife." *See* Trust Agreement, Ex. 10, at 2–3, § 2.3(b). Given Del Valle's ability to exercise control over the Property, Alum Rock is entitled to reach the entirety of that asset.

**Equitable Subordination/Subrogation:** The Mulligans argue that because they allegedly paid off senior liens and mortgages when they purchased the Property, they can claim the same priority as the liens they paid off. While Utah courts have generally recognized the doctrines of equitable subordination/subrogation, no Utah court has addressed the specific issue presented in this case: whether a party who pays off a senior mortgage as part of a property purchase can rely on equitable subrogation to defeat a recorded junior lien. Many courts have held that when a purchaser has constructive notice of a lien at the time they purchase property, equitable subrogation/subordination does not apply. For example, in *Blecher v. Blecher*, the Oregon Supreme Court held that a person "who assumes and agrees to pay an existing indebtedness as part of the purchase price of real property" is properly "den[ied] the right of subrogation . . . as attempted to be exercised against the holder of a recorded junior lien or mortgage." 87 P.2d 762, 765 (Or. 1939). The Oregon Supreme Court reasoned that this rule (1) encourages prospective purchasers "to consult available records in regard to contemplated real property transactions" and (2) "minimizes . . . the effect of any uncertainty of representation between vendor and vendee concerning existing incumbrances

of record." *Id.* In making its ruling, the Oregon Supreme Court noted that this rule had been adopted by courts in Iowa, Kansas, Indiana, Washington, Texas, Wisconsin, Georgia, Kentucky, and Pennsylvania. *See id.* at 764 (collecting cases).

And in a more recent case, the Florida District Court of Appeals adopted *Blecher*'s reasoning and held that "[a]lthough the equitable principle of subrogation is a meritorious doctrine and should be applied where necessary to do justice between the parties, it will not be allowed where its application would lead to confusion by undermining the orderly scheme established by the recording statute." *Hieber v. Florida Nat. Bank*, 522 So.2d 878, 879 (Fla. Dist. Ct. App. 1988). The court also noted that the appellant's "title insurer was under a duty to discovery the lien" and that "[r]elief from folly of those who in respect of contemplated property transactions do not consult available lien records seems more the task of the school than of the court." *Id.* at 879-80 (cleaned up).

In this case, it is undisputed that Alum Rock recorded the judgment on November 16, 2020. And as discussed more fully below, the simple act of recording gave the Mulligans (and their title insurer) notice of the judgment. Based on the reasoning of *Blecher*, *Hieber*, and the other cases cited above, the doctrine of equitable subrogation/subordination does not apply to defeat Alum Rocks' recorded lien. The Mulligans' remedy is against their title insurer, not Alum Rock. Therefore, the Mulligans are unlikely to prevail on their equitable subrogation/subordination claim, and the Court should deny the Motion.

**Bona Fide Purchaser/Constructive Notice:** The Mulligans also claim that they are bona fide purchasers because they had no constructive notice of Alum Rock's judgment lien. The Mulligans are incorrect. Utah Code § 57-3-102 says that "[e]ach document . . . shall, from

the time of recording with the appropriate county recorder, impart notice to all persons of

their contents." Utah courts call this "[r]ecord notice," which "results from a record or is

imputed by the recording statutes." *Pioneer Builders Co. of Nevada, Inc. v. K D A Corp.*, 2012 UT

74, ¶ 24, 292 P.3d 672 (cleaned up). While "[a] party who takes an interest in [property in]

good faith" can generally claim protection "as a bona fide purchaser, or BFP," *Morris v. Off-*

*Poste Capital LLC*, 2018 UT App 7, ¶ 30, 418 P.3d 66, this rule does not apply when someone

has record notice. As the Utah Supreme Court explained: "when documents filed with the

county recorder disclose an interest in a particular property, a subsequent purchaser has record

notice of the competing interest and does not take in good faith." *Pioneer Builders Co. of Nevada*,

2012 UT 74, ¶ 24 (cleaned up).

Here, there is no dispute that Alum Rock recorded the judgment in the Weber County

Recorder's office on November 16, 2020. Therefore, the Mulligans had constructive notice of

Alum Rock's lien, and they cannot claim that they were bona fide purchasers or otherwise had

no notice of the lien. It's that simple. Whether the Mulligans (or their title company) failed to

discover the judgment or understand its significance before purchasing the Property does not

change the conclusion.

But even if actual notice mattered (it does not), the Mulligans have failed to show that

Alum Rock's judgment could not have been discovered by a title search. In the Motion, the

Mulligans claim that "no judgments against either Co-Trustee appear in the searchable court

index where the Property is located." *See* Motion at 10. The only support the Mulligans provide

for this statement is Exhibit D to Felicia Canfield's declaration, but that exhibit only shows

judgments recorded during October 2020. It goes without saying that a judgment recorded in

November 2020 would not show up in a search limited to October 2020. And a search limited to October 2020 would give no indication of whether a judgment existed as of May 11, 2021—the day the Mulligans purchased the Property. Therefore, the Mulligans' assertion that "no judgments against [Del Valle] appear in the searchable court index" has no evidentiary support.

To avoid the straightforward conclusion that they had constructive notice of Alum Rock's judgment lien, the Mulligans rely on unrelated sections of Utah's recording statute, Utah Code § 57-3-102(4)–(5).[6] But these sections do not matter because the legal effect of a judgment lien is governed by the Judgments Act, Utah Code § 78B-6-201 *et seq.* As the Utah Supreme Court already determined in this case, Alum Rock properly recorded its judgment in the Weber County Recorder's office under Utah Code § 78B-5-202(7), which says that "a judgment entered by a district court, or the Business and Chancery Court, becomes a lien upon real property if . . . the judgment . . . is recorded in the office of the county recorder." Once Alum Rock recorded its judgment, it created a lien upon "all the real property of [Del Valle] . . . owned or acquired at any time by [Del Valle] during the time the judgment is effective." Utah Code § 78B-5-202(7)(c). And the Supreme Court determined that because Del Valle owned the Property through a revocable trust, Alum Rock's judgment lien attached to the Property because, under Utah law, property of revocable trust is subject to claims of the

---

[6] In addition to being irrelevant, the Mulligans' arguments about the meaning of Utah Code § 57-3-102(4)–(5) are downright absurd. For instance, the Mulligans' claim that under Utah Code § 57-3-102(5), Del Valle transferred the property to them "free and clear" of Alum Rock's judgment lien because Alum Rock's judgment lien was "not disclosed in the 2007 Specialty Warranty Deed" through which Del Valle obtained title to the Property. *See* Motion at 11. But how could the judgment lien—which was recorded in 2020—have been disclosed in a warranty deed from thirteen years earlier? This reading of the statute is absurd and shows that the Mulligans are grasping at straws to stop the execution sale.

settlor's creditors. *See Mulligan v. Alum Rock Riverside*, 2024 UT 22, ¶¶ 52-62. Therefore, under these statutes, the Mulligans had constructive notice of both Alum Rock's judgment lien and the fact that the lien attached to the Property.

In sum, the Mulligans have no chance of prevailing on the merits of their claims. This necessarily means that the Mulligans are not substantially likely to prevail, and the Court must deny the Motion.

### III.    The Mulligans Will Suffer No Irreparable Harm.

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (cleaned up). The Mulligans have failed to demonstrate that they will suffer irreparable harm if Alum Rock enforces the Writ of Execution. At the outset, it is important to note that the Mulligans offer no evidentiary support for their assertion that the "Property is the Mulligans' home." *See* Motion at 11. The Mulligans submitted no declarations, sworn statements, or other testimony that the Property is the Mulligan's home or primary residence—it is simply an unsworn statement from the Mulligans' counsel. *See* Utah R. Evid. 603 (requiring testimony to be made under oath). For all we know, the Property is simply an investment property, which would mean that any alleged injury the Mulligans may experience could be compensated through reimbursement from their title insurer.

In addition, a majority of the Mulligans' claims do not center on *whether* the Property can be sold at auction, but *how much* Alum Rock is entitled to receive from the sale. For the Mulligans' quiet title claim, for example, they seek a declaration regarding what portion of the Property is traceable to Del Valle's contribution. This claim does not affect whether Alum

24

Rock can execute on the Property (it can), it only affects how much of the proceeds will go to Alum Rock. In addition, the Mulligans' equitable subrogation/subordination claim only goes to whether the Mulligans can claim priority over Alum Rock's lien—and if the Property sells for more than what the Mulligans paid for it, then Alum Rock would still receive a payout. Like the quiet title claim, the equitable subrogation/subordination claim can only affect how the sales proceeds are divided between Alum Rock and the Mulligans. Because most of the Mulligans' claims can only affect distribution of the sales proceeds, the Mulligans will not be irreparably harmed by a sale.

In addition, the Mulligans' alleged harm must be balanced against two important facts. First, the Writ of Execution has already been upheld by the Utah Supreme Court, and in doing so, the Court disposed of all defenses the Mulligans chose to bring in the First Lawsuit. In other words, the Mulligans already lost, and they cannot claim that they will be irreparably harmed by the enforcement of a legitimate court order. And second, the Mulligans have a $1.8 million dollar title insurance policy that covers judgment liens. The Mulligans will accordingly recoup all amounts they put into the Property after an execution sale.

## IV. Alum Rock's Injury Outweighs the Mulligans' Injury.

As explained above, the Mulligans will experience no irreparable injury if Alum Rock proceeds with the execution sale. But Alum Rock, on the other hand, stands to suffer great injury if the Court grants an injunction. The Mulligans already delayed an execution sale by more than three years. Their arguments were rejected by the Utah Supreme Court, and after that happened, the Mulligans attempted to add Alum Rock to the Second Lawsuit. And now, the Mulligans have filed yet another duplicative lawsuit in the hopes of further delay. All the

while, Alum Rock has incurred years of attorney fees and experienced substantial delay in executing on the Property. Because the Mulligans have already lost this dispute, they will suffer no present injury from a valid execution sale—but Alum Rock stands to suffer greatly through continued delay.

### V.    The Injunction is Adverse to the Public Interest.

Regarding the public interest, the Mulligans claim that "[t]he public has no interest, whatsoever, in permitting [the] unlawful and illegal sale of real property." *See* Motion at 12. But the Utah Supreme Court has held that Alum Rock's judgment lien is valid and that the Third District properly issued the Writ of Execution. Given these facts, how could an execution sale be "unlawful and illegal"? Aside from the Mulligans' incorrect assertion that the public would be harmed by an "unlawful" sale, the Mulligans' requested injunction violates two important societal interests. First, the Mulligans' requested injunction violates the public's interest in the "just, speedy, and inexpensive determination of every action." Utah R. Civ. P. 1. The law strongly favors resolving disputes in a single lawsuit and avoiding inconsistent rulings, which is why doctrines likes claim preclusion, issue preclusion, and compulsory counterclaims exist. *See Daz Mgmt., LLC v. Honnen Equip. Co.*, 2022 UT 15, ¶ 20, 508 P.3d 84 (noting that claim preclusion "fulfills several important purposes," including "preserving the integrity of the judicial system by preventing inconsistent judicial outcomes"). And second, the Mulligans' requested injunction requires this Court to intrude upon and interfere with Judge Mow's jurisdiction in the First Lawsuit. The public has an interest in consistent judicial outcomes, which is not served when judges in different judicial districts issue conflicting and

inconsistent orders. Because the Mulligans' requested injunction violates several important societal interests, the Court should deny the Motion.

### VI.    The Court should Post a Bond.

In the even the Court decides to grant the injunction, it should require the Mulligans to post a $1.8 million dollar bond, which represents the value of their title insurance policy. Contrary to the Mulligans' assertion, "a party is not entitled to a waiver of the supersedeas bond . . . solely because the judgment res consists of real property." *U.S. v. O'Callagan*, 805 F.Supp.2d 1321, 1325 (M.D. Fla. 2011). This is so because real property is not, as the Mulligans assume, an asset with an eternally fixed value. If the Mulligans could obtain an injunction without posting a bond, it would leave the value of Alum Rock's lien "subject to the whims of the housing market and [the Mulligans'] willingness to maintain the value of the residence." *Bank of New York Mellon v. Worth*, No. 3:13–cv–1489 (MPS), 2015 WL 1780719, *3 (D. Conn. April 20, 2015). "Even if the housing market remains stable and [the Mulligans] maintain[] the residence, absent a bond [Alum Rock] lacks protection against damage to the house." *O'Callagan*, 805 F.Supp.2d at 1326. "[A]n assortment of natural disasters . . . could dramatically alter the value of the forfeited property." *U.S. v. Route 7, Box 7091, Chatsworth, Ga.*, Civ. A. No. 4:93–CV–0335–HLM, 1997 WL 412477, *1 (N.D. Ga. April 4, 1997). Because of the possibility that the Property could be completely destroyed by a natural disaster, a bond is required to protect Alum Rock against these risks. Contrary to the Mulligans' assertion, Alum Rock's lien does not provide sufficient security to protect it against the risks caused by an injunction without a bond. If the Court grants an injunction, it should require the Mulligans

to post a $1.8-million-dollar bond and order the Mulligans to add Alum Rock to any applicable
insurance policy.

## <u>CONCLUSION</u>

The Mulligans already had their day in court and lost. This Court should decline to
interfere with the enforcement of a lawful Writ of Execution that has been upheld by the
Utah Supreme Court. The Court should deny the Motion.

### <u>RULE 7(q) Word Limit Certification</u>

Pursuant to Rule 7(q) of the Utah Rules of Civil Procedure, Alum Rock certifies that
this opposition consists of 8220 words, exclusive of the caption, signature block, certificate
of service, and exhibits. This opposition is accordingly below the 9,000-word limit for
oppositions to motions under Rule 65A of the Utah Rules of Civil Procedure.

DATED this 10th day of January, 2025.

BENNETT TUELLER JOHNSON & DEERE

/s/  *Benjamin D. Johnson*
Benjamin D. Johnson
KC Hooker
*Attorneys for Defendant Alum Rock Riverside, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of January, 2025, I caused a true and correct copy

of the foregoing **OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY**

**RESTRAINING ORDER AND PRELIMINARY INJUNCTION** to be electronically

filed with the Court's ECF system and served by the method indicated below to the following:

Bradley L. Tilt                          (X)     GreenFiling ECF
FREEMAN LOVELL, PLLC                      ( )     E-Mailed
4568 S Highland Drive, Suite 290         ( )     E-Mail via GreenFiling
Salt Lake City, Utah 84117               ( )     U.S. Mail, Postage Prepaid
bradley.tilt@freemanlovell.com           ( )     U.S. Mail via GreenFiling
*Attorney for Plaintiffs*                 ( )     Certified Mail


Felicia B. Canfield                      (X)     GreenFiling ECF
CANFIELD LAW LLC                         ( )     E-Mailed
2413 Newton Avenue                       ( )     E-Mail via GreenFiling
Cody, WY 82414                           ( )     U.S. Mail, Postage Prepaid
canfieldlawllc@gmail.com                 ( )     U.S. Mail via GreenFiling
*Attorneys for Plaintiffs*                ( )     Certified Mail


                                          */s/ Benjamin D. Johnson*

29

# **<u>EXHIBIT 1</u>**

The Order of the Court is stated below:
Dated: October 23, 2020                    At the direction of:
         03:13:01 PM               /s/  ADAM T. MOW
                                        District Court Judge

                              by
                                   /s/  SCOTT KRIM
                                        District Court Clerk

Benjamin D. Johnson (10275)
Bennett Tueller Johnson & Deere
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121-5027
Telephone: (801) 438-2000
Facsimile: (801) 438-2050
Email: ben.johnson@btjd.com
*Attorneys for Plaintiff*

*W3101770*

E# 3101770  PG 1 OF 11
Leann H. Kilts, WEBER COUNTY RECORDER
16-Nov-20  0355 PM      FEE $40.00 DEP KL
REC FOR: BENNETT TUELLER JOHNSON AND DEERE
ELECTRONICALLY RECORDED

## IN THE THIRD JUDICIAL DISTRICT COURT, SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC, <br><br> Plaintiff, <br><br> vs. <br><br> PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive, <br><br> Defendants. | **NOTICE OF JUDGMENT** <br><br><br> Case No. 206927043 <br><br> Judge Adam Mow |

PLEASE TAKE NOTICE that the judgment filed from the Superior Court of California,

County of Riverside, State of California, has been filed in the 3RD JUDICIAL DISTRICT

COURT OF UTAH under the provisions of the UTAH FOREIGN JUDGMENT ACT (UCA

78B-5-301). Under this act, THIS JUDGMENT HAS THE SAME LEGAL FORCE AND

EFFECT AS A JUDGMENT RENDERED BY THE UTAH STATE COURT.

A hearing to contest the validity of the registered determination shall be requested within

20 days after service of notice.

1

Failure to contest the registration will result in confirmation of the foreign order.

Executed on this 13th day of October, 2020.

Bennett Tueller Johnson & Deere

/s/ Benjamin D. Johnson
Benjamin D. Johnson
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE BY MAILING

STATE OF UTAH             :
                          ss.
COUNTY OF SALT LAKE       :

_____, being first duly sworn, upon oath states that he/she has mailed a

copy of the notice of judgment to the judgment debtor:

Brett Del Valle
1803 E. Bay Avenue
Newport Beach, CA 92661

PRP Investors Madison, LLC
c/o Brett Del Valle, Reg. Agent
417 29th Street
Newport Beach, CA 92663

BDV, Inc.
c/o Brett Del Valle, Reg. Agent
417 29th Street
Newport Beach, CA 92663

BDV, LLC

E# 3101770   PG 3 OF 11

c/o Brett Del Valle, Reg. Agent
417 29th Street
Newport Beach, CA 92663

Dated this _____ day of _____, 2020.

_____
Deputy Clerk

3

## CERTIFICATE OF NOTIFICATION

I certify that a copy of the attached document was sent to the following people for case 206927043 by the method and on the date specified.

MAIL: PRP INVESTORS MADISON LLC 417 29TH STREET NEWPORT BEACH, CA 92663

MAIL: BRETT DEL VALLE 1803 E. BAY AVENUE NEWPORT BEACH, CA 92661

EMAIL: BENJAMIN JOHNSON BEN.JOHNSON@BTJD.COM

10/28/2020                    /s/ SCOTT KRIM

Date: _____        _____

                                    Signature

E# 3101770    PG 5 OF 11

JCW

JUN 23 2020

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUN 19 2020

Lucero Zuniga

1

2

3

4

5

6

7

8       SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF RIVERSIDE

10            PALM SPRINGS COURTHOUSE

11

12

13  ALUM ROCK RIVERSIDE LLC, a          CASE NO.  RIC 1601942
    California limited liability company
14                                      [PROPOSED] FINAL JUDGMENT AFTER
                                        COURT TRIAL
15              Plaintiff,

16          v.

17  PRP INVESTORS MADISON, LLC, a       Trial:   November 18, 2019 [POST]
    California Limited Liability Company, Dept:   PS1
18  and BRETT DEL VALLE, an individual  Judge:   Hon. Kira L. Klatchko
    and DOES 1 through 50 inclusive.
19
              Defendants.
20  _____

21  AND RELATED CROSS-
    COMPLAINTS

22  _____

23      This matter came on for Trial on November 18, 2019 before this Court and assigned to

24  Department PS1 of the Riverside County Superior Court, the Honorable Kira L. Klatchko

25  presiding. Trial proceeded each day through December 11, 2019. Each case was submitted, with

26  closing arguments on December 11, 2019 and December 18, 2019

27

28

E# 3101770    PG 6 OF 11

1      Kenneth R. Van Vleck, Esq. of GCA Law Partners LLP appeared for plaintiff Alum Rock

2  Riverside, LLC ("Alum Rock"). Donald J. Hamman, Esq. and Eve A. Brackmann, Esq. of Stuart

3  Kane LLP appeared for defendants Brett Del Valle, PRP Investors Madison, LLC, BDV, Inc., and

4  BDV, LLC.

5      After close of evidence, BDV, Inc., and BDV, LLC dismissed their cross-complaint and

6  Brett Del Valle and PRP Investors Madison, LLC dismissed their cross-complaint.

7      The Court reviewed and considered the testimony, evidence, demeanor, and credibility of

8  witnesses and arguments presented to the Court. On January 2, 2020, the Court filed its Tentative

9  Decision and Minute Order, which were served that day by the Clerk of the Court. Defendants

10  timely requested a statement of decision under Cal. Code of Civil Procedure § 632. On February

11  11, 2020, the Court filed its Proposed Statement Of Decision. On February 26, 2020, Plaintiff

12  served the Proposed Statement of Decision by mail. No party objected. The Proposed Statement

13  of Decision became the Statement of Decision by operation of law.

14      The Court hereby renders its FINAL JUDGMENT:

15      On the First Cause of Action for Breach of the 2012 Settlement Agreement: JUDGMENT

16  IS HEREBY ENTERED for plaintiff Alum Rock, LLC against PRP Investors Madison, LLC and

17  its alter ego Brett Del Valle for $2,834,276.95.

18      On the Fourth Cause of Action for Breach of the 2009 Indemnity Agreement:

19  JUDGMENT IS HEREBY ENTERED for plaintiff Alum Rock, LLC against PRP Investors

20  Madison, LLC; BDV, Inc.; BDV, LLC; and Brett Del Valle for $1,504,687.50.

21      The Court found insufficient evidence to support the Second Cause of Action for Breach

22  of Fiduciary Duty and the Third Cause of Action for Unjust Enrichment.

23

24  Dated: 3/18/20

25  Hon. Kira L. Klatchko
    JUDGE OF THE SUPERIOR COURT

26

27

28

-1-

This must be in red to be a
"CERTIFIED COPY"

Each document to which this certificate is attached
is certified to be a full, true and correct copy of the
original on file and of record in my office.

Superior Court of California
County of Riverside

By _____
                    DEPUTY

Dated:_____

Certification must be in red to be a
"CERTIFIED COPY"

# EXEMPLIFICATION CERTIFICATE

The documents to which this certificate is attached are full, true and correct copies

of the originals on file and of record in my office. All of which we have caused by these

presents to be exemplified, and the seal of our Superior Court of California, County of

Riverside to be hereunto affixed.

IN WITNESS WHEREOF, I have hereto set my hand

and affixed the Seal of the said Court,

This _____ day of _____, _____

_____

W. Samuel Hamrick Jr., Clerk

Superior Court of California, County of Riverside

I, _____Judge Harold W. Hopp_____, Judge of the Superior

Court of the State of California, in and for the County of Riverside, do hereby certify that

W. SAMUEL HAMRICK JR., whose name is subscribed to the preceding exemplification, is

the Clerk of the said Superior Court of the State of California, in and for the County of

Riverside, and that full faith and credit are due to his official acts. I further certify, that the

seal affixed to the exemplification is the seal of our said Superior Court and that the

attestation thereof is in due form and according to the form of attestation used in this State.

Date ____11/6/20____.    _____

Judge of the Superior Court of California

County of Riverside

28 USCA, Sec. 1738
Form No. 334 (1/90; 10/97; 2/99; 3/00; 10/00; 5/01;1/03; 4/03; 6/03)

Benjamin D. Johnson (10275)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121-5027
Telephone: (801) 438-2000
Facsimile: (801) 438-2050
Email: ben.johnson@btjd.com

*Attorneys for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT,

## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC, | **JUDGMENT INFORMATION STATEMENT** |
| Plaintiff, | |
| vs. | |
| PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive, | Case No. _____ |
| | Judge _____ |
| Defendants. | |

Plaintiff, Alum Rock Riverside LLC, as Judgment Creditor, provides the following

information in compliance with Section 78B-5-201.

    1.    The correct names of the Judgment Debtors are BRETT DEL VALLE, PRP

INVESTORS MADISON, LLC, BDV, Inc., and BDV, LLC.

    2.    The correct last known address of the Judgment Debtor Brett Del Valle is 1803

East Bay Avenue, Newport Beach, California 92661.

3.     The address at which Judgment Debtor Brett Del Valle received service of process is 417 29th Street, Newport Beach, California 92663.

4.     The correct last known address of Judgment Debtors PRP Investors Madison, LLC, BDV, Inc. and BDV, LLC and the address where Judgment Debtors received service of process is c/o Brett Del Valle, Registered Agent, 415 29th Street, Newport Beach, California 92663

5.     Judgment Debtor Brett Del Valle is a natural person whose SS No. is xxx-xx-2003; Date of Birth is 12/1961; and Driver's License No. is N8067219.

6.     Judgment Debtors PRP Investors Madison, LLC, BDV, Inc. and BDV, LLC are not natural persons.

7.     The name of the Judgment Creditor is Alum Rock Riverside LLC c/o Benjamin D. Johnson, Bennett Tueller Johnson & Deere, 3165 East Millrock Drive, Suite 500, Salt Lake City, Utah 84121.

8.     The amount of the Judgment against PRP Investors Madison, LLC and its alter ego Brett Del Valle is $2,834,276.95.

9.     The amount of the Judgment against PRP Investors Madison, LLC, BDV, Inc., BDV, LLC and Brett Del Valle is $1,504,687.50.

10.     The Judgment has not been stayed.

The Judgment Creditor has reviewed its own records, the records of its attorney and the records of the Court in which the Judgment was entered.  Any information required by Section 78B-5-201 but not provided in this statement is unknown and unavailable.

2

EXECUTED on this 13th day of October, 2020.

B_____min _. John___
A__orneys for Plaintiff

SUBSCRIBED AND SWORN TO before me this 13th day of October, 2020, by Benjamin D. Johnson.



NOTARY PUBLIC

3

# **<u>EXHIBIT 2</u>**

**IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT
IN AND FOR SALT LAKE COUNTY, STATE OF UTAH**

| | |
|---|---|
| **ALUM ROCK RIVERSIDE LLC**, <br><br> Plaintiff, <br><br> **vs.** <br><br> **PRP INVESTORS MADISON, LLC**, a California limited liability company; **BRETT DEL VALLE**, an individual; and **DOES 1 through 50** inclusive, <br><br> Defendants. | **RULING & ORDER ON MULLIGANS' REPLY TO WRIT OF EXECUTION** <br><br><br> **Case No. 206927043** <br><br> **Judge Adam T. Mow** |

The Utah Foreign Judgment Act provides that a foreign judgment entered in a district court becomes a lien if a stay of execution has not been granted, the requirements of the Act are satisfied, and the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located. Plaintiff Alum Rock Riverside LLC sued Brett Del Valle (and others) in California Superior Court for breach of a settlement agreement and breach of an indemnity agreement, among other claims. Alum Rock prevailed in that suit, and in June 2020, the California court issued a judgment for $4,338,964.45. On October 23, 2020, Alum Rock domesticated the California judgment in the Third District Court. On November 16, 2020, Alum Rock recorded the judgment with the Weber County Recorder. On May 11, 2021, the Del Valle Family Trust—a revocable trust controlled by Brett and Traci Del Valle as both the trustors and the trustees—conveyed property located at 1453 S. Basinview Road, Huntsville, Utah 84317 ("Property") to Molly and John Mulligan. On June 22, 2021, Alum Rock applied for a writ of execution against the Property, which this Court granted that same day. The Mulligans ask the Court to set aside the writ and find that Alum Rock does not have a lien on the Property. This

Case No. 206927043
Page 2 of 10

Court is asked to decide whether the domesticated judgment is a valid lien under Utah law. The Court is further asked to decide whether this Court has authority to issue a writ of execution for the Property, notwithstanding that the Property is in Weber County—outside the Third District. Because Alum Rock satisfied the requirements of both the Utah Foreign Judgment Act and the Judgment Lien Act, the domesticated judgment is a valid lien on the Property. And as the Utah Code of Judicial Administration authorizes this Court to issue all extraordinary writs and other writs necessary to carry into effect its orders, judgments, and decrees, the Court properly issued a writ of execution notwithstanding that the Property is located outside the Third District. The domesticated judgment is a valid lien on the Property and Alum Rock may proceed with the sale of the Property.

## **DISCUSSION**

### A. *Alum Rock's Lien on the Property*

The Mulligans first argue, in the Reply to Writ of Execution and Request for Hearing, that the Property "is not presently, and it never has been, owned by Brett Del Valle in his individual and personal capacity."[1] However, Utah Rule of Civil Procedure 64E provides "[a] writ of execution is available to seize property in the possession or under the control of the defendant following entry of a final judgment or order requiring the delivery of property or the payment of money."[2] Rule 64E does not contain any provision limiting its application to owners of property nor does it require the property be in the possession or under the control of the defendant at the time a judgment creditor files a writ of execution. Moreover, where a trust

---

[1] *See* Reply & Request for Hr'g 2, July 7, 2021.
[2] UTAH R. CIV. P. 64E(a).

Case No. 206927043
Page 3 of 10

agreement "identifies [an individual] as the trustor-trustee of [a] Trust during her lifetime . . . she

retains considerable control over the Trust property."[3]

In this case, the Del Valle Family Trust designates Brett and Traci Del Valle as trustors

of the Trust and appoints them both as co-trustees.[4] The Trust further provides:

> During the joint lifetimes of the Trustors, the community estate may be revoked in
> whole or in part by an instrument in writing signed by either Trustor, and any
> separate estate may be revoked in whole or in part by an instrument in writing
> signed by the Trustor who contributed that property to the trust.[5]

The Trust also provides that, except for the separate property interest of a Trustor in any life

insurance policy, "the Trustors may at any time during their joint lifetimes amend any of the

terms of this instrument by an instrument in writing signed by the Trustors and delivered to the

Trustee."[6] Finally, the Trust provides:

> During the joint lifetimes of the Trustors, the Trustors acting jointly with respect
> to the community estate, or a Trustor acting individually with respect to such
> Trustor's separate estate, may at any time direct the Trustee in writing to transfer
> property or sums of money out of the trust estate to any other person or
> organization.[7]

These provisions, taken together, establish unambiguously that, just as the plaintiff in *Perez*,

Brett Del Valle retained considerable control over the Property. Indeed, the Del Valles retained

the ability to revoke the Trust, to amend it, and to transfer property from it. In essence, they

retained all control regarding the Property they would have had if they had not transferred the

Property to the Trust. As the Property was under the control of Brett Del Valle at the time the

---

[3] *See Perez v. Dep't of Health*, No. 20050895-CA, 2006 WL 1882279, at *1 (Utah Ct. App. July 7, 2006).
[4] *See* Opp'n to Mulligans' Reply Ex. 6, at 1, Sept. 16, 2022.
[5] *See id.* at 3.
[6] *See id.*
[7] *See id.* at 5.

Case No. 206927043
Page 4 of 10

judgment was entered in this action, the Property is properly subject to a writ of execution under

rule 64E.

The Mulligans next argue that Alum Rock failed to comply with the statutory

requirements for the creation of a judgment lien and therefore no lien attached to the Property.

The Mulligans base their argument on section 78B-5-201, which provides "[o]n or after July 1,

1997, a judgment entered in a district court does not create a lien upon or affect the title to real

property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the

district court of the county in which the property is located."[8] Furthermore, "[o]n or after July 1,

2002 . . . a judgment entered in a district court does not create a lien upon or affect the title to

real property unless the judgment or an abstract of judgment is recorded in the office of the

county recorder in which the real property of the judgment debtor is located."[9] Finally, section

78B-5-202 provides:

> After July 1, 2002, a judgment entered by a district court or a justice court in the
> state becomes a lien upon real property if: (i) the judgment or an abstract of the
> judgment containing the information identifying the judgment debtor as described
> in Subsection 78B-5-201(4)(b) is recorded in the office of the county recorder; or
> (ii) the judgment or an abstract of the judgment and a separate information
> statement of the judgment creditor as described in Subsection 78B-5-201(5) is
> recorded in the office of the county recorder.[10]

The Mulligans further rely on section 78B-5-302 of the Utah Foreign Judgment Act,

which provides "[a] foreign judgment filed under this part has the same effect and is subject to

the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening,

---

[8] Utah Code Ann. § 78B-5-201(2).
[9] *Id.* § 78B-5-201(3)(a).
[10] *Id.* § 78B-5-202(7)(a)(i)-(ii).

Case No. 206927043
Page 5 of 10

vacating, setting aside, or staying a judgment of a district court of this state."[11] The Foreign

Judgment Act further provides:

> A foreign judgment entered in a district court under this part becomes a lien as
> provided in Section 78B-5-202 if: (a) a stay of execution has not been granted; (b)
> the requirements of this chapter are satisfied; and (c) the judgment is recorded in
> the office of the county recorder where the property of the judgment debtor is
> located, as provided in Section 78B-5-202.[12]

Under the plain language of these provisions, a foreign judgment will not create a lien until the

requirements in subsections 78B-5-201 and -202 have been satisfied.

The Court must therefore determine what section 78B-5-201 requires. In doing that, the

Court must also examine subsection 78B-5-201(4), which provides "[i]n addition to the

requirements of Subsections (2) and (3)(a), any judgment that is filed in the Registry of

Judgments on or after September 1, 1998, or any judgment or abstract of judgment that is

recorded in the office of a county recorder after July 1, 2002, shall include" a judgment

information statement.[13] Moreover, subsection 78B-5-201(6) provides:

> Any judgment that requires payment of money and is entered in a district court on
> or after September 1, 1998, or any judgment or abstract of judgment recorded in
> the office of a county recorder after July 1, 2002, that does not include the debtor
> identifying information as required in Subsection (4) is not a lien until a separate
> information statement of the judgment creditor is recorded.[14]

In interpreting these provisions, as well as section 78B-5-202, the Utah Court of Appeals

reasoned that "[h]ad the legislature intended that subsections (2) and (3) of section [78B-5-201]

be read together, as separate requirements for the creation of a lien on real property, it could have

---

[11] *Id.* §78B-5-302(3).
[12] *Id.* § 78B-5-305(1)(a)-(c).
[13] *Id.* § 78B-5-201(4)(a)-(b).
[14] *Id.* § 78B-5-201(6)(a).

Case No. 206927043
Page 6 of 10

used the word 'and' instead of 'or' in sections [78B-5-201(4)] and [78B-5-201(6)]."[15] It further

determined "that a proper reading of section [78B-5-201] requires subsections (2) and (3) to be

read independently."[16] This "allows section [78B-5-202], which provides that a judgment

becomes a lien upon real property if it is recorded in the office of the county recorder, to be read

in harmony with section [78B-5-201]."[17] The Court of Appeals ultimately determined that "after

July 1, 2002, a person seeking a lien on property need only file in the office of the county

recorder."[18] This interpretation accords with the unambiguous language of section 78B-5-202 as

well as subsections 78B-5-201(4) and (6), all of which are stated in the disjunctive—clarifying

that a judgment creditor must either file a judgment in the Registry of Judgments or in the office

of the county recorder.

Nevertheless, the Mulligans argue that *Kitches* was decided incorrectly, urging the Court

to instead rely on other cases interpreting the Judgment Lien Act. However, the primary case on

which the Mulligans rely for their assertion, *T3 Properties, LLC v. Persimmon Investments,

Inc.*,[19] involved the interpretation of the pre-2002 version of the Act. Subsection 78B-5-201(3)

had yet to be added to the statute. And, in *T3 Investments*, the judgment creditor had failed to

record an information statement with the judgment.[20] The Utah Court of Appeals ultimately

determined in that case that "the 2001 version of section [78B-5-201] of the judgment lien statute

---

[15] *See Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 2005 UT App 164, ¶13, 112 P.3d 1210. The Court notes section 78B-5-201 and -202 were renumbered in 2008. However, these provisions have not been substantively amended since *Kitches* was decided. Accordingly, the Court may properly rely on *Kitches* notwithstanding that it cites to the prior version of the statute.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] 2013 UT App 38, 299 P.3d 613.
[20] *See id.* at ¶17.

Case No. 206927043
Page 7 of 10

requires that a judgment be recorded in the Registry of Judgments with a separate information

statement in order to create a judgment lien."[21] *T3 Investments* is distinguishable on this point—

the Mulligans, in opposing the Writ, have not raised a failure to file a separate information sheet.

Furthermore, *T3 Investments* involved the 2001 version of the Act and therefore provides no

clarification regarding whether a judgment creditor must comply with both subsection (2) and

subsection (3)—which was added to the statute in 2002—prior to converting a judgment to a

lien. Accordingly, the Mulligans' argument on this issue is unavailing.

      The Mulligans also argue that, if the Court were to adopt Alum Rock's interpretation of

the statute, it would require less for a foreign judgment debtor to create a lien than is required for

a domestic judgment debtor to do so. However, *Kitches* applies with equal weight to both foreign

and domestic judgments. The decision addressed the requirements of the Judgment Lien Act,

which apply, according to the plain language of the applicable statutes, to both foreign and

domestic judgments.[22] To interpret the Foreign Judgment Act as requiring only the recording of a

judgment in the office of the county recorder where the real property subject to the lien is located

would not relieve foreign judgment creditors from any of the requirements in the Judgment Lien

Act. Therefore, the Mulligans' arguments are unavailing, and the Court determines Alum Rock

complied with sections 78B-5-201 and -202 when it recorded the judgment in Weber County on

November 16, 2020.

      Finally, the Mulligans argue that because they purchased the Property prior to the

issuance of the writ of execution, they purchased the property prior to the attachment of any lien

---

[21] *See Id.* at ¶28.
[22] *See Kitches & Zorn*, 2005 UT App 164, at ¶13, 112 P.3d 1210.

7

Case No. 206927043
Page 8 of 10

related to the judgment.[23] The judgment lien attached on November 16, 2020, when Alum Rock

recorded the judgment with the Weber County Recorder. Thus, the lien attached before the

Mulligans' purchase of the Property on May 11, 2021. "The transfer of property subsequent to

the attachment of [a] lien does not affect the lien for it is of the very nature and essence of a lien,

that no matter into whose hands the property goes, it passes *cum onere*."[24] And where liens

attach before a purchaser receives legal title, the purchaser acquires title "subject to the previous

encumbrances."[25] As the lien attached prior to the Mulligans' purchase of the Property, the

Mulligans acquired title subject to the lien.

   B.   *The Writ of Execution*

       The Mulligans also assert that the Court lacked jurisdiction to enter a writ of execution

regarding the Property, which is located outside the Third District. In support, the Mulligans cite

two cases, *Sherman v. Droubay*[26] and *Ashton-Jenkins Co. v. Bramel*.[27] This reliance is

misplaced. *Sherman* involved a statute requiring actions for the foreclosure of all liens and

mortgages on real property to be "tried in the county in which the subject of the action or some

part thereof is situated."[28] Similarly, in *Ashton-Jenkins*, the Utah Supreme Court interpreted a

statute requiring notice of a lis pendens to "be published in the county where the land lies."[29] No

---

[23] Again, the Mulligans have raised only Alum Rock's failure to file the judgment in the Registry of Judgments, they have not raised any issue with the sufficiency of the information statement included with the recorded judgment. So there is no need to further address the sufficiency of the judgment information statement.

[24] *See Utah Farm Prod. Credit Ass'n v. Wasatch Bank of Pleasant Grove*, 734 P.2d 904, 906 (Utah 1986).

[25] *F.D.I.C. v. Taylor*, 2011 UT App 416, ¶21, 267 P.3d 949.

[26] 74 P.348 (Utah 1903).

[27] 192 P. 375 (Utah 1920).

[28] *Sherman v. Droubay*, 74 P. 348, 348 (Utah 1903).

[29] *Ashton-Jenkins Co. v. Bramel*, 192 P. 375, 381 (Utah 1920).

Case No. 206927043
Page 9 of 10

such provision is found in rule 64E.[30] Thus, these cases are distinguishable and do not control

this Court's determination.

The Mulligans also argue that the language of section 78B-5-302 should apply to limit

the issuance of a writ of execution to the boundaries of the corresponding judicial district.

However, Rule 64E provides "[a] writ of execution is available to seize property in the

possession or under the control of the defendant following entry of a final judgment or order

requiring the delivery of property or the payment of money."[31] Rule 64 provides, in turn, that

"[i]f the writ directs the seizure of real property, the clerk of the court shall issue the writ to the

sheriff of the county in which the real property is located."[32] In interpreting this provision, courts

have determined that "Utah courts and clerks have no authority to direct sheriffs of other states'

counties to seize property."[33] Implicit in this determination is the correlate—that Utah courts

have authority to issue writs for the seizure of real property to sheriffs of Utah counties,

regardless where the district court is located in the state. Supporting such determination is the

Utah Code of Judicial Administration, which provides "[a] district court judge may issue all

extraordinary writs and other writs necessary to carry into effect the district court judge's orders,

judgments, and decrees."[34] "District courts are courts of general jurisdiction. As such, they

maintain jurisdiction to consider all matters except as limited by statute or constitution . . . .

Under this broad jurisdictional grant, district courts maintain a certain degree of inherent power

---

[30] *See generally* UTAH R. CIV. P. 64E.
[31] UTAH R. CIV. P. 64E(a).
[32] *Id.* R. 64(d)(1).
[33] *See Aequitas Enters., LLC v. Interstate Inv. Grp., LLC*, 2011 UT 82, ¶17, 267 P.3d 923.
[34] Utah Code Ann. § 78A-5-102(2).

Case No. 206927043
Page 10 of 10

to properly discharge their duties."[35] Accordingly, contrary to the Mulligans' assertion, the Court

possessed the requisite authority to issue the Writ notwithstanding that the Property was located

outside the Third District.

<u>**CONCLUSION**</u>

Sections 78B-5-201 and -202, read in concert, require only that a judgment creditor file a

judgment in the Registry of Judgments or that it file a judgment in the office of the county

recorder of the county in which the property subject to the lien is located and file a separate

information statement to convert a judgment to a lien. Alum Rock complied with these

provisions, recording the judgment and a separate judgment information sheet in the Weber

County Recorder's Office on November 16, 2020. As the Property was under the control of Mr.

Del Valle at the time the judgment was domesticated in Utah, it was subject to execution under

rule 64E. Finally, this Court is a court of general jurisdiction and may therefore issue writs,

including the writ at issue in this case. The location of the Property outside the Third District

does not invalidate the writ. The Court properly issued a writ of execution for the Property on

June 22, 2021, and the Court declines to set aside that writ.

This is the Order of the Court, and no further writing is required.

DATED October 27, 2022.

Judge Adam T. Mow
Third Judicial District Court

---

[35] *W. Water, LLC v. Olds*, 2008 UT 18, ¶42, 184 P.3d 578.

## CERTIFICATE OF NOTIFICATION

I certify that a copy of the attached document was sent to the following people for case 206927043
by the method and on the date specified.

MAIL: PRP INVESTORS MADISON LLC 417 29TH STREET NEWPORT BEACH, CALIFORNIA
92663

MAIL: BDV INC 417 29TH STREET NEWPORT BEACH, CALIFORNIA 92663

MAIL: BDV LLC 417 29TH STREET NEWPORT BEACH, CALIFORNIA 92663

MANUAL EMAIL: BRADLEY TILT BRADLEY.TILT@FREEMANLOVELL.COM

MANUAL EMAIL: BENJAMIN JOHNSON BEN.JOHNSON@BTJD.COM


10/27/2022          /s/ TANNER FLINDERS

Date: _____          _____

                              Signature

# **<u>EXHIBIT 3</u>**

*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2024 UT 22**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

————————

MOLLY J. MULLIGAN and JOHN P. MULLIGAN,
*Appellants,*

*v.*

ALUM ROCK RIVERSIDE, LLC,
*Appellee.*

————————

No. 20221024
Heard April 10, 2024
Filed July 18, 2024

————————

On Direct Appeal

————————

Third District, Salt Lake County
The Honorable Adam T. Mow
No. 206927043

————————

Attorneys:

Bradley L. Tilt, Salt Lake City, Felicia B. Canfield, Cody, Wyo.,
for appellants

Benjamin D. Johnson, KC Hooker, Salt Lake City, for appellee

————————

JUSTICE HAGEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE,
JUSTICE PETERSEN, and JUSTICE POHLMAN joined.

————————

JUSTICE HAGEN, opinion of the Court:

## INTRODUCTION

¶1    This case stems from a California judgment that Alum
Rock Riverside, LLC obtained against Brett Del Valle. After
domesticating the judgment in Utah and recording it with the
county recorder, Alum Rock received a writ of execution allowing
it to seize and sell a property in Weber County.

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

¶2    At the time Alum Rock recorded the judgment with the county recorder, the property was owned by a revocable trust that was established and administered by Brett and his wife. But the trust had sold the property by the time Alum Rock applied for the writ. And when the court issued the writ, the property's new owners—the Mulligans—objected, arguing that (1) Alum Rock failed to create a judgment lien because it did not record the judgment in the registry of judgments, (2) the writ was not available because the trust—not Brett—held title to the property when the judgment was domesticated in Utah, and (3) the district court lacked jurisdiction to issue the writ because the property was located in a different judicial district.

¶3    The district court upheld the writ over the Mulligans' objections, and we affirm. First, we hold that Alum Rock created a judgment lien when it recorded the judgment in the county recorder's office. As of July 1, 2002, a party seeking a judgment lien is not required to record the judgment in the registry of judgments. Second, we hold that the writ was available against the property, even though the title was held in the name of a revocable trust, because Brett retained all indicia of ownership over the property when the lien was created. And third, we hold that the Mulligans have not identified a relevant limitation on the district court's jurisdiction that would prevent it from issuing the writ.

## BACKGROUND

¶4    Alum Rock Riverside, LLC sued Brett Del Valle in California state court for breach of contract and other claims. Alum Rock prevailed, and the court issued a judgment in its favor totaling more than $4 million. Soon after, Alum Rock domesticated the judgment in Utah's Third District Court. Because the Del Valle Family Trust owned property in Weber County, Utah, Alum Rock recorded the judgment in the Weber County Recorder's Office.

¶5    Brett and his wife, Traci, had formed the trust years earlier, naming themselves as trustees. Brett and Traci retained broad powers over the trust and its property, including the power to revoke the trust, amend it, and transfer property from it. In addition, the trust empowered Brett and Traci, as trustees, to hold, manage, control, lease, and encumber trust property. Several years after they created the trust, Brett and Traci, acting as trustees, acquired the Weber County property at issue in this case.

¶6    The trust continued to hold title to the property when Alum Rock recorded its judgment against Brett in the county

Cite as: 2024 UT 22

Opinion of the Court

recorder's office. A few months after Alum Rock recorded the judgment, however, the trust conveyed the property to Molly and John Mulligan. And one month after that, Alum Rock applied for a writ of execution against the property, identifying Brett as the judgment debtor and asking the district court to "direct the sheriff to seize and sell" the property to satisfy the judgment.

¶7    When the court issued the writ as requested, the Mulligans challenged it. Acknowledging that their challenge "rises or falls" on whether a lien "was created and attached to the property," they asserted that Alum Rock did not do what the Judgment Act requires to create a judgment lien on real property.[1] Specifically, they claimed that Alum Rock did not fully comply with the following statutory requirements, found in Utah Code section 78B-5-201:

> (2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.

> (3)(a) On or after July 1, 2002, . . . a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021).

¶8    The Mulligans argued that because Alum Rock obtained its judgment against Brett in 2020—after both July 1, 1997, and July 1, 2002—Alum Rock needed to comply with the requirements of both subsections: filing the judgment in the registry of judgments and recording it with the county recorder. Because Alum Rock did not file the judgment in the registry of judgments, the Mulligans reasoned, a lien was not created.

---

[1] We refer to Utah Code, Title 78B, Chapter 5, Part 2 as the Judgment Act. Effective July 1, 2024, the Judgment Act was renumbered, and the legislature made minor stylistic changes. We cite the version in effect at the time the district court issued the writ.

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

¶9    The Mulligans also claimed that, under the Judgment Act and the Utah Rules of Civil Procedure, the writ was not "available" against the property. Under the Judgment Act, real property subject to a judgment lien "includes all the real property . . . owned or acquired at any time by the judgment debtor during the time the judgment is effective." *Id.* § 78B-5-202(7)(c)(ii) (2021). And under rule 64E of the Utah Rules of Civil Procedure, "[a] writ of execution is available to seize property in the possession or under the control of the defendant following entry of a final judgment." UTAH R. CIV. P. 64E(a). According to the Mulligans, the writ was "issued improperly" because (1) Brett never owned the property (the trust did), and (2) in any event, he did not possess or control the property at the relevant time (the Mulligans did).

¶10    Finally, the Mulligans questioned the district court's jurisdiction. In their view, the court lacked jurisdiction to issue the writ because the proceedings fall within reach of a venue statute that lists actions that "shall be tried in the county in which the [property] . . . is situated." *See* UTAH CODE § 78B-3-301(1) (2021).[2] The Mulligans also claimed that under Utah caselaw, actions in which the "main question . . . involves title to real property" may be heard only by the district court where the property is located. (Quoting *Calder v. Third Jud. Dist. Ct.*, 273 P.2d 168, 171 (Utah 1954).) Because the property here is outside the district court's geographic boundaries, the Mulligans maintained that the court lacked jurisdiction to issue the writ.

¶11    The district court upheld the writ against the Mulligans' challenge. It first concluded that the Judgment Act did not require Alum Rock to file its judgment in the registry of judgments, as the Mulligans had argued, and that Alum Rock's lien attached when the judgment was recorded with the county recorder. Next, the court determined that because the property was under Brett's control when Alum Rock domesticated the judgment, the property was subject to execution under rule 64E. Finally, the court rejected the Mulligans' challenge to its jurisdiction, explaining that it had the power to issue the writ even though the property is located outside the Third District.

---

[2] This venue statute has been renumbered and slightly altered, effective July 1, 2024. *See* UTAH CODE § 78B-3a-202(1). We cite the version in effect at the time the district court issued the writ.

Cite as: 2024 UT 22

Opinion of the Court

¶12  The Mulligans appeal, and we have jurisdiction under Utah Code subsection 78A-3-102(3)(j).

## ISSUES AND STANDARDS OF REVIEW

¶13  The parties dispute whether Alum Rock created a judgment lien on the property. "Judgment liens are creatures of statute . . . ." *Gildea v. Wells Fargo Bank, N.A.*, 2015 UT 11, ¶ 12, 347 P.3d 385. Accordingly, whether the property here is encumbered by Alum Rock's purported judgment lien raises a question of statutory interpretation, a legal question that we review for correctness. *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863.

¶14  The Mulligans also contest the district court's conclusions that the property is subject to the writ and that the court had jurisdiction to issue the writ. Because these determinations were premised on the court's interpretation of Utah law, they also present legal questions, which we review for correctness. *See Peak Alarm Co. v. Salt Lake City Corp.*, 2010 UT 22, ¶ 16, 243 P.3d 1221.

## ANALYSIS

¶15  The Mulligans challenge three aspects of the district court's decision, each of which turns in part on statutory interpretation. "The aim of statutory interpretation is to ascertain the intent of the legislature, and the best evidence of the legislature's intent is the plain language of the statute itself." *SunStone Realty Partners X LLC v. Bodell Constr. Co.*, 2024 UT 9, ¶ 11, 545 P.3d 260 (cleaned up). But because "statutory text may not be plain when read in isolation," *State v. J.M.S. (In re J.M.S.)*, 2011 UT 75, ¶ 13, 280 P.3d 410 (cleaned up), "we determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)," *McKitrick v. Gibson*, 2021 UT 48, ¶ 19, 496 P.3d 147 (cleaned up).

¶16  We first address the Mulligans' contention that Alum Rock skipped a necessary step to create a lien on the property by not filing its judgment in the registry of judgments. We clarify that to create a lien from a foreign judgment, creditors must adhere to relevant requirements under the Judgment Act as well as the Foreign Judgment Act. But since July 1, 2002, creditors do not need to file judgments in the registry of judgments to create a lien. Thus, Alum Rock created a valid lien when it recorded its judgment in the county recorder's office.

5

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

¶17 Next, we assess whether Brett "owned" the property, allowing Alum Rock's lien to attach, even though the revocable trust that he and his wife created and administered held title to it. We conclude that he did.

¶18 Finally, we consider and reject the Mulligans' argument that limitations on the district court's jurisdiction prohibited the court from issuing the writ.

I. ALUM ROCK CREATED A VALID LIEN ON THE PROPERTY

¶19 To resolve this appeal, we must decide whether Alum Rock created a valid lien on the property before it was sold to the Mulligans. The answer to that question largely depends on the meaning of two provisions of the Judgment Act.

¶20 These provisions, subsections (2) and (3)(a) of Utah Code section 78B-5-201, set out actions that judgment creditors have needed to perform at different times to create a judgment lien on real property:

> (2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.

> (3)(a) On or after July 1, 2002, . . . a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021). The Mulligans argue that these requirements—the registry-of-judgments requirement and the county-recorder requirement—"work together, cumulatively." Under their reading, because the judgment was domesticated in 2020, which is "on or after" both July 1, 1997, and July 1, 2002, *see id.*, Alum Rock could not create a lien on the property unless it (1) filed its judgment in the registry of judgments and (2) recorded it with the county recorder.

¶21 Before interpreting these provisions, we address a threshold issue raised by Alum Rock: whether section 78B-5-201 of the Judgment Act even applies here, given that Alum Rock's

Cite as: 2024 UT 22

Opinion of the Court

judgment is a foreign judgment. After explaining why the section applies, we interpret its provisions.

### A. Creditors Domesticating Foreign Judgments Must Adhere to the Judgment Act's Requirements for Creating a Lien

¶22  Alum Rock argues that the Judgment Act's registry-of-judgments requirement is not implicated here because Alum Rock's judgment is governed by the Foreign Judgment Act, which makes no mention of the registry of judgments. We disagree.

¶23  As it relates to converting a foreign judgment into a lien, the Foreign Judgment Act provides:

> (1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:
>
>> (a) a stay of execution has not been granted;
>>
>> (b) the requirements of this chapter are satisfied; and
>>
>> (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202 [of the Judgment Act].

UTAH CODE § 78B-5-305(1).

¶24  Alum Rock points out that this section of the Foreign Judgment Act mentions section 78B-5-202 of the Judgment Act but not section 78B-5-201. And, it adds, section 202 also does not mention section 201 or its registry-of-judgments requirement, on which the Mulligans' argument turns. *See id.* § 78B-5-202(7)(a) (2021) ("After July 1, 2002, a judgment . . . becomes a lien upon real property if . . . the judgment . . . is recorded in the office of the county recorder.").

¶25  These points are well taken. Still, the Foreign Judgment Act declares that foreign judgments are treated the same as domestic ones. Specifically, it provides that "[a] foreign judgment filed under [the Foreign Judgment Act] has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court of this state." *Id.* § 78B-5-302(3). Alum Rock argues that this language does not "incorporate[] the Judgment Act wholesale into the Foreign Judgment Act." Instead, Alum Rock urges us to parse this language and treat the phrase "for

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

reopening, vacating, setting aside, or staying" as modifying and limiting the entire preceding series—"procedures, defenses, enforcement, satisfaction, and proceedings."

¶26  To take one example, as Alum Rock sees it, foreign judgments are not generally "subject to the same procedures" as domestic judgments; they are merely "subject to the same procedures . . . *for reopening, vacating, setting aside, or staying*" as domestic judgments. Alum Rock thus argues that the Judgment Act applies to foreign judgments only when reopening, vacating, setting aside, or staying a foreign judgment, none of which Alum Rock seeks to do here.

¶27  But Alum Rock's argument is undercut by a decision that we issued after the briefing in this appeal was completed, *SunStone Realty Partners X LLC v. Bodell Construction Co.*, 2024 UT 9, 545 P.3d 260. There, the parties disputed whether, under the Foreign Judgment Act, Utah's or Hawaii's postjudgment interest rate applied to a Hawaii judgment that was domesticated in Utah. *Id.* ¶¶ 1–2. In resolving the dispute, we explained that the Foreign Judgment Act "mandates that foreign judgments domesticated using the [Foreign Judgment Act] are 'subject to the same procedures, defenses, enforcement, satisfaction, and proceedings . . . as a judgment of a district court of this state.'" *Id.* ¶ 13 (quoting UTAH CODE § 78B-5-302(3)). In line with this principle, we held that "[b]ecause postjudgment interest is an enforcement mechanism," Utah's postjudgment interest rate applied. *Id.* ¶ 21.

¶28  In *SunStone* we did not read the phrase "for reopening, vacating, setting aside, or staying" as modifying "enforcement." *See id.* ¶ 13; *see also* UTAH CODE § 78B-5-302(3). Indeed, it would be unreasonable to read the phrase to modify terms like "enforcement" and "satisfaction" because a judgment's enforcement or satisfaction would not be at issue in proceedings to reopen, vacate, set aside, or stay a judgment. This leads us to conclude that the phrase limits and modifies only the nearest item in the series to it—"proceedings."

¶29  We reject Alum Rock's reading for another reason as well. Under its reading, a creditor intending to create a lien based on a domestic judgment would be subject to all the Judgment Act's constraints, but a foreign-judgment creditor would not. This would result, counterintuitively, in a foreign judgment being *easier* to convert into a lien than a domestic one, which is contrary to an express purpose of the Foreign Judgment Act—to treat foreign

Cite as: 2024 UT 22

Opinion of the Court

judgments the same as domestic ones in key respects. *See* UTAH CODE § 78B-5-302(2)–(3).

¶30  Like postjudgment interest, a lien is a means of enforcing a judgment. As such, a foreign judgment is subject to the same requirements for lien creation as domestic judgments. Thus, the Foreign Judgment Act incorporates the Judgment Act's requirements for creating a judgment lien, including those found in section 78B-5-201.

### B. Alum Rock Did Not Need to File Its Judgment in the Registry of Judgments to Create a Lien

¶31  Having concluded that section 201 applies, we must interpret subsections (2) and (3)(a) and determine whether their requirements are cumulative (as the Mulligans argue) or sequential (as Alum Rock argues). We hold that they are sequential, not cumulative.

¶32  Although we have yet to decisively interpret these provisions, the court of appeals previously interpreted a substantively similar version of the statute under analogous circumstances and rejected the cumulative reading now advanced by the Mulligans. In *Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 2005 UT App 164, 112 P.3d 1210, judgment creditors recorded an abstract of their judgment in the county recorder's office and applied for a writ of execution permitting them to sell a property that was owned by the judgment debtor. *Id.* ¶¶ 2–3. But the judgment debtor deeded his interest in the property to his wife between the time the creditors recorded the judgment with the county recorder and the time they applied for the writ. *Id.* ¶ 2.

¶33  When the district court issued the writ, the judgment debtor objected, claiming that the creditors did not create a lien on the property before the debtor conveyed the property to his wife because they "had not . . . filed the Judgment in the Registry of Judgments." *Id.* ¶ 4. On appeal, the debtor argued that the registry-of-judgments and county-recorder provisions "must be read together, thereby creating a two-step process" that required post-2002 judgments to be filed "in both the Registry of Judgments and the office of the county recorder." *Id.* ¶ 12.

¶34  The *Kitches* court rejected this cumulative reading and held that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." *Id.* ¶ 13. We reach the same conclusion because it is supported by the structure of section

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

78B-5-201, other sections of the Utah Code from the Judgment Act and the Foreign Judgment Act, and the prior-construction canon of statutory interpretation.

¶35   The structure of section 201 itself signals that the registry-of-judgments and county-recorder requirements are to be read sequentially, creating independent requirements for successive time periods. For context, a district court's entry of judgment historically "create[d] a lien upon the real property of the judgment debtor" automatically. *See* UTAH CODE § 78B-5-202(2) (2021) ("Prior to July 1, 1997, . . . the entry of judgment by a district court creates a lien upon the real property of the judgment debtor . . . ."). But the legislature did away with this automatic-lien regime. As recognized by subsection (2) of section 78B-5-201, beginning July 1, 1997, a judgment lien does not arise automatically upon a district court's entry of judgment; such a judgment does not create a lien "unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located." *Id.* § 78B-5-201(2) (2021).

¶36   As with the automatic-lien regime, the legislature also phased out subsection (2)'s registry-of-judgments requirement. Subsection (3)(a) of section 201 marks this evolution in the law. Rather than allow a judgment to create a lien automatically (before July 1, 1997) or require judgment creditors to file the judgment in the registry of judgments (on or after July 1, 1997), beginning July 1, 2002, a judgment entered in the district court does not create a lien "unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located." *Id.* § 78B-5-201(3)(a) (2021).

¶37   This sequential reading makes sense when we zoom in on the grammatical structure of subsections (2) and (3)(a). The two subsections are separate, stand-alone provisions, each punctuated with a period. Their requirements are not joined with a conjunction such as "and" or "or." And subsection (3)(a) does not expressly incorporate subsection (2)'s registry-of-judgments requirement.

¶38   Contrast this with subsection (4) of the same section, which also imposes requirements on judgment creditors, requiring them to include certain information when filing or recording a judgment:

> (4) In addition to the requirements of Subsections (2) and (3)(a), any judgment that is filed in the Registry of Judgments on or after September 1, 1998, or any judgment or abstract of judgment that is

Cite as: 2024 UT 22

Opinion of the Court

recorded in the office of a county recorder after July
1, 2002, shall include:

> (a) the information identifying the judgment
> debtor as required under Subsection (4)(b) on
> the judgment or abstract of judgment; or

> (b) a copy of the separate information statement
> of the judgment creditor that contains:

>> (i) the correct name and last-known address
>> of each judgment debtor and the address at
>> which each judgment debtor received
>> service of process;

>> (ii) the name and address of the judgment
>> creditor;

>> (iii) the amount of the judgment as filed in
>> the Registry of Judgments;

>> (iv) if known, the judgment debtor's Social
>> Security number, date of birth, and driver's
>> license number if a natural person; and

>> (v) whether or not a stay of enforcement has
>> been ordered by the court and the date the
>> stay expires.

*Id.* § 78B-5-201(4) (2021). Unlike subsections (2) and (3)(a),
subsection (4)'s requirements are unified, with the cumulative
requirements indented, punctuated with semicolons, and joined
with a conjunction. And with the opening phrase "in addition to,"
subsection (4) expressly incorporates the requirements of previous
subsections.

¶39  As subsection (4) demonstrates, the legislature knows how
to signal when it intends requirements to be cumulative. But unlike
subsection (4), subsection (3) does not state that recording in the
county recorder's office must be done "[i]n addition to" the
registry-of-judgments requirement in subsection (2). And instead
of listing both requirements as indented subsections separated by
semicolons and a conjunction, the legislature listed the two
requirements as stand-alone provisions triggered on different
dates. That structure supports our reading that subsection (3)'s
requirements supplant those in subsection (2) after July 1, 2002.

¶40  Reading the subsections sequentially also makes sense
when we zoom out and look at related sections of the Utah Code.

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

We have a "duty to harmonize and reconcile statutory provisions." *Field v. Boyer Co.*, 952 P.2d 1078, 1081 (Utah 1998) (cleaned up). Reading section 201's requirements as being sequential harmonizes and reconciles them with section 78B-5-202 of the Judgment Act and section 78B-5-305 of the Foreign Judgment Act. Properly understood, all three statutes provide that, since July 1, 2002, a judgment becomes a lien on real property if it is recorded in the office of the county recorder. Utah Code section 78B-5-202 provides that, after July 1, 2002, a judgment becomes a lien on real property if it "is recorded in the office of the county recorder." UTAH CODE § 78B-5-202(7)(a) (2021). And Utah Code section 78B-5-305, part of the Foreign Judgment Act, provides:

> (1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:
>
>> (a) a stay of execution has not been granted;
>>
>> (b) the requirements of this chapter are satisfied; and
>>
>> (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202.

*Id.* § 78B-5-305(1).

¶41  Notice that these sections do not refer to the registry of judgments. If, as the Mulligans suggest, the legislature intended judgment creditors to continue filing in both the registry of judgments and the county recorder's office, this absence would be hard to reconcile. For example, consider how the text of section 202 squares with the Mulligans' reading of section 201. Section 202 provides, "After July 1, 2002, a judgment . . . becomes a lien upon real property if . . . the judgment . . . is recorded in the office of the county recorder." *Id.* § 78B-5-202(7)(a) (2021). But under the Mulligans' reading of section 201, after July 1, 2002, a judgment *does not* become a lien on real property if the judgment is recorded in the office of the county recorder; the judgment must also be filed in the registry of judgments.

¶42  Historical context helps explain why sections 202 and 305 mention the county-recorder requirement but not the registry-of-judgments requirement. In 2001, the legislature passed a bill that amended the Judgment Act and the Foreign Judgment Act in

Cite as: 2024 UT 22

Opinion of the Court

significant ways. *See* Judgment Lien Amendments, H.B. 305, 2001 Leg., Gen. Sess. (Utah 2001) (available at https://le.utah.gov/~2001/bills/hbillenr/HB0305.htm). The bill—which ushered in the county-recorder regime for judgment-lien creation—provided that the statutory overhaul was to take effect July 1, 2002. *See id.* Before that date, the sections that are now codified as sections 202 and 305 did not specify the manner of recording a judgment lien. *See* UTAH CODE §§ 78-22-1, 78-22a-5 (2001). As of July 1, 2002, however, the sections recognized and reflected the incoming county-recorder requirement. *See id.* §§ 78-22-1, 78-22a-5 (July 2002). Each section was amended to specify that for a judgment to create a lien, the judgment must be "recorded in the office of the county recorder." *See id.* §§ 78B-5-202(7)(a), -305(1)(c). But the legislature did not add similar language referring to the registry-of-judgments requirement. That omission further supports our conclusion that the outdated registry-of-judgments requirement was entirely supplanted by the county-recorder regime as of July 1, 2002.

¶43   The prior-construction canon of statutory interpretation also reinforces our reading of section 201. Under that canon, if a word or phrase has been uniformly interpreted in caselaw, "a later version of that act perpetuating the wording is presumed to carry forward that interpretation." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322 (2012). In other words, "where a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent." *Christensen v. Indus. Comm'n*, 642 P.2d 755, 756 (Utah 1982).

¶44   In *Kitches*, the court of appeals interpreted the section that is now codified as section 201 to mean that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." 2005 UT App 164, ¶ 13. That decision has stood as controlling law in this jurisdiction for nearly two decades, and during that time judgment creditors have presumably relied on it as such. The legislature has amended the Judgment Act—including section 201—several times since *Kitches* was decided, yet

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

it has not modified the language to abrogate the case's holding.[3] We presume that by amending the statute but leaving the portions relevant here unamended, the legislature was satisfied with *Kitches'* reading.

¶45 The Mulligans maintain that *Kitches* has not been the controlling law in Utah since 2013 because it was overtaken by the court of appeals' decision in *T3 Properties, LLC v. Persimmon Investments, Inc.*, 2013 UT App 38, 299 P.3d 613. There, a creditor obtained a court judgment in 2001, at which time the judgment debtor owned property in Salt Lake County. *Id.* ¶¶ 2–3. Not long after, however, the debtor conveyed his interest in the property to a third party. *Id.* ¶ 3. And not until years later did the creditor begin efforts to execute the judgment by having the property sold. *Id.* ¶ 4.

¶46 Between the time the court entered the judgment and the time the debtor transferred the property, the creditor recorded the judgment in the registry of judgments but did not file an information statement with the judgment.[4] *Id.* ¶¶ 16–17. The issue was whether the judgment creditor created a lien on the property before the debtor conveyed it away. *Id.* ¶ 17. To answer that question, the court interpreted the 2001 version of the Judgment Act, *id.* ¶¶ 16–28, which, like the current version, provided that "[o]n or after July 1, 1997, a judgment . . . does not create a lien upon or affect the title to real property unless the judgment is recorded in the Registry of Judgments," *see id.* ¶ 15 (quoting UTAH CODE § 78-22-1.5(2) (2001)). The next subsection provided, "In addition to the requirement of [the previous subsection], any judgment that is recorded in the Registry of Judgments on or after September 1,

---

[3] For examples of how section 201 has been amended over the years, see H.B. 46, 2011 Leg., Gen. Sess. (Utah 2011) (available at https://le.utah.gov/~2011/bills/static/HB0046.html); H.B. 315, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/hbillenr/hb0315.htm); H.B. 16, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/static/hb0016.html); H.B. 251, 2023 Leg., Gen. Sess. (Utah 2023) (available at https://le.utah.gov/~2023/bills/static/HB0251.html).

[4] There was some uncertainty about whether the judgment was recorded in the registry of judgments, but the court assumed that it was. *See T3 Pros., LLC v. Persimmon Invs., Inc.*, 2013 UT App 38, ¶¶ 16, 28, 299 P.3d 613.

Cite as: 2024 UT 22

Opinion of the Court

1998, shall include a separate information statement of the judgment creditor." *Id.* (quoting UTAH CODE § 78-22-1.5(3) (2001)).

¶47  The *T3* court concluded that under the 2001 version of the Judgment Act, "both requirements"—the registry-of-judgments and information-statement requirements—"must be satisfied to create a judgment lien." *Id.* ¶ 19. To support this conclusion, the court analyzed the relevant text by noting that (1) the legislature's "[u]se of the word 'shall' . . . indicates that filing an information statement is mandatory," and (2) the information-statement requirement "must be completed 'in addition' to" the registry-of-judgments requirement. *Id.* (cleaned up); *see also id.* ¶ 21. Even though the court's decision was based on the language of the 2001 version of the Judgment Act and turned on the information-statement requirement, the court added a footnote stating that "the 2002 version [of the Judgment Act] required that the judgment and the information statement be recorded in both the Registry of Judgments and in the county recorder's office." *Id.* ¶ 14 n.5.

¶48  According to the Mulligans, *T3* overtook *Kitches* as controlling law interpreting the Judgment Act. We disagree. Although the *T3* court included a footnote suggesting that the registry-of-judgments and county-recorder requirements of the 2002 Judgment Act are cumulative, *see id.*, that statement was dicta because it was "unnecessary to the decision in the case and therefore not precedential," *see Obiter Dictum*, BLACK'S LAW DICTIONARY (12th ed. 2024). A separate panel of the court, squarely presented with the issue, had held that those requirements are sequential and that judgments no longer need to be filed in the registry of judgments for a lien to attach. *See supra* ¶¶ 32–34. The *T3* court did not even mention *Kitches*, much less purport to overrule it. *Kitches* remained controlling law on the sequential nature of the recording requirements despite the footnote dicta in *T3*. We therefore presume that when the legislature amended section 201 post-*Kitches*, it saw no need to amend the recording requirements because it was satisfied with the prior judicial interpretation of those requirements in *Kitches*.

¶49  The Mulligans also argue that the court's analysis in *T3* favors a cumulative reading of the registry-of-judgments and county-recorder requirements. They maintain that *T3* "involved a deep analysis" of section 201 and "laid out a roadmap for how courts should analyze [the Judgment Act's] cumulative amendments over time." Although we are not bound to follow

15

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

court of appeals decisions, we often look to those decisions for their persuasive value. *Eaton Kenway, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 906 P.2d 882, 885 (Utah 1995). But we see little persuasive value in *T3* relative to the issue in the present case.

¶50  The court in *T3* interpreted a different provision in the 2001 version of the Judgment Act, which did not contain the county-recorder requirement. *See* 2013 UT App 38, ¶ 15. The question before the court was whether the registry-of-judgments and information-statement requirements were cumulative. *See id.* ¶ 28. Unlike the county-recorder requirement at issue here, the information-statement requirement specified that it was "[i]n addition to" the registry-of-judgments requirement found in section 201(2). *Id.* ¶ 12 (quoting Utah Code § 78-22-1.5(3) (2001)). This additional language, which expressly made the registry-of-judgments and the information-statement requirements cumulative, easily distinguishes *T3* from both *Kitches* and the present case.

¶51  We endorse *Kitches*' holding that, since July 1, 2002, a lien on real property is created by recording the judgment, along with other required information, with the county recorder where the real property is located. Alum Rock therefore did not need to record the judgment in the registry of judgments, and it created a lien by recording the judgment in the county recorder's office.

## II. BRETT OWNED THE PROPERTY FOR PURPOSES OF ALUM ROCK'S LIEN ATTACHING

¶52  The Mulligans argue that, under the Judgment Act, "[t]here is no basis for any judgment lien against the Property" because the trust, not Brett, held title to the property. Before explaining why we disagree, we pause to address the Mulligans' criticism of the district court's analysis.

¶53  The Mulligans criticize the district court for relying on rule 64E of the Utah Rules of Civil Procedure, rather than the Judgment Act, in concluding that the property is "subject to the execution." Rule 64E allows writs of execution to be issued against property that is "*in the possession or under the control of* the defendant." UTAH R. CIV. P. 64E(a) (emphasis added). The Judgment Act, in contrast, sets the conditions under which a judgment lien attaches in the first instance, providing that real property subject to a judgment lien "includes all the real property . . . *owned or acquired* at any time by the judgment debtor during the time the judgment is effective." UTAH CODE § 78B-5-202(7)(c)(ii) (2021) (emphasis added).

16

Cite as: 2024 UT 22

Opinion of the Court

¶54  The Mulligans argue that the district court should have focused its analysis on the Judgment Act, rather than on rule 64E, which they contend "has nothing whatsoever to do with whether the Foreign Judgment against Brett personally could become a lien against Property he never owned." But because they principally relied on rule 64E, not the Judgment Act, before the district court, the court's reliance on rule 64E was understandable. In their principal filing below, the Mulligans cited rule 64E and quoted, with emphasis, the rule's language regarding possession and control. In contrast, they mentioned the Judgment Act's "owned or acquired" language only in passing in a footnote.

¶55  It is true that the Mulligans argued to the district court that the property was "never . . . *owned* by Brett Del Valle in his individual and personal capacity." (Emphasis added.) Yet they never tied that argument to the language of the Judgment Act, and the thrust of their argument below was that the writ "was not properly available under the express terms" of the "governing Utah Rules of Civil Procedure." In its decision, the court rejected that rule-based argument because rule 64E "does not contain any provision limiting its application to owners of property."

¶56  On appeal, the Mulligans distance themselves from their prior reliance on rule 64E and embrace the Judgment Act's "owned or acquired" language.[5] Under the Judgment Act, real property subject to a judgment lien "includes all the real property. . . owned or acquired at any time by the judgment debtor during the time the judgment is effective."[6] *Id.* To the Mulligans, holding title is the essence of ownership. Because Brett "was never in title," they maintain that "he never owned the Property" and the lien never attached to it.

¶57  When the judgment was entered against Brett, the property was held by the Del Valle Family Trust, which is a revocable trust that Brett formed with his wife, Traci. "A trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of the beneficiaries." *Cont'l Bank & Tr. Co. v. Country Club Mobile Ests., Ltd.*, 632 P.2d 869, 872 (Utah 1981). A revocable trust is "[a] trust in which the settlor" (the person who creates the trust)

---

[5] Alum Rock has not challenged this issue as unpreserved.

[6] The Utah Code defines "[r]eal property" as "any right, title, estate, or interest in land." UTAH CODE § 57-1-1(3).

17

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

"reserves the right to terminate the trust and recover the trust property and any undistributed income." *Revocable Trust*, BLACK'S LAW DICTIONARY (12th ed. 2024). One standard estate-planning practice is to form "[a] revocable trust in which the settlor[s] . . . are also the trustees and manage the trust for their own benefit during their lifetimes." *West v. West (In re Est. of West)*, 948 P.2d 351, 355 (Utah 1997). When done properly, this strategy serves to "avoid probate of the assets while allowing the settlor to retain control of the trust property during his or her own lifetime." *See id.*

¶58  Under the terms of the Del Valle Family Trust, either Brett or Traci, as co-settlors, may revoke the "community estate" (community property held in trust), wholly or partially. Upon revocation, this property would be delivered to Brett and/or Traci and would continue to be their community property. Similarly, the "separate estate" (separate property and quasi-community property held in trust) may be revoked unilaterally by Brett or Traci, whichever of them contributed the property to the trust; and upon revocation, the property would be delivered to the contributor.

¶59  Brett and Traci may also amend the trust and transfer property from it. While they are both living, Brett and Traci may amend "any of the terms of [the trust] by an instrument in writing signed by [Brett and Traci] and delivered to the Trustee." And they may—acting jointly for community property, or individually for separate and quasi-community property—"transfer property . . . out of the trust estate to any other person or organization." In addition, as trustees, Brett and Traci may hold, manage, control, lease, and encumber trust property. With this backdrop, the question is whether, for purposes of the Judgment Act, Brett "owned" the property when the judgment was entered against him, even though the trust held title to it. *See* UTAH CODE § 78B-5-202(7)(c)(ii) (2021).

¶60  Because "the settlor of a revocable trust necessarily retains the functional equivalent of ownership of the trust assets," 6 AUSTIN WAKEMAN SCOTT ET AL., SCOTT AND ASCHER ON TRUSTS § 15.4.2 (6th ed. 2024), "[i]n . . . substantive respects (such as creditors' rights), the property held in a revocable trust is ordinarily to be treated as if it were property of the settlor," RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. a. (AM. L. INST. 2003). Thus, in certain situations—"by reason of a power of revocation, appointment, or withdrawal"—a person may have "the equivalent of ownership of

18

Cite as: 2024 UT 22

Opinion of the Court

the trust property, even though the legal title to the property is held by the trustee." *See id.* § 74 cmt. a (AM. L. INST. 2007).

¶61  In effect, the Mulligans argue that the trust shielded the property from Brett's judgment creditor, Alum Rock. But under Utah law, "[d]uring the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors." UTAH CODE § 75-7-505(1). That approach is consistent with the general rule that "property held in [a revocable] trust is subject to the claims of creditors of the settlor . . . if the same property belonging to the settlor . . . would be subject to the claims of the creditors." RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. e (AM. L. INST. 2003). And other courts "generally have concluded that the assets of a revocable trust are properly subject to the claims of the settlor's creditors." *Pandy v. Indep. Bank*, 372 P.3d 1047, 1050 (Colo. 2016) (en banc) (collecting cases).

¶62  In short, because settlors of revocable trusts can access the full bundle of property-rights sticks, they cannot keep those sticks from their creditors. Here, as co-settlor and co-trustee, Brett retained the hallmarks of ownership over the property. As the district court noted, Brett and Traci could, at any time, "revoke the Trust, . . . amend it, . . . [or] transfer property from it." Under these circumstances, we hold that, for purposes of the Judgment Act, Brett owned the property at the time the judgment was entered against him.[7] Accordingly, Alum Rock's lien attached to the property when Alum Rock recorded the lien with the county recorder.

### III. THE MULLIGANS HAVE NOT IDENTIFIED A LIMITATION ON THE DISTRICT COURT'S AUTHORITY TO ISSUE A WRIT OF EXECUTION ON PROPERTY LOCATED IN A COUNTY OUTSIDE THE THIRD DISTRICT

¶63 The Mulligans contend that the Third District Court "lacked authority" to issue the writ because the property sits in Weber County, which is outside the court's geographic boundaries. Because they have not identified a relevant limitation on the district court's jurisdiction to issue the writ, we reject that argument.

---

[7] Neither side has addressed whether Traci's joint ownership of the property has any effect on the judgment lien. For that reason, we express no opinion on the matter.

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

¶64  This matter arose when Alum Rock filed a notice of judgment with the Third District Court. There is no question that this was proper, because under the Foreign Judgment Act a foreign judgment like Alum Rock's California judgment "may be filed with the clerk of any district court in Utah." UTAH CODE § 78B-5-302(2). Once Alum Rock domesticated the judgment, the judgment inherited "the same effect . . . as a judgment" of a Utah district court. *Id.* § 78B-5-302(3). Such a judgment may be enforced through a writ of execution. *Id.* § 78A-5-102 ("A district court judge may issue all extraordinary writs and other writs necessary to carry into effect the district court judge's orders, judgments, and decrees.").

¶65  The Mulligans have not identified any relevant law that would limit a district court's authority to issue a writ of execution to be effectuated in a county outside that court's judicial district. They first cite a venue statute, which provides that "[a]ctions" for certain "causes involving real property shall be tried in the county in which the subject of the action . . . is situated." *Id.* § 78B-3-301(1) (2021). Those "causes" are

> for the recovery of real property, or of an estate or interest in the property; . . . for the determination . . . of the right or interest in the property; . . . for injuries to real property; . . . for the partition of real property; and . . . for the foreclosure of all liens and mortgages on real property.

*Id.*

¶66  But the Mulligans' reliance on this statute is misguided because no "[a]ction[] . . . involving real property" is at issue here. *See id.* Indeed, no cause of action is at issue at all. The causes of action that gave rise to Alum Rock's judgment against Brett (for breach of contract) were brought in California and, from what we can tell, had nothing to do with the Weber County property. Simply put, this proceeding to enforce that judgment through a writ of execution is not an action involving real property governed by the venue statute.[8]

─────────────────────

[8] For the same reason, the caselaw that the Mulligans cite regarding "action[s]" that "involve[] title to real property" misses the mark. *See Calder v. Third Jud. Dist. Ct.*, 273 P.2d 168, 171 (Utah 1954).

Cite as: 2024 UT 22

Opinion of the Court

¶67  The Mulligans also cite rule 64 of the Utah Rules of Civil Procedure as an additional limitation on the district court's authority. According to them, a distinction in word choice between two sentences in rule 64(d)(1) "precludes courts in one county from ordering seizure of real property located in a different county." Rule 64(d)(1) explains how court clerks are to issue writs for real and personal property:

> If the writ directs the seizure of real property, the court clerk will issue the writ to the sheriff of the county in which the real property is located. If the writ directs the seizure of personal property, the court may issue the writ to an officer of any county.

UTAH R. CIV. P. 64(d)(1). From this language, the Mulligans glean that "the rule expressly authorizes any court in any county in Utah to direct the seizure . . . of *personal property* located in any county in Utah" but does not do the same for *real property*.

¶68  Although the Mulligans are correct that the rule distinguishes between writs of execution for personal property versus real property and requires that the latter be directed to the "sheriff of the county in which the real property is located," *see id.*, the rule says nothing about which court may issue the writ. Rule 64(d)(1) contains no requirement that the district court issuing the writ be in the same county as the real property. If anything, by specifying that writs involving real property must be "issue[d] . . . to the sheriff of the county in which the real property is located," *see id.*, the rule seems to presuppose that the issuing court may be located elsewhere.

¶69  The Mulligans have not established that the district court exceeded its authority by issuing the writ. Neither the venue statute nor rule 64(d)(1) prohibits a district court from issuing a writ of execution for real property located in another Utah judicial district.

## CONCLUSION

¶70  Although Alum Rock needed to comply with the Judgment Act's requirements for creating a lien, filing in the registry of judgments was not one of those requirements. The lien attached to the property once Alum Rock recorded the judgment with the Weber County Recorder's Office. When the judgment was recorded, Brett owned the property for purposes of the Judgment Act because the property's title was held in a revocable trust settled by Brett and his wife. And the Mulligans have not shown that the

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

district court lacked authority to issue the writ. Accordingly, we affirm.

—————————

# **EXHIBIT 4**

2500-HO-49967

 **TITLE RESOURCES**

**HOMEOWNER'S POLICY OF TITLE INSURANCE**
For a one-to-four family residence
**Issued By**
**TITLE RESOURCES GUARANTY COMPANY**

## OWNER'S INFORMATION SHEET

Your Title Insurance Policy is a legal contract between You and Us.

It applies only to a one-to-four family residence and only if each insured named in Schedule A is a Natural Person. If the Land described in Schedule A of the Policy is not an improved residential lot on which there is located a one-to-four family residence, or if each insured named in Schedule A is not a Natural Person, contact Us immediately.

The Policy insures You against actual loss resulting from certain Covered Risks. These Covered Risks are listed beginning on page 2 of the Policy. The Policy is limited by:
- Provisions of Schedule A
- Exceptions in Schedule B
- Our Duty To Defend Against Legal Actions On Page 4
- Exclusions on page 4 and 5
- Conditions on pages 5 through 7.

You should keep the Policy even if You transfer Your Title to the Land. It may protect against claims made against You by someone else after You transfer Your Title.
**IF YOU WANT TO MAKE A CLAIM, SEE SECTION 3 UNDER CONDITIONS ON PAGE 5 and 6.**
The premium for this Policy is paid once. No additional premium is owed for the Policy.
This sheet is not Your insurance Policy. It is only a brief outline of some of the important Policy features. The Policy explains in detail Your rights and obligations and Our rights and obligations. Since the Policy--and not this sheet--is the legal document.

### YOU SHOULD READ THE POLICY VERY CAREFULLY.
If You have any questions about Your Policy, contact: TITLE RESOURCES GUARANTY COMPANY, 8111 LBJ Freeway, Ste. 1200, Dallas, TX 75251.

### Table of Contents

| | Page | | Page |
|---|---|---|---|
| OWNER'S COVERAGE STATEMENT | 2 | 8.   This Policy is the Entire Contract | 7 |
| COVERED RISKS | 2 & 3 | 9.   Increased Policy Amount | 7 |
| OUR DUTY TO DEFEND AGAINST LEGAL ACTIONS | 4 | 10.  Severability | 7 |
| EXCLUSIONS | 4 & 5 | 11.  Arbitration | 7 |
| CONDITIONS | 5 | 12.  Choice of Law | 7 |
| 1.   Definitions | 5 | SCHEDULE A | 8 |
| 2.   Continuation of Coverage | 5 | Policy Number, [Premium], Date [and Time] and Amount | |
| 3.   How to Make a Claim | 5 & 6 | Deductible Amounts and Maximum Dollar Limits of Liability | |
| 4.   Our Choices When We Learn of a Claim | 6 | Street Address of the Land | |
| 5.   Handling a Claim or Legal Action | 6 | 1.   Name of Insured | |
| 6.   Limitation of Our Liability | 6 & 7 | 2.   Interest in Land Covered | |
| 7.   Transfer of Your Rights to Us | 7 | 3.   Description of the Land | |
| | | SCHEDULE B – EXCEPTIONS | 9 |

**As soon as You Know of anything that might be covered by this Policy, You must notify Us promptly in writing at the address shown in Section 3 of the Conditions.**

TRGC Form: HO  ALTA Homeowner's Policy of Title Insurance - Revised 12/02/2013

**Copyright 2006-2013 American Land Title Association. All rights reserved.**
The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association

AMERICAN LAND TITLE ASSOCIATION

## OWNER'S COVERAGE STATEMENT

This Policy insures You against actual loss, including any costs, attorneys' fees and expenses provided under this Policy. The loss must result from one or more of the Covered Risks set forth below. This Policy covers only Land that is an improved residential lot on which there is located a one-to-four family residence and only when each insured named in Schedule A is a Natural Person.

Your insurance is effective on the Policy Date. This Policy covers Your actual loss from any risk described under Covered Risks if the event creating the risk exists on the Policy Date or, to the extent expressly stated in Covered Risks, after the Policy Date.

Your insurance is limited by all of the following:
- The Policy Amount
- For Covered Risk 16, 18, 19 and 21, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A
- The Exceptions in Schedule B
- Our Duty To Defend Against Legal Actions
- The Exclusions on page 4 and 5
- The Conditions on pages 5 through 7.

### COVERED RISKS

The Covered Risks are:
1. Someone else owns an interest in Your Title.
2. Someone else has rights affecting Your Title because of leases, contracts, or options.
3. Someone else claims to have rights affecting Your Title because of forgery or impersonation.
4. Someone else has an Easement on the Land.
5. Someone else has a right to limit Your use of the Land.
6. Your Title is defective. Some of these defects are:
   a. Someone else's failure to have authorized a transfer or conveyance of your Title.
   b. Someone else's failure to create a valid document by electronic means.
   c. A document upon which Your Title is based is invalid because it was not properly signed, sealed, acknowledged, delivered or recorded.
   d. A document upon which Your Title is based was signed using a falsified, expired, or otherwise invalid power of attorney.
   e. A document upon which Your Title is based was not properly filed, recorded, or indexed in the Public Records.
   f. A defective judicial or administrative proceeding.
7. Any of Covered Risks 1 through 6 occurring after the Policy Date.
8. Someone else has a lien on Your Title, including a:
   a. lien of real estate taxes or assessments imposed on Your Title by a governmental authority that are due or payable, but unpaid;
   b. Mortgage;
   c. judgment, state or federal tax lien;
   d. charge by a homeowner's or condominium association; or
   e. lien, occurring before or after the Policy Date, for labor and material furnished before the Policy Date.
9. Someone else has an encumbrance on Your Title.
10. Someone else claims to have rights affecting Your Title because of fraud, duress, incompetency or incapacity.
11. You do not have actual vehicular and pedestrian access to and from the Land, based upon a legal right.
12. You are forced to correct or remove an existing violation of any covenant, condition or restriction affecting the Land, even if the covenant, condition or restriction is excepted in Schedule B. However, You are not covered for any violation that relates to:
    a. any obligation to perform maintenance or repair on the Land; or
    b. environmental protection of any kind, including hazardous or toxic conditions or substances
    unless there is a notice recorded in the Public Records, describing any part of the Land, claiming a violation exists. Our liability for this Covered Risk is limited to the extent of the violation stated in that notice.
13. Your Title is lost or taken because of a violation of any covenant, condition or restriction, which occurred before You acquired Your Title, even if the covenant, condition or restriction is excepted in Schedule B.

TRGC Form: HO  ALTA Homeowner's Policy of Title Insurance - Revised 12/02/2013

Copyright 2006-2013 American Land Title Association. All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association



14. The violation or enforcement of those portions of any law or government regulation concerning:
    a. building;
    b. zoning;
    c. land use;
    d. improvements on the Land;
    e. land division; or
    f. environmental protection,
    if there is a notice recorded in the Public Records, describing any part of the Land, claiming a violation exists or declaring the intention to enforce the law or regulation. Our liability for this Covered Risk is limited to the extent of the violation or enforcement stated in that notice.

15. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 14 if there is a notice recorded in the Public Records, describing any part of the Land, of the enforcement action or intention to bring an enforcement action. Our liability for this Covered Risk is limited to the extent of the enforcement action stated in that notice.

16. Because of an existing violation of a subdivision law or regulation affecting the Land:
    a. You are unable to obtain a building permit;
    b. You are required to correct or remove the violation; or
    c. someone else has a legal right to, and does, refuse to perform a contract to purchase the Land, lease it or make a Mortgage loan on it.
    The amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

17. You lose Your Title to any part of the Land because of the right to take the Land by condemning it, if:
    a. there is a notice of the exercise of the right recorded in the Public Records and the notice describes any part of the Land; or
    b. the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.

18. You are forced to remove or remedy Your existing structures, or any part of them - other than boundary walls or fences - because any portion was built without obtaining a building permit from the proper government office. The amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

19. You are forced to remove or remedy Your existing structures, or any part of them, because they violate an existing zoning law or zoning regulation. If You are required to remedy any portion of Your existing structures, the amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

20. You cannot use the Land because use as a single-family residence violates an existing zoning law or zoning regulation.

21. You are forced to remove Your existing structures because they encroach onto Your neighbor's land. If the encroaching structures are boundary walls or fences, the amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

22. Someone else has a legal right to, and does, refuse to perform a contract to purchase the Land, lease it or make a Mortgage loan on it because Your neighbor's existing structures encroach onto the Land.

23. You are forced to remove Your existing structures which encroach onto an Easement or over a building set-back line, even if the Easement or building set-back line is excepted in Schedule B.

24. Your existing structures are damaged because of the exercise of a right to maintain or use any Easement affecting the Land, even if the Easement is excepted in Schedule B.

25. Your existing improvements (or a replacement or modification made to them after the Policy Date), including lawns, shrubbery or trees, are damaged because of the future exercise of a right to use the surface of the Land for the extraction or development of minerals, water or any other substance, even if those rights are excepted or reserved from the description of the Land or excepted in Schedule B.

26. Someone else tries to enforce a discriminatory covenant, condition or restriction that they claim affects Your Title which is based upon race, color, religion, sex, handicap, familial status, or national origin.

27. A taxing authority assesses supplemental real estate taxes not previously assessed against the Land for any period before the Policy Date because of construction or a change of ownership or use that occurred before the Policy Date.

28. Your neighbor builds any structures after the Policy Date -- other than boundary walls or fences -- which encroach onto the Land.

29. Your Title is unmarketable, which allows someone else to refuse to perform a contract to purchase the Land, lease it or make a Mortgage loan on it.

30. Someone else owns an interest in Your Title because a court order invalidates a prior transfer of the title under federal

Copyright 2006-2013 American Land Title Association. All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association

bankruptcy, state insolvency, or similar creditors' rights laws.
31. The residence with the address shown in Schedule A is not located on the Land at the Policy Date.
32. The map, if any, attached to this Policy does not show the correct location of the Land according to the Public Records.

## OUR DUTY TO DEFEND AGAINST LEGAL ACTIONS

We will defend Your Title in any legal action only as to that part of the action which is based on a Covered Risk and which is not excepted or excluded from coverage in this Policy. We will pay the costs, attorneys' fees, and expenses We incur in that defense.

We will not pay for any part of the legal action which is not based on a Covered Risk or which is excepted or excluded from coverage in this Policy.

We can end Our duty to defend Your Title under Section 4 of the Conditions.

## THIS POLICY IS NOT COMPLETE WITHOUT SCHEDULES A AND B.

In Witness Whereof, Title Resources Guaranty Company has caused this policy to be signed and sealed by duly authorized officers as of Date of Policy shown in Schedule A.

An Authorized Signature

Title Resources Guaranty Company
By
President/CEO
Michael Goyden
Secretary

## EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;
   d. improvements on the Land;
   e. land division; and
   f. environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5. Failure to pay value for Your Title.
6. Lack of a right:
   a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

TRGC Form: HO ALTA Homeowner's Policy of Title Insurance - Revised 12/02/2013

Copyright 2006-2013 American Land Title Association. All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association

Order Number: 49967

Policy Number: **2500-HO-49967**



**METRO NATIONAL TITLE**

### ALTA HOMEOWNER'S POLICY
### SCHEDULE A

Order Number: **49967**

Policy No.: **2500-HO-49967**

Property Type: **Utah – Purchase, Conventional**

Date of Policy: **May 11, 2021 at 12:15PM**

Amount of Insurance: **$1,800,000.00**

Owner's Premium: **$4,982.00**

Deductible Amounts and Maximum Dollar Limits of Liability for Covered Risks 16, 18, 19 and 21:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16 | 1% of Policy Amount or $2,500.00 (whichever is less) | $10,000.00 |
| Covered Risk 18 | 1% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 19 | 1% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 21 | 1% of Policy Amount or $2,500.00 (whichever is less) | $5,000.00 |

1. Name of Insured:
**Molly J. Mulligan and John P. Mulligan**

2. The estate or interest in the land which is covered by this policy is:
**FEE SIMPLE**

3. Title to the estate or interest in the land is vested in:
**Molly J. Mulligan and John P. Mulligan, wife and husband, as joint tenants**

4. The land referred to in this policy is in the State of Utah, County of Weber, and is described as follows:

      **See Attached "Exhibit A"**

Issued by Title Resources Guaranty Company - Utah

Order Number: **49967**                          Policy Number: **2500-HO-49967**

## ALTA OWNER'S POLICY
### Exhibit "A"

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Order Number: 49967                              Policy Number: 2500-HO-49967

## ALTA OWNER'S POLICY
## SCHEDULE B

The Company will not pay costs, attorneys fees or expenses that arise by reason of:

1. Water rights, claims or title to water, whether or not the matters excepted under are shown by Public Records.

**2. Taxes for the year 2021 and subsequent years. (Tax ID No. 20-119-0007)**

**3. The land described herein is located within the boundaries of the Weber Basin Water Conservancy District, Weber Area Dispatch 911 and Emergency Services District and the Weber Fire District and is subject to any assessments levied thereby.**

**4. Resolution No. 27-2012**
**Recorded: December 13, 2012**
**Entry No.: 2610456**

**A Resolution of the Board of County Commissioners of Weber County, Utah, confirming the tax to be levied for municipal services provided to the unincorporated area of Weber County and describing the services to be provided therein.**

**5. Affidavit, including the terms and conditions thereof:**
**Dated: March 09, 2015**
**Recorded: March 09, 2015**
**Entry No.: 2725109**

**6. Easement(s), Setbacks, notes and restrictions, as shown on the subdivision plat:**
**Recorded: September 5, 2007**
**Entry No.: 2290051**
**Book / Page: 66 / 87**

**7. All non-exclusive and exclusive easements and rights of way which affect the Common Area, and which are appurtenant to the subject property, filed of record in the Weber County Recorder's Office.**

**8. Sewer Maintenance Agreement, including the terms and conditions thereof:**
**Recorded: August 22, 2006**
**Entry No.: 2202618**

**Amended Sewer Maintenance Agreement, including the terms and conditions thereof:**
**Recorded: August 30, 2006**
**Entry No.: 2204634**

**Amended Sewer Maintenance Agreement, including the terms and conditions thereof:**
**Recorded: September 13, 2006**

Issued by Title Resources Guaranty Company - Utah

Order Number: 49967                              Policy Number: **2500-HO-49967**

Entry No.: <u>2207906</u>

9. Covenants, conditions, restrictions and reservation of easements in the declaration of restrictions but not limited to any recitals creating easements or party walls, omitting any covenants or restrictions, if any, including, but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

Recorded: August 23, 2006
Entry No.: <u>2203027</u>

Amended Declaration of Covenants, Conditions and Restrictions:
Recorded: July 10, 2019
Entry No.: <u>2990355</u>

Contains provision for continuing assessment liens, compliance should be checked by contacting the owners association.

End of Schedule B

7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake or subsidence.

9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## CONDITIONS

1. DEFINITIONS
   a. Easement - the right of someone else to use the Land for a special purpose.
   b. Estate Planning Entity - a legal entity or Trust established by a Natural Person for estate planning.
   c. Known - things about which You have actual knowledge. The words "Know" and "Knowing" have the same meaning as Known.
   d. Land - the land or condominium unit described in paragraph 3 of Schedule A and any improvements on the Land which are real property.
   e. Mortgage - a mortgage, deed of trust, trust deed or other security instrument.
   f. Natural Person - a human being, not a commercial or legal organization or entity. Natural Person includes a trustee of a Trust even if the trustee is not a human being.
   g. Policy Date - the date and time shown in Schedule A. If the insured named in Schedule A first acquires the interest shown in Schedule A by an instrument recorded in the Public Records later than the date and time shown in Schedule A, the Policy Date is the date and time the instrument is recorded.
   h. Public Records - records that give constructive notice of matters affecting Your Title, according to the state statutes where the Land is located.
   i. Title - the ownership of Your interest in the Land, as shown in Schedule A.
   j. Trust - a living trust established by a Natural Person for estate planning.
   k. We/Our/Us - Title Resources Guaranty Company
   l. You/Your - the insured named in Schedule A and also those identified in Section 2.b. of these Conditions.

2. CONTINUATION OF COVERAGE
   a. This Policy insures You forever, even after You no longer have Your Title. You cannot assign this Policy to anyone else.
   b. This Policy also insures:
      (1) anyone who inherits Your Title because of Your death;
      (2) Your spouse who receives Your Title because of dissolution of Your marriage;
      (3) the trustee or successor trustee of Your Trust or any Estate Planning Entity created for You to whom or to which You transfer Your Title after the Policy Date;
      (4) the beneficiaries of Your Trust upon Your death; or
      (5) anyone who receives Your Title by a transfer effective on Your death as authorized by law.
   c. We may assert against the insureds identified in Section 2.b. any rights and defenses that We have against any previous insured under this Policy.

3. HOW TO MAKE A CLAIM
   a. Prompt Notice Of Your Claim
      (1) As soon as You Know of anything that might be covered by this Policy, You must notify Us promptly in writing.
      (2) Send Your notice to Title Resources Guaranty Company, Attention: Claims Department, 8111 LBJ Freeway, Ste. 1200, Dallas, TX 75251, or trgcclaims@titleresources.com. Please include the Policy number shown in Schedule A , and the county and state where the Land is located. Please enclose a copy of Your policy, if available.
      (3) If You do not give Us prompt notice, Your coverage will be reduced or ended, but only to the extent Your failure affects Our ability to resolve the claim or defend You.
   b. Proof Of Your Loss
      (1) We may require You to give Us a written statement signed by You describing Your loss which includes:
         (a) the basis of Your claim;
         (b) the Covered Risks which resulted in Your loss;
         (c) the dollar amount of Your loss; and
         (d) the method You used to compute the amount of Your loss.
      (2) We may require You to make available to Us records, checks, letters, contracts, insurance policies and other papers which relate to Your claim. We may make copies of these papers.
      (3) We may require You to answer questions about Your claim under oath.
      (4) If You fail or refuse to give Us a statement of loss, answer Our questions under oath, or make available to Us the papers We request, Your coverage will be reduced or ended, but only to the extent Your

TRGC Form: HO  ALTA Homeowner's Policy of Title Insurance – Revised 12/02/2013

Copyright 2006-2013 American Land Title Association. All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association          Page 5 of 7



failure or refusal affects Our ability to resolve the claim or defend You.

4. OUR CHOICES WHEN WE LEARN OF A CLAIM

   a. After We receive Your notice, or otherwise learn, of a claim that is covered by this Policy, Our choices include one or more of the following:

     (1) Pay the claim;

     (2) Negotiate a settlement;

     (3) Bring or defend a legal action related to the claim;

     (4) Pay You the amount required by this Policy;

     (5) End the coverage of this Policy for the claim by paying You Your actual loss resulting from the Covered Risk, and those costs, attorneys' fees and expenses incurred up to that time which We are obligated to pay;

     (6) End the coverage described in Covered Risk 16, 18, 19 or 21 by paying You the amount of Your insurance then in force for the particular Covered Risk, and those costs, attorneys' fees and expenses incurred up to that time which We are obligated to pay;

     (7) End all coverage of this Policy by paying You the Policy Amount then in force, and those costs, attorneys' fees and expenses incurred up to that time which We are obligated to pay;

     (8) Take other appropriate action.

   b. When We choose the options in Sections 4.a. (5), (6) or (7), all Our obligations for the claim end, including Our obligation to defend, or continue to defend, any legal action.

   c. Even if We do not think that the Policy covers the claim, We may choose one or more of the options above. By doing so, We do not give up any rights.

5. HANDLING A CLAIM OR LEGAL ACTION

   a. You must cooperate with Us in handling any claim or legal action and give Us all relevant information.

   b. If You fail or refuse to cooperate with Us, Your coverage will be reduced or ended, but only to the extent Your failure or refusal affects Our ability to resolve the claim or defend You.

   c. We are required to repay You only for those settlement costs, attorneys' fees and expenses that We approve in advance.

   d. We have the right to choose the attorney when We bring or defend a legal action on Your behalf. We can appeal any decision to the highest level. We do not have to pay Your claim until the legal action is finally decided.

   e. Whether or not We agree there is coverage, We can bring or defend a legal action, or take other appropriate action under this Policy. By doing so, We do not give up any rights.

6. LIMITATION OF OUR LIABILITY

   a. After subtracting Your Deductible Amount if it applies, We will pay no more than the least of:

     (1) Your actual loss;

     (2) Our Maximum Dollar Limit of Liability then in force for the particular Covered Risk, for claims covered only under Covered Risk 16, 18, 19 or 21; or

     (3) the Policy Amount then in force.

   and any costs, attorneys' fees and expenses that We are obligated to pay under this Policy.

   b. If We pursue Our rights under Sections 4.a.(3) and 5.e. of these Conditions and are unsuccessful in establishing the Title, as insured:

     (1) the Policy Amount then in force will be increased by 10% of the Policy Amount shown in Schedule A, and

     (2) You shall have the right to have the actual loss determined on either the date the claim was made by You or the date it is settled and paid.

   c. (1) If We remove the cause of the claim with reasonable diligence after receiving notice of it, all Our obligations for the claim end, including any obligation for loss You had while We were removing the cause of the claim.

     (2) Regardless of 6.c.(1) above, if You cannot use the Land because of a claim covered by this Policy:

       (a) You may rent a reasonably equivalent substitute residence and We will repay You for the actual rent You pay, until the earlier of:

         (i) the cause of the claim is removed; or

         (ii) We pay You the amount required by this Policy. If Your claim is covered only under Covered Risk 16, 18, 19 or 21, that payment is the amount of Your insurance then in force for the particular Covered Risk.

       (b) We will pay reasonable costs You pay to relocate any personal property You have the right to remove from the Land, including transportation of that personal property for up to twenty-five (25) miles from the Land, and repair of any damage to that personal property because of the relocation. The amount We will pay You under this paragraph is limited to the value of the personal property before You relocate it.

   d. All payments We make under this Policy reduce the Policy Amount then in force, except for costs, attorneys' fees and expenses. All payments We make for claims which are covered only under Covered Risk 16, 18, 19 or 21

Copyright 2006-2013 American Land Title Association. All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association



also reduce Our Maximum Dollar Limit of Liability for the particular Covered Risk, except for costs, attorneys' fees and expenses.

e. If We issue, or have issued, a Policy to the owner of a Mortgage that is on Your Title and We have not given You any coverage against the Mortgage, then:

    (1) We have the right to pay any amount due You under this Policy to the owner of the Mortgage, and any amount paid shall be treated as a payment to You under this Policy, including under Section 4.a. of these Conditions;

    (2) Any amount paid to the owner of the Mortgage shall be subtracted from the Policy Amount then in force ; and

    (3) if Your claim is covered only under Covered Risk 16, 18, 19 or 21, any amount paid to the owner of the Mortgage shall also be subtracted from Our Maximum Dollar Limit of Liability for the particular Covered Risk.

f. If You do anything to affect any right of recovery You may have against someone else, We can subtract from Our liability the amount by which You reduced the value of that right.

## 7. TRANSFER OF YOUR RIGHTS TO US

a. When We settle Your claim, We have all the rights and remedies You have against any person or property related to the claim. You must not do anything to affect these rights and remedies. When We ask, You must execute documents to evidence the transfer to Us of these rights and remedies. You must let Us use Your name in enforcing these rights and remedies.

b. We will not be liable to You if We do not pursue these rights and remedies or if We do not recover any amount that might be recoverable.

c. We will pay any money We collect from enforcing these rights and remedies in the following order:

    (1) to Us for the costs, attorneys' fees and expenses We paid to enforce these rights and remedies;

    (2) to You for Your loss that You have not already collected;

    (3) to Us for any money We paid out under this Policy on account of Your claim; and

    (4) to You whatever is left.

d. If You have rights and remedies under contracts (such as indemnities, guaranties, bonds or other policies of insurance) to recover all or part of Your loss, then We have all of those rights and remedies, even if those contracts provide that those obligated have all of Your rights and remedies under this Policy.

## 8. THIS POLICY IS THE ENTIRE CONTRACT

This Policy, with any endorsements, is the entire contract between You and Us. To determine the meaning of any part of this Policy, You must read the entire Policy and any endorsements. Any changes to this Policy must be agreed to in writing by Us. Any claim You make against Us must be made under this Policy and is subject to its terms.

## 9. INCREASED POLICY AMOUNT

The Policy Amount  then in force will increase by ten percent (10%) of the Policy Amount shown in Schedule A each year for the first five years following the Policy Date shown in Schedule A, up to one hundred fifty percent (150%) of the Policy Amount shown in Schedule A. The increase each year will happen on the anniversary of the Policy Date shown in Schedule A.

## 10. SEVERABILITY

If any part of this Policy is held to be legally unenforceable, both You and We can still enforce the rest of this Policy.

## 11. ARBITRATION

a. If permitted in the state where the Land is located, You or We may demand arbitration.

b. The law used in the arbitration is the law of the state where the Land is located.

c. The arbitration shall be under the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). You can get a copy of the Rules from Us.

d. Except as provided in the Rules, You cannot join or consolidate Your claim or controversy with claims or controversies of other persons.

e. The arbitration shall be binding on both You and Us. The arbitration shall decide any matter in dispute between You and Us.

f. The arbitration award may be entered as a judgment in the proper court.

## 12. CHOICE OF LAW

The law of the state where the Land is located shall apply to this policy.

TRGC Form: HO  ALTA Homeowner's Policy of Title Insurance - Revised 12/02/2013

Copyright 2006-2013 American Land Title Association. All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members
in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association



# **EXHIBIT 5**

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Molly J. Mulligan and John P. Mulligan*

I am the  ☐ Plaintiff/Petitioner
            ☐ Defendant/Respondent
            ☐ Person claiming a property interest
            ☒ Attorney for the
                ☐    Plaintiff/Petitioner
                ☐    Defendant/Respondent
                X    Person claiming a property interest and my Utah Bar number is 7649

IN THE THIRD JUDICIAL DISTRICT COURT
IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC,<br><br>          Plaintiff,<br><br>  v.<br><br>PRP INVESTORS MADISON, LLC, a<br>California limited liability company;<br>BRETT DEL VALLE, an individual;<br>and DOES 1 through 50 inclusive,<br><br>Defendants. | **REPLY AND REQUEST FOR HEARING**<br><br>Case No. 206927043<br><br>Judge Adam Mow |

**(1)**    **X**    I have read the Notice of Execution and Exemptions form. I understand that, by filing this form, I cannot object to the judgment that I owe money to the creditor. I am filing this form because ***I believe that the creditor has improperly seized my clients' property to pay the judgment.***

**(2)**    **X**    ***My clients request that this matter be scheduled for a hearing***.

**(3)    X    Statements in the Application for Writ of Execution are inaccurate because:**

Paragraph 1 of the *Application for Writ of Execution* appears to **correctly state** that the underlying judgment which Plaintiff seeks to collect is "a judgment against debtor Brett Del Valle" in his individual and personal capacity. *See also e.g.*, the underlying foreign judgment, which Plaintiff filed in this above-named Utah court on October 13, 2020 (identifying "Brett Del Valle, an individual" as a defendant in its caption, and entering judgment for various amounts against "Brett Del Valle"); the Plaintiff's *Judgment Information Statement* also filed herein on October 13, 2020 (stating at paragraph 5: "Judgment Debtor Brett Del Valle is a natural person").

But the Plaintiff's *Application for Writ of Execution* then goes on to **incorrectly state** that the real property located at and commonly known as 1453 S. Basinview Road, Huntsville, Utah 84137, and more particularly described (in part) as Lot 7, Basinview Estates Cluster Subdivision 1ˢᵗ Amendment, and which bears Parcel No. 20-119-0007 (which real property is referred to hereinafter as the "**Property**"), is "the judgment debtor's property"; the *Application for Writ of Execution* then **incorrectly requests** that a Writ of Execution be issued to direct the Sheriff to seize and sell the Property purportedly as if it was "the debtor's … real property."  ¶¶ 4 and 6 of the Plaintiff's *Application for Writ of Execution*.

Those statements and requests in Plaintiff's *Application for Writ of Execution* are **incorrect, inaccurate, and improper, because** the Property is not presently – and it never has been – the judgment debtor's real property; the Property is not presently – and it never has been – owned by Brett Del Valle in his individual and personal capacity.

The relevant chain of title to the Property is as follows.  In the year 2007, the Property was conveyed from Basinview Development, LC to "Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of The Del Valle Family Trust dated October 30, 2002" (the "**Trust**").  Also in 2007, the Property was conveyed from the Trust to itself.  The Trust continued to own the Property at all times from 2007 until May 11, 2021, when the Trust then conveyed the Property to the Mulligans.  The Property has never been owned by "Brett Del Valle, an individual," as was **incorrectly and inaccurately** claimed in the Plaintiff's *Application for Writ of Execution*, and certainly not at any time since the foreign judgment was entered by the foreign court and/or filed with this Utah Court, both of which were in the year 2020.[1]

---

[1] Plaintiff's above-referenced *Judgment Information Statement* filed herein on October 13, 2020, also appears to identify the above-named Defendant PRP Investors Madison, LLC also as a judgment debtor on the foreign judgment that was filed with this above-named Utah Court.  The underlying foreign judgment, which Plaintiff filed in this above-named Utah court on October 13, 2020, as referenced in the main text above, appears to name PRP Investors Madison, LLC among the defendants in the caption, and at page two also appears to identify "PRP Investors" as one of the parties against whom judgment was entered in that foreign court.  But neither PRP Investors Madison, LLC, nor "PRP Investors" has at any time ever owned the Property, either; the Property is not presently, and never has been, that judgment debtor's property, either.

**(4)    X    *The Writ of Execution was issued improperly because:***

Rule 64E(a) of the Utah Rules of Civil Procedure states (with emphasis added): "A writ of execution is available to seize <u>property in the possession or under the control of the defendant following entry of a final judgment</u>".  Rule 64(a)(2) states that for purposes of Rule 64E (among other rules): "'Defendant' means the party against whom a claim is filed or against whom judgment has been entered."  Rule 64(a)(1) further states: "'Claim' means a claim, counterclaim, cross claim, third party claim or any other claim."

As applied to the case at bar, those governing rules state, provide, and mean that a Writ of Execution is available only to seize property in the possession or under the control of the judgment debtor "Brett Del Valle, an individual" after the entry of the judgment at issue.  However, as shown under item (3) hereinabove, and by this reference incorporated here, "Brett Del Valle, an individual" does not own the Property presently, has not owned it following the entry of the judgment at issue, and indeed he has never owned the Property.   Further, ever since their purchase of it in May of 2021, the Property has been in the possession and under the control of the Mulligans exclusively, and not in the possession or under the control of "Brett Del Valle, an individual".  A Writ of Execution as to the Property, therefore, was not properly available under the express terms of those governing Utah Rules of Civil Procedure.  Accordingly, the Writ of Execution in this case was issued improperly.[2]

Additionally, the Writ of Execution also was issued improperly because the foreign judgment domesticated to this above-named Court in Salt Lake County, Utah, is not, and as a matter of law it cannot be, any lien or encumbrance upon nor can it otherwise affect the Property which is located in Weber County, Utah.  Utah statutory law clearly, expressly, and unequivocally provides that a judgment "does <u>not</u> create a lien upon or affect the title to real property <u>unless</u> the judgment is <u>filed in</u> the Registry of Judgments of the office of the clerk of <u>the district court of the county in which the property is located</u>."  Utah Code § 78B-5-201(2) (emphases added).  It further expressly provides that even then, "a judgment entered in a district court does <u>not</u> create a lien upon or <u>affect the title to real property unless the judgment</u> or an abstract of judgment <u>is recorded in the office of the county recorder in which the real property</u> of the judgment debtor <u>is located</u>."  *Id.* § -201(3)(a) (emphases added).  It further and provides and confirms that a judgment can become a lien upon real property only if the above-referenced filings and recordings are made in the county in which the property is located, and that the property affected by the judgment is only the property that is located "in the county in which the recording … occurs."  *Id.* § -202(7)(c)(i).[3]  Likewise, Utah's Foreign Judgment Act also and

---

[2] Even if the Writ of Attachment in this case was issued purportedly as against apparent judgment debtor PRP Investors Madison, LLC, or "PRP Investors", it still would be improperly issued for all of the same reasons as set forth in items (4) and (3) of the main text above, and in footnote 1 above, all of which are by this reference incorporated as if fully set forth here, showing neither of those entities own, nor ever owned, the Property, either, nor is it under the possession or control of either of them.

[3] That same Utah Code Section 78B-5-202(7)(c) & (c)(ii) also and further confirm that even if all of those requirements are met, the judgment then affects only real property in that county "<u>of the judgment debtor</u>" and specifically such property "owned or acquired at any time <u>by the judgment debtor</u> <u>during the time the judgment is effective</u>." (Emphases added).  As shown above and throughout this Reply, and incorporated

further provides that even if a foreign judgment like the one at issue in this case is otherwise properly domesticated to Utah, nevertheless it still "is subject to the same procedures, defenses … as a judgment of a district court of this state," including particularly but without limitation that it becomes a lien upon real property only if (among other things) the foreign judgment "is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202." Utah Code § 78B-5-302(3) & -305(1)(c).

Because real property can be encumbered or otherwise affected by a judgment only if (i) the judgment (foreign or otherwise) is filed in the court in the county in which the property is located; and (ii) the judgment and certain additional documents also are recorded in the office of the county recorder in which the real property is located – and because neither of those two things occurred in this case – the Writ of Execution purportedly to execute upon a judgment was issued improperly.

**(5)    X    All [or this part: $10,000] of the property is exempt because:**
Even if the Mulligans' Property could properly be subjected to the Writ of Execution issued in this case (which it cannot be), the Mulligans would be entitled to a homestead exemption in and to the Property under and pursuant to Utah Code § 78B-5-503(2)(b)(i).

**(6)    X    My clients are not the judgment debtor, and they claim the following ownership in all or part of the property. (Explain.)**
By this reference Mulligans incorporate as if fully set forth here all of the contents and discussion set forth above in this Reply, including in particular, but without limitation, the response to and under paragraph (3) hereinabove. As set forth more fully above, the Property that is the subject of the Writ of Execution is owned by Mulligans, in its entirety, and exclusively.

**(7)    X    I have attached documents that support my client's claims.**

I have not included any non-public information in this document.

Dated July 7, 2021.                    FREEMAN LOVELL, PLLC

                                       /s/ Bradley L. Tilt
                                       Bradley L. Tilt
                                       *Attorneys for Molly J. Mulligan
                                       and John P. Mulligan*

here by this reference, the Property that is the subject of the Writ of Execution issued in this case is not owned by any of the subject judgment debtors, and never has been.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 7, 2021, I caused true and correct copies of this **REPLY AND REQUEST FOR HEARING, together with all attachments hereto,** to be served in the manner indicated below to the following-listed parties at their respective addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson | _____ Hand Delivery |
| Bennett Tueller Johnson & Deere | _____ First Class, United States Mail, |
| 3165 East Millrock Drive, Suite 500 | Postage Prepaid |
| Salt Lake City, Utah 84121 | __X__ E-filing via GreenFiling |
| ben.johnson@btjd.com | _____ E-filing via CM/ECF |
| *Attorneys for Plaintiff* | _____ Email |
| | _____ Other:_____ |

*/s/ Bradley L. Tilt*_____

File No. 014551
**When recorded return to:**
Lincoln Title Insurance Agency
4723 Harrison Boulevard, Suite 201
Ogden, UT 84403

**Mail tax notice to:**
Grantee
1201 Estelle Lane
Newport Beach, CA 92660

E# 2261271 PG 1 OF 1
ERNEST D ROWLEY, WEBER COUNTY RECORDER
03-MAY-07 346 PM FEE $10.00 DEP VD
REC FOR: LINCOLN TITLE INSURANCE AGENCY
ELECTRONICALLY RECORDED

# SPECIAL WARRANTY DEED

**Basinview Development, LC,**                          "Grantor",

hereby CONVEYS and WARRANTS against all claiming by, through, or under it to:

**Brett H. Del Valle and Traci M. Del Valle, Trustees of The Del Valle Family Trust Dated October 30, 2002,**                          "Grantees",

for the sum of TEN DOLLARS and other good and valuable consideration the following described tract of land in Weber County, State of Utah:

**ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, WEBER COUNTY, UTAH, ACCORDING TO THE OFFICIAL PLAT THEREOF.**

**20-108-0007**

SUBJECT TO: County and/or City taxes not delinquent; Bonds and/or Special Assessments not delinquent and Covenants, Conditions, Restrictions, Rights-of-Way, Easements, and Reservations now of Record or enforceable in law or equity.

WITNESS, the hand of said grantor, this 27 day of _April_ , A.D. 2007 .

**Basinview Development, LC**
**By:**

**Mark A. Bates, Managing Member**

STATE OF UTAH                          )
                                       )ss.
COUNTY OF _Weber_                      )

On the 27 day of _April_ , 2007 , personally appeared before me, Mark A. Bates, who did say that he is a Managing Member of Basinview Development, LC, that the foregoing instrument was signed on behalf of said Limited Liability Company by authority of Basinview Development, LC and that he duly acknowledged to me that said Limited Liability Company executed the same.

**Notary Public**

My Commission Expires:

Residing at:

DENISE W PAGE
NOTARY PUBLIC - STATE OF UTAH
4723 HARRISON BLVD
OGDEN, UT 84403
COMM. EXP. 11-05-2009

*W2293650*

E# 2293650 PG 1 OF 2
ERNEST D ROWLEY, WEBER COUNTY RECORDER
24-SEP-07  1146 AM FEE $12.00 DEP VD
REC FOR: LINCOLN TITLE INSURANCE AGENCY
ELECTRONICALLY RECORDED

File No. 014551
When recorded return to:
Lincoln Title Insurance Agency
4723 Harrison Boulevard, Suite 201
Ogden, UT 84403

Mail tax notice to:
Grantees
1201 Estelle Lane
Newport Beach, CA 92660

# WARRANTY DEED

Brett H. Del Valle and Traci M. Del Valle, Trustees of The Del Valle Family Trust Dated October 30, 2002, "Grantors",

hereby CONVEY and WARRANT to:

Brett H. Del Valle and Traci M. Del Valle, Trustees of The Del Valle Family Trust Dated October 30, 2002, as "Grantees",

for the sum of TEN DOLLARS and other good and valuable consideration the following described tract of land in Weber County, State of Utah:

ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1st AMENDMENT, WEBER COUNTY, UTAH, ACCORDING TO THE OFFICIAL PLAT THEREOF.

20-119-0007 Sp

SUBJECT TO: County and/or City taxes not delinquent; Bonds and/or Special Assessments not delinquent and Covenants, Conditions, Restrictions, Rights-of-Way, Easements, and Reservations now of Record or enforceable in law or equity.

WITNESS, the hand of said grantor, this __18__ day of __September__, A.D. 20__07__.

_____
Brett H. Del Valle, Trustee

_____
Traci M. Del Valle, Trustee

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of  California                    )

County of Orange                    )

On  Sept 18, 2007      before me, Deborah Fauerbach, Notary Public

_(here insert name and title of the officer)_

personally appeared  Brett H. Del Valle and Traci M. Del Valle

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Signature of Notary Public_

**DEBORAH FAUERBACH**
COMM. #1698508
Notary Public - California
Orange County
My Comm. Expires Oct. 10, 2010

(Seal)

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

_(Title or description of attached document)_

_(Title or description of attached document continued)_

Number of Pages _____ Document Date_____

_(Additional information)_

### CAPACITY CLAIMED BY THE SIGNER

☐ Individual (s)
☐ Corporate Officer

_(Title)_

☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

_Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required._

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - Indicate title or type of attached document, number of pages and date.
  - Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

CAPA v12.10.05 © by Association of Professional Notaries & CSA 800-873-9865 www.notaryclasses.com



*W3151874*

Mail Tax notice to:
Grantee
51 Chestnut Avenue
Clarendon Hills, IL 60514
MNT File No.: 49967
Tax ID No.: 20-119-0007

E# 3151874  PG 1 OF 3
Leann H. Kilts, WEBER COUNTY RECORDER
11-May-21  1215 PM     FEE $40.00 DEP DA(
REC FOR: METRO NATIONAL TITLE
ELECTRONICALLY RECORDED

# WARRANTY DEED

Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of the Del Valle Family Trust dated October 30, 2002

**GRANTOR** of Newport Beach, State of California, hereby CONVEYS and WARRANTS TO:

Molly J. Mulligan and John P. Mulligan, wife and husband, as joint tenants

**GRANTEE** of 51 Chestnut Avenue, Clarendon Hills, IL 60514 for the sum of TEN AND 00/100'S DOLLARS AND OTHER GOOD AND VALUABLE CONSIDERATION, the following described tract of land in Weber County, State of Utah:

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

**SUBJECT TO:** County and/or City Taxes not delinquent; Bonds and/or Special Assessments not delinquent and Covenants, Conditions, Restrictions, Rights-of-Way, Easements, Leases and Reservations now of Record.

---

Warranty Deed

Page 1

**WITNESS**, the hand(s) of said grantor(s), May _10_ 2021.

Brett H. Del Valle, Co-Trustee of the Del Valle
Family Trust dated October 30, 2002

Traci M. Del Valle, Co-Trustee of the Del Valle
Family Trust dated October 30, 2002

State of _CALIFORNIA_____, County of _ORANGE_____ )ss:

On _MAY 10th 2021_____ personally appeared before me Brett H. Del Valle and Traci M.
Del Valle, who upon being duly sworn (or affirmed) upon oath that they did sign the foregoing instrument
with authority as granted in the capacity as Co-Trustees of the Del Valle Family Trust dated October 30,
2002, and that the said Brett H. Del Valle and Traci M. Del Valle, duly acknowledged to me that they
executed the same.

– _Please See Attached_ –
Notary Public

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                            )
County of ORANGE                              )
On MAY 10th, 2021 _____ before me, *Chavon Kane, Notary Public* _____,
_____Date_____         Here Insert Name and Title of the Officer
personally appeared *BRETT H. DEL VALLE AND* _____
_____ *TRACI M. DEL VALLE* _____,
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

[Notary Seal:
CHAVON KANE
COMM...2213310
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. October 5, 2021]

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
Signature of Notary Public

_____Place Notary Seal Above_____

**OPTIONAL**

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: WARRANTY DEED _____ Document Date: _____
Number of Pages: 2 Signer(s) Other Than Named Above: NONE _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited  ☐ General | ☐ Partner — ☐ Limited  ☐ General |
| ☐ Individual    ☐ Attorney in Fact | ☐ Individual    ☐ Attorney in Fact |
| ☐ Trustee    ☐ Guardian or Conservator | ☐ Trustee    ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907



**Weber County Government**
**Property Information System**

# WEBER COUNTY RECORDER
## ABSTRACT OF TITLE
### 05/11/2021

**PARCEL NUMBER: 20-119-0007**

Prior Parcel Numbers:
20-108-0007

| OWNER: DEL VALLE FAMILY TRUST | ADDRESS: 1201 ESTELLE LN NEWPORT BEACH CA 92660 | TAX UNIT 520 |
|---|---|---|

**LEGAL DESCRIPTION:  2007   ORIG          ACRES:  1.52**
ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, 1ST AMENDMENT, WEBER COUNTY, UTAH.

| Grantor/ Grantee | Kind of Document Consideration | Time Period Entry # | Book-Page Doc Date | Record Date | Time Release | Abstract Date Entry Ref |
|---|---|---|---|---|---|---|
| ZIONS FIRST NATL BANK | RECON | | 1367-1567 | | 04:08 | |
| CRAIG, E D | $0.00 | 821408 | 10/03/1980 | 06-OCT-1980 | 1343- 477 | |
| CRAIG, E D | TRUST DD | | 1367-1568 | | 04:09 | |
| ZIONS FIRST NATL BK | $35,000.00 | 821409 | 10/03/1980 | 06-OCT-1980 | - | |
| ZIONS FIRST NATIONAL BANK TR | PT RECONVEYANCE | | 1372- 532 | | 02:56 | |
| WEBBER, JOHN U & WF | $0.00 | 825575 | 12/03/1980 | 03-DEC-1980 | 1323- 52 | |
| ZIONS FIRST NATL BANK TR | RECON | | 1372- 533 | | 02:57 | |
| WEBBER, JOHN U & WF | $0.00 | 825576 | 11/07/1980 | 03-DEC-1980 | 1273- 286 | |
| FACKRELL, ANN SWENSON | RELEASE | | 1378-0065 | | 03:36 | |
| WEBBER, JOHN U & RUTH M | $0.00 | 831722 | 03/11/1981 | 11-MAR-1981 | 1003-0732 | |
| WILLOUGHBY, DAVID R | TRUST DD | | 1384-0437 | | 12:39 | |
| BROWN DISTRIBUTING CO ETAL | $15,000.00 | 838323 | 02/23/1981 | 22-JUN-1981 | - | |
| WEBBER, JOHN U | WD | | 1390-1262 | | 02:34 | |
| WADMAN, V JAY | $10.00 | 844791 | 09/18/1981 | 01-OCT-1981 | - | |
| WEBBER, JOHN U & WF | WD | | 1380-1264 | | 02:35 | |
| JOHN U WEBBER CO | $10.00 | 844792 | 09/18/1981 | 01-OCT-1981 | - | |
| WADMAN, V JAY ETAL | WD | | 1390-1265 | | 02:36 | |
| SUMMERHAWKS LTD ETAL | $10.00 | 844793 | 09/18/1981 | 01-OCT-1981 | - | |
| SUMMERHAWKS LTD | DEED OF TRST | | 1390-1268 | | 02:37 | |
| JOHN U WEBBER CO ETAL | $408,000.00 | 844794 | 09/18/1981 | 01-OCT-1981 | - | |
| BOARD OF COUNTY COMMISSIONER | ORDNCE | | 1394-1772 | | 11:57 | |
| WHOM IT MAY CONCERN | $0.00 | 849262 | 12/21/1981 | 22-DEC-1981 | - | |
| AHLBERG, WILLIAM D | RELEASE | | 1395-0054 | | 09:56 | |
| WEBBER, JOHN U & WF | $0.00 | 849304 | 12/19/1981 | 23-DEC-1981 | - | |
| WILLOUGHBY, DAVID R & JEAN G | QCD | | 1399-0363 | | 03:53 | |
| BROWN DISTRIBUTING | $10.00 | 853531 | 10/00/1981 | 09-MAR-1982 | - | |
| WEBBER, JOHN U & WF | RELEASE | | 1401-1669 | | 10:19 | |
| ADAMS, ALFRED W & WF | $0.00 | 856371 | 04/27/1982 | 28-APR-1982 | 1003-0733 | |
| ZIONS FIRST NATL BANK TR | RECON | | 1402-0074 | | 01:52 | |
| WEBBER, JOHN U & RUTH M | $0.00 | 856503 | 04/26/1982 | 29-APR-1982 | 1323-0052 | |
| WEBER BASIN WTR CONSERV DIST V | WATER CONTRACT | | 1405-1501 | | 01:17 | |
| SUMMERHAWKS LTD WTR | $0.00 | 860593 | 06/14/1982 | 13-JUL-1982 | - | |
| ZIONS FIRST NATIONAL BANK | RECON | | 1413-0821 | | 04:13 | |
| CRAIG, E D | $0.00 | 868216 | 11/18/1982 | 22-NOV-1982 | 1367-1568 | |
| WEBBER, JOHN U & WF | WD | | 1432-1327 | | 02:42 | |
| BROWN DISTRIBUTING CO | $10.00 | 890715 | 09/20/1983 | 21-SEP-1983 | - | |

| Party | Document | Amount | Number | Book-Page / Date | Date | Reference |
|---|---|---|---|---|---|---|
| (cut off) | TRUST DD | $80,000.00 | 498298 | 12/27/1985 | 28-DEC-1985 | |
| BANK OF UTAH | RELEASE | | | 1439-1244 | | 11:07 |
| WEBBER, JOHN U & WF | $0.00 | | 899767 | 01/17/1984 | 18-JAN-1984 | 1235-0810 |
| CARDON LAND TITLE CO TR | PT RECONVEYANCE | | | 1467-1692 | | 11:12 |
| SUMMERHAWKS LTD ETAL | $0.00 | | 937356 | 05/10/1985 | 15-MAY-1985 | 1390-1268 |
| KEITER, JOHN E TR | WD | | | 1467-1756 | | 01:10 |
| SUMMERS, CLARKE C & WF | $10.00 | | 937370 | 05/15/1985 | 15-MAY-1985 | - |
| SUMMERHAWKS LTD | WD | | | 1467-1759 | | 01:11 |
| SUMMERS, CLARKE C & WF | $10.00 | | 937371 | 05/15/1985 | 15-MAY-1985 | - |
| SUMMERS, CLARKE C & WF | DEED TRST | | | 1469-0329 | | 03:03 |
| DESERET FEDERAL SV & LN ASSN | $168,750.00 | | 939126 | 06/06/1985 | 06-JUN-1985 | - |
| WEBER BASIN WTR CONSERV DIST V | ORDER ON PETN | | | 1471-1851 | | 04:37 |
| SUMMERS, CLARKE C & WF WTR | $99.66 | | 942577 | 06/28/1985 | 18-JUL-1985 | - |
| WEBBER, JOHN U | TRUST DD | | | 1480-0360 | | 01:14 |
| ZIONS FIRST NATIONAL BANK | $111,000.00 | | 953779 | 10/01/1985 | 22-NOV-1985 | - |
| WEBBER, JOHN U | ASSIGN OF CONTRT | | | 1480-0365 | | 01:15 |
| ZIONS FIRST NATIONAL BANK | $10.00 | | 953780 | 10/01/1985 | 22-NOV-1985 | - |
| SUMMERS, CLARKE C & MARCIA H | NTC OF LIEN | | | 1483-1787 | | 08:13 |
| HUGHES, BILL | $7,923.50 | | 958462 | // | 22-JAN-1986 | - |
| SUMMERS, CLARKE C & MARCIA H | NTC OF LIEN | | | 1486-2134 | | 12:25 |
| URE, BERT | $5,000.00 | | 963036 | // | 14-MAR-1986 | - |
| CARDON LAND TITLE CO TR | PT RECONVEYANCE | | | 1495-2518 | | 09:16 |
| SUMMERHAWKS LTD ETAL | $0.00 | | 977430 | 06/06/1986 | 04-AUG-1986 | 1380-1268 |
| URE, BERT | REL OF LIEN | | | 1497-0815 | | 03:10 |
| WHOM IT MAY CONCERN | $5,000.00 | | 979676 | 08/22/1986 | 22-AUG-1986 | 1486-2134 |
| KITCHEN STUDIO | REL OF LIEN | | | 1505-1673 | | 11:40 |
| WHOM IT MAY CONCERN | $7,927.50 | | 992691 | 09/02/1986 | 17-DEC-1986 | 1483-1787 |
| ZIONS FIRST NATIONAL BANK | PT RECONVEYANCE | | | 1505-1676 | | 11:41 |
| WEBBER, JOHN U | $0.00 | | 992692 | 09/11/1986 | 17-DEC-1986 | 1480-0360 |
| ZIONS FIRST NATL BANK | PT RELEASE | | | 1505-1678 | | 11:42 |
| WEBBER, JOHN U | $0.00 | | 992693 | 09/11/1986 | 17-DEC-1986 | 1480-0365 |
| SUMMERHAWKS LTD | WD | | | 1505-1681 | | 11:42 |
| SUMMERS, CLARKE C & WF | $10.00 | | 992694 | 06/11/1986 | 17-DEC-1986 | - |
| KEITER, JOHN E TR | WD | | | 1505-1681 | | 11:43 |
| SUMMERS, CLARKE C & WF | $10.00 | | 992695 | 06/11/1986 | 17-DEC-1986 | - |
| SUMMERS, CLARKE C & WF | DEED OF TRST | | | 1505-1682 | | 11:43 |
| MOORE FINANCIAL SERVICES INC E | $147,550.00 | | 992696 | 12/11/1986 | 17-DEC-1986 | - |
| SUMMERS, CLARKE C ETAL | TRUST DD | | | 1505-1687 | | 11:46 |
| CONTINENTAL BANK & TRUST CO | $30,000.00 | | 992697 | 12/11/1986 | 17-DEC-1986 | - |
| CLAYSON, CRAIG D | ASGNMT | | | 1506-0954 | | 03:08 |
| CITICORP HOMEOWNERS INC | $0.00 | | 993964 | 12/18/1986 | 29-DEC-1986 | 1505-1682 |
| MORGAN, TERRILYN B | REQ FOR NTC | | | 1509-1280 | | 12:58 |
| WHOM IT MAY CONCERN | $0.00 | | 998977 | // | 11-FEB-1987 | 1505-1682 |
| DESERET FED SV & LN ASSN TR | RECON | | | 1523-2253 | | 03:37 |
| SUMMERS, CLARKE C & WF | $0.00 | | 1021465 | 07/17/1987 | 11-AUG-1987 | 1469-0329 |
| CITICORP MTG INC FKA | ASGNMT | | | 1539-2706 | | 09:05 |
| LOMAS & NETTLETON CO | $0.00 | | 1046898 | 01/29/1988 | 20-MAY-1988 | 1505-1682 |
| ZIONS FIRST NATL BK | PT RELEASE ASSIGN | | | 1551-2861 | | 10:04 |
| WEBBER, JOHN U | $0.00 | | 1064975 | 12/02/1988 | 07-DEC-1988 | 1480-0365 |
| ZIONS FIRST NATL BK | PT RECONVEYANCE | | | 1551-2863 | | 10:05 |
| WEBBER, JOHN U | $0.00 | | 1064976 | 12/02/1988 | 07-DEC-1988 | 1480-0360 |
| WEBBER, JOHN U | ASSIGN INTEREST | | | 1557-2264 | | 03:20 |

| Name | Type / Amount | Instrument # | Book-Page | Date Filed | Date | Time / Ref |
|---|---|---|---|---|---|---|
| WEBBER, JOHN U | WARRANTY DEED | | 1557-2273 | | | 03:24 |
| WADMAN, V JAY | $10.00 | 1073781 | 09/21/1978 | 27-MAR-1989 | | - |
| WEBBER, JOHN U | WD | | 1557-2276 | | | 03:29 |
| WADMAN, V JAY | $0.00 | 1073782 | 09/21/1978 | 27-MAR-1989 | | - |
| SUMMERHAWKS LTD | WD | | 1565-2145 | | | 11:40 |
| WADMAN, V JAY ETAL | $10.00 | 1085860 | 07/20/1989 | 10-AUG-1989 | | - |
| WADMAN, V JAY ETAL | WD | | 1565-2148 | | | 11:44 |
| SUMMERS, CLARKE C TR ETAL | $10.00 | 1085861 | 07/20/1989 | 10-AUG-1989 | | - |
| SUMMERS, CLARKE C ETAL | TRUST DD | | 1576-0695 | | | 03:49 |
| WEST ONE BK UT | $19,529.84 | 1101910 | 02/12/1990 | 21-FEB-1990 | | - |
| SUMMERS, CLARKE C & WF | NON ASSUMP AGRMT | | 1576-0699 | | | 03:50 |
| WEST ONE BK UT | $0.00 | 1101911 | 02/12/1990 | 21-FEB-1990 | | - |
| ZIONS FIRST NATL BANK TR | RECON | | 1578-0869 | | | 08:05 |
| WEBBER, JOHN U | $0.00 | 1105213 | 03/26/1990 | 03-APR-1990 | 1480-0360 | |
| JOHN U WEBBER CO | ASGNMT | | 1588-1262 | | | 01:30 |
| PETERSEN, JERRY TR ETAL | $0.00 | 1121698 | 10/19/1990 | 19-OCT-1990 | 1390-1268 | |
| JOHN U WEBBER CO ETAL | TRUST DD | | 1590-2497 | | | 04:31 |
| AMERICA FIRST CR UN ETAL | $100,000.00 | 1125426 | 11/28/1990 | 28-NOV-1990 | | - |
| ZIONS FIRST NATL BK | REL | | 1592-1918 | | | 02:29 |
| WEBBER, JOHN U | $0.00 | 1128555 | 12/27/1990 | 07-JAN-1991 | 1480-0365 | |
| WEBBER, JOHN U | WD | | 1593-0599 | | | 01:36 |
| WADMAN, V JAY | $10.00 | 1129569 | 01/18/1991 | 22-JAN-1991 | | - |
| WADMAN, V JAY | WD | | 1593-0601 | | | 01:38 |
| WADMAN INVESTMENT | $10.00 | 1129570 | 01/18/1991 | 22-JAN-1991 | | - |
| WADMAN, V JAY | WD | | 1606-0582 | | | 12:26 |
| WADMAN INV | $10.00 | 1149606 | 08/21/1991 | 21-AUG-1991 | | - |
| WADMAN, V JAY | WD | | 1606-0585 | | | 12:27 |
| WADMAN INV | $10.00 | 1149607 | 08/21/1991 | 21-AUG-1991 | | - |
| WEST ONE BK TR | RECON | | 1610-0855 | | | 08:15 |
| SUMMERS, CLARKE C & WF | $0.00 | 1155526 | 10/17/1991 | 22-OCT-1991 | 1576-0695 | |
| SUMMERS, CLARKE C TR | QCD | | 1610-1011 | | | 11:50 |
| SUMMERS, CLARKE C & WF | $10.00 | 1155615 | 10/21/1991 | 22-OCT-1991 | | - |
| KEITER, JOHN E TR | QCD | | 1610-1012 | | | 11:51 |
| SUMMERS, CLARKE C & WF | $10.00 | 1155616 | 10/22/1991 | 22-OCT-1991 | | - |
| SUMMERS, CLARKE C & WF | TRUST DD | | 1610-1013 | | | 11:52 |
| WEST ONE BK UT | $135,000.00 | 1155617 | 10/10/1991 | 22-OCT-1991 | | - |
| WEST ONE BK UT | REQ FOR NTC | | 1610-1018 | | | 11:53 |
| WHOM IT MAY CONCERN | $0.00 | 1155618 | // | 22-OCT-1991 | 1505-1682 | |
| SUMMERS, CLARKE C & WF | NON ASSUMP AGRMNT | | 1610-1020 | | | 11:54 |
| WEST ONE BK UT | $135,000.00 | 1155619 | 10/10/1991 | 22-OCT-1991 | | - |
| WEST ONE BK TR | RECON | | 1610-2995 | | | 08:15 |
| SUMMERS, CLARKE C & WF | $0.00 | 1156485 | 10/17/1991 | 31-OCT-1991 | 1576-0695 | |
| WEST ONE BK TR | RECON | | 1611-0787 | | | 08:29 |
| SUMMERS, CLARKE C ETAL | $0.00 | 1156884 | 10/30/1991 | 05-NOV-1991 | 1505-1687 | |
| SUMMERS, CLARKE C ETAL | QCD | | 1628-0660 | | | 08:52 |
| KEITER, JOHN E TR | $10.00 | 1179922 | 05/29/1992 | 01-JUN-1992 | | - |
| CROWTHER, MARVIN | NTC ASSMNT | | 1639-2597 | | | 02:34 |
| WHOM IT MAY CONCERN | $0.00 | 1195168 | // | 01-OCT-1992 | | - |
| PETERSEN, JERRY TR ETAL | SUB TR | | 1640-1080 | | | 09:59 |
| ASSOCIATED TITLE CO | $0.00 | 1195772 | 05/14/1992 | 07-OCT-1992 | 1588-1262 | |
| ASSOCIATED TITLE CO TR | RECON | | 1640-1082 | | | 10:01 |
| KEITER, JOHN E TR ETAL | $0.00 | 1195773 | 09/25/1992 | 07-OCT-1992 | 1390-1268 | |

| Party | Instrument / Amount | Entry No. | Book-Page / Date | Time / Date | Ref | Ref 2 |
|---|---|---|---|---|---|---|
| SUMMERS, CLARKE C ETAL | QCD | | | 11/17/1993 | 29-NOV-1993 | |
| | $10.00 | 1259804 | | | | |
| SUMMERS, CLARKE C | DEED OF TRST | | 1691-0522 | 11:20 | | |
| WEST ONE BK UT ETAL | $202,300.00 | 1259805 | 11/23/1993 | 29-NOV-1993 | | |
| WEST ONE BK UT | SUBORD AGRMT | | 1691-0530 | 11:22 | | |
| WEST ONE BK | $0.00 | 1259806 | 11/23/1993 | 29-NOV-1993 | 1691-0522 | |
| SUMMERS, CLARKE C ETAL | QCD | | 1696-1793 | 01:20 | | |
| CLARKE C SUMMERS PN & PR SH PLI | $10.00 | 1266242 | 10/00/1993 | 30-DEC-1993 | | |
| WEST ONE BK UT | ASGNMT | | 1700-2557 | 12:29 | | |
| MORTGAGE AUTHORITY INC | $0.00 | 1271860 | 01/03/1994 | 31-JAN-1994 | 1691-0530 | |
| MORTGAGE AUTHORITY INC | ASGNMT | | 1732-1543 | 10:02 | | |
| SOURCE ONE MTG SERV CORP | $1.00 | 1314006 | 01/17/1994 | 29-SEP-1994 | 1691-0522 | |
| WEBER COUNTY | RESOL #18-96 | | 1801-0295 | 10:42 | | |
| WHOM IT MAY CONCERN | $0.00 | 1399404 | 04/03/1996 | 12-APR-1996 | | |
| WEBER COUNTY | RESOL #25-96 | | 1811-2786 | 09:23 | | |
| WHOM IT MAY CONCERN | $0.00 | 1413086 | 05/15/1996 | 18-JUN-1996 | | |
| SOURCE ONE MTG SERV CORP | ASGNMT | | 1930-2820 | 09:12 | | |
| CAPSTEAD INC | $0.00 | 1547548 | 02/01/1997 | 27-MAY-1998 | 1691-522 | |
| CAPSTEAD INC | ASGNMT | | 2007-2124 | 08:24 | | |
| GMAC MTG CORP | $0.00 | 1631210 | 02/01/1999 | 28-APR-1999 | 1691-522 | |
| US BK NATL ASSOC TR FKA ETAL | RECON | | 2316-0181 | 09:29 | | |
| SUMMERS, CLARKE C ETAL | $0.00 | 1911178 | 01/16/2003 | 06-FEB-2003 | 1610-1013 | 1155617 |
| GMAC MTG CORP | SUB TR | | 2373-1436 | 08:13 | | |
| RIVERS, ROD | $0.00 | 1941533 | // | 27-MAY-2003 | 1691-522 | 1259805 |
| RIVERS, ROD TR | RECON | | 2373-1438 | 08:13 | | |
| SUMMERS, CLARKE C | $0.00 | 1941534 | // | 27-MAY-2003 | 1691-522 | 1259805 |
| WEBER BASIN CONSERV DIST | ORDR ON PETN | | 2389-0252 | 09:35 | | |
| SUMMERS, CLARKE C | $0.00 | 1949479 | 04/25/2003 | 20-JUN-2003 | - | |
| WEBER BASIN WTR CONSERV DIST | ORD ON PETN | | - | 08:45 | | |
| CLARKE C SUMMERS PENSION & PRI | $0.00 | 2017007 | 01/30/2004 | 11-MAR-2004 | - | |
| WEBER BASIN WTR CONSERV DIST | ORD ON PETN | | - | 08:45 | | |
| CLARKE C SUMMERS PEN & PROF | $0.00 | 2017008 | 01/30/2004 | 11-MAR-2004 | - | |
| CLARKE C SUMMERS PROFIT SHARI | QCD | | - | 04:28 | | |
| SUMMERS, CLARKE C ETAL | $400,000.00 | 2098267 | 04/21/2005 | 21-APR-2005 | - | |
| WEBER COUNTY | RESOL 23-2005 | | - | 02:31 | | |
| WHOM IT MAY CONCERN | $0.00 | 2156401 | 07/12/2005 | 24-JAN-2006 | - | |
| CLARK C SUMMERS PNSN PRFT PLN | ASGNMT | | - | 09:17 | | |
| BASIN VIEW EST HOMEOWNERS ASS | $0.00 | 2193577 | 04/07/2006 | 14-JUL-2006 | 2389-252 | 2017007 |
| SUMMERS, CLARKE C ETAL | SP WD | | - | 12:11 | | |
| BASINVIEW DEV LC | $10.00 | 2193657 | 07/07/2006 | 14-JUL-2006 | - | |
| BASINVIEW DEV LC | DEED OF TRST | | - | 12:11 | | |
| SUMMERS, CLARKE C & WF ETAL | $2,990,517.95 | 2193658 | 07/07/2006 | 14-JUL-2006 | - | |
| BASINVIEW DEVL LC | DED PLAT | | - | 02:26 | | |
| WHOM IT MAY CONCERN | $0.00 | 2202617 | 08/04/2006 | 22-AUG-2006 | 64-55 | |
| BASINVIEW DEV LC ETAL | AGRMT | | - | 02:28 | 27-JAN-2010 | |
| WHOM IT MAY CONCERN | $0.00 | 2202618 | 08/04/2006 | 22-AUG-2006 | - | |
| BASINVIEW DEV LLC | AGRMT | | - | 02:31 | | |
| WHOM IT MAY CONCERN | $0.00 | 2202619 | 08/04/2006 | 22-AUG-2006 | - | |
| BASINVIEW DEV LC | DECL COV REST | | - | 03:45 | | |
| WHOM IT MAY CONCERN | $0.00 | 2203027 | 08/22/2006 | 23-AUG-2006 | - | |
| WEBER COUNTY ETAL | AMD AGRMT | | - | 11:04 | 27-JAN-2010 | |
| WHOM IT MAY CONCERN | $0.00 | 2204634 | 08/28/2006 | 30-AUG-2006 | - | |
| BASINVIEW DEVL LLC | AGRMT | | - | 03:23 | | |

| Name | Instrument / Amount | Doc # | Date 1 | Date 2 | | Ref # |
|---|---|---|---|---|---|---|
| BASINVIEW DEV LC | SP WD | | | | 03:46 | |
| DEL VALLE FAMLY TRST | $10.00 | 2261271 | 04/27/2007 | 03-MAY-2007 | - | |
| DEL VALLE FAMLY TRST | DEED OF TRST | | | | 03:46 | |
| WELLS FARGO BK ETAL | $500,000.00 | 2261272 | 04/25/2007 | 03-MAY-2007 | - | |
| LINCOLN TTL INS TR | PT RECON | - | | | 09:05 | |
| BASINVIEW DEV LC | $0.00 | 2264396 | 05/16/2007 | 17-MAY-2007 | - | 2193658 |
| WEBER COUNTY | ORDNCE 2007-24 | - | | | 03:56 | |
| WHOM IT MAY CONCERN | $0.00 | 2290050 | 09/04/2007 | 05-SEP-2007 | - | |
| DEL VALLE FAMILY TRUST ETAL | DED PLAT | 66-87 | | | 03:58 | |
| WHOM IT MAY CONCERN | $0.00 | 2290051 | 08/13/2007 | 05-SEP-2007 | - | |
| BASINVIEW DEV LC ETAL | NTC | - | | | 04:00 | |
| WHOM IT MAY CONCERN | $0.00 | 2290052 | 08/31/2007 | 05-SEP-2007 | - | |
| VEL VALLE FMLY TRST | WD | - | | | 11:46 | |
| DEL VALLE FMLY TRST | $10.00 | 2293650 | 09/18/2007 | 24-SEP-2007 | - | |
| DEL VALLE TRST | DEED OF TRST | - | | | 12:16 | |
| CALIFORNIA NATL BK ETAL | $1,750,000.00 | 2313274 | 12/12/2007 | 31-DEC-2007 | - | |
| DEL VALLE TRST | ASGNMT | - | | | 12:16 | |
| CALIFORNIA NATL BK | $0.00 | 2313275 | 12/21/2007 | 31-DEC-2007 | - | |
| WELLS FARGO BK NW TR | RECON | - | | | 08:57 | |
| DEL VALLE TRST | $0.00 | 2319710 | 01/15/2008 | 05-FEB-2008 | - | 2261272 |
| DEL VALLE, BRETT H | NTC COMP | - | | | 10:47 | |
| WHOM IT MAY CONCERN | $0.00 | 2350137 | 06/23/2008 | 25-JUN-2008 | - | |
| CALIFORNIA NATL BK | MOD AGRMT | - | | | 12:08 | |
| DEL VALLE FAMILY TRUST | $0.00 | 2432420 | 07/01/2009 | 31-AUG-2009 | - | 2313274 |
| US BANK NATL ASSN ETAL | MOD AGRMT | - | | | 10:26 | |
| WHOM IT MAY CONCERN | $1,750,000.00 | 2453101 | 10/01/2009 | 07-JAN-2010 | - | 2313274 |
| FDIC | ASGNMT | - | | | 08:22 | 10-AUG-2010 |
| US BK NATL ASSOC | $0.00 | 2485659 | 10/30/2009 | 10-AUG-2010 | - | |
| SCHIMMELPFENNIG, TODD | REQ FOR NTC | - | | | 08:20 | 18-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527425 | 05/04/2011 | 18-MAY-2011 | - | 2261272 |
| SCHIMMELPHENNIG, TODD | REQ FOR NTC | - | | | 08:20 | 18-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527426 | // | 18-MAY-2011 | - | 2313274 |
| DEL VALLE FMLY TRST ETAL | MOD AGRMT | - | | | 08:06 | 19-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527547 | 04/26/2011 | 19-MAY-2011 | - | 2313274 |
| US BANK NATL ASSN | SUB TR | - | | | 03:06 | 29-JUN-2012 |
| WALKER, RUSSELL S | $0.00 | 2583677 | 06/27/2012 | 29-JUN-2012 | - | 2313274 |
| WALKER, RUSSELL S | NTC OF DFLT | - | | | 03:06 | 29-JUN-2012 |
| DEL VALLE FAMILY TRUST | $0.00 | 2583678 | 06/29/2012 | 29-JUN-2012 | - | 2313274 |
| CHASE BK FKA ETAL | SUB TR/RECON | - | | | 09:49 | 04-FEB-2014 |
| JPMORGAN CHASE BANK ETAL | $0.00 | 2601884 | 10/04/2012 | 23-OCT-2012 | - | 2067446 |
| WEBER COUNTY | RESOL #27-2012 | - | | | 10:38 | |
| WHOM IT MAY CONCERN | $0.00 | 2610456 | 12/11/2012 | 13-DEC-2012 | - | |
| DEL VALLE, BRETT | DEED OF TRST | - | | | 03:01 | 03-MAR-2014 |
| PRP INVESTORS FONTANA LLC ETAL | $360,009.12 | 2677120 | 12/19/2013 | 03-MAR-2014 | - | |
| US BANK | SUB TR | - | | | 01:10 | 05-JUN-2014 |
| HALLIDAY JR, PAUL M | $0.00 | 2689333 | 05/29/2014 | 05-JUN-2014 | - | 2527547 |
| HALLIDAY JR, PAUL M TR | NTC OF DFLT | - | | | 03:02 | 15-JUL-2014 |
| DEL VALLE, BRETT H ETAL | $214,000.00 | 2692310 | 06/27/2014 | 27-JUN-2014 | - | |
| STATE OF UTAH | CERT OF CREATION | - | | | 01:50 | 20-JAN-2015 |
| WHOM IT MAY CONCERN | $0.00 | 2718461 | 12/01/2014 | 20-JAN-2015 | - | |
| WEBER COUNTY | AFFT | - | | | 09:38 | |
| WHOM IT MAY CONCERN | $0.00 | 2725109 | 03/09/2015 | 09-MAR-2015 | - | |

| | | | | | | |
|---|---|---|---|---|---|---|
| MEREDITH JR, FRED M TR | NTC OF DFLT | | | | | MAR-2016 |
| DEL VALLE FAMILY TRUST | $0.00 | 2782540 | 03/11/2016 | 11-MAR-2016 | - | 2453101 |
| STATE OF UTAH | CERT DISSOLUTION | | | | 11:23 | 15-JUN-2016 |
| WHOM IT MAY CONCERN | $0.00 | 2795066 | // | 25-MAY-2016 | - | |
| WEBER COUNTY | RESOL #12-2016 | | - | | 11:24 | 13-JUN-2016 |
| WHOM IT MAY CONCERN | $0.00 | 2795067 | 05/10/2016 | 25-MAY-2016 | - | |
| US BANK ETAL | SUB TR/RECON | | | | 12:10 | 03-JUL-2017 |
| US BANK TRUST CO ETAL | $0.00 | 2866077 | 06/22/2017 | 03-JUL-2017 | - | 2313274 |
| DEL VALLE FAMILY TRUST | DEED OF TRST | | - | | 09:37 | 20-SEP-2017 |
| BOFI FED BANK ETAL | $750,000.00 | 2879566 | 09/13/2017 | 20-SEP-2017 | | |
| OGDEN VALLEY PARKS SERVICE AR | ANNEX PLAT | | - | | 12:58 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897531 | // | 28-DEC-2017 | | |
| STATE OF UTAH | CERT ANEX | | - | | 12:58 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897532 | 12/27/2017 | 28-DEC-2017 | | |
| OGDEN VALLEY PARKS SERVICE AR | NTC BNDRY ADJUST | | - | | 12:59 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897533 | 12/20/2017 | 28-DEC-2017 | | |
| WEBER COUNTY | RESOL 43-2017 | | - | | 12:59 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897534 | 10/17/2017 | 28-DEC-2017 | | |
| OGDEN VALLEY PARKS SERVICES A | RESOL BNDRY ADJUST | | - | | 01:00 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897535 | 12/28/2017 | 28-DEC-2017 | | |
| PRP INVESTORS FONATNA LLC ETAL | SUB TR/RECON | | - | | 04:20 | 17-JUL-2018 |
| PRP INVESTORS FONTANA LLC ETAL | $0.00 | 2931280 | 07/16/2018 | 17-JUL-2018 | - | 2677120 |
| DE VALLE FAMILY TRUST | TRUST DD | | - | | 04:20 | 17-JUL-2018 |
| SINGLE BOX CALI LP ETAL | $9,558,800.00 | 2931281 | 07/16/2018 | 17-JUL-2018 | - | |
| BASINVIEW ESTATES HOA INC | AMD DECL COV | | - | | 12:53 | 10-JUL-2019 |
| WHOM IT MAY CONCERN | $0.00 | 2990355 | 04/16/2019 | 10-JUL-2019 | - | 2203027 |
| LINCOLN TTL INS AGENCY TR | NTC OF DFLT | | - | | 10:55 | 18-JUL-2019 |
| DEL VALLE FAMILY TRUST | $0.00 | 2991776 | 07/18/2019 | 18-JUL-2019 | - | 2931281 |
| SINGLE BOX CALI LP | ASGNMT OF TRST DD | | - | | 10:06 | 19-JUL-2019 |
| SB FB HOUSTON LP | $0.00 | 2991983 | 07/18/2019 | 19-JUL-2019 | - | 2931281 |
| SB FB HOUSTON LP | SUB TR | | - | | 10:06 | 19-JUL-2019 |
| LINCOLN TTL INS AGENCY | $0.00 | 2991984 | 07/18/2019 | 19-JUL-2019 | - | 2931281 |
| FOUNDERS TTL CO | AFFT | | - | | 04:04 | 30-SEP-2019 |
| WHOM IT MAY CONCERN | $0.00 | 3006790 | 09/27/2019 | 30-SEP-2019 | - | |
| LINCOLN TTL INS AGENCY TR | RECON | | - | | 09:24 | 22-NOV-2019 |
| DEL VALLE FAMILY TRUST | $0.00 | 3018148 | 11/22/2019 | 22-NOV-2019 | - | 2931281 |
| DEL VALLE, BRETT H ETAL | DEED OF TRST | | - | | 03:52 | 06-JUL-2020 |
| TSS ENTERPRISES INC ETAL | $0.00 | 3066407 | 05/08/2019 | 06-JUL-2020 | - | |
| SCHIMMELPFENNING, TODD | REQ FOR NTC | | - | | 03:03 | 10-MAR-2021 |
| WHOM IT MAY CONCERN | $0.00 | 3133579 | 02/25/2021 | 10-MAR-2021 | - | 2879566 |

*04-07-2021 ABSTRACTED THROUGH*

**\*\*\* RUN DATE: May 11, 2021, 11:23 an \*\*\***          **\*\*\* END OF ABSTRACT \*\*\***

# **<u>EXHIBIT 6</u>**

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

> **If you do not respond to this document within applicable time limits, judgment could be entered against you as requested.**

IN THE SECOND DISTRICT COURT IN AND FOR
WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> SINGLE BOX, L.P.; SB AB WEST LOOP, L.P.; BRETT H. DEL VALLE and TRACI M. DEL VALLE, as Co-Trustees of The Del Valle Family Trust dated October 30, 2002, <br><br> Defendants. | **COMPLAINT** <br><br> Case No. _____ <br><br> Judge _____ |

Plaintiffs assert, allege, and pray for relief as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiffs Molly M. Mulligan and John P. Mulligan each are individuals (referred to hereinafter collectively as "**Plaintiffs**" or "**Mulligans**") who together, as wife and husband and as joint tenants, own and claim that certain real property which is the subject of this case.

2.      The real property which is the subject of this case is located in Weber County, State of Utah, and is more particularly described as follows (the "**Property**"):

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

3.      Defendant Single Box, L.P. ("**Single Box**") is an entity which claims or may claim to have an interest in or to the Property.

4.      Defendant SB AB West Loop, L.P. ("**West Loop**") is an entity which claims or may claim to have an interest in or to the Property.

5.      Defendants Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of The Del Valle Family Trust dated October 30, 2002 (referred to hereinafter individually and/or collectively as the "**Trust**") previously owned the Property and conveyed it by warranty deed to Plaintiffs.

6.      Jurisdiction is proper in this Court, including without limitation pursuant to Utah Code Ann. § 78B-6-401.

7.      Venue is proper in this Court, including without limitation pursuant to Utah Code Ann. § 78B-3-301(1) and § 78B-3-304 because this action involves real property located in Wasatch County, Utah.

8.      This matter is a Tier 2 case under and pursuant to Rule 26(c)(3) of the Utah Rules of Civil Procedure.

## GENERAL ALLEGATIONS

9.      The Trust purchased and obtained title of record to the Property in 2007.

10.     The Trust at all times owned the Property from its purchase in 2007 until the Trust sold the Property to Plaintiffs in the spring of 2021.

11.     Plaintiffs purchased the Property from the Trust in the spring of 2021, and the Trust conveyed the Property to Plaintiffs by that certain *Warranty Deed* which was recorded on May 11, 2021, as Entry No. 3151874 in the office and records of the Weber County Recorder (the "**Warranty Deed**").

12.     The claimed interests of Defendant Single Box and/or Defendant West Loop in or to the Property is/are based and premised upon a certain document entitled *Entry of Foreign Judgment Pursuant to Utah Code Ann. § 78B-5-302*, which they claim was recorded on October 5, 2020, as Entry No. 3090706 in the office and records of the Weber County Recorder, and which they claim is, created, and constitutes a judgment lien upon and/or against the Property (the "**Claimed Judgment Lien**").

13.     The Claimed Judgment Lien relates to a claimed underlying foreign judgment which was entered against Brett Del Valle individually and personally (among others, but not including and/or not against the Trust).

14.     Defendants Single Box and/or West Loop nevertheless claim that the Claimed Judgment Lien attached to and encumbered the Property, including particularly but without limitation purportedly ahead of and with priority over Plaintiffs' interests in and ownership of the Property, they have failed and/or refused to release of record the Claimed Judgment Lien which

3

therefore is and constitutes a cloud upon Plaintiffs' title to the Property, and they have stated that

they intend to enforce the Claimed Judgment Lien against the Property.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment and Quiet Title – against Single Box and West Loop)**

15.     Plaintiffs incorporate into and make a part of this cause of action each and every

other paragraph in this Complaint.

16.     An actual controversy has arisen and now exists regarding the Claimed Judgment

Lien of Defendants Single Box and/or West Loop upon and/or against the Property which has

been conveyed to and is owned by Plaintiffs.

17.     The interests of the parties are adverse, concrete, and justiciable, and declaratory

relief is warranted.

18.     Either the Claimed Judgment Lien did not attach at all as any lien upon nor

encumbrance against the Property because the claimed judgment debtor Brett Del Valle

personally never owned the Property at any time relevant to this case, or, in the alternative only,

the Claimed Judgment Lien attached to, encumbers, and/or affects at most only a one half

interest in and/or against the Property, including without limitation by virtue of and pursuant to,

perhaps among other things:

        a.     Paragraph 12.12 of the Trust document which provides that the Trust

"shall be governed by the laws of the state of [the] situs" with respect to real property

rights and interests;

        b.     Utah Code Section 75-7-505(1) which provides that: "If a trust has more

4

than one settlor, the amount the creditor or assignee of a particular settlor may reach may

not exceed the settlor's interest in the portion of the trust attributable to that settlor's

contribution."; and

      c.     The fact that there appear to be two settlors of the Trust each of whom

therefore had at most only a one half interest in and to the Property; Brett H. Del Valle, as

an apparent settlor of the Trust had, and the Claimed Judgment Lien therefore could

attach to, at most only a one half interest in and to the Property.

19.     Plaintiffs seeks to quiet title to their ownership of the Property as against the

Claimed Judgment Lien, in whole or in part.

20.     A judicial declaration is necessary and appropriate at this time in order that the

Plaintiffs may confirm their rights with respect to ownership of the Property, including in

advance of and before any attempt by Defendants Single Box and/or West Loop to enforce the

Claimed Judgment Lien against the Property.

21.     Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of

Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that either the

Claimed Judgment Lien did not attach at all as any lien upon nor encumbrance against the

Property because the claimed judgment debtor Brett Del Valle personally never owned the

Property at any time relevant to this case, or, in the alternative only, the Claimed Judgment Lien

attached to, encumbers, and/or affects at most only a one half interest in and/or against the

Property.

22.     Additionally, pursuant to Utah Code Ann. §§ 78B-6-1301, *et. seq*., Rule 57 of the

Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to judgment quieting title of

the Property in Plaintiffs, either fully free and clear of and from, and unaffected by, any and all

estates, rights, titles, and/or interests which may be held and/or claimed by and/or under the

Claimed Judgment Lien, or, in the alternative only, Plaintiffs are entitled to judgment quieting

title of at least a one half interest in and to the Property free and clear of and unaffected by the

Claimed Judgment Lien (*i.e.*, that the Claimed Judgment Lien can affect at most only a one half

interest in and to the Property).

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.


## SECOND CAUSE OF ACTION
### (Equitable Subordination – against Single Box and West Loop)

23.    Plaintiffs incorporate into and make a part of this cause of action each and every

other paragraph in this Complaint.

24.    Prior to Plaintiffs' purchase of the Property from the Trust, the Property was

subject to and encumbered by a *Deed of Trust* which was recorded on September 20, 2017, as

Entry No. 2879566 in the office and records of the Weber County Recorder (the "**First Position

Trust Deed**").

25.    Also prior to Plaintiffs' purchase of the Property from the Trust, the Property was

subject to and encumbered by a *Deed of Trust With Assignment of Rents* which was recorded on

July 6, 2020, as Entry No. 3066407 in the office and records of the Weber County Recorder (the

"**Second Position Trust Deed**").

26.    Further prior to Plaintiffs' Purchase of the Property from the Trust, the Property

6

was subject to and encumbered by a lien for unpaid county property taxes (the "**Property Tax
Lien**").

27.    The First Position Trust Deed and the Second Position Trust Deed each were prior
and superior to Plaintiffs' later-recorded Claimed Judgment Lien.

28.    As a matter of law the Property Tax Lien has super-priority ahead of and superior
to any interest of the Claimed Judgment Lien.

29.    Plaintiffs' proceeds for and from Plaintiffs' purchase of the Property were used to
pay off pay off the First Position Trust Deed ($712,209.92), the Second Position Trust Deed
($948,000.00), and the Property Tax Lien ($46,248.89), all having priority over, ahead of, and
superior to any interest of the Claimed Judgment Lien, in the total cumulative amount of at least
$1,706,458.81.

30.    Plaintiffs paid and authorized the payment and disbursement of those proceeds of,
for and from their purchase of the Property to pay off those obligations and liens against the
Property with the understanding and intent that Plaintiffs' Warranty Deed and all other rights of
Plaintiffs in and to the Property would be in a first priority position ahead of and without any
liens and/or encumbrances (other than those which Plaintiffs themselves may have signed and
pledged), including without limitation occupying the priority places of and instead of the First
Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, and ahead of and
superior to all other estates, rights, titles, claims, and/or interests in, to, on, and/or against the
Property (other than those which Plaintiffs themselves may have signed and pledged).

31.    At the time Plaintiffs purchased the Property and disbursed and/or authorized

disbursement of their purchase proceeds, Plaintiffs did not know that of Defendants Single Box,

West Loop, or either of them, held or would claim to hold any priority position pursuant to the

Claimed Judgment Lien, or otherwise, over, ahead of, or superior to Plaintiffs' ownership of the

Property pursuant to their Warranty Deed or otherwise.

      32.    It would be inequitable and unjust if the Claimed Judgment Lien were not

equitably subordinated to Plaintiff's ownership of and Warranty Deed on and to the Property.

      33.    By virtue of Plaintiffs' purchase proceeds having paid off prior liens and

obligations on and against the Property, including, without limitation, prior liens and obligations

to which the Claimed Judgment Lien and any and all other interests held or claimed by

Defendants Single Box, West Loop, and each of them, were at all times junior, subject, and

inferior, their Claimed Judgment Lien and interests should be equitably subordinated to

Plaintiffs' ownership and Warranty Deed, to at least the extent that Plaintiffs' purchase proceeds

paid off and reduced prior liens and obligations on and against the Property to which any and all

interests of Defendants Single Box, West Loop, and each of them, were at all times junior,

subject, and inferior.

      34.    Plaintiffs are entitled, pursuant to Utah Code Ann. §§ 78B-6-401 *et seq*., Rule 57

of the Utah Rules of Civil Procedure, and otherwise, to declaratory judgment that, by virtue of

Plaintiffs having paid off liens and obligations on and against the Property that were prior and

superior to the Claimed Judgment Lien and any and all other estates, rights, titles, or interests in

the Property held and/or claimed by Defendants Single Box, West Loop, and each and either of

them, and to which they always were subject and inferior, the Claimed Judgment Lien and any

and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendants

Single Box, West Loop, and each and either of them, are equitably subordinated to and do not

affect Plaintiffs' ownership, Warranty Deed, and other interests, at least to the extent that

Plaintiffs' purchase proceeds paid off or reduced prior liens and obligations on and against the

Property.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.


### THIRD CAUSE OF ACTION
**(Equitable Subrogation – against Single Box and West Loop)**

35.     Plaintiffs incorporate into and make a part of this cause of action each and every

other paragraph in this Complaint.

36.     It would be inequitable and unjust if Plaintiffs' ownership, Warranty Deed, and

other interests in and to the Property were not equitably and otherwise subrogated to a position of

priority ahead of and superior to the Claimed Judgment Lien and to any and all other estates,

rights, titles, or interests in the Property held and/or claimed by Defendants Single Box, West

Loop, and each and either of them, due to and in light of Plaintiffs' purchase proceeds having

paid off liens and obligations on and against the Property that were prior and superior to the

Claimed Judgment Lien and to any and all other estates, rights, titles, or interests in the Property

held and/or claimed by Defendants Single Box, West Loop, and each and either of them, and to

which they always were subject and inferior.

37.     If Plaintiffs ownership, Warranty Deed, and other interests were not equitably

subrogated to a position of priority ahead of and superior to the Claimed Judgment Lien and to

any and all other estates, rights, titles, or interests in the Property held and/or claimed by

Defendants Single Box, West Loop, and each and either of them, then Defendants Single Box,

West Loop, and each and either of them would be unjustly enriched and reap a windfall by virtue

of Plaintiffs having paid off other liens and obligations to which the Claimed Judgment Lien and

to any and all other estates, rights, titles, or interests in the Property held and/or claimed by

Defendants Single Box, West Loop, and each and either of them always were, and would

otherwise have remained, subordinate.

38.    Plaintiffs are entitled, pursuant to Utah Code Ann. §§ 78B-6-401 *et seq*., Rule 57

of the Utah Rules of Civil Procedure, and otherwise to declaratory judgment that Plaintiffs'

ownership, Warranty Deed, and other interests in and to the Property should be and are

subrogated to the priority positions in, on, and to the Property of all prior liens and obligations,

with priority over the Claimed Judgment Lien and to any and all other estates, rights, titles, or

interests in the Property held and/or claimed by Defendants Single Box, West Loop, and each

and either of them, which were paid off with Plaintiffs' purchase proceeds, including particularly

but without limitation to the priority position of the First Position Trust Deed, the Second

Position Trust Deed, the Property Tax Lien, and each of them, ahead of and superior to the

Claimed Judgment Lien and to any and all other estates, rights, titles, or interests in the Property

held and/or claimed by Defendants Single Box, West Loop, and each and either of them, at least

to the extent that Plaintiffs' purchase proceeds paid off or reduced such prior liens and

obligations on and against the Property.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment of, and Damages for,
### Breaches of Warranty Deed – against the Trust)

39.    Plaintiffs incorporate into and make a part of this cause of action each and every

other paragraph in this Complaint.

40.    When the Trust executed the Warranty Deed to Plaintiffs, and by executing it, the

Trust, among other things, as a matter of law (including without limitation under and pursuant to

Utah Code Ann. § 57-1-12(2)), expressly covenanted and warranted, among other things, that the

Trust was lawfully seised of good and marketable title of and to the Property, that the Trust had

the right to and that by the Warranty Deed the Trust in fact did convey and warrant the Property

to Plaintiffs, and that the Trust would defend generally the title of the Property in Plaintiffs

against all adverse claims and demands (subject only to certain specified interests stated on the

face of the Warranty Deed which do not apply to this case).

41.    Plaintiffs have provided, and do again hereby provide, written notice to the Trust

of and regarding the claims and potential interests in the Property which are the subject of this

case, and has demanded, including in writing, that the Trust release, satisfy, and otherwise

discharge the same to provide and ensure the full, free, clear, and marketable title of and to the

Property to Plaintiffs as the Trust is legally and statutorily required to do by virtue of the

Warranty Deed.

42.    To date, however, the Trust has failed, and/or refused, to comply with the requests

and demands as stated in the immediately preceding paragraph.

43.    Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq.*, Rule 57 of the Utah Rules of

11

Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of

the foregoing the Trust is in breach of its covenants and warranties of title with respect to the

Property contained and implied as a matter of law in and as a part of the Warranty Deed.

44.     Plaintiffs have suffered, are continuing to suffer, and otherwise will suffer and are

entitled to recover from the Trust, damages as a result of the Trust's breaches of the various

covenants and warranties of the Warranty Deed, regarding ownership of and title to the Property,

in amounts that will be shown at trial.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.


### FIFTH CAUSE OF ACTION
**(Injunctive Relief)**

45.     Plaintiffs incorporate into and make a part of this cause of action each and every

other paragraph in this Complaint.

46.     Defendants Single Box and West Loop have stated to Plaintiffs that they intend to

enforce their Claimed Judgment Lien against the Property.

47.     Defendants Single Box, West Loop, and each and/or either of them, proceeding

with any enforcement of their Claimed Judgment Lien against the Property, including without

limitation any execution upon and/or foreclosure of the Property allegedly pursuant to their

Claimed Judgment Lien, including without limitation during the pendency of this action and

before the issues in this lawsuit have been ruled upon by the Court as to the validity, scope,

effect, and/or priority of the Claimed Judgment Lien, would result in immediate, great, and

irreparable injury and damage to Plaintiffs who have no plain, speedy, or adequate remedy at law

to protect their Property unless Defendants Single Box, West Loop, and each and/or either of
them, is/are restrained from taking such action.

48.     Defendants Single Box, West Loop, and each and/or either of them, proceeding
with any enforcement of their Claimed Judgment Lien against the Property could render a final
judgment for Plaintiffs ineffectual in the absence of temporary, preliminary, and permanent
injunctive relief.

49.     Plaintiffs are entitled to a temporary restraining order and preliminary injunction
during the pendency of this action, and thereafter to a permanent injunction, restraining and
enjoining Defendants Single Box, West Loop, and each and/or either of them, from proceeding
to any enforcement, execution, and/or foreclosure upon and/or against the Property pursuant to
the Claimed Judgment Lien, and from attempting to enforce the Claimed Judgment Lien against
the Property in any way.


**WHEREFORE**, Plaintiffs pray for relief as follows:

1.     Judgment declaring that either the Claimed Judgment Lien did not attach at all as
any lien upon nor encumbrance against the Property because the claimed judgment debtor Brett
Del Valle personally never owned the Property at any time relevant to this case, or, in the
alternative only, the Claimed Judgment Lien attached to, encumbers, and/or affects at most only
a one half interest in and/or against the Property.

2.     Judgment quieting title of the Property in Plaintiffs, either fully free and clear of
and from, and unaffected by, any and all estates, rights, titles, and/or interests which may be held

and/or claimed by and/or under the Claimed Judgment Lien, or, in the alternative only, quieting

title in Plaintiff of and to at least a one half interest in and to the Property free and clear of and

unaffected by the Claimed Judgment Lien (*i.e.*, that the Claimed Judgment Lien can affect at

most only a one half interest in and to the Property).

       3.     Judgment declaring that, by virtue of Plaintiffs having paid off liens and

obligations on and against the Property that were prior and superior to the Claimed Judgment

Lien and any and all other estates, rights, titles, or interests in the Property held and/or claimed

by Defendants Single Box, West Loop, and each and either of them, and to which they always

were subject and inferior, the Claimed Judgment Lien and any and all other estates, rights, titles,

or interests in the Property held and/or claimed by Defendants Single Box, West Loop, and each

and either of them, should be and are equitably subordinated to and do not affect Plaintiffs'

ownership, Warranty Deed, and other interests, at least to the extent that Plaintiffs' purchase

proceeds paid off or reduced prior liens and obligations on and against the Property.

       4.     Judgment declaring that Plaintiffs' ownership, Warranty Deed, and other interests

in and to the Property should be and are subrogated to the priority positions in, on, and to the

Property of all prior liens and obligations, with priority over the Claimed Judgment Lien and to

any and all other estates, rights, titles, or interests in the Property held and/or claimed by

Defendants Single Box, West Loop, and each and either of them, which were paid off with

Plaintiffs' purchase proceeds, including particularly but without limitation Plaintiffs' ownership,

Warranty Deed, and other interests should be subrogated to the priority position of the First

Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, and each of them,

ahead of, superior to, and unable to be affected by the Claimed Judgment Lien and/or any and all
other estates, rights, titles, or interests in the Property held and/or claimed by Defendants Single
Box, West Loop, and each and either of them, at least to the extent that Plaintiffs' purchase
proceeds paid off or reduced such prior liens and obligations on and against the Property.

5.      Judgment declaring that the Trust is in breach of its covenants and warranties of
title with respect to the Property contained and implied as a matter of law in and as a part of the
Warranty Deed.

6.      Awarding to Plaintiffs, and against the Trust, a money judgment for all damages
Plaintiffs have suffered and are continuing to suffer as a result of the Trust's breaches of the
various covenants and warranties of the Warranty Deed, in amounts that will be shown at trial.

7.      Issuance of a temporary restraining order, preliminary injunction, and permanent
injunction, including without limitation during the pendency of this action, restraining and enjoining
Defendants Single Box, West Loop, and each and/or either of them, from proceeding to any
enforcement, execution, and/or foreclosure upon and/or against the Property pursuant to the
Claimed Judgment Lien, and from in any way, directly or indirectly, initiating, continuing,
and/or otherwise attempting to enforce the Claimed Judgment Lien against the Property in any
way.

8.      For such other and further relief to which Plaintiffs are entitled at law or equity.

DATED September 9, 2021.          FREEMAN LOVELL, PLLC


  */s/ Bradley L. Tilt*
Bradley L. Tilt
*Attorneys for Plaintiffs*

15

# **<u>EXHIBIT 7</u>**

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Office: (385) 355-4826
bradley.tilt@freemanlovell.com
*Attorney for Plaintiffs*

---

**IN THE THIRD JUDICIAL DISTRICT COURT**
**SALT LAKE COUNTY, STATE OF UTAH**

---

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC, | **REPLY MEMORANDUM IN SUPPORT OF MULLIGANS' REPLY AND REQUEST FOR HEARING** |
| Plaintiff | |
| v. | |
| PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive, | Civil No. 206927043 |
| | Judge Adam Mow |
| Defendants. | |

---

Molly J. Mulligan and John P. Mulligan (collectively the "**Mulligans**") respectfully submit this reply memorandum in support of their *Reply and Request for Hearing*, dated July 7, 2021 (the "**Reply**")[1].

**CONCISE STATEMENT REGARDING**
**NEW MATTERS RAISED IN OPPOSITION TO MULLIGANS' REPLY**

Plaintiff filed its *Opposition to Mulligans' Reply and Request for Hearing* (the "**Opposition**") on the basis that the claimed $4.5 million dollar California judgment it filed with this Court (the "**Judgment**") constitutes and is a valid lien on the Mulligans' Property, even

---

[1] The Mulligans incorporate by reference herein the definitions set forth in their Reply and Request for Hearing.

1

though Plaintiff failed to comply with the statutory requirements for creating any lien. It further argues that the issued Writ is valid for execution on the Mulligans' Property, notwithstanding Plaintiff's failure to acquire a judgment lien in the first instance, or that the Third Judicial District Court does not have *in rem* jurisdiction over property located in the Fourth Judicial District.

Plaintiff bases its statutory arguments on a tortured and incoherent reading of Utah's Foreign Judgments Act and the Judgment Lien Statute (collectively the "**Statutes**"), by referencing related sections divorced from the consistent meaning of other provisions of each Statute and both Statutes together. The reading of related statutes and neighboring subparts as part of a whole is required by the "canon of consistent meaning" as adopted by the Utah Supreme Court.

Finally, Plaintiff erroneously asserts that this Court has jurisdiction to issue the Writ pursuant to Utah R. Civ. P. 64(d)(1). But Plaintiff's shallow reading of Rule 64(d)(1) erroneously assumes that if a court clerk must issue the writ in the county where the real property is located, then it follows that the same court clerk could issue a writ in a county located in a different judicial district court. Plaintiff is wrong. Its specious argument presupposes that a Utah judicial district court has *in rem* jurisdiction to enforce a money judgment in a county located in a *different* judicial district. Indeed, judicial district court judges preside over a number of counties within in their own judicial district but that does not mean a judge from one judicial district can enforce a money judgment on property located in a county in *another* judicial district.

All of Plaintiff's arguments fail as a matter of law, and Plaintiff does not have a lien on the Mulligans' Property.

## RESPONSES TO PLAINTIFF'S
## STATEMENT OF RELEVANT FACTS

The so-called "Statement of Relevant Facts" section in Plaintiff's Opposition

("**Plaintiff's Fact Statement**") is flawed because it is replete with legal conclusions, not facts,

such as it "domesticated" and "created a lien" on the Mulligans' Property.  The Mulligans'

therefore object to any and all of Plaintiff's asserted facts to the extent they raise/are actually

legal issues before this Court.  Based Plaintiff's Fact Statement and Exhibits, the following facts

are relevant for this Reply to the Opposition filed by Plaintiff.[2]

1. A California court entered a money judgment in favor of Plaintiff on March 18, 2020
   in the total amount of $4,338,964.45 (the "**California Judgment**")[3]. *See* Ex. 1
   Opposition.

2. Plaintiff filed a "Notice of Judgment" for the California Judgment on October 13,
   2020 in Utah's Third Judicial District Court, Salt Lake County (the "**Claimed
   Judgment**").  *See* Ex. 2 Opposition.

3. On November 16, 2020, Plaintiff recorded the Notice of Judgment and Information
   Statement in Weber County. *Id.*

4. On May 11, 2021, the Trust conveyed the Property located in Weber County to the
   Mulligans'.  *See* Ex. 5 Opposition.

5. On June 22, 2021 Plaintiff submitted its Application for and Writ of Execution to the
   Third Judicial District Court, Salt Lake County, which was entered the same day (the
   "**Claimed Writ**").

---

[2] The Mulligans further incorporate by reference herein each of the facts set forth in its Reply and
Request for Hearing.
3 Plaintiff claims in its Opposition the California Judgment is "nearly $4.5 million dollar[s]".

## ARGUMENT

Plaintiff is not entitled to the request it seeks, and the Claimed Judgment and Claimed

Writ should each be set aside. Plaintiff ignored the interplay between the Utah Foreign Judgment

Act and the Judgment Lien Statute and failed to comply with their requirements.  Furthermore,

Plaintiff also failed to file and register the California Judgment in the Fourth Judicial District

Court, which has the requisite *in rem* jurisdiction for the purpose of enforcing a money

judgment.  In short, Plaintiff did not create any lien on the Mulligans' Property.

## I. THE CLAIMED JUDGMENT NEVER ATTACHED TO THE PROPERTY AND DID NOT CREATE ANY LIEN BECAUSE PLAINTIFF FAILED TO COMPLY WITH THE MANDATORY STATUTORY REQUIREMENTS

### A. Plaintiff's Interpretation of Utah's Foreign Judgment Act and the Judgment Lien Statute is Incorrect, Disjointed, and Creates an Absurd Result

It is well known that liens are creatures of statute and that compliance with the relevant

statute(s) is mandatory to create a lien. Judgment creditors know this. Plaintiff knows this. Yet

contrary to the statutory requirements of §78B-5-201(2)(stating that a judgment "*does not create*

*a lien…unless the judgment is filed in the Registry of Judgments of the office of the clerk of the*

*district court of the county in which the property is located*"), Plaintiff admittedly did not file the

Claimed Judgment in any Registry of Judgments and therefore failed to create a lien.

Plaintiff attempts to parse, pick, and choose, in Utah's Judicial Code Chapter 5 Foreign

Judgment Act and the Judgment Lien Statute to justify why it did not comply with the

requirements of each. It claims that pursuant §78B-5-305 ("Lien") of the Foreign Judgment Act,

it only needs to enter a foreign judgment in a district court and record it in the county recorder

where the property is located to create a lien, and that because the Act does not refer to "Registry

4

of Judgments", like §78B-5-201 of the Judgment Lien Statute does, such filing simply isn't required of them.

But Plaintiff relies solely on §78B-5-305 of the Foreign Judgment Act and its reference to compliance with the provisions of §78B-5-202, in the Judgment Lien Statute, while utterly ignoring a prior subjection of the Act, §78B-5-302(3) ("Definition – Filing and Status of Foreign Judgments"), which unequivocally states that "*[a] foreign judgment filed under this part has the same effect <u>and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court of this state</u>*" (emphasis added).

Thus, under its plain language, the Foreign Judgment Act expressly mandates that <u>in addition</u> to recording a foreign judgment with a county recorder as set forth in its subsection -305, *and as a preliminary matter*, a foreign judgment is subject to Utah's statutory requirements for creating a lien in the first instance under subsection -302, *i.e.,* by way of the Judgment Lien Statute[4].  Utah courts have held this is so. *See e.g., Osborne v. Osborne*, 2011 UT App 150, ¶3 (explaining that pursuant to §78B-5-302 a foreign judgment is bound by the statutory provisions relating to the enforcement of a Utah judgment)(*citing Bankler v. Bankler*, 963 P.2d 797, 799-

---

[4] Plaintiff's own actions contradict its claimed position that it need only comply with Sections 78B-3-305 and 78B-5-202 pursuant to the Foreign Judgment Act to create a lien, because it did, in some respects, also comply with the Judgment Lien Statute by including with the Claimed Judgment an Information Statement as required by §78B-5-201(4). On the one hand Plaintiff argues that Section 78B-5-202 only requires recording and information identifying the judgment debtor, but on the other hand it asserts that it does not need to file its Claimed Judgment in the Registry of Judgments because that requirement is set forth in Section 78B-5-201 not -202. Opposition, p.6. This conclusion results from a disjointed reading of the Statutes and their subparts. *See e.g., Irving Place Associates v. 628 Park Avenue, LLC*, 2015 UT 91a at ¶21 ("[t]he canon of consistent meaning is at its strongest when it is applied to a term used in neighboring subparts of the same statutory provision"), further discussed below.

801 (Utah Ct. App 1998)( "[o]nce a foreign judgment is filed, it is 'subject to the same

procedures to attack or enforce as a Utah judgment'").

It makes no sense that a judgment creditor seeking to create a lien in Utah by way of a

foreign judgment has fewer steps and hurdles to create the lien than a judgment creditor seeking

to enforce and create a lien pursuant to a Utah judgment.  Plaintiff's isolated interpretation of the

Utah Foreign Judgment Act creates an absurd result and dooms its Claimed Lien.  *Utley v. Mill

Man Steel, Inc.*, 2015 UT 75, ¶37, 357 P.3d 992 ("we do not interpret the terms of statutory

provisions in isolation.  We read them in context.  The relevant context, moreover, must include

an understanding of the structure and purpose of the statute."); *Id.*, ¶46 (requiring construction of

statute "that avoids absurd consequences").  Plaintiff must also comply with each of the

provisions of the Utah Judgment Lien Statute, which it admittedly did not do.  Plaintiff therefore

failed to create a lien merely by recording the Claimed Judgment in the Weber County recorder's

office.

B.  Plaintiff's Reliance on *Kitches* to Justify its Interpretation of Utah's Foreign
     Judgment Act and the Judgment Lien Statute is Misplaced and Unavailing

Plaintiff relies on *Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 112 P.3d 1210 (Utah Ct.

App. 2005) to support its disjointed argument that filing its Claimed Judgment in the Registry of

Judgments was not required.  But *Kitches* at best is distinguishable and at worst was wrongly

decided.

The *Kitches* court considered the issue of whether a March 17, 2003 judgment that

plaintiffs had recorded created a lien on the debtor's real property, and whether its lien had

priority over the debtor's conveyance of the subject property to his wife two months later on

May 12, 2003.  Applying an earlier version of Utah's Judgment Lien Statute, the *Kitches* court

6

held that Sections 78-22-1 and 78-22-1.5 should be read in the disjunctive, such that the plaintiff need only file its judgment in the county recorder's office to create a lien on the debtor's real property which, therefore, had priority over the May 12, 2003 deed.

The debtor had argued "that subsections (2) and (3) of §78-22-1.5 should be read together, thereby creating a two-step process for establishing a lien on real property after July 1, 2002". *Id.* at ¶ 12. The *Kitches* court disagreed and focused its analysis on the language in Section 78-22-1 ("a judgment 'becomes a lien upon real property' if it is recorded in the office of the county recorder") and various subsections of Section 78-22-1.5 that include additional requirements for recording with the judgment with debtor information and methods of recording, "in the disjunctive". *Id.*  In support of its logic the *Kitches* court pointed out that "Section 78-22-1.5(4) provides that 'any judgment that is filed in the Registry of Judgments on or after September 1, 1998, *or* any judgment or abstract of judgment that is recorded in the office of a county recorder after July 1, 2002, shall include' particular additional information" (emphasis original). Had the legislature intended the two subsections to be read together, the *Kitches* court said, "[the legislature] could have used the word "and" instead of "or". *Id.* at ¶ 13.

The problem with this logic, and the *Kitches* decision, is that it violates the requirements of the current Judgment Lien Statute wherein Sections 78B-5-201*et seq.* enumerates in its subsections a number of requirements that a judgment creditor must follow to create a judgment lien (including, for example, the requirement to file its judgment in the Registry of Judgments as set forth in subsection -201(2)). Further, a judgment creditor is required to comply with <u>all</u> of the subsection requirements in Section 75B-5-201, not just the ones it <u>wants</u> to.  *See e.g., T3 Properties, LLC v. Persimmon Inves., Inc.*, 2013 UT App 38 (judgment creditor failed to comply

7

with the statutory requirements under both Sections 78-22-1 <u>and</u> -1.5 (current versions are

Sections 78B-5-202 and -201); the judgment therefore never became a lien on the Property).

Additionally, contrary to Plaintiff's assertion, compliance with some or all of the

provisions of Section 78B-5-202 does not mean that a judgment creditor does not have to also

comply with the requirements set forth in neighboring subsection Section 78B-5-201.  Dissecting

the statute in this way would frustrate the purposes of the Judgment Lien Statute as a whole.

The Utah Supreme Court case of *Irving Place Assoc.*, cited in footnote 4 above, is

instructive and dispositive.  In that case, the court considered the interplay between creating a

lien pursuant to Section 78B-5-201(4)(recording the judgment with the debtor's information in

the county recorder's office) or 78B-5-201(5)(recording a separate information statement).  At

issue in particular, was whether the judgment needed to be a final judgment to create a lien (it

does under Section 78B-5-202(7)) and whether the judgment creditor provided the debtor

information required by Section 78B-5-202(7)(a)(i) (it didn't).  The *Irving* court found the

relevant statutory provisions ambiguous because Section 78B-5-201(4) does not specify a "final"

judgment[5].  But after further analysis of a number of relevant statutory provisions that expressly

or impliedly referenced "final judgments" in their application, it held that "*the canon of

consistent meaning tells us that the 'judgment[s]' subject to a lien under a neighboring statute –

section 202(7) – are also the final kind*."[6] *Id.* at ¶21.

---

[5] The Mulligans maintain that the statutory provisions at issue in this case are not ambiguous.
Plaintiff's selective reading of them, by contrast, would create ambiguity for judgment creditors
and debtors alike.

[6] For example, the *Irving* court stated that a "closely proximate subsection" of the lien provisions
at issue, Section 78B-5-202(1), imposes an eight-year limitation on judgments, which can only
mean final judgments.  *Id.* at ¶20.

Applying the lengthy statutory analysis and guidance set forth in *Irving*, there can only be one result: Sections 78B-5-201, 202, and their subparts, and the Judgment Lien Statute as a whole, must all be interpreted together as a whole, cohesively, and in harmony, resulting in the failure of Plaintiff to create a judgment lien on the Mulligans' Property.

## II.  THIS COURT DOES NOT HAVE *IN REM* JURISDICTION TO ISSUE THE WRIT OR OTHERWISE ENFORCE THE CLAIMED JUDGMENT TO BE EXECUTED IN A COUNTY OUTSIDE OF ITS JUDICIAL DISTRICT

Plaintiff was statutorily required to file its Claimed Judgment in the Registry of Judgments with the Fourth Judicial District Court in Weber County because the Property at issue is located in Weber County.[7]  Section 78B-5-201(2) expressly provides that:

> On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect title to real property unless the judgment is filed <u>in the Registry of Judgments in the office of the clerk **of the district court of the county in which the property is located**</u>.

(Emphasis added).  Instead, Plaintiff filed its Claimed Judgment in the Third Judicial District Court in Salt Lake County on October 13, 2020, in violation of the above provision and established case law. Because this action is *in rem* – solely to execute a money judgment and create a lien or interest in real property – jurisdiction to do so can only lie with the Fourth Judicial District Court.

The Utah Supreme Court in *Calder v. Third Jud. Dist. Ct. In & For Salt Lake Cnty*, 2 Utah 2nd 309, 314-315, 273 P.2d 168, 171-172 (1954), explained it like this:

---

[7] The Mulligans do not concede the issue raised in their Reply and Request for Hearing – that the Claimed Judgment was against debtor Brett Del Valle, an individual, and other debtors, none of whom ever owned the Property.

> [I]f the main question in action involves title to real property, it is a local action and must
> be brought within the county where the land is situated, but this is not so where the
> question of title <u>or interest in real property</u> is only <u>incidental</u> to the main controversy.

(Emphasis added) (holding that because the plaintiff sought recission of a contract and not a

determination of an interest in real property, the district court did not err in refusing to grant a

change of venue on that ground)(citing numerous cases in which courts distinguished between a

"transitory action" involving, for example, recission of a contract for sale, fraud that vitiates the

contract, or other such allegations, that could be brought in a district court where the alleged

actions occurred, versus a "local action", or *in rem* jurisdiction, involving an interest in real

property which must be brought within the county where the land is situated).  *See e.g., Sherman

v. Droubay*, 27 Utah 47, 74 P. 348, 350 (1903)("...the action at bar should have been

commenced, as the statute directed, in the county of Tooele, where the real property securing the

debt was situate") (citing *Fields v. Daisy Min. Co.*, 26 Utah, 373, 73 Pac. 521); *see also Ashton-

Jenkins Co. v. Bramel*, 56 Utah 587, 192 P. 375, 377-378 (citing a similar Minnesota case for the

proposition that "[I]t is now the settled doctrine of this court that the district courts of this state

may be clothed with full power to inquire into and conclusively adjudicate the state of the title of

all land <u>within their respective jurisdictions</u>" (emphasis added)).

　　　While the statutes and cases make clear that *in rem*, or "local action", jurisdiction belongs

in the county where the judgment debtor's property is located, a judgment debtor's failure to

object waives any jurisdictional challenge. *See Snyder v. Pike*, 30 Utah 102, 83 P. 692, 693-94

(1905)(a defendant failing challenge the jurisdiction of the court on the ground that the suit was

not brought in the property county, waives the objection)(distinguishing *Fields v. Daisy* and

others on the grounds that plaintiff did not object to jurisdiction of the Forth Judicial District

Court when it entered a decree directing a sale of the mortgaged premises for the payment of the indebtedness to the Sheriff of Emery County, where the property was located).

In the instant case the Mulligans have, and do, object the lack of jurisdiction of this Third Judicial District Court over property located in the Fourth Judicial District; Mulligans have, and do, object to the entry of the Claimed Judgment and issuance of the Claimed Writ by the Third Judicial District Court. Furthermore, this Court is authorized to set aside the Claimed Writ pursuant to Utah Rule of Civil Procedure 54(b) the Mulligans request that it do so. *See Jordan Construction, Inc. v. Federal National Mortgage Association*, 2017 UT 28, ¶¶27-38.

## CONCLUSION

Plaintiff is a judgment creditor, and as such, it is <u>Plaintiff's</u> responsibility to diligently protect its interests by complying with the statutes that allow the creation of a lien on real property. Plaintiff failed to do so. Plaintiff's failure should not, and cannot, be foisted on the Mulligans. Plaintiff cannot pick and choose which subsections of the Statutes to follow or ignore depending on the result it wants. It's analysis and arguments are wholly ineffective to breathe life into the Claimed Judgment lien that was never created and never attached to the Mulligans' Property. Furthermore, Plaintiff failed to file its Claimed Judgment and Writ Application in the correct judicial district court; another reason Plaintiff failed to create a lien on the Property.

For all of the foregoing reasons the Mulligans respectfully request this court to set aside the Claimed Judgment and Claimed Writ, finding that Plaintiff does not have a lien on the Mulligans' Property. The Mulligans also request a hearing to present oral argument on its Reply and Request for Hearing.

DATED September 30, 2022

FREEMAN LOVELL, PLLC

_____ */s/ Bradley L. Tilt*_____
Bradley L. Tilt
*Attorneys for Molly J. Mulligan*
*and John P. Muligan*

## SERVICE CERTIFICATE

I certify that on September 30, 2022, I caused true and correct copies of this **REPLY
MEMORANDUM IN SUPPORT OF MULLIGANS' REPLY AND REQUEST FOR
HEARING** to be served in the manner indicated below to the following-listed parties at their
respective addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson<br>Bennett Tueller Johnson & Deere<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, Utah 84121<br>ben.johnson@btjd.com<br>*Attorneys for Plaintiff* | _____ Hand Delivery<br>_____ First Class, United States Mail,<br>         Postage Prepaid<br>__X__ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>_____ Email<br>_____ Other:_____ |

*/s/ Bradley L. Tilt*_____
*Bradley L. Tilt*

12

# **EXHIBIT 8**

**The Order of the Court is stated below:**
**Dated:** June 22, 2021        /s/  KATHERINE CARLSON
12:41:19 PM        District Court Clerk

Benjamin D. Johnson (10275)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Facsimile: (801) 438-2050
Email: ben.johnson@btjd.com

*Attorneys for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT

## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC, | **WRIT OF EXECUTION** |
| Plaintiff, | |
| vs. | |
| PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive, | Case No. 206927043 <br><br> Judge Adam Mow |
| Defendants. | |

To the SHERIFF OR CONSTABLE:

(1)    A judgment has been entered against the judgment debtor. After calculation of interest, costs and payments, the judgment debtor owes $4,339,089.45.

(2)    You are directed to seize and sell enough of the judgment debtor's non-exempt property described in Paragraphs (5) and (6) of the Application for Writ of Execution to satisfy that amount.

(3)    You are directed to serve this Writ and all attachments on the debtor and on the people named in Paragraphs (5) and (6) of the Application for Writ of Execution.

---

(4)    You are to return this Writ within 10 days after receiving it, with a signed account of your actions in executing this Writ.

## HEREBY ENTERED BY THE COURT

**Effective on the Date When the Court Stamp Is Affixed to the First Page of this Document**

# **<u>EXHIBIT 9</u>**

# THE DEL VALLE FAMILY TRUST

By and Between

## BRETT H. DEL VALLE AND TRACI M. DEL VALLE
Trustors

and

## BRETT H. DEL VALLE AND TRACI M. DEL VALLE
Trustees

Dated October 30, 2002

## TABLE OF CONTENTS

### ARTICLE 1

### SUCCESSOR TRUSTEES

*Page*

| | | |
|---|---|---|
| 1.1 | Appointment | 1 |
| 1.2 | Liability of Successor Trustee | 1 |
| 1.3 | Vacancy | 1 |
| 1.4 | Powers of Successor Trustee | 2 |

### ARTICLE 2

### TRUST PROPERTY

| | | |
|---|---|---|
| 2.1 | Trust Estate | 2 |
| 2.2 | Addition of Property | 2 |
| 2.3 | Character of Property | 2 |

### ARTICLE 3

### RIGHTS RESERVED BY TRUSTORS

| | | |
|---|---|---|
| 3.1 | Revocation During Trustors' Joint Lifetimes | 3 |
| 3.2 | Amendment During Trustors' Joint Lifetimes | 4 |
| 3.3 | Revocation and Amendment by Survivor | 4 |

### ARTICLE 4

### INITIAL TRUST DURING JOINT
### LIFETIMES OF TRUSTORS

| | | |
|---|---|---|
| 4.1 | Principal and Income from Community Estate | 4 |
| 4.2 | Principal and Income from Separate Estates | 5 |
| 4.3 | Income or Principal on Request | 5 |
| 4.4 | Transfers Out of Trust Estate | 5 |
| 4.5 | Incapacitation of Trustor | 5 |
| 4.6 | Payment of Taxes, Debts and Expenses on Death of Decedent | 6 |

## ARTICLE 5

## DIVISION ON DECEDENT'S DEATH

5.1   Division of Trust Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    a.   Survivor's Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    b.   Decedent's Estate - Survivor Survives for Thirty (30) Days . . . . . 7
    c.   Decedent's Estate - Survivor Does Not Survive for Thirty (30)
        Days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
5.2   Marital Deduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## ARTICLE 6

## SURVIVOR'S TRUST

6.1   Principal and Income from Survivor's Trust   . . . . . . . . . . . . . . . . . . . . 8
6.2   Lifetime Distributions Under Power of Appointment   . . . . . . . . . . . . . . 9
6.3   Distribution Upon Death of Survivor . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## ARTICLE 7

## DISCLAIMER

## ARTICLE 8

## PAYMENT OF TAXES, DEBTS, AND EXPENSES ON
## DEATH OF SURVIVOR

## ARTICLE 9

## RESIDENCE

## ARTICLE 10

## DISCLAIMER TRUST

10.1   Principal and Income from Disclaimer Trust   . . . . . . . . . . . . . . . . . . . 11
10.2   Distribution Upon Death of Survivor . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## ARTICLE 11

### CHILDREN'S TRUST

11.1   Division and Administration .............................. 11
11.2   Ultimate Contingent Beneficiaries ......................... 14

## ARTICLE 12

### MISCELLANEOUS PROVISIONS

12.1   Notice to Trustee of Births, Etc. ......................... 14
12.2   Definition of Education ................................. 14
12.3   Segregation of Trusts .................................. 15
12.4   Duty to Inquire ...................................... 15
12.5   Payments to Other Than Beneficiary ....................... 15
12.6   Perpetuities Savings Clause ............................. 16
12.7   Severability ......................................... 16
12.8   Number and Gender .................................... 16
12.9   Qualified Retirement Benefits ........................... 16
12.10  Delayed Termination, Distribution or Division ............... 16
12.11  Headings ........................................... 17
12.12  Governing Law ....................................... 17
12.13  Undistributed Income .................................. 17
12.14  Allocation of Expenses Among Successive Beneficiaries .......... 17
12.15  Distribution of Trust if Uneconomical Administration ........... 17
12.16  Changed Conditions ................................... 18
12.17  Obligation of Support ................................. 18
12.18  Transfer Agents ..................................... 18
12.19  Right of Representation ................................ 18

## ARTICLE 13

### TRUSTEE'S POWERS

13.1   Continue to Hold Property .............................. 19
13.2   Manage and Control ................................... 19
13.3   Lease Property ....................................... 19
13.4   Borrow ............................................ 19
13.5   Carry Insurance ...................................... 19
13.6   Commence or Defend Litigation; Compromise or Adjust Claims ...... 19
13.7   Budget Income and Expenses ............................. 19
13.8   Invest and Reinvest ................................... 20
13.9   Professional Assistance ................................ 20
13.10  Nominee's Name ...................................... 20

13.11 Bonds at Premium ........................................ 20
13.12 Bonds at Discount ........................................ 20
13.13 Undivided Interests ...................................... 20
13.14 Administration Expenses .................................. 21
13.15 Divisions and Distributions .............................. 21
13.16 Tax Elections ........................................... 21
13.17 Bank Accounts .......................................... 21
13.18 Disclaim, Release, or Restrict Powers .................... 21
13.19 Partnership ............................................ 21
13.20 Powers Concerning Businesses ............................ 22
13.21 Abandon Property ....................................... 23
13.22 Principal and Income .................................... 23
13.23 General Powers Regarding Real Estate ..................... 24
13.24 Granting Power to Subordinate ........................... 24
13.25 Employment of Real Estate Brokers ....................... 24
13.26 Authorizing Trustee To Foreclose and to Bid on Property ... 24
13.27 Purchase Assets from Personal Representatives ............ 24
13.28 Loans to Personal Representatives and Others ............. 25
13.29 Insurance .............................................. 25
13.30 Loans and Purchases by Trustee .......................... 26
13.31 Lend to Beneficiaries ................................... 26
13.32 Guarantee Loans ........................................ 26
13.33 Consider Tax Consequences .............................. 26
13.34 Death Taxes ............................................ 27
13.35 Oil, Gas, and Similar Interests .......................... 27
13.37 General Powers and Limitations .......................... 28

## ARTICLE 14

### GENERATION SKIPPING TRANSFER TAX PROVISIONS

14.1 Definitional Material ..................................... 28
14.2 Executor's Generation-Skipping Authority: Exemption Allocation ..... 29
14.3 Separation of Exempt and Nonexempt Trusts ................ 29
14.4 General Powers and Other Special Generation-Skipping Provisions ..... 31
14.5 Generation-Skipping "Favorable Interpretation" Clause ........... 32

## ARTICLE 15

### TRUSTEE PROVISIONS

15.1 Incapacitation of Trustee ................................ 32
15.2 Compensation of Trustee ................................. 33
15.3 No Bond ................................................ 33

15.4   Resignation of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
15.5   Accounting  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## ARTICLE 16

## SPECIAL PROVISIONS

16.1   Additional Insurance Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
16.2   Definitions:  Children, Issue, Living, Etc.  . . . . . . . . . . . . . . . . . . . . . 35
16.3   Spendthrift Provision  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
16.4   Absence from Place of Administration . . . . . . . . . . . . . . . . . . . . . . . 36
16.5   Simultaneous Death  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
16.6   No Contest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
16.7   Power to Delegate  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
16.8   Disinheritance of Omitted Heirs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
16.9   Tangible Personal Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
16.10  Name of Trust  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## SCHEDULE A

## INVENTORY OF TRUST ESTATE

## THE DEL VALLE FAMILY TRUST

THIS TRUST AGREEMENT is made between BRETT H. DEL VALLE and TRACI M. DEL VALLE, husband and wife, herein designated the "Trustors," or separately as "husband" and "wife" respectively, and BRETT H. DEL VALLE and TRACI M. DEL VALLE, herein acting as original Co-Trustees hereunder.

### ARTICLE 1

### SUCCESSOR TRUSTEES

**1.1    Appointment.** The Trustors have been appointed as Co-Trustees hereof. If for any reason during the joint lifetimes of the Trustors either Trustor shall cease to act as Co-Trustee, the other Trustor shall act as sole Trustee. Except as otherwise provided in this trust instrument, upon the death of the first Trustor to die, the other Trustor shall act as sole Trustee. Should both Trustors cease for any reason to act as Trustee, KIMBERLY SUSAN ROBERTS shall act as successor Trustee. Should KIMBERLY SUSAN ROBERTS fail or cease for any reason to act as Trustee, KIMBERLY DEL VALLE shall act as successor Trustee.

**1.2    Liability of Successor Trustee.** No successor Trustee shall be liable or responsible for any losses or expenses resulting from or occasioned by anything done or neglected to be done in the administration of any trust created herein prior to the date of acceptance of appointment of such Trustee. Moreover, no successor Trustee shall be charged with the responsibility for examining or investigating the actions of any predecessor Trustee hereunder and may accept the accounting records of any predecessor Trustee showing assets on hand without further investigation and without incurring any liability to any person claiming or having an interest in any trust created herein.

**1.3    Vacancy.** In the event any Trustee of any trust hereunder fails to qualify or ceases to act for any reason whatsoever, and if there is no provision herein for such eventuality, said vacancy may be filled by a majority of the class composed of (i) the adult, competent beneficiaries of such trust then entitled or authorized in the Trustee's discretion to receive distributions therefrom and (ii) the guardians of the person of all minor, and the conservators of the person of all incompetent, adult beneficiaries of such trust then entitled or authorized in the Trustee's discretion to receive distributions therefrom, by appointing a successor individual or corporate Trustee. Any such appointment shall be made by a written instrument executed by the party or parties making such appointment and delivered to the successor Trustee. In the event a successor Trustee is not appointed within ninety (90) days following the event requiring such appointment in the manner prescribed above, then a successor Trustee shall be appointed by a court having jurisdiction over the trust for the appointment of a successor Trustee. Notwithstanding the foregoing, in no event shall any beneficiary then entitled or authorized in the Trustee's discretion to receive distributions from such trust, or the spouse of any such beneficiary, or any vested remainder beneficiary of such trust, be appointed to act as the successor Trustee; provided, however, that the Survivor may act as successor Trustee of the Survivor's Trust, the Disclaimer Trust and the

Children's Trust and a person who is a member of the class composed of the Trustors' issue,
and/or such person's spouse, may act as successor Trustee of the separate trust created for
such person's benefit under subparagraph 11.1a.(1) or 11.1a.(2) hereof, as the case may be,
if such person is then entitled to request full distribution of his or her trust pursuant to
subparagraph 11.1a.(1)(b) or 11.1a.(2)(a)(ii) hereof, as the case may be.

    **1.4**    **Powers of Successor Trustee.** Except as may otherwise be specifically
provided in this trust instrument to the contrary, any successor Trustee of a particular trust
created under this instrument shall succeed to all title to the property of said trust and to all
powers of any predecessor Trustee of said trust with the same effect as though such
successor Trustee had been originally named as Trustee of said trust.

## ARTICLE 2

### TRUST PROPERTY

    **2.1**    **Trust Estate.** The Trustors have transferred and delivered to the Trustee,
without consideration on the Trustee's part, the property described in Schedule A to this
trust instrument. Said property, together with any other property that may become subject to
this trust instrument (whether or not listed on Schedule A), shall constitute the "trust estate,"
and shall be held, administered and distributed in accordance with this instrument.

    **2.2**    **Addition of Property.** Either Trustor or any other person may add additional
property to these trusts, such as by making the proceeds of insurance policies payable to the
Trustee, by making the benefits under any pension plan, profit-sharing plan, or other
retirement plan payable to the Trustee, by transferring property to the Trustee by deed,
assignment, beneficiary designation, or otherwise, by transfer under the Will of either
Trustor, or any other person, or by transferring property from another trust pursuant to the
terms of such trust.

    **2.3**    **Character of Property.**

    a.    A transfer to the trust estate of any joint tenancy property of the
Trustors shall terminate the joint tenancy. The Trustors hereby agree that the character of
such property shall be the community property of the Trustors.

    b.    It is the Trustors' intention that all community property transferred to
or held in the trust estate (sometimes herein called the "community estate"), or withdrawn
therefrom, shall continue to retain its character as community property. It is also the
Trustors' intention that the Trustee shall have no more extensive power over any community
property transferred to or held in the trust estate than either of the Trustors would have had
under California Family Code Sections 1100 and 1102 had this trust not been created, and
this instrument shall be so interpreted to achieve this intention notwithstanding any other
provision of this trust instrument to the contrary. This limitation shall terminate on the
death of either Trustor. Notwithstanding the foregoing, the Trustee for the benefit of the
community, shall have the power to convey, encumber or otherwise dispose of community,

real and personal property held hereunder without the consent of or prior notice to either
husband or wife, whether or not the husband or wife shall then be capable of giving such
consent or of understanding such notice.

    c.  Any separate property or quasi-community property of a Trustor
transferred to or held in the trust estate shall be called the "separate estate" of the Trustor
contributing such property. As used herein, the term "quasi-community property" refers to
the property of a Trustor held in the trust estate that is defined in California Probate Code
Section 66, including the expectant interest of such Trustor's spouse in that property. Any
separate property or quasi-community property transferred to or held in the trust estate shall
continue to retain its character as the separate property or quasi-community property, as the
case may be, of the Trustor contributing such property to the trust estate, subject, however,
to all the terms and conditions of this trust instrument. For purposes of convenience, the
term "separate estate" as used in this instrument and the term "separate property" as
hereafter used in this instrument shall be deemed to include quasi-community property
transferred to or held in the trust estate. However, the Trustors do not intend thereby to
change the character of that property from quasi-community property to separate property.
The Trustors do acknowledge, however, that each Trustor intends under this instrument to
dispose of said Trustor's entire quasi-community property held in the trust estate (including
the expectant interest of said Trustor's surviving spouse in such property) as if it were said
Trustor's separate property and as if said Trustor's spouse had no interest in such property.
Nevertheless, each Trustor recognizes that said Trustor's surviving spouse may be entitled
by law to take his or her expectant interest in the deceased Trustor's quasi-community
property free of this trust, notwithstanding the terms of this trust instrument. In recognition
of this fact, it is the intent of each Trustor that if the deceased Trustor's surviving spouse
elects to take his or her expectant interest in the deceased Trustor's quasi-community
property free of this trust, then all the provisions of this trust instrument for the benefit of
the surviving Trustor shall nevertheless be carried into effect with respect to all property
remaining subject thereto.

## ARTICLE 3

### RIGHTS RESERVED BY TRUSTORS

  **3.1** **Revocation During Trustors' Joint Lifetimes.** During the joint lifetimes of
the Trustors, the community estate may be revoked in whole or in part by an instrument in
writing signed by either Trustor, and any separate estate may be revoked in whole or in part
by an instrument in writing signed by the Trustor who contributed that property to the trust.
This power of revocation shall be exercised by delivering such written instrument to the
other Trustor and to the Trustee in the case of the community estate, and to the Trustee in
the case of the separate estate of a Trustor. On revocation with respect to the community
estate, the Trustee shall promptly deliver to either or both Trustors all or the designated
portion of the community estate, which shall continue to be the community property of the
Trustors and which shall be held and administered as community property by the Trustor or
Trustors receiving the property. On revocation with respect to the separate estate of a
Trustor, the Trustee shall promptly deliver to the contributing Trustor all or the designated

portion of that property. If this instrument is revoked with respect to all or a major portion of the assets subject to the instrument, the Trustee shall be entitled to retain sufficient assets reasonable to secure payment of liabilities lawfully incurred by the Trustee in the administration of the trust, including Trustee's fees that have been earned, unless the Trustors shall indemnify the Trustee against loss or expense.

**3.2  Amendment During Trustors' Joint Lifetimes.** Except as otherwise provided in subparagraph 16.1a. below, the Trustors may at any time during their joint lifetimes amend any of the terms of this instrument by an instrument in writing signed by both Trustors and delivered to the Trustee.

**3.3  Revocation and Amendment by Survivor.** From and after the death of the first Trustor to die (often referred to in this instrument as the "Decedent"), the surviving Trustor (often referred to in this instrument as the "Survivor") shall have the power to alter, amend, revoke, or terminate the Survivor's Trust in whole or in part, but no other trust created under the terms of this trust instrument may be altered, amended, terminated or revoked (except to the extent permitted under this instrument pursuant to the exercise of a power of appointment granted by this instrument). On revocation or termination of the Survivor's Trust, all or that portion of its assets affected shall be delivered to the Survivor. This power of revocation or amendment shall be exercised by an instrument in writing signed by the Survivor and delivered to the Trustee. From and after the death of the Survivor, no trust created hereunder may be altered, amended, terminated, or revoked (except to the extent permitted under this instrument pursuant to the exercise of a power of appointment granted by this instrument).

## ARTICLE 4

### INITIAL TRUST DURING JOINT
### LIFETIMES OF TRUSTORS

**4.1  Principal and Income from Community Estate.** During the joint lifetimes of the Trustors, the Trustee shall pay to either or both the Trustors, for the account of the community, or apply for the Trustors' benefit, as much of the net income, and if the Trustee considers the net income insufficient, as much of the principal, of the community estate as is necessary in the Trustee's discretion for the Trustors' health, education, support, maintenance, comfort, enjoyment, and welfare, in accordance with their accustomed manner of living. Any community income not so paid or applied, and which is not paid, applied, or requested pursuant to other provisions of this Article 4, shall be accumulated and added to principal of the community estate. The Trustor receiving payments shall have the same duty to use income and principal of the community estate received under this trust instrument for the benefit of the Trustors as he or she has with respect to any other community property. In making distributions of income or principal under this paragraph, the Trustee may take into consideration, to the extent the Trustee deems advisable, any other community income or resources of the Trustors known to the Trustee and reasonably available for these purposes.

**4.2    Principal and Income from Separate Estates.**  During the joint lifetimes of the Trustors, the Trustee shall pay to or apply for the benefit of the Trustor whose separate property was transferred to the trust, as much of the net income, and if the Trustee considers the net income insufficient, as much of the principal, of that Trustor's separate estate as is necessary in the Trustee's discretion for the health, education, support, maintenance, comfort, enjoyment, and welfare of that Trustor, in accordance with his or her accustomed manner of living.  Any such income not so paid or applied, and which is not paid, applied, or requested pursuant to other provisions of this Article 4, shall be accumulated and added to the principal of the separate estate of that Trustor.  In making distributions of income or principal under this paragraph, the Trustee may take into consideration, to the extent the Trustee deems advisable, any other separate property income or resources of that Trustor known to the Trustee and reasonably available for these purposes.

**4.3    Income or Principal on Request.**  During the joint lifetimes of the Trustors, the Trustee shall also pay to either or both the Trustors, for the account of the community, or shall apply for the Trustors' benefit, as much of the net income and principal of the community estate as either Trustor shall request in writing.  The Trustor receiving payments shall have the same duty to use income and principal of the community estate received hereunder for the benefit of the Trustors as he or she has with respect to any other community property.  During such period of time, the Trustee shall also pay to or apply for the benefit of the Trustor whose separate property was transferred to the trust, as much of the net income and principal of that Trustor's separate estate as said Trustor shall request in writing.

**4.4    Transfers Out of Trust Estate.**  During the joint lifetimes of the Trustors, the Trustors acting jointly with respect to the community estate, or a Trustor acting individually with respect to such Trustor's separate estate, may at any time direct the Trustee in writing to transfer property or sums of money out of the trust estate to any other person or organization.  Notwithstanding anything in this trust instrument to the contrary, this power may be exercised by the respective conservator of the estate of either Trustor or by his or her duly appointed attorney-in-fact, by making gifts from such Trustor's separate property or share of the community property to one or more of the Trustors' issue that qualify for the annual federal gift tax exclusion as said exclusion may now or hereafter exist under the federal gift tax law; provided, however, that no such gifts to any one donee shall in any calendar year exceed the amount of the annual federal gift tax exclusion then available without prior court authorization; and, provided further, that no transfer hereunder shall be made by such conservator or attorney-in-fact if the Trustee, in the Trustee's discretion, determines that such a transfer would jeopardize the Trustee's ability to provide for the health, support or maintenance of either Trustor.

**4.5    Incapacitation of Trustor.**  If during the joint lifetimes of the Trustors, either in the Trustee's discretion or as certified in writing by two licensed physicians, one of whom shall be such Trustor's attending physician, either Trustor has become physically or mentally incapacitated such that he or she is unable to manage his or her own affairs, whether or not a court of competent jurisdiction has declared him or her incompetent, mentally ill, or in need of a conservator, it is the Trustors' desire that distributions continue to be made to the Trustors in accordance with the other provisions of this Article 4.  However, if during such

period of incapacity, the community property of the Trustors and separate property of the
incapacitated Trustor's spouse is insufficient or not reasonably available to provide for the
health, support in his or her accustomed manner of living, and maintenance of the
incapacitated Trustor's spouse, then the Trustee shall pay to the spouse of the incapacitated
Trustor, or apply for the benefit of either Trustor, as much of the net income, and if the net
income is insufficient, as much of the principal, of the separate estate of the incapacitated
Trustor as is reasonably required for the Trustors' health, support in their accustomed
manner of living, and maintenance, after taking into consideration, to the extent the Trustee
deems advisable, any other income or resources of the Trustors known to the Trustee and
reasonably available for these purposes. The provisions of this paragraph shall be given
effect until such time as the incapacitated Trustor, either in the Trustee's discretion or as
certified by two licensed physicians, one of whom shall be such Trustor's attending
physician, is again able to manage his or her own affairs, or until the earlier death of either
Trustor. Any such income not so paid or applied under this paragraph, and which is not
paid, applied, or requested pursuant to other provisions of this Article 4, shall be
accumulated and added to the principal of the separate estate of the incapacitated Trustor. If
a conservator of the estate or person and estate of the incapacitated Trustor is appointed, the
Trustee shall take into account any payments made for either Trustor's benefit by the
conservator. For purposes of this paragraph, a Trustor shall conclusively be deemed to be
incapacitated and unable to manage his or her affairs if a conservator of his or her estate or
person and estate has been appointed by a court having jurisdiction over such matters.

### 4.6 Payment of Taxes, Debts and Expenses on Death of Decedent.

a. The following items shall be paid out of the Decedent's share of the
trust estate upon the Decedent's death:

(1) The legally enforceable debts properly chargeable to the
Decedent's estate under California law in effect at the date of Decedent's death;

(2) The estate, inheritance, and other death taxes (excluding any
additional tax imposed under Internal Revenue Code Sections 2032A and 2057(f), or any
successor provision thereto, or any generation-skipping transfer tax), including interest and
penalties thereon, imposed by reason of the Decedent's death which are attributable to the
trust estate (including any property passing to the trust estate by reason of the Decedent's
death) or to any property of the Decedent passing outright to the Survivor under the
Decedent's Will;

(3) The last illness and funeral expenses of the Decedent; and

(4) The administration expenses incurred in administering the
Decedent's estate.

b. Any payments for such estate, inheritance, or other death taxes shall be
apportioned in accordance with the provisions of any applicable tax law or proration statute.

c. Any payments for such last illness, funeral, and administration
expenses shall be charged first to the Disclaimer Trust, or to the extent it is insufficient,
then to the Decedent's share of the Survivor's Trust, or to the extent it is insufficient, then
to the Children's Trust.

d. Notwithstanding the foregoing directions regarding payment of the
Decedent's legally enforceable debts, the following limitations and provisions shall apply
with respect to the payment of such debts: (i) only to the extent the Disclaimer Trust is
insufficient shall debts of the Decedent be charged to the Decedent's share of the Survivor's
Trust, except that if any property passing to the Survivor's Trust is subject to a trust deed,
mortgage, or other encumbrance so that the value of such property would be reduced with
respect to the Decedent's estate, by such trust deed, mortgage, or other encumbrance for
purposes of the federal estate tax marital deduction, then any payments with respect to such
trust deed, mortgage, or other encumbrance shall be charged to the Decedent's share of the
Survivor's Trust to the extent of such reduction; (ii) no secured debt of the Decedent shall
be paid out of the trust estate unless it is secured by property which is held in the trust estate
at the Decedent's death or which passes to the trust estate by reason of the Decedent's death;
and (iii) the direction to pay certain debts of the Decedent under this paragraph shall not be
construed as a requirement to pay any debts of the Decedent before they have become due
and payable.

## ARTICLE 5

## DIVISION ON DECEDENT'S DEATH

**5.1    Division of Trust Estate.** Upon the Decedent's death, the trust estate,
including property received by the trust estate upon or by reason of the death of the
Decedent (other than property not held in the trust estate at the Decedent's death which has
been specifically directed by another instrument which effectively disposes of such property,
to be added directly to a specifically designated trust established under this trust instrument,
such property being allocable to such trust), shall be held, administered and distributed as
follows:

a. **Survivor's Trust.** There shall be allocated to the Survivor's Trust the
Survivor's interest in the Trustors' community estate, including any undistributed or accrued
income on it, to be held, administered and distributed as provided in this subparagraph a.
and Article 6 hereof. There shall also be allocated to the Survivor's Trust any other
property of the Survivor (including but not limited to the Survivor's separate estate) added
by the Survivor to the trust estate either during the Survivor's lifetime or upon or by reason
of the Survivor's death (including any undistributed or accrued income on such property)
which has not otherwise been directed by the Survivor to be added directly to another
specifically designated trust established under this trust instrument.

b. **Decedent's Estate - Survivor Survives for Thirty (30) Days.** In the
event the Survivor survives the Decedent by thirty (30) days, there shall also be allocated to
the Survivor's Trust, in addition to that property allocated pursuant to paragraph 5.1a.

above, the Decedent's separate property and the Decedent's interest in the Trustors'
community estate included in or added to the trust estate in any manner, including any
undistributed or accrued income on it, and any other property not otherwise allocated under
the provisions of this Trust. Any property so allocated to the Survivor's Trust shall be
added to property allocated to the Survivor's Trust pursuant to paragraph 5.1a. above and
thereafter held, administered and distributed in accordance with Article 6 hereof.

      c.     **Decedent's Estate - Survivor Does Not Survive for Thirty (30)
Days.** In the event the Survivor does not survive the Decedent for thirty (30) days, the
Decedent's interest in the Trustors' community estate and the Decedent's separate property,
included in or added to the trust estate in any manner, including any undistributed or accrued
income on it and any other property not otherwise allocated under the provisions of this trust
shall be allocated to a separate and distinct trust to be known hereunder as the "Children's
Trust" and shall thereafter be held, administered and distributed as provided in Article 11
hereof.

      **5.2**    **Marital Deduction.** Notwithstanding any other provision in this trust
instrument to the contrary, during the Survivor's lifetime, the Survivor shall have the power
to require the Trustee to make all or part of the principal of the Survivor's Trust productive
or to convert promptly any unproductive part into productive property. This power shall be
exercised by the Survivor in a written instrument delivered to the Trustee. It is the
Trustors' intention that the Survivor's Trust qualify for the marital deduction under Section
2056 of the Internal Revenue Code and the regulations pertaining to that section or any
corresponding or substitute provisions applicable to the trust estate. Accordingly, and
notwithstanding any provision in this trust instrument to the contrary, the Trustee shall not
take any action or have any power that will impair the marital deduction, and all provisions
regarding the Survivor's Trust shall be interpreted to conform to this primary objective;
provided, however, that this limitation upon the Trustee shall not be construed to limit the
Trustee's discretion with respect to its decision to use all or any portion of the amounts
described in Internal Revenue Code Section 642(g) (or any corresponding or substitute
provision), and the regulations pertaining thereto, as federal estate tax deductions or as
federal income tax deductions.

## ARTICLE 6

### SURVIVOR'S TRUST

      The Trustee shall hold, manage and distribute the principal and net income of the
Survivor's Trust as follows:

      **6.1**    **Principal and Income from Survivor's Trust.** From and after the death of
the Decedent, the Trustee shall pay to or apply for the benefit of the Survivor the entire net
income of the Survivor's Trust, quarter-annually or more frequently. If the Trustee deems
the net income of the Survivor's Trust to be insufficient, the Trustee shall also pay to or
apply for the benefit of the Survivor from time to time so much of the principal of the
Survivor's Trust as the Trustee, in the Trustee's discretion, deems necessary for the

Survivor's support in his or her accustomed manner of living, health, maintenance, education, comfort, enjoyment and welfare, after taking into consideration, to the extent the Trustee deems advisable, any other income or resources of the Survivor known to the Trustee and reasonably available for these purposes.

**6.2    Lifetime Distributions Under Power of Appointment.** In addition, during the Survivor's lifetime, the Trustee shall distribute so much of the principal of the Survivor's Trust, up to the whole thereof, to such one or more persons or entities, including the Survivor and the creditors of the Survivor, and on such terms and conditions, either outright or in trust, as the Survivor shall appoint from time to time by a written instrument delivered to the Trustee. This power of appointment shall be exercisable by the Survivor alone and in all events.

**6.3    Distribution Upon Death of Survivor.** Upon the death of the Survivor, the Trustee shall distribute the remaining balance (including any additions thereto occurring upon or by reason of the Survivor's death) of the Survivor's Trust (including both principal and any accrued or undistributed income) to such one or more persons or entities, including the Survivor's estate, and on such terms and conditions, either outright or in trust, as the Survivor shall appoint by a written instrument delivered to the Trustee making specific reference to and exercising this power of appointment or by a Will specifically referring to and exercising this power of appointment. This power of appointment shall be exercisable by the Survivor alone and in all events. Any portion of the Survivor's Trust (including such additions thereto) not effectively appointed in this manner (including both principal and any accrued or undistributed income) shall be allocated to the Children's Trust, to be held, administered and distributed in accordance with the terms of Article 11 hereof.

## ARTICLE 7

## DISCLAIMER

Notwithstanding any provision in this trust instrument to the contrary, if the Survivor (or any person or entity permitted by law to disclaim on behalf of the Survivor) disclaims all of the Survivor's interests in all or any portion of the Decedent's property passing to the Survivor's Trust, that property or the affected portion thereof (as the case may be) shall be allocated to and become a part of a separate and distinct trust, to be known hereunder as the "Disclaimer Trust," and shall be held, administered, and distributed in accordance with the terms of this trust instrument relating to the Disclaimer Trust. Notwithstanding any provision in this trust instrument to the contrary, if the Survivor (or any person or entity permitted by law to disclaim on behalf of the Survivor) disclaims any interest in all or any portion of the Disclaimer Trust, that trust or the affected portion thereof (as the case may be) shall be administered and distributed as if that disclaimed interest had been omitted from the original terms of that trust, unless the Survivor (or such person or entity) disclaims all of the Survivor's interests in that trust or the affected portion thereof, in which event that trust or the affected portion thereof (as the case may be) shall be held, administered, and distributed as if the Survivor had died after having survived the Decedent provided, however, that in no event (and notwithstanding any provision in this trust instrument to the

contrary) shall the Trustee be required or have any duty to make any distribution out of any property being administered under Article 11 hereof in which the Survivor has disclaimed any interest, in discharge of any legal obligation of the Survivor.

## ARTICLE 8

### PAYMENT OF TAXES, DEBTS, AND EXPENSES ON DEATH OF SURVIVOR

On the death of the Survivor, but subject to any power of appointment exercised by the Survivor, the Trustee shall, to the extent the residue of the Survivor's estate disposed of by the Survivor's Will (excluding, however, any assets thereof which the Trustee determines, in his discretion, should not be used for the payment of such taxes, debts, costs, and other expenses of the Survivor hereinafter described in this Article) is insufficient, pay out of the Survivor's Trust (i) the Survivor's legally enforceable debts; (ii) the Survivor's expenses of last illness and funeral; (iii) the administration expenses incurred in administering the Survivor's estate; and (iv) any estate, inheritance, or other death taxes (excluding any additional tax imposed under Internal Revenue Code Sections 2032A and 2057(f), or any successor provision thereto, or any generation-skipping transfer tax), including interest and penalties thereon, attributable by reason of the Survivor's death to the Survivor's Trust (including any property of the Survivor passing to the Survivor's Trust by reason of the Survivor's death) or to any property specifically bequeathed by the Survivor's Will to any of the Survivor's children, without apportionment or charge against any beneficiary of the trust estate or transferee of property passing outside the trust estate. Notwithstanding the foregoing directions regarding payment of the Survivor's legally enforceable debts, the following provisions shall apply with respect to the payment of such debts: (i) no secured debt of the Survivor shall be paid by the Trustee unless it is secured by property which is held in the trust estate at the Survivor's death or which passes to the trust estate by reason of the Survivor's death; and (ii) the foregoing direction to pay certain debts of the Survivor shall not be construed as a requirement to pay any debts of the Survivor before they have become due and payable.

## ARTICLE 9

### RESIDENCE

On the death of the Decedent, the Survivor shall have the right to continue to occupy all real property held in any trust created hereunder of which the Survivor is entitled during his or her lifetime to all of the net income, without payment of rent therefor, that the Survivor and the Decedent were using for residential purposes (whether on a full or part-time basis, including resort property); provided, however, that the Survivor, in his or her discretion, may direct the Trustee of each such trust having an interest in such property to sell the interest of such trust in such property and, in the Survivor's discretion, to replace it with an interest in another residence selected by the Survivor for the Survivor's occupancy which interest in the case of the Disclaimer Trust must be of comparable or lower value.

## ARTICLE 10

## DISCLAIMER TRUST

From and after the death of the Decedent, the Trustee shall hold, administer, and distribute the principal and net income of the Disclaimer Trust as follows:

**10.1   Principal and Income from Disclaimer Trust.** The Trustee shall pay to or apply for the benefit of the Survivor the entire net income of the Disclaimer Trust, quarter-annually or more frequently. If the Trustee deems the net income of the Disclaimer Trust to be insufficient, the Trustee shall also pay to or apply for the benefit of the Survivor from time to time so much of the principal of the Disclaimer Trust as is reasonably required for the Survivor's support in his or her accustomed manner of living, health, maintenance, and education, after taking into consideration, to the extent the Trustee deems advisable, any other income or resources of the Survivor known to the Trustee and reasonably available for these purposes. Payments out of the principal of the trust estate to the Survivor for such purposes shall be first made out of the Survivor's Trust until it is exhausted, and thereafter out of the Disclaimer Trust, except that all or any part of such payments may be made from the Disclaimer Trust, without exhausting the Survivor's Trust, if for any reason the Trustee shall deem advisable.

**10.2   Distribution Upon Death of Survivor.** Upon the death of the Survivor, the remaining principal of the Disclaimer Trust, together with all accrued or undistributed income therefrom, shall be distributed to the Children's Trust, to be held, administered and distributed in accordance with the terms of Article 11 hereof.

## ARTICLE 11

## CHILDREN'S TRUST

**11.1   Division and Administration.** Upon the death of the Survivor, the Trustee shall hold, administer, and distribute the principal and net income of the Children's Trust as follows:

a.   The Trustee shall divide the Children's Trust into as many equal shares as there are children of the Trustors then living, and children of the Trustors then deceased leaving issue then living. The Trustee shall allocate one such share to each such living child and one such share to each group composed of the then living issue of each such deceased child. Each such share shall be distributed, or retained in trust, as hereinafter provided:

(1)   Each share allocated to a living child of the Trustors shall be held in a separate and distinct trust and shall be administered and distributed as follows:

(a)   The Trustee may pay to or apply for the benefit of the child, as much of the net income and principal of that child's trust as the Trustee in the

Trustee's discretion deems necessary for the child's support, health, maintenance and
education, after taking into consideration, to the extent the Trustee shall deem advisable, any
other reasonably available income or resources of the child, known to the Trustee. Any net
income not distributed shall be accumulated and added to principal.

        (b)     At any time after attaining age twenty-five (25), the
child may, by written instrument filed with the Trustee, require the Trustee to distribute to
the child a portion of the principal of the child's trust not to exceed one-third (⅓) of the
principal of the child's trust valued as of the applicable valuation date; at any time after
attaining age thirty (30), the child may, by written instrument filed with the Trustee, require
the Trustee to distribute to the child an additional portion of the principal of the child's trust
not to exceed one-half (½) of that portion of the principal of the child's trust not already
subject to the child's power of withdrawal valued as of the applicable valuation date; at any
time after attaining age thirty-five (35), the child may, by written instrument filed with the
Trustee, require the Trustee to distribute to the child all or any portion of the child's trust.
The right to require such distributions shall be a continuing right until termination of the
child's trust. The "applicable valuation date" shall be the last to occur of the Survivor's
death or the date the child attains the applicable age to which reference is made.

        (c)     Upon the death of the child, any portion of the child's
trust then held for the child's benefit which was not subject to the child's power of
withdrawal at the child's death, shall be distributed to or for the benefit of such issue of said
child in such proportions and subject to such trusts, powers and conditions as said child may
provide and appoint by a written instrument delivered to the Trustee making specific
reference to and exercising this power of appointment or by a Will specifically referring to
and exercising this power of appointment. This limited power shall not under any
circumstances be exercisable in favor of said child, his or her estate, his or her creditors, or
the creditors of his or her estate, nor shall it be exercisable for the purpose of discharging
any legal obligation of said child or for the pecuniary benefit of said child. Upon the death
of the child, any portion of the child's trust then held for the child's benefit which was
subject to the child's power of withdrawal at the child's death (exclusive of any undistributed
portion as to which the child had previously filed an authorized request for distribution, such
portion being distributable to the child's estate upon the child's death), shall be distributed to
or for the benefit of such one or more persons or entities, including the child's own estate,
and on such terms and conditions, either outright or in trust, as said child may provide and
appoint by a written instrument delivered to the Trustee making specific reference to and
exercising this power of appointment or by a Will specifically referring to and exercising
this power of appointment. If or to the extent that said child shall have failed to exercise
any such limited or general power of appointment, or an attempted exercise of any such
power of appointment shall have been invalid or ineffective for any reason, or said child
shall have released, renounced or revoked the exercise of any such power of appointment,
the property subject to it shall be distributed to or retained in trust for the benefit of the then
living issue of the child in accordance with the provisions of subparagraph 11.1a.(2) below.
Should no such issue of the child be then living, such property shall be divided into as many
equal parts as there are children of the Trustors then living and children of the Trustors then
deceased who have issue then living. The Trustee shall allocate one such equal part to each
such living child and one such equal part to each group composed of the then living issue of

each such deceased child. Each such part allocated to a living child of the Trustors shall be added to the share described in subparagraph 11.1a.(1) which has been set aside for such child and shall thereafter be administered according to the terms of subparagraph 11.1a.(1). Each such part allocated to a group composed of the then living issue of a deceased child of the Trustors shall be added to the share or portion described in subparagraph 11.1a.(2) which has been set aside for such issue and shall thereafter be administered according to the terms of subparagraph 11.1a.(2).

(2)    Each share or portion of the trust estate allocated to or held for the benefit of the issue of a deceased child of the Trustors shall be distributed to such issue, upon the principle of representation, subject, however, to the provisions concerning distributions to such issue set forth below:

(a)    Any portion of the trust estate distributed to a beneficiary who is a member of a group composed of issue of a deceased child of the Trustors under the foregoing provisions shall be held in a separate and distinct trust and shall be administered and distributed as follows:

(i)    The Trustee may pay to or apply for the benefit of the beneficiary, as much of the net income and principal of said beneficiary's trust as the Trustee in the Trustee's discretion deems necessary for such beneficiary's support, health, maintenance and education after taking into consideration, to the extent the Trustee shall deem advisable, any other reasonably available income or resources of the beneficiary, known to the Trustee. Any net income not distributed shall be accumulated and added to principal.

(ii)    Unless sooner terminated in accordance with the provisions of paragraph 12.6 of this trust instrument, at any time after attaining age twenty-five (25) the beneficiary may, by written instrument filed with the Trustee, require the Trustee to distribute to the beneficiary a portion of the principal of the beneficiary's trust not to exceed one-third (⅓) of the principal of the beneficiary's trust valued as of the applicable valuation date; upon the beneficiary attaining age thirty (30), the beneficiary may, by written instrument filed with the Trustee, require the Trustee to distribute to the beneficiary, all or any portion of the beneficiary's trust. The "applicable valuation date" shall be the last to occur of the Survivor's death or the date the beneficiary attains the age to which reference is made. The right to require such distributions shall be a continuing right until termination of the beneficiary's trust.

(iii)    Upon the death of the beneficiary, any portion of the beneficiary's trust then held for the beneficiary's benefit (exclusive of any undistributed portion as to which the beneficiary had previously filed an authorized request for distribution, such portion being distributable to the beneficiary's estate upon the beneficiary's death), shall be distributed to or for the benefit of such one or more persons or entities, including the beneficiary's own estate, and on such terms and conditions, either outright or in trust, as said beneficiary may provide and appoint by a written instrument delivered to the Trustee making specific reference to and exercising this power of appointment or by a Will specifically referring to and exercising this power of appointment. If or to the extent that

said beneficiary shall have failed to exercise such general power of appointment, or an attempted exercise of such power of appointment shall have been invalid or ineffective for any reason, or said beneficiary shall have released, renounced or revoked the exercise of such power of appointment, the property subject to it shall be distributed to or retained in trust for the benefit of the then living issue of the beneficiary in accordance with the provisions of this subparagraph 11.1a.(2). Should no such issue of the beneficiary be then living, such property shall be distributed to the then living issue of the Trustors by right of representation; provided, however, that if any portion of the beneficiary's trust would otherwise be distributed to a person for whose benefit a trust is then being administered under this paragraph 11.1, that portion shall instead be added to that trust and shall thereafter be administered according to its terms.

    **11.2 Ultimate Contingent Beneficiaries.** Any of the trust estate not disposed of under other provisions of this trust instrument shall go and be distributed in two equal shares as follows:

    a. One such share shall be distributed to the husband's sister, KIMBERLY DEL VALLE, if she is then living and, if not, then to the husband's sister, DEBORAH RAFF, if she is then living. If neither of the husband's aforesaid sisters is then living, such property shall be distributed to the then living issue of DEBORAH RAFF to be allocated among them on the principle of representation; provided further, that if any such issue has not then attained the age of twenty-one (21) years, such beneficiary's interest in such property shall be distributed to a custodian, selected by the Trustee, including the Trustee if not otherwise prohibited by law, to be held for such beneficiary's benefit under the California Uniform Transfers to Minors Act until such beneficiary attains the age of twenty-one (21).

    b. One such share shall be distributed in equal shares to the wife's sister, KIMBERLY SUSAN ROBERTS, and the wife's brother, CHRISTOPHER HOYNG, or entirely to the survivor of them.

## ARTICLE 12

### MISCELLANEOUS PROVISIONS

    **12.1 Notice to Trustee of Births, Etc.** Until the Trustee of the applicable trust shall receive from some person interested in such trust written notice of any birth, marriage, death, or other event upon which the right to payments from such trust may depend, the Trustee shall incur no liability to persons whose interests may have been affected by that event for disbursements made in good faith.

    **12.2 Definition of Education.** Whenever provision is made herein for payment for the education of a beneficiary, the term "education" shall be construed to include enrollment at one or more preparatory schools, institutions of higher learning (including college and post-graduate study), commercial, technical, art and music instruction, so long as pursued in the judgment of the Trustee of the applicable trust to advantage by the beneficiary at an

institution of the beneficiary's choice. Said Trustee shall take into consideration, in addition to the costs of tuition, books and supplies (including personal computers, software and related equipment), the beneficiary's related living and travel expenses to the extent that they are reasonable.

**12.3    Segregation of Trusts.** Subject to any express limitations stated elsewhere in this trust instrument, there need be no physical segregation or division of the various trusts except as segregation or division may be required by the termination of any of the trusts, but the Trustee of the applicable trust shall keep separate accounts for the different undivided interests held in such trust.

**12.4    Duty to Inquire.** No party entering into any transaction of any kind whatsoever with a Trustee with respect to any of the trusts created herein shall be under any duty, obligation or liability to inquire into the authority of the Trustee to enter into such transaction or into the manner in which the Trustee might dispose of the consideration received by the Trustee in connection with such transaction.

**12.5    Payments to Other Than Beneficiary.** In the event any payment or distribution is directed or authorized to be made hereunder to a beneficiary who is then a minor, or whose mental or physical health is then such that in the opinion of the Trustee of the applicable trust the interests of such beneficiary may be served by providing disbursement or distribution on behalf of such beneficiary through other channels, in whole or in part, other than directly to such beneficiary or in a manner provided by law, the Trustee of the applicable trust may make such payment or distribution, from time to time, in any one or more of the following ways:

a.    By making such payment or distribution for the beneficiary's benefit to the guardian or conservator of the person of such beneficiary; to a previously designated custodian under the California Uniform Transfers to Minors Act or, if none, to such custodian as is designated by the Trustee, to be held for the benefit of such beneficiary until the age of twenty-one (21); to any suitable person with whom the beneficiary resides or who cares for him or her; or to a relative of the beneficiary; provided, however, that a parent of a minor beneficiary receiving payments or distributions pursuant to this subparagraph a. for the minor's account shall not use the payments or distributions to discharge any of the parent's legal obligations and the Trustee shall not make a payment or distribution to any such parent pursuant to this subparagraph a. unless the parent shall first so agree with the Trustee in writing;

b.    By the Trustee expending or using the same for such beneficiary in accordance with the terms hereof; or

c.    By making payments or distributions directly to a minor if in the Trustee's judgment the minor is of sufficient age and maturity to spend the money properly.

The Trustee shall be free of liability and shall be discharged from any further accountability for distributing assets in compliance with this paragraph.

Notwithstanding the foregoing, this paragraph 12.5 shall not be construed to permit the accumulation of income of the Survivor's Trust.

**12.6  Perpetuities Savings Clause.** Unless sooner terminated in accordance with other provisions of this trust instrument or the provisions of any trust created by the exercise of any power of appointment conferred by this trust instrument, each trust created hereunder and each trust created by the exercise of any such power of appointment shall terminate twenty-one (21) years after the death of the last survivor of the Trustors and the Trustors' issue living on the date of death of the Decedent. All principal and undistributed income of any trust so terminated shall be distributed to the then income beneficiaries of that trust in the proportions in which they are, at the time of termination, entitled to receive the income; provided, however, that if the rights to income are not then fixed by the terms of the trust, distribution under this clause shall be made, upon the principle of representation, to such issue of the Trustors as are then entitled or authorized, in the Trustee's discretion, to receive income payments from the terminated trust, or, if there are no such issue, in equal shares to those beneficiaries who are then entitled or authorized in the Trustee's discretion to receive income payments therefrom.

**12.7  Severability.** If any provision of this trust instrument is unenforceable, the remaining provisions shall nevertheless be carried into effect.

**12.8  Number and Gender.** As used in this trust instrument, the masculine, feminine or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so indicates.

**12.9  Qualified Retirement Benefits.** Notwithstanding anything in this instrument to the contrary, the Trustee shall not pay any death taxes, including interest or penalties, last illness and funeral expenses, administration expenses, debts, or other obligations of a deceased Trustor or his estate from funds received from qualified retirement plans, individual retirement accounts, or other similar benefits that are otherwise excluded from the deceased Trustor's gross estate for federal estate tax purposes under Section 2039 of the Internal Revenue Code or any successor statute or from proceeds of insurance policies on the deceased Trustor's life unless such proceeds are otherwise taxable in the deceased Trustor's estate for federal estate tax purposes or would otherwise be liable for the payment of such debts, expenses or other obligations in the absence of their payment to this trust; provided, however, that this paragraph 12.9 shall not be construed to prevent the Trustee of any trust hereunder who is required by law to make any such payments or who is directed or authorized to make any such payments in other provisions of this trust instrument, from using, in said Trustee's discretion, loan or sale proceeds received by said Trustee pursuant to a transaction contemplated by paragraph 13.27 or 13.28 hereof for making such payments, nor shall it be construed to prevent a Trustee of any trust hereunder from entering, in said Trustee's discretion, into a transaction contemplated by paragraph 13.27 or 13.28 hereof.

**12.10  Delayed Termination, Distribution or Division.** Notwithstanding that by the terms hereof this Trust may terminate or a distribution or division may be required by reason of the death of a Trustor or for any other reason, but subject to the provisions of

paragraph 12.6 hereof, the Trustee may prolong termination, distribution or division for a
reasonable period of time in order to (1) receive assets made payable to the Trustee upon or
by reason of a person's death, (2) sell assets of the Trust when the Trustee deems such
action advisable to accomplish orderly distribution or other reasonable objectives, (3)
complete the orderly administration of the Trust, including the payment of all taxes due upon
or by reason of such person's death, or (4) avoid adverse tax consequences which may arise
by reason of such action creating a "disposition" which would adversely affect an election
available for federal estate or income tax purposes.  In determining what is a reasonable
period of time, due consideration shall be given to the period of time required for final
determination of federal estate taxes and in any event a delay until the federal estate tax
return has been filed shall be deemed reasonable.  When the Trustee defers distribution or
division of the Trust assets or termination of any Trust created hereunder, the deferred
division, distribution or termination shall be made as if it had taken place at the time
prescribed in the Trust instrument in the absence of this paragraph and all rights given to the
beneficiaries of these Trust assets under provisions of this instrument shall be deemed to
have accrued and vested as of that prescribed time.

**12.11 Headings.** The various headings used herein are for convenience of reference
only and constitute no part of the trust agreement.

**12.12 Governing Law.** The validity of this trust with respect to real property shall
be governed by the laws of the state of its situs.  The validity of this trust with respect to
personal property, and the construction, interpretation, and administration of this trust with
respect to all property, shall be governed by the laws of the State of California in force from
time to time regardless of whether the situs or place of administration of the trust changes.

**12.13 Undistributed Income.** With respect to any trust created hereunder in which
the beneficiary has a fixed right to all or a specified percentage or portion of the income of
such trust, income accrued or held undistributed by the Trustee at the termination of said
trust shall go to the next beneficiaries of the trust in proportion to their interest in it;
provided, however, that the exercise of any power of appointment pertaining to any trust
created hereunder shall be effective as to the entire appointed portion of such trust, including
accrued or undistributed income.

**12.14 Allocation of Expenses Among Successive Beneficiaries.** Among successive
beneficiaries of this trust, all taxes and other current expenses shall be deemed to have been
paid and charged to the period in which they first became due and payable.

**12.15 Distribution of Trust if Uneconomical Administration.** If at any time
following the death of the Survivor any trust created under Article 11 hereof which is being
administered for any income beneficiary or group of income beneficiaries has such fair
market value as to make continued administration of the trust uneconomical as determined by
the Trustee in the Trustee's reasonable discretion, the Trustee may pay the entire balance of
such trust to the person or persons then entitled to the income therefrom, in proportion to
their interests therein. If the right to income is not fixed at the time the Trustee determines
that the continued administration of the trust would be uneconomical, distribution under this
paragraph shall be made, by right of representation, to such issue of the Trustors as are then

entitled or authorized in the Trustee's discretion to receive income payments from such trust,
or, if there are no such issue, in equal shares to those beneficiaries who are then entitled or
authorized in the Trustee's discretion to receive income payments from such trust.

**12.16 Changed Conditions.** The Trustors recognize that in the future there may be
changed conditions in regard to property rights, taxation, and many other social, economic,
and political matters which, could they foresee, might lead them to make different
disposition of the property transferred to the trust estate. With this in mind, the Trustors
empower the Trustee in the Trustee's discretion, following the death of the Survivor, to
transfer, pay over, and distribute any part or all of the principal of each trust created under
Article 11, on the principle of representation, to those issue of the Trustors who are then
entitled or authorized in the Trustee's discretion to receive income payments from such trust
or, if there are no such issue, in equal shares to those beneficiaries who are then entitled or
authorized in the Trustee's discretion to receive income payments from such trust. The
Trustors request the Trustee not to make payments of principal pursuant to this paragraph
because of temporary conditions but only because of changes in general conditions which
they are unable to foresee and which in the judgment of the Trustee would cause the
continuance of the trust to be prejudicial to the best interests and welfare of the
beneficiaries. Any decision of the Trustee with respect to the Trustee's exercise or
nonexercise of any discretionary power hereunder, or the time or manner of the exercise
thereof, made in good faith, shall fully protect the Trustee from liability and shall be binding
and conclusive on all persons interested in any trust hereunder.

**12.17 Obligation of Support.** Any other provisions of this trust instrument
notwithstanding, no person acting as a Trustee of any trust governed by Article 11 hereof
who holds in a fiduciary capacity a power to appoint or distribute the income or principal of
such trust to or for the benefit of others, shall use such power to distribute income or
principal of such trust to discharge, in whole or in part, the personal legal obligation, if any,
of said Trustee, from time to time existing, to provide for the support, health, maintenance,
or education of such other persons, or to discharge any other personal legal obligation of
said Trustee. When determining the legal obligation of any person to provide for the
support, health, maintenance, or education of any of the beneficiaries of such trust, the
existence of such trust and funds made available by it shall not be taken into consideration.

**12.18 Transfer Agents.** Any transfer agent or other person dealing with the trust
estate (hereinafter "third party") shall be entitled to rely upon a copy of those portions of
this instrument and any amendments hereto which are relevant to the proposed transaction,
including but not limited to those portions which set forth the powers of the Trustee, general
provisions, and designation of Trustees and successor Trustees, which partial copies shall be
certified by the then acting Trustee or by the Trustee's legal counsel as a true copy of such
portions then in effect. Such third party shall incur no liability to the trust, the Trustors, or
any beneficiary for acting upon any order or request of the Trustee made in reliance on the
terms set forth in such partial copy, and shall not be required to see to the disposition of any
of the proceeds or the faithful discharge of the Trustee's duties.

**12.19 Right of Representation.** When distribution is directed or authorized to be
made under this instrument by right of representation or upon the principle of representation,

distribution on that basis shall be construed to require distribution by right of representation on a strict or pure stirpital basis (i.e., requiring division at each generation whether or not there are living members in each generation).

## ARTICLE 13

### TRUSTEE'S POWERS

To carry out the purposes of the trusts created hereunder, but subject to any limitations stated elsewhere in this instrument, the Trustee of each such trust is vested with the following powers with respect to the applicable trust being administered by said Trustee, in addition to those now or hereafter conferred by law:

**13.1  Continue to Hold Property.** To continue to hold any property, including shares of any corporate Trustee's own stock, as long as the Trustee deems advisable.

**13.2  Manage and Control.** To manage, control, grant options on, sell (for cash or on deferred payments within or beyond the term of the trust), convey, exchange, partition, divide, improve and repair trust property.

**13.3  Lease Property.** To lease trust property for terms within or beyond the term of the trust and for any purpose, including exploration for and removal of gas, oil, and other minerals; and to enter into community oil leases, pooling, and unitization agreements.

**13.4  Borrow.** To borrow money and to encumber or hypothecate trust property by mortgage, deed of trust, pledge, or otherwise for the debts of the trust or the joint debts of the trust and a co-owner of trust property.

**13.5  Carry Insurance.** To carry, at the expense of the trust, insurance of such kinds and in such amounts as the Trustee deems advisable to protect the trust and the Trustee personally against any hazard.

**13.6  Commence or Defend Litigation; Compromise or Adjust Claims.** To commence or defend such litigation with respect to the trust or any property of the trust as the Trustee may deem advisable, at the expense of the trust, and to compromise or otherwise adjust any claims or litigation against or in favor of the trust. The Trustee's powers under this paragraph shall apply during the term of the trust and after distribution of trust assets. However, the Trustee shall have no obligations or duties with respect to any litigation or claims occurring after distribution of trust assets unless the Trustee is adequately indemnified by the distributees for any loss in connection with such matters.

**13.7  Budget Income and Expenses.** To budget the estimated annual income and expenses of the trust in such manner as to equalize, as far as practicable, periodical income payments to beneficiaries.

**13.8    Invest and Reinvest.** To invest and reinvest all or any part of the trust in such common or preferred stocks, shares of investment trusts and investment companies, mutual funds, bonds, debentures, mortgages, deeds of trust, mortgage participations, notes, real estate, or other property, as the Trustee, in the Trustee's discretion, may select and to buy, sell, and trade in securities of every nature (including "short" sales), options of every kind, and to otherwise deal in puts and calls, and for such purposes to maintain and operate margin accounts and other accounts with brokers as security for loans and advances made to the Trustee. The Trustee may also invest in the shares of any registered investment company whether or not the Trustee or any of its affiliates is an advisor to, or other service provider to such company, and receives compensation for providing such advisory or other services. The Trustee may continue to hold in the form in which received (or a form to which changed by reorganization, merger, splitup, stock dividend, or other like occurrence) any securities or other property the Trustee may at any time acquire under the trust, it being the Trustors' express desire and intention that the Trustee have full power to invest and reinvest the trust funds without being restricted to forms of investment that the Trustee may otherwise be permitted to make by law. The investments need not be diversified.

**13.9    Professional Assistance.** To appoint, employ, hire and pay such agents and employees as the Trustee deems necessary or advisable, including (without limiting the generality of the foregoing) accountants, attorneys, investment counselors, property managers, brokers, and custodians of the trust property.

**13.10    Nominee's Name.** To hold securities or other property in the Trustee's name as Trustee under the trust, or in the Trustee's own name, or in the name of a nominee of the Trustee, without disclosing any fiduciary relation, or the Trustee may hold securities unregistered in such condition that ownership will pass by delivery.

**13.11    Bonds at Premium.** To purchase bonds and to pay such premiums in connection with the purchase as the Trustee in the Trustee's discretion deems advisable; provided, however, that each premium shall be repaid periodically to principal out of the interest on the bond in such reasonable manner as the Trustee shall determine and, to the extent necessary, out of the proceeds on the sale or other disposition of the bond. Notwithstanding the foregoing, the Trustee shall not be required to amortize bond premiums during the joint lifetimes of the Trustors.

**13.12    Bonds at Discount.** To purchase bonds at such discount as the Trustee in the Trustee's discretion deems advisable, provided, however, that each discount shall be accumulated periodically as interest in such reasonable manner as the Trustee shall determine and to the extent necessary paid out of the proceeds on the sale or other disposition of the bond or out of principal. Notwithstanding the foregoing, the Trustee shall not be required to amortize bond discounts during the joint lifetimes of the Trustors.

**13.13    Undivided Interests.** To hold undivided interests in property, real or personal.

**13.14  Administration Expenses.**  To incur and pay property taxes, assessments, costs, charges, fees and other expenses of every kind in connection with the administration of the trust.

**13.15  Divisions and Distributions.**  To partition, allot, and distribute the trust, on any division or partial or final distribution of the trust, in undivided interests or in kind, or partly in money and partly in kind, at valuations determined by the Trustee, and to sell such property as said Trustee may deem necessary to make division or distribution.  In making any division or partial or final distribution of the trust, the Trustee shall be under no obligation to make a prorata division, or to distribute the same assets to beneficiaries similarly situated; but rather, said Trustee may, in its discretion, make a nonprorata division between trusts or shares and nonprorata distributions to such beneficiaries, as long as the respective assets allocated to separate trusts or shares, or distributed to such beneficiaries, have equivalent or proportionate fair market value.  The income tax basis of assets allocated or distributed nonprorata need not be equivalent and may vary to a greater or lesser amount, as determined by the Trustee in his discretion.

**13.16  Tax Elections.**  To take any action and to make any election in the discretion of the Trustee of the applicable trust to minimize the tax liabilities of the trust and its beneficiaries, and the Trustee shall allocate the benefits among the various beneficiaries, and it shall make adjustments in the rights of any beneficiaries, or between the income and principal accounts, to compensate for the consequences of any tax election or any investment or administrative decision that the Trustee believes has had the effect of directly or indirectly preferring one beneficiary or group of beneficiaries over others.

**13.17  Bank Accounts.**  To open and maintain bank or savings accounts and safe deposit boxes in the name of the Trustee with any bank, trust company or savings and loan association authorized and doing business in any state of the United States of America.  If more than one Trustee of a trust shall be acting, the Trustees of such trust may designate one or more of them to conduct banking activities and to make deposits, withdrawals and endorsements upon giving written notice of such designation to the bank, trust company, or savings and loan association in question; and such bank, trust company or savings and loan association shall be protected in relying upon such designation.

**13.18  Disclaim, Release, or Restrict Powers.**  Each Trustee shall have the power to disclaim, release, or restrict the scope of any power that he may hold in connection with the trusts created under this instrument, whether said power is expressly granted in this instrument or implied by law.  The Trustee shall exercise this power, in a written instrument specifying the powers to be disclaimed, released, or restricted and the nature of any such restriction.

**13.19  Partnership.**  The Trustee may enter into any general or limited partnership agreement, become and remain a general or limited partner under it, and carry out all the terms and conditions of any partnership agreement, notwithstanding the fact that the Trustee may also be a partner of the partnership for the Trustee's own account.

**13.20  Powers Concerning Businesses.**  With respect to any business interest that may become a part of the trust, whether organized as a sole proprietorship, partnership, or corporation, and upon such terms, for such time, and in such manner as the Trustee may deem advisable:

  a. To hold, retain, and continue to operate such business solely at the risk of the trust and without liability on the part of the Trustee for any losses resulting therefrom;

  b. To dissolve, liquidate, or sell at such time and upon such terms as the Trustee deems advisable;

  c. To enlarge, diminish, or change the scope or nature of the activities of any business;

  d. To incorporate such business and hold the stock as an asset of the trust;

  e. To serve as an officer, director, or employee of the business;

  f. To authorize the participation and contribution by the business in any form of employee benefit plan, whether or not qualified as being tax deductible, as may be desirable from time to time;

  g. To authorize mergers, reorganizations, consolidations, exchanges of stock and any other form of recognized business transaction involving ownership change;

  h. To employ such officers, managers, employees, or agents (including any beneficiary hereunder) as the Trustee deems advisable in the management of such business, including electing or employing directors, officers, or employees of the Trustee to take part in the management of such business as directors or officers or otherwise, and to pay any such person reasonable compensation for his services without regard to the fees payable to the Trustee;

  i. To accept as correct financial or other statements rendered by the business from time to time as to its conditions and operations except when having actual notice to the contrary;

  j. To invest additional sums from the trust in any such business even to the extent the trust may be invested largely or entirely in such business, without liability for any loss resulting from lack of diversification;

  k. To exercise all powers as may be necessary to enable the Trustee to administer any such business interest in accordance with the provisions of this instrument.

  If the business shall be unincorporated, contractual and tort liabilities arising out of the business shall be satisfied, first, out of the business and, second, out of the trust, but it is intended that in no event shall there be a liability of the Trustee, and if the

Trustee shall be held liable, the Trustee shall be entitled to indemnification from the business
and the trust in the order named.

The Trustee shall have the powers enumerated herein notwithstanding
the fact that a Trustee may also own an interest for his own account in any such business.

**13.21 Abandon Property.** To abandon any property or interest in property
belonging to the trust when, in the Trustee's discretion, such abandonment is in the best
interests of the trust and its beneficiaries.

**13.22 Principal and Income.**

a.    During the joint lifetimes of the Trustors, the Trustee shall have the
power, exercisable in the Trustee's sole discretion, to determine what is principal or income
of the trust estate and to apportion and allocate receipts and expenses and other charges
between these accounts.

b.    Except as may otherwise be specifically provided in this trust
instrument and subject to the later provisions of this paragraph, following the death of the
Decedent matters relating to the rights of beneficiaries among themselves as to principal and
income shall be governed by the provisions of the California Uniform Principal and Income
Act from time to time existing. In the event the California Uniform Principal and Income
Act shall contain no provision concerning a particular item, the Trustee shall have the power
to determine what is principal or income of the applicable trust and apportion and allocate,
in the Trustee's reasonable discretion, receipts and expenses as between these accounts. All
of the foregoing powers shall be subject to the Trustee's duties to treat equitably both the
income beneficiaries and remaindermen under the trust. In this connection, the following
shall be observed by the Trustee:

(1)    A reasonable reserve for depreciation of all income-producing
depreciable real and personal property, and capital improvements and extraordinary repairs
thereto, shall be charged to income from time to time.

(2)    A reasonable reserve for depletion of all depletable natural
resources including, but not limited to, oil, gas, mineral and timber property shall be
charged to income from time to time.

(3)    A reasonable reserve for amortization of all intangible property
having a limited economic life including, but not limited to, patents and copyrights shall be
charged to income from time to time.

(4)    All distributions by mutual funds and similar entities of gains
from the sale or other disposition of property shall be credited to principal.

(5)    All premiums paid and discounts received in connection with
the purchase of any bond or other obligation shall be amortized by making an appropriate
charge or credit to income.

**13.23  General Powers Regarding Real Estate.**  To subdivide, raze, alter, dedicate, vacate, resubdivide, donate, partition or release real estate and any or all improvements thereon; to renew or extend leases, amend, change or modify leases, contract to make leases, grant options to lease, options to renew leases, options to purchase the whole or any part of the reversion, contract regarding the manner of fixing the amounts of present or future rentals, and grant easements or charges of any kind, on or with respect to such real estate, or any right, title or interest therein, all for such considerations and on such terms and conditions as the Trustee shall decide; and to make alterations to any buildings located on any trust property or demolish the same and construct new buildings, all in the manner and upon the terms and conditions that the Trustee shall deem advisable, and to enter into contracts with respect to the foregoing.

**13.24  Granting Power to Subordinate.**  The Trustee is authorized to subordinate any encumbrance on property that the trust may hold if, in the Trustee's discretion, subordination does not unreasonably impair the security held for the loan or obligation.

**13.25  Employment of Real Estate Brokers.**  The Trustee may (a) employ real estate agents and brokers to facilitate the sale or leasing of any property of the trust; (b) list property for sale or lease on such terms and conditions as the Trustee may determine; (c) grant an exclusive right to sell or lease; and (d) agree to and pay such compensation and commissions to agents and brokers as the Trustee, in the Trustee's discretion, shall determine.

**13.26  Authorizing Trustee To Foreclose and to Bid on Property.**  The Trustee is empowered to bid for and purchase any real or personal property in which the Trustee may have an interest as lienholder or otherwise, and which is sold at foreclosure sale or at trustee's or pledgee's sale, under any mortgage or deed of trust, or at any judicial sale.  The Trustee may also acquire by purchase at any foreclosure sale, or by deed in lieu of any foreclosure or sale, property covered by any mortgage, deed of trust, or pledge then in default, and the property may be accepted in partial or full satisfaction of the encumbrances against the property.

**13.27  Purchase Assets from Personal Representatives.**  The Trustee of any trust created hereunder may, in the Trustee's discretion, purchase, at fair market value as of the time of purchase, any securities or other property tendered to it by the executor or administrator of the estate of either Trustor or by the Trustee of any other trust created hereunder, at any time and from time to time.  If there shall be any question as to the market value of such property, it shall be fixed by the Trustee making the purchase ("purchasing Trustee") and said executor, administrator, or selling Trustee, as the case may be, and if they shall be unable to agree, or if the duly appointed and acting executor or administrator of the estate of either Trustor or the selling Trustee, as the case may be, is also the Trustee of the trust making the purchase, such value shall be determined by an independent appraiser of recognized competency to appraise the particular class of property involved to be selected by the personal representative or selling Trustee and the purchasing Trustee, and said appraiser's determination shall be conclusive.

**13.28  Loans to Personal Representatives and Others.**  Subject to the provisions of paragraph 13.31 below, the Trustee of any trust created hereunder may, in the Trustee's discretion, make loans of trust funds from that trust to the executor or administrator of the estate of either Trustor or to the Trustee of any other trust created hereunder, or to any other person or entity, provided that any such loan shall be adequately secured and shall bear a reasonable rate of interest.

**13.29  Insurance.**

a.      Subject to the limitations contained in subparagraph b. immediately below, with respect to any policy of insurance on the life of any person which may form a part of the trust, to exercise and enjoy for the purpose of the trust as absolute owner of such policy or policies, any benefits, rights, options, and privileges under or with respect to such policies, including, but not limited to, the right to borrow upon and pledge such policies for a loan or loans, to enter into split dollar arrangements, to sell such policies, to surrender them for their cash surrender value, or to surrender or join in the surrender of such policies for predated policies having an aggregate value equal to the policies at surrender. The Trustee of the trust of which any such policy forms a part shall designate such trust as the beneficiary of such policy. Said Trustee may, in its discretion, pay from the income (but not the income of any trust created hereunder of which the Survivor is entitled during his or her lifetime to all of the net income) or principal of such trust any premiums, assessments, or other charges on any such life insurance policy. In the case of any nonpayment, however, which results in the cessation of the policy as a binding insurance contract, said Trustee shall see to it that any and all rights of the trust in and to such policy shall be preserved and protected in a manner consistent with the provisions of this paragraph.

b.      Notwithstanding any provision in this trust instrument to the contrary, the Survivor, whether or not acting as a Trustee hereunder, shall not have any authority to exercise any of the powers granted in this trust instrument with respect to any policy of insurance on the Survivor's life held in any trust created herein other than the Survivor's Trust, and the Survivor, whether or not acting as Trustee hereunder, shall not possess any incidents of ownership in any policy of insurance on the Survivor's life which forms a part of any trust created herein other than the Survivor's Trust. All such authority and rights with respect to any such life insurance policy or policies shall be exercised and possessed by the successor Trustee or Co-Trustees designated in paragraph 1.1 hereof, other than the Survivor, successively and in the order named, and said successor Trustee or Co-Trustees shall possess all incidents of ownership in any such policy or policies.

c.      Upon receipt of proof of death of the insured under any policy of life insurance for which the applicable trust is beneficiary, the Trustee of such trust shall use reasonable efforts to collect in a lump sum all sums payable under said policy to said trust, provided that said Trustee shall be reasonably indemnified if no trust funds are available from which said Trustee can pay the expenses of collection. All sums so received shall become part of the principal of the trust, except that interest paid by the insurer for a period subsequent to maturity shall be added to income. All such sums shall be held, administered, and distributed in accordance with the provisions of this trust instrument. In connection with such life insurance policies, the Trustee of such trust shall have full power to compromise,

arbitrate, or otherwise adjust any claim, dispute or controversy arising under any such policy, and shall have the authority to initiate, defend, settle and compromise any legal proceeding necessary in said Trustee's opinion to collect the proceeds of any such policy. Said Trustee's receipt to any insurer for the insurance proceeds under such policy shall be considered in full discharge of the insurer's liability to the trust and the insurer shall not be under any duty to inquire into the disposition or application of policy proceeds.

**13.30  Loans and Purchases by Trustee.**  To loan or advance the Trustee's own funds to the trust for any purpose, with interest at current rates; to receive security for such loans in the form of a mortgage, pledge, deed of trust, or other encumbrance of any assets of the trust; to purchase assets of the trust at their fair market value as determined by an independent appraisal of those assets; and to sell property to the trust not in excess of its fair market value as determined by an independent appraisal.  Any such independent appraisal shall be by an independent appraiser of recognized competency to appraise the particular class of property involved.

**13.31  Lend to Beneficiaries.**  Following the death of the Decedent, to lend money from the applicable trust to any beneficiary of such trust entitled or authorized in the Trustee's discretion to receive current distributions of income or principal from such trust (other than the Survivor), upon such terms and conditions as the Trustee in his discretion may determine; any such loan may be made on a sound or unsound economic basis and may be made without requiring security therefor and without charging interest thereon, all as the Trustee in his discretion may decide; provided, however, that the Trustee shall take into consideration Internal Revenue Code Section 7872 or any successor thereto and any other provisions of the Internal Revenue Code with respect to the imputation of interest for federal tax purposes.  This paragraph shall only apply to the trusts governed by Article 11 hereof.

**13.32  Guarantee Loans.**  Subject to the provisions of paragraph 2.3 above, the Trustee shall have the power during the joint lifetimes of the Trustors to endorse or guarantee any loan made to either or both of the Trustors or to any corporation, partnership, or other business entity in which either or both of the Trustors or the trust owns an interest; provided, however, that an endorsement or guarantee or an encumbrance or hypothecation by the Trustee pursuant to this paragraph shall not be effective with respect to the separate estate of a Trustor unless the Trustee first obtains that Trustor's written consent.  The Trustee is empowered to execute such documents as may be appropriate or necessary to effect such an endorsement or guarantee and may encumber or hypothecate trust property by pledge, mortgage, deed of trust, or otherwise in order to secure any such endorsement, guarantee, or loan.

**13.33  Consider Tax Consequences.**  When determining distribution of income or principal authorized by this instrument and the person to whom it is made, to consider the tax consequences to the applicable trust and to the beneficiaries to whom distribution may be made (including the power to allocate different classes of income to different beneficiaries).  The Trustee may make distributions from the applicable trust whether or not otherwise authorized by this instrument if the retention of the amount distributed would be considered an accumulation under Sections 665 to 668 of the Internal Revenue Code of 1986, or any successor to them.  Such distribution shall be made to any of the beneficiaries of the

applicable trust to whom the Trustee may make current income distributions. This paragraph shall only apply to the trusts governed by Article 11 hereof.

**13.34  Death Taxes.**  Except as otherwise specifically provided, and subject to any exercised power of appointment over the Survivor's Trust, federal estate taxes and foreign or state death taxes, if any, imposed on or by reason of the inclusion of any portion of the trust in the gross taxable estate of any person under the provisions of any federal, state, or foreign tax law and any taxes imposed by reason of the generation-skipping transfer tax and the taxes imposed under Internal Revenue Code Sections 2032A and 2057(f), or any successor thereto, shall be paid by the Trustee of the applicable trust, unless other adequate provision shall have been made therefor, and charged to, prorated among, or recovered from the trust or the persons entitled to the benefits therefrom as and to the extent provided by any applicable tax law or proration statute.

**13.35  Oil, Gas, and Similar Interests.**  With respect to oil, natural gas, minerals, and all other natural resources and rights to and interests therein (together with all equipment pertaining thereto) including, without limiting the generality of the foregoing, oil and gas royalties, leases, or other oil and gas interests of any character, whether owned in fee, as lessee, lessor, licensee, concessionaire or otherwise, or alone or jointly with others as partner, joint tenant, or joint venturer or in any other noncorporate manner, (a) to make oil, gas and mineral leases or subleases; (b) to pay delay rentals, lease bonuses, royalties, overriding royalties, taxes, assessments, and all other charges; (c) to sell, lease, exchange, mortgage, pledge or otherwise hypothecate any or all of such rights and interests; (d) to make farm-out, pooling, and unitization agreements; (e) to make reservations or impose conditions on the transfer of any such rights or interests; (f) to employ the most advantageous business form in which properly to exploit such rights and interests, whether as corporations, partnerships, limited partnerships, mining partnerships, joint ventures, co-tenancies, or otherwise; (g) to drill, test, explore, mine, develop and otherwise exploit any and all such rights and interests; (h) to produce, process, sell or exchange all products recovered through the exploitation of such rights and interests, and to enter into contracts and agreements for or in respect of the installation or operation of absorption, reprocessing or other processing plants; (i) to employ personnel, rent office space, buy or lease office equipment, contract and pay for geological surveys and studies, and procure appraisals; and (j) to conduct and engage in any and all activities incident to the foregoing powers, with full power to borrow and pledge in order to finance such activities, and to do any other act or thing which may be now or hereafter recognized or contemplated as common or proper practices among those engaged in the business of prospecting for, developing, producing, processing, transporting, or marketing any such oil, gas, mineral, or other natural resource interests.

**13.36  Power to Appoint Attorney in Fact.**  The Trustee shall have the power to appoint any person as attorney in fact, under a general or special power of attorney, to perform any or all acts and exercise any and all powers which the Trustee might perform or exercise, including, without limitation, the right to buy and sell trust securities or other property, and the right to open, deposit and withdraw from bank savings and checking accounts and savings and loan accounts; provided, however, that after the death of either Trustor, no such attorney in fact who is a beneficiary hereunder shall have the power in such

capacity to make any discretionary distributions of income and/or principal that are not
limited by an ascertainable standard from any trust created hereunder to or for the benefit of
such beneficiary, such beneficiary's estate, such beneficiary's creditors, or the creditors of
such beneficiary's estate.

**13.37 General Powers and Limitations.** Although the enumeration of certain
powers of the Trustee shall not limit the Trustee's general powers, the Trustee shall always
be subject to the discharge of the Trustee's fiduciary obligations in the exercise of any
powers contained herein. Furthermore, the Trustee shall always be subject to the following
limitations in the exercise of its powers:

a. The Trustee shall always be required to act in good faith as normally
required by general standards of trust administration customarily imposed on fiduciaries
acting in a similar capacity;

b. Nothing contained in this instrument shall be construed to prevent the
Survivor from receiving all of the net income of the Survivor's Trust less often than
annually or to prevent the Survivor from receiving from the Survivor's Trust substantially
that degree of beneficial enjoyment of the property of the Survivor's Trust that the principles
of the law of trusts accord to a person who is unqualifiedly designated as the life beneficiary
of a trust as contemplated by Section 2056 of the Internal Revenue Code (and the regulations
pertaining thereto), it being the Trustors' intent that the Survivor's Trust produce for the
Survivor for life such an income, or that the Survivor should have such use of the property
held in the Survivor's Trust, as is consistent with the value of the trust principal and its
preservation; however, the provisions of this subparagraph b. shall be construed in a manner
consistent with the powers granted to a Trustee under paragraph 13.1 above, except that
unproductive property held in the Survivor's Trust, upon the written request of the Survivor,
shall be promptly made productive or promptly converted to productive property.

## ARTICLE 14

## GENERATION SKIPPING TRANSFER TAX PROVISIONS

### 14.1 Definitional Material.

a. References to "generation-skipping" or "GS" in this trust instrument
refer to the term "generation-skipping" as it is used in the federal generation skipping
transfer tax under Chapter 13 of the Internal Revenue Code of 1986, as amended ("IRC")
and is used in terminology associated with various provisions of that tax. For example, "GS
exemption" refers to the exemption provided in Section 2631(a) of that tax.

b. References to a "trust" or to "trusts" refer also to a separate share or
shares of a trust if appropriate to the context and to the Trustors' apparent objectives and if
the shares will be "substantially separate and independent shares of different beneficiaries"
entitled to be treated as separate trusts for generation-skipping purposes under IRC
§ 2654(b).

c.      In this Article, and in the generation-skipping context generally, the term "executor" refers to the person or persons authorized by IRC provisions or Treasury regulations to make the transferor election for qualified terminable interest property under IRC § 2652(a)(3) and to allocate the exemption under IRC § 2631(a). No person acting as executor, however, shall be authorized to make or participate in any generation-skipping election or allocation decision if the power to do so would result in his or her having a general power of appointment (for federal estate and gift tax purposes) over property with respect to which he or she would not otherwise have such a general power; should this prohibition leave no executor able to make elections and allocations, the office of executor for this limited purpose shall be filled in the manner that other vacancies in the office of executor of the Decedent's will would be filled.

d.      In this Article, and in the generation-skipping context generally, the term "exempt" or "Exempt" refers to property or a trust (or share) that has a generation-skipping inclusion ratio of zero (that is, an applicable fraction for generation-skipping purposes of one). When reference is made to an "Exempt Trust" or to the "Exempt Portion" of certain property or of a trust, this is a reference to or a special titling for property or a trust that has or is to be established having an inclusion ratio of zero. The term "Nonexempt Portion" or the adjective "nonexempt" or "Nonexempt" indicates property or a trust that has a generation-skipping inclusion ratio of one (that is, an applicable fraction of zero).

**14.2   Executor's Generation-Skipping Authority: Exemption Allocation.**  In exercising the power to allocate a Trustor's generation-skipping exemption under IRC § 2631(a), or a counterpart exemption under any applicable state law, such Trustor's executor may allocate any portion of such exemption to any property of which that Trustor is the transferor for generation-skipping purposes, including property transferred prior to that Trustor's death. These decisions may be based on transfers, gift tax returns and other information known to the executor, with no requirement that allocations benefit the various transferees or beneficiaries of such property equally, proportionally or in any other particular manner.

**14.3   Separation of Exempt and Nonexempt Trusts.**

a.      For each trust that is otherwise to be established (or that is in existence) under this trust instrument, if any of a Trustor's or another's generation-skipping exemption is allocated to property of that trust or to the "Exempt Portion" of that trust, unless the trust thereby has a generation-skipping inclusion ratio of zero, the Trustee shall instead establish two separate trusts so that each separate trust has a generation-skipping inclusion ratio of either zero (the Exempt Portion) or one (the Nonexempt Portion). This is to be accomplished by allocating to the Nonexempt Trust the minimum dollar amount necessary to leave the exempt trust with an inclusion ratio of zero.

b.      Except as expressly provided in this trust instrument, when a trust otherwise to be established is divided under the foregoing provisions into exempt and nonexempt trusts or otherwise into multiple trusts, each trust shall have the same provisions as the original trust from which it is established; provided, however, that any references in

this trust instrument to the original trust shall collectively refer to the separate trusts derived
from it. Nevertheless, the Trustee may exercise administrative and distributive discretion,
and donees of powers of appointment may exercise their powers, differently with respect to
each of the separate trusts (even otherwise identical trusts) derived from the divided trust.

      c.     Any funding requirement of a dollar (i.e., pecuniary) amount under
this Article 14 may be satisfied in cash or in kind, in undivided interests, or partly in each;
any assets that are used to satisfy the dollar amount shall be valued for this purpose at their
date or dates of distribution; and each such dollar amount gift or funding requirement in this
document shall bear interest from the date specified under applicable local law (and, if none,
from the date of the relevant GS transferor's gift or death, as the case may be) to the date of
payment, such interest to be at the statutory rate applicable to pecuniary gifts under state law
governing the administration (and, absent such statutory rate, at 80% of the rate applicable
under IRC Section 7520 at the date of the relevant GS transferor's gift or death as the case
may be). The foregoing interest requirement shall be interpreted and adapted to meet the
"appropriate interest" requirement imposed by applicable proposed or final GS Treasury
regulations.

      d.     Upon termination, partial termination or other later subdivision or
distribution of any of the separate trusts created by the foregoing provisions or other
provisions of this trust instrument, or when separate trusts are to be combined, the
nonexempt (inclusion ratio of one) or exempt (zero inclusion ratio) generation-skipping
character of the property of the trusts shall be preserved. Accordingly, when property is to
be added to or combined with the property of another trust or other trusts or when additional
trusts are to be established from one or more sources, nonexempt property or trusts shall not
be added to or combined with exempt property or trusts, even if this requires the
establishment of additional separate trusts with the same terms and provisions. If, for
example, the terms of what would otherwise be one trust direct that, on termination (or on
failure to exercise a power of appointment), trust property is to be added to another trust,
the exempt property of a separate trust that had been derived from the terminating trust shall
be added only to an exempt trust derived from the recipient trust; nonexempt property shall
be similarly added only to a nonexempt recipient trust; and if no appropriate recipient trust
exists for either exempt or nonexempt property, then a new trust of that character shall be
established with the same terms and provisions as those of the trust that would otherwise
receive that property under the original trust terms. Furthermore, in any case not covered
by the foregoing directions (such as that of a partially exempt trust), if the GS inclusion ratio
of any property that is to be added to or combined with a trust has a different inclusion ratio
than that trust, the Trustee shall refrain from making the addition or combination and shall
instead establish for that property a trust with provisions identical to those of the trust to or
with which the property would have been added or combined.

      e.     The Trustee of any trust shall have authority, in the Trustee's sole
discretion, to combine that trust with any other trust or trusts having the same inclusion ratio
(including trusts established, during life or at death, by either or both of the Trustors or by
issue of the Trustors); and the Trustee may establish separate shares in the combined trust if
and as needed to preserve the rights and protect the best interests of the various beneficiaries
when the trusts being combined do not have identical terms or when separate shares are

otherwise deemed desirable by the Trustee. Trusts with different inclusion ratios may also
be combined in a trust, provided their inclusion ratios are maintained unchanged through
substantially separate and independent shares of different beneficiaries under IRC § 2654(b).
Similarly, the Trustee shall have sole discretionary authority, to subdivide separate or
separable shares of a single trust into separate trusts. These powers to combine and divide
trusts may be exercised from time to time, and may be used to modify or reverse their prior
exercise. In deciding whether and how to exercise this authority the Trustee may take
account of efficiencies of administration, generation-skipping and other transfer tax
considerations, income tax factors affecting the various trusts and their beneficiaries, present
and future financial and other objectives of the trusts and beneficiaries, the need or
desirability of having the same or different trustees for various trusts or shares, and any
other considerations the Trustee may deem appropriate to these decisions.

        f.    Notwithstanding other provisions of this trust document, whenever this
document directs that a particular trust (or portion thereof) or the total unappointed balances
of a certain number of trusts, are to be divided and allocated among certain specified
beneficiaries at any time following the surviving spouse's death, Trustee, in dividing that
trust (or portion thereof) or the collective unappointed balances of such trusts, need not
allocate on a proportionate basis among those beneficiaries (i) exempt or nonexempt property
of a particular GS transferor, (ii) property as to which the special rule of IRC § 2612(c)(2)
applies as to a particular GS transferor, or (iii) property having any other special tax or
nontax characteristic; provided that the total share of property a beneficiary (or group of
beneficiaries) receives out of the total property to be divided and allocated is equivalent to
the total share to which the beneficiary (or group of beneficiaries) is entitled out of the total
property to be divided and allocated. A good faith exercise or non-exercise of Trustee's
discretionary powers under this subparagraph shall fully protect Trustee from liability to any
trust beneficiary for Trustee's exercise or non-exercise of such powers.

### 14.4   General Powers and Other Special Generation-Skipping Provisions.

        a.    If the Trustee of any nonexempt trust under this trust instrument
determines that the combined income tax and generation-skipping and other transfer tax
burdens (federal and state) on the trust and its beneficiaries would be reduced, the Trustee
shall have the power to amend the terms of the trust to grant to any descendant of the
Trustors or spouse of a descendant who is a beneficiary of that trust a general power of
appointment as defined for federal estate tax purposes. Such an amendment may create
either a purely testamentary power of appointment or a power to withdraw trust property,
may confer such general powers upon more than one beneficiary, and may limit the amount
subject to any such general power, require that it be exercised jointly with another in a
manner consistent with the objectives of the power, or otherwise impose conditions and
limitations on its exercise. The Trustee shall also have the power to eliminate any such
general power or to modify it, including in a manner that will reduce or increase the amount
of property subject to it, to alter the conditions or terms of its exercise, to reduce it from a
general to a non-general power, or to otherwise modify it, all in the Trustee's sole
discretion. The Trustee may also exercise the amendment power to subdivide a trust into
separate trusts or shares in order to separate properties or portions subject to a general
power from other properties or portions. The Trustee's power to create, eliminate or

modify general powers of appointment may be exercised repeatedly and from time to time, but no Trustee may exercise or participate in the exercise of a power to so amend a trust in any way that would increase his or her benefits under that trust or exercise a power of amendment in a manner that has the effect of granting himself or herself a general power of appointment as defined for estate tax purposes. In the event the granting of the aforementioned power would result in the Trustee holding a general power of appointment, the office of Trustee for this limited purpose shall be filled by the first successor Trustee or Co-Trustee named in paragraph 1.1 above for whom such power would not result in the holder having a general power of appointment and in the event of a vacancy, such office shall be filled in the manner that other vacancies in the office of Trustee would be filled. No Trustee shall be liable for any good faith exercise of a power to amend a trust in the manner prescribed here.

b.     It is the Trustors' intention to encourage the Trustee to administer separate trusts under this trust instrument in ways that, in the long run, are likely to reduce unnecessary income and transfer taxation among trusts and their beneficiaries and that are likely to make efficient utilization of available tax privileges, such as generation-skipping exemptions. Consistent with these objectives, the Trustee of any trust may consult with other trustees and may in reasonable ways coordinate decisions and actions of the trust with those of other trusts under this trust instrument, under other dispositions made by the Trustors, and under wills and trusts of others when those other trusts have, in whole or in part, similar beneficiaries. Without limiting the foregoing, the Trustors specifically authorize (but do not require) the Trustee, in administering different trusts wholly or in part for the benefit of a particular beneficiary or group of beneficiaries, to adopt different investment patterns and objectives for different trusts based on their generation-skipping ratios and to prefer making distributions from nonexempt trusts to beneficiaries who are non-skip persons for generation-skipping purposes and from exempt trusts to those who are skip persons.

**14.5   Generation-Skipping "Favorable Interpretation" Clause.** All provisions of this trust instrument, except to the extent inconsistent with the marital deduction objectives of the Survivor's Trust or other transfer, shall be construed to provide for or at least to permit divisions, distributions and administration of trusts and other dispositions in a timely manner consistent with the Trustors' objectives of efficiently using available generation-skipping exemptions and (to the extent possible) of establishing and maintaining only trusts (or substantially separate and independent shares) that have inclusion ratios either of zero or of one and are thus either entirely exempt or entirely nonexempt.

## ARTICLE 15

## TRUSTEE PROVISIONS

**15.1   Incapacitation of Trustee.** If a person acting as a Trustee hereunder becomes physically or mentally incapacitated in any way so as to make it impracticable for such person to give prompt and intelligent consideration to financial matters, such person shall cease to act as a Trustee hereunder, and the individual, individuals, or corporation

designated in or appointed pursuant to the terms of this instrument as the successor sole
Trustee or Co-Trustee, as the case may be, may act or commence to act as the Trustee
hereunder without liability for assuming the office of Trustee after delivering written notice
thereof to such incapacitated person and to such of the Trustors as are then living and
competent. A person shall conclusively be deemed to be incapacitated as described in the
preceding sentence if a conservator of the person or estate, or both, of such person has been
appointed by a court having jurisdiction over such matters or two licensed physicians, one of
whom shall be the attending physician of such person, have stated in writing that such
incapacitation exists.

    **15.2    Compensation of Trustee.** No compensation shall be paid to a Trustor while
acting as Trustee hereunder. Unless compensation is waived, any other Trustee hereunder
shall be entitled to reasonable compensation for its services as such without prior court
order. However, any corporate fiduciary acting as Trustee hereunder shall be entitled to
receive reasonable compensation for its services in the amount and at the time specified in its
schedule of fees and charges established from time to time by its department for trusts of a
character similar to this Trust and in effect when such compensation is payable.

    **15.3    No Bond.** No bond shall be required of any Trustee named herein, or
appointed pursuant to the terms hereof, whether acting jointly or severally in the
performance of duties as a Trustee hereunder, and whether anyone named or appointed as
Co-Trustee shall be qualified and acting.

    **15.4    Resignation of Trustee.** Any Trustee from time to time acting may resign as
Trustee of any trust created under this instrument by an instrument in writing signed by such
Trustee and delivered to all the qualified and acting Co-Trustees, if any, and if none, to all
of the adult, competent beneficiaries of such trust then entitled or authorized in the Trustee's
discretion to receive current income distributions therefrom, and to the parents or guardians
of the person of all minor, and the conservators of the person or other personal
representatives of all incompetent, adult, beneficiaries of such trust then entitled or
authorized in the Trustee's discretion to receive current income distributions therefrom, at
the last known address of such beneficiaries, parents or legal representatives thereof. Such
resignation shall be effective upon the delivery of such written instrument to all qualified and
acting Co-Trustees, or if none, upon the written acceptance to act of a successor Trustee.

    **15.5    Accounting.**

        a.    During the joint lifetimes of the Trustors, the Trustee shall account
only to the Trustors, and their written approval shall be final and conclusive in respect to
transactions disclosed in the account as to all beneficiaries of the trust, including unborn and
unascertained beneficiaries.

        b.    Following the death of the Decedent, the Trustee of the Survivor's
Trust shall account only to the Survivor, and the Survivor's written approval shall be final
and conclusive in respect to transactions disclosed in the account as to all beneficiaries of the
Survivor's Trust, including unborn and unascertained beneficiaries.

       c.     Following the death of the Decedent, the Trustee of each trust created hereunder (other than the Survivor's Trust) shall render an accounting from time to time, but not less frequently than every year, regarding the transactions of such trust. Accountings shall also be rendered by any Trustee within sixty (60) days after his resignation or removal by a court of competent jurisdiction. Accountings shall be made by delivering a written accounting to each beneficiary entitled to a current income distribution or, if there are no such current income beneficiaries, to each beneficiary entitled to current distribution out of income or principal in the Trustee's discretion, and to each vested remainderman in being. If any person entitled to receive an accounting is a minor or is under a disability, the accounting shall be delivered to his parents or the guardian of his person if he is a minor, or to the guardian or conservator of his person if he is under any other disability. However, in no event shall any adult beneficiary of such trust have the power to settle an account on behalf of any other beneficiary or remainderman of such trust who is a minor or is under a disability if such power would give the adult beneficiary the sole right to settle an account rendered by such adult beneficiary while acting as a Trustee hereunder or rendered by a Trustee who is subject to removal by such adult beneficiary, but in each such case the Trustee of the applicable trust may select another individual to settle the account on behalf of such minor or disabled beneficiary or remainderman who will fairly represent the interests of such minor or disabled beneficiary or remainderman. Unless any such beneficiary or remainderman, including such parents, guardians, conservators, or other representatives of such beneficiaries or remaindermen who are authorized to settle the account, shall deliver a written objection to the Trustee within sixty (60) days after receipt of the Trustee's account, the account shall be final and conclusive in respect to transactions disclosed in the account as to all beneficiaries of the trust, including unborn and unascertained beneficiaries. After settlement of the account by agreement of the parties objecting to it, or by expiration of the sixty (60) day period, the Trustee shall no longer be liable to any beneficiary of the trust, including unborn and unascertained beneficiaries, in respect to transactions disclosed in the account, except for the Trustee's intentional wrongdoing or fraud.

    **15.6   Trustor's Power to Delegate and Unilaterally Execute.** While the Trustors are acting as Co-Trustees hereunder, either Trustor shall have the power from time to time to delegate to the other Trustor all or any of his power over the management of trust assets or any specific asset for such period as such Trustor determines, (specifically including but not limited to the power to grant a power of attorney over bank or securities accounts). The power of delegation shall be exercised by delivery by the delegating Trustor to the other Trustor of written notice specifying the powers delegated; this delegation shall terminate on delivery by the delegating Trustor to the other Trustor of written notice of termination. Furthermore, while the Trustors are acting as Co-Trustees hereunder, the signature of either Trustor as Co-Trustee shall be sufficient to bind any trust created pursuant to this trust instrument. No person dealing with a Trustee shall be required to determine the authority of any such Trustor as Co-Trustee to make any commitment or undertaking on behalf of any trust created hereby, nor the authority of any such Trustee to sign and deliver on behalf of any trust created hereby any instrument of conveyance, partnership agreement, note, deed of trust, lease agreement, or other legal document.

# ARTICLE 16

## SPECIAL PROVISIONS

### 16.1  Additional Insurance Provisions.

a.     Notwithstanding anything in this instrument to the contrary, at no time shall an insured Trustor have the right to alter, amend, terminate, or revoke any trust created under this instrument in such a manner as to in any way affect the separate property interest of the other Trustor in any life insurance policy (including the proceeds thereof) on the insured Trustor's life. The right to alter, amend, terminate, or revoke such trust with respect to the other Trustor's separate property interest in such policy of life insurance (including the proceeds thereof) shall reside solely in such Trustor and shall be exercised by a written instrument signed by such Trustor and delivered to the Trustee.

b.     In addition to the limitations contained in subparagraph b. of paragraph 13.29 hereof and notwithstanding anything in this trust instrument to the contrary, at no time shall the Survivor be entitled to or possess any interest in any policy of insurance on the life of the Survivor which forms a part of any trust created hereunder other than the Survivor's Trust, nor shall the Survivor be entitled to benefit in any manner from any such policy of insurance or to receive any benefits accruing from or attributable to any such policy, including, but not limited to, any cash or other proceeds received on the surrender of any such policy, or any income, dividends, or interest derived therefrom, or any benefits received in lieu thereof, and the Survivor shall not possess any powers of withdrawal or appointment over any such policy or its proceeds.

### 16.2  Definitions: Children, Issue, Living, Etc.

a.     The terms "child," "children," and "issue" as used in this trust instrument, shall mean and be limited to the following:

(1)     Children. Such terms when referring to the children of the Trustors, shall mean and be limited to:

(a)     RYAN JOSEPH DEL VALLE, born on June 4, 1998; and RACHEL DOREEN DEL VALLE, born on March 29, 2000.

(b)     Any mutual children hereafter born to the Trustors; and

(c)     Any persons hereafter adopted jointly by the Trustors during the Trustors' marriage.

(2)     Issue. Such terms when referring to the issue of the Trustors other than the Trustors' children (as "children" is defined in paragraph 16.2a.(1) above) shall mean and be limited to lineal descendants of all degrees of such children who are:

(a)    Persons either conceived or born into the class during a valid marriage;

(b)    Persons born into the class out of wedlock who lived for a significant period during minority as a member of the household of the relevant natural parent or who have been received and treated by the relevant natural parent as his or her child; or

(c)    Persons adopted into the class during a valid marriage or by the relevant parent while such parent is single who were minors at the date of adoption or who lived for a significant period during minority as a member of the household of the adoptive parent; and the issue of any such adopted person if such issue come within the scope of the term "issue" as limited by the provisions of this paragraph 16.2a.(2).

(d)    Whether a person has "lived for a significant period during minority as a member of the household" of an adoptive or natural parent or whether a person has "been received and treated by the relevant natural parent as his or her natural child" shall be determined by the following persons or entities:  (i) with respect to a power of appointment granted to a person in this trust instrument in a nonfiduciary capacity under which members of the class in question are permissible appointees, the holder of such power, in his or her sole and absolute discretion, shall make such determination and (ii) in all other cases the Trustee of the applicable trust to which the determination is relevant in its reasonable discretion, shall make such determination.

b.    Living. The word "living" as used in this trust instrument shall include unborn persons in the period of gestation.

**16.3   Spendthrift Provision.** Except as otherwise expressly provided in this instrument, no beneficiary of any trust created under this instrument shall have the power to anticipate, encumber, or transfer his or her interest in the principal or income of such trust in any manner.  Except as otherwise expressly provided in this instrument, no part of any trust created under this instrument shall be liable for or charged with any debts, contracts, liabilities, or torts of any beneficiary of such trust or subject to seizure or other process by any creditor of any beneficiary of such trust.

**16.4   Absence from Place of Administration.** As long as any individual named in or appointed pursuant to the terms of this instrument shall serve as Co-Trustee of any trust created hereunder, that individual shall have the power from time to time to delegate to the other Co-Trustee of such trust all or any of his powers as Co-Trustee during temporary vacation periods or other temporary absences from the place of administration of the trust. The power of delegation shall be exercised by delivery by the delegating Co-Trustee to the other Co-Trustee of written notice specifying the powers delegated; this delegation shall terminate on delivery by the delegating Co-Trustee to the other Co-Trustee of written notice of termination of delegation.  The delegating Co-Trustee shall incur no liability to any beneficiary of the trust as a result of any actions taken or not taken within the scope of delegation during the period of delegation.

**16.5   Simultaneous Death.** If it cannot be established by clear and convincing evidence that one Trustor survived the other, then for purposes of this trust agreement, TRACI M. DEL VALLE shall in all events be deemed to have survived.

**16.6   No Contest.** If any beneficiary of any trust created hereunder, either alone or with other persons or entities, shall in any manner directly or indirectly contest, attack, thwart, or otherwise seek to impair or invalidate any part of provision of either Trustor's estate plan, as hereinafter defined, then any share or interest under this trust instrument set aside for that beneficiary is revoked and shall be disposed of in the same manner as if the contesting beneficiary, as provided in this instrument, had predeceased such Trustor without issue. For the purpose of construing this no-contest clause, the term "Trustor's estate plan" shall include such Trustor's will of equal date with this trust instrument and all codicils thereto, this trust instrument, including all amendments thereto, any transmutations from separate to community property or vice versa during the life of such Trustor, any lifetime gifts made by such Trustor, and any beneficiary designation made by such Trustor during the Trustor's lifetime on any life insurance policy, annuity contract, employee benefit plan, pay on death account, IRA account, or any other type of contractual arrangement whereby a beneficiary is designated on a contractual arrangement signed by such Trustor. The terms "contest," "attack," thwart," and "impair," when used in connection with conduct described in this no-contest clause, shall include but are not limited to any conduct aimed against the Trustor's estate plan, the Trustor's estate, the trust estate under this trust instrument, or any assets subject to the Trustor's estate plan based on and including but not limited to any of the following theories:

     a.    A constructive trust theory;

     b.    Lack of capacity, undue influence, mistake, duress, or fraud;

     c.    Any alleged oral or written agreement that the Trustor agreed to bequeath or give anything to any person or entity ("claimant") claiming such oral or written agreement. This provision shall apply to any personal service agreement alleged by claimant and also to any alleged agreement where the claimant alleges "detrimental reliance" on the Trustor's representations or lack thereof, provide a basis for an agreement by equitable estoppel;

     d.    An action in quantum meruit;

     e.    A claim to any property alleged by the personal representative of the Trustor's probate estate or the Trustee of this Trust to belong to the Trustor's probate estate or this Trust;

     f.    The filing of a creditor's claim or prosecution of an action based upon it (if the creditor's claim has been rejected by the Trustor's personal representative or trustee of any trust created under this document);

     g.    Any action or proceeding to determine the character of property;

     h.    A petition for settlement or compromise concerning the terms of this trust instrument.

     i.    Any action seeking to invalidate or rescind any lifetime gift made by the Trustor;

     j.    Any action to invalidate any irrevocable trust created by the Trustor during the Trustor's lifetime; or

     k.    In any other way, contest, thwart, or seek to impair any provision of the Trustor's estate plan, including provisions in this trust intrument, in the Trustor's will, or in any other estate planning instrument signed by the Trustor.

The Trustee is authorized to defend, at the expense of the Trust, any contest or attack on either Trustor's estate plan. If any provision of this paragraph 16.6 is found to be unenforceable by any court of competent jurisdiction, the remaining provisions of this paragraph shall be deemed severable from such unenforceable provision, and the remaining provisions shall be given full force and effect.

**16.7    Power to Delegate.** While the Trustors are acting as Co-Trustees hereunder, either Trustor shall have the power from time to time to delegate to the other Trustor all or any of his power over the management of Trustee trust assets or any specific asset for such period as such Trustor determines, (specifically including but not limited to the power to grant a power of attorney over bank accounts). The power of delegation shall be exercised by delivery by the delegating Trustor to the other Trustor of written notice specifying the powers delegated; this delegation shall terminate on delivery by the delegating Trustor to the other Trustor of written notice of termination.

**16.8    Disinheritance of Omitted Heirs.** Except as otherwise provided in this trust instrument, the Trustors have intentionally and with full knowledge omitted to provide in this trust instrument for their issue or for any other heirs of the Trustors.

**16.9    Tangible Personal Property.** In addition to the rights granted to the Survivor under other provisions of this trust instrument, following the death of the Decedent, the Survivor shall have the right during his or her lifetime to the use of all jewelry, silverware, art objects, household furniture and furnishings, clothing, books, pictures, paintings, and other tangible articles of a personal nature held in any trust created hereunder of which the Survivor is entitled during his or her lifetime to all of the net income. During the lifetime of the Survivor, the Trustee shall not sell any of such property without the consent of the Survivor.

**16.10    Name of Trust.** The trusts created in this instrument may be referred to collectively as the DEL VALLE FAMILY TRUST, and each separate trust created in this instrument may be referred to by adding the name of such trust or by adding the name of the beneficiary.

The Trustors and Trustees have executed this instrument at *Newport Beach*,
California on this 30 day of *October*, 2002.

_____
BRETT H. DEL VALLE, Trustor

_____
TRACI M. DEL VALLE, Trustor

_____
BRETT H. DEL VALLE, Trustee

_____
TRACI M. DEL VALLE, Trustee

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF ORANGE       )

On _____Oct. 30_____, 2002, before me, _Beckie Brown_,
Notary Public, personally appeared BRETT H. DEL VALLE and TRACI M. DEL VALLE,
[ ] ~~personally known to me~~ -OR- [x] proved to me on the basis of satisfactory evidence to
be the persons whose names are subscribed to the within instrument and acknowledged to me
that they executed the same in their authorized capacities, and that by their signatures on the
instrument the persons, or the entity upon behalf of which the persons acted, executed the
instrument.

Witness my hand and official seal.



BECKIE BROWN
COMM. #1287976
Notary Public-California
ORANGE COUNTY
My Comm. Exp. Jan. 18, 2005

_Beckie Brown_
(Signature of Notary)

Capacity claimed by signers: Trustors and Trustees of the DEL VALLE FAMILY TRUST

## SCHEDULE A

## INVENTORY OF TRUST ESTATE

1.    <u>Community Property</u>.

2.    <u>Husband's Separate Property</u>.

3.    <u>Wife's Separate Property</u>.

_____
BRETT H. DEL VALLE

_____
TRACI M. DEL VALLE

SECOND JUDICIAL DISTRICT - OGDEN DISTRICT COURT
WEBER COUNTY, STATE OF UTAH

| | | |
|---|---|---|
| MOLLY J MULLIGAN | : | EXHIBIT LIST |
| Plaintiff | : | |
| vs. | : | |
| | : | Case No: 240908957 |
| ALUM ROCK RIVERSIDE LLC | : | JUDGE: NOEL S HYDE |
| Defendant | : | Date: January 14, 2025 |

KYLE HOOKER Attorney for the Defendant
BENJAMIN JOHNSON Attorney for the Defendant
FELICIA CANFIELD Attorney for the Plaintiff
BRADLEY TILT Attorney for the Plaintiff

| NO. | PARTY DESCRIPTION | OFF | REC | REF | WDN | ADV | SUB |
|---|---|---|---|---|---|---|---|
| 1 | PLA  Binder | Y | Y | | | | |

Date: January 16, 2025                    /s/ AMY HARRIS
                                          Signature

| | | | |
|---|---|---|---|
| OFF = Offered | REF = Refused | ADV = Under Advisement | REL = Released |
| REC = Received | WDN = Returned/Withdrawn | SUB = Original Substituted | |

Benjamin D. Johnson (10275)
KC Hooker (18018)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Email: ben.johnson@btjd.com;
kchooker@btjd.com
*Attorneys for Defendant Alum Rock Riverside, LLC*

---

## IN THE SECOND JUDICIAL DISTRICT COURT, ODGEN WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs, <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; BRETT H. DEL VALLE and TRACI M. DEL VALLE as Co-Trustees of the Del Valle Family Trust dated October 30, 2002, <br><br> Defendants. | **OBJECTION TO PROPOSED ORDER AND PRELIMINARY INJUNCTION** <br><br> Case No. 240908957 <br><br> Judge: Camille Neider |

Defendant Alum Rock Riverside, LLC ("**_Alum Rock_**"), pursuant to Rule 7 and Rule

65A of the Utah Rules of Civil Procedure, files this Objection to Proposed Order and

Preliminary Injunction:

## ARGUMENT

Alum Rock objects to the form of the proposed order, which is attached hereto as

**Exhibit 1**. In short, the proposed order fails to address the following issues:

1. The Court's determination that further proceedings must be held to determine the

nature and extent of the interests of Brett De Valle and Tracie De Valle in the

Property (as defined in the order) for application of Utah Code Ann. section 75-7-

505(1);

2. That this Court will not hear previously determined legal issues that were before

the Utah Supreme Court and Third Judicial District Court, Case No. 206927043,

including that Alum Rock has a judgment lien against the Property.

3. That Alum Rock may re-notice a sheriff's sale of the Property if it is made clear in

the notice of sale that only the interests of Brett De Valle are being sold.

A redline of the proposed order with Alum Rock's revisions is attached hereto as **Exhibit 2.**

A clean version of Alum's proposed order is attached hereto as **Exhibit 3.**

## CONCLUSION

For the reasons stated herein, the Court should enter an order with the modifications

requested by Alum Rock.

DATED this 22nd day of January, 2025.

BENNETT TUELLER JOHNSON & DEERE


/s/  *Benjamin D. Johnson*
Benjamin D. Johnson
KC Hooker
*Attorneys for Defendant Alum Rock Riverside, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of January, 2025, I caused a true and correct copy of the foregoing **OBJECTION TO PROPOSED ORDER AND PRELIMINARY INJUNCTION** to be electronically filed with the Court's ECF system and served on the following:

Bradley L. Tilt
Freeman Lovell, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
bradley.tilt@freemanlovell.com
*Attorney for Plaintiffs*

Felicia B. Canfield
Canfield Law LLC
2413 Newton Avenue
Cody, WY 82414
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

*/s/ Holly Van Leeuwen*

# EXHIBIT 1

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826                                             **Tax ID No. 20-119-0007**
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and<br>JOHN P. MULLIGAN,<br><br>    Plaintiffs<br><br>    v.<br><br>ALUM ROCK RIVERSIDE, LLC, a<br>California limited liability company; Brett H.<br>Del Valle and Traci M. Del Valle as Co-<br>Trustees of the Del Valle Family Trust dated<br>October 30, 2002<br><br>    Defendants. | **ORDER AND PRELIMINARY<br>INJUNCTION**<br><br><br>Case No. 240908957<br><br>Judge Noel S. Hyde |

The request of Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively, "**Plaintiffs**"

or "**Mulligans**") for issuance of a preliminary injunction that was included in and part of the

Mulligans' *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and

Preliminary Injunction* (the "**Preliminary Injunction Motion**") filed on December 23, 2024

came on for hearing before the above-named Court, the Honorable Judge Noel S. Hyde

presiding, at 10:00 a.m. on January 14, 2025 (the "**Hearing**").  Mulligans were represented at the

Hearing by Bradley L. Tilt, of Freeman Lovell, PLLC.  Defendant Alum Rock Riverside, LLC

("**Defendant**" or "**Alum Rock**") was represented at the Hearing by Benjamin D. Johnson, of

Bennett, Tueller, Johnson & Deere.

The Court having reviewed Mulligans' Preliminary Injunction Motion and the *Declaration*

*of Felicia B. Canfield* in support, and all exhibits thereto, that was filed concurrently with the

Preliminary Injunction Motion, having reviewed the *Objection to Order Granting Ex Parte*

*Motion for Issuance of a Temporary Restraining Order and Preliminary Injunction* filed by

Alum Rock on December 26, 2024 and the Alum Rock's further *Opposition to Plaintiffs' Motion*

*for Temporary Restraining Order and Preliminary Injunction* filed on January 10, 2025 and the

exhibits thereto (collectively, "**Alum Rock's Oppositions**"), having further heard the testimony

provided at the Hearing, and reviewed Exhibit 1 tabs 1 through 15 which all were presented at

and admitted into evidence during the Hearing, having reviewed all other applicable pleadings

and papers on file herein, and the Court having heard the oral argument of the Mulligans' and of

Alum Rock's respective legal counsel of record presented during the Hearing, the Court being

duly informed in the premises, and for good cause shown, and the Court having issued its ruling

orally from the bench at the conclusion of the Hearing,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1.　　Plaintiffs' Preliminary Injunction Motion is granted.

2.　　Alum Rock, and anyone acting by, with, or through Alum Rock, is **HEREBY**

**ENJOINED** from continuing with, allowing, and/or holding and is **ORDERED TO CANCEL**

the Sheriff's Sale scheduled for January 16, 2025 at 12:00 p.m. and/or for January 21, at 12:00

p.m., and/or any other Sheriff's Sale that may presently be scheduled pursuant the *Notice of*

*Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, Civil No. 206927043, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**") and/or to the *Writ of Execution* issued on June 22, 2021 in the writ proceeding in that above-referenced Civil No. 206927043 (the "**Writ of Execution**"), on or affecting the real property located in Weber County, Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.
>
> Tax ID No. 20-119-0007

3.     Defendant Alum Rock is further **RESTRAINED** from and **ORDERED** to immediately **CEASE** any and all efforts to foreclose on and/or sell the Property pursuant to the Alum Rock Lien or the Writ of Execution pending any further contrary order of this Court.

4.     **NO BOND** not any other security shall be required for the issuance of this preliminary injunction.

5.     Copies of this **ORDER AND PRELIMINARY INJUNCTION** may be recorded in the office of the Weber County Recorder in the State of Utah.

The GROUNDS for this *Order and Preliminary Injunction* are as follows:

Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or "**Plaintiffs**") each are individual owners of record of the Property and the home thereon,

3

pursuant to a *Warranty Deed* that was recorded on May 11, 2021 as Entry No. 3151874 in the official records of the Weber County Recorder's office (the "**Warranty Deed**").

      Plaintiffs have demonstrated that based on the material facts and the applicable statutory and case law that they meet each of the four Rule 65A elements necessary to obtain a preliminary injunction as stated hereinabove.  Plaintiffs have demonstrated that: (1) there is a substantial likelihood that Plaintiffs will prevail on the merits of their underlying claims; (2) Plaintiffs will suffer irreparable harm by the loss of their Property, which Utah law recognizes to be unique and irreplaceable, unless this Court issues a preliminary injunction as stated hereinabove; (3) the threatened injury to Plaintiffs outweighs whatever damage the preliminary injunction may cause Defendant; and (4) this Court's issuance of the preliminary injunction stated hereinabove benefit the public interest and is not adverse to it.

      Defendant did not prove at the hearing any potential loss of value of the Property nor of any damages that Defendant might incur, and/or in what amount, that would necessitate any bond or other security to be posted for this preliminary injunction.

      Notwithstanding the foregoing, and without limitation of any kind upon any of the foregoing, the Court further states and clarifies that its oral ruling from the bench during the Hearing, and its above-stated written order, are not any actual and/or final ruling upon any of the merits of any of the parties' underlying claims and/or defenses herein.  The Court's oral ruling from the bench at the Hearing, and this above-captioned order, are exclusively and only on and for the preliminary injunction as stated hereinabove, and nothing more.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***

4

## SERVICE CERTIFICATE

I certify that on May 29, 2015, I caused a true and correct copy of the foregoing **ORDER AND JUDGMENT GRANTING *PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*, INCLUDING DECREE OF FORECLOSURE, ORDER OF SALE, AND RULE 54(b) CERTIFICATION** to be served in the manner indicated to the following parties at the addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JOHNSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, UT 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside, LLC* | _____ Hand Delivery<br>_____First Class, United States Mail, Postage Prepaid<br>_____ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>_X_ Email<br>_____ Other:_____ |
| Felicia B. Canfield<br>Canfield Law LLC<br>2413 Newton Avenue<br>Cody, WY 82414<br>canfieldlawllc@gmail.com<br>*Attorneys for Plaintiffs* | _____ Hand Delivery<br>_____ First Class, United States Mail, Postage Prepaid<br>_____ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>_X_ Email<br>_____ Other:_____ |

    /s/ *Bradley L. Tilt*_____
Bradley L. Tilt

5

# **EXHIBIT 2**

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

**Tax ID No. 20-119-0007**

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

### IN THE SECOND DISTRICT COURT IN AND FOR WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **ORDER AND PRELIMINARY INJUNCTION** <br><br> Case No. 240908957 <br><br> Judge Noel S. Hyde |

The request of Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively, "**Plaintiffs**" or "**Mulligans**") for issuance of a preliminary injunction that was included in and part of the Mulligans' *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and Preliminary Injunction* (the "**Preliminary Injunction Motion**") filed on December 23, 2024 came on for hearing before the above-named Court, the Honorable Judge Noel S. Hyde

presiding, at 10:00 a.m. on January 14, 2025 (the "**Hearing**").  Mulligans were represented at the
Hearing by Bradley L. Tilt, of Freeman Lovell, PLLC.  Defendant Alum Rock Riverside, LLC
("**Defendant**" or "**Alum Rock**") was represented at the Hearing by Benjamin D. Johnson, of
Bennett, Tueller, Johnson & Deere.

The Court having reviewed Mulligans' Preliminary Injunction Motion and the *Declaration
of Felicia B. Canfield* in support, and all exhibits thereto, that was filed concurrently with the
Preliminary Injunction Motion, having reviewed the *Objection to Order Granting Ex Parte
Motion for Issuance of a Temporary Restraining Order and Preliminary Injunction* filed by
Alum Rock on December 26, 2024 and the Alum Rock's further *Opposition to Plaintiffs' Motion
for Temporary Restraining Order and Preliminary Injunction* filed on January 10, 2025 and the
exhibits thereto (collectively, "**Alum Rock's Oppositions**"), having further heard the testimony
provided at the Hearing, and reviewed Exhibit 1 tabs 1 through 15 which all were presented at
and admitted into evidence during the Hearing, having reviewed all other applicable pleadings
and papers on file herein, and the Court having heard the oral argument of the Mulligans' and of
Alum Rock's respective legal counsel of record presented during the Hearing, the Court being
duly informed in the premises, and for good cause shown, and the Court having issued its ruling
orally from the bench at the conclusion of the Hearing,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1. The Temporary Restraining Order entered on January 9, 2025 is hereby dissolved
and is of no further force or effect.

~~1.~~2. Plaintiffs' Preliminary Injunction Motion is granted in part and denied in part.

3. Alum Rock, and anyone acting by, with, or through Alum Rock, is **HEREBY
ENJOINED** from continuing with, allowing, and/or holding and is **ORDERED TO CANCEL**

2

the ~~Sheriff's Sale scheduled~~sheriff's sale originally set by the Weber County Sheriff's Office ~~for~~for January 16, 2025 at 12:00 p.m.~~,~~ ~~and/or for~~and thereafter rescheduled to January 21, at 12:00 p.m.~~.~~, on the real property commonly known as 1453 South Basinview Road, Huntsville, UT 84317, and more particularly described as follows -(the "**Property**"):

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

4.    Further proceedings must be held in order to determine the extent and nature of the interests of Brett De Valle and Traci De Valle in the Property for a determination of what creditors may reach under Utah Code Ann. section 75-7-505(1). The Second Judicial District Court in and for Weber County is the proper venue for such determination under Utah law as the Property is located in Weber County, Utah.

5.    The Utah Supreme Court's prior determination that Alum Rock has a judgment lien on the Property, and all other matters previous determined and adjudicated by the Utah Supreme Court and other prior trial court final decisions, cannot be challenged in this action, as these issues have already been determined in prior proceedings.

~~2.~~    As such, Alum Rock may re-notice ~~,~~~~and/or any other~~a ~~Sheriff's~~sheriff's ~~Sale~~sale on the Property ~~that may presently be scheduled~~ pursuant to the *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, Civil No. 206927043 (the "**Alum Rock Judgment**") ~~, which Notice was recorded in the office and general records of~~

3

466 of 494

the Weber County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**") and/or to theand pursuant to the *Writ of Execution* previously issued on June 22, 2021 in the writ proceeding in that above-referenced Civil No. 206927043 (the "**Writ of Execution**")from the Alum Rock Judgment, if it is clarified in any notice of sale regarding the Property that only the interests of Brett De Valle are being sold, whatever that interest may be. , on or affecting the real property located in Weber County, Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

6.

3.      Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

4.

5.      Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

6.

7.      Tax ID No. 20-119-0007

8.

9.      Defendant Alum Rock is further **RESTRAINED** from and **ORDERED** to immediately **CEASE** any and all efforts to foreclose on and/or sell the Property pursuant to the Alum Rock Lien or the Writ of Execution pending any further contrary order of this Court.

10.7.    **NO BOND** not nor any other security shall be required for the issuance of this preliminary injunction.

4

~~11.~~8.    Copies of this **ORDER AND PRELIMINARY INJUNCTION** may be recorded in the office of the Weber County Recorder in the State of Utah.

The GROUNDS for this *Order and Preliminary Injunction* are as follows:

Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or "**Plaintiffs**") ~~each are individual owners of record of the Property and the home thereon,~~ were conveyed the Property pursuant to a *Warranty Deed* that was recorded on May 11, 2021 as Entry No. 3151874 in the official records of the Weber County Recorder's office (the "**Warranty Deed**").

Plaintiffs have demonstrated that based on the material facts and the applicable statutory and case law that they meet each of the four Rule 65A elements necessary to obtain a preliminary injunction as stated hereinabove.  Plaintiffs have demonstrated that: (1) there is a substantial likelihood that Plaintiffs will prevail on the merits of their underlying claims; (2) Plaintiffs will suffer irreparable harm by the loss of their Property, which Utah law recognizes to be unique and irreplaceable, unless this Court issues a preliminary injunction as stated hereinabove; (3) the threatened injury to Plaintiffs outweighs whatever damage the preliminary injunction may cause Defendant; and (4) this Court's issuance of the preliminary injunction stated hereinabove benefit the public interest and is not adverse to it.

Defendant did not prove at the hearing any potential loss of value of the Property nor of any damages that Defendant might incur, and/or in what amount, that would necessitate any bond or other security to be posted for this preliminary injunction.

Notwithstanding the foregoing, and without limitation of any kind upon any of the foregoing, the Court further states and clarifies that its oral ruling from the bench during the

5

Hearing, and its above-stated written order, are not any actual and/or final ruling upon any of the merits of any of the parties' underlying claims and/or defenses herein. The Court's oral ruling from the bench at the Hearing, and this above-captioned order, are exclusively and only on and for the preliminary injunction as stated hereinabove, and nothing more.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***

> Formatted: Indent: First line: 0", Add space between paragraphs of the same style

## SERVICE CERTIFICATE

I certify that on May 29, 2015, I caused a true and correct copy of the foregoing **ORDER AND JUDGMENT GRANTING *PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*, INCLUDING DECREE OF FORECLOSURE, ORDER OF SALE, AND RULE 54(b) CERTIFICATION** to be served in the manner indicated to the following parties at the addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JOHNSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, UT 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside, LLC* | _____ Hand Delivery<br>_____ First Class, United States Mail, Postage Prepaid<br>_____ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>__X__ Email<br>_____ Other:_____ |
| Felicia B. Canfield<br>Canfield Law LLC<br>2413 Newton Avenue<br>Cody, WY 82414<br>canfieldlawllc@gmail.com<br>*Attorneys for Plaintiffs* | _____ Hand Delivery<br>_____ First Class, United States Mail, Postage Prepaid<br>_____ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>__X__ Email<br>_____ Other:_____ |

_/s/ Bradley L. Tilt_____
Bradley L. Tilt

6

# **<u>EXHIBIT 3</u>**

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826                                         **Tax ID No. 20-119-0007**
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **ORDER AND PRELIMINARY INJUNCTION** <br><br><br> Case No. 240908957 <br><br> Judge Noel S. Hyde |

The request of Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively, "**Plaintiffs**"

or "**Mulligans**") for issuance of a preliminary injunction that was included in and part of the

Mulligans' *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and

Preliminary Injunction* (the "**Preliminary Injunction Motion**") filed on December 23, 2024

came on for hearing before the above-named Court, the Honorable Judge Noel S. Hyde

presiding, at 10:00 a.m. on January 14, 2025 (the "**Hearing**").  Mulligans were represented at the

Hearing by Bradley L. Tilt, of Freeman Lovell, PLLC.  Defendant Alum Rock Riverside, LLC

("**Defendant**" or "**Alum Rock**") was represented at the Hearing by Benjamin D. Johnson, of

Bennett, Tueller, Johnson & Deere.

The Court having reviewed Mulligans' Preliminary Injunction Motion and the *Declaration*

*of Felicia B. Canfield* in support, and all exhibits thereto, that was filed concurrently with the

Preliminary Injunction Motion, having reviewed the *Objection to Order Granting Ex Parte*

*Motion for Issuance of a Temporary Restraining Order and Preliminary Injunction* filed by

Alum Rock on December 26, 2024 and the Alum Rock's further *Opposition to Plaintiffs' Motion*

*for Temporary Restraining Order and Preliminary Injunction* filed on January 10, 2025 and the

exhibits thereto (collectively, "**Alum Rock's Oppositions**"), having further heard the testimony

provided at the Hearing, and reviewed Exhibit 1 tabs 1 through 15 which all were presented at

and admitted into evidence during the Hearing, having reviewed all other applicable pleadings

and papers on file herein, and the Court having heard the oral argument of the Mulligans' and of

Alum Rock's respective legal counsel of record presented during the Hearing, the Court being

duly informed in the premises, and for good cause shown, and the Court having issued its ruling

orally from the bench at the conclusion of the Hearing,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1.      The Temporary Restraining Order entered on January 9, 2025 is hereby dissolved

and is of no further force or effect.

2.      Plaintiffs' Preliminary Injunction Motion is granted in part and denied in part.

3.      Alum Rock, and anyone acting by, with, or through Alum Rock, is **HEREBY**

**ENJOINED** from continuing with, allowing, and/or holding and is **ORDERED TO CANCEL**

2

the sheriff's sale originally set by the Weber County Sheriff's Office for January 16, 2025 at

12:00 p.m., and thereafter rescheduled to January 21, at 12:00 p.m., on the real property

commonly known as 1453 South Basinview Road, Huntsville, UT 84317, and more particularly

described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT,
> according to the official plat thereof on file and of record in the office of the Weber
> County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across
> Basinview Road (a private road), as shown on the official dedicated plat, to and from
> said Lot to a physically open and legally dedicated public street.
>
> Tax ID No. 20-119-0007

4.    Further proceedings must be held in order to determine the extent and nature of

the interests of Brett De Valle and Traci De Valle in the Property for a determination of what

creditors may reach under Utah Code Ann. section 75-7-505(1). The Second Judicial District

Court in and for Weber County is the proper venue for such determination under Utah law as the

Property is located in Weber County, Utah.

5.    The Utah Supreme Court's prior determination that Alum Rock has a judgment

lien on the Property, and all other matters previous determined and adjudicated by the Utah

Supreme Court and other prior trial court final decisions, cannot be challenged in this action, as

these issues have already been determined in prior proceedings.

6.    As such, Alum Rock may re-notice a sheriff's sale on the Property pursuant to the

*Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake

County, Civil No. 206927043 (the "**Alum Rock Judgment**") and pursuant to the *Writ of*

*Execution* previously issued on June 22, 2021 from the Alum Rock Judgment, if it is clarified in

any notice of sale regarding the Property that only the interests of Brett De Valle are being sold,

whatever that interest may be.

7.      **NO BOND** nor any other security shall be required for the issuance of this

preliminary injunction.

8.      Copies of this **ORDER AND PRELIMINARY INJUNCTION** may be recorded

in the office of the Weber County Recorder in the State of Utah.

The GROUNDS for this *Order and Preliminary Injunction* are as follows:

Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or

"**Plaintiffs**") were conveyed the Property pursuant to a *Warranty Deed* that was recorded on

May 11, 2021 as Entry No. 3151874 in the official records of the Weber County Recorder's

office (the "**Warranty Deed**").

Plaintiffs have demonstrated that based on the material facts and the applicable statutory

and case law that they meet each of the four Rule 65A elements necessary to obtain a

preliminary injunction as stated hereinabove.  Plaintiffs have demonstrated that: (1) there is a

substantial likelihood that Plaintiffs will prevail on the merits of their underlying claims; (2)

Plaintiffs will suffer irreparable harm by the loss of their Property, which Utah law recognizes to

be unique and irreplaceable, unless this Court issues a preliminary injunction as stated

hereinabove; (3) the threatened injury to Plaintiffs outweighs whatever damage the preliminary

injunction may cause Defendant; and (4) this Court's issuance of the preliminary injunction

stated hereinabove benefit the public interest and is not adverse to it.

Defendant did not prove at the hearing any potential loss of value of the Property nor of

any damages that Defendant might incur, and/or in what amount, that would necessitate any

4

bond or other security to be posted for this preliminary injunction.

Notwithstanding the foregoing, and without limitation of any kind upon any of the
foregoing, the Court further states and clarifies that its oral ruling from the bench during the
Hearing, and its above-stated written order, are not any actual and/or final ruling upon any of the
merits of any of the parties' underlying claims and/or defenses herein.  The Court's oral ruling
from the bench at the Hearing, and this above-captioned order, are exclusively and only on and
for the preliminary injunction as stated hereinabove, and nothing more.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***

## SERVICE CERTIFICATE

I certify that on May 29, 2015, I caused a true and correct copy of the foregoing
**ORDER AND JUDGMENT GRANTING *PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT*, INCLUDING DECREE OF FORECLOSURE, ORDER OF SALE, AND
RULE 54(b) CERTIFICATION** to be served in the manner indicated to the following parties
at the addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JOHNSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, UT 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside, LLC* | _____ Hand Delivery<br>_____First Class, United States Mail,<br>Postage Prepaid<br>_____ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>  X  Email<br>_____ Other:_____ |
| Felicia B. Canfield<br>Canfield Law LLC<br>2413 Newton Avenue<br>Cody, WY 82414<br>canfieldlawllc@gmail.com<br>*Attorneys for Plaintiffs* | _____ Hand Delivery<br>_____  First Class, United States Mail,<br>Postage Prepaid<br>_____ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>  X  Email<br>_____ Other:_____ |

  /s/ *Bradley L. Tilt*_____
Bradley L. Tilt

5

6

SECOND DISTRICT COURT
Request for Copy of Recording of Court Proceeding
(Recordings available for previous 9 years only)
Email Weber & Morgan County requests to: 2webermorgand@utcourts.gov
Email Davis County requests to: 2davisd@utcourts.gov

**All Fees must be paid before recording will be prepared**

Date of Request: 01/22/2025                    Case Number: 240908957

Court Location:  ■Ogden  ❏Farmington  ❏Layton  ❏Bountiful  ❏Morgan

Judge/Commissioner: _____    Case Name: Molly J. Mulligan    vs./and    Alum Rock Riverside LLC

Hearing Date: 01/17/2025                    Hearing Time: 1:00 pm

**REQUESTOR'S INFORMATION:**

Party Type:  ❏Plaintiff/Petitioner  ■Defendant/Respondent  ❏Private Atty  ❏Other

  ❏Prosecutor (Billing will be sent to Co Atty)  ❏Public Defender (Billing will be sent to PDA or City)

Name: KC Hooker of Bennett Tueller Johnson & Deere

Address: 3165 E Millrock Dr, Ste 500, Salt Lake City, UT 84121

Phone No.: ( 801 ) 438-2000

Email Address: kchooker@btjd.com

❏ Check if copy is to be mailed to above address
❏ Check if copy will be picked up

**PLEASE CHECK REQUESTED FORMAT BELOW**
❏ **$15.00 Windows Media Player Digital Audio/Video** (*1 CD will hold approx. 8 hours of recording*)
  Copy will be ready for pickup/delivery within ten (10) business days from the date payment is received.
❏ **$15.00 Audio CD – Plays in CD Player** (*1 CD holds 80 minutes*)
  Copy will be ready for pickup/delivery within ten (10) business days from the date payment is received.
■ **$15.00 Emailed MP3** (*per half day of testimony*)
  Copy will be emailed within ten (10) business days from the date payment is received.
  **E-mail to:** atorres@btjd.com

❏ **$15.00 Shared Audio** (*per half day of testimony*)
  Copy will be shared within five (5) business days from the date payment is received. Shared Audio to be accessed through FTR, which requires a free download. Shared audio will not be able to be downloaded and subsequently shared with others. Please list all email addresses you would like the audio shared with. Any future requests for the same recording will require a new request to be submitted and a fee to be paid.
  **Emails to Share Audio with:** _____

| | | |
|---|---|---|
| **Copy Fee** | $ _____ | |
| **Mailing Costs** | $ _____ | ($4.13 for up to 3 CD's in a mailer) |
| **Total** | $ _____ | |

**NOTE: Copies will be discarded after 30 days if not picked up. Payments will not be refunded/transferred to another request.**
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
**COURT USE ONLY:**
Copied by: _____    Date: _____    Date emailed/mailed: _____

Bradley L. (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

**IN THE SECOND DISTRICT COURT IN AND FOR
WEBER COUNTY, STATE OF UTAH**

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **RESPONSE TO *OBJECTION TO PROPOSED ORDER AND PRELIMINARY INJUNCTION*** <br><br><br> Case No. 240908957 <br><br> Judge Noel S. Hyde |

Plaintiffs Molly J. Mulligan and John P. Mulligan ("**Plaintiffs**" or "**Mulligans**"), on

January 15, 2025, served their proposed *Order and Preliminary Injunction* herein following a

preliminary injunction hearing held in this case the day prior ("**Mulligans' Proposed Order**").

Defendant Alum Rock Riverside, LLC ("**Defendant**" or "**Alum Rock**"), on January 22,

2025, filed an *Objection to Proposed Order and Preliminary Injunction* (the "**Objection**"),

which included as Exhibit 2 to it proposed redlines to Mulligans' Proposed Order, and as Exhibit

3 to it an alternate order proposed by Alum Rock ("**Alum Rock's Alternate Proposed Order**") which included/accepted Alum Rock's proposed redlines shown in its Exhibit 2.

Pursuant to Rule 7(j)(5)(C) of the Utah Rules of Civil Procedure, Mulligans are concurrently herewith filing with the Court the Mulligans' Proposed Order as originally drafted and served (save for fixing typos that were in the Certificate of Service thereof).

Further pursuant to that Rule, Mulligans file this response to Alum Rock's Objection.

Mulligans do not dispute point No. 1. in the Objection. Indeed, Mulligans agree that the Court determined at the Hearing (as that term is defined in Mulligans' Proposed Order) that further proceedings must be held to determine the nature and extent of the interests of Brett Del Valle in the Property (as that term is defined in Mulligans' Proposed Order) for application of Utah Code Section 75-7-505(1) to determine therefore what extent of interest in the Property, if any, may therefore be reached by Alum Rock as a creditor of Brett Del Valle. Mulligans, therefore, do not object to inclusion in the order to be entered by the Court of what Alum Rock proposes to add as paragraph 4 in/of Alum Rock's Alternate Proposed Order (stating that such further proceedings must be held and determination made, and that this above-named Court is the proper venue for such proceedings and determination).

Mulligans dispute in part point No. 2. in the Objection. Mulligans acknowledge that at the Hearing this Court stated and held that it would not relitigate issues previously ruled upon and determined by the Utah Supreme Court in *Mulligans v. Alum Rock*, 2024 UT 22. Mulligans, therefore, do not object to inclusion in the order to be entered by the Court of those portions of what Alum Rock proposes to add as paragraph 5 in/of Alum Rock's Alternate Proposed Order which state that prior Utah Supreme Court determinations cannot be challenged in this action. However, Mulligans did not hear or understand the Court to state during its oral ruling from the bench at the Hearing anything regarding "other prior trial court final decisions" – indeed, it could

2

not have stated or ruled any such thing, because no such matters were before the Court at the Hearing, and also because the Utah Supreme Court expressly stated that the "other prior trial court" proceedings leading to that appeal was merely "a proceeding to enforce that judgment through a writ of execution [and] is <u>not an action</u>" at all.  *Id.* ¶ 66 (emphasis added).  As there was "not an action" previously, there cannot have been any final judgment on the merits for any claim preclusion, which Alum Rock seeks to inject in its paragraph 5, on anything other than what the Utah Supreme Court ruled upon and determined.  *See e.g., Daz Mgmt., LLC v. Honnen Equip. Co.,* 2022 UT 15, ¶ 25, 508 P.3d 84, 90 ("For claim preclusion to apply, the first lawsuit must have ended with a final judgment on the merits.").  Because the narrow and procedurally warped environment of those prior trial court proceedings regarding the technical question of statutory and rule compliance for judgment lien perfection and for proper issuance of a writ are materially different to the facts and legal theories that are the subject of this present above-captioned case, moreover (which this Court acknowledged during its oral ruling at the Hearing), and because as this Court also ruled at the Hearing that this above-named Court is the only venue with jurisdiction to hear the Mulligans' present real property claims and that the prior trial court proceedings in the Third Judicial District did not hear them nor have jurisdiction to hear them, nothing in Alum Rock's unspecified "other prior trial court" proceedings is in any way precluded in this case unless it was previously ruled upon and determined by the Utah Supreme Court.  *See e.g., Gillmor v. Fam. Link, LLC*, 2012 UT 38, 284 P.3d 622 (holding claim preclusion did not apply where a first case was litigated based on private use of a road but the second case was based on use by the general public – because of the difference in underlying facts and legal theories).

Mulligans therefore object to inclusion of the collateral estoppel type language which Alum Rock seeks to inject into paragraph 5 of Alum Rock's Alternative Proposed Order

regarding unspecified "other prior trial court final decisions"; it is not consistent with what the

Court ruled at the Hearing, it is vague and unspecified, and it is inconsistent with governing law.

Mulligans dispute the entirety of point No. 3. in the Objection.  Mulligans acknowledge

that at the Hearing this Court stated it was <u>not ruling anything</u> with regard to any hypothetical

potential future notice of sale which Alum Rock might attempt to issue.  But that is different than

Alum Rock's claim in point No. 3. in the Objection, which purports to state that the Court

somehow affirmatively and expressly gave Alum Rock permission to re-notice a sale.  The Court

cannot, did not do, and should not render any such advance advisory opinion purporting to

authorize some non-existent potential future notice of sale, entirely sight unseen.  As noted above

in regard to point No. 1. in the Objection, the parties agree that this Court determined at the

Hearing that further proceedings must be held to determine the nature and extent of the interests

of Brett Del Valle in the Property for application of Utah Code Section 75-7-505(1) to determine

therefore what extent of interest in the Property, if any, may therefore be reached by Alum Rock

as a creditor of Brett Del Valle.  Unless and until such further proceedings have been held and

such further determination has been reached by the Court, this Court cannot, and it did not,

prejudge whether any particular but as-yet unseen and purely hypothetical form of notice by

Alum Rock might theoretically conform to the requirements and limitations of Utah Code

Section 75-7-505(1).

Mulligans, therefore, object to the language proposed as paragraph 6 in Alum Rock's

Alternate Proposed Order stating that "Alum Rock may re-notice a sheriff's sale".  In addition to

the above-stated legal issues and problems with any such un-made advisory opinion, Alum

Rock's own paragraph 6 language itself highlights the myriad practical problems that such an

advisory opinion would create – stating, with emphasis added here, "…only the interests of Brett

Del Valle are being sold, <u>whatever that interest may be</u>."  In other words, unless and until the

4

further proceedings admittedly required in this case have been held, and until the further

determination admittedly required in this case based on such further proceedings is then made,

nobody – not Alum Rock itself, nor any hypothetical potential bidder at any attempted sale by

Alum Rock – would have any way to know what they would be bidding on or buying.

"Whatever that interest may be" might even ultimately mean no interest at all – as was shown

and argued by Mulligans at the Hearing.[1]  The Court did not and should not pre-ordain and pre-

authorize Alum Rock to re-notice a sale of "whatever [Brett Del Valle's] interest might be" until

---

[1] Allowing Alum Rock to inject this advance permission language by way of an impermissible advisory
ruling like that would also be bad public policy and would merely invite further litigation and
complications into this already complicated matter.  If Alum Rock were to proceed with a new/amended
notice of sale, and even if that sale was not then restrained on a further motion in light of the various
issues discussed in this response, for example, it is exceedingly unlikely that anybody would come to bid
at the sale because there are lis pendens recorded on the property giving notice of various lawsuits
pending as to the property – including in particular the lis pendens pertaining to this above-captioned
case, in which the Court confirmed at the Hearing that any sale could only be as to Brett's "contribution"
interest in the property – which the Court further confirmed at the Hearing is as yet unascertained and
must be the subject of ongoing litigation.  Nobody is going to come to bid at any foreclosure sale
(artificially, therefore, deflating the bidding to everyone's detriment) where they would be buying an
unknown "contribution" interest in the property, which can only become known after ongoing litigation;
nobody, in other words, is likely to bid where bidding would merely buy their way into the middle of this
lawsuit.  And even if someone did come to bid – then what?  Would they get a Certificate of Sale of some
wholly unknown "contribution" interest of Brett Del Valle in the Property?  Would they get a Sheriff's
Deed in 180 days also of some wholly unknown "contribution" interest of Brett Del Valle in the
Property?  Would that make the purchaser a tenant-in-common with the Mulligans?  With what rights,
exactly?  And what if the ongoing litigation eventually establishes that Brett Del Valle had no
"contribution" interest in the Property whatsoever?  What would have to be done to unwind that Sheriff's
Sale and/or undo whatever actions any such purchaser of an unknown interest may have attempted to take
as against the Mulligans in the meantime before being declared to have purchased no interest whatsoever
in the Property?

      All of the above is compounded (making it all the less likely that anyone would come to bid at
any new/amended notice of sale even if one was pre-authorized by an advisory opinion of this Court, and
making it all the more inadvisable for Alum Rock to rush to a new/amended notice of sale or even to
credit bid at one) by the equitable subrogation and equitable subordination claims that are part of this case
– of which the Mulligans' lis pendens also provides notice.  Even if it was ultimately determined,
therefore, that Brett Del Valle had any "contribution" interest in the Property, however slight, that could
be sold at a newly-noticed sheriff's sale, Alum Rock's judgment/writ interest may and should be
equitably subordinated to, and Mulligans should be equitably subrogated to, the priority of liens which
Mulligans' purchase proceeds paid off as was shown during the Hearing.  Even if any "contribution"
interest was subject to purchase, therefore, there still would be significant practical problems and issues
with exactly what that means unless and until the equitable subrogation and equitable subordination
claims are litigated and ruled upon as well.

Brett Del Valle's interest is indeed actually ascertained and ruled upon, as Alum Rock itself admits this Court actually did rule at the Hearing is required.

For all of the foregoing reasons, Alum Rock's Objection is without merit, and Alum Rock's Alternate Proposed Order is inconsistent with this Court's actual oral rulings made from the bench at the Hearing and is flawed.  For all of the foregoing reasons, therefore, this Court should overrule Alum Rock's Objection, should reject Alum Rock's Alternate Proposed Order, and should enter the Mulligans Proposed Order as it was originally served and as it is therefore being filed concurrently herewith (except, potentially, adding to it paragraph 4 from Alum Rock's Alternate Proposed Order, and potentially also the part of paragraph 5 from Alum Rock's Alternate Proposed Order regarding the Utah Supreme Court rulings as discussed hereinabove).

Dated January 23, 2025.

FREEMAN LOVELL, PLLC

*/s/ Bradley L. Tilt*
Bradley L. Tilt
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 23, 2025 I caused true and correct copies of this **RESPONSE TO *OBJECTION TO PROPOSED ORDER AND PRELIMINARY INJUNCTION*** to be served in the manner indicated below to the following-listed parties at their respective addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JOHNSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, UT 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside, LLC* | _____Hand Delivery<br>_____First Class, United States Mail,<br>Postage Prepaid<br>__X__ E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>_____Email<br>_____Other: _____ |
| Felicia B. Canfield<br>Canfield Law LLC<br>2413 Newton Avenue<br>Cody, WY 82414<br>canfieldlawllc@gmail.com<br>*Attorneys for Plaintiffs* | _____Hand Delivery<br>_____First Class, United States Mail,<br>Postage Prepaid<br>__X__ E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>_____Email<br>_____Other: _____ |

*/s/ Bradley L. Tilt*

Bradley L. (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

**IN THE SECOND DISTRICT COURT IN AND FOR
WEBER COUNTY, STATE OF UTAH**

| | |
|---|---|
| MOLLY J. MULLIGAN; and<br>JOHN P. MULLIGAN,<br><br>       Plaintiffs<br><br>    v.<br><br>ALUM ROCK RIVERSIDE, LLC, a<br>California limited liability company; Brett H.<br>Del Valle and Traci M. Del Valle as Co-<br>Trustees of the Del Valle Family Trust dated<br>October 30, 2002<br><br>      Defendants. | **REQUEST TO SUBMIT FOR DECISION**<br>***ORDER AND PRELIMINARY<br>INJUNCTION***<br><br><br>Case No. 240908957<br><br>Judge Noel S. Hyde |

Plaintiffs Molly J. Mulligan and John P. Mulligan ("**Mulligans**"), on January 15, 2025,

served their proposed *Order and Preliminary Injunction* herein following a preliminary

injunction hearing held in this case the day prior ("**Mulligans' Proposed Order**").

Defendant Alum Rock Riverside, LLC ("**Alum Rock**"), on January 22, 2025, filed an

*Objection to Proposed Order and Preliminary Injunction* (the "**Objection**"), which included as

Exhibit 2 to it proposed redlines to Mulligans' Proposed Order, and as Exhibit 3 to it an alternate

order proposed by Alum Rock ("**Alum Rock's Alternate Proposed Order**") which included/accepted Alum Rock's proposed redlines shown in its Exhibit 2.

Pursuant to Rule 7(j)(5)(C) of the Utah Rules of Civil Procedure, Mulligans are concurrently herewith filing with the Court the Mulligans' Proposed Order as originally drafted and served (save for fixing typos that were in the Certificate of Service thereof).

Further pursuant to that Rule, Mulligans also concurrently herewith are filing their Response to Objection to Proposed Order and Preliminary Injunction ("**Mulligans' Response**").

All permitted briefing with respect to Mulligans' Proposed Order is now completed. Mulligans therefore hereby respectfully request the Clerk of the Court to submit all of the above-defined items to the Court for decision.

Dated January 23, 2025.

FREEMAN LOVELL, PLLC

 */s/ Bradley L. Tilt*
Bradley L. Tilt
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on January 23, 2025 I caused true and correct copies of this **REQUEST TO SUBMIT FOR DECISION** *ORDER AND PRELIMINARY INJUNCTION* to be served in the manner indicated below to the following-listed parties at their respective addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JOHNSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, UT 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside, LLC* | _____Hand Delivery<br>_____First Class, United States Mail,<br>    Postage Prepaid<br>\_\_X\_\_\_E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>_____Email<br>_____Other: _____ |
| Felicia B. Canfield<br>Canfield Law LLC<br>2413 Newton Avenue<br>Cody, WY 82414<br>canfieldlawllc@gmail.com<br>*Attorneys for Plaintiffs* | _____Hand Delivery<br>_____First Class, United States Mail,<br>    Postage Prepaid<br>\_\_X\_\_\_E-filing via GreenFiling<br>_____E-filing via CM/ECF<br>_____Email<br>_____Other: _____ |

            */s/ Bradley L. Tilt*

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

**Tax ID No. 20-119-0007**

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN,<br><br>    Plaintiffs<br><br>v.<br><br>ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002<br><br>    Defendants. | **ORDER AND PRELIMINARY INJUNCTION**<br><br><br>Case No. 240908957<br><br>Judge Noel S. Hyde |

The request of Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively, "**Plaintiffs**"

or "**Mulligans**") for issuance of a preliminary injunction that was included in and part of the

Mulligans' *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary Restraining Order and*

*Preliminary Injunction* (the "**Preliminary Injunction Motion**") filed on December 23, 2024

came on for hearing before the above-named Court, the Honorable Judge Noel S. Hyde

presiding, at 10:00 a.m. on January 14, 2025 (the "**Hearing**").  Mulligans were represented at the

Hearing by Bradley L. Tilt, of Freeman Lovell, PLLC.  Defendant Alum Rock Riverside, LLC

("**Defendant**" or "**Alum Rock**") was represented at the Hearing by Benjamin D. Johnson, of

Bennett, Tueller, Johnson & Deere.

The Court having reviewed Mulligans' Preliminary Injunction Motion and the *Declaration

of Felicia B. Canfield* in support, and all exhibits thereto, that was filed concurrently with the

Preliminary Injunction Motion, having reviewed the *Objection to Order Granting Ex Parte

Motion for Issuance of a Temporary Restraining Order and Preliminary Injunction* filed by

Alum Rock on December 26, 2024 and the Alum Rock's further *Opposition to Plaintiffs' Motion

for Temporary Restraining Order and Preliminary Injunction* filed on January 10, 2025 and the

exhibits thereto (collectively, "**Alum Rock's Oppositions**"), having further heard the testimony

provided at the Hearing, and reviewed Exhibit 1 tabs 1 through 15 which all were presented at

and admitted into evidence during the Hearing, having reviewed all other applicable pleadings

and papers on file herein, and the Court having heard the oral argument of the Mulligans' and of

Alum Rock's respective legal counsel of record presented during the Hearing, the Court being

duly informed in the premises, and for good cause shown, and the Court having issued its ruling

orally from the bench at the conclusion of the Hearing,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1.      Plaintiffs' Preliminary Injunction Motion is granted.

2.      Alum Rock, and anyone acting by, with, or through Alum Rock, is **HEREBY

ENJOINED** from continuing with, allowing, and/or holding and is **ORDERED TO CANCEL**

the Sheriff's Sale scheduled for January 16, 2025 at 12:00 p.m. and/or for January 21, at 12:00

p.m., and/or any other Sheriff's Sale that may presently be scheduled pursuant the *Notice of

*Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, Civil

No. 206927043, which Notice was recorded in the office and general records of the Weber

County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**") and/or to

the *Writ of Execution* issued on June 22, 2021 in the writ proceeding in that above-referenced

Civil No. 206927043 (the "**Writ of Execution**"), on or affecting the real property located in

Weber County, Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317,

more particularly described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT,
> according to the official plat thereof on file and of record in the office of the Weber
> County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across
> Basinview Road (a private road), as shown on the official dedicated plat, to and from
> said Lot to a physically open and legally dedicated public street.
>
> Tax ID No. 20-119-0007

3.      Defendant Alum Rock is further **RESTRAINED** from and **ORDERED** to

immediately **CEASE** any and all efforts to foreclose on and/or sell the Property pursuant to the

Alum Rock Lien or the Writ of Execution pending any further contrary order of this Court.

4.      **NO BOND** not any other security shall be required for the issuance of this

preliminary injunction.

5.      Copies of this **ORDER AND PRELIMINARY INJUNCTION** may be recorded

in the office of the Weber County Recorder in the State of Utah.

   The GROUNDS for this *Order and Preliminary Injunction* are as follows:

   Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or

"**Plaintiffs**") each are individual owners of record of the Property and the home thereon,

3

pursuant to a *Warranty Deed* that was recorded on May 11, 2021 as Entry No. 3151874 in the

official records of the Weber County Recorder's office (the "**Warranty Deed**").

Plaintiffs have demonstrated that based on the material facts and the applicable statutory

and case law that they meet each of the four Rule 65A elements necessary to obtain a

preliminary injunction as stated hereinabove.  Plaintiffs have demonstrated that: (1) there is a

substantial likelihood that Plaintiffs will prevail on the merits of their underlying claims; (2)

Plaintiffs will suffer irreparable harm by the loss of their Property, which Utah law recognizes to

be unique and irreplaceable, unless this Court issues a preliminary injunction as stated

hereinabove; (3) the threatened injury to Plaintiffs outweighs whatever damage the preliminary

injunction may cause Defendant; and (4) this Court's issuance of the preliminary injunction

stated hereinabove benefit the public interest and is not adverse to it.

Defendant did not prove at the hearing any potential loss of value of the Property nor of

any damages that Defendant might incur, and/or in what amount, that would necessitate any

bond or other security to be posted for this preliminary injunction.

Notwithstanding the foregoing, and without limitation of any kind upon any of the

foregoing, the Court further states and clarifies that its oral ruling from the bench during the

Hearing, and its above-stated written order, are not any actual and/or final ruling upon any of the

merits of any of the parties' underlying claims and/or defenses herein.  The Court's oral ruling

from the bench at the Hearing, and this above-captioned order, are exclusively and only on and

for the preliminary injunction as stated hereinabove, and nothing more.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***

4

## SERVICE CERTIFICATE

I certify that on January 15, 2025, I caused a true and correct copy of the foregoing **ORDER AND PRELIMINARY INJUNCTION** to be served in the manner indicated to the following parties at the addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson<br>KC Hooker<br>BENNETT TUELLER JOHNSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, UT 84121<br>ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside, LLC* | _____ Hand Delivery<br>_____ First Class, United States Mail, Postage Prepaid<br>_____ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>__X__ Email<br>_____ Other:_____ |
| Felicia B. Canfield<br>Canfield Law LLC<br>2413 Newton Avenue<br>Cody, WY 82414<br>canfieldlawllc@gmail.com<br>*Attorneys for Plaintiffs* | _____ Hand Delivery<br>_____ First Class, United States Mail, Postage Prepaid<br>_____ E-filing via GreenFiling<br>_____ E-filing via CM/ECF<br>__X__ Email<br>_____ Other:_____ |

_/s/ Bradley L. Tilt_____

Bradley L. Tilt

5

Benjamin D. Johnson (10275)
KC Hooker (18018)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Email: ben.johnson@btjd.com;
kchooker@btjd.com
*Attorneys for Defendant Alum Rock Riverside, LLC*

---

**IN THE SECOND JUDICIAL DISTRICT COURT, ODGEN
WEBER COUNTY, STATE OF UTAH**

---

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br>      Plaintiffs, <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; BRETT H. DEL VALLE and TRACI M. DEL VALLE as Co-Trustees of the Del Valle Family Trust dated October 30, 2002, <br><br>      Defendants. | **REQUEST TO SUBMIT FOR DECISION** <br><br> (Order and Preliminary Injunction) <br><br> Case No. 240908957 <br><br> Judge: Noel S. Hyde <br><br> **HEARING REQUESTED** |

---

Defendant Alum Rock Riverside, LLC ("***Alum Rock***"), by and through counsel and

pursuant to Rule 7(g) of the Utah Rules of Civil Procedure, hereby requests to submit for

decision the Order and Preliminary Injunction. This request is based on the following:

1. Defendant Alum Rock filed an objection to the proposed order on the Motion

   for Temporary Restraining Order and Preliminary Injunction on January 22, 2025.

2. Plaintiff responded to Defendant's objection on January 23, 2025 and submitted a proposed order. No other briefings are anticipated or allowed under the Rules. Defendant requests a hearing.

DATED this 23rd day of January, 2025.

BENNETT TUELLER JOHNSON & DEERE

/s/  *Benjamin D. Johnson*
Benjamin D. Johnson
KC Hooker
*Attorneys for Defendant Alum Rock Riverside, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January, 2025, a true and correct copy of the

**REQUEST TO SUBMIT FOR DECISION** was served Green Filing on the following:

Bradley L. Tilt
FREEMAN LOVELL, PLLC
4568 S. Highland Drive, Suite 290
Salt Lake City, UT 84117
bradley.tilt@freemanlovell.com
Attorneys for Plaintiff

Felicia B. Canfield
CANFIELD LAW LLC
2413 Newton Ave
Cody, WY 82414
canfieldlawllc@gmail.com
Attorneys for Plaintiff

*Holly Van Leeuwen*