# EXHIBIT  1

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

---

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **DECLARATION OF FELICIA B. CANFIELD** <br><br> Case No. 1:25-cv-00008-DA <br><br> Assigned Judge: Dale A. Kimball <br><br> Referred Magistrate Judge: Cecilia M. Romero |

I, FELICIA B. CANFIELD, declare and state as follows:

1.      I am over the age of 18 years, and I have personal knowledge of and am fully

competent to testify as to all matters stated herein.  I am an attorney duly licensed to practice

law in the State of Utah, and represent Plaintiffs in this matter.  I am familiar with the contents

of all documents referenced herein.

2.      My law practice since 2003 has included and focused primarily upon real

property related matters.  I am familiar with searching real property titles in counties located

throughout the state of Utah and in reading and interpreting documents recorded on county

records regarding real properties in counties throughout the State of Utah.  I am also familiar

with searching and obtaining documents from Utah state courts through XChange, and federal

district courts and bankruptcy courts located in Utah through PACER.

3.      I am familiar with and have been involved in this action since its inception, when

on December 20, 2024 I caused to be filed a *Complaint and Jury Demand* on behalf of Plaintiffs

in the Second Judicial District Court, In and For Weber County, State of Utah, as Civil No.

240908957.

4.      The real property which is the subject of this action is located in Weber County,

State of Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more

particularly described as follows (the "**Property**"):

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT,
according to the official plat thereof on file and of record in the office of the Weber
County Recorder.

Together with a right of use for an easement for ingress and egress over and across
Basinview Road (a private road), as shown on the official dedicated plat, to and from
said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

5.      The Exhibits attached hereto, corresponding to those of the subparagraphs

immediately below, are and consist of the following:

A.    *Warranty Deed* from Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of the Del Valle Family Trust dated October 20, 2002, as grantor, to the Mulligans, as joint tenants, as grantee, which was recorded on May 11, 2021 as Entry No. 3151874 in the official records of the Weber County Recorder's office (the "**Warranty Deed**");

B.    Deed of Trust that was recorded on the Property on August 2, 2021 as Entry No. 3172556 (the "**Mulligans' Trust Deed**");

C.    *RESPA Deed of Trust* recorded on the Property on September 20, 2017, as Entry No. 2879566 (the "**First Position Trust Deed**") and its reconveyance; *Deed of Trust with Assignment of Rents* recorded on July 6, 2020, as Entry No. 3066407 (the "**Second Position Trust Deed**") and its reconveyance; posting summary showing delinquent property taxes paid in the amount of $46,248.89 for tax years 2018-2020 (the "**Delinquent Property Taxes**"); posting summary showing delinquent homeowner association dues paid in the amount of $2,125.00 (the "**Delinquent HOA Dues**");

D.    Property Abstract and Weber County Judgment Index;

E.    *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770, based on subject foreign judgment (the "**Alum Rock Lien**").

F.    *Writ of Execution* issued June 22, 2021, in Civil No. 206927043, Third District Court, Salt Lake County (the "**Writ of Execution**");

G.    *Mulligan v. Alum Rock Riverside, LLC*, 2024 UT 22;

H.    Utah Code Section 75-7-505;

3

**I.**     *Special Warranty Deed* by which the Trust obtained title to the Property, recorded on May 3, 2007 as Entry No. 2261271 in the official records of the Weber County Recorder's office (the "**Special Warranty Deed**");

**J.**     Utah Code Section 57-3-102; and,

**K.**     *Complaint and Jury Demand*, as Civil No. 240908957, in the Second Judicial District Court for the State of Utah.

**L.**     *Temporary Restraining Order* issued on June 9, 2025 in Civil No. 240908957, in the Second Judicial District Court for the State of Utah.

**M.**     *Lis Pendens* recorded on the Property on December 23, 2024 as Entry No. 3352068 in the official records of the Weber County Recorder.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 13, 2025.

CANFIELD LAW LLC

        */s/ Felicia B. Canfield*
Felicia B. Canfield
*Attorneys for Plaintiffs*

# EXHIBIT A

*W3151874*

Mail Tax notice to:
Grantee
51 Chestnut Avenue
Clarendon Hills, IL 60514
MNT File No.: 49967
Tax ID No.: 20-119-0007

E# **3151874**   PG 1 OF 3
Leann H. Kilts, WEBER COUNTY RECORDER
11-May-21   1215 PM      FEE $40.00 DEP DA(
REC FOR: METRO NATIONAL TITLE
ELECTRONICALLY RECORDED

## WARRANTY DEED

Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of the Del Valle Family Trust dated October 30, 2002

**GRANTOR** of Newport Beach, State of California, hereby CONVEYS and WARRANTS TO:

Molly J. Mulligan and John P. Mulligan, wife and husband, as joint tenants

**GRANTEE** of 51 Chestnut Avenue, Clarendon Hills, IL 60514 for the sum of TEN AND 00/100'S DOLLARS AND OTHER GOOD AND VALUABLE CONSIDERATION, the following described tract of land in Weber County, State of Utah:

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

**SUBJECT TO:** County and/or City Taxes not delinquent; Bonds and/or Special Assessments not delinquent and Covenants, Conditions, Restrictions, Rights-of-Way, Easements, Leases and Reservations now of Record.

**M0057**

E# 3151874   PG 2 OF 3

**WITNESS**, the hand(s) of said grantor(s), May _10_ 2021,

_(signature)_

Brett H. Del Valle, Co-Trustee of the Del Valle
Family Trust dated October 30, 2002

_(signature)_

Traci M. Del Valle, Co-Trustee of the Del Valle
Family Trust dated October 30, 2002

State of _CALIFORNIA_____, County of _ORANGE_____ )ss:

On _MAY 10ᵗʰ 2021___ personally appeared before me Brett H. Del Valle and Traci M. Del Valle, who upon being duly sworn (or affirmed) upon oath that they did sign the foregoing instrument with authority as granted in the capacity as Co-Trustees of the Del Valle Family Trust dated October 30, 2002, and that the said Brett H. Del Valle and Traci M. Del Valle, duly acknowledged to me that they executed the same.

– _Please see Attached_ –
Notary Public

Warranty Deed                                                                                 Page 2

E# 3151874    PG 3 OF 3

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of ORANGE )

On MAY 10th 2021 _____ before me, Chavon Kane, NOTARY PUBLIC _____
  *Date*                                        *Here Insert Name and Title of the Officer*

personally appeared BRETT H. DEL VALLE AND
  _____ TRACI M. DEL VALLE _____
                          *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

CHAVON KANE
COMM...2213310
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. October 5, 2021

Signature _____
           *Signature of Notary Public*

*Place Notary Seal Above*

―――――――――――――――― **OPTIONAL** ――――――――――――――――

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: WARRANTY DEED _____ Document Date: _____

Number of Pages: 2 ___ Signer(s) Other Than Named Above: NONE _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual       ☐ Attorney in Fact
☐ Trustee       ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual       ☐ Attorney in Fact
☐ Trustee       ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

**M0059**

# EXHIBIT B

*W3172556*

After Recording Return To:
**Morgan Stanley Private Bank,
National Association
4270 Ivy Pointe Blvd., Suite 400
Cincinnati, OH 45245**

E# **3172556**  PG 1 OF 25
Leann H. Kilts, WEBER COUNTY RECORDER
02-Aug-21  1105 AM        FEE $40.00 DEP DAC
REC FOR: METRO NATIONAL TITLE
ELECTRONICALLY RECORDED

Prepared By:
**Morgan Stanley Private Bank,
National Association
4270 Ivy Pointe Blvd, Suite 400
Cincinnati, OH 45245**


8635wmNT

[Space Above This Line For Recording Data]

# DEED OF TRUST

MIN: **1002628-6009077190-6**
Loan #: **6009077190**

Parcel Number: **20-119-0007**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**    **"Security Instrument"** means this document, which is dated **July 30, 2021**, together with all Riders to this document.
**(B)**    **"Borrower"** is **Molly J. Mulligan and John P. Mulligan, wife and husband, as joint tenants**. Borrower is the trustor under this Security Instrument.
**(C)**    **"Lender"** is **Morgan Stanley Private Bank, National Association**. Lender is a **National Bank** organized and existing under the laws of **The United States of America**. Lender's address is **4270 Ivy Pointe Blvd, Suite 400, Cincinnati, OH 45245**.
**(D)**    **"Trustee"** is **METRO NATIONAL TITLE, 345 E. BROADWAY, SALT LAKE CITY, UT 84111**.
**(E)**    **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)**    **"Note"** means the promissory note signed by Borrower and dated **July 30, 2021** .  The Note states that Borrower owes Lender **ONE MILLION ONE HUNDRED SEVENTY THOUSAND AND NO/100** Dollars (U.S. $ **1,170,000.00**) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  **September 01, 2051**.
**(G)**    **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H)**    **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late



**UTAH**—Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  © 3044 01/14



**Form 3045 1/01** *(page 1 of 14 pages,*

charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider  [ ] Condominium Rider  [X] Second Home Rider
[ ] Balloon Rider  [X] Planned Unit Development Rider  [ ] VA Riders
[ ] 1-4 Family Rider  [ ] Biweekly Payment Rider  [ ] Other(s) [specify]

**(J)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** **"Escrow Items"** means those items that are described in Section 3.

**(N)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, conveys and warrants to Trustee, in trust, with power of sale, the following described property located in the **COUNTY** of **WEBER**:





UTAH--Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  © 3044 01/14

Form 3045 1/01 *(page 2 of 14 pages,*

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.**

which currently has the address of **1453 Basinview Rd**, **Huntsville**, Utah **84317** ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant, convey and warrant the Property and that the Property is unencumbered, except for encumbrances of record. Borrower further warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.  Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all



UTAH--Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  © 3044 01/14



Form 3045  1/01  *(page 3 of 14 pages,*

payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds,



UTAH—Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  © 3044 01/14



**Form 3045 1/01** *(page 4 of 14 pages,*

annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk,





hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall





promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately





designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or





earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any





UTAH--Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  © 3044 01/14

Form 3045 1/01 *(page 9 of 14 pages,*

Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable



UTAH--Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
Mortgage Cadence Document Center © 3044 01/14



**Form 3045 1/01** *(page 10 of 14 pages,*

Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address



UTAH–Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Mortgage Cadence Document Center  © 3044 01/14



Form 3045  1/01  *(page 11 of 14 pages,*

of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.    Hazardous Substances.**  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of  (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge,  (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice**



UTAH--Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  © 3044 01/14



Form 3045  1/01  *(page 12 of 14 pages,*

shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the power of sale is invoked, Trustee shall execute a written notice of the occurrence of an event of default and of the election to cause the Property to be sold and shall record such notice in each county in which any part of the Property is located. Lender or Trustee shall mail copies of such notice in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. In the event Borrower does not cure the default within the period then prescribed by Applicable Law, Trustee shall give public notice of the sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines (but subject to any statutory right of Borrower to direct the order in which the Property, if consisting of several known lots or parcels, shall be sold). Trustee may in accordance with Applicable Law, postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county clerk of the county in which the sale took place.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.



UTAH–Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Mortgage Cadence Document Center © 3044 01/14



Form 3045  1/01  *(page 13 of 14 pages,*

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)        _____ (Seal)
Borrower - **John P. Mulligan**                        Borrower - **Molly J. Mulligan**

[Space Below This Line for Acknowledgement]
_____

State of ~~Utah~~ IL
§

County of _Du Page_ )

On this _30_ day of _July_, in the year 20_21_, before me, _Elisabeth R Tully_ a notary public, personally appeared _John Mulligan + Molly Mulligan_ proved on the basis of satisfactory evidence to be the person(s) whose name(s) (is/are) subscribed to in this document, and acknowledged (he/she/they) executed the same.

Witness my hand and official seal.

_Elisabeth R. Tully_
(notary signature)

> ELISABETH RUTH TULLY
> Official Seal
> Notary Public - State of Illinois
> My Commission Expires Jul 16, 2023

(seal)

Origination Company: **Morgan Stanley Private Bank, National Association**
      NMLSR ID: **663185**
Originator: **Ron Webb**
      NMLSR ID: **1103761**





UTAH–Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  © 3044 01/14

Form 3045  1/01  (page 14 of 14 pages,

Exhibit "A"

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

MIN: **1002628-6009077190-6**                                    Loan #: **6009077190**

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **30th** day of **July, 2021**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **Morgan Stanley Private Bank, National Association** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**1453 Basinview Rd, Huntsville, UT 84317**
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in THE COVENANTS, CONDITIONS AND RESTRICTIONS FILED OF RECORD THAT AFFECT THE PROPERTY (the "Declaration"). The Property is a part of a planned unit development known as:

**Basinview Estates Cluster Subdivision**
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including





MULTISTATE PUD RIDER–Single Family–**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    **Form 3150 1/01**
Mortgage Cadence Document Center © 3204 01/14                                                                                (page 1 of 3 pages)

deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C.  Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D.  Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E.  Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F.  Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.







**MULTISTATE PUD RIDER**-Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  © 3204 01/14

Form 3150 1/01
*(page 2 of 3 pages)*

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)        _____ (Seal)
Borrower - **John P. Mulligan**                Borrower - **Molly J. Mulligan**

Origination Company: **Morgan Stanley Private Bank, National Association**
    NMLSR ID: **663185**
Originator: **Ron Webb**
    NMLSR ID: **1103761**





**MULTISTATE PUD RIDER**–Single Family–**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Mortgage Cadence Document Center  © 3204 01/14

**Form 3150 1/01**
*(page 3 of 3 pages)*

MIN: **1002628-6009077190-6**

Loan #: **6009077190**

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made this **30th** day of **July, 2021**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to **Morgan Stanley Private Bank, National Association** (the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at:

**1453 Basinview Rd, Huntsville, UT 84317**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower will occupy and use the Property as Borrower's second home. Borrower will maintain exclusive control over the occupancy of the Property, including short-term rentals, and will not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property. Borrower will keep the Property available primarily as a residence for Borrower's personal use and enjoyment for at least one year after the date of this Second Home Rider, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.





MULTISTATE SECOND HOME RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3890 1/01 (rev. 4/19)
Mortgage Cadence Document Center  © 3221 04/19                                                                                    *(page 1 of 2)*

E# 3172556   PG 20 OF 25

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.

 _____ (Seal)
Borrower - **John P. Mulligan**

 _____ (Seal)
Borrower - **Molly J. Mulligan**

Origination Company: **Morgan Stanley Private Bank, National Association**
    NMLSR ID: **663185**
Originator: **Ron Webb**
    NMLSR ID: **1103761**

‖ *6 0 0 9 0 7 7 1 9 0 * ‖     ‖ *M C 2 N D H M R D R * ‖

MULTISTATE SECOND HOME RIDER—Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3890 1/01 (rev. 4/19)
Mortgage Cadence Document Center  © 3221 04/19                                              *(page 2 of 2)*

MIN: **1002628-6009077190-6**                                        Loan #: **6009077190**

# FIXED/ADJUSTABLE RATE RIDER

**(30-day Average SOFR Index (As Published by the Federal Reserve Bank of New York)–Rate Caps–Ten-Year Interest Only Period)**

THIS FIXED/ADJUSTABLE RATE RIDER is made this **30th** day of **July, 2021**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **Morgan Stanley Private Bank, National Association** ("Lender") of the same date and covering the property described in the Security Instrument and located at:

**1453 Basinview Rd, Huntsville, UT 84317**
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial fixed interest rate of **2.450%**. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)    Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **September, 2031**, and the adjustable interest rate I will pay may change on that day every 6th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each

FIXED/ADJUSTABLE RATE RIDER-30-day Average SOFR Index
Ten-Year Interest Only Period-Single Family
Mortgage Cadence Document Center  © 13089 08/20

2/06

(page 1 of 5)

date on which my adjustable interest rate could change, is called a "Change Date."

**(B)    The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the "Administrator"). The "Index" is a benchmark, known as the 30-day Average SOFR index. The Index is currently published by the Federal Reserve Bank of New York. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(H) below.

**(C)    Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **THREE AND NO/1000** percentage points (**3.000**%) (the "Margin") to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(H)(2) below. The Note Holder will then round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D)    Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.450**% or less than **3.000**%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than ONE AND NO/1000 percentage points (1.000%) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than **7.450**% or less than **3.000**%.

**(E)    Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.



FIXED/ADJUSTABLE RATE RIDER-30-day Average SOFR Index
Ten-Year Interest Only Period-Single Family
Mortgage Cadence Document Center  © 13089 08/20



2/06

(page 2 of 5)

**(F)**  **Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G)**  **Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

**(H)**  **Replacement Index and Replacement Margin**

The Index is deemed to be no longer available and will be replaced if any of the following events (each, a "Replacement Event") occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the "Replacement Index") and may also select a new margin (the "Replacement Margin"), as follows:

> (1) If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.
>
> (2) If a replacement index has not been selected or recommended for use in consumer products under Section (H)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and monthly payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

**B.**  **TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1.  Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the



FIXED/ADJUSTABLE RATE RIDER-30-day Average SOFR Index
Ten-Year Interest Only Period-Single Family
Mortgage Cadence Document Center  © 13089 08/20



2/06

(page 3 of 5)

terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the





FIXED/ADJUSTABLE RATE RIDER-30-day Average SOFR Index
Ten-Year Interest Only Period-Single Family
Mortgage Cadence Document Center  © 13089 08/20

2/06

(page 4 of 5)

transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.



_____ (Seal)
Borrower - **John P. Mulligan**



_____ (Seal)
Borrower - **Molly J. Mulligan**

Origination Company: **Morgan Stanley Private Bank, National Association**
   NMLSR ID: **663185**
Originator: **Ron Webb**
   NMLSR ID: **1103761**

FIXED/ADJUSTABLE RATE RIDER-30-day Average SOFR Index
Ten-Year Interest Only Period-Single Family
Mortgage Cadence Document Center © 13089 08/20

2/06

(page 5 of 5)

# EXHIBIT C

# FIRST POSITION TRUST DEED & RECONVEYANCE

|||||||||||||||||||||||||||||||||||||||||||||||||||
*W2879566*

After Recording Return To:
BOFI FEDERAL BANK
4350 LA JOLLA VILLAGE DRIVE, 140
SAN DIEGO, CALIFORNIA 92122
Loan Number: 70184957

E# **2879566** PG 1 OF 26
Leann H. Kilts, WEBER COUNTY RECORDER
20-Sep-17  0937 AM     FEE $40.00 DEP KL
REC FOR: SERVICELINK EAST ESCROW
ELECTRONICALLY RECORDED

Tax Serial No.: 20-119-0007

──────────────────── [Space Above This Line For Recording Data] ────────────────────

Record and Return To:
ServiceLink
1355 Cherrington Parkway
Moon Township, PA 15108

**RESPA**

**DEED OF TRUST**

#22533882

**MIN:** 1007359-0003391921-9                                   **MERS Phone: 888-679-6377**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)   "Security Instrument"** means this document, which is dated  SEPTEMBER 12, 2017          , together with all Riders to this document.
**(B)   "Borrower"** is   BRETT H DEL VALLE AND TRACI M DEL VALLE, TRUSTEES OF THE DEL VALLE FAMILY TRUST DATED OCTOBER 30,2002

Borrower is the trustor under this Security Instrument.
**(C)   "Lender"** is   BOFI FEDERAL BANK

Lender is a   FEDERALLY CHARTERED SAVINGS BANK                                    organized and existing under the laws of   CALIFORNIA
Lender's address is   4350 LA JOLLA VILLAGE DRIVE, 140, SAN DIEGO, CALIFORNIA 92122

**(D)   "Trustee"** is   GUARDIAN TITLE COMPANY OF UTAH
6975 UNION PARK CENTER, MIDVALE, UTAH 84047

**(E)   "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)   "Note"** means the promissory note signed by Borrower and dated  SEPTEMBER 12, 2017          .
The Note states that Borrower owes Lender   SEVEN HUNDRED FIFTY THOUSAND AND 00/100
                          Dollars (U.S. $ 750,000.00          ) plus interest.

DocMagic *EForms*
www.docmagic.com

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than OCTOBER 1, 2047                .

**(G)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)  "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)  "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| ☒ Adjustable Rate Rider | ☒ Planned Unit Development Rider |
| ☐ Balloon Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Second Home Rider |
| ☐ Condominium Rider | ☒ Other(s) [specify]  Accommodation Rider, Revocable Trust Rider |

**(J)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)  "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)  "Escrow Items"** means those items that are described in Section 3.

**(N)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)  "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)  "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)  "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, conveys and warrants to Trustee, in trust, with power of sale, the following described property located in the

|  COUNTY | of | WEBER | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 20-119-0007

which currently has the address of                          1453 BASINVIEW ROAD
                                                                    [Street]

                      HUNTSVILLE                   , Utah        84317        ("Property Address"):
                          [City]                                      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant, convey and warrant the Property and that the Property is unencumbered, except for encumbrances of record. Borrower further warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in

one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.

Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.  Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which

reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage

Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability

UTAH - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045  1/01                                        Page 9 of 15                                        DocMagic *eFarms*
www.docmagic.com

under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

UTAH - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045  1/01                              Page 11 of 15                              DocMagic *eFemms*
                                                                                      www.docmagic.com

**21. Hazardous Substances**. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If the power of sale is invoked, Trustee shall execute a written notice of the occurrence of an event of default and of the election to cause the Property to be sold and shall record such notice in each county in which any part of the Property is located. Lender or Trustee shall mail copies of such notice in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. In the event Borrower does not cure the default within the period then prescribed by Applicable Law, Trustee shall give public notice of the sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines (but subject to any statutory right of Borrower to direct the order in which the**

Property, if consisting of several known lots or parcels, shall be sold). Trustee may in accordance with Applicable Law, postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county clerk of the county in which the sale took place.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
BRETT H DEL VALLE, TRUSTEE    -Borrower
OF THE DEL VALLE FAMILY TRUST DATED
OCTOBER 30,2002

_____ (Seal)
TRACI M DEL VALLE, TRUSTEE    -Borrower
OF THE DEL VALLE FAMILY TRUST DATED
OCTOBER 30,2002

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

Witness:

_____

Witness:

_____

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

### CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )

County of _Orange_ )

On _September 13, 2017_ before me, _Jane E. Katnik, Notary Public_,
    *Date*                 *Here Insert Name and Title of the Officer*

personally appeared _Brett H. Delvalle_
_Traci M. Delvalle_,
                *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

**JANE E. KATNIK**
Commission # 2106588
Notary Public - California
Orange County
My Comm. Expires May 2, 2019

Signature _Jane E. Katnik_
           *Signature of Notary Public*

*Place Notary Seal Above*

─────────────── **OPTIONAL** ───────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _Deed of Trust_  Document Date: _9-13-17_
Number of Pages: _15_  Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)  Item #5907

———————————— [Space Below This Line For Acknowledgment] ————————————

State of __UTAH_____ )
                                  ) SS.
County of _WEBER_____ )

On this _____ day of _____ , in the year _____ , before me

_____ , a notary public,

personally appeared BRETT H DEL VALLE AND TRACI M DEL VALLE_____

_____

_____ ,

proved on the basis of satisfactory evidence to be the person(s) whose name(s) (is/are) subscribed to in this document, and acknowledged (he/she/they) executed the same.

_____
Notary Signature

My commission expires: _____

(Notary Seal)

Loan Originator: MELISSA R. WALLEN, NMLSR ID 1011004
Loan Originator Organization: BOFI FEDERAL BANK, NMLSR ID 524995

UTAH - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3045  1/01                        Page 15 of 15                    DocMagic eForms
                                                                        www.docmagic.com

MIN: 1007359-0003391921-9

# ACCOMMODATION RIDER

Loan Number: 70184957

THIS ACCOMMODATION RIDER is made this   12th  day of   SEPTEMBER, 2017                   ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Mortgagor") to
secure Borrower's Promissory Note (the "Note") to   BOFI FEDERAL BANK, A FEDERALLY
CHARTERED SAVINGS BANK                                              (the "Lender")
of the same date and covering the property described in the Security Instrument and located at:

1453 BASINVIEW ROAD, HUNTSVILLE, UTAH 84317

[Property Address]

Mortgagor acknowledges it is a   TRUST                                   and any reference in
[Trust/LLC/Partnership/Corporation]
Mortgage, Deed of Trust or Security Deed to an individual or borrower shall mean the
TRUST                          .
[Trust/LLC/Partnership/Corporation]

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security Instrument,
Mortgagor and Lender further covenant and agree as follows:

In exchange for a valuable and sufficient consideration, Mortgagors are executing the Security Instrument
and this Accommodation Rider to secure the above described Note. The Undersigned Mortgagors, without
affecting Lender's rights hereunder or the lien hereof, waives any right of notice or demand in the event
Lender, pursuant to the Note and this Security Instrument and any amendments thereto: (a) renews, extends,
accelerates or otherwise changes the terms of the indebtedness or any part thereof, including increases or
decreases of the rate of interest thereon; (b) takes and holds additional security for the payment of the
indebtedness guaranteed, and exchanges, enforces, waives and releases any security; (c) applies such security
and directs the order or manner of sale thereof as Lender in its discretion may determine; and (d) releases
or substitutes any one or more endorsers or guarantors. Lender may without notice assign this Security
Instrument in whole or in part.

ACCOMMODATION: The Security Instrument secures a Promissory Note executed by
BRETT H DEL VALLE, TRACI M DEL VALLE

collectively ("Borrower"), in favor of the Lender thereunder. Mortgagor is executing this Accommodation
Rider as an accommodation to Borrower and thereafter agrees as follows:

Mortgagor waives any right to require Lender to: (a) proceed against Borrower; (b) proceed against or
exhaust any security held from Borrower; or (c) pursue any other remedy in Lender's power whatsoever.
Lender may, at its election, foreclose upon any such security by judicial or non-judicial sale, without
affecting or impairing in any way the liability of Mortgagor hereunder except to the extent the indebtedness

DocMagic *eForms*
www.docmagic.com

has been paid, and Mortgagor waives any defense arising out of the absence, impairment or loss of any right or remedy of Mortgagor against Borrower, or any such security, whether resulting from such election by Lender or otherwise. Mortgagor waives any defense arising by reason of the cessation from any cause whatsoever of the liability of Borrower. Until all indebtedness of Borrower to Lender shall have been paid in full, even though such indebtedness is in excess of Mortgagor's liability hereunder, Mortgagor shall have no right of subrogation, and waives any right to enforce and remedy which Lender now has or may hereafter have against Borrower and waives any benefit of, and any right to participate in any security now or hereafter held by Lender. Mortgagor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of the Security Instrument and of the existence, creation or incurring of new or additional indebtedness. Mortgagor assumes the responsibility for being and keeping himself informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of the indebtedness which diligent inquiry would reveal, and agree that absent a request for such information by Mortgagor, Lender shall have no duty to advise Mortgagor of information know to it regarding such condition or any such circumstances.

BY SIGNING BELOW, Mortgagor accepts and agrees to the terms and covenants contained in this Accommodation Rider.

_____ (Seal)
BRETT H DEL VALLE,        -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
TRACI M DEL VALLE,        -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

DocMagic EForms
www.docmagic.com

# FIXED/ADJUSTABLE RATE RIDER

### (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this  12th  day of        SEPTEMBER    ,  2017    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to  BOFI FEDERAL BANK, A FEDERALLY CHARTERED SAVINGS BANK ("Lender") of the same date and covering the property described in the Security Instrument and located at:

1453 BASINVIEW ROAD, HUNTSVILLE, UTAH 84317
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.**  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.   ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of        4.750    %.  The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A)  Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of OCTOBER, 2024                        , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.  The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B)  The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*.  The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

---

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 250/1000 percentage points ( 3.250 %) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 10.750 % or less than 4.750 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 10.750 % or less than 4.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1.    Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.    When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if:  (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
BRETT H DEL VALLE,                -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
TRACI M DEL VALLE,                -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this        12th        day of
SEPTEMBER, 2017                    , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date,
given by the undersigned (the "Borrower") to secure Borrower's Note to  BOFI FEDERAL BANK, A
FEDERALLY CHARTERED SAVINGS BANK
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

1453 BASINVIEW ROAD, HUNTSVILLE, UTAH 84317
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other
such parcels and certain common areas and facilities, as described in
COVENANTS, CONDITIONS AND RESTRICTIONS OF RECORD

(the "Declaration").  The Property is a part of a planned unit development known as

BASINVIEW ESTATES
[Name of Planned Unit Development]

(the "PUD").  The Property also includes Borrower's interest in the homeowners association or equivalent
entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the
uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.**  In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

**A.  PUD Obligations.**  Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents.  The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation,
trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or
other rules or regulations of the Owners Association.  Borrower shall promptly pay, when due, all dues and
assessments imposed pursuant to the Constituent Documents.

**B.  Property Insurance.**  So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and

---

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                    Page 1 of 3

**DocMagic *eForms***
*www.docmagic.com*

which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
BRETT H DEL VALLE,                -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
TRACI M DEL VALLE,                -Borrower
TRUSTEE OF THE DEL VALLE FAMILY
TRUST DATED OCTOBER 30,2002

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

Loan #        : 3391921

# Exhibit A

LEGAL DESCRIPTION

The following described property:

All of Lot 7, Basinview Estates Cluster Subdivision 1st Amendment, Weber County, Utah, according to the Official Plat thereof.

Assessor's Parcel No:        20-119-0007



*W3160813*

AFTER RECORDING, RETURN TO:
First American Title Insurance Company
10011 S. Centennial Parkway #340
Sandy, UT 84070
Reference Number: 70184957



E# **3160813**   PG 1 OF 1
Leann H. Kilts, WEBER COUNTY RECORDER
14-Jun-21  0322 PM      FEE $40.00 DEP TN
REC FOR: FIRST AMERICAN TITLE
ELECTRONICALLY RECORDED

MERS MIN: 100735900033919219; 888-679-MERS

**FULL RECONVEYANCE**

First American Title Insurance Company, authorized to conduct business in the State of Utah, pursuant to a written request of the Beneficiary thereunder, does hereby reconvey, without warranty, to the person or persons entitled thereto, the trust property now held by it as Trustee under said Trust Deed, which Trust Deed covers real property situated in Weber County, State of Utah, described as follows:

Trustor(s):        Brett H Del Valle and Traci M Del Valle Trustees of The Del Valle Family Trust Dated October 30 2002
Beneficiary:    Mortgage Electronic Registration Systems, Inc. as nominee for Axos Bank Formerly Known As BofI Federal Bank, its successors and assigns
Recording Date:    9/20/2017  Entry #: 2879566  Book:N/A  Page: N/A
Legal Description:

All of Lot 7, Basinview Estates Cluster Subdivision 1st Amendment, Weber County, Utah, according to the Official Plat thereof.

Tax ID Number:  20-119-0007

In Witness Whereof, First American Title Insurance Company, as Trustee, has caused its Company name to be hereto affixed this 6/14/2021.

First American Title Insurance Company

By _____

Lori Whitehead, Authorized Agent

State of UT                      )
County of Salt Lake              )

On this 6/14/2021, personally appeared before me Lori Whitehead, who being duly sworn, did say that he is an Authorized Agent, and that said instrument was signed in behalf of said Company.

_____
Courtney Payne - Notary Public
Commission Number: 714517
Commission Expires: 10/5/2024

COURTNEY PAYNE
NOTARY PUBLIC - STATE OF UTAH
My Comm. Exp. 10/05/2024
Commission #714517

*W3066407*

Order No.                                              |

                                                       |              E# 3066407 PG 1 OF 10
                                                       |              LEANN H KILTS, WEBER COUNTY RECORDER
                                                       |              06-JUL-20  352  PM FEE $40.00 DEP PV
                                                       |              REC FOR: BRETT DEVALLE
**WHEN RECORDED MAIL TO:**                             |

                                                       |
Emerald Bay Capital Inc.                               |
1200 Estelle Lane                                      |
Newport Beach, CA 92660                                |

                                                       |
APN: 20-119-0007                                       |
                                      SPACE ABOVE THIS LINE FOR RECORDER'S USE

## DEED OF TRUST WITH ASSIGNMENT OF RENTS

This DEED OF TRUST WITH ASSIGNMENT OF RENTS, made effective as of Brett H. Del Valle (Trustee) and Traci M. Del Valle (Trustee) for the Del Valle Family Trust dated October 30, 2002 whose address is 417 29th Street , Newport Beach, CA 92663, is between TSS Enterprises Inc., a California Corporation, herein called TRUSTOR, whose address is *1200 Estelle Lane, Newport Beach, CA 92660*, *ORANGE COAST TITLE COMPANY*, herein called TRUSTEE; and , herein called BENEFICIARY, whose address is

WITNESSETH: That Trustor grants to Trustee in Trust, with Power of Sale, that property located in the County of Weber, State of Utah, described as:

### SEE EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY THIS REFERENCE

together with the rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits, for the purpose of securing (1) that certain Secured Promissory Note dated April 1, 2008, made by Trustor, as Maker, in favor of Beneficiary, as Holder; (2) the performance of each agreement of Trustor incorporated by reference or contained herein; and (3) the payment of additional sums and interest thereon which may hereafter be loaned to Trustor, or its successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust.

A.     To protect the security of this Deed of Trust, Trustor agrees:

       (1)     To keep said property in good condition and repair; not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general.

       (2)     If improvements are constructed on said property, to provide, maintain and deliver to Beneficiary fire insurance satisfactory to and with loss payable to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon any indebtedness secured

1

# SECOND POSITION TRUST DEED & RECONVEYANCE

and in such order as Beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(3)     To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed of Trust.

(4)     To pay: at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock; when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all costs, fees and expenses of this Trust.

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may: make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

(5)     To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

B.     It is mutually agreed:

(1)     That any award of damages in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him in the same manner and with the same effect as above provided for disposition of proceeds other insurance.

(2)     That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his right either to require prompt payment when due of all other sums so secured or to declare default for failure so to pay.

(3)     That at any time or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed of Trust, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof; join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge hereof.

(4)     That upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed of Trust to Trustee for cancellation and retention or other disposition as Trustee in its sole discretion may choose and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall

2

be conclusive proof of the truthfulness thereof. The Grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

(5)     That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable. Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his own name sue for or otherwise collect such rents, issues, and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorneys' fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(6)     That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

(7)     Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed of Trust is recorded and the name and address of the new Trustee.

3

(8)    That this Deed of Trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns.  The term Beneficiary shall mean the owner and holder, including pledgees, of the obligations secured hereby, whether or not named as Beneficiary herein.  In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

(9)    That Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.  Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

(10)    If there is more than one Trustor, the liability of the Trustors will be joint and several, and the reference to "Trustor" shall be deemed to refer to each Trustor and to all Trustors. The rights, options, powers and remedies granted in this Deed of Trust shall extend to the Beneficiary and to its successors and assigns, and shall be binding upon the Trustor and its successors and assigns, and shall be applicable hereto and to all renewals, amendments and/or extensions hereof.

The undersigned Trustor requests that a copy of any notice of default and of any notice of sale hereunder be mailed to him at his address hereinbefore set forth.


Signature of Trustor:


By: _____
Name: _Brett DelValle_____
Title: _____

**CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California    )
                       )
County of ORANGE       )

On MAY 8th, 2019 before me, CHAVON KANE
Notary Public, personally appeared BRETT DELVALLE
_____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Chavon Kane_

CHAVON KANE
COMM...2213310
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. October 5, 2021
BCT3

(Seal)

5

E# 3066407 PG 6 OF 10

**DO NOT RECORD**

### REQUEST FOR FULL RECONVEYANCE

TO ORANGE COAST TITLE COMPANY, TRUSTEE:

The undersigned is the legal owner and holder of the obligations secured hereby, and of all other indebtedness secured by the foregoing Deed of Trust. Said obligations secured hereby, together with all other indebtedness secured by said Deed of Trust, have been fully paid and satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust, to cancel said obligations secured hereby, and all other evidences of indebtedness secured by said Deed of Trust delivered to you herewith, together with the said Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of said Deed of Trust, all the estate now held by you under the same.

Dated_____

_____

_____

Please mail Deed of Trust

and Reconveyance to _____

**Do not lose or destroy this Deed of Trust.**

6

## EXHIBIT "A"

## DESCRIPTION OF REAL PROPERTY

LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, 1ST AMENDMENT, ACCORDING
TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE WEBER COUNTY
RECORDING OFFICE.

APN:   20-119-0007

## RIDER TO DEED OF TRUST

This Rider to Deed of Trust (this "Rider") is by this reference made a part of, and incorporated within, that certain Deed of Trust with Assignment of Rents (the "Deed of Trust") to which this Rider is attached. Unless otherwise defined herein, each term bearing initial capital letters herein shall have the respective definition ascribed to such term under the Deed of Trust. In the event of any conflict between the provisions of this Rider, the Deed of Trust or that certain Secured Promissory Note secured by the Deed of Trust (the "Note"), the terms of this Rider shall prevail and control.

1.     Notice of Default. In the event of any default of Trustor hereunder or under any obligation secured hereby, neither Beneficiary nor Trustee shall be entitled to exercise any right or remedy provided for herein or in any obligation secured hereby unless Trustor has failed to cure said default within twenty days after receipt by Trustor of written notice thereof from Beneficiary if said default can be cured by payment or money only, or if said default cannot be cured by payment of money only unless Trustor has not cured said default within 20 days after receipt by Trustor of such written notice, or if the default cannot be cured by payment of money only and cannot reasonably be cured within said 20 days then unless Trustor does not commence curing the default within said 20 days and does not complete such cure within diligently pursue such cure thereafter 60 days after such written notice.

2.     Acceleration upon Transfers of Ownership. If any of the following occurs after the effective date, then Beneficiary shall have the right, at its option, to declare, without notice, all outstanding indebtedness secured hereby to be immediately due and payable: (1) Trustor voluntarily or involuntarily sells, conveys, transfers, mortgages, encumbers, assigns, hypothecates, disposes of the property described on Exhibit "A" to the Deed of Trust or any improvements constructed thereon (which real property and improvements are collectively referred to herein as the "Subject Property") or any part thereof or any interest therein (whether it is a legal or equitable interest), or enters into a contract to do any of the above; (2) as a result of the death of an individual who succeeds to Trustor's interest in the Subject Property, title to the Subject Property is transferred to one other than a surviving spouse who, by reason of executing this or any other document, is also an obligor hereof; (3) if Trustor is a corporation, more than 50% in the aggregate of the corporate stock is sold, transferred, pledged, hypothecated, assigned or otherwise disposed of, whether directly or indirectly; (4) if Trustor is a trust, there is a change or transfer of more than 50% in the aggregate of the beneficial interest therein; (5) if Trustor is a partnership or limited liability company or other legal entity, more than 50% in the aggregate of the capital interests or interests in the profits and losses of such partnership, limited liability company or other entity (as the case may be) is sold, transferred, pledged, hypothecated, assigned or otherwise disposed of, whether voluntary or involuntary.

3.     Security Agreement. Trustor hereby grants and assigns to Beneficiary a security interest, to secure payment and performance of all of the obligations secured by the Deed of Trust, in all of the following described personal property in which Trustor now or at any time hereafter has any interest (collectively, the "Collateral"):

All goods, building and other materials, supplies, work in process, equipment, machinery, fixtures, and signs e, wherever situated, which are or are to be incorporated into, used in connection with, or appropriated for use on the Subject Property, together with all rents, issues, deposits and profits of the Subject Property and the Collateral. Such personal property shall include, without limitation, all inventory, accounts, cash receipts, deposit accounts, accounts receivable, contract rights, general intangibles, chattel paper, instruments, documents, notes, drafts, letters of credit, insurance policies, insurance and condemnation awards and proceeds, any other rights to the payment of money, trade names, trademarks and service marks arising from or related to the Subject Property or any business now or hereafter conducted thereon by Trustor; all permits, consents, approvals, licenses,

8

entitlements, authorizations and other rights granted by, given by or obtained from, any governmental entity with respect to the Subject Property; all deposits or other security now or hereafter made with or given to utility companies by Trustor with respect to the Subject Property; all advance payments of insurance premiums made by Trustor with respect to the Subject Property; all plans, drawings and specifications relating to the Subject Property; all loan funds held by Secured Party, whether or not disbursed; all reserves, deferred payments, deposits, accounts, refunds, cost savings and payments of any kind related to the Subject Property or any portion thereof; together with all replacements and proceeds of, and additions and accessions to, any of the foregoing; together with all books, records and files relating to any of the foregoing.

For purposes of this Rider and the Deed of Trust, the Collateral shall be deemed a part of the "property" encumbered by the Deed of Trust. As to all of the Collateral which is or which hereafter becomes a "fixture" under applicable law, this Deed of Trust constitutes a fixture filing under Sections 9502 and 9604 of the California Uniform Commercial Code, as amended or recodified from time to time.

Trustor acknowledges and agrees that Beneficiary will file with the California Secretary of State any and all Form UCC-1 Financing Statements and any and all continuations, modifications or terminations of any such statements which Beneficiary may reasonably determine is necessary to perfect the security interest in the Collateral granted under this Rider.

    4.    Hazardous Materials Covenants.

        (a)    Definitions.  As used in this Rider, the term "Hazardous Materials" shall mean and include any hazardous or toxic materials, substances or wastes as now or hereafter designated under any law, statute, ordinance, rule, regulation, order or ruling of any agency of the State of California, the United States government or any local governmental authority, including, without limitation, asbestos, petroleum, petroleum hydrocarbons and petroleum-based products, urea formaldehyde foam insulation, polychlorinated biphenyls ("PCBs"), and freon and other chlorofluorocarbons.  As used in this Rider, "Environmental Law" means any federal, state, foreign and local law, statute, ordinance, rule, regulation, license, permit, approval, order, judgment or agreement with any governmental entity relating to (i) the protection, preservation or restoration of the environment or to human health or safety, or (ii) the exposure to, or the use, storage, recycling, treatment, generation, transportation, handling, production, processing, release or disposal of any Hazardous Materials, in each case as amended and as now or hereafter in effect.

        (b)    No Hazardous Activities.  Trustor shall not cause or permit the Subject Property to be used as a site for the use, generation, manufacture, storage, treatment, release, discharge, disposal, transportation or presence of any Hazardous Materials (as defined below), other than as permitted by, and strictly in accordance with, applicable law in the ordinary course of developing, building, financing, marketing and selling a residential tract housing project.

        (c)    Compliance.  Trustor shall comply and cause the Subject Property to comply with all Environmental Laws.

        (d)    Notices.  Trustor shall immediately notify Beneficiary in writing of: (i) the discovery of any Hazardous Materials on, under or about the Subject Property; (ii) any knowledge by Trustor that the Subject Property does not comply with any Environmental Laws; and (iii) any claims or actions pending or threatened against Trustor or the Subject Property relating to Hazardous Materials or pursuant to any Environmental Law (each, a "Hazardous Material Claim").

        (e)    Remedial Action.  In response to the presence of any Hazardous Materials on, under or about the Subject Property, Trustor shall immediately take, at Trustor's sole expense, all remedial

action required by all Environmental Laws or any judgment, consent decree, settlement or compromise in respect to any Hazardous Materials Claims.

     5.    <u>Hazardous Materials Indemnity</u>. Trustor hereby agrees to defend, indemnify and hold harmless Beneficiary and Beneficiary's representatives (the "Indemnified Parties") from and against any and all losses, damages, liabilities, claims, actions, judgments, court costs and legal or other expenses (including, without limitation, attorneys' fees and expenses) which any of them may incur as a direct or indirect consequence of the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of any Hazardous Materials in, on, under or about the Subject Property by Trustor or Trustor's representatives. Such indemnity shall not include any of the foregoing items to the extent caused by any Indemnified Party, or first arising during the period that any Indemnified Party owned the Property. Such indemnity shall include, without limitation: (a) the costs, whether foreseeable or unforeseeable, of any repair, cleanup or detoxification of the Subject Property which is required by any governmental authority or is otherwise necessary to render the Subject Property in compliance with all Environmental Laws; (b) all other direct or indirect consequential damages (including, without limitation, any third party tort claim or governmental claims, fines or penalties against any of the Indemnified Parties, and (c) all court costs and attorney's fees paid or incurred by any of the Indemnified Parties. **TRUSTOR'S DUTY AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS INDEMNIFIED PARTIES SHALL SURVIVE THE CANCELLATION OF THE NOTE AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE DEED OF TRUST.**

     6.    <u>Legal Effect</u>. Trustor and Beneficiary agree that: (a) Section 4 of this Rider is intended as Beneficiary's written request for information (and Trustor's response) concerning the environmental condition of the real property security as required by California Code of Civil Procedure §726.5; and (b) each covenant in this Rider (together with any indemnity applicable to a breach of any such covenant) with respect to the environmental condition of the real property security is intended by Beneficiary and Trustor to be an "environmental provision" for purposes of California Code of Civil Procedure §736, and as such it is expressly understood that Trustor's duty to indemnify the Indemnified Parties hereunder shall survive: (i) any judicial or non-judicial foreclosure under the Deed of Trust, or transfer of the Subject Property in lieu thereof; (ii) the release and reconveyance or cancellation of the Deed of Trust; and (iii) the satisfaction of all Trustor's obligations under the Note and the Deed of Trust.

     7.    <u>Insurance</u>. Trustor shall obtain and maintain a policy of comprehensive public liability insurance and property damage insurance with limits as reasonably required by Beneficiary, insuring against liability for injury and/or death to any person and/or damage to any property occurring on the Subject Property from any cause whatsoever. Trustor shall provide to Beneficiary the originals of all required insurance policies, or other evidence of insurance acceptable to Beneficiary. All insurance policies shall provide that the insurance shall not be cancelable or materially changed without ten (10) days prior written notice to Beneficiary, and Beneficiary shall be named under a Lender's Loss Policy Endorsement on all insurance policies which Trustor actually maintains with respect to the Subject Property. Trustor shall provide to Lender evidence of any other insurance Beneficiary may deem reasonably necessary to protect the Subject Property.

*W3156191*

E# **3156191** PG 1 OF 1
Leann H. Kilts, WEBER COUNTY RECORDER
26-May-21 0116 PM        FEE $40.00 DEP PC\
REC FOR: METRO NATIONAL TITLE
ELECTRONICALLY RECORDED

WHEN RECORDED MAIL TO:
Metro National Title
1597 North Woodland Park Drive #100B
Layton, Utah 84041
MNT File No.: 49967
Tax ID No.: 20-119-0007

## DEED OF FULL RECONVEYANCE

METRO NATIONAL TITLE, a Utah corporation, as trustee under that certain deed of trust securing the obligations of the Trustor:

Brett H. Del Valle and Traci M. Del Valle

Recorded July 6, 2020 as Entry No. 3066407, of the records of the County Recorder of Weber County, Utah pursuant to written request of the beneficiary thereunder, does hereby reconvey, without warranty, to the persons legally entitled thereto, the trust property now held by it as trustee under said deed of trust covering real property situate in Weber County, Utah, described as follows:

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Date: 5/21/2021

Metro National Title, Trustee

By: Blake T. Heiner, Vice President

STATE OF UTAH,    County of Salt Lake:  ss

On 5/21/2021 personally appeared before me Blake T. Heiner, who being by me duly sworn, did say that such person is the Vice President of METRO NATIONAL TITLE, a Utah Corporation, and that said instrument was signed on behalf of said Corporation by authority of its by-laws and the said Blake T. Heiner acknowledged to me that the said Corporation executed the same.

Notary Public

Notary Public - State of Utah
CAMILLA TRILLO
Comm. #710892
My Commission Expires
March 26, 2024

# POSTING SUMMARY

| POSTING SUMMARY | |
|---|---|

| | | | |
|---|---|---|---|
| Bank: | US Bank - Layton Office (153195285926) | | |
| File Number: | 49967 | Sales Price: | $1,800,000.00 |
| Closer: | Sue Anthony | Loan Number: | |
| Buyer(s): | Molly J. Mulligan and John P. Mulligan | Underwriter: | Title Resources Guaranty Company - Utah |
| | | Est Settlement: | 5/7/2021 |
| Seller(s): | Del Valle Family Trust dated October 30, 2002 | Actual Settlement: | 5/7/2021 |
| | | Property Address: | 1453 South Basinview Road, Huntsville, UT  84317 |

### Receipts

| Payer | Cleared Date | Rcvd Date | Method | Status | Number | Credit | Debit |
|---|---|---|---|---|---|---|---|
| Molly J. Mulligan and John P. Mulligan | 05/06/2021 | 05/06/2021 | Wire | Received | | $1,775,896.73 | |
| | | | | | Posted Receipts: | | $1,775,896.73 |

### Disbursements

| Payee | Cleared Date | Issued Date | Method | Status | Number | Credit | Debit |
|---|---|---|---|---|---|---|---|
| Axos Bank | 05/11/2021 | 05/11/2021 | Wire | Issued | | | $712,209.92 |
| Emerald Bay Capital, Inc. | 05/11/2021 | 05/11/2021 | Wire | Issued | | | $948,000.00 |
| Metro National Title | 05/11/2021 | 05/11/2021 | Check | Issued | 24952 | | $4,753.60 |
| MNT Underwriters Trust Fund | 05/26/2021 | 05/11/2021 | Check | Issued | 24953 | | $1,033.40 |
| MNT Recon Trust | 05/26/2021 | 05/11/2021 | Check | Issued | 24954 | | $95.00 |
| Elevate Home Warranty | 05/20/2021 | 05/11/2021 | Check | Issued | 24955 | | $500.00 |
| Basinview Cluster Estates HOA | 05/14/2021 | 05/11/2021 | Check | Issued | 24956 | | $2,125.00 |
| Weber County Treasurer | 05/14/2021 | 05/11/2021 | Check | Issued | 24957 | | $46,248.89 |
| Mountain Real Estate Companies, LLC | 05/11/2021 | 05/11/2021 | Check | Issued | 24958 | | $60,930.92 |
| | | | | | Posted Disbursements: | | -$1,775,896.73 |
| | | | | | Posted Balance: | | $0.00 |

# EXHIBIT D



**Weber County Government**
**Property Information System**

# WEBER COUNTY RECORDER
## ABSTRACT OF TITLE
### 05/11/2021

**PARCEL NUMBER: 20-119-0007**
**Prior Parcel Numbers:**
20-108-0007

| OWNER: DEL VALLE FAMILY TRUST | ADDRESS: 1201 ESTELLE LN NEWPORT BEACH CA 92660 | TAX UNIT 520 |
|---|---|---|

| LEGAL DESCRIPTION:  2007   ORIG | ACRES:  1.52 |
|---|---|

ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, 1ST
AMENDMENT, WEBER COUNTY, UTAH.

| Grantor/ Grantee | Kind of Document Consideration | Time Period Entry # | Book-Page Doc Date | Record Date | Time Release | Abstract Date Entry Ref |
|---|---|---|---|---|---|---|
| ZIONS FIRST NATL BANK | RECON | | 1367-1567 | | 04:08 | |
| CRAIG, E D | $0.00 | 821408 | 10/03/1980 | 06-OCT-1980 | 1343- 477 | |
| CRAIG, E D | TRUST DD | | 1367-1568 | | 04:09 | |
| ZIONS FIRST NATL BK | $35,000.00 | 821409 | 10/03/1980 | 06-OCT-1980 | - | |
| ZIONS FIRST NATIONAL BANK TR | PT RECONVEYANCE | | 1372- 532 | | 02:56 | |
| WEBBER, JOHN U & WF | $0.00 | 825575 | 12/03/1980 | 03-DEC-1980 | 1323- 52 | |
| ZIONS FIRST NATL BANK TR | RECON | | 1372- 533 | | 02:57 | |
| WEBBER, JOHN U & WF | $0.00 | 825576 | 11/07/1980 | 03-DEC-1980 | 1273- 286 | |
| FACKRELL, ANN SWENSON | RELEASE | | 1378-0065 | | 03:36 | |
| WEBBER, JOHN U & RUTH M | $0.00 | 831722 | 03/11/1981 | 11-MAR-1981 | 1003-0732 | |
| WILLOUGHBY, DAVID R | TRUST DD | | 1384-0437 | | 12:39 | |
| BROWN DISTRIBUTING CO ETAL | $15,000.00 | 838323 | 02/23/1981 | 22-JUN-1981 | - | |
| WEBBER, JOHN U | WD | | 1390-1262 | | 02:34 | |
| WADMAN, V JAY | $10.00 | 844791 | 09/18/1981 | 01-OCT-1981 | - | |
| WEBBER, JOHN U & WF | WD | | 1380-1264 | | 02:35 | |
| JOHN U WEBBER CO | $10.00 | 844792 | 09/18/1981 | 01-OCT-1981 | - | |
| WADMAN, V JAY ETAL | WD | | 1390-1265 | | 02:36 | |
| SUMMERHAWKS LTD ETAL | $10.00 | 844793 | 09/18/1981 | 01-OCT-1981 | - | |
| SUMMERHAWKS LTD | DEED OF TRST | | 1390-1268 | | 02:37 | |
| JOHN U WEBBER CO ETAL | $408,000.00 | 844794 | 09/18/1981 | 01-OCT-1981 | - | |
| BOARD OF COUNTY COMMISSIONER | ORDNCE | | 1394-1772 | | 11:57 | |
| WHOM IT MAY CONCERN | $0.00 | 849262 | 12/21/1981 | 22-DEC-1981 | - | |
| AHLBERG, WILLIAM D | RELEASE | | 1395-0054 | | 09:56 | |
| WEBBER, JOHN U & WF | $0.00 | 849304 | 12/19/1981 | 23-DEC-1981 | - | |
| WILLOUGHBY, DAVID R & JEAN G | QCD | | 1399-0363 | | 03:53 | |
| BROWN DISTRIBUTING | $10.00 | 853531 | 10/00/1981 | 09-MAR-1982 | - | |
| WEBBER, JOHN U & WF | RELEASE | | 1401-1669 | | 10:19 | |
| ADAMS, ALFRED W & WF | $0.00 | 856371 | 04/27/1982 | 28-APR-1982 | 1003-0733 | |
| ZIONS FIRST NATL BANK TR | RECON | | 1402-0074 | | 01:52 | |
| WEBBER, JOHN U & RUTH M | $0.00 | 856503 | 04/26/1982 | 29-APR-1982 | 1323-0052 | |
| WEBER BASIN WTR CONSERV DIST V | WATER CONTRACT | | 1405-1501 | | 01:17 | |
| SUMMERHAWKS LTD WTR | $0.00 | 860593 | 06/14/1982 | 13-JUL-1982 | - | |
| ZIONS FIRST NATIONAL BANK | RECON | | 1413-0821 | | 04:13 | |
| CRAIG, E D | $0.00 | 868216 | 11/18/1982 | 22-NOV-1982 | 1367-1568 | |
| WEBBER, JOHN U & WF | WD | | 1432-1327 | | 02:42 | |
| BROWN DISTRIBUTING CO | $10.00 | 890715 | 09/20/1983 | 21-SEP-1983 | - | |

Bates #000058

| Party | Type | Amount | Doc # | Book-Page | Date | Recorded | Ref | Time |
|---|---|---|---|---|---|---|---|---|
| WEBBER, JOHN U & RUTH M... | TRUST DD | | 898298 | | 12/.../1983 | 28-DEC-1983 | | |
| BANK OF UTAH | | $80,000.00 | | | | | | |
| BANK OF UTAH | RELEASE | | | 1439-1244 | | | | 11:07 |
| WEBBER, JOHN U & WF | | $0.00 | 899767 | | 01/17/1984 | 18-JAN-1984 | 1235-0810 | |
| CARDON LAND TITLE CO TR | PT RECONVEYANCE | | | 1467-1692 | | | | 11:12 |
| SUMMERHAWKS LTD ETAL | | $0.00 | 937356 | | 05/10/1985 | 15-MAY-1985 | 1390-1268 | |
| KEITER, JOHN E TR | WD | | | 1467-1756 | | | | 01:10 |
| SUMMERS, CLARKE C & WF | | $10.00 | 937370 | | 05/15/1985 | 15-MAY-1985 | - | |
| SUMMERHAWKS LTD | WD | | | 1467-1759 | | | | 01:11 |
| SUMMERS, CLARKE C & WF | | $10.00 | 937371 | | 05/15/1985 | 15-MAY-1985 | - | |
| SUMMERS, CLARKE C & WF | DEED TRST | | | 1469-0329 | | | | 03:03 |
| DESERET FEDERAL SV & LN ASSN | | $168,750.00 | 939126 | | 06/06/1985 | 06-JUN-1985 | - | |
| WEBER BASIN WTR CONSERV DIST V | ORDER ON PETN | | | 1471-1851 | | | | 04:37 |
| SUMMERS, CLARKE C & WF WTR | | $99.66 | 942577 | | 06/28/1985 | 18-JUL-1985 | - | |
| WEBBER, JOHN U | TRUST DD | | | 1480-0360 | | | | 01:14 |
| ZIONS FIRST NATIONAL BANK | | $111,000.00 | 953779 | | 10/01/1985 | 22-NOV-1985 | - | |
| WEBBER, JOHN U | ASSIGN OF CONTRT | | | 1480-0365 | | | | 01:15 |
| ZIONS FIRST NATIONAL BANK | | $10.00 | 953780 | | 10/01/1985 | 22-NOV-1985 | - | |
| SUMMERS, CLARKE C & MARCIA H | NTC OF LIEN | | | 1483-1787 | | | | 08:13 |
| HUGHES, BILL | | $7,923.50 | 958462 | | // | 22-JAN-1986 | - | |
| SUMMERS, CLARKE C & MARCIA H | NTC OF LIEN | | | 1486-2134 | | | | 12:25 |
| URE, BERT | | $5,000.00 | 963036 | | // | 14-MAR-1986 | - | |
| CARDON LAND TITLE CO TR | PT RECONVEYANCE | | | 1495-2518 | | | | 09:16 |
| SUMMERHAWKS LTD ETAL | | $0.00 | 977430 | | 06/06/1986 | 04-AUG-1986 | 1380-1268 | |
| URE, BERT | REL OF LIEN | | | 1497-0815 | | | | 03:10 |
| WHOM IT MAY CONCERN | | $5,000.00 | 979676 | | 08/22/1986 | 22-AUG-1986 | 1486-2134 | |
| KITCHEN STUDIO | REL OF LIEN | | | 1505-1673 | | | | 11:40 |
| WHOM IT MAY CONCERN | | $7,927.50 | 992691 | | 09/02/1986 | 17-DEC-1986 | 1483-1787 | |
| ZIONS FIRST NATIONAL BANK | PT RECONVEYANCE | | | 1505-1676 | | | | 11:41 |
| WEBBER, JOHN U | | $0.00 | 992692 | | 09/11/1986 | 17-DEC-1986 | 1480-0360 | |
| ZIONS FIRST NATL BANK | PT RELEASE | | | 1505-1678 | | | | 11:42 |
| WEBBER, JOHN U | | $0.00 | 992693 | | 09/11/1986 | 17-DEC-1986 | 1480-0365 | |
| SUMMERHAWKS LTD | WD | | | 1505-1681 | | | | 11:42 |
| SUMMERS, CLARKE C & WF | | $10.00 | 992694 | | 06/11/1986 | 17-DEC-1986 | - | |
| KEITER, JOHN E TR | WD | | | 1505-1681 | | | | 11:43 |
| SUMMERS, CLARKE C & WF | | $10.00 | 992695 | | 06/11/1986 | 17-DEC-1986 | - | |
| SUMMERS, CLARKE C & WF | DEED OF TRST | | | 1505-1682 | | | | 11:43 |
| MOORE FINANCIAL SERVICES INC E | | $147,550.00 | 992696 | | 12/11/1986 | 17-DEC-1986 | - | |
| SUMMERS, CLARKE C ETAL | TRUST DD | | | 1505-1687 | | | | 11:46 |
| CONTINENTAL BANK & TRUST CO | | $30,000.00 | 992697 | | 12/11/1986 | 17-DEC-1986 | - | |
| CLAYSON, CRAIG D | ASGNMT | | | 1506-0954 | | | | 03:08 |
| CITICORP HOMEOWNERS INC | | $0.00 | 993964 | | 12/18/1986 | 29-DEC-1986 | 1505-1682 | |
| MORGAN, TERRILYN B | REQ FOR NTC | | | 1509-1280 | | | | 12:58 |
| WHOM IT MAY CONCERN | | $0.00 | 998977 | | // | 11-FEB-1987 | 1505-1682 | |
| DESERET FED SV & LN ASSN TR | RECON | | | 1523-2253 | | | | 03:37 |
| SUMMERS, CLARKE C & WF | | $0.00 | 1021465 | | 07/17/1987 | 11-AUG-1987 | 1469-0329 | |
| CITICORP MTG INC FKA | ASGNMT | | | 1539-2706 | | | | 09:05 |
| LOMAS & NETTLETON CO | | $0.00 | 1046898 | | 01/29/1988 | 20-MAY-1988 | 1505-1682 | |
| ZIONS FIRST NATL BK | PT RELEASE ASSIGN | | | 1551-2861 | | | | 10:04 |
| WEBBER, JOHN U | | $0.00 | 1064975 | | 12/02/1988 | 07-DEC-1988 | 1480-0365 | |
| ZIONS FIRST NATL BK | PT RECONVEYANCE | | | 1551-2863 | | | | 10:05 |
| WEBBER, JOHN U | | $0.00 | 1064976 | | 12/02/1988 | 07-DEC-1988 | 1480-0360 | |
| WEBBER, JOHN U | ASSIGN INTEREST | | | 1557-2264 | | | | 03:20 |

Bates #000059

| Name | Type / Amount | Document | Book-Page | Date | Date 2 | Ref | Time |
|---|---|---|---|---|---|---|---|
| WEBBER, JOHN U | WARRANTY DEED | | 1557-2273 | | | | 03:24 |
| WADMAN, V JAY | $10.00 | 1073781 | | 09/21/1978 | 27-MAR-1989 | - | |
| WEBBER, JOHN U | WD | | 1557-2276 | | | | 03:29 |
| WADMAN, V JAY | $0.00 | 1073782 | | 09/21/1978 | 27-MAR-1989 | - | |
| SUMMERHAWKS LTD | WD | | 1565-2145 | | | | 11:40 |
| WADMAN, V JAY ETAL | $10.00 | 1085860 | | 07/20/1989 | 10-AUG-1989 | - | |
| WADMAN, V JAY ETAL | WD | | 1565-2148 | | | | 11:44 |
| SUMMERS, CLARKE C TR ETAL | $10.00 | 1085861 | | 07/20/1989 | 10-AUG-1989 | - | |
| SUMMERS, CLARKE C ETAL | TRUST DD | | 1576-0695 | | | | 03:49 |
| WEST ONE BK UT | $19,529.84 | 1101910 | | 02/12/1990 | 21-FEB-1990 | - | |
| SUMMERS, CLARKE C & WF | NON ASSUMP AGRMT | | 1576-0699 | | | | 03:50 |
| WEST ONE BK UT | $0.00 | 1101911 | | 02/12/1990 | 21-FEB-1990 | - | |
| ZIONS FIRST NATL BANK TR | RECON | | 1578-0869 | | | | 08:05 |
| WEBBER, JOHN U | $0.00 | 1105213 | | 03/26/1990 | 03-APR-1990 | 1480-0360 | |
| JOHN U WEBBER CO | ASGNMT | | 1588-1262 | | | | 01:30 |
| PETERSEN, JERRY TR ETAL | $0.00 | 1121698 | | 10/19/1990 | 19-OCT-1990 | 1390-1268 | |
| JOHN U WEBBER CO ETAL | TRUST DD | | 1590-2497 | | | | 04:31 |
| AMERICA FIRST CR UN ETAL | $100,000.00 | 1125426 | | 11/28/1990 | 28-NOV-1990 | - | |
| ZIONS FIRST NATL BK | REL | | 1592-1918 | | | | 02:29 |
| WEBBER, JOHN U | $0.00 | 1128555 | | 12/27/1990 | 07-JAN-1991 | 1480-0365 | |
| WEBBER, JOHN U | WD | | 1593-0599 | | | | 01:36 |
| WADMAN, V JAY | $10.00 | 1129569 | | 01/18/1991 | 22-JAN-1991 | - | |
| WADMAN, V JAY | WD | | 1593-0601 | | | | 01:38 |
| WADMAN INVESTMENT | $10.00 | 1129570 | | 01/18/1991 | 22-JAN-1991 | - | |
| WADMAN, V JAY | WD | | 1606-0582 | | | | 12:26 |
| WADMAN INV | $10.00 | 1149606 | | 08/21/1991 | 21-AUG-1991 | - | |
| WADMAN, V JAY | WD | | 1606-0585 | | | | 12:27 |
| WADMAN INV | $10.00 | 1149607 | | 08/21/1991 | 21-AUG-1991 | - | |
| WEST ONE BK TR | RECON | | 1610-0855 | | | | 08:15 |
| SUMMERS, CLARKE C & WF | $0.00 | 1155526 | | 10/17/1991 | 22-OCT-1991 | 1576-0695 | |
| SUMMERS, CLARKE C TR | QCD | | 1610-1011 | | | | 11:50 |
| SUMMERS, CLARKE C & WF | $10.00 | 1155615 | | 10/21/1991 | 22-OCT-1991 | - | |
| KEITER, JOHN E TR | QCD | | 1610-1012 | | | | 11:51 |
| SUMMERS, CLARKE C & WF | $10.00 | 1155616 | | 10/22/1991 | 22-OCT-1991 | - | |
| SUMMERS, CLARKE C & WF | TRUST DD | | 1610-1013 | | | | 11:52 |
| WEST ONE BK UT | $135,000.00 | 1155617 | | 10/10/1991 | 22-OCT-1991 | - | |
| WEST ONE BK UT | REQ FOR NTC | | 1610-1018 | | | | 11:53 |
| WHOM IT MAY CONCERN | $0.00 | 1155618 | | // | 22-OCT-1991 | 1505-1682 | |
| SUMMERS, CLARKE C & WF | NON ASSUMP AGRMNT | | 1610-1020 | | | | 11:54 |
| WEST ONE BK UT | $135,000.00 | 1155619 | | 10/10/1991 | 22-OCT-1991 | - | |
| WEST ONE BK TR | RECON | | 1610-2995 | | | | 08:15 |
| SUMMERS, CLARKE C & WF | $0.00 | 1156485 | | 10/17/1991 | 31-OCT-1991 | 1576-0695 | |
| WEST ONE BK TR | RECON | | 1611-0787 | | | | 08:29 |
| SUMMERS, CLARKE C ETAL | $0.00 | 1156884 | | 10/30/1991 | 05-NOV-1991 | 1505-1687 | |
| SUMMERS, CLARKE C ETAL | QCD | | 1628-0660 | | | | 08:52 |
| KEITER, JOHN E TR | $10.00 | 1179922 | | 05/29/1992 | 01-JUN-1992 | - | |
| CROWTHER, MARVIN | NTC ASSMNT | | 1639-2597 | | | | 02:34 |
| WHOM IT MAY CONCERN | $0.00 | 1195168 | | // | 01-OCT-1992 | - | |
| PETERSEN, JERRY TR ETAL | SUB TR | | 1640-1080 | | | | 09:59 |
| ASSOCIATED TITLE CO | $0.00 | 1195772 | | 05/14/1992 | 07-OCT-1992 | 1588-1262 | |
| ASSOCIATED TITLE CO TR | RECON | | 1640-1082 | | | | 10:01 |
| KEITER, JOHN E TR ETAL | $0.00 | 1195773 | | 09/25/1992 | 07-OCT-1992 | 1390-1268 | |

Bates #000060

| Party | Instrument | Amount | Entry No. | Book-Page / Date | Date Filed | Date Rec. | Time | Ref 1 | Ref 2 |
|---|---|---|---|---|---|---|---|---|---|
| SUMMERS, CLARKE C ETAL | QCD | | | | | | | | |
| SUMMERS, CLARKE C | | $10.00 | 1259804 | | 11/17/1993 | 29-NOV-1993 | | | |
| SUMMERS, CLARKE C | DEED OF TRST | | | 1691-0522 | | | 11:20 | | |
| WEST ONE BK UT ETAL | | $202,300.00 | 1259805 | | 11/23/1993 | 29-NOV-1993 | | | |
| WEST ONE BK UT | SUBORD AGRMT | | | 1691-0530 | | | 11:22 | | |
| WEST ONE BK | | $0.00 | 1259806 | | 11/23/1993 | 29-NOV-1993 | 1691-0522 | | |
| SUMMERS, CLARKE C ETAL | QCD | | | 1696-1793 | | | 01:20 | | |
| CLARKE C SUMMERS PN & PR SH PLN | | $10.00 | 1266242 | | 10/00/1993 | 30-DEC-1993 | | | |
| WEST ONE BK UT | ASGNMT | | | 1700-2557 | | | 12:29 | | |
| MORTGAGE AUTHORITY INC | | $0.00 | 1271860 | | 01/03/1994 | 31-JAN-1994 | 1691-0530 | | |
| MORTGAGE AUTHORITY INC | ASGNMT | | | 1732-1543 | | | 10:02 | | |
| SOURCE ONE MTG SERV CORP | | $1.00 | 1314006 | | 01/17/1994 | 29-SEP-1994 | 1691-0522 | | |
| WEBER COUNTY | RESOL #18-96 | | | 1801-0295 | | | 10:42 | | |
| WHOM IT MAY CONCERN | | $0.00 | 1399404 | | 04/03/1996 | 12-APR-1996 | - | | |
| WEBER COUNTY | RESOL #25-96 | | | 1811-2786 | | | 09:23 | | |
| WHOM IT MAY CONCERN | | $0.00 | 1413086 | | 05/15/1996 | 18-JUN-1996 | - | | |
| SOURCE ONE MTG SERV CORP | ASGNMT | | | 1930-2820 | | | 09:12 | | |
| CAPSTEAD INC | | $0.00 | 1547548 | | 02/01/1997 | 27-MAY-1998 | 1691-522 | | |
| CAPSTEAD INC | ASGNMT | | | 2007-2124 | | | 08:24 | | |
| GMAC MTG CORP | | $0.00 | 1631210 | | 02/01/1999 | 28-APR-1999 | 1691-522 | | |
| US BK NATL ASSOC TR FKA ETAL | RECON | | | 2316-0181 | | | 09:29 | | |
| SUMMERS, CLARKE C ETAL | | $0.00 | 1911178 | | 01/16/2003 | 06-FEB-2003 | 1610-1013 | 1155617 | |
| GMAC MTG CORP | SUB TR | | | 2373-1436 | | | 08:13 | | |
| RIVERS, ROD | | $0.00 | 1941533 | // | | 27-MAY-2003 | 1691-522 | 1259805 | |
| RIVERS, ROD TR | RECON | | | 2373-1438 | | | 08:13 | | |
| SUMMERS, CLARKE C | | $0.00 | 1941534 | // | | 27-MAY-2003 | 1691-522 | 1259805 | |
| WEBER BASIN CONSERV DIST | ORDR ON PETN | | | 2389-0252 | | | 09:35 | | |
| SUMMERS, CLARKE C | | $0.00 | 1949479 | | 04/25/2003 | 20-JUN-2003 | - | | |
| WEBER BASIN WTR CONSERV DIST | ORD ON PETN | | | - | | | 08:45 | | |
| CLARKE C SUMMERS PENSION & PRO | | $0.00 | 2017007 | | 01/30/2004 | 11-MAR-2004 | - | | |
| WEBER BASIN WTR CONSERV DIST | ORD ON PETN | | | - | | | 08:45 | | |
| CLARKE C SUMMERS PEN & PROF | | $0.00 | 2017008 | | 01/30/2004 | 11-MAR-2004 | - | | |
| CLARKE C SUMMERS PROFIT SHARIN | QCD | | | - | | | 04:28 | | |
| SUMMERS, CLARKE C ETAL | | $400,000.00 | 2098267 | | 04/21/2005 | 21-APR-2005 | - | | |
| WEBER COUNTY | RESOL 23-2005 | | | - | | | 02:31 | | |
| WHOM IT MAY CONCERN | | $0.00 | 2156401 | | 07/12/2005 | 24-JAN-2006 | - | | |
| CLARK C SUMMERS PNSN PRFT PLN | ASGNMT | | | - | | | 09:17 | | |
| BASIN VIEW EST HOMEOWNERS ASS | | $0.00 | 2193577 | | 04/07/2006 | 14-JUL-2006 | 2389-252 | 2017007 | |
| SUMMERS, CLARKE C ETAL | SP WD | | | - | | | 12:11 | | |
| BASINVIEW DEV LC | | $10.00 | 2193657 | | 07/07/2006 | 14-JUL-2006 | - | | |
| BASINVIEW DEV LC | DEED OF TRST | | | - | | | 12:11 | | |
| SUMMERS, CLARKE C & WF ETAL | | $2,990,517.95 | 2193658 | | 07/07/2006 | 14-JUL-2006 | - | | |
| BASINVIEW DEVL LC | DED PLAT | | | - | | | 02:26 | | |
| WHOM IT MAY CONCERN | | $0.00 | 2202617 | | 08/04/2006 | 22-AUG-2006 | 64-55 | | |
| BASINVIEW DEV LC ETAL | AGRMT | | | - | | | 02:28 | 27-JAN-2010 | |
| WHOM IT MAY CONCERN | | $0.00 | 2202618 | | 08/04/2006 | 22-AUG-2006 | - | | |
| BASINVIEW DEV LLC | AGRMT | | | - | | | 02:31 | | |
| WHOM IT MAY CONCERN | | $0.00 | 2202619 | | 08/04/2006 | 22-AUG-2006 | - | | |
| BASINVIEW DEV LC | DECL COV REST | | | - | | | 03:45 | | |
| WHOM IT MAY CONCERN | | $0.00 | 2203027 | | 08/22/2006 | 23-AUG-2006 | - | | |
| WEBER COUNTY ETAL | AMD AGRMT | | | - | | | 11:04 | 27-JAN-2010 | |
| WHOM IT MAY CONCERN | | $0.00 | 2204634 | | 08/28/2006 | 30-AUG-2006 | - | | |
| BASINVIEW DEVL LLC | AGRMT | | | - | | | 03:23 | | |

Bates #000061

| Party | Instrument / Amount | Doc # | Date 1 | Date 2 | Time | Reference |
|---|---|---|---|---|---|---|
| BASINVIEW DEV LC | SP WD | | | | 03:46 | |
| DEL VALLE FAMLY TRST | $10.00 | 2261271 | 04/27/2007 | 03-MAY-2007 | - | |
| DEL VALLE FAMLY TRST | DEED OF TRST | | | | 03:46 | |
| WELLS FARGO BK ETAL | $500,000.00 | 2261272 | 04/25/2007 | 03-MAY-2007 | - | |
| LINCOLN TTL INS TR | PT RECON | | - | | 09:05 | |
| BASINVIEW DEV LC | $0.00 | 2264396 | 05/16/2007 | 17-MAY-2007 | - | 2193658 |
| WEBER COUNTY | ORDNCE 2007-24 | | | | 03:56 | |
| WHOM IT MAY CONCERN | $0.00 | 2290050 | 09/04/2007 | 05-SEP-2007 | - | |
| DEL VALLE FAMILY TRUST ETAL | DED PLAT | | 66-87 | | 03:58 | |
| WHOM IT MAY CONCERN | $0.00 | 2290051 | 08/13/2007 | 05-SEP-2007 | - | |
| BASINVIEW DEV LC ETAL | NTC | | - | | 04:00 | |
| WHOM IT MAY CONCERN | $0.00 | 2290052 | 08/31/2007 | 05-SEP-2007 | - | |
| VEL VALLE FMLY TRST | WD | | - | | 11:46 | |
| DEL VALLE FMLY TRST | $10.00 | 2293650 | 09/18/2007 | 24-SEP-2007 | - | |
| DEL VALLE TRST | DEED OF TRST | | | | 12:16 | |
| CALIFORNIA NATL BK ETAL | $1,750,000.00 | 2313274 | 12/12/2007 | 31-DEC-2007 | - | |
| DEL VALLE TRST | ASGNMT | | - | | 12:16 | |
| CALIFORNIA NATL BK | $0.00 | 2313275 | 12/21/2007 | 31-DEC-2007 | - | |
| WELLS FARGO BK NW TR | RECON | | - | | 08:57 | |
| DEL VALLE TRST | $0.00 | 2319710 | 01/15/2008 | 05-FEB-2008 | - | 2261272 |
| DEL VALLE, BRETT H | NTC COMP | | - | | 10:47 | |
| WHOM IT MAY CONCERN | $0.00 | 2350137 | 06/23/2008 | 25-JUN-2008 | - | |
| CALIFORNIA NATL BK | MOD AGRMT | | - | | 12:08 | |
| DEL VALLE FAMILY TRUST | $0.00 | 2432420 | 07/01/2009 | 31-AUG-2009 | - | 2313274 |
| US BANK NATL ASSN ETAL | MOD AGRMT | | - | | 10:26 | |
| WHOM IT MAY CONCERN | $1,750,000.00 | 2453101 | 10/01/2009 | 07-JAN-2010 | - | 2313274 |
| FDIC | ASGNMT | | - | | 08:22 | 10-AUG-2010 |
| US BK NATL ASSOC | $0.00 | 2485659 | 10/30/2009 | 10-AUG-2010 | - | |
| SCHIMMELPFENNIG, TODD | REQ FOR NTC | | - | | 08:20 | 18-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527425 | 05/04/2011 | 18-MAY-2011 | - | 2261272 |
| SCHIMMELPHENNIG, TODD | REQ FOR NTC | | - | | 08:20 | 18-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527426 | // | 18-MAY-2011 | - | 2313274 |
| DEL VALLE FMLY TRST ETAL | MOD AGRMT | | - | | 08:06 | 19-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527547 | 04/26/2011 | 19-MAY-2011 | - | 2313274 |
| US BANK NATL ASSN | SUB TR | | - | | 03:06 | 29-JUN-2012 |
| WALKER, RUSSELL S | $0.00 | 2583677 | 06/27/2012 | 29-JUN-2012 | - | 2313274 |
| WALKER, RUSSELL S | NTC OF DFLT | | - | | 03:06 | 29-JUN-2012 |
| DEL VALLE FAMILY TRUST | $0.00 | 2583678 | 06/29/2012 | 29-JUN-2012 | - | 2313274 |
| CHASE BK FKA ETAL | SUB TR/RECON | | - | | 09:49 | 04-FEB-2014 |
| JPMORGAN CHASE BANK ETAL | $0.00 | 2601884 | 10/04/2012 | 23-OCT-2012 | - | 2067446 |
| WEBER COUNTY | RESOL #27-2012 | | - | | 10:38 | |
| WHOM IT MAY CONCERN | $0.00 | 2610456 | 12/11/2012 | 13-DEC-2012 | - | |
| DEL VALLE, BRETT | DEED OF TRST | | - | | 03:01 | 03-MAR-2014 |
| PRP INVESTORS FONTANA LLC ETAL | $360,009.12 | 2677120 | 12/19/2013 | 03-MAR-2014 | - | |
| US BANK | SUB TR | | - | | 01:10 | 05-JUN-2014 |
| HALLIDAY JR, PAUL M | $0.00 | 2689333 | 05/29/2014 | 05-JUN-2014 | - | 2527547 |
| HALLIDAY JR, PAUL M TR | NTC OF DFLT | | - | | 03:02 | 15-JUL-2014 |
| DEL VALLE, BRETT H ETAL | $214,000.00 | 2692310 | 06/27/2014 | 27-JUN-2014 | - | |
| STATE OF UTAH | CERT OF CREATION | | - | | 01:50 | 20-JAN-2015 |
| WHOM IT MAY CONCERN | $0.00 | 2718461 | 12/01/2014 | 20-JAN-2015 | - | |
| WEBER COUNTY | AFFT | | - | | 09:38 | |
| WHOM IT MAY CONCERN | $0.00 | 2725109 | 03/09/2015 | 09-MAR-2015 | - | |

Bates #000062

| | | | | | | |
|---|---|---|---|---|---|---|
| MEREDITH JR, PROB M TR | NTC OF DFLT | | - | | | 11-MAR-2016 |
| DEL VALLE FAMILY TRUST | $0.00 | 2782340 | 03/11/2016 | 11-MAR-2016 | - | 2453101 |
| STATE OF UTAH | CERT DISSOLUTION | | - | | 11:23 | 15-JUN-2016 |
| WHOM IT MAY CONCERN | $0.00 | 2795066 | // | 25-MAY-2016 | - | |
| WEBER COUNTY | RESOL #12-2016 | | - | | 11:24 | 13-JUN-2016 |
| WHOM IT MAY CONCERN | $0.00 | 2795067 | 05/10/2016 | 25-MAY-2016 | - | |
| US BANK ETAL | SUB TR/RECON | | - | | 12:10 | 03-JUL-2017 |
| US BANK TRUST CO ETAL | $0.00 | 2866077 | 06/22/2017 | 03-JUL-2017 | - | 2313274 |
| DEL VALLE FAMILY TRUST | DEED OF TRST | | - | | 09:37 | 20-SEP-2017 |
| BOFI FED BANK ETAL | $750,000.00 | 2879566 | 09/13/2017 | 20-SEP-2017 | - | |
| OGDEN VALLEY PARKS SERVICE AR | ANNEX PLAT | | - | | 12:58 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897531 | // | 28-DEC-2017 | - | |
| STATE OF UTAH | CERT ANEX | | - | | 12:58 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897532 | 12/27/2017 | 28-DEC-2017 | - | |
| OGDEN VALLEY PARKS SERVICE AR | NTC BNDRY ADJUST | | - | | 12:59 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897533 | 12/20/2017 | 28-DEC-2017 | - | |
| WEBER COUNTY | RESOL 43-2017 | | - | | 12:59 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897534 | 10/17/2017 | 28-DEC-2017 | - | |
| OGDEN VALLEY PARKS SERVICES A | RESOL BNDRY ADJUST | | - | | 01:00 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897535 | 12/28/2017 | 28-DEC-2017 | - | |
| PRP INVESTORS FONATNA LLC ETAL | SUB TR/RECON | | - | | 04:20 | 17-JUL-2018 |
| PRP INVESTORS FONTANA LLC ETAL | $0.00 | 2931280 | 07/16/2018 | 17-JUL-2018 | - | 2677120 |
| DE VALLE FAMILY TRUST | TRUST DD | | - | | 04:20 | 17-JUL-2018 |
| SINGLE BOX CALI LP ETAL | $9,558,800.00 | 2931281 | 07/16/2018 | 17-JUL-2018 | - | |
| BASINVIEW ESTATES HOA INC | AMD DECL COV | | - | | 12:53 | 10-JUL-2019 |
| WHOM IT MAY CONCERN | $0.00 | 2990355 | 04/16/2019 | 10-JUL-2019 | - | 2203027 |
| LINCOLN TTL INS AGENCY TR | NTC OF DFLT | | - | | 10:55 | 18-JUL-2019 |
| DEL VALLE FAMILY TRUST | $0.00 | 2991776 | 07/18/2019 | 18-JUL-2019 | - | 2931281 |
| SINGLE BOX CALI LP | ASGNMT OF TRST DD | | - | | 10:06 | 19-JUL-2019 |
| SB FB HOUSTON LP | $0.00 | 2991983 | 07/18/2019 | 19-JUL-2019 | - | 2931281 |
| SB FB HOUSTON LP | SUB TR | | - | | 10:06 | 19-JUL-2019 |
| LINCOLN TTL INS AGENCY | $0.00 | 2991984 | 07/18/2019 | 19-JUL-2019 | - | 2931281 |
| FOUNDERS TTL CO | AFFT | | - | | 04:04 | 30-SEP-2019 |
| WHOM IT MAY CONCERN | $0.00 | 3006790 | 09/27/2019 | 30-SEP-2019 | - | |
| LINCOLN TTL INS AGENCY TR | RECON | | - | | 09:24 | 22-NOV-2019 |
| DEL VALLE FAMILY TRUST | $0.00 | 3018148 | 11/22/2019 | 22-NOV-2019 | - | 2931281 |
| DEL VALLE, BRETT H ETAL | DEED OF TRST | | - | | 03:52 | 06-JUL-2020 |
| TSS ENTERPRISES INC ETAL | $0.00 | 3066407 | 05/08/2019 | 06-JUL-2020 | - | |
| SCHIMMELPFENNING, TODD | REQ FOR NTC | | - | | 03:03 | 10-MAR-2021 |
| WHOM IT MAY CONCERN | $0.00 | 3133579 | 02/25/2021 | 10-MAR-2021 | - | 2879566 |

*04-07-2021 ABSTRACTED THROUGH*

*** RUN DATE: May 11, 2021, 11:23 an ***          *** END OF ABSTRACT ***

Bates #000063



## Weber County Government
## Property Information System

# Weber County Fee & Entry Report

<-- Back to Kind of Intrument Search

**From 02-OCT-2020 Through 05-OCT-2020**

**Kind of Instrument: JUDGMT**                                          **RUN DATE: 19-Sep-2024**

[ Print Report ]

---

Entry Nbr: 3090706    Date Recorded: 05-OCT-2020    Consideration: $9,301.28    Book-Page: -                          Parcel Nbr: --
        Grantor: PRP MENIFEE LLC DEFT ETAL JDG                            Grantee: SB AB WEST LOOP LP PLTF
    Property Owner:                                              In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3090722    Date Recorded: 05-OCT-2020    Consideration: $448,126.00    Book-Page: -                        Parcel Nbr: --
        Grantor: CANNON, COLE ETAL JDG                                    Grantee: UNITED STATES OF AMERICA
    Property Owner:                                              In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3090727    Date Recorded: 05-OCT-2020    Consideration: $227,218.00    Book-Page: -                        Parcel Nbr: --
        Grantor: SPARKS, DAVID ETAL JDG                                   Grantee: UNITED STATES OF AMERICA
    Property Owner:                                              In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3090728    Date Recorded: 05-OCT-2020    Consideration: $560,918.00    Book-Page: -                        Parcel Nbr: --
        Grantor: SPARKS, DAVID W JDG                                      Grantee: UNITED STATES OF AMERICA
    Property Owner:                                              In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3090736    Date Recorded: 05-OCT-2020    Consideration: $227,218.00    Book-Page: -                        Parcel Nbr: --
        Grantor: STUART, JOSHUA JDG                                       Grantee: UNITED STATES OF AMERICA
    Property Owner:                                              In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

Entry Nbr: 3090745    Date Recorded: 05-OCT-2020    Consideration: $86,107.00    Book-Page: -                         Parcel Nbr: --
        Grantor: HOSKINS, KEATON JDG                                      Grantee: UNITED STATES OF AMERICA
    Property Owner:                                              In Care of Address:
    Property Address:                                            Lot/Description: X , JDG

---

© 2024 Weber County

 

# Weber County Fee & Entry Report

<-- Back to Kind of Intrument Search

**From 19-OCT-2020 Through 23-OCT-2020**

**Kind of Instrument: JUDGMT**                                    **RUN DATE: 19-Sep-2024**

[Print Report]

---

Entry Nbr: 3093912    Date Recorded: 19-OCT-2020    Consideration: $2,400.02    Book-Page: -    Parcel Nbr: --
    Grantor: CONNIFF, DAVID DEFT JUDG    Grantee: PROTFOLIO RECOVERY ASSOCIATES LLC PLTF
    Propery Owner:    In Care of Address:
    Property Address:    Lot/Description: X , NO DESC

---

Entry Nbr: 3094675    Date Recorded: 21-OCT-2020    Consideration: $18,345.50    Book-Page: -    Parcel Nbr: --
    Grantor: MARTINEZ, CARESSA DEFT JDG    Grantee: SUMMIT FINL HOLDINGS LLC PLTF
    Propery Owner:    In Care of Address:
    Property Address:    Lot/Description: X , JDG

---

Entry Nbr: 3094830    Date Recorded: 21-OCT-2020    Consideration: $178,918.43    Book-Page: -    Parcel Nbr: --
    Grantor: TEAM KCM LLC DEFT ETAL JDG    Grantee: ULTIMATE MONSTER TRUCKS PTY LTD PLTF
    Propery Owner:    In Care of Address:
    Property Address:    Lot/Description: X , JDG

---

Entry Nbr: 3094900    Date Recorded: 21-OCT-2020    Consideration: $3,089.95    Book-Page: -    Parcel Nbr: --
    Grantor: MCMAINS, SHANDA D DEFT JDG    Grantee: RC WILLEY PLTF
    Propery Owner:    In Care of Address:
    Property Address:    Lot/Description: X , JDG

---

Entry Nbr: 3095026    Date Recorded: 21-OCT-2020    Consideration: $6,455.33    Book-Page: -    Parcel Nbr: --
    Grantor: PARISH, TAYLOR K DEFT JDG    Grantee: HORIZON CR UN PLTF
    Propery Owner:    In Care of Address:
    Property Address:    Lot/Description: X , JDG

---

Entry Nbr: 3095051    Date Recorded: 21-OCT-2020    Consideration: $0.00    Book-Page: -    Parcel Nbr: 03-007-0050
    Grantor: GALLEGOS, A DAVID DEFT JDG    Grantee: BRUHL, HEINZ J PLTF
    Propery Owner: STEFFEN, MARK J    In Care of Address: 199 W 21ST ST OGDEN UT 84401
    Property Address: 199 W 21ST ST OGDEN 84401    Lot/Description: 18&19 , REEVES ADD

---

Entry Nbr: 3095281    Date Recorded: 22-OCT-2020    Consideration: $420.00    Book-Page: -    Parcel Nbr: --
    Grantor: MEMBRENO, JULIO CESAR DEFT JDG    Grantee: OGDEN CITY PLTF
    Propery Owner:    In Care of Address:
    Property Address:    Lot/Description: X , JDG

---

Entry Nbr: 3095282    Date Recorded: 22-OCT-2020    Consideration: $1,145.00    Book-Page: -    Parcel Nbr: --
    Grantor: MEMBRENO, JULIO C DEFT JDG    Grantee: OGDEN CITY PLTF
    Propery Owner:    In Care of Address:
    Property Address:    Lot/Description: X , NO DESC

---

© 2024 Weber County

# EXHIBIT E

The Order of the Court is stated below:
Dated: October 23, 2020                    At the direction of:
        03:13:01 PM          /s/  ADAM T. MOW
                                  District Court Judge
                             by
                             /s/  SCOTT KRIM
                                  District Court Clerk

Benjamin D. Johnson (10275)
Bennett Tueller Johnson & Deere
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121-5027
Telephone: (801) 438-2000
Facsimile: (801) 438-2050
Email: ben.johnson@btjd.com
*Attorneys for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT, SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC,<br><br>        Plaintiff,<br><br>vs.<br><br>PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive,<br><br>        Defendants. | **NOTICE OF JUDGMENT**<br><br><br><br>Case No. 206927043<br><br>Judge Adam Mow |

PLEASE TAKE NOTICE that the judgment filed from the Superior Court of California, County of Riverside, State of California, has been filed in the 3RD JUDICIAL DISTRICT COURT OF UTAH under the provisions of the UTAH FOREIGN JUDGMENT ACT (UCA 78B-5-301). Under this act, THIS JUDGMENT HAS THE SAME LEGAL FORCE AND EFFECT AS A JUDGMENT RENDERED BY THE UTAH STATE COURT.

A hearing to contest the validity of the registered determination shall be requested within 20 days after service of notice.

1

Failure to contest the registration will result in confirmation of the foreign order.

Executed on this 13th day of October, 2020.

Bennett Tueller Johnson & Deere

_/s/ Benjamin D. Johnson_
Benjamin D. Johnson
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE BY MAILING

STATE OF UTAH       :
                  ss.
COUNTY OF SALT LAKE  :

_____, being first duly sworn, upon oath states that he/she has mailed a

copy of the notice of judgment to the judgment debtor:

Brett Del Valle
1803 E. Bay Avenue
Newport Beach, CA 92661

PRP Investors Madison, LLC
c/o Brett Del Valle, Reg. Agent
417 29th Street
Newport Beach, CA 92663

BDV, Inc.
c/o Brett Del Valle, Reg. Agent
417 29th Street
Newport Beach, CA 92663

BDV, LLC

2

Bates #000012 of 3

c/o Brett Del Valle, Reg. Agent
417 29th Street
Newport Beach, CA 92663

Dated this _____ day of _____, 2020.

_____
Deputy Clerk

3

UCW

JUN 23 2020

1

2

3

4

5

6

7

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUN 19 2020

Lucero Zuniga

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

PALM SPRINGS COURTHOUSE

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC, a California limited liability company | CASE NO.  RIC 1601942 |
| Plaintiff, | [PROPOSED] FINAL JUDGMENT AFTER COURT TRIAL |
| v. | |
| PRP INVESTORS MADISON, LLC, a California Limited Liability Company, and BRETT DEL VALLE, an individual and DOES 1 through 50 inclusive, | Trial:      November 18, 2019 [POST]<br>Dept:      PS1<br>Judge:    Hon. Kira L. Klatchko |
| Defendants. | |
| AND RELATED CROSS-COMPLAINTS | |

This matter came on for Trial on November 18, 2019 before this Court and assigned to Department PS1 of the Riverside County Superior Court, the Honorable Kira L. Klatchko presiding. Trial proceeded each day through December 11, 2019. Each case was submitted, with closing arguments on December 11, 2019 and December 18, 2019

Bates #000015

1   Kenneth R. Van Vleck, Esq. of GCA Law Partners LLP appeared for plaintiff Alum Rock

2   Riverside, LLC ("Alum Rock"). Donald J. Hamman, Esq. and Eve A. Brackmann, Esq. of Stuart

3   Kane LLP appeared for defendants Brett Del Valle, PRP Investors Madison, LLC, BDV, Inc., and

4   BDV, LLC.

5   After close of evidence, BDV, Inc., and BDV, LLC dismissed their cross-complaint and

6   Brett Del Valle and PRP Investors Madison, LLC dismissed their cross-complaint.

7   The Court reviewed and considered the testimony, evidence, demeanor, and credibility of

8   witnesses and arguments presented to the Court. On January 2, 2020, the Court filed its Tentative

9   Decision and Minute Order, which were served that day by the Clerk of the Court.  Defendants

10   timely requested a statement of decision under Cal. Code of Civil Procedure § 632. On February

11   11, 2020, the Court filed its Proposed Statement Of Decision. On February 26, 2020, Plaintiff

12   served the Proposed Statement of Decision by mail. No party objected. The Proposed Statement

13   of Decision became the Statement of Decision by operation of law.

14   The Court hereby renders its FINAL JUDGMENT:

15   On the First Cause of Action for Breach of the 2012 Settlement Agreement: JUDGMENT

16   IS HEREBY ENTERED for plaintiff Alum Rock, LLC against PRP Investors Madison, LLC and

17   its alter ego Brett Del Valle for $2,834,276.95.

18   On the Fourth Cause of Action for Breach of the 2009 Indemnity Agreement:

19   JUDGMENT IS HEREBY ENTERED for plaintiff Alum Rock, LLC against PRP Investors

20   Madison, LLC; BDV, Inc.; BDV, LLC; and Brett Del Valle for $1,504,687.50.

21   The Court found insufficient evidence to support the Second Cause of Action for Breach

22   of Fiduciary Duty and the Third Cause of Action for Unjust Enrichment.

23

24   Dated: _3/18/20_

25   Hon. Kira L. Klatchko
    JUDGE OF THE SUPERIOR COURT

26

27

28

-1-

[PROPOSED] JUDGMENT AFTER COURT TRIAL - CASE NO.: 1601942

Bates #000016

This must be in red to be a
"CERTIFIED COPY"

Each document to which this certificate is attached
is certified to be a full, true and correct copy of the
original on file and of record in my office.

Superior Court of California
County of Riverside

By _____
              DEPUTY
          7/20/2c

Dated: _____

Certification must be in red to be a
"CERTIFIED COPY"

SUPERIOR COURT OF CALIFORNIA
EUREKA
COUNTY OF RIVERSIDE

# EXEMPLIFICATION CERTIFICATE

The documents to which this certificate is attached are full, true and correct copies of the originals on file and of record in my office. All of which we have caused by these presents to be exemplified, and the seal of our Superior Court of California, County of Riverside to be hereunto affixed.

IN WITNESS WHEREOF, I have hereto set my hand and affixed the Seal of the said Court,

This _____ day of _____, _____

_____
W. Samuel Hamrick Jr., Clerk
Superior Court of California, County of Riverside

I, _____ Judge Harold W. Hopp _____, Judge of the Superior Court of the State of California, in and for the County of Riverside, do hereby certify that W. SAMUEL HAMRICK JR., whose name is subscribed to the preceding exemplification, is the Clerk of the said Superior Court of the State of California, in and for the County of Riverside, and that full faith and credit are due to his official acts. I further certify, that the seal affixed to the exemplification is the seal of our said Superior Court and that the attestation thereof is in due form and according to the form of attestation used in this State.

Date _____.    _____

Judge of the Superior Court of California
County of Riverside

28 USCA, Sec. 1738
Form No. 334 (1/90; 10/97; 2/99; 3/00; 10/00; 5/01;1/03; 4/03; 6/03)

**CERTIFICATE OF NOTIFICATION**

I certify that a copy of the attached document was sent to the following people for case 206927043 by the method and on the date specified.

MAIL: BRETT DEL VALLE 1803 E. BAY AVENUE NEWPORT BEACH, CA 92661

10/28/2020        /s/ SCOTT KRIM

Date: _____        _____

Signature

JUN 2 3 2020
Bates #000001

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUN 19 2020

Lucero Zuniga

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

PALM SPRINGS COURTHOUSE

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC, a California limited liability company | CASE NO.  RIC 1601942 |
| Plaintiff, | [PROPOSED] FINAL JUDGMENT AFTER COURT TRIAL |
| v. | |
| PRP INVESTORS MADISON, LLC, a California Limited Liability Company, and BRETT DEL VALLE, an individual and DOES 1 through 50 inclusive, | Trial:    November 18, 2019 [POST] Dept:    PS1 Judge:    Hon. Kira L. Klatchko |
| Defendants. | |
| AND RELATED CROSS-COMPLAINTS | |

This matter came on for Trial on November 18, 2019 before this Court and assigned to

Department PS1 of the Riverside County Superior Court, the Honorable Kira L. Klatchko

presiding. Trial proceeded each day through December 11, 2019. Each case was submitted, with

closing arguments on December 11, 2019 and December 18, 2019

Bates #000002

1    Kenneth R. Van Vleck, Esq. of GCA Law Partners LLP appeared for plaintiff Alum Rock

2  Riverside, LLC ("Alum Rock"). Donald J. Hamman, Esq. and Eve A. Brackmann, Esq. of Stuart

3  Kane LLP appeared for defendants Brett Del Valle, PRP Investors Madison, LLC, BDV, Inc., and

4  BDV, LLC.

5    After close of evidence, BDV, Inc., and BDV, LLC dismissed their cross-complaint and

6  Brett Del Valle and PRP Investors Madison, LLC dismissed their cross-complaint.

7    The Court reviewed and considered the testimony, evidence, demeanor, and credibility of

8  witnesses and arguments presented to the Court. On January 2, 2020, the Court filed its Tentative

9  Decision and Minute Order, which were served that day by the Clerk of the Court.  Defendants

10  timely requested a statement of decision under Cal. Code of Civil Procedure § 632. On February

11  11, 2020, the Court filed its Proposed Statement Of Decision. On February 26, 2020, Plaintiff

12  served the Proposed Statement of Decision by mail. No party objected. The Proposed Statement

13  of Decision became the Statement of Decision by operation of law.

14    The Court hereby renders its FINAL JUDGMENT:

15    On the First Cause of Action for Breach of the 2012 Settlement Agreement: JUDGMENT

16  IS HEREBY ENTERED for plaintiff Alum Rock, LLC against PRP Investors Madison, LLC and

17  its alter ego Brett Del Valle for $2,834,276.95.

18    On the Fourth Cause of Action for Breach of the 2009 Indemnity Agreement:

19  JUDGMENT IS HEREBY ENTERED for plaintiff Alum Rock, LLC against PRP Investors

20  Madison, LLC; BDV, Inc.; BDV, LLC; and Brett Del Valle for $1,504,687.50.

21    The Court found insufficient evidence to support the Second Cause of Action for Breach

22  of Fiduciary Duty and the Third Cause of Action for Unjust Enrichment.

23

24  Dated: 3/18/20

25    Hon. Kira L. Klatchko
    JUDGE OF THE SUPERIOR COURT

26

27

28

-1-

Bates #000003

This must be in red to be a
"CERTIFIED COPY"

Each document to which this certificate is attached
is certified to be a full, true and correct copy of the
original on file and of record in my office.

Superior Court of California
County of Riverside

By _____
              DEPUTY
                7/20/20

Dated: _____

Certification must be in red to be a
"CERTIFIED COPY"

Bates #000004

# EXEMPLIFICATION CERTIFICATE

The documents to which this certificate is attached are full, true and correct copies of the originals on file and of record in my office. All of which we have caused by these presents to be exemplified, and the seal of our Superior Court of California, County of Riverside to be hereunto affixed.

IN WITNESS WHEREOF, I have hereto set my hand and affixed the Seal of the said Court,

This _____ day of _____, _____

W. Samuel Hamrick Jr., Clerk
Superior Court of California, County of Riverside

I, _____Judge Harold W. Hopp_____, Judge of the Superior Court of the State of California, in and for the County of Riverside, do hereby certify that W. SAMUEL HAMRICK JR., whose name is subscribed to the preceding exemplification, is the Clerk of the said Superior Court of the State of California, in and for the County of Riverside, and that full faith and credit are due to his official acts. I further certify, that the seal affixed to the exemplification is the seal of our said Superior Court and that the attestation thereof is in due form and according to the form of attestation used in this State.

Date __l l6l 20_____, _____

Judge of the Superior Court of California
County of Riverside

28 USCA, Sec. 1738
Form No. 334 (1/90; 10/97; 2/99; 3/00; 10/00; 5/01;1/03; 4/03; 6/03)

# EXHIBIT F

The Order of the Court is stated below:
**Dated:** June 22, 2021          /s/   KATHERINE CARLSON
          12:41:19 PM                    District Court Clerk



Benjamin D. Johnson (10275)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Facsimile: (801) 438-2050
Email: ben.johnson@btjd.com

*Attorneys for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT

## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC,<br><br>          Plaintiff,<br><br>vs.<br><br>PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive,<br><br>Defendants. | **WRIT OF EXECUTION**<br><br><br><br>Case No. 206927043<br><br>Judge Adam Mow |

To the SHERIFF OR CONSTABLE:

(1)     A judgment has been entered against the judgment debtor. After calculation of interest, costs and payments, the judgment debtor owes $4,339,089.45.

(2)     You are directed to seize and sell enough of the judgment debtor's non-exempt property described in Paragraphs (5) and (6) of the Application for Writ of Execution to satisfy that amount.

(3)     You are directed to serve this Writ and all attachments on the debtor and on the people named in Paragraphs (5) and (6) of the Application for Writ of Execution.

---

(4)    You are to return this Writ within 10 days after receiving it, with a signed account of your actions in executing this Writ.

## HEREBY ENTERED BY THE COURT

## Effective on the Date When the Court Stamp Is Affixed to the First Page of this Document

Writ of Execution

Approved Board of District Court Judges June 12, 2009
Revised April 6, 2015

Page 2 of 2

Bates #000042

June 22, 2021 12:41 PM

2 of 2

Benjamin D. Johnson (10275)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Facsimile: (801) 438-2050
Email: ben.johnson@btjd.com

*Attorneys for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT

## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC,<br><br>     Plaintiff,<br><br>vs.<br><br>PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive,<br><br>Defendants. | **APPLICATION FOR WRIT OF EXECUTION**<br><br><br>Case No. 206927043<br><br>Judge Adam Mow |

Judgment Creditor, by and through counsel, states as follows:

(1)    On October 23, 2021, a judgment against debtor Brett Del Valle was entered in the amount of $4,338,964.45.

(2)    The amount due is:

| | |
|---|---|
| Amount of Original Judgment | $4,338,964.45 |
| Pre-Judgment Interest | $0.00 |
| Post-Judgment Interest | TBD |
| Cost to file Application for Writ | $50.00 |

| | |
|---|---|
| Cost to serve this Writ | $75.00 |
| Filing and Service Fees for other Writs (Attach receipts.) | $0.00 |
| Subtotal | $4,339,089.45 |
| Less Payments Made | $0.00 |
| Total Amount Due | $4,339,089.45 |

(3)     The judgment debtor is:

| | |
|---|---|
| Name | Brett Del Valle |
| Address | 417 29th Street<br>Newport Beach, CA 92663<br>--or--<br>1201 Estelle Lane<br>Newport Beach, CA 92660-4904 |
| Social security number (Last 4 digits only, if known) | xxx-xx-2003 |
| Driver's license number and state of issuance (Last 4 digits only, if known) | N8067219 |
| Year and month of birth (if known) | 12/1961 |

(4)     I request that a Writ of Execution be issued directing the Sheriff or Constable to seize and sell enough of the judgment debtor's property described below to satisfy the judgment. I request that the Writ be served on the debtor and on the people named in Paragraphs (5) and (6), along with the attached forms.

(5)     I request that the Writ of Execution direct the Sheriff or Constable to seize and sell the debtor's following personal property:

| Description | Location | Estimated Value | Name & address of anyone other than debtor claiming an interest |
|---|---|---|---|
| | | | |

(6)     I request that the Writ of Execution direct the Sheriff to seize and sell the debtor's following real property.

| Property Description or Address | Estimated Value | Name and address of anyone other than debtor claiming an interest |
|---|---|---|
| 1453 S. Basinview Road, Huntsville, Utah 84317<br><br>Parcel No. 20-119-0007<br><br>Legal:  Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT | $1,800,000.00 | Molly J. Mulligan<br>John P. Mulligan<br>51 Chestnut Avenue<br>Clarendon Hills, IL 60514 |

I have not included any non-public information in this document.

I declare under penalty of Utah Code Section 78B-5-705 that everything stated in this document is true and correct.

Date _____ 6/22/2021    Sign here ▶ _____ /s/ Benjamin D. Johnson

Benjamin D. Johnson, Attorneys for Plaintiff

Typed or printed name _____

# EXHIBIT G

556 P.3d 21
Supreme Court of Utah.

Molly J. MULLIGAN and John P. Mulligan, Appellants,

v.

ALUM ROCK RIVERSIDE, LLC, Appellee.

No. 20221024
|
Heard April 10, 2024
|
Filed July 18, 2024
|
Rehearing Denied August 21, 2024

**Synopsis**

**Background:** After domesticating California judgment against judgment debtors in Utah, judgment creditor filed application writ of execution on real property to which judgment lien attached, which was owned by family revocable trust established by judgment debtors at time of judgment but was later conveyed to subsequent purchasers. The Third District Court, Salt Lake County, Adam T. Mow, J., issued writ, and then upheld writ over purchasers' objections. Purchasers appealed.

**Holdings:** The Supreme Court, Hagen, J., held that:

[1] whether judgment creditor that domesticated California judgment obtained valid lien on real property that was owned by trust at time of judgment was subject to requirements of Judgment Act;

[2] as matter of apparent first impression, creditor was not required to file judgment in Registry of Judgments in district court of county where real property was situated, in addition to recording judgment in office of county recorder, in order to obtain valid judgment lien on real property, under Judgment Act;

[3] real property was subject to writ of execution even though judgment debtors were not record owners of property;

[4] trust for which real property was asset could not shield real property from execution;

[5] venue statute requiring that causes of action involving real property be tried in county where property was situated had no bearing on district court's jurisdiction to issue writ of execution; and

[6] district court did not lack jurisdiction to issue writ of execution of judgment on real property situated outside its judicial district.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (15)

**[1]** **Appeal and Error** 🔑 Judgment in General
**Judgment** 🔑 Nature of lien

Judgment liens are creatures of statute; accordingly, whether real property is encumbered by judgment lien raises question of statutory interpretation, which is legal question that appellate court reviews for correctness. Utah Code Ann. § 78B-5-201.

**[2]** **Appeal and Error** 🔑 Review for Correctness or Error

Court's interpretation of Utah law presents legal questions, which appellate court reviews for correctness.

**[3]** **Statutes** 🔑 Plain Language; Plain, Ordinary, or Common Meaning

The aim of statutory interpretation is to ascertain the intent of the legislature, and the best evidence of the legislature's intent is the plain language of the statute itself.

**[4]** **Statutes** 🔑 Context
**Statutes** 🔑 Statutory scheme in general

Because statutory text may not be plain when read in isolation, when interpreting a statute, the court determines the meaning of the text given the relevant context of the statute, including,

particularly, the structure and language of the statutory scheme.

**[5]** **Judgment** Enforcement in other states

To create a lien from a foreign judgment, creditors must adhere to relevant requirements under the Judgment Act as well as the Foreign Judgment Act. Utah Code Ann. §§ 78B-5-201, 78B-5-305(1).

**[6]** **Judgment** Enforcement in other states

Whether judgment creditor that domesticated California judgment in Utah obtained valid lien on real property in Utah that was owned by trust established by judgment debtors was subject to requirements of Judgment Act, where Foreign Judgment Act expressly incorporated requirements of Judgment Act by providing that "foreign judgment filed under [the Foreign Judgment Act] has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court" of Utah. Utah Code Ann. §§ 78B-5-201, 78B-5-302(3).

**[7]** **Judgment** Nature of lien

**Judgment** Enforcement in other states

A lien is a means of enforcing a judgment; as such, a foreign judgment is subject to the same requirements for lien creation as domestic judgments. Utah Code Ann. §§ 78B-5-201, 78B-5-305(1).

**[8]** **Judgment** Enforcement in other states

Judgment creditor that domesticated 2020 California judgment in Utah was not required to file judgment in Registry of Judgments in district court of county where real property owned by trust established by judgment debtors was located, in addition to recording judgment with office of county recorder where real property was situated, in order to obtain valid

judgment lien against property, under separate provisions of Judgment Act stating that, after July 1, 1997, judgment creditor seeking to obtain judgment lien had to "file judgment in Registry of Judgments of the office of the clerk of the district court of the county in which the property is located," and that after July 1, 2002, creditor had to record judgment "in office of county recorder in which the real property of the judgment debtor is located"; statute was sequential, not cumulative, and therefore, creditor needed only to record domesticated judgment in office of county recorder. Utah Code Ann. § 78B-5-201(2), (3)(a).

**[9]** **Statutes** Reenactment or incorporation of prior statute

**Statutes** Presumptions

When interpreting statute, where legislature amends portion of statute but leaves other portions unamended, or reenacts them without change, legislature is presumed to have been satisfied with prior judicial constructions of unchanged portions of statute and to have adopted them as consistent with its own intent.

**[10]** **Creditors' Remedies** Ownership or Possession of Subject Matter

**Judgment** Enforcement in other states

Real property owned by revocable family trust established by husband and wife judgment debtors was subject to writ of execution obtained by judgment creditor that domesticated California judgment in Utah, under Judgment Act, which provided that real property subject to a judgment lien "includes all the real property … owned or acquired at any time by the judgment debtor during the time the judgment is effective," even if debtors never "owned" subject property; debtors were co-settlors with power to amend or revoke trust, and to transfer property from trust, and upon revocation of trust, property would be delivered to debtors, either together or individually, as part of community property, and therefore, debtors held functionally equivalent

Mulligan v. Alum Rock Riverside, LLC, 556 P.3d 21 (2024)

2024 UT 22

of ownership of property. Utah Code Ann. § 78B-5-202(7)(c)(ii).

**[11]    Trusts** 🔑 Nature and essentials of trusts

"Trust" is form of ownership in which legal title to property is vested in trustee, who has equitable duties to hold and manage it for benefit of beneficiaries.

**[12]    Trusts** 🔑 Nature and essentials of trusts

One standard estate-planning practice is to form a revocable trust in which the settlor is also the trustee and manages the trust for their own benefit during their lifetime, and when done properly, this strategy serves to avoid probate of the assets while allowing the settlor to retain control of the trust property during his or her own lifetime.

**[13]    Creditors' Remedies** 🔑 Interests under wills, trusts, and estates

Family revocable trust established by judgment debtors, which owned real property, could not shield real property from execution by judgment creditor after California judgment was domesticated in Utah and creditor obtained valid judgment lien on property by recording judgment in office of county recorder in county where property was situated. Utah Code Ann. § 78B-5-201(3)(a).

**[14]    Creditors' Remedies** 🔑 Jurisdiction and authority to issue and control

Venue statute requiring that causes of action involving real property be tried in county where property was situated had no bearing on district court's jurisdiction to issue writ of execution of California judgment domesticated in Utah on real property to which judgment lien attached that was located in county outside district court's judicial district, where request for writ of execution was not cause of action. Utah Code Ann. § 78B-3-301(1).

**[15]    Creditors' Remedies** 🔑 Jurisdiction and authority to issue and control

Civil rule providing that, "if the writ directs the seizure of real property, the court clerk will issue the writ to the sheriff of the county in which the real property is located," and if it "directs the seizure of personal property, the court may issue the writ to an officer of any county" did not operate to divest district court of jurisdiction to issue writ of execution on real property situated in county outside its judicial district on request of judgment creditor that domesticated California judgment and obtained judgment lien on property, despite assertion by subsequent purchasers that court's authority to issue writ to "officer of any county" did not apply to seizure of real property, where rule said nothing about which court could issue writ and contained no requirement that district court issuing writ be in the same county as subject real property. Utah R. Civ. P. 64(d)(1).

**\*23** Third District, Salt Lake County, The Honorable Adam T. Mow, No. 206927043

**Attorneys and Law Firms**

Bradley L. Tilt, Salt Lake City, Felicia B. Canfield, Cody, Wyo., for appellants

Benjamin D. Johnson, KC Hooker, Salt Lake City, for appellee

Justice Hagen authored the opinion of the Court, in which Chief Justice Durrant, Associate Chief Justice Pearce, Justice Petersen, and Justice Pohlman joined.

Justice Hagen, opinion of the Court:

### INTRODUCTION

¶1 This case stems from a California judgment that Alum Rock Riverside, LLC obtained against Brett Del Valle. After domesticating the judgment in Utah and recording it with

2024 UT 22

the county recorder, Alum Rock received a writ of execution allowing it to seize and sell a property in Weber County.

¶2 At the time Alum Rock recorded the judgment with the county recorder, the property was owned by a revocable trust that was established and administered by Brett and his wife. But the trust had sold the property by the time Alum Rock applied for the writ. And when the court issued the writ, the property's new owners—the Mulligans—objected, arguing that (1) Alum Rock failed to create a judgment lien because it did not record the judgment in the registry of judgments, (2) the writ was not available because the trust—not Brett—held title to the property when the judgment was domesticated in Utah, and (3) the district court lacked jurisdiction to issue the writ because the property was located in a different judicial district.

¶3 The district court upheld the writ over the Mulligans' objections, and we affirm. First, we hold that Alum Rock created a judgment lien when it recorded the judgment in the county recorder's office. As of July 1, 2002, a party seeking a judgment lien is not required to record the judgment in the registry of judgments. Second, we hold that the writ was available against the property, even though the title was held in the name of a revocable trust, because Brett retained all indicia of ownership over the property when the lien was created. And third, we hold that the Mulligans have not identified a relevant limitation on the district court's jurisdiction that would prevent it from issuing the writ.

**BACKGROUND**

¶4 Alum Rock Riverside, LLC sued Brett Del Valle in California state court for breach of contract and other claims. Alum Rock prevailed, and the court issued a judgment in its favor totaling more than $4 million. Soon after, Alum Rock domesticated the judgment **\*24** in Utah's Third District Court. Because the Del Valle Family Trust owned property in Weber County, Utah, Alum Rock recorded the judgment in the Weber County Recorder's Office.

¶5 Brett and his wife, Traci, had formed the trust years earlier, naming themselves as trustees. Brett and Traci retained broad powers over the trust and its property, including the power to revoke the trust, amend it, and transfer property from it. In addition, the trust empowered Brett and Traci, as trustees, to hold, manage, control, lease, and encumber trust property. Several years after they created the trust, Brett and Traci,

acting as trustees, acquired the Weber County property at issue in this case.

¶6 The trust continued to hold title to the property when Alum Rock recorded its judgment against Brett in the county recorder's office. A few months after Alum Rock recorded the judgment, however, the trust conveyed the property to Molly and John Mulligan. And one month after that, Alum Rock applied for a writ of execution against the property, identifying Brett as the judgment debtor and asking the district court to "direct the sheriff to seize and sell" the property to satisfy the judgment.

¶7 When the court issued the writ as requested, the Mulligans challenged it. Acknowledging that their challenge "rises or falls" on whether a lien "was created and attached to the property," they asserted that Alum Rock did not do what the Judgment Act requires to create a judgment lien on real property. [1] Specifically, they claimed that Alum Rock did not fully comply with the following statutory requirements, found in Utah Code section 78B-5-201:

> (2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.

> (3)(a) On or after July 1, 2002, ... a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021).

¶8 The Mulligans argued that because Alum Rock obtained its judgment against Brett in 2020—after both July 1, 1997, and July 1, 2002—Alum Rock needed to comply with the requirements of both subsections: filing the judgment in the registry of judgments and recording it with the county recorder. Because Alum Rock did not file the judgment in the registry of judgments, the Mulligans reasoned, a lien was not created.

¶9 The Mulligans also claimed that, under the Judgment Act and the Utah Rules of Civil Procedure, the writ was not "available" against the property. Under the Judgment Act, real property subject to a judgment lien "includes all the real property ... owned or acquired at any time by the

judgment debtor during the time the judgment is effective." *Id.* § 78B-5-202(7)(c)(ii) (2021). And under rule 64E of the Utah Rules of Civil Procedure, "[a] writ of execution is available to seize property in the possession or under the control of the defendant following entry of a final judgment." UTAH R. CIV. P. 64E(a). According to the Mulligans, the writ was "issued improperly" because (1) Brett never owned the property (the trust did), and (2) in any event, he did not possess or control the property at the relevant time (the Mulligans did).

¶10 Finally, the Mulligans questioned the district court's jurisdiction. In their view, the court lacked jurisdiction to issue the writ because the proceedings fall within reach of a venue statute that lists actions that "shall be tried in the county in which the [property] ... is situated." *See* UTAH CODE § 78B-3-301(1) (2021).[2] The Mulligans also claimed **\*25** that under Utah caselaw, actions in which the "main question ... involves title to real property" may be heard only by the district court where the property is located. (Quoting *Calder v. Third Jud. Dist. Ct.*, 2 Utah 2d 309, 273 P.2d 168, 171 (1954).) Because the property here is outside the district court's geographic boundaries, the Mulligans maintained that the court lacked jurisdiction to issue the writ.

¶11 The district court upheld the writ against the Mulligans' challenge. It first concluded that the Judgment Act did not require Alum Rock to file its judgment in the registry of judgments, as the Mulligans had argued, and that Alum Rock's lien attached when the judgment was recorded with the county recorder. Next, the court determined that because the property was under Brett's control when Alum Rock domesticated the judgment, the property was subject to execution under rule 64E. Finally, the court rejected the Mulligans' challenge to its jurisdiction, explaining that it had the power to issue the writ even though the property is located outside the Third District.

¶12 The Mulligans appeal, and we have jurisdiction under Utah Code subsection 78A-3-102(3)(j).

## ISSUES AND STANDARDS OF REVIEW

**[1]** ¶13 The parties dispute whether Alum Rock created a judgment lien on the property. "Judgment liens are creatures of statute ...." *Gildea v. Wells Fargo Bank, N.A.*, 2015 UT 11, ¶ 12, 347 P.3d 385. Accordingly, whether the property here is encumbered by Alum Rock's purported judgment lien raises a question of statutory interpretation, a legal question that we review for correctness. *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863.

**[2]** ¶14 The Mulligans also contest the district court's conclusions that the property is subject to the writ and that the court had jurisdiction to issue the writ. Because these determinations were premised on the court's interpretation of Utah law, they also present legal questions, which we review for correctness. *See Peak Alarm Co. v. Salt Lake City Corp.*, 2010 UT 22, ¶ 16, 243 P.3d 1221.

## ANALYSIS

**[3]** **[4]** ¶15 The Mulligans challenge three aspects of the district court's decision, each of which turns in part on statutory interpretation. "The aim of statutory interpretation is to ascertain the intent of the legislature, and the best evidence of the legislature's intent is the plain language of the statute itself." *SunStone Realty Partners X LLC v. Bodell Constr. Co.*, 2024 UT 9, ¶ 11, 545 P.3d 260 (cleaned up). But because "statutory text may not be plain when read in isolation," *State v. J.M.S. (In re J.M.S.)*, 2011 UT 75, ¶ 13, 280 P.3d 410 (cleaned up), "we determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)," *McKitrick v. Gibson*, 2021 UT 48, ¶ 19, 496 P.3d 147 (cleaned up).

**[5]** ¶16 We first address the Mulligans' contention that Alum Rock skipped a necessary step to create a lien on the property by not filing its judgment in the registry of judgments. We clarify that to create a lien from a foreign judgment, creditors must adhere to relevant requirements under the Judgment Act as well as the Foreign Judgment Act. But since July 1, 2002, creditors do not need to file judgments in the registry of judgments to create a lien. Thus, Alum Rock created a valid lien when it recorded its judgment in the county recorder's office.

¶17 Next, we assess whether Brett "owned" the property, allowing Alum Rock's lien to attach, even though the revocable trust that he and his wife created and administered held title to it. We conclude that he did.

¶18 Finally, we consider and reject the Mulligans' argument that limitations on the district court's jurisdiction prohibited the court from issuing the writ.

Mulligan v. Alum Rock Riverside, LLC, 556 P.3d 21 (2024)

2024 UT 22

**\*26**  I. ALUM ROCK CREATED A
VALID LIEN ON THE PROPERTY

¶19 To resolve this appeal, we must decide whether Alum Rock created a valid lien on the property before it was sold to the Mulligans. The answer to that question largely depends on the meaning of two provisions of the Judgment Act.

¶20 These provisions, subsections (2) and (3)(a) of Utah Code section 78B-5-201, set out actions that judgment creditors have needed to perform at different times to create a judgment lien on real property:

(2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.

(3)(a) On or after July 1, 2002, ... a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021). The Mulligans argue that these requirements—the registry-of-judgments requirement and the county-recorder requirement—"work together, cumulatively." Under their reading, because the judgment was domesticated in 2020, which is "on or after" both July 1, 1997, and July 1, 2002, *see id.*, Alum Rock could not create a lien on the property unless it (1) filed its judgment in the registry of judgments and (2) recorded it with the county recorder.

¶21 Before interpreting these provisions, we address a threshold issue raised by Alum Rock: whether section 78B-5-201 of the Judgment Act even applies here, given that Alum Rock's judgment is a foreign judgment. After explaining why the section applies, we interpret its provisions.

*A. Creditors Domesticating Foreign Judgments Must Adhere to the Judgment Act's Requirements for Creating a Lien*

 [6]   ¶22 Alum Rock argues that the Judgment Act's registry-of-judgments requirement is not implicated here because Alum Rock's judgment is governed by the Foreign Judgment Act, which makes no mention of the registry of judgments. We disagree.

¶23 As it relates to converting a foreign judgment into a lien, the Foreign Judgment Act provides:

(1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:

(a) a stay of execution has not been granted;

(b) the requirements of this chapter are satisfied; and

(c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202 [of the Judgment Act].

UTAH CODE § 78B-5-305(1).

¶24 Alum Rock points out that this section of the Foreign Judgment Act mentions section 78B-5-202 of the Judgment Act but not section 78B-5-201. And, it adds, section 202 also does not mention section 201 or its registry-of-judgments requirement, on which the Mulligans' argument turns. *See id.* § 78B-5-202(7)(a) (2021) ("After July 1, 2002, a judgment ... becomes a lien upon real property if ... the judgment ... is recorded in the office of the county recorder.").

¶25 These points are well taken. Still, the Foreign Judgment Act declares that foreign judgments are treated the same as domestic ones. Specifically, it provides that "[a] foreign judgment filed under [the Foreign Judgment Act] has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court of this state." *Id.* § 78B-5-302(3). Alum Rock argues that this language does not "incorporate[ ] the Judgment Act wholesale into the Foreign Judgment Act." Instead, Alum Rock urges us to parse this language and treat the phrase "for reopening, vacating, setting aside, or staying" as modifying and limiting the entire **\*27**  preceding series—"procedures, defenses, enforcement, satisfaction, and proceedings."

¶26 To take one example, as Alum Rock sees it, foreign judgments are not generally "subject to the same procedures" as domestic judgments; they are merely "subject to the same procedures ... *for reopening, vacating, setting aside, or staying*" as domestic judgments. Alum Rock thus argues that the Judgment Act applies to foreign judgments only

when reopening, vacating, setting aside, or staying a foreign judgment, none of which Alum Rock seeks to do here.

¶27 But Alum Rock's argument is undercut by a decision that we issued after the briefing in this appeal was completed, *SunStone Realty Partners X LLC v. Bodell Construction Co.*, 2024 UT 9, 545 P.3d 260. There, the parties disputed whether, under the Foreign Judgment Act, Utah's or Hawaii's postjudgment interest rate applied to a Hawaii judgment that was domesticated in Utah. *Id.* ¶¶ 1–2. In resolving the dispute, we explained that the Foreign Judgment Act "mandates that foreign judgments domesticated using the [Foreign Judgment Act] are 'subject to the same procedures, defenses, enforcement, satisfaction, and proceedings ... as a judgment of a district court of this state.' " *Id.* ¶ 13 (quoting UTAH CODE § 78B-5-302(3)). In line with this principle, we held that "[b]ecause postjudgment interest is an enforcement mechanism," Utah's postjudgment interest rate applied. *Id.* ¶ 21.

¶28 In *SunStone* we did not read the phrase "for reopening, vacating, setting aside, or staying" as modifying "enforcement." *See id.* ¶ 13; *see also* UTAH CODE § 78B-5-302(3). Indeed, it would be unreasonable to read the phrase to modify terms like "enforcement" and "satisfaction" because a judgment's enforcement or satisfaction would not be at issue in proceedings to reopen, vacate, set aside, or stay a judgment. This leads us to conclude that the phrase limits and modifies only the nearest item in the series to it —"proceedings."

¶29 We reject Alum Rock's reading for another reason as well. Under its reading, a creditor intending to create a lien based on a domestic judgment would be subject to all the Judgment Act's constraints, but a foreign-judgment creditor would not. This would result, counterintuitively, in a foreign judgment being *easier* to convert into a lien than a domestic one, which is contrary to an express purpose of the Foreign Judgment Act —to treat foreign judgments the same as domestic ones in key respects. *See* UTAH CODE § 78B-5-302(2)–(3).

 **[7]**  ¶30 Like postjudgment interest, a lien is a means of enforcing a judgment. As such, a foreign judgment is subject to the same requirements for lien creation as domestic judgments. Thus, the Foreign Judgment Act incorporates the Judgment Act's requirements for creating a judgment lien, including those found in section 78B-5-201.

## B. Alum Rock Did Not Need to File Its Judgment in the Registry of Judgments to Create a Lien

 **[8]**  ¶31 Having concluded that section 201 applies, we must interpret subsections (2) and (3)(a) and determine whether their requirements are cumulative (as the Mulligans argue) or sequential (as Alum Rock argues). We hold that they are sequential, not cumulative.

¶32 Although we have yet to decisively interpret these provisions, the court of appeals previously interpreted a substantively similar version of the statute under analogous circumstances and rejected the cumulative reading now advanced by the Mulligans. In *Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 2005 UT App 164, 112 P.3d 1210, judgment creditors recorded an abstract of their judgment in the county recorder's office and applied for a writ of execution permitting them to sell a property that was owned by the judgment debtor. *Id.* ¶¶ 2–3. But the judgment debtor deeded his interest in the property to his wife between the time the creditors recorded the judgment with the county recorder and the time they applied for the writ. *Id.* ¶ 2.

¶33 When the district court issued the writ, the judgment debtor objected, claiming that the creditors did not create a lien on the property before the debtor conveyed the property to his wife because they "had not ... filed the Judgment in the Registry of **\*28** Judgments." *Id.* ¶ 4. On appeal, the debtor argued that the registry-of-judgments and county-recorder provisions "must be read together, thereby creating a two-step process" that required post-2002 judgments to be filed "in both the Registry of Judgments and the office of the county recorder." *Id.* ¶ 12.

¶34 The *Kitches* court rejected this cumulative reading and held that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." *Id.* ¶ 13. We reach the same conclusion because it is supported by the structure of section 78B-5-201, other sections of the Utah Code from the Judgment Act and the Foreign Judgment Act, and the prior-construction canon of statutory interpretation.

¶35 The structure of section 201 itself signals that the registry-of-judgments and county-recorder requirements are to be read sequentially, creating independent requirements for successive time periods. For context, a district court's entry of judgment historically "create[d] a lien upon the real

property of the judgment debtor" automatically. *See* UTAH CODE § 78B-5-202(2) (2021) ("Prior to July 1, 1997, ... the entry of judgment by a district court creates a lien upon the real property of the judgment debtor ...."). But the legislature did away with this automatic-lien regime. As recognized by subsection (2) of section 78B-5-201, beginning July 1, 1997, a judgment lien does not arise automatically upon a district court's entry of judgment; such a judgment does not create a lien "unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located." *Id.* § 78B-5-201(2) (2021).

¶36 As with the automatic-lien regime, the legislature also phased out subsection (2)'s registry-of-judgments requirement. Subsection (3)(a) of section 201 marks this evolution in the law. Rather than allow a judgment to create a lien automatically (before July 1, 1997) or require judgment creditors to file the judgment in the registry of judgments (on or after July 1, 1997), beginning July 1, 2002, a judgment entered in the district court does not create a lien "unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located." *Id.* § 78B-5-201(3)(a) (2021).

¶37 This sequential reading makes sense when we zoom in on the grammatical structure of subsections (2) and (3)(a). The two subsections are separate, stand-alone provisions, each punctuated with a period. Their requirements are not joined with a conjunction such as "and" or "or." And subsection (3) (a) does not expressly incorporate subsection (2)'s registry-of-judgments requirement.

¶38 Contrast this with subsection (4) of the same section, which also imposes requirements on judgment creditors, requiring them to include certain information when filing or recording a judgment:

(4) In addition to the requirements of Subsections (2) and (3)(a), any judgment that is filed in the Registry of Judgments on or after September 1, 1998, or any judgment or abstract of judgment that is recorded in the office of a county recorder after July 1, 2002, shall include:

(a) the information identifying the judgment debtor as required under Subsection (4)(b) on the judgment or abstract of judgment; or

(b) a copy of the separate information statement of the judgment creditor that contains:

(i) the correct name and last-known address of each judgment debtor and the address at which each judgment debtor received service of process;

(ii) the name and address of the judgment creditor;

(iii) the amount of the judgment as filed in the Registry of Judgments;

(iv) if known, the judgment debtor's Social Security number, date of birth, and driver's license number if a natural person; and

(v) whether or not a stay of enforcement has been ordered by the court and the date the stay expires.

*Id.* § 78B-5-201(4) (2021). Unlike subsections (2) and (3)(a), subsection (4)'s requirements are unified, with the cumulative requirements **\*29** indented, punctuated with semicolons, and joined with a conjunction. And with the opening phrase "in addition to," subsection (4) expressly incorporates the requirements of previous subsections.

¶39 As subsection (4) demonstrates, the legislature knows how to signal when it intends requirements to be cumulative. But unlike subsection (4), subsection (3) does not state that recording in the county recorder's office must be done "[i]n addition to" the registry-of-judgments requirement in subsection (2). And instead of listing both requirements as indented subsections separated by semicolons and a conjunction, the legislature listed the two requirements as stand-alone provisions triggered on different dates. That structure supports our reading that subsection (3)'s requirements supplant those in subsection (2) after July 1, 2002.

¶40 Reading the subsections sequentially also makes sense when we zoom out and look at related sections of the Utah Code. We have a "duty to harmonize and reconcile statutory provisions." *Field v. Boyer Co.*, 952 P.2d 1078, 1081 (Utah 1998) (cleaned up). Reading section 201's requirements as being sequential harmonizes and reconciles them with section 78B-5-202 of the Judgment Act and section 78B-5-305 of the Foreign Judgment Act. Properly understood, all three statutes provide that, since July 1, 2002, a judgment becomes a lien on real property if it is recorded in the office of the county recorder. Utah Code section 78B-5-202 provides that, after July 1, 2002, a judgment becomes a lien on real property if it "is recorded in the office of the county recorder." UTAH

CODE § 78B-5-202(7)(a) (2021). And Utah Code section 78B-5-305, part of the Foreign Judgment Act, provides:

> (1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:
>
> (a) a stay of execution has not been granted;
>
> (b) the requirements of this chapter are satisfied; and
>
> (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202.

*Id.* § 78B-5-305(1).

¶41 Notice that these sections do not refer to the registry of judgments. If, as the Mulligans suggest, the legislature intended judgment creditors to continue filing in both the registry of judgments and the county recorder's office, this absence would be hard to reconcile. For example, consider how the text of section 202 squares with the Mulligans' reading of section 201. Section 202 provides, "After July 1, 2002, a judgment ... becomes a lien upon real property if ... the judgment ... is recorded in the office of the county recorder." *Id.* § 78B-5-202(7)(a) (2021). But under the Mulligans' reading of section 201, after July 1, 2002, a judgment *does not* become a lien on real property if the judgment is recorded in the office of the county recorder; the judgment must also be filed in the registry of judgments.

¶42 Historical context helps explain why sections 202 and 305 mention the county-recorder requirement but not the registry-of-judgments requirement. In 2001, the legislature passed a bill that amended the Judgment Act and the Foreign Judgment Act in significant ways. *See* Judgment Lien Amendments, H.B. 305, 2001 Leg., Gen. Sess. (Utah 2001) (available at https://le.utah.gov/~2001/bills/hbillenr/HB0305.htm). The bill—which ushered in the county-recorder regime for judgment-lien creation—provided that the statutory overhaul was to take effect July 1, 2002. *See id.* Before that date, the sections that are now codified as sections 202 and 305 did not specify the manner of recording a judgment lien. *See* UTAH CODE §§ 78-22-1, 78-22a-5 (2001). As of July 1, 2002, however, the sections recognized and reflected the incoming county-recorder requirement. *See id.* §§ 78-22-1, 78-22a-5 (July 2002). Each section was amended to specify that for a judgment to create a lien, the judgment must be "recorded in the office of the county recorder." *See id.* §§ 78B-5-202(7)(a), -305(1)(c). But the legislature did not add similar language referring to the registry-of-judgments

requirement. That omission further supports our conclusion that the outdated registry-of-judgments requirement was entirely supplanted **\*30** by the county-recorder regime as of July 1, 2002.

**[9]** ¶43 The prior-construction canon of statutory interpretation also reinforces our reading of section 201. Under that canon, if a word or phrase has been uniformly interpreted in caselaw, "a later version of that act perpetuating the wording is presumed to carry forward that interpretation." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322 (2012). In other words, "where a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent." *Christensen v. Indus. Comm'n*, 642 P.2d 755, 756 (Utah 1982).

¶44 In *Kitches*, the court of appeals interpreted the section that is now codified as section 201 to mean that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." 2005 UT App 164, ¶ 13, 112 P.3d 1210. That decision has stood as controlling law in this jurisdiction for nearly two decades, and during that time judgment creditors have presumably relied on it as such. The legislature has amended the Judgment Act—including section 201—several times since *Kitches* was decided, yet it has not modified the language to abrogate the case's holding.[3] We presume that by amending the statute but leaving the portions relevant here unamended, the legislature was satisfied with *Kitches*' reading.

¶45 The Mulligans maintain that *Kitches* has not been the controlling law in Utah since 2013 because it was overtaken by the court of appeals' decision in *T3 Properties, LLC v. Persimmon Investments, Inc.*, 2013 UT App 38, 299 P.3d 613. There, a creditor obtained a court judgment in 2001, at which time the judgment debtor owned property in Salt Lake County. *Id.* ¶¶ 2–3. Not long after, however, the debtor conveyed his interest in the property to a third party. *Id.* ¶ 3. And not until years later did the creditor begin efforts to execute the judgment by having the property sold. *Id.* ¶ 4.

¶46 Between the time the court entered the judgment and the time the debtor transferred the property, the creditor recorded

*Mulligan v. Alum Rock Riverside, LLC*, 556 P.3d 21 (2024)
2024 UT 22

the judgment in the registry of judgments but did not file an information statement with the judgment. [4] *Id.* ¶¶ 16–17. The issue was whether the judgment creditor created a lien on the property before the debtor conveyed it away. *Id.* ¶ 17. To answer that question, the court interpreted the 2001 version of the Judgment Act, *id.* ¶¶ 16–28, which, like the current version, provided that "[o]n or after July 1, 1997, a judgment ... does not create a lien upon or affect the title to real property unless the judgment is recorded in the Registry of Judgments," *see id.* ¶ 15 (quoting UTAH CODE § 78-22-1.5(2) (2001)). The next subsection provided, "In addition to the requirement of [the previous subsection], any judgment that is recorded in the Registry of Judgments on or after September 1, 1998, shall include a separate information statement of the judgment creditor." *Id.* (quoting UTAH CODE § 78-22-1.5(3) (2001)).

¶47 The *T3* court concluded that under the 2001 version of the Judgment Act, "both requirements"—the registry-of-judgments and information-statement requirements—"must be satisfied to create a judgment lien." *Id.* ¶ 19. To support this conclusion, the court analyzed the relevant text by noting that (1) the legislature's "[u]se of the word 'shall' ... indicates that filing an information statement is mandatory," and (2) the information-statement requirement "must be completed 'in addition' to" the registry-of-judgments requirement. *Id.* (cleaned up); *see also id.* ¶ 21. **\*31** Even though the court's decision was based on the language of the 2001 version of the Judgment Act and turned on the information-statement requirement, the court added a footnote stating that "the 2002 version [of the Judgment Act] required that the judgment and the information statement be recorded in both the Registry of Judgments and in the county recorder's office." *Id.* ¶ 14 n.5.

¶48 According to the Mulligans, *T3* overtook *Kitches* as controlling law interpreting the Judgment Act. We disagree. Although the *T3* court included a footnote suggesting that the registry-of-judgments and county-recorder requirements of the 2002 Judgment Act are cumulative, *see id.*, that statement was dicta because it was "unnecessary to the decision in the case and therefore not precedential," *see Obiter Dictum*, BLACK'S LAW DICTIONARY (12th ed. 2024). A separate panel of the court, squarely presented with

the issue, had held that those requirements are sequential and that judgments no longer need to be filed in the registry of judgments for a lien to attach. *See supra* ¶¶ 32–34. The *T3* court did not even mention *Kitches*, much less purport to overrule it. *Kitches* remained controlling law on the sequential nature of the recording requirements despite the footnote dicta in *T3*. We therefore presume that when the legislature amended section 201 post-*Kitches*, it saw no need to amend the recording requirements because it was satisfied with the prior judicial interpretation of those requirements in *Kitches*.

¶49 The Mulligans also argue that the court's analysis in *T3* favors a cumulative reading of the registry-of-judgments and county-recorder requirements. They maintain that *T3* "involved a deep analysis" of section 201 and "laid out a roadmap for how courts should analyze [the Judgment Act's] cumulative amendments over time." Although we are not bound to follow court of appeals decisions, we often look to those decisions for their persuasive value. *Eaton Kenway, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 906 P.2d 882, 885 (Utah 1995). But we see little persuasive value in *T3* relative to the issue in the present case.

¶50 The court in *T3* interpreted a different provision in the 2001 version of the Judgment Act, which did not contain the county-recorder requirement. *See* 2013 UT App 38, ¶ 15, 299 P.3d 613. The question before the court was whether the registry-of-judgments and information-statement requirements were cumulative. *See id.* ¶ 28. Unlike the county-recorder requirement at issue here, the information-statement requirement specified that it was "[i]n addition to" the registry-of-judgments requirement found in section 201(2). *Id.* ¶ 12 (quoting Utah Code § 78-22-1.5(3) (2001)). This additional language, which expressly made the registry-of-judgments and the information-statement requirements cumulative, easily distinguishes *T3* from both *Kitches* and the present case.

¶51 We endorse *Kitches*' holding that, since July 1, 2002, a lien on real property is created by recording the judgment, along with other required information, with the county recorder where the real property is located. Alum Rock therefore did not need to record the judgment in the registry of judgments, and it created a lien by recording the judgment in the county recorder's office.

## II. BRETT OWNED THE PROPERTY FOR PURPOSES OF ALUM ROCK'S LIEN ATTACHING

¶52 The Mulligans argue that, under the Judgment Act, "[t]here is no basis for any judgment lien against the Property" because the trust, not Brett, held title to the property. Before explaining why we disagree, we pause to address the Mulligans' criticism of the district court's analysis.

¶53 The Mulligans criticize the district court for relying on rule 64E of the Utah Rules of Civil Procedure, rather than the Judgment Act, in concluding that the property is "subject to the execution." Rule 64E allows writs of execution to be issued against property that is "*in the possession or under the control of* the defendant." UTAH R. CIV. P. 64E(a) (emphasis added). The Judgment Act, in contrast, sets the conditions under which a judgment lien attaches in the first instance, providing that real property subject to a judgment lien "includes all the real property ... *owned or acquired* at any time by the **\*32** judgment debtor during the time the judgment is effective." UTAH CODE § 78B-5-202(7)(c)(ii) (2021) (emphasis added).

¶54 The Mulligans argue that the district court should have focused its analysis on the Judgment Act, rather than on rule 64E, which they contend "has nothing whatsoever to do with whether the Foreign Judgment against Brett personally could become a lien against Property he never owned." But because they principally relied on rule 64E, not the Judgment Act, before the district court, the court's reliance on rule 64E was understandable. In their principal filing below, the Mulligans cited rule 64E and quoted, with emphasis, the rule's language regarding possession and control. In contrast, they mentioned the Judgment Act's "owned or acquired" language only in passing in a footnote.

¶55 It is true that the Mulligans argued to the district court that the property was "never ... *owned* by Brett Del Valle in his individual and personal capacity." (Emphasis added.) Yet they never tied that argument to the language of the Judgment Act, and the thrust of their argument below was that the writ "was not properly available under the express terms" of the "governing Utah Rules of Civil Procedure." In its decision, the court rejected that rule-based argument because rule 64E "does not contain any provision limiting its application to owners of property."

**[10]** ¶56 On appeal, the Mulligans distance themselves from their prior reliance on rule 64E and embrace the Judgment Act's "owned or acquired" language.[5] Under the Judgment Act, real property subject to a judgment lien "includes all the real property... owned or acquired at any time by the judgment debtor during the time the judgment is effective."[6] *Id.* To the Mulligans, holding title is the essence of ownership. Because Brett "was never in title," they maintain that "he never owned the Property" and the lien never attached to it.

**[11]    [12]** ¶57 When the judgment was entered against Brett, the property was held by the Del Valle Family Trust, which is a revocable trust that Brett formed with his wife, Traci. "A trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of the beneficiaries." *Cont'l Bank & Tr. Co. v. Country Club Mobile Ests., Ltd.*, 632 P.2d 869, 872 (Utah 1981). A revocable trust is "[a] trust in which the settlor" (the person who creates the trust) "reserves the right to terminate the trust and recover the trust property and any undistributed income." *Revocable Trust*, BLACK'S LAW DICTIONARY (12th ed. 2024). One standard estate-planning practice is to form "[a] revocable trust in which the settlor[s] ... are also the trustees and manage the trust for their own benefit during their lifetimes." 🚩*West v. West (In re Est. of West)*, 948 P.2d 351, 355 (Utah 1997). When done properly, this strategy serves to "avoid probate of the assets while allowing the settlor to retain control of the trust property during his or her own lifetime." *See* 🚩*id.*

¶58 Under the terms of the Del Valle Family Trust, either Brett or Traci, as co-settlors, may revoke the "community estate" (community property held in trust), wholly or partially. Upon revocation, this property would be delivered to Brett and/or Traci and would continue to be their community property. Similarly, the "separate estate" (separate property and quasi-community property held in trust) may be revoked unilaterally by Brett or Traci, whichever of them contributed the property to the trust; and upon revocation, the property would be delivered to the contributor.

¶59 Brett and Traci may also amend the trust and transfer property from it. While they are both living, Brett and Traci may amend "any of the terms of [the trust] by an instrument in writing signed by [Brett and Traci] and delivered to the Trustee." And they may—acting jointly for community property, or individually for separate and quasi-community property—"transfer property **\*33** ... out of the trust estate

2024 UT 22

to any other person or organization." In addition, as trustees, Brett and Traci may hold, manage, control, lease, and encumber trust property. With this backdrop, the question is whether, for purposes of the Judgment Act, Brett "owned" the property when the judgment was entered against him, even though the trust held title to it. *See* UTAH CODE § 78B-5-202(7)(c)(ii) (2021).

¶60 Because "the settlor of a revocable trust necessarily retains the functional equivalent of ownership of the trust assets," 6 AUSTIN WAKEMAN SCOTT ET AL., SCOTT AND ASCHER ON TRUSTS § 15.4.2 (6th ed. 2024), "[i]n ... substantive respects (such as creditors' rights), the property held in a revocable trust is ordinarily to be treated as if it were property of the settlor," RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. a. (AM. L. INST. 2003). Thus, in certain situations—"by reason of a power of revocation, appointment, or withdrawal"—a person may have "the equivalent of ownership of the trust property, even though the legal title to the property is held by the trustee." *See id.* § 74 cmt. a (AM. L. INST. 2007).

 **[13]**  ¶61 In effect, the Mulligans argue that the trust shielded the property from Brett's judgment creditor, Alum Rock. But under Utah law, "[d]uring the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors." UTAH CODE § 75-7-505(1). That approach is consistent with the general rule that "property held in [a revocable] trust is subject to the claims of creditors of the settlor ... if the same property belonging to the settlor ... would be subject to the claims of the creditors." RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. e (AM. L. INST. 2003). And other courts "generally have concluded that the assets of a revocable trust are properly subject to the claims of the settlor's creditors." *Pandy v. Indep. Bank*, 372 P.3d 1047, 1050 (Colo. 2016) (en banc) (collecting cases).

¶62 In short, because settlors of revocable trusts can access the full bundle of property-rights sticks, they cannot keep those sticks from their creditors. Here, as co-settlor and co-trustee, Brett retained the hallmarks of ownership over the property. As the district court noted, Brett and Traci could, at any time, "revoke the Trust, ... amend it, ... [or] transfer property from it." Under these circumstances, we hold that, for purposes of the Judgment Act, Brett owned the property at the time the judgment was entered against him.[7] Accordingly, Alum Rock's lien attached to the property when Alum Rock recorded the lien with the county recorder.

## III. THE MULLIGANS HAVE NOT IDENTIFIED A LIMITATION ON THE DISTRICT COURT'S AUTHORITY TO ISSUE A WRIT OF EXECUTION ON PROPERTY LOCATED IN A COUNTY OUTSIDE THE THIRD DISTRICT

¶63 The Mulligans contend that the Third District Court "lacked authority and jurisdiction" to issue the writ because the property sits in Weber County, which is outside the court's geographic boundaries. Because they have not identified a relevant limitation on the district court's jurisdiction to issue the writ, we reject that argument.

¶64 This matter arose when Alum Rock filed a notice of judgment with the Third District Court. There is no question that this was proper, because under the Foreign Judgment Act a foreign judgment like Alum Rock's California judgment "may be filed with the clerk of any district court in Utah." UTAH CODE § 78B-5-302(2). Once Alum Rock domesticated the judgment, the judgment inherited "the same effect ... as a judgment" of a Utah district court. *Id.* § 78B-5-302(3). Such a judgment may be enforced through a writ of execution. *Id.* § 78A-5-102 ("A district court judge may issue all extraordinary writs and other writs necessary to carry into effect the district court judge's orders, judgments, and decrees.").

 **[14]**  ¶65 The Mulligans have not identified any relevant law that would limit a district court's authority to issue a writ of execution to be effectuated in a county outside that court's judicial district. They first cite a venue statute, which provides that "[a]ctions" for certain "causes involving real property **\*34** shall be tried in the county in which the subject of the action ... is situated." *Id.* § 78B-3-301(1) (2021). Those "causes" are

> for the recovery of real property, or of an estate or interest in the property; ... for the determination ... of the right or interest in the property; ... for injuries to real property; ... for the partition of real property; and ... for the foreclosure of all liens and mortgages on real property.

*Id.*

¶66 But the Mulligans' reliance on this statute is misguided because no "[a]ction[ ] ... involving real property" is at issue here. *See id.* Indeed, no cause of action is at issue at all. The causes of action that gave rise to Alum Rock's judgment against Brett (for breach of contract) were brought in California and, from what we can tell, had nothing to do with the Weber County property. Simply put, this proceeding to enforce that judgment through a writ of execution is not an action involving real property governed by the venue statute. [8]

 [15]  ¶67 The Mulligans also cite rule 64 of the Utah Rules of Civil Procedure as an additional limitation on the district court's authority. According to them, a distinction in word choice between two sentences in rule 64(d)(1) "precludes courts in one county from ordering seizure of real property located in a different county." Rule 64(d)(1) explains how court clerks are to issue writs for real and personal property:

> If the writ directs the seizure of real property, the court clerk will issue the writ to the sheriff of the county in which the real property is located. If the writ directs the seizure of personal property, the court may issue the writ to an officer of any county.

UTAH R. CIV. P. 64(d)(1). From this language, the Mulligans glean that "the rule expressly authorizes any court in any county in Utah to direct the seizure ... of *personal property* located in any county in Utah" but does not do the same for *real property*.

¶68 Although the Mulligans are correct that the rule distinguishes between writs of execution for personal property versus real property and requires that the latter be directed to the "sheriff of the county in which the real property is located," *see id.*, the rule says nothing about which court may issue the writ. Rule 64(d)(1) contains no requirement that the district court issuing the writ be in the same county as the real property. If anything, by specifying that writs involving real property must be "issue[d] ... to the sheriff of the county in which the real property is located," *see id.*, the rule seems to presuppose that the issuing court may be located elsewhere.

¶69 The Mulligans have not established that the district court exceeded its authority by issuing the writ. Neither the venue statute nor rule 64(d)(1) prohibits a district court from issuing a writ of execution for real property located in another Utah judicial district.

### CONCLUSION

¶70 Although Alum Rock needed to comply with the Judgment Act's requirements for creating a lien, filing in the registry of judgments was not one of those requirements. The lien attached to the property once Alum Rock recorded the judgment with the Weber County Recorder's Office. When the judgment was recorded, Brett owned the property for purposes of the Judgment Act because the property's title was held in a revocable trust settled by Brett and his wife. And the Mulligans have not shown that the district court lacked authority to issue the writ. Accordingly, we affirm.

**All Citations**

556 P.3d 21, 2024 UT 22

---

### Footnotes

1    We refer to Utah Code, Title 78B, Chapter 5, Part 2 as the Judgment Act. Effective July 1, 2024, the Judgment Act was renumbered, and the legislature made minor stylistic changes. We cite the version in effect at the time the district court issued the writ.

2    This venue statute has been renumbered and slightly altered, effective July 1, 2024. *See* UTAH CODE § 78B-3a-202(1). We cite the version in effect at the time the district court issued the writ.

3    For examples of how section 201 has been amended over the years, see H.B. 46, 2011 Leg., Gen. Sess. (Utah 2011) (available at https://le.utah.gov/~2011/bills/static/HB0046.html); H.B. 315, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/hbillenr/hb0315.htm); H.B. 16, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/static/hb0016.html); H.B. 251, 2023 Leg., Gen. Sess. (Utah 2023) (available at https://le.utah.gov/~2023/bills/static/HB0251.html).

4    There was some uncertainty about whether the judgment was recorded in the registry of judgments, but the court assumed that it was. See T3 Pros., LLC v. Persimmon Invs., Inc., 2013 UT App 38, ¶¶ 16, 28, 299 P.3d 613.

5    Alum Rock has not challenged this issue as unpreserved.

6    The Utah Code defines "[r]eal property" as "any right, title, estate, or interest in land." UTAH CODE § 57-1-1(3).

7    Neither side has addressed whether Traci's joint ownership of the property has any effect on the judgment lien. For that reason, we express no opinion on the matter.

8    For the same reason, the caselaw that the Mulligans cite regarding "action[s]" that "involve[ ] title to real property" misses the mark. See Calder v. Third Jud. Dist. Ct., 2 Utah 2d 309, 273 P.2d 168, 171 (1954).

---

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

West's Utah Code Annotated
 Title 75. Utah Uniform Probate Code (Refs & Annos)
  Chapter 7. Utah Uniform Trust Code (Refs & Annos)
   Part 5. Creditor's Claims--Spendthrift and Discretionary Trusts (Refs & Annos)

U.C.A. 1953 § 75-7-505

§ 75-7-505. Creditor's claim against settlor

Effective: September 1, 2024

Currentness

Regardless of whether the terms of a trust contain a spendthrift provision, the following rules apply:

(1) During the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors. If a revocable trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution.

(2)(a) With respect to an irrevocable trust other than an irrevocable trust that meets the requirements of Section 75B-1-302, a creditor or assignee of the settlor may reach the maximum amount that can be distributed to or for the settlor's benefit.

(b) With respect to an irrevocable trust that has more than one settlor, other than an irrevocable trust that meets the requirements of Section 75B-1-302, the amount a creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution.

(c) Notwithstanding Subsections (2)(a) and (b), a creditor of a settlor may not satisfy the creditor's claim from an irrevocable trust solely because the trustee may make a discretionary distribution reimbursing the settlor for income tax liability of the settlor attributable to the income of the irrevocable trust, when the distribution is:

(i) subject to the discretion of a trustee who is not the settlor;

(ii) subject to the consent of an advisor who is not the settlor; or

(iii) at the direction of an advisor who is not the settlor.

(3) After the death of a settlor, and subject to the settlor's right to direct the source from which liabilities will be paid, the property of a trust that was revocable at the settlor's death, but not property received by the trust as a result of the death of the settlor which is otherwise exempt from the claims of the settlor's creditors, is subject to claims of the settlor's creditors, costs of administration of the settlor's estate, the expenses of the settlor's funeral and disposal of remains, and statutory allowances to a surviving spouse and children to the extent the settlor's probate estate is inadequate to satisfy those claims, costs, expenses, and allowances.

**Credits**

Laws 2004, c. 89, § 54, eff. July 1, 2004; Laws 2017, c. 125, § 2, eff. May 9, 2017; Laws 2017, c. 204, § 31, eff. May 9, 2017; Laws 2023, c. 421, § 3, eff. May 3, 2023; Laws 2024, c. 364, § 9, eff. Sept. 1, 2024.

**Editors' Notes**

### UNIFORM LAW COMMENTS[UTC § 505]

Subsection (a)(1) states what is now a well accepted conclusion, that a revocable trust is subject to the claims of the settlor's creditors while the settlor is living. *See* Restatement (Third) of Trusts Section 25 cmt. e (Tentative Draft No. 1, approved 1996). Such claims were not allowed at common law, however. *See* Restatement (Second) of Trusts Section 330 cmt. o (1959). Because a settlor usually also retains a beneficial interest that a creditor may reach under subsection (a)(2), the common law rule, were it retained in this Code, would be of little significance. *See* Restatement (Second) of Trusts Section 156(2) (1959).

Subsection (a)(2), which is based on Restatement (Third) of Trusts Section 58(2) and cmt. e (Tentative Draft No. 2, approved 1999), and Restatement (Second) of Trusts Section 156 (1959), follows traditional doctrine in providing that a settlor who is also a beneficiary may not use the trust as a shield against the settlor's creditors. The drafters of the Uniform Trust Code concluded that traditional doctrine reflects sound policy. Consequently, the drafters rejected the approach taken in States like Alaska and Delaware, both of which allow a settlor to retain a beneficial interest immune from creditor claims. *See* Henry J. Lischer, Jr., *Domestic Asset Protection Trusts: Pallbearers to Liability*, 35 Real Prop. Prob. & Tr. J. 479 (2000); John E. Sullivan, III, *Gutting the Rule Against Self-Settled Trusts: How the Delaware Trust Law Competes with Offshore Trusts*, 23 Del. J. Corp. L. 423 (1998). Under the Code, whether the trust contains a spendthrift provision or not, a creditor of the settlor may reach the maximum amount that the trustee could have paid to the settlor-beneficiary. If the trustee has discretion to distribute the entire income and principal to the settlor, the effect of this subsection is to place the settlor's creditors in the same position as if the trust had not been created. For the definition of "settlor," see Section 103(14).

This section does not address possible rights against a settlor who was insolvent at the time of the trust's creation or was rendered insolvent by the transfer of property to the trust. This subject is instead left to the State's law on fraudulent transfers. A transfer to the trust by an insolvent settlor might also constitute a voidable preference under federal bankruptcy law.

Subsection (a)(3) recognizes that a revocable trust is usually employed as a will substitute. As such, the trust assets, following the death of the settlor, should be subject to the settlor's debts and other charges. However, in accordance with traditional doctrine, the assets of the settlor's probate estate must normally first be exhausted before the assets of the revocable trust can be reached. This section does not attempt to address the procedural issues raised by the need first to exhaust the decedent's probate estate before reaching the assets of the revocable trust. Nor does this section address the priority of creditor claims or liability of the decedent's other nonprobate assets for the decedent's debts and other charges. Subsection (a)(3), however, does ratify the typical pourover will, revocable trust plan. As long as the rights of the creditor or family member claiming a statutory allowance are not impaired, the settlor is free to shift liability from the probate estate to the revocable trust. Regarding other issues associated with potential liability of nonprobate assets for unpaid claims, see Section 6-102 of the Uniform Probate Code, which was added to that Code in 1998.

Subsection (b)(1) treats a power of withdrawal as the equivalent of a power of revocation because the two powers are functionally identical. This is also the approach taken in Restatement (Third) of Trusts Section 56 cmt. b (Tentative Draft No. 2, approved 1999). If the power is unlimited, the property subject to the power will be fully subject to the claims of the power holder's creditors, the same as the power holder's other assets. If the power holder retains the power until death, the property subject to the power may be liable for claims and statutory allowances to the extent the power holder's probate estate is insufficient to satisfy those claims and allowances. For powers limited either in time or amount, such as a right to withdraw a $10,000

annual exclusion contribution within 30 days, this subsection would limit the creditor to the $10,000 contribution and require the creditor to take action prior to the expiration of the 30-day period.

Upon the lapse, release, or waiver of a power of withdrawal, the property formerly subject to the power will normally be subject to the claims of the power holder's creditors and assignees the same as if the power holder were the settlor of a now irrevocable trust. Pursuant to subsection (a)(2), a creditor or assignee of the power holder generally may reach the power holder's entire beneficial interest in the trust, whether or not distribution is subject to the trustee's discretion. However, following the lead of Arizona Revised Statutes Section 14-7705(g) and Texas Property Code Section 112.035(e), subsection (b)(2) creates an exception for trust property which was subject to a Crummey or five and five power. Upon the lapse, release, or waiver of a power of withdrawal, the holder is treated as the settlor of the trust only to the extent the value of the property subject to the power at the time of the lapse, release, or waiver exceeded the greater of the amounts specified in IRC Sections 2041(b)(2) or 2514(e) [greater of 5% or $5,000], or IRC Section 2503(b) [$10,000 in 2001].

The Uniform Trust Code does not address creditor issues with respect to property subject to a special power of appointment or a testamentary general power of appointment. For creditor rights against such interests, see Restatement (Property) Second: Donative Transfers Sections 13.1-13.7 (1986).

U.C.A. 1953 § 75-7-505, UT ST § 75-7-505

Current with laws through the 2024 Fourth Special Session. Some statutes sections may be more current, see credits for details

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT I

*W2261271*

E# 2261271 PG 1 OF 1
ERNEST D ROWLEY, WEBER COUNTY RECORDER
03-MAY-07  346 PM  FEE $10.00 DEP VD
REC FOR: LINCOLN TITLE INSURANCE AGENCY
ELECTRONICALLY RECORDED

File No. 014551
**When recorded return to:**
Lincoln Title Insurance Agency
4723 Harrison Boulevard, Suite 201
Ogden, UT 84403

**Mail tax notice to:**
Grantee
1201 Estelle Lane
Newport Beach, CA 92660

# SPECIAL WARRANTY DEED

**Basinview Development, LC,**                                    "Grantor",

hereby CONVEYS and WARRANTS against all claiming by, through, or under it to:

**Brett H. Del Valle and Traci M. Del Valle, Trustees of The Del Valle Family Trust Dated October 30, 2002,**                          "Grantees",

for the sum of TEN DOLLARS and other good and valuable consideration the following described tract of land in Weber County, State of Utah:

**ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, WEBER COUNTY, UTAH, ACCORDING TO THE OFFICIAL PLAT THEREOF.**

20-108-0007

SUBJECT TO: County and/or City taxes not delinquent; Bonds and/or Special Assessments not delinquent and Covenants, Conditions, Restrictions, Rights-of-Way, Easements, and Reservations now of Record or enforceable in law or equity.

WITNESS, the hand of said grantor, this 27 day of April, A.D. 2007.

Basinview Development, LC
By: _____

**Mark A. Bates, Managing Member**

STATE OF UTAH                )
                             )ss.
COUNTY OF Weber              )

On the 27 day of April, 2007, personally appeared before me, Mark A. Bates, who did say that he is a Managing Member of Basinview Development, LC, that the foregoing instrument was signed on behalf of said Limited Liability Company by authority of Basinview Development, LC and that he duly acknowledged to me that said Limited Liability Company executed the same.

Denise W Page
**Notary Public**

My Commission Expires:

Residing at:

DENISE W PAGE
NOTARY PUBLIC - STATE OF UTAH
4723 HARRISON BLVD
OGDEN, UT 84403
COMM. EXP. 11-05-2009

Bates #000052

# EXHIBIT J

West's Utah Code Annotated
Title 57. Real Estate
Chapter 3. Recording of Documents (Refs & Annos)
Part 1. General Provisions

U.C.A. 1953 § 57-3-102

§ 57-3-102. Record imparts notice--Change in interest rate--Validity
of document--Notice of unnamed interests--Conveyance by grantee

Currentness

(1) Each document executed, acknowledged, and certified, in the manner prescribed by this title, each original document or certified copy of a document complying with Section 57-4a-3, whether or not acknowledged, each copy of a notice of location complying with Section 40-1-4, and each financing statement complying with Section 70A-9a-502, whether or not acknowledged shall, from the time of recording with the appropriate county recorder, impart notice to all persons of their contents.

(2) If a recorded document was given as security, a change in the interest rate in accordance with the terms of an agreement pertaining to the underlying secured obligation does not affect the notice or alter the priority of the document provided under Subsection (1).

(3) This section does not affect the validity of a document with respect to the parties to the document and all other persons who have notice of the document.

(4) The fact that a recorded document recites only a nominal consideration, names the grantee as trustee, or otherwise purports to be in trust without naming beneficiaries or stating the terms of the trust does not charge any third person with notice of any interest of the grantor or of the interest of any other person not named in the document.

(5) The grantee in a recorded document may convey the interest granted to him free and clear of all claims not disclosed in the document in which he appears as grantee or in any other document recorded in accordance with this title that sets forth the names of the beneficiaries, specifies the interest claimed, and describes the real property subject to the interest.

**Credits**

Laws 1977, c. 272, § 54; Laws 1985, c. 159, § 7; Laws 1988, c. 155, § 14; Laws 1989, c. 88, § 8; Laws 1998, c. 61, § 2, eff. July 1, 1998; Laws 1998, c. 85, § 4, eff. May 4, 1998; Laws 2000, c. 252, § 11, eff. July 1, 2001.

**Codifications** R.S. 1898, § 2000; C.L. 1907, § 2000; C.L. 1917, § 4900; R.S. 1933, § 78-3-2; C. 1943, § 78-3-2; C. 1953, § 57-3-2.

Notes of Decisions (143)

U.C.A. 1953 § 57-3-102, UT ST § 57-3-102

Current with laws through the 2024 Fourth Special Session. Some statutes sections may be more current, see credits for details

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT K

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorney for Plaintiffs*

> **If you do not respond to this document within applicable time limits, judgment could be entered against you as requested.**

---

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **COMPLAINT** <br> **AND** <br> **JURY DEMAND** <br><br> **(Tier 3)** <br><br> Case No. __240908957_____ <br><br> Judge __Noel S. Hyde___ |

Plaintiffs assert, allege, and pray for relief as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiffs Molly M. Mulligan and John P. Mulligan each are individuals (referred

to hereinafter collectively as "**Plaintiffs**" or "**Mulligans**") who together, as wife and husband

and as joint tenants, own and claim that certain real property which is the subject of this case.

2.      The real property which is the subject of this case is located in Weber County, State of Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, and is more particularly described as follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

3.      Defendant Alum Rock Riverside, LLC ("**Defendant**" or "**Alum Rock**"), is a California limited liability company which claims or may claim to have an interest in or to the Property.

4.      Defendants Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of The Del Valle Family Trust dated October 30, 2002 (referred to hereinafter individually and/or collectively as the "**Trust**" or the "**Del Valle Family Trust**") are co-trustees of the Trust ("**Co-Trustees**"), which Trust previously owned the Property and conveyed it by warranty deed to Plaintiffs.

5.      Jurisdiction is proper in this Court, including without limitation pursuant to Utah Code Ann. § 78B-6-401.

6.      Venue is proper in this Court, including without limitation pursuant to Utah Code Ann. § 78B-3-301(1) and § 78B-3-304 because this action involves real property located in Wasatch County, Utah.

7.     This matter is a Tier 3 case under and pursuant to Rule 26(c)(3) of the Utah Rules of Civil Procedure.

## GENERAL ALLEGATIONS

8.     The Del Valle Family Trust purchased and obtained title of record to the Property in 2007 by way of a *Special Warranty Deed* from Basinview Development, LC, which deed was recorded on May 3, 2007 as Entry No. 2261271 in the official records of the Weber County Recorder's office (the "**Special Warranty Deed**").

9.     When the Trust purchased the Property, the Trust, as borrower, obtained a loan from Wells Fargo Bank, N.A., which loan was secured by a *Short Form Deed of Trust* in the principal amount of $500,000.00, which was recorded on the Property on May 3, 2007, as Entry No. 2261272 (the Trust's "**Purchase Money Trust Deed**").

10.    The Trust further obtained a loan, as borrower, from California National Bank, which loan was secured by *a Construction Deed of Trust* in the principal amount of $1,750,000.00, which was recorded on the Property on December 31, 2007, as Entry No. 2313274 (the Trust's "**Construction Trust Deed**").

11.    On information and belief, Defendants Co-Trustees Brett H. Del Valle ("**Brett**") and Traci M. Del Valle ("**Traci**") did not contribute the Property to the Trust because the Trust purchased the Property directly from Basinview Development, LC and paid value for the Property and the residence built thereon, including as evidenced by the Purchase Money Trust Deed and the Construction Trust Deed.

12.    The Trust at all times owned the Property of record from 2007 until 2021 when the Trust, as Grantor, sold the Property to Plaintiffs, as joint tenants, conveying title by way of a

3

*Warranty Deed* recorded on May 11, 2021 as Entry No. 3151874 in the official records of the Weber County Recorder's office (the vesting "**Warranty Deed**").

13.    Plaintiffs obtained a loan for their purchase of the Property, which loan is secured by a Deed of Trust in favor of Morgan Stanley Private Bank, which was recorded on the Property on August 2, 2021 as Entry No. 3172556 (the "**Morgan Stanley Trust Deed**").

14.    When the Mulligans purchased the Property from the Trust they paid off various liens and encumbrances of record, including: (1) $712,209.92 paid in satisfaction of a mortgage loan given by BOFI Federal Bank to the Trust, as borrower, which loan was secured by a *RESPA Deed of Trust* recorded on the Property on September 20, 2017, as Entry No. 2879566 (the "**First Position Trust Deed**") ; (2) $948,000.00 paid in satisfaction of a mortgage loan given by TSS Enterprises Inc. to the Trust, which loan was secured by a *Deed of Trust with Assignment of Rents* recorded on July 6, 2020, as Entry No. 3066407 (the "**Second Position Trust Deed**"); (3) unpaid, delinquent property taxes in the amount of $46,248.89 for tax years 2018-2020 (the "**Delinquent Property Taxes**"); and, (4) delinquent homeowner association dues in the amount of $2,125.00 (the "**Delinquent HOA Dues**"), all of which liens and encumbrances appeared in the public record.

15.    Each of the Trust's Purchase Money Trust Deed and the Construction Trust Deed were reconveyed of record prior to the recording of the First Trust Deed and the Second Trust Deed.

16.    After the Mulligans purchased the Property from the Trust and their purchase proceeds paid off the First Trust Deed and the Second Trust Deed, each of those deeds of trust were subsequently reconveyed of record.

17.    Neither of the Co-Trustees appears in any individual and/or personal capacity in

any public record, abstract, or title search as an owner of the Property at any point in time, including not in the chain of title when Plaintiffs purchased the Property from the Trust.

18.     No judgments against either of the Co-Trustees in any individual and/or personal capacity of either of them were recorded on or against the Property in the office or records of the Weber County Recorder; no judgments against either of the Co-Trustees in any individual and/or personal capacity of either of them appear in any Weber County Recorder abstract or title search of the Property; and no judgments against either of the Co-Trustees in any individual and/or personal capacity of either of them appear in the searchable court index where the Property is located, including not during the time leading up to and including when the Mulligans purchased the Property.

19.     The claimed interests of defendant Alum Rock in or to the Property is/are based and premised upon a certain document entitled *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, which was recorded in the office and records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770, but which was not abstracted to or against the Property (the "**Alum Rock Lien**").

20.     The Alum Rock Lien relates to an underlying foreign judgment which was entered on March 18, 2020 against Brett Del Valle in his individual and personal capacity only and not in his capacity as one of the Co-Trustees of the Trust (among other judgment debtors, but not including and/or not against the Trust nor either of the Co-Trustees of the Trust including not Traci Del Valle).

21.     Defendant Alum Rock claims that the Alum Rock Lien attached to and encumbers the Property, including particularly but without limitation purportedly ahead of and with priority over Plaintiffs' interests in and ownership of the Property, it has failed and/or refused to release

of record the Alum Rock Lien which therefore is and constitutes a cloud upon Plaintiffs' title to the Property, and it has stated that it intends to enforce the Alum Rock Lien against the Property.

22.     On or about June 22, 2021, in a writ "proceeding" brought in the Third District Court in and for Salt Lake County, Utah, Alum Rock obtained a *Writ of Execution* against the Property to enforce its Lien (the "**Writ of Execution**").

23.     Pursuant to an appeal of the issuance of the Writ of Execution, in *Mulligan v. Alum Rock Riverside, LLC*, 2024 UT 22, ¶¶ 58, 62, 66 and n. 8, 69, the Utah Supreme Court held that Alum Rock created a judgment lien when it recorded its *Notice of Judgment* with the Weber County recorder on October 23, 2020; that its Writ of Execution was validly issued in only a writ "proceeding" in Salt Lake County (which the Utah Supreme Court expressly held was not an action, including not one to which Plaintiffs were parties); and specifically stated that it expressed "no opinion" on "whether [Co-Trustee Traci Del Valle's] joint ownership of the Property has any effect on [Alum Rock's] judgment lien". *Id.* n. 7.

24.     Utah Code Section 75-7-505(1) provides that: "If a trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution."

25.     The *Mulligan* decision did not foreclose Plaintiffs from bringing an action asserting claims and causes of action in the county where the Property is located in relation to the Alum Rock Lien.

26.     On or about December 18, 2024, Defendant Alum Rock caused to be posted on the Property a Weber County Sheriff's Office *Notice of Sale – Real Property*, which sets forth a sale date of January 16, 2024 at 12:00 p.m. (the "**Notice of Sale**").

6

## FIRST CAUSE OF ACTION
**(Declaratory Judgment and Quiet Title)**

27.     Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

28.     An actual controversy has arisen and now exists regarding the Alum Rock Lien upon and/or against the Property which has been conveyed to and is owned by Plaintiffs, including pursuant to the Warranty Deed.

29.     The interests of the parties are adverse, concrete, and justiciable, and declaratory relief is warranted.

30.     Plaintiffs seek to quiet title to their ownership of the Property as against any claimed rights or interests to the Property asserted by Defendant Alum Rock, including pursuant to the Alum Rock Lien, in whole or in part.

31.     A judicial declaration is necessary and appropriate at this time in order that the Plaintiffs may confirm their rights with respect to ownership of the Property, including in advance of and before any attempt by Defendant Alum Rock to enforce its Lien against the Property.

32.     Utah Code Section 75-7-505(1) provides that: "If a trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution."

33.     Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that:

       a.     Brett Del Valle and Traci M. Del Valle, as apparent settlors of the Trust, did not contribute the Property, or any portion of the Property to the Trust, and that Alum

7

Rock's Lien therefore did not attach to any purported contribution interest of Brett Del Valle in or to the Property (*i.e.*, did not attach at all to the Property); or,

b.        In the alternative only, if Brett Del Valle and Traci M. Del Valle, as apparent settlors, did contribute the Property to the Trust, then Alum Rock's Lien only attached to, encumbers, and/or affects any interest in the portion of the trust attributable to settlor Brett Del Valle's contribution, if any, and Alum Rock's Lien did not attach to the portion of the trust attributable to Traci M. Del Valle's contribution (leaving the Property free and clear of and from, and unaffected by, the Alum Rock Lien to the extent of Traci M. Del Valle's contribution); and in either event that,

c.        Alum Rock cannot foreclose the Alum Rock Lien against and/or upon any part, portion, and/or interest whatsoever in or to the Property unless and until Alum Rock has established and proven to this Court what portion of the Property previously owned by the Trust was attributable to Brett Del Valle's contribution, if indeed any at all, and this Court has declared such portion of the Property which is therefore subject to the Alum Rock Lien.

34.        Additionally, pursuant to Utah Code Ann. §§ 78B-6-1301, *et. seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to judgment quieting title of the Property in Plaintiffs, either fully free and clear of and from, and unaffected by, any and all estates, rights, titles, and/or interests which may be held and/or claimed by and/or under the Alum Rock Lien; or, in the alternative only, Plaintiffs are entitled to judgment quieting title in that portion of the Property that is unaffected and unencumbered by any contribution interest apparent settlor Brett Del Valle, if any, and that the Alum Rock Lien can only affect and encumber at most, and only, any contribution interest of apparent settlor Brett Del Valle, if any.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## SECOND CAUSE OF ACTION
### (Equitable Subordination)

35.    Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

36.    Prior to Plaintiffs' purchase of the Property from the Trust, the Property was subject to and encumbered the First Position Trust Deed.

37.    Also prior to Plaintiffs' purchase of the Property from the Trust, the Property was subject to and encumbered by the Second Position Trust Deed.

38.    Further prior to Plaintiffs' purchase of the Property from the Trust, the Property was subject to and encumbered by a lien for the unpaid Delinquent Property Taxes (the "**Property Tax Lien**").

39.    Further prior to Plaintiffs' purchase of the Property from the Trust, the Property was subject to and encumbered by a lien for the unpaid Delinquent HOA Dues (the "**HOA Lien**").

40.    The First Position Trust Deed and the Second Position Trust Deed each were prior and superior to the later-recorded Alum Rock Lien.

41.    The Property Tax Lien and the HOA Lien each were prior and superior to the later-recorded Alum Rock Lien.

42.    As a matter of law, the Property Tax Lien had super-priority ahead of and superior to any interest of the Alum Rock Lien.

43.    Plaintiffs' proceeds for and from Plaintiffs' purchase of the Property were used to pay off the First Position Trust Deed in the amount of $712,209.92, the Second Position Trust

Deed in the amount of $948,000.00, the Property Tax Lien in the amount of $46,248.89, and the

HOA Lien in the amount of $2,125.00, all having priority over, ahead of, and superior to any

interest of the Alum Rock Lien, in the total cumulative amount of at least $1,708,583.81.

44.     Plaintiffs paid and authorized the payment and disbursement of those proceeds of,

for and from their purchase of the Property to pay off those prior and superior obligations and

liens against the Property with the understanding and intent that Plaintiffs' Warranty Deed and

all other rights of Plaintiffs in and to the Property would be in a first priority position ahead of

and without any liens and/or encumbrances (other than those which Plaintiffs themselves may

have signed and pledged), including without limitation occupying the priority places of and

instead of the First Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien,

the HOA Lien, and ahead of and superior to all other estates, rights, titles, claims, and/or

interests in, to, on, and/or against the Property (other than those which Plaintiffs themselves may

have signed and pledged).

45.     At the time Plaintiffs purchased the Property and disbursed and/or authorized

disbursement of their purchase proceeds, Plaintiffs did not know that Defendant Alum Rock held

or would claim to hold any priority position pursuant to the Alum Rock Lien, or otherwise, over,

ahead of, or superior to Plaintiffs' ownership of the Property pursuant to Plaintiffs' Warranty

Deed or otherwise.

46.     It would be inequitable and unjust if the Alun Rock Lien were not equitably

subordinated to Plaintiffs' ownership of and Warranty Deed on and to the Property.

47.     By virtue of Plaintiffs' purchase proceeds having paid off the prior liens and

obligations on and against the Property in at least the amount of $1,708,583.81, including,

without limitation, prior liens and obligations to which the Alum Rock Lien, and any and all

10

other interests held or claimed by Defendant Alum Rock, were at all times junior, subject, and

inferior, the interests of Defendant Alum Rock, should be equitably subordinated to Plaintiffs'

ownership and Warranty Deed, to at least the extent that Plaintiffs' purchase proceeds paid off

and reduced prior liens and obligations on and against the Property, to which any and all interests

of Defendant Alum Rock, were at all times junior, subject, and inferior.

48.     Plaintiffs are entitled, pursuant to Utah Code Ann. §§ 78B-6-401 *et seq.*, Rule 57

of the Utah Rules of Civil Procedure, and otherwise, to declaratory judgment that, by virtue of

Plaintiffs having paid off the liens and obligations on and against the Property that were prior

and superior to the Alum Rock Lien and to any and all other estates, rights, titles, or interests in

the Property held and/or claimed by Defendant Alum Rock, and to which they always were

subject and inferior, the Alum Rock Lien and any and all other estates, rights, titles, or interests

in the Property held and/or claimed by Defendant Alum Rock, are equitably subordinated to and

do not affect Plaintiffs' ownership, Warranty Deed, and other interests, at least to the extent that

Plaintiffs' purchase proceeds paid off or reduced prior liens and obligations on and against the

Property, in at least the amount of $1,708,583.81.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

### THIRD CAUSE OF ACTION
### (Equitable Subrogation)

49.     Plaintiffs incorporate into and make a part of this cause of action each and every

other paragraph in this Complaint.

50.     It would be inequitable and unjust if Plaintiffs' ownership, Warranty Deed, and

other interests in and to the Property were not equitably and otherwise subrogated to a position of

priority ahead of and superior to the Alum Rock Lien and to any and all other estates, rights,

11

titles, or interests in the Property held and/or claimed by Defendant Alum Rock, due to and in light of Plaintiffs' purchase proceeds having paid off the liens and obligations on and against the Property, in at least the amount of $1,708,583.81, that were prior and superior to the Alun Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, and to which they always were subject and inferior.

51.     If Plaintiffs' ownership, Warranty Deed, and other interests were not equitably subrogated to a position of priority ahead of and superior to the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, then Defendant Alum Rock would be unjustly enriched and reap a windfall by virtue of Plaintiffs having paid off other liens and obligations to which the Alum Rock Lien, and any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, always were, and would otherwise have remained, junior, inferior and subordinate.

52.     Plaintiffs are entitled, pursuant to Utah Code Ann. §§ 78B-6-401 *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise to declaratory judgment that Plaintiffs' ownership, Warranty Deed, and other interests in and to the Property should be and are subrogated to the priority positions in, on, and to the Property of all prior liens and obligations, with priority over the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, which were paid off with Plaintiffs' purchase proceeds, in at least the amount of $1,708,583.81, including particularly but without limitation to the priority position of the First Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, the HOA Lien, and each of them, ahead of and superior to the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, at least to the extent that Plaintiffs' purchase proceeds

paid off or reduced such prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment – No Constructive Notice)

53.     Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

54.     Leading up to and at the time that the Mulligans purchased the Property, the Alum Rock Lien did not appear of record in any Weber County Recorder abstract of title for the Property.

55.     Leading up to and at the time that the Mulligans purchased the Property, the Alum Rock Lien did not appear in any title search of the Property.

56.     Leading up to and at the time that the Mulligans purchased the Property, the Alum Rock Lien did not appear in the searchable court index in any Weber County court where the Property is located.

57.     At all times, including leading up to and at the time that the Mulligans purchased the Property, the Alum Rock Lien did not appear in the Weber County Judgment Index.

58.     The Trust was not recorded, and no other document was recorded that disclosed a claim to the Property that set forth the Trust's beneficiaries' names, specified the beneficiaries' interest on which the claim was based, and described the Property as being subject to that interest.

59.     The Warranty Deed did not disclose any claim of Alum Rock.

60.     Utah Code Section 57-3-102(4) states, in pertinent part: "The fact that a recorded

13

document … names the grantee as trustee, or otherwise purports to be in trust without naming beneficiaries or stating the terms of the trust does not charge any third person with notice of any interest of the grantor or of the interest of any other person not named in the document."

61.      No Trust instruments or documents are recorded on or against the Property that discloses, names, or states: (1) the name(s) of any settlor(s) and/or beneficiar(ies) of the Trust; (2) the terms of the Trust; (3) discloses any contribution interests of any settlor(s) of the Trust; or (4) discloses any claims as against the Property by, though, or under the Trust and/or its settlors.

62.      Utah Code Section 57-3-102(4) dictates that the Mulligans were not charged with any notice of any individual contribution interests of Brett H. Del Valle and Traci M. Del Valle, in their respective individual and personal capacities, in the Property to which the Alum Rock Lien could attach.

63.      Utah Code Section 57-3-102(5) states: "The grantee in a recorded document may convey the interest granted to him free and clear of all claims not disclosed in the document in which he appears as grantee or in any other document recorded in accordance with this title that sets forth the names of the beneficiaries, specifies the interest claimed, and describes the real property subject to the interest."

64.      Utah Code Section 57-3-102(5) dictates that the Warranty Deed imparted notice to Plaintiffs that the Co-Trustees of the Trust could and did convey the Property to Plaintiffs "free and clear" of all claims not disclosed in the 2007 Special Warranty Deed in which the Co-Trustees of the Trust appeared as grantees and by which the Trust acquired title, and "free and clear" of all unrecorded equitable interests in the Property held or claimed by anyone, including Alum Rock, whose interest was not disclosed in any other recorded document that sets forth the names of the beneficiaries, specifies the interest claimed by Alum Rock, and describes the real

14

property subject to the interest.

65.    Plaintiffs thus had no constructive notice of any interest of Brett Del Valle in his individual and/or personal capacity in or to the Property (including without limitation any contribution interest as a now apparent settlor of the unrecorded Trust, or otherwise).

66.    Plaintiffs also thus had no constructive notice of the Alum Rock Lien which was entered against Brett Del Valle in his individual and personal capacity only (and against other judgment debtors not relevant to this case) and not in his capacity as one of the Co-Trustees of the Trust.

67.    If and to the extent that the Alum Rock Lien attached to and/or encumbered any part, portion, or contribution interest in, to, and/or of the Property (*see* First Cause of Action hereinabove and by this reference incorporated here), then the Alum Rock Lien constituted a material defect on and against the Property that was not disclosed to Plaintiffs.

68.    Pursuant to Utah Code Ann. §§ Utah Code Section 57-3-102(4) and (5), 78B-6-401, *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien and any and all other claims of or by Defendant Alum Rock to any estate, right, title, lien, encumbrance, and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

15

## FIFTH CAUSE OF ACTION
### (Declaratory Judgment – Bona Fide Purchasers)

69.     Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

70.     An actual controversy has arisen and now exists regarding the Alum Rock Lien upon and/or against the Property which has been conveyed to and is owned by Plaintiffs, including pursuant to the Warranty Deed.

71.     Plaintiffs paid valuable consideration and acted in good faith when they purchased the Property.

72.     When Plaintiffs purchased the Property the only owner of record was, and for fourteen years only ever had been, the Trust.

73.     When Plaintiffs purchased the Property no liens of record existed against the Trust, the grantor on the Warranty Deed conveying title to Plaintiffs, other than the First Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, and the HOA Lien (each of which were prior and superior to the later-recorded Alum Rock Lien, and all of which were paid off and satisfied with Plaintiffs' proceeds for and from Plaintiffs' purchase of the Property).

74.     As a result, when Plaintiffs purchased the Property Plaintiffs had no constructive notice of, no actual knowledge of, and could not and did not discover any judgment liens on or against the Property and had no notice and/or knowledge of any adverse interest in or to the Property.

75.     Plaintiffs purchased for value, paid for, and obtained title to the Property without notice and/or knowledge of the Alum Rock Lien, which was related to a foreign judgment which was not entered against the Trust, and without notice and/or knowledge of any other claim in or

16

to the Property by Defendant Alum Rock.

76.     At the time the Mulligans purchased the Property, they had no notice and/or knowledge of the Alum Rock Lien, nor of any other claim by Alum Rock, in, to, and/or against the Property.

77.     At the time the Mulligans purchased the Property, nothing in the official records of the Weber County Recorder showed whether the Trust was a purportedly revocable trust, nor whether there was any contribution interest of the Property by any revocable trust settlor(s).

78.     Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing Plaintiffs are bona fide purchasers of the Property who paid valuable consideration, in good faith, without notice of any adverse claims of Defendant Alum Rock, including without notice of the Alum Rock Lien, and that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien, and any and all other claims by Defendant Alum Rock to any estate, right, title, lien, encumbrance, and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

### SIXTH CAUSE OF ACTION
**(Declaratory Judgment of, and Damages for,
Breaches of Warranty Deed – against the Trust)**

79.     Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

80.     When the Trust executed the Warranty Deed to Plaintiffs, and by executing it, the

17

Trust, among other things, as a matter of law (including without limitation under and pursuant to Utah Code Ann. § 57-1-12(2)), expressly covenanted and warranted, among other things, that the Trust was lawfully seised of good and marketable title of and to the Property, that the Trust had the right to and that by the Warranty Deed the Trust in fact did convey and warrant the Property to Plaintiffs, and that the Trust would defend generally the title of the Property in Plaintiffs against all adverse claims and demands (subject only to certain specified interests stated on the face of the Warranty Deed which do not apply to this case).

81.     Plaintiffs have provided, and do again hereby provide, written notice to the Trust of and regarding the claims and potential interests in the Property which are the subject of this case, and has demanded, including in writing, that the Trust release, satisfy, and otherwise discharge the same to provide and ensure the full, free, clear, and marketable title of and to the Property to Plaintiffs as the Trust is legally and statutorily required to do by virtue of the Warranty Deed.

82.     To date, however, the Trust has failed, and/or refused, to comply with the requests and demands as stated in the immediately preceding paragraph.

83.     Plaintiffs have suffered, are continuing to suffer, and otherwise will suffer and are entitled to recover from the Trust, damages as a result of the Trust's breaches of the various covenants and warranties of the Warranty Deed, regarding ownership of and title to the Property, in amounts that will be shown at trial.

84.     Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing the Trust is in breach of its covenants and warranties of title with respect to the Property contained and implied as a matter of law in and as a part of the Warranty Deed.

18

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### (Injunctive Relief – Restraining Order)

85.    Plaintiffs incorporate into and make a part of this cause of action each and every other paragraph in this Complaint.

86.    As a matter of express and unequivocal statutory law in Utah, Alum Rock cannot foreclose the Alum Rock Lien against and/or upon any part, portion, and/or interest whatsoever in or to the Property unless and until Alum Rock has established and proven to this Court what portion of the Property previously owned by the Trust was attributable to apparent settlor Brett Del Valle's contribution, if indeed any at all, and unless and until this Court has declared such portion of the Property which is therefore subject to the Alum Rock Lien and to any execution upon and/or foreclosure thereof and/or thereto.

87.    Defendant Alum Rock has stated to Plaintiffs that it intends to enforce its Lien against the Property and intends to proceed with a sale of the Property pursuant to its Writ of Execution.

88.    Defendant Alum Rock has scheduled a Sheriff's Sale of the Property for January 16, 2024 at 12:00 p.m., notwithstanding the Utah Supreme Court expressly having not reached the question in the *Mulligan* decision, of "whether [Co-Trustee Traci Del Valle's] joint ownership of the Property has any effect on [Alum Rock's] judgment lien" and further notwithstanding Alum Rock's failure to establish and prove to this Court what portion of the Property previously owned by the Trust was attributable to apparent settlor Brett Del Valle's contribution, if indeed any at all, and what portion of the Property is therefore subject to the Alum Rock Lien and to any execution upon and/or foreclosure thereof, if indeed any at all.

19

89.     The *Mulligan* decision further did not reach or consider any legal issues or claims brought by the Mulligans in any action, including not in this action.

90.     Defendant Alum Rock proceeding with any Sheriff's Sale of Plaintiffs' Property pursuant to the Alum Rock Lien and/or the Writ of Execution based thereon, including without limitation any execution upon and/or foreclosure of the Property pursuant to the Alum Rock Lien and/or the Writ of Execution based thereon, including without limitation during the pendency of this action and before Alum Rock has established and proven to this Court what portion of the Property previously owned by the Trust was attributable to apparent settlor Brett Del Valle's contribution, if indeed any at all, and before this Court has so declared such portion of the Property which is therefore subject to execution and/or foreclosure by Alum Rock, if indeed any at all, would result in immediate, great, and irreparable injury and damage to Plaintiffs who have no plain, speedy, or adequate remedy at law to protect their Property unless Defendant Alum Rock is restrained from taking such action.

91.     Defendant Alum Rock proceeding with any Sheriff's Sale of Plaintiffs' Property pursuant to the Alum Rock Lien and/or the Writ of Execution based thereon, including without limitation any execution upon and/or foreclosure of the Property pursuant to the Alum Rock Lien and/or the Writ of Execution based thereon, including without limitation during the pendency of this action and before Plaintiffs' claims have been adjudicated (Plaintiffs' claims and causes of action for declaratory judgment and quiet title, equitable subrogation, equitable subordination, declaratory judgment – no constructive notice, declaratory judgment – bona fide purchasers, and declaratory judgment – breaches of warranty deed), would result in immediate, great, and irreparable injury and damage to Plaintiffs who have no plain, speedy, or adequate remedy at law to protect their Property unless Defendant Alum Rock is restrained from taking such action.

92.     These determinations present serious issues on the merits which should be the subject of further litigation.

93.     Without these determinations Plaintiffs cannot adequately protect their interests.

94.     Without these determinations neither Alum Rock, nor any other potential bidders at any execution and/or foreclosure sale under or relating to Alum Rock's Lien and/or Alum Rock's Writ of Execution can even know whether and/or how much to bid because nobody knows what fractional part, portion, and/or interest in the Property is subject to any execution and/or foreclosure sale, if indeed any at all.

95.     Prior to such determinations, Plaintiffs will suffer irreparable harm and potential loss or damage to their ownership interests in the Property unless Defendant Alum Rock is enjoined from proceeding with any Sheriff's Sale of the Property.

96.     The potential loss or damage to Plaintiffs' ownership interests in their Property outweighs whatever damage maintaining status quo through an injunction may cause Defendant Alum Rock and is not adverse to the public interest.  Indeed, maintaining status quo through injunctive relief is supportive of the public interest and will prevent Alum Rock and/or other potential bidders from bidding and/or paying for an unknowable fractional part, portion, and/or interest in the Property is actually subject to any execution and/or foreclosure sale, if indeed any at all, and/or would prevent chilled and/or artificially low bidding due to such unknown factors.

97.     Defendant Alum Rock proceeding with any enforcement of the Alum Rock Lien against the Property could render a final judgment for Plaintiffs ineffectual in the absence of temporary, preliminary, and permanent injunctive relief.

98.     Plaintiffs are entitled to a temporary restraining order and preliminary injunction during the pendency of this action, and thereafter to a permanent injunction, restraining and

enjoining Defendant Alum Rock from proceeding to any enforcement, execution, and/or foreclosure upon and/or against the Property pursuant to the Alum Rock Lien, and from attempting to enforce the Alum Rock Lien against the Property in any way.

**WHEREFORE**, Plaintiffs pray for relief as follows:

1.      Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that:

a.      Brett Del Valle and Traci M. Del Valle, as apparent settlors of the Trust, did not contribute the Property, or any portion of the Property to the Trust, and that Alum Rock's Lien therefore did not attach to any purported contribution interest of Brett Del Valle in or to the Property (*i.e.*, did not attach at all to the Property); or,

b.      In the alternative only, if Brett Del Valle and Traci M. Del Valle, as apparent settlors, did contribute the Property to the Trust, then Alum Rock's Lien only attached to, encumbers, and/or affects any interest in the portion of the trust attributable to settlor Brett Del Valle's contribution, if any, and Alum Rock's Lien did not attach to the portion of the trust attributable to Traci M. Del Valle's contribution (leaving the Property free and clear of and from, and unaffected by, the Alum Rock Lien to the extent of Traci M. Del Valle's contribution); and in either event that,

c.      Alum Rock cannot foreclose the Alum Rock Lien against and/or upon any part, portion, and/or interest whatsoever in or to the Property unless and until Alum Rock has established and proven to this Court what portion of the Property previously owned by the Trust was attributable to Brett Del Valle's contribution, if indeed any at all, and this Court has declared such portion of the Property which is therefore subject to the Alum Rock Lien.

22

2.    Additionally, pursuant to Utah Code Ann. §§ 78B-6-1301, *et. seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to judgment quieting title of the Property in Plaintiffs, either fully free and clear of and from, and unaffected by, any and all estates, rights, titles, and/or interests which may be held and/or claimed by and/or under the Alum Rock Lien; or, in the alternative only, Plaintiffs are entitled to judgment quieting title in that portion of the Property that is unaffected and unencumbered by any contribution interest apparent settlor Brett Del Valle, if any, and that the Alum Rock Lien can only affect and encumber at most, and only, any contribution interest of apparent settlor Brett Del Valle, if any.

3.    Plaintiffs are entitled, pursuant to Utah Code Ann. §§ 78B-6-401 *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, to declaratory judgment that, by virtue of Plaintiffs having paid off the liens and obligations on and against the Property that were prior and superior to the Alum Rock Lien and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, and to which they always were subject and inferior, the Alum Rock Lien and any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, are equitably subordinated to and do not affect Plaintiffs' ownership, Warranty Deed, and other interests, at least to the extent that Plaintiffs' purchase proceeds paid off or reduced prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

4.    Plaintiffs are entitled, pursuant to Utah Code Ann. §§ 78B-6-401 *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise to declaratory judgment that Plaintiffs' ownership, Warranty Deed, and other interests in and to the Property should be and are subrogated to the priority positions in, on, and to the Property of all prior liens and obligations, with priority over the Alum Rock Lien, and to any and all other estates, rights, titles, or interests

23

in the Property held and/or claimed by Defendant Alum Rock, which were paid off with Plaintiffs' purchase proceeds, in at least the amount of $1,708,583.81, including particularly but without limitation to the priority position of the First Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, the HOA Lien, and each of them, ahead of and superior to the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, at least to the extent that Plaintiffs' purchase proceeds paid off or reduced such prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

5.  Pursuant to Utah Code Ann. §§ Utah Code Section 57-3-102(4) and (5), 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien and any and all other claims of or by Defendant Alum Rock to any estate, right, title, lien, encumbrance, and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

6.  Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing Plaintiffs are bona fide purchasers of the Property who paid valuable consideration, in good faith, without notice of any adverse claims of Defendant Alum Rock, including without notice of the Alum Rock Lien, and that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien, and any and all other claims by Defendant Alum Rock to any estate, right, title, lien, encumbrance,

24

and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

7.    Pursuant to Utah Code Ann. §§ 78B-6-401, *et seq*., Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing the Trust is in breach of its covenants and warranties of title with respect to the Property contained and implied as a matter of law in and as a part of the Warranty Deed.

8.    Plaintiffs are entitled to a temporary restraining order and preliminary injunction during the pendency of this action, and thereafter to a permanent injunction, restraining and enjoining Defendant Alum Rock from proceeding to any enforcement, execution, and/or foreclosure upon and/or against the Property pursuant to the Alum Rock Lien, and from attempting to enforce the Alum Rock Lien against the Property in any way.

9.    For such other and further relief to which Plaintiffs are entitled at law or equity.

DATED December 20, 2024.

 */s/Felicia B Canfield*
Felicia B. Canfield
*Attorneys for Plaintiffs*

# EXHIBIT L

The Order of the Court is stated below:
**Dated:** January 09, 2025     /s/   NOEL S. HYDE
04:53:52 PM                     District Court Judge

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826                                    **Tax ID No. 20-119-0007**
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN, <br><br> Plaintiffs <br><br> v. <br><br> ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002 <br><br> Defendants. | **ORDER GRANTING MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER** <br><br> Case No. 240908957 <br><br> Judge NOEL S HYDE |

The court has reviewed the *Ex-Parte Motion of Plaintiffs for Issuance of a Temporary*

*Restraining Order and Preliminary Injunction* (the "**Motion**") filed on December 23, 2024 and the *Declaration of Felicia B. Canfield* in support and all exhibits thereto, and has also reviewed and considered the response and objection filed by Defendant relating to the Motion.

Pursuant to Rule 65A of the Utah Rules of Civil Procedure and otherwise, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

1.  Plaintiffs' Motion for a temporary restraining order is granted.

2.  Defendant Alum Rock Riverside, LLC ("**Defendant**" or "**Alum Rock**"), and anyone acting by, with, or through Alum Rock, is **HEREBY RESTRAINED** from continuing with, allowing, and/or holding and is **ORDERED TO CANCEL** the Sheriff's Sale scheduled for January 16, 2025 at 12:00 p.m., including pursuant the *Notice of Judgment* filed on October 23, 2020 in the Third Judicial District Court, Salt Lake County, Civil No. 206927043, which Notice was recorded in the office and general records of the Weber County Recorder on October 23, 2020 as Entry No. 3101770 (the "**Alum Rock Lien**") and/or to the Writ of Execution issued on June 22, 2021 in the writ proceeding (the "**Writ of Execution**"), on the real property located in Weber County, Utah, commonly known as 1453 South Basinview Road, Huntsville, UT 84317, more particularly described as follows (the "**Property**"):

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

Tax ID No. 20-119-0007

3.      Defendant Alum Rock is further **RESTRAINED** from and **ORDERED** to immediately **CEASE** any and all efforts to foreclose on and/or sell the Property pursuant to the Alum Rock Lien or the Writ of Execution.

4.      Copies of this **ORDER GRANTING MOTION OF PLAINTIFFS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER** may be recorded in the office of the Weber County Recorder in the State of Utah.

5.      **This temporary restraining order will expire 14 days after the date of its issuance unless further extended by agreement of the parties or order of the court.**

6.      An in-person hearing to consider Plaintiffs' request for a preliminary injunction will be conducted in the above-entitled court on **Friday, January 17, 2025, at 1:00 p.m.,** or as soon thereafter as counsel can be heard.

The GROUNDS for this Order and the TRO are as follows:

Plaintiffs Molly J. Mulligan and John P. Mulligan (collectively "**Mulligans**" or "**Plaintiffs**") each are individual owners of record of the Property, which is their home and irreplaceable real property. The potential loss of such real property constitutes irreparable harm within the meaning of Rule 65A.

Plaintiffs have demonstrated that based on the material facts and the applicable statutory and case law that they meet each of the four Rule 65A elements necessary to obtain the TRO. Plaintiffs have demonstrated that: (1) there is a substantial likelihood that Plaintiffs will prevail on

the merits of their underlying claims; (2) Plaintiffs will suffer irreparable harm unless this Court

issues a TRO; (3) the threatened injury to Plaintiffs outweighs whatever damage the TRO may

cause Defendant; and this (4) Court's issuance of a TRO benefit the public interest and is not

adverse to it.

**\*\*END OF ORDER – entered when indicated by the Court's seal at the top of first page\*\***



# EXHIBIT M

*W3352068*

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Plaintiffs*

Felicia B. Canfield (09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, WY 82414
Office: (307) 228-5986
canfieldlawllc@gmail.com
*Attorneys for Plaintiffs*

E# 3352068 PG 1 OF 6
Leann H. Kilts, WEBER COUNTY RECORDER
23-Dec-24 1045 AM    FEE $40.00 DEP TH
REC FOR: FREEMAN LOVELL PLLC
ELECTRONICALLY RECORDED

**Tax ID No. 20-119-0007**

## IN THE SECOND DISTRICT COURT IN AND FOR
## WEBER COUNTY, STATE OF UTAH

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN,<br><br>Plaintiffs<br><br>v.<br><br>ALUM ROCK RIVERSIDE, LLC, a California limited liability company; Brett H. Del Valle and Traci M. Del Valle as Co-Trustees of the Del Valle Family Trust dated October 30, 2002<br><br>Defendants. | **LIS PENDENS**<br><br>Case No. 240908957<br><br>Judge CAMILLE NEIDER |

Pursuant to Utah Code Ann. § 78B-6-1303, and otherwise, the above-named Plaintiffs, by and through their undersigned legal counsel of record, hereby give notice of the pendency of the above-captioned action which is pending in the above-named Court seeking, among other things,

various claims, causes of action, and forms of relief with regard to and affecting the real property

which is the subject of this case is located in Weber County, State of Utah, commonly known as

1453 South Basinview Road, Huntsville, UT 84317, and is more particularly described as

follows (the "**Property**"):

> Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT,
> according to the official plat thereof on file and of record in the office of the Weber
> County Recorder.
>
> Together with a right of use for an easement for ingress and egress over and across
> Basinview Road (a private road), as shown on the official dedicated plat, to and from
> said Lot to a physically open and legally dedicated public street.
>
> Tax ID No. 20-119-0007

The claims, causes of action, and forms of relief with regard to and affecting the Property which

are asserted in and are the subject of this above-captioned action include, without limitation:

    1.      Judgment declaring that pursuant to Utah Code Ann. §§ 78B-6-401, *et seq.*, Rule

57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory

judgment that:

        a.      Brett Del Valle and Traci M. Del Valle, as apparent settlors of the Trust,

did not contribute the Property, or any portion of the Property to the Trust, and that Alum

Rock's Lien therefore did not attach to any purported contribution interest of Brett Del

Valle in or to the Property (*i.e.*, did not attach at all to the Property); or,

        b.      In the alternative only, if Brett Del Valle and Traci M. Del Valle, as

apparent settlors, did contribute the Property to the Trust, then Alum Rock's Lien only

attached to, encumbers, and/or affects any interest in the portion of the trust attributable

to settlor Brett Del Valle's contribution, if any, and Alum Rock's Lien did not attach to

the portion of the trust attributable to Traci M. Del Valle's contribution (leaving the Property free and clear of and from, and unaffected by, the Alum Rock Lien to the extent of Traci M. Del Valle's contribution); and in either event that,

      c.    Alum Rock cannot foreclose the Alum Rock Lien against and/or upon any part, portion, and/or interest whatsoever in or to the Property unless and until Alum Rock has established and proven to this Court what portion of the Property previously owned by the Trust was attributable to Brett Del Valle's contribution, if indeed any at all, and this Court has declared such portion of the Property which is therefore subject to the Alum Rock Lien.

2.    Judgment declaring that pursuant to Utah Code Ann. §§ 78B-6-1301, *et. seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to judgment quieting title of the Property in Plaintiffs, either fully free and clear of and from, and unaffected by, any and all estates, rights, titles, and/or interests which may be held and/or claimed by and/or under the Alum Rock Lien; or, in the alternative only, Plaintiffs are entitled to judgment quieting title in that portion of the Property that is unaffected and unencumbered by any contribution interest apparent settlor Brett Del Valle, if any, and that the Alum Rock Lien can only affect and encumber at most, and only, any contribution interest of apparent settlor Brett Del Valle, if any.

3.    Judgment declaring pursuant to Utah Code Ann. §§ 78B-6-401 *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, to declaratory judgment that, by virtue of Plaintiffs having paid off the liens and obligations on and against the Property that were prior and superior to the Alum Rock Lien and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, and to which they always were subject and inferior, the Alum Rock Lien and any and all other estates, rights, titles, or interests

3

in the Property held and/or claimed by Defendant Alum Rock, are equitably subordinated to and do not affect Plaintiffs' ownership, Warranty Deed, and other interests, at least to the extent that Plaintiffs' purchase proceeds paid off or reduced prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

4.      Judgment declaring that pursuant to Utah Code Ann. §§ 78B-6-401 *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise to declaratory judgment that Plaintiffs' ownership, Warranty Deed, and other interests in and to the Property should be and are subrogated to the priority positions in, on, and to the Property of all prior liens and obligations, with priority over the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, which were paid off with Plaintiffs' purchase proceeds, in at least the amount of $1,708,583.81, including particularly but without limitation to the priority position of the First Position Trust Deed, the Second Position Trust Deed, the Property Tax Lien, the HOA Lien, and each of them, ahead of and superior to the Alum Rock Lien, and to any and all other estates, rights, titles, or interests in the Property held and/or claimed by Defendant Alum Rock, at least to the extent that Plaintiffs' purchase proceeds paid off or reduced such prior liens and obligations on and against the Property, in at least the amount of $1,708,583.81.

5.      Judgment declaring Utah Code Ann. §§ Utah Code Section 57-3-102(4) and (5), 78B-6-401, *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien and any and all other claims of or by Defendant Alum Rock to any estate, right, title, lien, encumbrance, and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and

4

to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

6.      Judgment declaring that pursuant to Utah Code Ann. §§ 78B-6-401, *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing Plaintiffs are bona fide purchasers of the Property who paid valuable consideration, in good faith, without notice of any adverse claims of Defendant Alum Rock, including without notice of the Alum Rock Lien, and that Plaintiffs' estates, rights, titles, and interests in and to the Property are free and clear of and from, and are wholly unaffected by, the Alum Rock Lien, and any and all other claims by Defendant Alum Rock to any estate, right, title, lien, encumbrance, and/or other interest in, on, or to the Property, and that Plaintiffs' interests in and to the Property are wholly unaffected by any attempt of Defendant Alum Rock to execute upon and/or to foreclose any claimed lien upon and/or encumbrance against the Property.

7.      Judgment declaring that pursuant to Utah Code Ann. §§ 78B-6-401, *et seq.*, Rule 57 of the Utah Rules of Civil Procedure, and otherwise, Plaintiffs are entitled to declaratory judgment that by virtue of the foregoing the Trust is in breach of its covenants and warranties of title with respect to the Property contained and implied as a matter of law in and as a part of the Warranty Deed.

8.      Issuance of a temporary restraining order and preliminary injunction during the pendency of this action, and thereafter to a permanent injunction, restraining and enjoining Defendant Alum Rock from proceeding to any enforcement, execution, and/or foreclosure upon and/or against the Property pursuant to the Alum Rock Lien, and from attempting to enforce the Alum Rock Lien against the Property in any way.

5

DATED December 2ᵗʰ, 2024.

                FREEMAN LOVELL, PLLC

                Bradley L. Tilt
                *Attorneys for Plaintiffs*

STATE OF UTAH        )
                    : ss.
COUNTY OF SALT LAKE  )

The foregoing *Lis Pendens* was acknowledged before me this 20ᵗʰ day of December, 2024, by Bradley L. Tilt, of Freeman Lovell, PLLC.

NOTARY PUBLIC
Angela Byers
733294
My Commission Expires
09/20/2027
STATE OF UTAH

NOTARY PUBLIC
Residing at: Salt Lake, Utah

6