# EXHIBIT 9
## (Petition for Rehearing)

## IN THE SUPREME COURT OF THE STATE OF UTAH

MOLLY J. MULLIGAN and
JOHN P. MULLIGAN,

      Appellants

vs.

ALUM ROCK RIVERSIDE, LLC,

      Appellee.

Appellate Case No. 20221024-SC

## APPELLANTS' PETITION FOR REHEARING

Appeal from the Third District Court
In and For Salt Lake County, State of Utah, Case No. 206927043
The Honorable Adam T. Mow, Presiding

Benjamin D. Johnson
KC Hooker
Bennett Tueller Johnson & Deere
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
ben.johnson@btjd.com
kchooker@btjd.com
*Attorneys for Appellee*

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
bradley.tilt@freemanlovell.com
*Attorney for Appellants*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, Wyoming 82414
canfieldlawllc@gmail.com
*Attorney for Appellants*

Appellants Molly J. and John P. Mulligan ("**Mulligans**") respectfully submit this petition for rehearing of this Court's Opinion issued on July 18, 2024, which was reported at 2024 UT 22 (the "**Opinion**"), a copy of which is attached as Addendum 1.

## ARGUMENT

The Mulligans respectfully submit that the Court has misapprehended the facts and law relating the creation of a lien and issuance of the Writ of Execution against their Weber County property based upon a California Foreign Judgment that Appellee Alum Rock Riverside, LLC ("**Alum Rock**") obtained against its debtor, Brett Del Valle (who never owned the property), which Alum Rock attempted to domesticate by filing its Notice of Judgment in the Third Judicial District Court in Salt Lake County, but failed to file its Notice of Judgment in the Registry of Judgments with the Fourth Judicial District Court in Weber County, all in violation of several Utah statutes *which are in harmony with each other*: § 78B-5-302(3)[1]; § 78B-5-305(1)[2]; § 78B-5-201(2)[3], § 78B-5-202(7)(c)[4],

---

[1] "A foreign judgment filed under this part [the Utah Foreign Judgment Act] has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court of this state" (emphases added).

[2] "A foreign judgment entered in a district court under this part becomes a lien as provided in 78B-5-202 *if*: (a) a stay of execution has not been granted; (b) the requirements of this chapter [Procedure and Evidence] are satisfied; and (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202" (emphases added).

[3] "On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located" (emphases added).

[4] "The real property subject to the lien includes all the real property of the judgment debtor…(ii) owned or acquired at any time by the judgment debtor during the time the judgment is effective" (emphases added).

and §78B-3-301(1)[5], Utah Code Ann. Those misapprehensions resulted in this Court erroneously concluding that Alum Rock created a lien on real property in Weber County and that the Writ of Execution was validly issued, which was the principal basis for denying the Mulligans' appeal; the Court therefore should revisit and revise its Opinion.

## I.   TEXTUAL EVIDENCE THAT CREDITORS *MUST* FILE THEIR JUDGMENTS IN THE REGISTRY OF JUDGMENTS IS ABUNDANT; AND THIS COURT HAS ALREADY HELD THAT IT APPLIES.

Much of the focus of the briefing and arguments in this appeal, at oral argument held on April 10, 2024, and in the Opinion, was on the threshold issue of whether Alum Rock created a lien on the Mulligans' property in the first instance such that any writ could be issued, whether by the District Court in Salt Lake County or by a court in Weber County. The Mulligans respectfully submit that the Court, after holding that under Utah's Foreign Judgment Act (§ 78B-5-301 *et seq.*) creditors of foreign judgments must also comply with the Judgment Lien Statute (§ 78B-5-201 *et seq.*), erroneously ruled that § 78B-5-201(2) of the Judgment Lien Statute no longer applies to any judgments entered after July 1, 2002. This ruling, however, misapprehends the language of the statute and the textual evidence therein, *i.e.,* that both "**lien creation**" subsections (2) and (3)(a) are still required of all creditors if they wish to create a lien on real property, including as evidenced internally in the "**shall include**" subsection (4), *which expressly incorporates the Registry of Judgments requirement in **two places** in that subsection*. It states:

---

[5] "Actions for the following causes involving real property shall be tried in the county in which the subject of the action, or some part, is situated: (e) for the foreclosure of all liens and mortgages on real property" (emphases added).

§ 78B-5-201. Definitions – <u>Judgment recorded in Registry of Judgments</u>

(1) For purposes of this part, "<u>Registry of Judgments</u>" means the index where a <u>judgment is filed and searchable</u> by the name of the judgment debtor through electronic means or by tangible documents.

(2) On or after July 1, 1997, a <u>judgment entered in a district court does not create a lien upon or affect title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located</u>.

(3)(a) On or after July 1, 2002, except as provided in Subsection (3)(b), a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of the judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.
…
(4) **<u>In addition to</u>** the requirements of Subsections (2) **and** (3)(a), any judgment that is filed in the Registry of Judgments on or after September 1, 1998, or any judgment or abstract of judgment that is recorded in the office of a county recorder after July 1, 2002, shall include**[6]**:

> (a) the information identifying the judgment debtor as required under Subsection (4)(b) on the judgment or abstract of judgment; or

> (b) a copy of the separate information statement of the judgment creditor that contains:
> …
> (iii) <u>the amount of the judgment **as filed in the Registry of Judgments**</u>

Utah law is clear that a judgment must be accompanied by information about the

judgment debtor, whether in the judgment itself or attached separately as an information

statement – and in either case, pursuant § 78B-5-201(4)(b)(iii), that information must

include "<u>the amount of the judgment **as filed in the Registry of Judgments**</u>" thereby

---

[6] Here, given other textual evidence, statutory and case law discussed below, "or" should be read to mean that the subsection (4) "shall include" requirements apply to both (2) and (3)(a), not that (2) and (3)(a) are mutually exclusive.

expressly incorporating both lien creation subsections (2) and (3)(a) – *i.e.*, cumulative requirements added over time. *See e.g., Irving Place Assocs. v. 628 Park Ave, LLC*, 2015 UT 91, ¶ 24, 362 P.3d 1246; and, *T3 Properties*, 2013 UT App 38, ¶ 21, 299 P.3d at 618[7].

Furthermore, in 2017 **_this Court already held that_** the "judgment registry statute" (§ 78B-5-201) "applies only to judgment creditors who wish to create a lien on the judgment debtor's property[8]". *2DP Blanding, LLC v. Palmer*, 2017 UT 62, ¶ 31, 423 P.3d 1247, 1253. In *2DP Blanding* this Court dealt with whether the "judgment registry statute" applied to First National's Foreclosure order and decided that it did not because the order "does not create that kind of [judgment creditor] relationship…[T]he order instead established the relative priority of First National's trust deed against Palmer's deed and authorized the bank to foreclose on the properties against a separate debtor. The

---

[7] "…the reason the information statement requirement is set out in a separate subsection is not difficult to ascertain. Subsection (2) was included in section 1.5 when it was enacted in 1997, and by its terms, applies "[o]n or after July 1, 1997." Subsection (3), however was not added to section 1.5 until 1998 and by its terms, only applies to judgments that were recorded "on or after September 1, 1998." The information statement requirement is separate from subsection (2) because it took effect a year later. Thus, separate subsections do not mean that the information statement is not essential to the creation of a judgement lien; rather these requirements are set forth in different subsections due to the different dates of application. So, in order for "a judgment rendered or recorded" "[o]n or after July 1, 1997," to create a judgment lien it must be recorded **_in the Registry of Judgments_**. But effective a year later, "**in addition to**" the recording requirement of subsection (2) a judgment must "include a separate information statement of the judgment creditor" in order to create a lien on real property" (emphases added).

[8] Mulligans expressly further reserve their arguments below and on appeal that the Mulligans' Property is not, and never has been, property owned by Alum Rock's debtor, including as discussed further below.

judgment registry statute consequently did not govern the recording of First National's foreclosure order." In so holding, this Court expressly referenced the "judgment registry statute" saying it "impos[es] duties on judgment creditor to obtain a lien on judgment debtor's real property" and "require[es] the judgment to include 'the amount of the judgment *as filed in the Registry of Judgments*." *Id.* at ¶ 31 and fn. 8 (emphases added).

In addition, the Mulligans respectfully submit that this Court misapplied *Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 2005 UT App 164, 112 P.3d 1210, and misapprehended legislative history of the Judgment Lien Statute in paragraphs 31-39 of its Opinion when it erroneously **equated** the *removal* in 1997 of "automatic-lien regime" language in § 78B-5-202(2) (adding the requirement that as of July 1, 1997 "…a judgment does not create a lien 'unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located'") **with the further *addition*** in 2002 of subsection (3)(a) ("a judgment entered in the district court does not create a lien 'unless the judgment or an abstract of the judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.'"). The Court's conclusion that the ***addition*** of subsection (3)(a) is evidence that "legislature also **phased out** subsection (2)'s registry-of-judgments requirement" is, respectfully, illogical, and not supported by the textual evidence in the statute itself, nor this Court's analysis in *2DP Blanding*, nor by other cases and rules discussed below.

Also, in parsing the statutory language of § 78B-5-201, the Court erroneously contrasted the ***external*** grammatical structure and punctuation of the two "lien creation" subsections (2) and (3)(a), which are not separated by an "or" or "but" conjunction, with

the ***internal*** punctuation of subsection (4) that lists out the "shall include" disclosure requirements for a judgment, and in doing so, ignored that (4) <u>begins</u> with the phrase "*<u>In addition to</u>* the requirements of Subsections (2) ***and*** (3)(a)…" and proceeds to, in that same enumerated list, require disclosure of "the amount of the judgment ***as filed in the Registry of Judgments***".  Opinion ¶¶ 35-40. The Court concludes that reading subsection (2) out of the lien creation requirements brings two statutes into harmony because although the Foreign Judgment Act expressly refers creditors to the requirements of the Judgment Lien Statute, it does not itself reference the Registry of Judgments. But respectfully, if this Court maintains that reading out § 78B-5-202(2) brings the Judgment Statute in harmony with the Foreign Judgment Act, it does so to the peril of harmony *within* the Judgment Lien Statute itself and settled law and practice[9].

Furthermore, the Court's assertion in paragraph 44 of the Opinion that *Kitches* has stood as "controlling law in this jurisdiction for nearly two decades, and during that time judgment creditors have presumably relied on it as such" is unsupported by any evidence including, for example, by creditors, debtors, lenders, or title companies whose job it is to search out liens in court records and county records, and is further belied by textual evidence in the statute itself as shown above, and by *2DP Blanding, T3* (supra), <u>and other cases decided **after** *Kitches*,</u> such as, for example, *Charlton v. Charlton*, 2007 UT App 198, in which the Utah Court of Appeals assumed without deciding that judgments must

---

[9] The Mulligans also submit that the Judgment Lien Statute and the Foreign Judgment Act are *already* in harmony with each other because foreign judgments creditors are specifically directed to look to Utah's Judgment Lien Statute to create a lien on real property in Utah – as are domestic creditors, who do not rely on the Act at all.

be filed in the registry of judgments but that "the date that the judgment is filed in the 'registry of judgments'," is not the date from which an appeal runs (*citing Glacier Land Co. v. Klawe*, 2006 UT App 209, ¶ 3, 138 P.3d 109 (observing that a "stamp on the Judgment states it was 'entered in the registry of judgments' on March 14, 2005," but holding that is not the date from which an appeal runs)); *Wilden Family Dental, Inc. v. Dannon*, 2007 UT App 404, ¶ 1 (observing that "[t]he judgment also contains a stamp stating that it was entered in the registry of judgments on August 7, 2007," but holding that is not the date from which an appeal runs) (citing *Glacier Land Co.*)).

Indeed, the Mulligans respectfully submit that the presumption and reliance by creditors, lenders, title companies and others has been in the *other direction* – that creditors *are* required to file their judgments in the Registry of Judgments to create a lien on real property. **<u>This requirement is not trivial</u>**; it serves the important public purpose of docketing judgments <u>in a searchable court database in the county where real property is located</u> so that judgments (whether recorded yet or not) and liens (whether choate or inchoate) that affect or may affect real property can be discovered. Prospective buyers, sellers, lenders, and title companies, among others, all have a vested interest in being able to locate docketed judgments, including ones that purport to create a lien (especially if not yet recorded). And title companies, in particular, as discussed during oral argument, routinely and regularly search court records for judgments that may or do affect real property or the sellers and buyers thereof[10].  It is their legislative imposed duty to do so.

---

[10] *See* § 31A-20-110. Underwriting rules for title insurance, states, *inter alia*: "(1) A title insurance policy may not be written until the title insurer or its individual title insurance

The legislature has expressly recognized this important role of searching for judgments in court records and provided for it by enacting a number of court rules designed to provide access to court records designated as public. For example, Rule 4-202. Purpose, Utah Rules of Judicial Administration, provides in relevant part:

> Intent: To recognize the delicate balance of interests served by open and closed court records.
> …
> Statement of the Rule:
> (1) <u>This list of interests served by public court records</u> is not exhaustive but is meant to <u>illustrate the important objectives of open government</u>:
>
> (F) <u>to give notice of important claims</u>, rights and obligations…

Rule 4-202.02. Records Classification, provides in relevant part[11]:

> (2) Public Court Records. Public court records include but are not limited to:
> (L) <u>indexes</u> approved by the Management Committee of the Judicial Council, including the following, in courts other than the juvenile court; an index may contain any other index information:
> (viii) <u>civil judgment</u>…

Rule 4-205. Security of Court Records, provides in relevant part:

> Intent: …To assure that <u>authorized personnel</u> have access to court records when appropriate

---

producer or agency title insurance producer has conducted a reasonable examination of the title and has made a determination of insurability of title under sound underwriting principles. Evidence of this examination and reasonable determination shall be retained in the files of the title insurer…for not less than 15 years after the policy has been issued…" *Accord Chapman v. Uintah County*, 2003 UT App 383, 81 P.3d 761; *Culp Constr. Co. v. Buildmart Mall*, 795 P.3d 650 (Utah 1990); *Johnson and Allphin v. First American Title Ins. Co.*, 2016 WL 6459579.

[11] *See also State v. Allgier*, 2011 UT 47, ¶¶ 10-11, 258 P.3d 589 (holding that under the plain language of the UCJA there is a 'presumptive right of public access to court records…including "to give notice of important claims, rights and obligations'"); *accord Supernova Media, Inc. v. Pia Anderson Dorius Reynard & Moss*, LLC 2013 UT 7, 297 P.3d 599.

(3) <u>The clerk of the court may authorize, in writing, abstractors, credit bureau representatives,</u> **title company representatives** *and others who regularly research court records* to have direct access to public court records…

Taken together with the textual evidence, caselaw and rules discussed herein,[12] and the harmony that exists between them, it appears to the Mulligans that the legislature has mandated that to create a lien on real property after July 1, 2002, a creditor must <u>both</u> file it in the requisite Registry of Judgments and record it with the county recorder – and that *T3*, decided in 2013, which extensively analyzed and explained the evolution of the Judgment Lien Statute over time, is on point and controlling, while *Kitches*, decided in 2005, if not wrongly decided, is at least distinguishable, including since its "<u>starting point for establishing a judgment lien on real property [was] section 78-22-1 [§ 78B-5-202</u>

---

[12] At oral argument the Court allowed Alum Rock to raise a new argument under § 75-7-505, Utah Trust Code, which had never been referenced, briefed or argued by the parties below or on appeal (Transcript pp. 23, 49) and further invited counsel for Alum Rock to submit supplemental authority on the question of whether "when the legislature does not amend a statute in response to an interpretation, that we give that same weight?" (Transcript p. 28) (a copy of the oral argument Transcript is attached to this petition as Addendum 2). In the spirit of assisting this Court to rule on the Mulligans' petition, they offer supplemental authority consistent with this Court's guidance in *Patterson v. Patterson*, 2011 UT 68, ¶ 18, 266 P.3d 828, 833, wherein it stated: "[b]ut we routinely consider new authority relevant to issues that have been properly preserved, and we have never prevented a party from raising a controlling authority that directly bears upon a properly preserved issue. Further, we are unwilling to disregard controlling authority that bears upon the ultimate resolution of a case solely because the parties did not raise it below." And the Mulligans expressly preserved for appeal questions relating to whether Alum Rock validly created a lien on their property, including pursuant to the Foreign Judgment Act and the Judgment Lien Statute.

Additionally, at oral argument the Court specifically asked about title companies and how they investigate judgments against judgment debtors, which counsel for Mulligans, who has practiced title insurance law for more than 25 years, addressed and discussed (Transcript pp. 45-47).

today]" rather than today's § 78B-5-201 [78-22-1.5 in the time of *Kitches*]. *Kitches,* ¶ 10 (emphases added))[13].

Further, following *Kitches* reads out of existence § 78B-5-202(3), which provides: "[a]n abstract of judgment issued by the court in which the judgment is entered may be filed in any court of this state <u>and shall have the same force and effect as a judgment</u> entered in that court" and the language in § 78B-5-201(4) that states "<u>or abstract of judgment that is recorded in the office of a county recorder after J</u>uly 1, 2002". If a creditor does not need to file its judgment <u>or an abstract</u> in the court where the real property upon which it seeks to create a lien is located, then there is no need for these provisions.

---

[13] Additionally, in ¶ 46 in the Opinion the Court acknowledges that the core issue in *T3* is the same issue in this case, *i.e.,* "[t]he issue [in *T3*] was whether the judgment creditor created a lien on the property before the debtor conveyed it away". Therefore, its dismissal in ¶¶ 47-48 of the *T3* statement that a judgment must be filed in the registry of judgments as mere dicta ignores that this conclusion was expressly made in this context: "<u>These cumulative amendments were in effect until July 1, 2002 and are part of what we have designated as the 2001 version of the judgment lien statute.  The statute was significantly revised again, effective July 1, 2002 (the 2002 version) …Notably, the 2002 version required that the judgment and the information statement be recorded in both the Registry of Judgments and in the county recorder's office.</u>" (*T3* at ¶ 15 and fn 5.) (emphasis added). Thus, the *T3* footnote was an extension of the court's in-depth analysis of the statue, even beyond the information statement at issue, not just a side note.

Confusingly, in ¶ 48, while discussing *T3*, the Court stated that "[a] separate panel of the court, squarely presented with the issue, had held those requirements are sequential and that judgments no longer need to be filed in the registry of judgments for a lien to attach" but *T3* held no such thing.

And, respectfully, the analysis in ¶ 43 in which the Court discusses that "where a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent" leads to a "cumulative" conclusion not the sequential conclusion which the Court adopted.

## II.    IN DECIDING THAT ALUM ROCK'S DEBTOR "OWNED" THE PROPERTY THIS COURT LEAP-FROGGED OVER FACT FINDING AND EVIDENTIARY HEARINGS.

The Mulligans respectfully submit that in its Opinion, this Court prematurely decided that Alum Rock's debtor, Brett Del Valle, "owned" the Property, such that Alum Rock's lien could attach and that the Writ was therefore properly issued, on the facial basis that the Del Valle Family Trust is revocable[14] – but without the parties having conducted any fact-finding discovery and without any evidentiary hearings to probe the extent, control, contribution, and ownership interest that Brett may have had as a settlor and trustor. In doing so, the Court relied on general principles about creditors rights, trusts, and on § 75-7-505(1). Opinion. ¶¶ 57-62[15]. But section 75-7-505(1) provides: "During the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors. If a revocable trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust *attributable to that settlor's contribution*"[16] (emphases

---

[14] As a practical matter the Mulligans would have no way of knowing that the grantor, the "Del Valle Family Trust", is a *revocable* trust nor that any judgment against an individual named Brett Del Valle (which judgment would not show up in a grantor search of the Weber County public court records) could somehow create a lien on the subject property.

[15] *But see Hillam v. Hillam* 2024 Ut App 102, ¶ 37 (finding unpreserved a "distinct legal theory" because "[w]e see no place in Tara's pleadings or in the court's analysis where anyone invoked Utah Code section 75-7-505(2)(a), which provides the analytical foundation for the issue Tara is presenting on appeal".

[16] In footnote 2 of their appellate Reply Brief, the Mulligans called out and reserved the issue that: "*Brett Del Valle's wife is not Alum Rock's judgment debtor, so even if it could somehow execute against his prior co-trustee interest in the Property, it could not do so against hers*", although the Court erroneously stated in its footnote 7 that "[n]either side has addressed whether Traci's joint ownership of the property has any effect on the judgment lien. For that reason, we express no opinion on the matter."

added). At the Scheduling Conference held on August 17, 2022, counsel for Alum Rock

expressly requested the District Court to allow it to conduct fact discovery followed by an

evidentiary hearing:

> MR. JOHNSON: …I would like to talk to Brett Del Valle about this trust he set up, So my – my request would be a short period for some very limited discovery as <u>to talk to the parties about the trust</u>, and just to make sure this is also, a, you know, <u>a legitimate transfer of assets</u>. This is a multi-million-dollar judgment that we're trying to collect on. So there's a fair amount at stake.
>
> <u>So my ask would be some basic discovery</u>, just two or three quick depositions.  If we could have <u>an evidentiary hearing</u> in maybe 90 to 120 days. I do think we need to brief the legal issues, <u>in</u> particular did this judgment attach to the property, and there's kind of a couple issues related to that.
> …
> MR. JOHNSON: I probably want to talk to the Mulligans briefly just to inquire into the nature of their relationship with this Del Valle character… It would be a brief deposition <u>just to confirm that this –that they are BFP's</u>, that t<u>hey don't know Brett Del Valle </u>and the nature of that.  I don't anticipate that it would be a very long deposition, <u>but if I'm allowed to talk to Brett Del Valle about this trust and the nature of this trust; is it a revocable trust; is it a irrevocable trust; was the trust really – was the property really treated as (inaudible) in the trust, things along those line</u>s…"

R000299-302. After some discussion, the District Court decided to set "oral argument on

the legal issues, and then my goal is to be able to give you a decision at that hearing so

that we can discuss, you know, do we need to set it for further evidentiary issues of

discovery or hearing or what have you, or if that's the end of my involvement in the case.

I think that's a good way to handle that threshold issue."[17]

Additionally, the Mulligans respectfully submit that they *did* argue, and *did*

preserve below, the question of whether § 78B-5-202(7)(c) governs to preclude

---

[17] The trust provides that co-settlors are tenants in common; therefore, if this Court holds that Alum Rock's lien attached, evidence on what Brett's interest was is needed.

attachment of Alum Rock's lien because a judgment lien can only attach to "real property of the judgment debtor". In their *Reply and Request for Hearing*, the Mulligans expressly argued this legal theory, including by tying it to §78B-5-202(7)(c), *even though* they were replying to a Writ of Execution issued under Rule 64E:

> (3) But the Plaintiff's *Application for Writ of Execution* then goes on to **incorrectly state** that the real property located at and commonly known as 1453 S. Basinview Road, Huntsville, Utah 84137, and more particularly described (in part) as Lot 7, Basinview Estates Cluster Subdivision 1st Amendment, and which bears Parcel No. 20-119-0007 (which real property is referred to hereinafter as the "**Property**"), *is "the judgment debtor's property"*; the *Application for Writ of Execution* then **incorrectly requests** that a Writ of Execution be issued to direct the Sheriff to seize and sell the Property *purportedly as if it was "the debtor's … real property."* ¶¶ 4 and 6 of the Plaintiff's *Application for Writ of Execution*. Those statements and requests in Plaintiff's *Application for Writ of Execution* are **incorrect, inaccurate, and improper,** *because the Property is not presently – and it never has been – the judgment debtor's real property*; *the Property is not presently – and it never has been – owned by Brett Del Valle in his individual and personal capacity*
>
> (4) It further and provides and confirms that a judgment can become a lien upon real property <u>only if the above-referenced filings and recordings are made in the county in which the property is located</u>…
>
> **And** in footnote 3: '*That same Utah Code Section 78B-5-202(7)(*c) & (c)(ii) also and further confirm that even if all of those requirements are met, the judgment then *affects only real property in that county "of the judgment debtor"*" and specifically such property "owned or acquired at any time **by the judgment debtor during the time the judgment is effective**."

R000049 (some emphases added). And in additional filings below, they continued to assert the argument that even if Alum Rock had created a valid lien pursuant to Utah's Judgment Lien Statute, Alum Rock's Writ was improper and invalid because it was issued against real property *not owned by its judgment debtor*. Thus, this Court's harsh treatment and criticism of the Mulligans in ¶¶ 54-56 seems unfair and inaccurate.

13

Therefore, to the extent this Court upholds its ruling that Alum Rock created a lien, the Mulligans respectfully submit that it should withhold any decision relative to whether its debtor's status as a settlor of the trust *a fortiori* means that he "owned" the property such that its lien *automatically* attached, including under § 78B-5-202(7), and remand the case to the District Court for further fact finding and proceedings on that question.

## III.   A LIEN FORECLOSURE IS AN *IN REM* ACTION AND MUST BE BROUGHT WHERE THE REAL PROPERTY IS LOCATED.

The Mulligans respectfully submit that this Court also misapprehended the meaning of Section 78B-3-301, Actions involving real property, when it decided that the Salt Lake County District Court had jurisdiction to issue the Writ. § 78B-3-301 provides:

(1) Actions for the following <u>causes</u> involving real property ***shall*** <u>be tried in the county in which the subject of the action</u>, or some part**, *is situated*:**

(e) <u>for the foreclosure of **all liens**</u> and mortgages <u>on real property</u>.

The Court opined in ¶ 63 of its Opinion that the Mulligans "*have not identified a relevant limitation on the district court's jurisdiction to issue the wr*it" but the Mulligans argued on pages 3, 6, 11, and 30 of their Principal Brief, and on page 14 of their Reply, that § 78B-3-301 applies to limit the District Court's jurisdiction because this is a solely *in rem* action – *i.e.,* the California contract dispute resulted in a judgment and the Utah action pertains only to execution and foreclosure of Alum Rock's purported lien <u>*on real property*</u>. But this Court did not address *in rem* principles at all, which the Mulligans expressly raised and argued in pages 3-4, 6, 11, 30, 32 of their Principal Brief and in pages 13-15 of their Reply. Notably, however, Alum Rock filed and recorded a *Lis*

14

*Pendens* on the Mulligans' Property, pursuant to § 78B-6-1303[18], giving notice:

> …<u>of an action</u> pending in the Third Judicial District Court of Salt Lake County, Case No. 206927043 (the "Action"). <u>In the Action</u>, Alum Rock claims a judgment lien against the below described property and, <u>pursuant to its judgment in the Action, has obtained a writ of execution against the below described property</u>…"

Thus, the Court's determination that "***no [a]ction[]…involving real property' is at issue…Indeed, no cause of action is at issue at all***" is erroneous and should be corrected. *See also Derma Pen, LLC v. 4EverYoung Ltd.*, No. 2:13-CV-00729-DN-EJF, 2015 WL 791595 (D. Utah) (Application for Writ of Execution is an *in rem* or *quasi in rem* proceeding: "[i]n determining whether a court has assumed jurisdiction over the property in question, a court must look to the judgment sought…[w]here, however, the judgment sought requires 'that the court or its officers have possession or control of the property which is the subject of the suit in order to proceed with the cause and grant the relief sought,' then the proceeding is considered *in rem* or *quasi in rem*)[19].

---

[18] 78B-6-1303, Lis pendens – Notice, provides:"(1)(a) Any party to an action filed in … a district court of this state…that affects the title to, or the right of possession of, real property may file a notice of pendency of action…(3) From the time of filing the notice, a purchaser, an encumbrancer of the property, or any other party in interest that may be affected by the action is considered to have constructive notice of the pendency of action."

[19] *See also SMS Fin., LLC v. CBC Fin. Corp.*, 2017 UT 90, ¶ 5, 417 P.3d 70, 72 (assuming that filing for a writ of execution was an "action" to foreclose its judgment lien); *see also e.g., Carmack v. Park Cities Healthcare, LLC*, No. 3:16-CV-3500-D, 2021 WL 4133494, at *7 (N.D. Tex. Sept. 10, 2021) ("<u>attachment proceedings are essentially *in rem* actions because they result in control of the property. This logic applies as well to writs of execution. Much like writs of attachment, writs of execution "result in actual or constructive control over the res itself, rather than simply adjudicating personal rights to the subject property</u>," meaning they are also essentially *in rem* actions) (citing *GM Gold & Diamonds LP v. Fabrege Co.,* 489 F. Supp. 2d 725, 727 (S.D. Tex. 2007)).

RESPECTFULLY SUBMITTED this 1st day of August, 2024.


    */s/Felicia B. Canfield*
Felicia B. Canfield
CANFIELD LAW LLC
*Attorneys for Appellants*


## CERTIFICATION PURSUANT TO RULE
## 35(a)(3) OF THE UTAH RULES OF APPELLATE PROCEDURE

I certify that the above Appellants' Petition for Rehearing is presented in good

faith and not for delay.


    */s/Felicia B. Canfield*
Felicia B. Canfield
CANFIELD LAW LLC
*Attorney for Appellants*

16

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2024, I caused a true and correct copy of the

foregoing **APPELLANTS' PETITION FOR REHEARING** to be served in the manner

indicated to the following parties at the addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson (10275)<br>KC Hooker (18018)<br>BENNETT TUELLER JOHNSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, Utah 84121<br>Telephone: (801) 438-2000<br>Ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside LLC* | _____Hand Delivery<br>_____First Class, United States Mail,<br>     Postage Prepaid<br>\_\_X\_\_E-filing via Appellate e-filing<br>system<br>\_\_X\_\_Email<br>_____Other:_____ |
| Bradley L. Tilt (Utah Bar No. 07649)<br>FREEMAN LOVELL, PLLC<br>4568 S Highland Drive, Suite 290<br>Salt Lake City, Utah 84117<br>Office:(385) 355-4826<br>bradley.tilt@freemanlovell.com<br>*Attorneys for Molly J. Mulliglan and John P. Mulligan* | _____Hand Delivery<br>_____First Class, United States Mail,<br>     Postage Prepaid<br>\_\_X\_\_E-filing via Appellate e-filing<br>system<br>\_\_X\_\_Email<br>\_\_Other:_____ |

_____*/s/Felicia B. Canfield*_____
Felicia B. Canfield
CANFIELD LAW LLC
*Attorney for Appellants*

17

# **<u>ADDENDUM 1</u>**

2024 UT 22

*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2024 UT 22**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

———————

MOLLY J. MULLIGAN and JOHN P. MULLIGAN,
*Appellants,*

*v.*

ALUM ROCK RIVERSIDE, LLC,
*Appellee.*

———————

No. 20221024
Heard April 10, 2024
Filed July 18, 2024

———————

On Direct Appeal

———————

Third District, Salt Lake County
The Honorable Adam T. Mow
No. 206927043

———————

Attorneys:

Bradley L. Tilt, Salt Lake City, Felicia B. Canfield, Cody, Wyo.,
for appellants

Benjamin D. Johnson, KC Hooker, Salt Lake City, for appellee

———————

JUSTICE HAGEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE,
JUSTICE PETERSEN, and JUSTICE POHLMAN joined.

———————

JUSTICE HAGEN, opinion of the Court:

### INTRODUCTION

¶1    This case stems from a California judgment that Alum
Rock Riverside, LLC obtained against Brett Del Valle. After
domesticating the judgment in Utah and recording it with the
county recorder, Alum Rock received a writ of execution allowing
it to seize and sell a property in Weber County.

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

¶2   At the time Alum Rock recorded the judgment with the
county recorder, the property was owned by a revocable trust that
was established and administered by Brett and his wife. But the
trust had sold the property by the time Alum Rock applied for the
writ. And when the court issued the writ, the property's new
owners—the Mulligans—objected, arguing that (1) Alum Rock
failed to create a judgment lien because it did not record the
judgment in the registry of judgments, (2) the writ was not
available because the trust—not Brett—held title to the property
when the judgment was domesticated in Utah, and (3) the district
court lacked jurisdiction to issue the writ because the property was
located in a different judicial district.

¶3   The district court upheld the writ over the Mulligans'
objections, and we affirm. First, we hold that Alum Rock created a
judgment lien when it recorded the judgment in the county
recorder's office. As of July 1, 2002, a party seeking a judgment lien
is not required to record the judgment in the registry of judgments.
Second, we hold that the writ was available against the property,
even though the title was held in the name of a revocable trust,
because Brett retained all indicia of ownership over the property
when the lien was created. And third, we hold that the Mulligans
have not identified a relevant limitation on the district court's
jurisdiction that would prevent it from issuing the writ.

## BACKGROUND

¶4   Alum Rock Riverside, LLC sued Brett Del Valle in
California state court for breach of contract and other claims. Alum
Rock prevailed, and the court issued a judgment in its favor
totaling more than $4 million. Soon after, Alum Rock domesticated
the judgment in Utah's Third District Court. Because the Del Valle
Family Trust owned property in Weber County, Utah, Alum Rock
recorded the judgment in the Weber County Recorder's Office.

¶5   Brett and his wife, Traci, had formed the trust years earlier,
naming themselves as trustees. Brett and Traci retained broad
powers over the trust and its property, including the power to
revoke the trust, amend it, and transfer property from it. In
addition, the trust empowered Brett and Traci, as trustees, to hold,
manage, control, lease, and encumber trust property. Several years
after they created the trust, Brett and Traci, acting as trustees,
acquired the Weber County property at issue in this case.

¶6   The trust continued to hold title to the property when
Alum Rock recorded its judgment against Brett in the county

2

Cite as: 2024 UT 22

Opinion of the Court

recorder's office. A few months after Alum Rock recorded the judgment, however, the trust conveyed the property to Molly and John Mulligan. And one month after that, Alum Rock applied for a writ of execution against the property, identifying Brett as the judgment debtor and asking the district court to "direct the sheriff to seize and sell" the property to satisfy the judgment.

¶7    When the court issued the writ as requested, the Mulligans challenged it. Acknowledging that their challenge "rises or falls" on whether a lien "was created and attached to the property," they asserted that Alum Rock did not do what the Judgment Act requires to create a judgment lien on real property.[1] Specifically, they claimed that Alum Rock did not fully comply with the following statutory requirements, found in Utah Code section 78B-5-201:

> (2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.

> (3)(a) On or after July 1, 2002, . . . a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021).

¶8    The Mulligans argued that because Alum Rock obtained its judgment against Brett in 2020—after both July 1, 1997, and July 1, 2002—Alum Rock needed to comply with the requirements of both subsections: filing the judgment in the registry of judgments and recording it with the county recorder. Because Alum Rock did not file the judgment in the registry of judgments, the Mulligans reasoned, a lien was not created.

---

[1] We refer to Utah Code, Title 78B, Chapter 5, Part 2 as the Judgment Act. Effective July 1, 2024, the Judgment Act was renumbered, and the legislature made minor stylistic changes. We cite the version in effect at the time the district court issued the writ.

3

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

¶9    The Mulligans also claimed that, under the Judgment Act and the Utah Rules of Civil Procedure, the writ was not "available" against the property. Under the Judgment Act, real property subject to a judgment lien "includes all the real property . . . owned or acquired at any time by the judgment debtor during the time the judgment is effective." *Id.* § 78B-5-202(7)(c)(ii) (2021). And under rule 64E of the Utah Rules of Civil Procedure, "[a] writ of execution is available to seize property in the possession or under the control of the defendant following entry of a final judgment." UTAH R. CIV. P. 64E(a). According to the Mulligans, the writ was "issued improperly" because (1) Brett never owned the property (the trust did), and (2) in any event, he did not possess or control the property at the relevant time (the Mulligans did).

¶10   Finally, the Mulligans questioned the district court's jurisdiction. In their view, the court lacked jurisdiction to issue the writ because the proceedings fall within reach of a venue statute that lists actions that "shall be tried in the county in which the [property] . . . is situated." *See* UTAH CODE § 78B-3-301(1) (2021).[2] The Mulligans also claimed that under Utah caselaw, actions in which the "main question . . . involves title to real property" may be heard only by the district court where the property is located. (Quoting *Calder v. Third Jud. Dist. Ct.*, 273 P.2d 168, 171 (Utah 1954).) Because the property here is outside the district court's geographic boundaries, the Mulligans maintained that the court lacked jurisdiction to issue the writ.

¶11   The district court upheld the writ against the Mulligans' challenge. It first concluded that the Judgment Act did not require Alum Rock to file its judgment in the registry of judgments, as the Mulligans had argued, and that Alum Rock's lien attached when the judgment was recorded with the county recorder. Next, the court determined that because the property was under Brett's control when Alum Rock domesticated the judgment, the property was subject to execution under rule 64E. Finally, the court rejected the Mulligans' challenge to its jurisdiction, explaining that it had the power to issue the writ even though the property is located outside the Third District.

---

[2] This venue statute has been renumbered and slightly altered, effective July 1, 2024. *See* UTAH CODE § 78B-3a-202(1). We cite the version in effect at the time the district court issued the writ.

Cite as: 2024 UT 22

Opinion of the Court

¶12  The Mulligans appeal, and we have jurisdiction under Utah Code subsection 78A-3-102(3)(j).

## ISSUES AND STANDARDS OF REVIEW

¶13  The parties dispute whether Alum Rock created a judgment lien on the property. "Judgment liens are creatures of statute . . . ." *Gildea v. Wells Fargo Bank, N.A.*, 2015 UT 11, ¶ 12, 347 P.3d 385. Accordingly, whether the property here is encumbered by Alum Rock's purported judgment lien raises a question of statutory interpretation, a legal question that we review for correctness. *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863.

¶14  The Mulligans also contest the district court's conclusions that the property is subject to the writ and that the court had jurisdiction to issue the writ. Because these determinations were premised on the court's interpretation of Utah law, they also present legal questions, which we review for correctness. *See Peak Alarm Co. v. Salt Lake City Corp.*, 2010 UT 22, ¶ 16, 243 P.3d 1221.

## ANALYSIS

¶15  The Mulligans challenge three aspects of the district court's decision, each of which turns in part on statutory interpretation. "The aim of statutory interpretation is to ascertain the intent of the legislature, and the best evidence of the legislature's intent is the plain language of the statute itself." *SunStone Realty Partners X LLC v. Bodell Constr. Co.*, 2024 UT 9, ¶ 11, 545 P.3d 260 (cleaned up). But because "statutory text may not be plain when read in isolation," *State v. J.M.S. (In re J.M.S.)*, 2011 UT 75, ¶ 13, 280 P.3d 410 (cleaned up), "we determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)," *McKitrick v. Gibson*, 2021 UT 48, ¶ 19, 496 P.3d 147 (cleaned up).

¶16  We first address the Mulligans' contention that Alum Rock skipped a necessary step to create a lien on the property by not filing its judgment in the registry of judgments. We clarify that to create a lien from a foreign judgment, creditors must adhere to relevant requirements under the Judgment Act as well as the Foreign Judgment Act. But since July 1, 2002, creditors do not need to file judgments in the registry of judgments to create a lien. Thus, Alum Rock created a valid lien when it recorded its judgment in the county recorder's office.

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

¶17  Next, we assess whether Brett "owned" the property, allowing Alum Rock's lien to attach, even though the revocable trust that he and his wife created and administered held title to it. We conclude that he did.

¶18  Finally, we consider and reject the Mulligans' argument that limitations on the district court's jurisdiction prohibited the court from issuing the writ.

### I. ALUM ROCK CREATED A VALID LIEN ON THE PROPERTY

¶19  To resolve this appeal, we must decide whether Alum Rock created a valid lien on the property before it was sold to the Mulligans. The answer to that question largely depends on the meaning of two provisions of the Judgment Act.

¶20  These provisions, subsections (2) and (3)(a) of Utah Code section 78B-5-201, set out actions that judgment creditors have needed to perform at different times to create a judgment lien on real property:

> (2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.

> (3)(a) On or after July 1, 2002, . . . a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021). The Mulligans argue that these requirements—the registry-of-judgments requirement and the county-recorder requirement—"work together, cumulatively." Under their reading, because the judgment was domesticated in 2020, which is "on or after" both July 1, 1997, and July 1, 2002, *see id.*, Alum Rock could not create a lien on the property unless it (1) filed its judgment in the registry of judgments and (2) recorded it with the county recorder.

¶21  Before interpreting these provisions, we address a threshold issue raised by Alum Rock: whether section 78B-5-201 of the Judgment Act even applies here, given that Alum Rock's

Cite as: 2024 UT 22

Opinion of the Court

judgment is a foreign judgment. After explaining why the section applies, we interpret its provisions.

### A. Creditors Domesticating Foreign Judgments Must Adhere to the Judgment Act's Requirements for Creating a Lien

¶22  Alum Rock argues that the Judgment Act's registry-of-judgments requirement is not implicated here because Alum Rock's judgment is governed by the Foreign Judgment Act, which makes no mention of the registry of judgments. We disagree.

¶23  As it relates to converting a foreign judgment into a lien, the Foreign Judgment Act provides:

> (1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:
>
> > (a) a stay of execution has not been granted;
> >
> > (b) the requirements of this chapter are satisfied; and
> >
> > (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202 [of the Judgment Act].

UTAH CODE § 78B-5-305(1).

¶24  Alum Rock points out that this section of the Foreign Judgment Act mentions section 78B-5-202 of the Judgment Act but not section 78B-5-201. And, it adds, section 202 also does not mention section 201 or its registry-of-judgments requirement, on which the Mulligans' argument turns. *See id.* § 78B-5-202(7)(a) (2021) ("After July 1, 2002, a judgment . . . becomes a lien upon real property if . . . the judgment . . . is recorded in the office of the county recorder.").

¶25  These points are well taken. Still, the Foreign Judgment Act declares that foreign judgments are treated the same as domestic ones. Specifically, it provides that "[a] foreign judgment filed under [the Foreign Judgment Act] has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court of this state." *Id.* § 78B-5-302(3). Alum Rock argues that this language does not "incorporate[] the Judgment Act wholesale into the Foreign Judgment Act." Instead, Alum Rock urges us to parse this language and treat the phrase "for

7

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

reopening, vacating, setting aside, or staying" as modifying and limiting the entire preceding series—"procedures, defenses, enforcement, satisfaction, and proceedings."

¶26  To take one example, as Alum Rock sees it, foreign judgments are not generally "subject to the same procedures" as domestic judgments; they are merely "subject to the same procedures . . . *for reopening, vacating, setting aside, or staying*" as domestic judgments. Alum Rock thus argues that the Judgment Act applies to foreign judgments only when reopening, vacating, setting aside, or staying a foreign judgment, none of which Alum Rock seeks to do here.

¶27  But Alum Rock's argument is undercut by a decision that we issued after the briefing in this appeal was completed, *SunStone Realty Partners X LLC v. Bodell Construction Co.*, 2024 UT 9, 545 P.3d 260. There, the parties disputed whether, under the Foreign Judgment Act, Utah's or Hawaii's postjudgment interest rate applied to a Hawaii judgment that was domesticated in Utah. *Id.* ¶¶ 1–2. In resolving the dispute, we explained that the Foreign Judgment Act "mandates that foreign judgments domesticated using the [Foreign Judgment Act] are 'subject to the same procedures, defenses, enforcement, satisfaction, and proceedings . . . as a judgment of a district court of this state.'" *Id.* ¶ 13 (quoting UTAH CODE § 78B-5-302(3)). In line with this principle, we held that "[b]ecause postjudgment interest is an enforcement mechanism," Utah's postjudgment interest rate applied. *Id.* ¶ 21.

¶28  In *SunStone* we did not read the phrase "for reopening, vacating, setting aside, or staying" as modifying "enforcement." *See id.* ¶ 13; *see also* UTAH CODE § 78B-5-302(3). Indeed, it would be unreasonable to read the phrase to modify terms like "enforcement" and "satisfaction" because a judgment's enforcement or satisfaction would not be at issue in proceedings to reopen, vacate, set aside, or stay a judgment. This leads us to conclude that the phrase limits and modifies only the nearest item in the series to it—"proceedings."

¶29  We reject Alum Rock's reading for another reason as well. Under its reading, a creditor intending to create a lien based on a domestic judgment would be subject to all the Judgment Act's constraints, but a foreign-judgment creditor would not. This would result, counterintuitively, in a foreign judgment being *easier* to convert into a lien than a domestic one, which is contrary to an express purpose of the Foreign Judgment Act—to treat foreign

Cite as: 2024 UT 22

Opinion of the Court

judgments the same as domestic ones in key respects. *See* UTAH CODE § 78B-5-302(2)–(3).

¶30  Like postjudgment interest, a lien is a means of enforcing a judgment. As such, a foreign judgment is subject to the same requirements for lien creation as domestic judgments. Thus, the Foreign Judgment Act incorporates the Judgment Act's requirements for creating a judgment lien, including those found in section 78B-5-201.

### B. Alum Rock Did Not Need to File Its Judgment in the Registry of Judgments to Create a Lien

¶31  Having concluded that section 201 applies, we must interpret subsections (2) and (3)(a) and determine whether their requirements are cumulative (as the Mulligans argue) or sequential (as Alum Rock argues). We hold that they are sequential, not cumulative.

¶32  Although we have yet to decisively interpret these provisions, the court of appeals previously interpreted a substantively similar version of the statute under analogous circumstances and rejected the cumulative reading now advanced by the Mulligans. In *Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 2005 UT App 164, 112 P.3d 1210, judgment creditors recorded an abstract of their judgment in the county recorder's office and applied for a writ of execution permitting them to sell a property that was owned by the judgment debtor. *Id.* ¶¶ 2–3. But the judgment debtor deeded his interest in the property to his wife between the time the creditors recorded the judgment with the county recorder and the time they applied for the writ. *Id.* ¶ 2.

¶33  When the district court issued the writ, the judgment debtor objected, claiming that the creditors did not create a lien on the property before the debtor conveyed the property to his wife because they "had not . . . filed the Judgment in the Registry of Judgments." *Id.* ¶ 4. On appeal, the debtor argued that the registry-of-judgments and county-recorder provisions "must be read together, thereby creating a two-step process" that required post-2002 judgments to be filed "in both the Registry of Judgments and the office of the county recorder." *Id.* ¶ 12.

¶34  The *Kitches* court rejected this cumulative reading and held that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." *Id.* ¶ 13. We reach the same conclusion because it is supported by the structure of section

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

78B-5-201, other sections of the Utah Code from the Judgment Act
and the Foreign Judgment Act, and the prior-construction canon of
statutory interpretation.

¶35   The structure of section 201 itself signals that the registry-
of-judgments and county-recorder requirements are to be read
sequentially, creating independent requirements for successive
time periods. For context, a district court's entry of judgment
historically "create[d] a lien upon the real property of the judgment
debtor" automatically. *See* UTAH CODE § 78B-5-202(2) (2021) ("Prior
to July 1, 1997, . . . the entry of judgment by a district court creates
a lien upon the real property of the judgment debtor . . . ."). But the
legislature did away with this automatic-lien regime. As
recognized by subsection (2) of section 78B-5-201, beginning July 1,
1997, a judgment lien does not arise automatically upon a district
court's entry of judgment; such a judgment does not create a lien
"unless the judgment is filed in the Registry of Judgments of the
office of the clerk of the district court of the county in which the
property is located." *Id.* § 78B-5-201(2) (2021).

¶36   As with the automatic-lien regime, the legislature also
phased out subsection (2)'s registry-of-judgments requirement.
Subsection (3)(a) of section 201 marks this evolution in the law.
Rather than allow a judgment to create a lien automatically (before
July 1, 1997) or require judgment creditors to file the judgment in
the registry of judgments (on or after July 1, 1997), beginning July
1, 2002, a judgment entered in the district court does not create a
lien "unless the judgment or an abstract of judgment is recorded in
the office of the county recorder in which the real property of the
judgment debtor is located." *Id.* § 78B-5-201(3)(a) (2021).

¶37   This sequential reading makes sense when we zoom in on
the grammatical structure of subsections (2) and (3)(a). The two
subsections are separate, stand-alone provisions, each punctuated
with a period. Their requirements are not joined with a conjunction
such as "and" or "or." And subsection (3)(a) does not expressly
incorporate subsection (2)'s registry-of-judgments requirement.

¶38   Contrast this with subsection (4) of the same section, which
also imposes requirements on judgment creditors, requiring them
to include certain information when filing or recording a judgment:

> (4) In addition to the requirements of Subsections
> (2) and (3)(a), any judgment that is filed in the
> Registry of Judgments on or after September 1, 1998,
> or any judgment or abstract of judgment that is

Cite as: 2024 UT 22

Opinion of the Court

recorded in the office of a county recorder after July
1, 2002, shall include:

> (a) the information identifying the judgment
> debtor as required under Subsection (4)(b) on
> the judgment or abstract of judgment; or

> (b) a copy of the separate information statement
> of the judgment creditor that contains:

>> (i) the correct name and last-known address
>> of each judgment debtor and the address at
>> which each judgment debtor received
>> service of process;

>> (ii) the name and address of the judgment
>> creditor;

>> (iii) the amount of the judgment as filed in
>> the Registry of Judgments;

>> (iv) if known, the judgment debtor's Social
>> Security number, date of birth, and driver's
>> license number if a natural person; and

>> (v) whether or not a stay of enforcement has
>> been ordered by the court and the date the
>> stay expires.

*Id.* § 78B-5-201(4) (2021). Unlike subsections (2) and (3)(a),
subsection (4)'s requirements are unified, with the cumulative
requirements indented, punctuated with semicolons, and joined
with a conjunction. And with the opening phrase "in addition to,"
subsection (4) expressly incorporates the requirements of previous
subsections.

¶39  As subsection (4) demonstrates, the legislature knows how
to signal when it intends requirements to be cumulative. But unlike
subsection (4), subsection (3) does not state that recording in the
county recorder's office must be done "[i]n addition to" the
registry-of-judgments requirement in subsection (2). And instead
of listing both requirements as indented subsections separated by
semicolons and a conjunction, the legislature listed the two
requirements as stand-alone provisions triggered on different
dates. That structure supports our reading that subsection (3)'s
requirements supplant those in subsection (2) after July 1, 2002.

¶40  Reading the subsections sequentially also makes sense
when we zoom out and look at related sections of the Utah Code.

Opinion of the Court

We have a "duty to harmonize and reconcile statutory provisions." *Field v. Boyer Co.*, 952 P.2d 1078, 1081 (Utah 1998) (cleaned up). Reading section 201's requirements as being sequential harmonizes and reconciles them with section 78B-5-202 of the Judgment Act and section 78B-5-305 of the Foreign Judgment Act. Properly understood, all three statutes provide that, since July 1, 2002, a judgment becomes a lien on real property if it is recorded in the office of the county recorder. Utah Code section 78B-5-202 provides that, after July 1, 2002, a judgment becomes a lien on real property if it "is recorded in the office of the county recorder." UTAH CODE § 78B-5-202(7)(a) (2021). And Utah Code section 78B-5-305, part of the Foreign Judgment Act, provides:

> (1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:
>
>> (a) a stay of execution has not been granted;
>>
>> (b) the requirements of this chapter are satisfied; and
>>
>> (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202.

*Id.* § 78B-5-305(1).

¶41  Notice that these sections do not refer to the registry of judgments. If, as the Mulligans suggest, the legislature intended judgment creditors to continue filing in both the registry of judgments and the county recorder's office, this absence would be hard to reconcile. For example, consider how the text of section 202 squares with the Mulligans' reading of section 201. Section 202 provides, "After July 1, 2002, a judgment . . . becomes a lien upon real property if . . . the judgment . . . is recorded in the office of the county recorder." *Id.* § 78B-5-202(7)(a) (2021). But under the Mulligans' reading of section 201, after July 1, 2002, a judgment *does not* become a lien on real property if the judgment is recorded in the office of the county recorder; the judgment must also be filed in the registry of judgments.

¶42  Historical context helps explain why sections 202 and 305 mention the county-recorder requirement but not the registry-of-judgments requirement. In 2001, the legislature passed a bill that amended the Judgment Act and the Foreign Judgment Act in

Cite as: 2024 UT 22

Opinion of the Court

significant ways. *See* Judgment Lien Amendments, H.B. 305, 2001 Leg., Gen. Sess. (Utah 2001) (available at https://le.utah.gov/~2001/bills/hbillenr/HB0305.htm). The bill—which ushered in the county-recorder regime for judgment-lien creation—provided that the statutory overhaul was to take effect July 1, 2002. *See id.* Before that date, the sections that are now codified as sections 202 and 305 did not specify the manner of recording a judgment lien. *See* UTAH CODE §§ 78-22-1, 78-22a-5 (2001). As of July 1, 2002, however, the sections recognized and reflected the incoming county-recorder requirement. *See id.* §§ 78-22-1, 78-22a-5 (July 2002). Each section was amended to specify that for a judgment to create a lien, the judgment must be "recorded in the office of the county recorder." *See id.* §§ 78B-5-202(7)(a), -305(1)(c). But the legislature did not add similar language referring to the registry-of-judgments requirement. That omission further supports our conclusion that the outdated registry-of-judgments requirement was entirely supplanted by the county-recorder regime as of July 1, 2002.

¶43  The prior-construction canon of statutory interpretation also reinforces our reading of section 201. Under that canon, if a word or phrase has been uniformly interpreted in caselaw, "a later version of that act perpetuating the wording is presumed to carry forward that interpretation." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322 (2012). In other words, "where a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent." *Christensen v. Indus. Comm'n*, 642 P.2d 755, 756 (Utah 1982).

¶44  In *Kitches*, the court of appeals interpreted the section that is now codified as section 201 to mean that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." 2005 UT App 164, ¶ 13. That decision has stood as controlling law in this jurisdiction for nearly two decades, and during that time judgment creditors have presumably relied on it as such. The legislature has amended the Judgment Act—including section 201—several times since *Kitches* was decided, yet

13

Opinion of the Court

it has not modified the language to abrogate the case's holding.[3] We presume that by amending the statute but leaving the portions relevant here unamended, the legislature was satisfied with *Kitches*' reading.

¶45 The Mulligans maintain that *Kitches* has not been the controlling law in Utah since 2013 because it was overtaken by the court of appeals' decision in *T3 Properties, LLC v. Persimmon Investments, Inc.*, 2013 UT App 38, 299 P.3d 613. There, a creditor obtained a court judgment in 2001, at which time the judgment debtor owned property in Salt Lake County. *Id.* ¶¶ 2–3. Not long after, however, the debtor conveyed his interest in the property to a third party. *Id.* ¶ 3. And not until years later did the creditor begin efforts to execute the judgment by having the property sold. *Id.* ¶ 4.

¶46 Between the time the court entered the judgment and the time the debtor transferred the property, the creditor recorded the judgment in the registry of judgments but did not file an information statement with the judgment.[4] *Id.* ¶¶ 16–17. The issue was whether the judgment creditor created a lien on the property before the debtor conveyed it away. *Id.* ¶ 17. To answer that question, the court interpreted the 2001 version of the Judgment Act, *id.* ¶¶ 16–28, which, like the current version, provided that "[o]n or after July 1, 1997, a judgment . . . does not create a lien upon or affect the title to real property unless the judgment is recorded in the Registry of Judgments," *see id.* ¶ 15 (quoting UTAH CODE § 78-22-1.5(2) (2001)). The next subsection provided, "In addition to the requirement of [the previous subsection], any judgment that is recorded in the Registry of Judgments on or after September 1,

---

[3] For examples of how section 201 has been amended over the years, see H.B. 46, 2011 Leg., Gen. Sess. (Utah 2011) (available at https://le.utah.gov/~2011/bills/static/HB0046.html); H.B. 315, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/hbillenr/hb0315.htm); H.B. 16, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/static/hb0016.html); H.B. 251, 2023 Leg., Gen. Sess. (Utah 2023) (available at https://le.utah.gov/~2023/bills/static/HB0251.html).

[4] There was some uncertainty about whether the judgment was recorded in the registry of judgments, but the court assumed that it was. *See T3 Pros., LLC v. Persimmon Invs., Inc.*, 2013 UT App 38, ¶¶ 16, 28, 299 P.3d 613.

Cite as: 2024 UT 22

Opinion of the Court

1998, shall include a separate information statement of the judgment creditor." *Id.* (quoting UTAH CODE § 78-22-1.5(3) (2001)).

¶47  The *T3* court concluded that under the 2001 version of the Judgment Act, "both requirements"—the registry-of-judgments and information-statement requirements—"must be satisfied to create a judgment lien." *Id.* ¶ 19. To support this conclusion, the court analyzed the relevant text by noting that (1) the legislature's "[u]se of the word 'shall' . . . indicates that filing an information statement is mandatory," and (2) the information-statement requirement "must be completed 'in addition' to" the registry-of-judgments requirement. *Id.* (cleaned up); *see also id.* ¶ 21. Even though the court's decision was based on the language of the 2001 version of the Judgment Act and turned on the information-statement requirement, the court added a footnote stating that "the 2002 version [of the Judgment Act] required that the judgment and the information statement be recorded in both the Registry of Judgments and in the county recorder's office." *Id.* ¶ 14 n.5.

¶48  According to the Mulligans, *T3* overtook *Kitches* as controlling law interpreting the Judgment Act. We disagree. Although the *T3* court included a footnote suggesting that the registry-of-judgments and county-recorder requirements of the 2002 Judgment Act are cumulative, *see id.*, that statement was dicta because it was "unnecessary to the decision in the case and therefore not precedential," *see Obiter Dictum*, BLACK'S LAW DICTIONARY (12th ed. 2024). A separate panel of the court, squarely presented with the issue, had held that those requirements are sequential and that judgments no longer need to be filed in the registry of judgments for a lien to attach. *See supra* ¶¶ 32–34. The *T3* court did not even mention *Kitches*, much less purport to overrule it. *Kitches* remained controlling law on the sequential nature of the recording requirements despite the footnote dicta in *T3*. We therefore presume that when the legislature amended section 201 post-*Kitches*, it saw no need to amend the recording requirements because it was satisfied with the prior judicial interpretation of those requirements in *Kitches*.

¶49  The Mulligans also argue that the court's analysis in *T3* favors a cumulative reading of the registry-of-judgments and county-recorder requirements. They maintain that *T3* "involved a deep analysis" of section 201 and "laid out a roadmap for how courts should analyze [the Judgment Act's] cumulative amendments over time." Although we are not bound to follow

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

court of appeals decisions, we often look to those decisions for their persuasive value. *Eaton Kenway, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 906 P.2d 882, 885 (Utah 1995). But we see little persuasive value in *T3* relative to the issue in the present case.

¶50  The court in *T3* interpreted a different provision in the 2001 version of the Judgment Act, which did not contain the county-recorder requirement. *See* 2013 UT App 38, ¶ 15. The question before the court was whether the registry-of-judgments and information-statement requirements were cumulative. *See id.* ¶ 28. Unlike the county-recorder requirement at issue here, the information-statement requirement specified that it was "[i]n addition to" the registry-of-judgments requirement found in section 201(2). *Id.* ¶ 12 (quoting Utah Code § 78-22-1.5(3) (2001)). This additional language, which expressly made the registry-of-judgments and the information-statement requirements cumulative, easily distinguishes *T3* from both *Kitches* and the present case.

¶51  We endorse *Kitches*' holding that, since July 1, 2002, a lien on real property is created by recording the judgment, along with other required information, with the county recorder where the real property is located. Alum Rock therefore did not need to record the judgment in the registry of judgments, and it created a lien by recording the judgment in the county recorder's office.

## II. BRETT OWNED THE PROPERTY FOR PURPOSES OF ALUM ROCK'S LIEN ATTACHING

¶52  The Mulligans argue that, under the Judgment Act, "[t]here is no basis for any judgment lien against the Property" because the trust, not Brett, held title to the property. Before explaining why we disagree, we pause to address the Mulligans' criticism of the district court's analysis.

¶53  The Mulligans criticize the district court for relying on rule 64E of the Utah Rules of Civil Procedure, rather than the Judgment Act, in concluding that the property is "subject to the execution." Rule 64E allows writs of execution to be issued against property that is "*in the possession or under the control of* the defendant." UTAH R. CIV. P. 64E(a) (emphasis added). The Judgment Act, in contrast, sets the conditions under which a judgment lien attaches in the first instance, providing that real property subject to a judgment lien "includes all the real property . . . *owned or acquired* at any time by the judgment debtor during the time the judgment is effective." UTAH CODE § 78B-5-202(7)(c)(ii) (2021) (emphasis added).

16

Cite as: 2024 UT 22

Opinion of the Court

¶54  The Mulligans argue that the district court should have focused its analysis on the Judgment Act, rather than on rule 64E, which they contend "has nothing whatsoever to do with whether the Foreign Judgment against Brett personally could become a lien against Property he never owned." But because they principally relied on rule 64E, not the Judgment Act, before the district court, the court's reliance on rule 64E was understandable. In their principal filing below, the Mulligans cited rule 64E and quoted, with emphasis, the rule's language regarding possession and control. In contrast, they mentioned the Judgment Act's "owned or acquired" language only in passing in a footnote.

¶55  It is true that the Mulligans argued to the district court that the property was "never . . . *owned* by Brett Del Valle in his individual and personal capacity." (Emphasis added.) Yet they never tied that argument to the language of the Judgment Act, and the thrust of their argument below was that the writ "was not properly available under the express terms" of the "governing Utah Rules of Civil Procedure." In its decision, the court rejected that rule-based argument because rule 64E "does not contain any provision limiting its application to owners of property."

¶56  On appeal, the Mulligans distance themselves from their prior reliance on rule 64E and embrace the Judgment Act's "owned or acquired" language.[5] Under the Judgment Act, real property subject to a judgment lien "includes all the real property. . . owned or acquired at any time by the judgment debtor during the time the judgment is effective."[6] *Id.* To the Mulligans, holding title is the essence of ownership. Because Brett "was never in title," they maintain that "he never owned the Property" and the lien never attached to it.

¶57  When the judgment was entered against Brett, the property was held by the Del Valle Family Trust, which is a revocable trust that Brett formed with his wife, Traci. "A trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of the beneficiaries." *Cont'l Bank & Tr. Co. v. Country Club Mobile Ests., Ltd.*, 632 P.2d 869, 872 (Utah 1981). A revocable trust is "[a] trust in which the settlor" (the person who creates the trust)

---

[5] Alum Rock has not challenged this issue as unpreserved.

[6] The Utah Code defines "[r]eal property" as "any right, title, estate, or interest in land." UTAH CODE § 57-1-1(3).

17

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

"reserves the right to terminate the trust and recover the trust property and any undistributed income." *Revocable Trust*, BLACK'S LAW DICTIONARY (12th ed. 2024). One standard estate-planning practice is to form "[a] revocable trust in which the settlor[s] . . . are also the trustees and manage the trust for their own benefit during their lifetimes." *West v. West (In re Est. of West)*, 948 P.2d 351, 355 (Utah 1997). When done properly, this strategy serves to "avoid probate of the assets while allowing the settlor to retain control of the trust property during his or her own lifetime." *See id.*

¶58  Under the terms of the Del Valle Family Trust, either Brett or Traci, as co-settlors, may revoke the "community estate" (community property held in trust), wholly or partially. Upon revocation, this property would be delivered to Brett and/or Traci and would continue to be their community property. Similarly, the "separate estate" (separate property and quasi-community property held in trust) may be revoked unilaterally by Brett or Traci, whichever of them contributed the property to the trust; and upon revocation, the property would be delivered to the contributor.

¶59  Brett and Traci may also amend the trust and transfer property from it. While they are both living, Brett and Traci may amend "any of the terms of [the trust] by an instrument in writing signed by [Brett and Traci] and delivered to the Trustee." And they may—acting jointly for community property, or individually for separate and quasi-community property—"transfer property . . . out of the trust estate to any other person or organization." In addition, as trustees, Brett and Traci may hold, manage, control, lease, and encumber trust property. With this backdrop, the question is whether, for purposes of the Judgment Act, Brett "owned" the property when the judgment was entered against him, even though the trust held title to it. *See* UTAH CODE § 78B-5-202(7)(c)(ii) (2021).

¶60  Because "the settlor of a revocable trust necessarily retains the functional equivalent of ownership of the trust assets," 6 AUSTIN WAKEMAN SCOTT ET AL., SCOTT AND ASCHER ON TRUSTS § 15.4.2 (6th ed. 2024), "[i]n . . . substantive respects (such as creditors' rights), the property held in a revocable trust is ordinarily to be treated as if it were property of the settlor," RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. a. (AM. L. INST. 2003). Thus, in certain situations—"by reason of a power of revocation, appointment, or withdrawal"—a person may have "the equivalent of ownership of

Cite as: 2024 UT 22

Opinion of the Court

the trust property, even though the legal title to the property is held by the trustee." *See id.* § 74 cmt. a (AM. L. INST. 2007).

¶61  In effect, the Mulligans argue that the trust shielded the property from Brett's judgment creditor, Alum Rock. But under Utah law, "[d]uring the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors." UTAH CODE § 75-7-505(1). That approach is consistent with the general rule that "property held in [a revocable] trust is subject to the claims of creditors of the settlor . . . if the same property belonging to the settlor . . . would be subject to the claims of the creditors." RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. e (AM. L. INST. 2003). And other courts "generally have concluded that the assets of a revocable trust are properly subject to the claims of the settlor's creditors." *Pandy v. Indep. Bank*, 372 P.3d 1047, 1050 (Colo. 2016) (en banc) (collecting cases).

¶62  In short, because settlors of revocable trusts can access the full bundle of property-rights sticks, they cannot keep those sticks from their creditors. Here, as co-settlor and co-trustee, Brett retained the hallmarks of ownership over the property. As the district court noted, Brett and Traci could, at any time, "revoke the Trust, . . . amend it, . . . [or] transfer property from it." Under these circumstances, we hold that, for purposes of the Judgment Act, Brett owned the property at the time the judgment was entered against him.[7] Accordingly, Alum Rock's lien attached to the property when Alum Rock recorded the lien with the county recorder.

### III. THE MULLIGANS HAVE NOT IDENTIFIED A LIMITATION ON THE DISTRICT COURT'S AUTHORITY TO ISSUE A WRIT OF EXECUTION ON PROPERTY LOCATED IN A COUNTY OUTSIDE THE THIRD DISTRICT

¶63  The Mulligans contend that the Third District Court "lacked authority and jurisdiction" to issue the writ because the property sits in Weber County, which is outside the court's geographic boundaries. Because they have not identified a relevant limitation on the district court's jurisdiction to issue the writ, we reject that argument.

---

[7] Neither side has addressed whether Traci's joint ownership of the property has any effect on the judgment lien. For that reason, we express no opinion on the matter.

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

¶64 This matter arose when Alum Rock filed a notice of judgment with the Third District Court. There is no question that this was proper, because under the Foreign Judgment Act a foreign judgment like Alum Rock's California judgment "may be filed with the clerk of any district court in Utah." UTAH CODE § 78B-5-302(2). Once Alum Rock domesticated the judgment, the judgment inherited "the same effect . . . as a judgment" of a Utah district court. *Id.* § 78B-5-302(3). Such a judgment may be enforced through a writ of execution. *Id.* § 78A-5-102 ("A district court judge may issue all extraordinary writs and other writs necessary to carry into effect the district court judge's orders, judgments, and decrees.").

¶65 The Mulligans have not identified any relevant law that would limit a district court's authority to issue a writ of execution to be effectuated in a county outside that court's judicial district. They first cite a venue statute, which provides that "[a]ctions" for certain "causes involving real property shall be tried in the county in which the subject of the action . . . is situated." *Id.* § 78B-3-301(1) (2021). Those "causes" are

> for the recovery of real property, or of an estate or interest in the property; . . . for the determination . . . of the right or interest in the property; . . . for injuries to real property; . . . for the partition of real property; and . . . for the foreclosure of all liens and mortgages on real property.

*Id.*

¶66 But the Mulligans' reliance on this statute is misguided because no "[a]ction[] . . . involving real property" is at issue here. *See id.* Indeed, no cause of action is at issue at all. The causes of action that gave rise to Alum Rock's judgment against Brett (for breach of contract) were brought in California and, from what we can tell, had nothing to do with the Weber County property. Simply put, this proceeding to enforce that judgment through a writ of execution is not an action involving real property governed by the venue statute.[8]

---

[8] For the same reason, the caselaw that the Mulligans cite regarding "action[s]" that "involve[] title to real property" misses the mark. *See Calder v. Third Jud. Dist. Ct.*, 273 P.2d 168, 171 (Utah 1954).

Cite as: 2024 UT 22

Opinion of the Court

¶67  The Mulligans also cite rule 64 of the Utah Rules of Civil Procedure as an additional limitation on the district court's authority. According to them, a distinction in word choice between two sentences in rule 64(d)(1) "precludes courts in one county from ordering seizure of real property located in a different county." Rule 64(d)(1) explains how court clerks are to issue writs for real and personal property:

> If the writ directs the seizure of real property, the court clerk will issue the writ to the sheriff of the county in which the real property is located. If the writ directs the seizure of personal property, the court may issue the writ to an officer of any county.

UTAH R. CIV. P. 64(d)(1). From this language, the Mulligans glean that "the rule expressly authorizes any court in any county in Utah to direct the seizure . . . of *personal property* located in any county in Utah" but does not do the same for *real property*.

¶68  Although the Mulligans are correct that the rule distinguishes between writs of execution for personal property versus real property and requires that the latter be directed to the "sheriff of the county in which the real property is located," *see id.*, the rule says nothing about which court may issue the writ. Rule 64(d)(1) contains no requirement that the district court issuing the writ be in the same county as the real property. If anything, by specifying that writs involving real property must be "issue[d] . . . to the sheriff of the county in which the real property is located," *see id.*, the rule seems to presuppose that the issuing court may be located elsewhere.

¶69  The Mulligans have not established that the district court exceeded its authority by issuing the writ. Neither the venue statute nor rule 64(d)(1) prohibits a district court from issuing a writ of execution for real property located in another Utah judicial district.

## CONCLUSION

¶70  Although Alum Rock needed to comply with the Judgment Act's requirements for creating a lien, filing in the registry of judgments was not one of those requirements. The lien attached to the property once Alum Rock recorded the judgment with the Weber County Recorder's Office. When the judgment was recorded, Brett owned the property for purposes of the Judgment Act because the property's title was held in a revocable trust settled by Brett and his wife. And the Mulligans have not shown that the

Mulligan *v.* Alum Rock Riverside

Opinion of the Court

district court lacked authority to issue the writ. Accordingly, we affirm.

———————

# **ADDENDUM 2**

Oral Argument Transcript

1          UTAH SUPREME COURT

2    _____
                                    )
3    MOLLY J. MULLIGAN and JOHN     )    Case No.   206927043
     P. MULLIGAN,                   )
4                                   )
                                    )
5              Appellants,          )
                                    )    TRANSCRIPT OF:
6    v.                             )    ORAL ARGUMENT
                                    )
7    ALUM ROCK RIVERSIDE, LLC,      )
                                    )
8              Appellee.            )
     _____)

9

        BEFORE THE HONORABLE CHIEF JUSTICE MATTHEW B. DURRANT

10

11              UTAH SUPREME COURT
              450 SOUTH STATE STREET
12            SALT LAKE CITY, UT 84114

13

                   APRIL 10, 2024

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    A P P E A R A N C E S

2

   For the Appellants:
3
           Bradley L. Tilt
4          FREEMAN LOVELL, PLLC
           4568 South Highland Drive
5          Suite 290
           Salt Lake City, UT 84117
6
   For the Appellee:
7
           KC Hooker
8          BENNETT TUELLER JOHNSON & DEERE
           3165 East Millrock Drive
9          Suite 500
           Salt Lake City, UT 84121
10
                          -ooOoo-
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          April 10, 2024

 2                        P R O C E E D I N G S

 3            THE CLERK:  The Honorable Chief Justice Matthew B.

 4    Durrant presiding.  Please be seated.

 5            CHIEF JUSTICE DURRANT:  This is the case of Mulligan

 6    vs. Alum Rock Riverside.

 7            A couple of notes before we begin.  While we have

 8    allocated 20 minutes to a side, if we're still asking questions

 9    when your time runs out, please continue to respond.  And don't

10    worry about asking for additional time.  That's understood.

11    And any such extra time responding to questions will not cut

12    into rebuttal time.  It may mean that at the end of the day,

13    one side has more time than the other.  Not the best result,

14    but it's just a function of how many questions we have of your

15    case, not necessarily a reflection on how we view your case.

16            Okay.  I think that's covers things, so let's begin

17    with counsels' appearances.

18            MR. TILT:  Bradley Tilt, your Honor, representing the

19    appellants, the Mulligans.

20            CHIEF JUSTICE DURRANT:  Mr. Tilt, good morning and

21    welcome.

22            MR. HOOKER:  KC Hooker on behalf of Appellee Alum

23    Rock Riverside LLC.

24            CHIEF JUSTICE DURRANT:  Mr. Hooker, welcome.

25            Okay.  Let's jump into things.
```

```
 1              MR. TILT:  Good morning, Justices, and may it please
 2    the Court.
 3              I want to just start by bullet-pointing six of the
 4    key facts in this case, which are:  In 2002, the creation of
 5    the Del Valle Family Trust.  In 2007, the Weber County
 6    property, which is the subject of this case, was conveyed from
 7    the developer, Basin View Development, directly to the Del
 8    Valle Family Trust.  In March of 2020, Alum Rock obtained a
 9    judgment in California against Brett Del Valle individually and
10    personally, among others that are not relevant to this case,
11    but not against the Mulligans, not against the family trust.
12              In October of 2020, Alum Rock filed its California
13    judgment in the Third District Court in Salt Lake County.  Also
14    in October of 2020, Alum Rock recorded its judgment in the
15    Weber County Recorder's Office.  In May of 2021, the family
16    trust, which had held the property at all times since 2007 when
17    it obtained the conveyance from the developer, conveyed the
18    Weber County property at issue in this case to the Mulligans.
19              It was in June of 2021 when Alum Rock then filed an
20    application for a writ of execution with the Third District
21    Court in Salt Lake County, seeking to foreclose upon and to
22    sell the Mulligans' property in Weber County for a judgment
23    entered against Brett Del Valle personally, who never owned the
24    property.
25              The claims of Alum Rock for any sort of a judgment
```

1    lien upon the real property at issue in this case fail for two

2    reasons.  And the writ of execution fails also for two reasons

3    that I'll get to in just a moment.

4            So first of all, as to whether there could be any

5    judgment lien upon this Weber County real property, there

6    cannot.  By statute, Section 78B-5-201(2), a -- in order to

7    have a judgment lien -- in order to create a judgment lien on

8    real property on or after 1997, judgment creditors must file

9    their judgment in the Registry of Judgments in the court in the

10   county where the property is located.  And there is no dispute

11   that Weber County is where the property was located, but that

12   Alum Rock never filed anything with the Second District Court

13   in Weber County.  It therefore failed the requirements of

14   Subsection 201(2) and therefore cannot have a judgment lien on

15   that property.

16           The district court in this case erred because it

17   followed the analysis set forth in the Kitches case by the Utah

18   Court of Appeals from -- I forget exactly -- early 2000s, which

19   construed the Subsections 201(2) and then the other Subsection

20   201(3)(a), which requires recording it in the county recorder's

21   office of the county where the property is located.  The

22   district court followed Kitches and said that those are

23   disjunctive.  You can either file something with the court or

24   you can record something with the county recorder.  And either

25   of those individually, separately, will create a judgment lien.

1          That is not, however, how the judgment statute reads.

2    Kitches read some of the subsections within 201, like

3    Subsection 201-4, 201-5, and 201(6).  Each had a number of

4    further subsections with letter designations on them, and it

5    said, you know, if you -- to perfect your judgment lien, you

6    need to do this in Subsection (5), and then it would list (a),

7    (b), (c), or (d).  And Subsection (6) would list (a), (b), or

8    (c).

9          The district court in this case erroneously followed

10   the erroneous ruling of the Kitches court to infer those "ors"

11   between sub-subsections, letter-numbered subsections,

12   erroneously applied the "or" designation between the numbered

13   subsections, (2), (3), (4), (5), (6).  There is no "or" between

14   (2), (3), (4), (5), and (6) of the -- of Subsection 201.

15          JUSTICE HAGEN:  Let me ask you this question.  The T3

16   case that you relied on, it seems to have put a lot of emphasis

17   on the fact that Subsection (4) starts with "In addition to."

18   What do -- what should we, if anything, make of the fact that

19   (3) does not contain "in addition to" the requirements of

20   Subsection (2)?

21          MR. TILT:  No significance should be attributed to

22   that, because what Subsection (4) does say is "In addition to

23   Subsections (2) and (3)."  So Subsection (4) already includes

24   stating that (2) and (3) both need to be met.  And so the fact

25   that Subsection (3) doesn't say "in addition to (2)" should not

1    carry any weight with this Court, because Subsection (4)

2    clarifies that (2) and (3) both apply and both need to be

3    satisfied.

4              JUSTICE PEARCE:  I suppose that's one way of reading

5    Subsection (4).  I mean, the other is in addition to the

6    requirement of Subsection (2), if Subsection (2) applies, in

7    addition to the requirements of Subsection (3)(a), if

8    Subsection (3)(a) applies.  I mean, what is the best textual

9    evidence that the legislature wanted (2) and (3) to be

10   harmonized and to have both of those have to be complied with

11   rather than setting -- what the legislature was doing is

12   setting a new rule on or after 2000 -- or July 1, 2002?

13             MR. TILT:  Well, T3 sets forth the historical

14   analysis and the road map for how this Court should also get

15   there.  Textually, I would submit, in addition to what T3 says,

16   is that if the legislature intended that you could create a

17   judgment lien by doing (2) or (3) or (4) or (5), then it would

18   have done what it does in every statute where that's the case,

19   and it would have put an "or" between the last two numbered

20   subsections.  I'm not sure if it's (6) and (7) or whether it's

21   (8) and (9).  It would have put "or" there.

22             But by not putting "or" there, what it said is

23   these -- (1), (2), (3), (4) -- whether it be to (7) or (9), I

24   forget now, but --

25             JUSTICE HAGEN:  I think we would expect to see an

1    "or" or an "and" between two numbered subsections within a

2    subsection.  But do we normally in statute see a conjunction

3    between two separately numbered sections?

4             MR. TILT:  Yes.  For example, if the statute said --

5    if Subsection 201 said, "You create a judgment lien by:" and

6    then it listed all of those things, you would expect to see

7    some sort of a conjunction there to let you know whether it was

8    "and" or "or."

9             In this case, though, it just launches right in, and

10   it just starts with "Subsection (1), this; Subsection (2),

11   this; Subsection (3), this requirement."  And as T3 explained,

12   those requirements have various date components attached to

13   them only by virtue of the fact that they were enacted at

14   different times.  And so what the legislature did, as explained

15   in T3, is said, "Prior to 1997, all that was required under the

16   statute was a judgment be entered, and the judgment entered

17   became a lien on real property."  In '97, the Court said, "No.

18   We need to have you also record with the county recorder."  In

19   2002, I think it was, the legislature amended the statute

20   again, and it imposed certain additional requirements.

21            And T3 explained that it's very easy to see why we

22   had these different requirements coming in over time and why

23   they have different date components to them, because that's

24   when they were enacted.  But what it said was -- specifically

25   at Footnote 5, it drove the point home specific to this

1    particular case, where it said, "Notably, the 2000 version

2    required that the judgment and information statement be

3    recorded in both the Registry of Judgments and in the county

4    recorder's office."

5          JUSTICE HAGEN:  And is that the -- I'm sorry.  Was

6    that the footnote in T3?

7          MR. TILT:  Footnote 5 of T3, yes.

8          JUSTICE HAGEN:  And that was -- that issue was not

9    before the Court?

10         MR. TILT:  That specific issue was not before the

11   Court, but that analysis, that quote, is consistent with the

12   remainder of its analysis, which says, "When the legislature

13   adds requirements over time, they are cumulative."  And that is

14   a word that the T3 court also used:  They are cumulative.

15         JUSTICE HAGEN:  Although, don't you think -- wouldn't

16   you agree that T3 put a lot of stock in the fact that

17   Subsection (4) started with "In addition to"?

18         MR. TILT:  I really don't think that that was the

19   central point of T3, but I do think that the "in addition to"

20   language is significant.

21         JUSTICE HAGEN:  And going back to the other point we

22   were just discussing a moment ago about whether these

23   Arabic-numbered sections generally have an "or" or an "and"

24   connecting them.  Can you give me an example numbered

25   subsection like that that doesn't end in a period, that ends in

1   like a comma or a semicolon and an "and" or an "or"?

2            MR. TILT:  Off the top of my head, candidly, I

3   cannot.  But I do want to get back to Justice Pearce's question

4   about textual evidence.  Among the other items I've talked

5   about here today, another piece of textual evidence to show

6   that you have to record in the county and also file in the

7   court is Section 78B-5-202.  At Subsection (2), it says, again,

8   prior to 1997, "A judgment becomes a lien on real property in

9   the county in which the judgment is entered."  And then

10  Subsection (3) says "An abstract of the judgment issued by a

11  county in which a judgment is entered may be filed by any court

12  in this state and may have the same full force and effect as

13  any judgment entered in that court."

14           That, to me, signals that the legislature understands

15  that the different venues, the different courts throughout the

16  state, each have their own separate jurisdiction over the

17  property within their respective boundaries.  And otherwise,

18  there would be no need to abstract a judgment from one county

19  to another county.  And so you have to have that abstracted in

20  the court in order for the Registry of Judgments requirement to

21  be met and also then record with the county to create a

22  judgment lien.

23           JUSTICE PEARCE:  I know it can be kind of tricky

24  business to sometimes interpret a statute in light of its

25  purpose, but what do you understand the purpose of recording

1   the abstractive judgment -- or entering the abstractive

2   judgment in the court of any state?  What -- what function does

3   that play?

4           MR. TILT:  That is a separate and additional resource

5   that title companies use to search for -- for judgments and

6   potential judgment liens on a property.  It is routine -- and

7   we cited some information in the brief on that -- for title

8   companies to search not only the county records, but also the

9   court records, because that's another place where you could

10  find a judgment.  And this judgment never was recorded in

11  that -- or filed in that court in Weber County; and, therefore,

12  it was not findable.

13          JUSTICE PEARCE:  And so if you were trying to look at

14  the legislative purpose of this, it's -- you would say the

15  legislature is trying to benefit title companies by having

16  judgments placed in two different places, both filed with the

17  county recorder and in the abstractive judgment?

18          MR. TILT:  I can't say that was their specific

19  intent, no, but I do think that is a purpose of it, and it does

20  serve a purpose functionally and -- in effect in the actual

21  industry.

22          JUSTICE HAGEN:  How do you -- oh, I'm sorry.

23          JUSTICE POHLMAN:  Go ahead, please.

24          JUSTICE HAGEN:  How do you reconcile your

25  interpretation of what's now 201 with the Foreign Judgment Act

1    that only refers to being recorded in the Office of the County

2    Recorder?

3              MR. TILT:  Well, it would be -- the Foreign Judgment

4    Act actually says that in order to become a judgment lien on

5    real property, under 78B-5-305(1), "A foreign judgment becomes

6    a lien as provided in 78B-5-202," the judgment statute.  In

7    other words, you have to -- you have to satisfy both, whatever

8    is said in the Foreign Judgment Act and also the regular

9    judgment lien statute for domestic judgment liens.  So it

10   becomes a lien under Section 202 if -- and then Subsection (b)

11   of 305(1) says "If the requirements of this chapter are

12   satisfied."  And the chapter is Chapter 5.  78B-5.  The Foreign

13   Judgment Act under B-5-301 et seq, and the regular judgment

14   lien statute is also in Chapter 5, Section 201 et seq.

15             So the -- the Foreign Judgment Act itself says you

16   have to satisfy the requirements, plural.  It doesn't say "some

17   of."  You have to satisfy the requirements of this chapter.

18   All.

19             JUSTICE POHLMAN:  Do you think the -- do you think

20   the legislature really meant "chapter" there?  I mean, the

21   chapter is procedure and evidence, and it includes things for

22   issues in trial, evidence, affidavits.  I mean, I've --

23   obviously you didn't write the statute, but I find it kind of a

24   strange reference there --

25             MR. TILT:  Except for if --

```
 1              JUSTICE POHLMAN:  -- and wondered if it really meant
 2    to say "this part."
 3              MR. TILT:  I don't --
 4              JUSTICE POHLMAN:  Because "chapter," there's so many
 5    requirements in this chapter that really have nothing to do
 6    with executing on a judgment.
 7              MR. TILT:  And I would suggest that the Court can
 8    only take the legislature as face value.  It has to apply the
 9    words that the legislature wrote, and what the legislature
10    wrote was "chapter."  And that statute, like the judgment lien
11    statute, has been amended numerous times over the years.  And
12    that "chapter" reference remains.  And --
13              JUSTICE POHLMAN:  And why would they then have Part
14    (3)?  Because Part (3) is a requirement -- or Subpart (3) is a
15    requirement of Part (2) of the chapter.  So it just seems a
16    little odd to me that the legislature would really intend to
17    say, "You've got to satisfy all of Chapter 5," which, by the
18    way, is talking about public safety peer counseling --
19    right? -- "but then also we're going to pull out one particular
20    thing from that entire chapter that you have to satisfy."
21              And so does it really make sense for us to interpret
22    it as saying you have to include -- you have to satisfy
23    everything?
24              MR. TILT:  I think it does.  I don't know that the
25    other things -- I mean, maybe they just don't apply, and so
```

1    maybe that's the response.  But the Judgment Lien Act under

2    Section 201 et seq. is a part of Chapter 5.  And I would submit

3    that it would be even odder for the legislature to say, "Okay.

4    You get your judgment in California, and you bring it here and

5    you have to do less than somebody would have to do if they got

6    their judgment here in order to get a judgment lien.  You don't

7    have to worry about Subsection 201 et seq.  You can just record

8    and not have to do anything else."

9         JUSTICE POHLMAN:  Why do you think they then

10   specifically mention 202 instead of 201 and 202 if they really

11   wanted to make sure, "Let's reemphasize you have to satisfy the

12   whole chapter, but we're going to pull out one particular

13   subsection from one of the parts and -- but, yeah, just make

14   sure you follow everything else"?  I mean, does that make much

15   sense?

16        MR. TILT:  Except for the fact that that's what the

17   legislature did, I'd have to say, yes, that does make sense.

18   Part of the judgment lien statute is part of Chapter 5.  We

19   have to presume that the legislature knew that the judgment

20   lien statute was part of Chapter 5 and, therefore, that what it

21   meant was you have to supply all the requirements of 201 et

22   seq. as well as 301 et seq.

23        JUSTICE POHLMAN:  Okay.  So, fair.  But then why add

24   a Part (3)?  Why pull out one specific thing?  What do we take

25   from that?

```
 1              MR. TILT:  I don't have any answer for that.

 2              JUSTICE POHLMAN:  Okay.

 3              JUSTICE HAGEN:  Can I ask you?  What do -- what

 4    conclusion, if any, should we draw from the fact that Kitches

 5    has been controlling law in this state for 19 years, and, yet,

 6    the legislature has not amended the Judgment Act, even though

 7    they actually have amended other parts of it?

 8              MR. TILT:  Well, I would submit that Kitches has not

 9    been controlling law since 2013 when T3 was decided and it

10    said, "No, it's not disjunctive.  It's not 'or.'  They are

11    cumulative.  All of the requirements of the judgment lien

12    statute are cumulative in the words of T3."

13              JUSTICE HAGEN:  So you think that that footnote in T3

14    overruled Kitches?

15              MR. TILT:  The footnote does not expressly reference

16    Kitches.  And I'm -- I don't even think that -- to be clear,

17    my -- my reliance on T3 is not limited to Footnote 5.

18              JUSTICE HAGEN:  I understand.

19              MR. TILT:  It's just that Footnote 5 specifically

20    does call out that you have to do both of those things in order

21    to get a judgment lien.  But the remainder of the analysis of

22    T3 writ large is what I rely on to say, as the statute gets

23    amended over time and things are added to it, you have to --

24    those are cumulative, was, again, the words of T3.

25              JUSTICE HAGEN:  And I understand that you're saying
```

1  that that analysis is preferable and that you would like us to

2  follow that, but I guess my specific question is did T3

3  overrule Kitches?  Because you're saying that Kitches has not

4  been controlling law for the last 19 years.  Why?

5          MR. TILT:  Because -- again, T3 does not expressly

6  say, "We overrule Kitches," but its entire basis of analysis is

7  completely different, and it did specifically call out in

8  Footnote 5 that you've got to do both of those things.  And so

9  it impliedly overruled Kitches, and now this Court ought to

10  expressly overrule Kitches and follow the T3 road map.  That's

11  how this Court ought to -- it is a well laid out road map.  It

12  talks about the history of the statute over time, how things

13  were added to it, and how those additions are cumulative; they

14  are not disjunctive.

15          JUSTICE HAGEN:  Okay.  Let me ask you this question.

16  Let's say that we disagree and we find that Kitches has been

17  controlling law for the last 19 years.  Do we draw any

18  inference from the fact that the legislature has not amended

19  the Judgment Act to -- to basically abrogate Kitches?

20          MR. TILT:  I would say no, because the legislature, I

21  would submit, has already -- it's -- I mean, the statute says

22  what it says.  It says in 78B-5-201(2) you've got to record --

23  or file with the court.  In Subsection (3), you have to record

24  with the county.  It doesn't say you can do either one of those

25  things.  I can't account for why the legislature would not have

addressed that. I can only presume they had other priorities in any given session. But I do think the analysis is short-sighted and just textually incorrect. And it reads out of existence the Subsection 202(3) requirement of abstracting judgments to other counties if you want to have them have effect in other counties.

CHIEF JUSTICE DURRANT: Counsel?

JUSTICE POHLMAN: Can I ask you -- oh, go ahead, Chief.

CHIEF JUSTICE DURRANT: No. You go ahead.

JUSTICE POHLMAN: You sure? Okay.

Let me ask you about this argument about 201 potentially being ambiguous. So they submitted some legislative history, right? And you say in response to that that "The district court found it unambiguous. Kitches found it unambiguous. So Alum Rock's arguments to the contrary are patently irrelevant and must be disregarded."

Does that mean this Court, if we were to look at 201 and find it ambiguous, our hands are tied? We can't find it ambiguous?

MR. TILT: No. But it's just not ambiguous. I mean --

JUSTICE POHLMAN: No. I understand your argument. There's not an "and." There's not an "or." Perhaps it's a bit ambiguous. I'm just -- I'm asking if we were to conclude it

1    was.  First of all, are our hands tied?  Can we conclude it is

2    if that's what we find?  And if so, what do we turn to, then,

3    at that point?  Or what do we do?  Do we remand it?  Do we

4    consider the legislative history?  What result would ensue?

5            MR. TILT:  If this Court were to find it ambiguous --

6    and I certainly don't suggest that it's beyond this Court's

7    power to find it to be ambiguous.  But if this Court were to

8    find it to be ambiguous, then at that point, I think we would

9    need to -- boy, if it's ambiguous, I think we need to -- I

10   don't know.  I don't think the -- I don't think the legislative

11   history helps anything.  Again, it's not the proper -- it's not

12   the actual enrolled copy of the bill that they referred to and

13   so forth.  And one legislator's comment here or there I don't

14   think should control the day over a plain textual reading.  I

15   don't think it's ambiguous, but if you find it is, I honestly

16   don't know what you would --

17           JUSTICE POHLMAN:  How we resolve it?

18           MR. TILT:  -- refer to to resolve that.

19           JUSTICE POHLMAN:  Okay.  Thank you.

20           CHIEF JUSTICE DURRANT:  If it's ambiguous, what would

21   be your response to the Thomas Hatch affidavit filed in the

22   Kitches case?

23           MR. TILT:  I'm sorry.  I couldn't hear you.

24           CHIEF JUSTICE DURRANT:  Thomas Hatch was the sponsor,

25   and he filed an affidavit in the Kitches case.  So that -- we

1  only get to that if it's ambiguous.  What would be your

2  response?

3          MR. TILT:  My response would be that, again, one

4  legislator's affidavit and one legislator's intent, he can't

5  presume to have spoken for the entire legislature.  And I'm

6  sure he didn't.  And so I just don't think that that would

7  clarify anything as compared to --

8          CHIEF JUSTICE DURRANT:  Would you point to other

9  aspects of the legislative history to counter that?

10          MR. TILT:  We have not -- we have not explored the

11  legislative history because we think it's irrelevant.  The

12  statute is not ambiguous, and so that's not a required

13  (inaudible) in our view.

14          CHIEF JUSTICE DURRANT:  On a separate point, Judge

15  Mow distinguishes T3 Properties in a number of respects.  What

16  are your specific criticism -- criticisms of that judge's

17  holding on that point?

18          MR. TILT:  Well, he talked about that T3 dealt with

19  the judgment information statement requirement, which is not at

20  issue in this case.  And we fully acknowledge that.  It's not

21  what's at issue in the case.  It is factually different.  Every

22  case is factually different.  But the analysis -- this case is

23  all about how do you interpret these changes over time?  And

24  does the 2000 -- does the 2002 amendment replace or does it add

25  to the 1997 requirement?  Nothing that the district court

1    analyzed in this case even addressed that.  It addressed the

2    wrong thing.

3            So, yes, the judgment information statement

4    requirement wasn't the specific issue in this case like it was

5    in T3, but the history and how the Court should read that

6    history and read those additions to the statute as cumulative

7    is the appropriate approach.

8            CHIEF JUSTICE DURRANT:  He also distinguished it I

9    think on the ground that it dealt with the pre-2002 version of

10   the act, correct?

11           MR. TILT:  Honestly, I don't understand the Court's

12   reasoning on that, because when we look at the statute today as

13   compared to what it was at that time, the requirements

14   of 2000 -- of Subsection (2) in 1997 and then the addition

15   in 2000 -- excuse me -- the Subsection (2) added in 1997, that

16   was there at the time of the T3 statute.  It's there now.

17   That, to me, supports the idea that it's cumulative and that

18   the district court took the wrong approach in that regard.

19           JUSTICE HAGEN:  I'd like to clarify something about

20   your second argument if I could.  I think that there was some

21   confusion in the briefing about it.  As I understand it, and

22   especially as clarified by your reply brief, your second

23   argument is a challenge that the lien never attached because it

24   was not -- the property was not owned by the judgment debtor.

25   Is that correct?

1           MR. TILT:  Yes.

2           JUSTICE HAGEN:  And that's why it's not an argument

3   under 64(e).  It's an argument under the statute, under 202; is

4   that right?

5           MR. TILT:  Correct.

6           JUSTICE HAGEN:  I have -- I'm a little bit concerned

7   about that only because when I look back at the reply to the

8   writ of execution, that particular argument was raised in a

9   footnote that was connected to your argument on whether the

10  district court had jurisdiction.  And then it wasn't addressed

11  again in the -- in your reply, and it wasn't addressed during

12  oral argument.  Was that sufficient to preserve that issue?  I

13  mean, it certainly seems like the district court did not

14  completely comprehend that as a separate issue since the

15  district court addressed the 64 -- the rule issue and not the

16  statute.

17          So, sorry.  That's a long way of saying is the

18  footnote in your original reply to the writ of execution enough

19  to preserve that argument for us to review?

20          MR. TILT:  I think it is.  It is in the briefing, as

21  you mentioned, and I don't know whether the specific statutory

22  section and -- whether it came up in a jurisdictional context

23  or otherwise, I candidly can't recall.  And you would be more

24  familiar with the record than I am at this point, probably.

25          Whether that specifically came up and was argued

1    again -- but that has been sort of a theme of our case

2    throughout this, is the judgment debtor, Brett, never owned the

3    property.  And that is a requirement under 202 for the -- for

4    any judgment lien.  It can only attach to real property of the

5    judgment debtor, owned during the life of the judgment.  And

6    since this judgment debtor never owned the property, it cannot

7    have attached.  That's been an undercurrent of everything in

8    our theory of the case.

9              JUSTICE HAGEN:  Thank you.

10             JUSTICE POHLMAN:  Let me ask you.  One of the

11   arguments that's made is that because it's a revocable trust,

12   he does, in effect, own the property.  I would like to just

13   hear your response to that.  And also, what law do we look at

14   to decide whether that's the case?  I notice that this trust

15   was created under California law.  The law people have referred

16   to in the briefing seems to be what Utah says about revocable

17   trusts.  I'm just curious if you think that curious is resolved

18   by looking at Utah law or California law.

19             MR. TILT:  I think that question cannot be resolved

20   by this Court because it was not raised until a supplemental

21   authority filing two days ago.  And it wasn't in the briefs; it

22   wasn't in the arguments.  It's not a supplemental authority.

23   It's a brand new argument.  So I don't think this Court can

24   address that at all.

25             But if the Court were to address that, the way it

1    should be resolved is that -- to say that we've got

2    subsection -- we've got 75-7-505, which is what was cited to in

3    the supplemental authority --

4         JUSTICE POHLMAN:  Well, let me just stop you for one

5    second, because I think the supplemental authority gets to a

6    slightly different issue.  Because this issue is something I

7    thought about before supplemental authority came in, so I'm

8    just looking back at the briefing to see if I had just come up

9    with it on my own.  But I see on page 15, which is just the

10   summary of the argument in the red brief, but it at least talks

11   there about how a settlor co-trustee of a revocable trust has

12   at least control of the property.  So I guess maybe if they're

13   referring to it as control as opposed to ownership, I'm not

14   sure if that nuance matters.

15        But, anyway.  I mean, at least this issue of what

16   kind of rights someone might have in the property vis-a-vis

17   their position as a trustee and settlor was something that was

18   raised in the briefing to us.

19        MR. TILT:  That nuance, I submit, is very important.

20   That's another way this district court erred in this case, is,

21   again, the judgment lien statute says you can only have a lien

22   on the judgment debtor's property that is owned.  That's the

23   statutory term.  And the district court in this case conflated

24   that with the Rule 64 execution term that you can have a writ

25   of execution on property that is in the possession or control

1  of the judgment debtor.

2         Possession and control do not equal a judgment lien.

3  That's the first way that that argument is addressed.  And the

4  second is --

5         JUSTICE POHLMAN:  But let me talk about his decision

6  for just a second, because at least Rule 64 -- if you go to

7  64(a), it defines the terms that are used throughout the rules

8  of 64, right?  And it defines property as property of the

9  debtor.  So I think it's already embedded there, that we're

10  talking about writs of execution of property owned by the

11  debtor that's also within their control, contrasting it with

12  garnishment rules, for example, where you get a writ of

13  garnishment about a property the defendant owns but isn't in

14  its control and possession.

15         So I think ownership, you need to have ownership.  I

16  think that's clear, right?  So then the question is does

17  Mr. Del Valle own this property by virtue of his position

18  relative to the trust or not?  And so I guess that's the

19  question I want to focus on.

20         MR. TILT:  I would propose that the case of Jessup

21  vs. Five Star Franchising, 515 P.3d 466 -- it's a Utah Court of

22  Appeals case from 2022 -- is how that ought to be resolved.

23  And specifically, at Footnote 10 of that case, the Jessup

24  court -- and this is not in the briefing because it was only

25  looked at in the context of the supplemental brief -- the Court

1  there said that it could not affirm a summary judgment in that

2  case on the basis that the trust was revocable and, therefore,

3  the settlor had control of the trust, because it said, "We

4  therefore disagree with the district court's conclusion that

5  simply because the trusts were revocable, Jessup and Kristy as

6  settlors could act unilaterally in their capacities to remove

7  the property from the trust.  The extent of authority will

8  depend on the precise language of the instrument and not just

9  on the status of the trust as revocable."

10          And that's part of the problem that we have in this

11  case, is the trust on its face does not give unfettered

12  authority to the judgment debtor, Brett Del Valle, to deal with

13  the property.  He is a co-trustee only, and the trust is set up

14  for himself as a beneficiary, but also for his spouse, and

15  there are various children's trusts that are discussed in

16  there.  It is the beneficiaries that own the property, the

17  equitable interest in the property.  And the mere fact that

18  this trust is revocable does not on its own mean that he had

19  control of it.  You have to look further than this district

20  court did as to exactly what control he had.

21          And beyond the face of the document, there was zero

22  evidence taken to show that Brett actually had any control,

23  that he actually exercised any control.  This property was

24  conveyed to the trust in 2007, and it was conveyed out of the

25  trust in 2020 -- '21.  So we have no factual findings to

```
 1    support the ruling of this district court in this -- or to

 2    support any ruling in this case that there was control

 3    sufficient for Subsection 505 to be dispositive in this case.

 4              JUSTICE POHLMAN:  What facts would you need beyond

 5    the trust agreement?  I mean, like who else is controlling it

 6    if not the co-trustees?  And I understand you may not have

 7    exclusive control.  I think that may be an important point, but

 8    at least how would -- I mean, what fact would otherwise come

 9    into play here?

10              MR. TILT:  Well, if he was, you know, financing it

11    and taking the money himself somehow, then he would be

12    exercising personal control.  Or if he -- I mean, I don't know

13    what -- what there might be because we don't have any factual

14    record on that, but...

15              JUSTICE POHLMAN:  I guess who else other than the two

16    co-trustees would have control?

17              MR. TILT:  Well, the two -- the two co-trustees would

18    have control, but the difference -- the question is what

19    control do they have?  And that has to be defined by the terms

20    of the trust itself, and there was no analysis of that.  The

21    Court just said, "It's revocable; and, therefore, he controlled

22    the property."  That's not sufficient.

23              CHIEF JUSTICE DURRANT:  As you read the trust, is it

24    unilaterally revocable by him?  Or does it require the consent

25    of his wife?
```

1          MR. TILT:  I honestly do not -- I -- you know, my

2    recollection is -- and I'll review it while counsel has his

3    say -- but my recollection is that the document is vague as to

4    that.  It talks about them as co-trustees.  It repeatedly

5    refers to them as co-trustees.  But to my recollection, the

6    document never calls out one or the other of them can sign or

7    both of them can sign.  It just is open-ended on that issue.

8          All right.  I'll defer to opposing counsel.

9          CHIEF JUSTICE DURRANT:  Thank you, Mr. Tilt.

10          MR. TILT:  Thank you.

11          CHIEF JUSTICE DURRANT:  Mr. Hooker.

12          MR. HOOKER:  Thank you.  May it please the Court.

13          I'd like to start out addressing a question that

14    Justice Hagen had asked about if Kitches was controlling, which

15    is our position that Kitches has been the controlling law

16    since 2005, would the fact that the legislature has not amended

17    the Judgment Act since then have any indication of how we

18    interpret the statute?

19          I think it does, and we haven't cited this case law

20    in our brief, but I believe that when there is controlling

21    authority interpreting a statute, the legislature is aware of

22    it, and they reconsider that statute at a later time and choose

23    not to respond to that case, it is affirming the interpretation

24    from the courts.

25          I think that that is another reason to interpret the

1    Judgment Act the way that Kitches did here.  The legislature --

2            JUSTICE HAGEN:  Do you happen -- I'm sorry.  And I

3    realize you didn't cite it in your brief, but I'm asking.  Do

4    you have case law at your fingertips to support that?  That

5    when we -- when the legislature does not amend a statute in

6    response to an interpretation, that we give that some weight?

7            MR. HOOKER:  I do not at my fingertips.

8            JUSTICE HAGEN:  Okay.

9            MR. HOOKER:  It's something that is in my mind from

10   other cases I've done, but the citations are not at my

11   fingertips.

12           JUSTICE HAGEN:  Well, you are welcome to file, of

13   course, supplemental authority responding to that question if

14   you wish.

15           JUSTICE POHLMAN:  And can I follow up just quickly on

16   that?  Is that something that we would defer to or at least

17   consider relevant if the statute's ambiguous only?  Or do we

18   consider that even if we don't find ambiguity in the statute?

19           MR. HOOKER:  That is a question where I'm not -- I'm

20   not sure whether or not that's an aspect of legislative history

21   or whether that is a legislative intent, plain language.

22   That's something that I'm not prepared to answer today.

23           JUSTICE POHLMAN:  Okay.  Thanks.

24           MR. HOOKER:  But I think it is a good question.

25           I would like to start with the Foreign Judgment Act.

```
 1   Because we have a California judgment here that's been
 2   domesticated in Utah pursuant to that act, I think that the --
 3   the statutory interpretation question should start there in
 4   terms of whether my client was required to file its judgment in
 5   the Registry of Judgments in addition to the recording
 6   requirement.
 7            As has been --
 8            JUSTICE HAGEN:  Let me just stop you right before you
 9   start.  I apologize.
10            MR. HOOKER:  No problem.
11            JUSTICE HAGEN:  Do you -- and I -- I actually thought
12   about sending out a notice on this, and I failed to do so.  So
13   if you're not familiar with this case, I completely understand.
14   But have you seen our decision in Sunstone Realty vs. Bodell?
15   Or is it is switched?
16            JUSTICE POHLMAN:  I think you got it.
17            JUSTICE HAGEN:  Have you seen that, where we
18   basically talk about the Foreign Judgment Act and assume that
19   enforcement means something separate than the list of items
20   that follow?
21            MR. HOOKER:  No.  I have not.  I have not seen that
22   case.
23            JUSTICE HAGEN:  Okay.  Sorry.  Go ahead.  Please.
24            MR. HOOKER:  So as we -- you know, it was discussed
25   in the opening argument, when you look at Section 305 of the
```

1    Judgment Act, you know, it contains three requirements for a

2    foreign judgment becoming a lien.  We have a stay of execution

3    that hasn't been granted, the requirements of this chapter

4    being satisfied, and that the judgment's recorded in the office

5    of the County Recorder's Office, as provided in Section 202.

6          You know, we have here a situation where the

7    legislature is drafting a statute and specifically

8    contemplating how you create liens from foreign judgments.  And

9    when they are drafting that statute, they specifically call out

10   the county recording requirement, and they reference Section

11   202 in the Judgment Act.  I think that this is an important

12   fact for the Court to consider, both in interpreting the

13   Foreign Judgment Act and interpreting that act with the

14   Judgment Act in harmony, that the legislature, if it had

15   wanted -- if it thought that the Registry of Judgments

16   requirement applied to either foreign judgments or judgments

17   that come from Utah in the first instance, they would have

18   mentioned that explicitly in the statute about liens.  And the

19   only way that the Mulligans can get Section 201 of the Judgment

20   Act and the registry requirement into the Foreign Judgment Act

21   is by basically created a hypothetical scenario where the

22   legislature was thinking of liens; they wanted to call out

23   specifically the recording requirement; they wanted to have the

24   registry requirement in there as well; but decided it wasn't

25   worth mentioning specifically, and that people would figure out

1   that it had been incorporated through various other provisions.

2   I don't think the legislature drafts statutes that way, and I

3   think that this Court shouldn't presume that that is what

4   happened.

5          JUSTICE POHLMAN:  So what meaning do you give to

6   Subpart (b), where it seems to incorporate not only everything

7   from the Utah Foreign Judgment Act but also the Judgment Act

8   and everything else that's within the chapter?

9          MR. HOOKER:  Yeah.  The way that I read that, I think

10  that when the legislature wrote this chapter, they meant the

11  Foreign Judgment Act, not everything in Chapter 5.

12         JUSTICE POHLMAN:  That is how interpreted it below,

13  right?  I mean, he -- when he referred to this particular

14  provision, he substituted in there "act" instead of "chapter."

15         MR. HOOKER:  Yeah.  And I share your concerns that

16  Chapter 5 has a lot of miscellaneous provisions that have

17  nothing to do with judgments liens, some that you had

18  mentioned, others.  The Comparative Negligence Act is also in

19  Chapter 5.

20         I think that it's also important to remember -- and

21  this is indicated in Section 307 of the Foreign Judgment Act.

22  This is a uniform act.  It's an act that many states have

23  applied.  And in Section 307, it says that the Court should

24  construe the Foreign Judgment Act to effectuate the general

25  purpose and make uniform -- laws uniform on the states.

1          I think that, you know, the uniform act likely used

2     the word "chapter," and the legislature adopted that, really

3     meaning it meant the Foreign Judgment Act, not the chapter in

4     which that act is situated.

5          JUSTICE PEARCE:  Are we free to redefine it that way,

6     though, absent some showing of absurdity, that no reasonable

7     legislature could have intended it to mean chapter?  Are we in

8     the business of saying, "This is what they meant," and putting

9     in -- you know, just rewriting the statute using a different

10    word?

11         MR. HOOKER:  I don't think that it would be a

12    rewriting of the statute in this circumstance.  I think, you

13    know, when we -- the Court starts at the plain language when it

14    interprets statutes, but it also needs to make a harmonious

15    hold with similar related statutes.

16         And so if you, you know, focus on the -- this -- to

17    these two words, "this chapter," in isolation, that could be a

18    tenable reading.  But when you read it in harmony with the

19    other statutes in this -- in this chapter, I think that, you

20    know, it would be a reference to the part and not this chapter.

21         You do mention the absurdity doctrine.  I do think

22    this could be a situation where that would apply, because I

23    don't think that any reasonable legislature would have meant to

24    incorporate requirements for affidavits and evidence and the

25    comparative negligence statute into a section on foreign

```
 1    judgments.  I can't imagine a reasonable legislator meaning to

 2    do that.

 3              JUSTICE HAGEN:  Apart from 305(1)(c), though, we have

 4    302(3), which says that a foreign judgment has the same effect

 5    and is subject to the same procedures, defenses, enforcement,

 6    satisfaction, and then proceedings for various things.

 7              Now, as I understand your argument, you're saying

 8    that that doesn't require us to apply the Judgment Act, because

 9    that is only referring to reopening, vacating, setting aside,

10    or staying; is that right?

11              MR. HOOKER:  Yes.  That is what we had argued in our

12    brief, that after the word "for," it's a post-positive modifier

13    that applies to everything in the series before it.

14              And, you know, even looking at this section in

15    general -- and I'm -- and I'm sorry.  Did you have a follow-up

16    question, your Honor, on that?

17              JUSTICE HAGEN:  Yes.  Let me just ask you one thing.

18    Let's assume for a moment -- and I realize we didn't send out

19    anything about this, but let's assume for a moment that in --

20    that we've recently interpreted that differently, that

21    procedures, defenses, enforcement, and satisfaction mean -- are

22    independent of that list.  What would be your position then?

23              MR. HOOKER:  My position with that one -- it's -- I'm

24    honestly not very concerned if that is the case.

25              JUSTICE HAGEN:  Okay.
```

```
 1              MR. HOOKER:  Because I don't think that it changes
 2    the outcome here.  Because what you have is -- you know,
 3    without engaging in kind of which -- whether the reopening and
 4    vacating language applies to everything else in the series, I
 5    think that the Subsection (3) is just a general statement that
 6    there should be uniformity between how you go about dealing
 7    with foreign judgments and judgments out of a Utah court.
 8              But this specific section does not say anything
 9    specifically about liens.  It is Section 305 that speaks
10    specifically to liens.  And when you have provisions where you
11    have one that's directly on point and speaks to the subject
12    matter, that is what should govern the analysis over kind of a
13    more general intent and purpose statement.  So that would be my
14    position on that.
15              JUSTICE HAGEN:  Even if we were to say that liens
16    fall within enforcement under that Subsection (3), you're
17    saying that the more specific section controls?
18              MR. HOOKER:  I would.
19              JUSTICE HAGEN:  Okay.
20              MR. HOOKER:  That would be my argument, yes.
21              JUSTICE HAGEN:  Okay.  Thank you.
22              JUSTICE PEARCE:  Are you at all troubled by the
23    number of times in 302 that the legislature emphasizes "as used
24    in this part" or "a foreign judgment filed under this part has
25    the same effect"?  We do have a cannon of meaningful variation,
```

1    and that when the legislature uses different terms, we usually

2    presume they mean it.

3           So when it uses "chapter," should we draw any meaning

4    from the fact that it knows when it wants to use "part"

5    apparently and use "chapter"?

6           MR. HOOKER:  This is a question I haven't thought of

7    before, but you are right.  It looks like in several sections

8    of the Foreign Judgment Act, it does say "this part."  Section

9    301, it says "In Section 302 as well."

10          I think that if the legislators used -- the

11   legislature's using the words "part" and "chapter," that that

12   is something that is important, and it could be the case, then,

13   that when the legislature says "this chapter" in Section 305,

14   it was meaning to incorporate the Judgment Act.

15          I think that even if that is the case, you know, we

16   have -- I think it still reaches the same result.  And I -- I

17   know that we kind of started off our brief with, "Don't look at

18   the Judgment Act."  We think that either way, this Section 305

19   either can stand on its own or it's something that needs to be

20   interpreted in harmony with the Judgment Act.  And it leads to

21   the same result.

22          And so I think that, you know, to get to your

23   specific concern, if this Court wants to avoid the question of

24   what this chapter means, what this part means, we can look to

25   the Judgment Act and interpret it in harmony with the Foreign

1    Judgment Act to reach the same result.

2             JUSTICE POHLMAN:  And that's by adopting the Kitches

3    analysis?

4             MR. HOOKER:  And that's by adopting the Kitches

5    analysis and a few other reasons as well that were enlisted in

6    Kitches.

7             JUSTICE POHLMAN:  Okay.  Let me ask you about Kitches

8    for a minute.  The Court seems to rely pretty heavily there on

9    the "or" that's used in Subsection (4), finding it's

10   disjunctive.  To me, whether or not the "or" is disjunctive

11   isn't really the answer to the question.  I mean, "ors" can be

12   either inclusive or exclusive, meaning '"or' or both" or '"or'

13   but not both," right?

14            MR. HOOKER:  Yes.

15            JUSTICE POHLMAN:  And so -- I mean, if you read

16   Gardner [phonetic], he says, '"Ors' almost always introduce

17   some ambiguity."  So I feel like Kitches kind of just

18   acknowledges something.  "Oh, there's an 'or' here, so it

19   therefore must be exclusive."  And I'm not sure I see anything

20   else in that provision that tells me that was intended to be

21   exclusive versus inclusive.  And if I'm using (4) to try to

22   interpret 201 -- (4) isn't clear to me.  If (4) has some

23   ambiguity, I'm not sure how it really is helpful in trying to

24   decide whether both Subsection (1) and Subsection (2) apply.

25   Can you help me with that?

```
1              MR. HOOKER:  Yes.  The way that -- I think that I
2     read Kitches a little bit differently.  They -- the Court of
3     Appeals in Kitches, before getting to the disjunctive "or" in
4     Subsection (4), they first look at Section 202, which back then
5     was numbered -- numbered differently.  They look specifically
6     at Subsection (7) in 204.  This is the first one that they look
7     at.  And in Subsection (7)(a), it says "After 2000 -- after
8     July 1st, 2002, a judgment entered by a district court or a
9     justice court in this state becomes a lien upon real property
10    if," and then it lists some judgment information statement that
11    needs to be filed.
12              So I think that the Court of Appeals, they first
13    looked at that section and said, "Well, we have language here
14    that says that when you record, it becomes a lien."  And that
15    seems as though it's a sufficient requirement.  If you had to
16    do something else like the Registry of Judgments, it couldn't
17    become a lien just by recording.
18              And then after looking at that section, the Court of
19    Appeals goes back to Section 201 and they look at Subsection
20    (4), and they say -- and they note, "Well, if the legislature
21    had intended the Registry of Judgments requirement and the
22    recording requirement to operate together as cumulative
23    requirements, then they could have used the word 'and' instead
24    of 'or' when referring to this judgment information statement
25    required for both."
```

1    So I think the way the Court of Appeals read the
2    statute in Kitches was -- I honestly don't know if the outcome
3    would have been different if they had only focused on that
4    "or."  I agree with you that "or" on its own is not helpful.
5    JUSTICE POHLMAN:  I guess I'm just trying to figure
6    out, just reading their opinion anyway, what meaning they
7    really derive from -- and I'm trying to remember how these new
8    sections correspond, but 78-22-1, at least in Kitches.  Because
9    they do cite it.  They say that's the starting point.
10    MR. HOOKER:  Yes.
11    JUSTICE POHLMAN:  But all they do it quote it.
12    MR. HOOKER:  Uh-huh.
13    JUSTICE POHLMAN:  And then they go on to talk about
14    1.5 and 2 and 3, and then they talk about 4.  And then their
15    analysis seems to be focused on the disjunctive "or" in 4.  And
16    they seem to derive a lot from that.  Just help me see maybe
17    where they seem to derive meaning from just that first
18    subsection, which I think is now 202 for us.
19    MR. HOOKER:  Yeah.  I would say that where they
20    derive that meaning -- and the fact that they just quote it --
21    is I think indicative to them where they didn't feel like there
22    was anything else they needed to expound upon.  It's like,
23    "Look at this language.  It says it becomes a lien."  And
24    that's what it says.  I don't think that they felt they needed
25    to say "And it becomes a lien," blah blah blah, and then they

1    focused on the disjunctive.

2            So I agree with you that more of the analysis is on

3    the "or," but I actually think that the main focus of their

4    opinion is on that becoming a lien subsection and that it was

5    at least clear enough for them that it just needed to be

6    quoted.  It could have been expounded upon.  We -- we do so in

7    our -- in our opposition brief.

8            But I think that, for the Court of Appeals, that that

9    becoming a lien section is very important to them, because

10   they're trying to avoid conflicts in the statute, which is what

11   this Court should do.  You presume that the legislator

12   doesn't -- legislature is not trying to create conflicting

13   statutes.  And if you have language that says it becomes a lien

14   if it's recorded, it creates a conflict if you have a different

15   section where you interpret it saying, well, it doesn't become

16   a lien if it's recorded.  You also have to file it in the

17   registry.

18           I don't know if that answers the question.

19           JUSTICE POHLMAN:  No, that's helpful.  I mean, I do

20   think you are right that there's potentially a conflict here

21   where we're dealing with it in two different places.  And so

22   which one do we give meaning to?  I guess I'm just not sure I

23   ultimately agree with their analysis about 1.5.

24           MR. HOOKER:  Mm-hmm.

25           JUSTICE POHLMAN:  I don't know that that helps inform

1    much.

2              MR. HOOKER:  I -- and I think that even if that --

3    personally, if that Subsection (4) and the "or" language wasn't

4    in there, I still think that the result would be the same,

5    particularly when you look -- when you interpret the Judgment

6    Act consistently with the Foreign Judgment Act.  We don't want

7    there to be any sort of conflict between those two.  And the

8    Judgment Act just says that you need to record in --

9    incorporate Section 202, it doesn't mention Section 201.

10             So in my opinion, the result is the same regardless

11   of this "or" language.  And I think this Court could reach that

12   result without even engaging in the Court of Appeals analysis

13   of that specific subsection.

14             With the couple minutes left of my time, I wanted to

15   point you to somewhere in the record.  Justice Pohlman, you had

16   asked a question about what law governs with the trust and

17   control.

18             If you look at the record on page 143, there's a

19   governing law section of the trust, and it says that when

20   there's real property involved, the governing law is the law of

21   situs where the property is located.  And so I think because

22   we're dealing with property located in Utah, Utah law would

23   apply to determine how to interpret that trust and the trust

24   issues.  And then on that point, I think that Section 505 of

25   Chapter 7 in the trust code is dispositive of this issue, where

1    it pretty clearly states that if you have a revocable trust,

2    the creditors can go after a property in that trust against the

3    settlor.

4            And I think here, it is undisputed that the judgment

5    creditor was a settlor of the trust and that it was a revocable

6    trust.

7            JUSTICE POHLMAN:  And is that the new argument that

8    shows up in the supplemental letter?

9            MR. HOOKER:  It is, your Honor.  And I would -- in

10   response to their -- to the Mulligans' argument that this Court

11   should not look at that new subsection, your Honor, I don't

12   think there's any preservation issue here.  This is -- this

13   authority is relevant to an issue that they raised in their

14   brief of whether or not the judgment debtor had control over

15   the property.

16           So it's relevant to an issue they raised, and there's

17   also pretty clear case law that says that appellants do not

18   need to preserve citations to legal authority.  You preserve

19   issues.  You don't have to preserve citations.  I would refer

20   the Court to the Patterson vs. Patterson case on that point.

21   The citation is 2011 UT 68, specifically paragraph 18, where

22   the Court said, "We routinely consider new authority relevant

23   to issues that have been properly -- been preserved, and we've

24   never prevented a party from raising controlling authority that

25   directly bears upon a properly preserved issue.  Further, we

1    are unwilling to disregard controlling authority that bears on

2    the ultimate resolution of the case solely because the parties

3    did not raise it below."

4            I think that would apply here.  If this Court ignored

5    the Utah Trust Code, then it could potentially lead to an

6    erroneous ruling of Utah law and this Court's -- you know, the

7    consideration first and foremost is to get the law right even

8    if the controlling authority is something that we didn't catch

9    until the week before oral argument.  And that's the reason why

10   notices of supplemental authority are in the Rules of Appellate

11   Procedure.

12           JUSTICE HAGEN:  Can I ask you a question on this same

13   topic?  In your -- in your brief here on appeal, you engage

14   with their argument that the property wasn't owned by the

15   judgment debtor under 202(7)(c).  But I don't believe you

16   engaged with that below, and I don't think the district court

17   did either.  What -- do you know why that is?

18           MR. HOOKER:  Yes.  So we -- as you have noted before

19   when you were speaking with Mr. Tilt, the argument about

20   whether or not a judgment lien could attach based on the

21   ownership, arguments like that was contained in a footnote in

22   their reply, and it kind of fell off the radar there.

23           And I -- when we were drafting our brief, we had

24   considered whether or not to have a full section on

25   preservation, and I think that, you know, there is some -- I

1    think that it could be the case that raising it in a footnote

2    would not have brought the issue to the level of consciousness

3    for the district court to have -- to have ruled on that issue.

4    And, in fact, the district court did not rule on that issue; it

5    only focused on Rule 64(e), because that's what the parties had

6    focused on.

7            But the fact that it was in the reply, the district

8    court could have looked at it.  We decided that since we had --

9    we were already hitting the page limit, that -- as you all

10   know, preservation issues get sticky and take up a lot of

11   briefing space.  And so we chose not to brief that issue.

12           I do think that if this Court was inclined to not

13   reach that issue, finding that it wasn't preserved, I think

14   that you would be well within your rights to do so.

15           JUSTICE POHLMAN:  One of the issues on this ownership

16   question -- I mean, the arguments on it have evolved a little

17   bit -- right? -- from when they were in the district court and

18   even on the appellate briefing.

19           MR. HOOKER:  Yes.

20           JUSTICE POHLMAN:  And one of the things that's come

21   up that I think is kind of interesting is even if we were to

22   conclude that Mr. Del Valle has ownership interest in this

23   property, it's not exclusive, right?  It's jointly owned

24   with -- or his wife is a co-trustee according to the trust

25   document anyway.

1       And so I'm just wondering -- I mean, it doesn't

2   appear that she was given notice of the writ.  And so I'm just

3   wondering, what do we do with that?  And, again, part of it is

4   because this has evolved a little bit from the arguments that

5   were made, so I'm just not exactly sure how that fits into what

6   we should be looking at right now.  Because I'm -- even if we

7   conclude he has ownership interest, I'm not sure it's

8   exclusive.

9       MR. HOOKER:  I think that the -- where that may fit

10  into this analysis would be something that would be dealt with

11  on -- when we go back down below and not here, because if it is

12  the case that the judgment debtor's wife also had an ownership

13  interest in the property, that doesn't mean that a lien could

14  not attach or that a writ of execution couldn't go to the

15  property.  It's just how much of the money goes to my client

16  and how much of the money -- because if -- you know, if

17  Mr. Del Valle's wife does have, you know, say, 50 -- say it was

18  community property and she would get 50 percent of it.  That's

19  how -- that would be an issue of how do you distribute the

20  proceeds after the sale?  Not whether or not an execution writ

21  could go to the property in the first place.

22      JUSTICE PEARCE:  I realize that there might be

23  preservation concerns, but do you see any advantage to a remand

24  back for some factual findings on the ownership issue?

25      MR. HOOKER:  I don't.  I think that, like the

1    district court, the -- the issue can be resolved by looking at

2    the trust.  And I think that the trust answers the question of

3    whether or not Mr. Del Valle had ownership sufficient for a

4    lien to attach or for writ of execution.

5            So I -- I don't think that a remand for factual

6    findings would be necessary on this point.  I think that

7    everything that this Court needs to rule on that issue is -- is

8    here in the record.

9            JUSTICE HAGEN:  And this is a purely practical

10   question, and I don't know if you'll know the answer to this,

11   but I was interested in the discussion of whether a title

12   company or proposed purchaser like the Mulligans would be able

13   to connect the judgment here against the judgment debtor to the

14   actual trust that just bore his last name.  Do you know how

15   that works?  I mean, what happens if someone's going to buy a

16   property from a trust?  Does the title company -- how does the

17   title company investigate that?

18           MR. HOOKER:  I -- I don't have a ton of experience

19   with title companies, but I can tell you that we did issue a

20   subpoena to the title company down below, and this is -- and we

21   did get the trust from the title company's records.  I believe

22   that title companies -- when they're dealing with people who

23   own properties and particularly when trusts own properties --

24   you know, there are so many properties held in trust.  People

25   do so for estate planning reasons.  When you're dealing with

1  individuals selling property to you and you know the property

2  is held in trust, I would assume that the title companies would

3  require the seller to give them a property of their trust so

4  they can research the county records to see if there are any

5  judgments for the sellers individual, for their trusts, for

6  companies that they own, that kind of information, so that they

7  can make sure that there's not something that they miss and

8  that there's not a lien against the property.  I imagine that's

9  how it goes in these circumstances.  I don't know completely,

10  but, you know, title companies have a very strong incentive to

11  make sure they catch everything.  So I assume that they would

12  be as thorough as possible on that issue.

13          JUSTICE HAGEN:  Thank you.

14          MR. HOOKER:  I'm guessing my time is up.

15          CHIEF JUSTICE DURRANT:  Thank you, Mr. Hooker.

16          Mr. Tilt?

17          MR. TILT:  I'd like to start right there, and I will

18  say I do have a lot of experience representing title companies,

19  and that's not what they do.  They don't look at every

20  potential trust that you own.  If there's a -- if a person is

21  selling property, they will look at that person's credit.  They

22  will look at that person's court record in the county at issue.

23  They will look at that person's record in the County Recorder's

24  Office.  They won't search trusts, because those are separate

25  entities.  They won't search businesses, because those are

```
1   separate entities.  Those separate entities all have their own
2   separate obligations and their own separate existences,
3   separate and apart from the individual.
4           JUSTICE HAGEN:  But if the person selling the
5   property is a trust, is it typical that they receive a copy of
6   the trust so they can see who the settlor is or who the trustee
7   is?
8           MR. TILT:  Yes.
9           JUSTICE HAGEN:  And then would it be commonplace for
10  them to then search those names for liens?
11          MR. TILT:  No.  They just need to have the trust in
12  order to know, okay, these are the people that do have the
13  title --
14          JUSTICE HAGEN:  Authority?
15          MR. TILT:  -- they have the authority to sign the
16  deed.  But they're not looking for the trustors or the -- or
17  any obligations of anybody but the trust.  They'll search the
18  title on the trust, they'll search court records on the trust,
19  but they're not going to go and search Brett, because they
20  would have no reason to search Brett.  He doesn't have an
21  interest in the property.  Why would we search Brett?
22          JUSTICE HAGEN:  And I realize that none of this is in
23  the record.  This was just really my own curiosity about how
24  this worked practically.  So...
25          MR. TILT:  Sure.  No.  I understand.
```

1      And I do want to get to a question that you raised

2  earlier, but I first want to respond to what I told Justice

3  Durrant I would get to him.

4      The trust under paragraph 1.1 -- and this is Bates

5  No. -- I don't know because my hole punch cut it off.  000127

6  in the record.  It's Addendum 2, I believe, to our brief.

7  Section 1.1 of the trust talks -- is the most clear language

8  that I have found in there as to what the relationship of the

9  co-trustees is and what their respective powers are.

10      It says "The trustors have been appointed as

11  co-trustees.  If for any reason during the joint lifetimes of

12  the trustors either trustor shall cease to act as co-trustee,

13  the other trustor shall act as sole trustee."  And then it

14  talks about "Upon the death of one of the co-trustees, then

15  they act as sole trustee."  But absent a death or one of the

16  co-trustees ceasing to act as such, they are, under this

17  document, co-trustees.  And it is noteworthy there for -- that

18  the deed to my client's was signed by both trustors in this

19  case, both of the co-trust -- co-trustees -- excuse me -- in

20  this case, which -- all of which gives an inference, if not

21  clarity, that they both have to sign something and -- in order

22  to transfer the property or to control the property.

23      That gets to a point that counsel raised.  And he is

24  correct that if -- if the Court finds that this judgment

25  against Brett attached to property of the Del Valle Family

1  Trust, it can only attach to his portion expressly by statute

2  under 75-7-505(1). After talking about how property of a

3  revocable trust is subject to claims of the settlor's

4  creditors, it says "If a trust has more than one settlor, the

5  amount and the -- the amount the creditor or assignee of a

6  particular settlor may reach may not exceed the settlor's

7  interest in the portion of the trust attributable to that

8  settlor's contribution."

9          So at most, a one-half interest in the property could

10  potentially be reached by -- by this judgment.

11          JUSTICE POHLMAN: Can I just ask one quick question?

12  That statute you cited mentioned a revocable trust. Do you

13  agree that this is a revocable trust?

14          MR. TILT: Yeah. I don't think there's any question

15  this is a revocable trust. But the other issue that comes up

16  under that -- under the probate code that counsel points to is

17  Section 75-7-507, which says "Trust property is not subject to

18  personal obligations of a trustee."

19          Now, in this case, Brett is a settlor, but he's also

20  a trustee. So I think there's an irreparable -- irreconcilable

21  conflict between those two statutes. 507 says you can't reach

22  this property because -- just because he's the trustee of a

23  trust. So that's another response we would have to the belated

24  citation to 505.

25          Justice Hagen asked counsel about Kitches and that

1    there had been no amendment, and counsel argued, yes, the

2    implication therefore has to be that the legislature presumed

3    that the Kitches ruling was the correct one.  That same

4    analysis, though, has to apply as well to the T3 case where it

5    said in Footnote 5, "Notably, you have to satisfy both of the

6    requirements, filing with the court and recording with the

7    county."  We also have ten years of legislative sessions since

8    T3, and the legislature did not reverse or otherwise change the

9    statute in light of that holding.

10        So to -- I don't think any supplemental authority is

11    needed or supplemental briefing from either party on that,

12    because what's good for the goose is good for the gander.  That

13    applies to both cases.  T3 being the newer of the two, I would

14    submit that the T3 case is the one that would govern.

15        JUSTICE PEARCE:  Is there any fact finding needed to

16    sort out questions of ownership and control?  Or do we have

17    everything in front of us that would allow us to make those

18    decisions?

19        MR. TILT:  Ownership does not require any fact

20    finding.  Control, I -- I think there might need to be

21    something further on control.  Now, control of course is not

22    relevant to whether there is a lien.  Control alone will not

23    give rise to a lien.  Control will only allow a potential writ

24    of execution.  And the writ parenthetically -- the distinction

25    between judgment and writ is highly significant in this case,

1    because a writ can only attach to property of the judgment

2    debtor in their possession or control.  But by the time this

3    writ was issued, by the time the application was made for this

4    writ, the property was already out of the possession and

5    control of the trust or Brett or anybody else.  It was owned

6    for a month by my clients before the writ was issued.

7              So unless they have a judgment lien, Alum Rock has no

8    interest in this property whatsoever.  The writ is wholly void

9    unless they have a judgment lien.  And so that distinction

10   between ownership and control is important, because the control

11   language of the -- of the rule regarding writs cannot override

12   the statutory language requiring ownership.

13             JUSTICE PEARCE:  And you believe that everything we

14   would need to decide who owned the property on the relevant

15   dates --

16             MR. TILT:  Yes.

17             JUSTICE PEARCE:  -- is in the record in front of us

18   and requires no fact finding?

19             MR. TILT:  Correct.

20             JUSTICE PEARCE:  Okay.

21             MR. TILT:  There was some discussion about Section

22   302 and -- of the Foreign Judgment Lien Act.  And the Osborne

23   [phonetic] case that was cited in the briefing dispenses with

24   Alum Rock's post-positive modifier interpretation of Section

25   302.  What the Osborne case said is that the -- the language of

1    the statute that says "A foreign judgment filed under this part

2    has the same effect and is subject to the same procedures,

3    defenses, enforcement, satisfaction, and proceedings for

4    reopening, vacating, and setting aside will apply the same to a

5    foreign judgment as to a domestic judgment" -- Osborne says,

6    yeah, that all applies.  It talked about -- the Osborne case

7    said the decree in that case had the same effect and was

8    subject to the same procedures, defenses, and enforcement as

9    the judgment of the district court.  The failing of the

10   post-positive modifier analysis that is championed by Alum Rock

11   is it completely ignores the "and" that's right in the middle

12   of that section.  All of those things conjunctively are the

13   same for a foreign judgment as a domestic judgment.  A foreign

14   judgment expressly, under Subsection (5) and under -- even

15   under 302, has to therefore meet all of the requirements of

16   Chapter 5.

17           And it is significant that the legislature used

18   "part" in 302, but "chapter" in 305.  We have to presume that

19   the legislature used each of its words intentionally.  And

20   therefore, the difference between "part" and "chapter"

21   appearing within three subsections of one another has to be

22   given significance by this Court.

23           Because the Alum Rock judgment filing was made in the

24   Third District Court in Salt Lake County, it therefore did not

25   meet the statutory requirement of being filed in the Registry

```
 1   of Judgments in the Second District Court in Weber County, as
 2   is required under 78B-5-201(2).  It therefore never created a
 3   judgment lien.  It couldn't.  It doesn't have a judgment lien.
 4           This Court ought to clarify that all of the
 5   requirements of both the Foreign Judgment Act and the judgment
 6   lien statute must be met in order to have a judgment lien on
 7   real property.  This Court therefore should reverse the
 8   district court, conclude that there is no judgment lien,
 9   conclude therefore that the writ of execution is untimely an
10   invalid, and quiet titling the property in favor of the
11   Mulligans.  Thank you.
12           CHIEF JUSTICE DURRANT:  Thank you, Mr. Tilt,
13   Mr. Hooker.  We appreciate the excellent oral and written
14   arguments in this case.  And we will take it under advisement.
15           Court is adjourned.
16           (Proceedings concluded.)
17
18
19
20
21
22
23
24
25
```

1    STATE OF UTAH          )
                            )
2    COUNTY OF SALT LAKE )

3                    I, PHOEBE S. MOORHEAD, Certified Shorthand

4    Reporter for the State of Utah, certify:

5                    That I received the audio recording and

6    transcribed it to the best of my ability into typewriting; that

7    a full, true, and correct transcription of said audio recording

8    so recorded and transcribed is set forth in the foregoing

9    pages.

10                   I FURTHER CERTIFY that I am neither counsel

11   for nor related to any party to said action nor in anywise

12   interested in the outcome thereof.

13                   Certified and dated this 29th day of July,

14   2024.

15

16

17   _____

18   PHOEBE S. MOORHEAD, RPR, CRR
     Certified Shorthand Reporter
     for the State of Utah

19

20

21

22

23

24

25

**.**

'''or' [2] - 36:12
'''ors' [1] - 36:16
'21 [1] - 25:25
'97 [7] - 8:17
'and' [1] - 37:23
'or [1] - 15:10
'of' [2] - 38:18, 37:24

**0**

000127 [1] - 48:5

**1**

1 [4] - 7:12, 7:23, 8:10, 36:24
1.1 [2] - 48:4, 48:7
1.5 [2] - 38:14, 39:23
10 [2] - 3:1, 24:23
143 [1] - 40:18
15 [1] - 23:9
18 [1] - 41:21
19 [3] - 15:5, 16:4, 16:17
1997 [5] - 5:8, 8:15, 10:8, 19:25, 20:14, 20:15
1st [1] - 37:8

**2**

2 [20] - 6:13, 6:14, 6:20, 6:23, 6:24, 6:25, 7:2, 7:6, 7:9, 7:17, 7:23, 8:10, 10:7, 13:15, 20:14, 20:15, 36:24, 38:14, 48:6
20 [1] - 3:8
2000 [8] - 7:12, 9:1, 19:24, 20:14, 20:15, 37:7
2000s [1] - 5:18
2002 [8] - 4:4, 7:12, 8:19, 19:24, 37:8
2005 [1] - 27:16
2007 [3] - 4:5, 4:16, 25:24
201 [15] - 6:2, 6:14, 8:5, 11:25, 12:14, 14:2, 14:7, 14:10, 14:21, 17:12, 17:18, 30:19, 36:22, 37:19, 40:9
201(2 [2] - 5:14, 5:19
201(3)(a [1] - 5:20
201(6) [1] - 6:3
201-4 [1] - 6:3
201-5 [1] - 6:3
2011 [1] - 41:21
2013 [1] - 15:9
202 [10] - 12:10, 14:10, 21:3, 22:3, 30:5, 30:11, 37:4, 38:18, 40:9
202(3 [1] - 17:4
202(7)(c) [1] - 42:15
2020 [4] - 4:8, 4:12, 4:14,

25:25
2021 [2] - 4:15, 4:19
2022 [1] - 24:22
2024 [1] - 3:1
204 [1] - 37:6

**3**

3 [19] - 6:13, 6:14, 6:19, 6:24, 6:25, 7:2, 7:9, 7:17, 7:23, 8:11, 10:10, 13:14, 14:24, 16:23, 34:5, 34:16, 38:14
3) [1] - 6:23
3)a [3] - 7:7, 7:8
301 [2] - 14:22, 35:9
302 [6] - 34:23, 35:9, 51:22, 51:25, 52:15, 52:18
302(3 [1] - 33:4
305 [5] - 29:25, 34:9, 35:13, 35:18, 52:18
308 [1] - 12:11
305(1)(c [1] - 33:3
307 [2] - 31:21, 31:23

**4**

4 [16] - 6:13, 6:14, 6:17, 6:22, 6:23, 7:1, 7:17, 7:23, 9:17, 36:9, 36:21, 36:22, 37:4, 37:20, 38:14, 38:15, 40:3
4) [1] - 7:5
466 [1] - 24:21

**5**

5 [21] - 6:6, 6:13, 6:14, 7:17, 8:25, 9:7, 12:12, 12:14, 13:17, 14:12, 14:18, 14:20, 15:17, 15:19, 16:8, 31:11, 31:16, 31:19, 50:5, 52:14, 52:16
50 [2] - 44:17, 44:18
505 [3] - 26:3, 40:24, 49:24
507 [1] - 49:21
515 [1] - 24:21

**6**

6 [3] - 6:7, 6:14, 7:20
6) [1] - 6:13
64 [4] - 21:15, 23:24, 24:6, 24:8
64(a [1] - 24:7
64(e [4] - 43:5
64(e) [1] - 21:3
68 [1] - 41:21

**7**

7 [4] - 7:20, 7:23, 37:6, 40:26
7)(a [1] - 37:7
75-7-505 [1] - 23:2
75-7-505(1) [1] - 49:2
75-7-507 [1] - 49:17
78-22-1 [1] - 38:8
78B-5 [1] - 12:12
78B-5-201(2 [2] - 5:6, 16:22
78B-5-201(2) [1] - 53:2
78B-5-202 [2] - 10:7, 12:6
78B-5-305(1 [1] - 12:5

**8**

8 [1] - 7:21

**9**

9 [1] - 7:23
9) [1] - 7:21

**A**

able [1] - 45:12
abrogate [1] - 16:19
absent [2] - 32:6, 48:15
abstract [2] - 10:10, 10:18
abstracted [1] - 10:19
abstracting [1] - 17:4
abstractive [3] - 11:1, 11:17
absurdity [2] - 32:6, 32:21
according [1] - 43:24
account [1] - 16:25
acknowledge [1] - 19:20
acknowledges [1] - 36:18
act [13] - 20:10, 25:6, 29:2, 30:13, 31:14, 31:22, 32:1, 32:4, 48:12, 48:13, 48:15, 48:16
Act [37] - 11:25, 12:4, 12:8, 12:13, 12:15, 14:1, 15:6, 16:19, 27:17, 28:1, 28:25, 29:18, 30:1, 30:11, 30:13, 30:14, 30:20, 31:7, 31:11, 31:18, 31:21, 31:24, 32:3, 33:8, 36:8, 35:14, 35:18, 35:20, 35:25, 36:1, 40:6, 40:8, 51:22, 53:5
actual [2] - 11:20, 18:12, 45:14
add [2] - 14:23, 19:24
added [3] - 15:23, 16:13, 20:15
addendum [1] - 48:6
addition [11] - 6:17, 6:19, 6:22, 6:25, 7:5, 7:7, 7:15, 9:17, 9:19, 20:14, 29:5

additional [3] - 3:10, 8:20, 11:4
additions [2] - 16:13, 20:8
address [3] - 22:24, 22:25, 21:10, 21:11, 21:15, 24:3
addressing [1] - 27:13
adds [1] - 9:13
adjourned [1] - 53:15
adopted [1] - 32:2
adopting [2] - 36:2, 36:4
advantage [1] - 44:23
advisement [1] - 53:14
affidavit [3] - 18:21, 18:25, 19:4
affidavits [2] - 12:22, 32:24
affirm [1] - 25:1
affirming [1] - 27:23
ago [2] - 9:22, 22:21
agree [5] - 9:16, 38:4, 39:2, 39:23, 49:13
agreement [1] - 26:5
ahead [4] - 11:23, 17:8, 17:10, 29:23
allocated [1] - 3:6
allow [2] - 50:17, 50:23
almost [1] - 36:16
alone [1] - 50:22
Alum [13] - 3:6, 3:22, 4:8, 4:12, 4:14, 4:19, 4:25, 5:12, 17:16, 51:7, 51:24, 52:10, 52:23
ambiguity [3] - 28:18, 36:17, 36:23
ambiguous [14] - 17:13, 17:19, 17:20, 17:21, 17:25, 18:5, 18:7, 18:8, 18:9, 18:15, 18:20, 19:1, 19:12, 28:17
amend [1] - 28:5
amended [7] - 8:19, 13:11, 15:6, 15:7, 15:23, 16:18, 27:16
amendment [2] - 19:24, 50:1
amount [2] - 49:5
analysis [20] - 5:17, 7:14, 9:11, 9:12, 15:21, 16:1, 16:6, 17:2, 19:22, 26:20, 34:12, 36:3, 36:5, 38:15, 39:2, 39:23, 40:12, 44:10, 50:4, 52:10
analyzed [1] - 20:1
answer [4] - 15:1, 28:22, 38:11, 45:10
answers [2] - 39:18, 45:2
anyway [3] - 23:15, 38:6, 43:25
apart [2] - 33:3, 47:3
apologize [1] - 29:9
appeal [1] - 42:13

Appeals [8] - 5:18, 24:22,
37:3, 37:12, 37:19, 38:1,
39:8, 40:12
appear [1] - 44:2
appearances [1] - 3:17
appearing [1] - 52:21
appellants [2] - 3:19, 41:17
Appellate [1] - 42:10
appellate [1] - 43:18
Appellee [1] - 3:22
application [2] - 4:20, 51:3
applied [3] - 6:12, 30:16,
31:23
applies [6] - 7:6, 7:8, 33:12
34:4, 50:13, 52:6
apply [10] - 7:2, 13:8,
13:25, 32:22, 33:8, 36:24,
40:23, 42:4, 50:4, 52:4
appointed [1] - 48:10
appreciate [1] - 53:13
approach [2] - 20:7, 20:18
appropriate [1] - 20:7
April [1] - 3:1
Arabic [1] - 9:23
Arabic-numbered [1] - 9:23
argued [2] - 21:25, 33:11,
50:1
argument [21] - 17:12,
17:23, 20:20, 20:23, 21:2,
21:3, 21:8, 21:9, 21:12,
21:19, 22:23, 23:10, 24:3,
29:25, 33:7, 34:20, 41:7,
41:10, 42:9, 42:14, 42:19
arguments [7] - 17:16,
22:11, 22:22, 42:21, 43:16,
44:4, 53:14
aside [2] - 33:9, 52:4
aspect [1] - 28:20
aspects [1] - 19:9
assignee [1] - 49:5
assume [5] - 29:18, 33:18,
33:19, 46:2, 46:11
attach [6] - 22:4, 42:20,
44:14, 45:4, 49:1, 51:1
attached [4] - 8:12, 20:23,
22:7, 48:25
attributable [1] - 49:7
attributed [1] - 6:21
authority [19] - 22:21,
22:22, 23:3, 23:5, 23:7,
25:7, 25:12, 27:21, 28:13,
41:13, 41:16, 41:22, 41:24,
42:1, 42:8, 42:10, 47:14,
47:15, 50:10
avoid [2] - 35:23, 39:10
aware [1] - 27:21

**B**

B-5-301 [1] - 12:13
based [1] - 42:20

Basin [1] - 4:7
basis [2] - 16:6, 25:2
Bates [1] - 48:4
bears [2] - 41:25, 42:1
became [1] - 8:17
become [3] - 12:4, 37:17,
39:15
becomes [6] - 10:8, 12:5,
12:10, 37:9, 37:14, 38:23,
38:25, 39:13
becoming [3] - 30:2, 39:4,
39:9
begin [2] - 3:7, 3:16
behalf [1] - 3:22
belated [1] - 49:23
below [6] - 31:12, 42:3,
42:16, 44:11, 45:20
beneficiaries [1] - 25:16
beneficiary [1] - 25:14
benefit [1] - 11:15
best [2] - 3:13, 7:8
between [12] - 6:11, 6:12,
6:13, 7:19, 8:1, 8:3, 34:6,
40:7, 49:21, 50:25, 51:10,
52:20
beyond [3] - 18:6, 25:21,
26:4
bill [1] - 18:12
bit [5] - 17:24, 21:6, 37:2,
43:17, 44:4
blah [3] - 30:26
Bodell [1] - 29:14
bore [1] - 45:14
boundaries [1] - 10:17
boy [1] - 16:9
Bradley [1] - 3:18
brand [1] - 22:23
Brett [11] - 4:9, 4:23, 22:2,
25:12, 25:22, 47:19, 47:20,
47:21, 48:25, 49:19, 51:5
brief [14] - 11:7, 20:22
23:10, 24:25, 27:20, 28:3,
33:12, 35:17, 39:7, 41:14,
42:13, 42:23, 43:11, 48:6
briefing [10] - 20:21, 21:20,
22:16, 23:6, 23:18, 24:24,
43:11, 43:18, 50:11, 51:23
briefs [1] - 22:21
bring [1] - 14:4
brought [1] - 43:2
bullet [1] - 4:3
bullet-pointing [1] - 4:3
business [2] - 10:24, 32:8
businesses [1] - 46:25
but... [1] - 26:14
buy [1] - 45:15

**C**

c) [1] - 6:8
California [6] - 4:9, 4:12,

14:4, 22:15, 22:18, 29:1
candidly [2] - 10:2, 21:23
cannon [1] - 34:25
cannot [8] - 5:6, 5:14, 10:3,
22:6, 22:19, 51:11
capacities [1] - 25:6
carry [1] - 7:1
case [25] - 3:5, 3:15, 4:4,
4:6, 4:10, 4:18, 5:1, 5:16,
5:17, 6:9, 6:16, 7:18, 8:9,
9:1, 18:22, 18:25, 19:20,
19:21, 19:22, 20:1, 20:4,
22:1, 22:8, 22:14, 23:20,
23:23, 24:20, 24:22, 24:23,
25:2, 25:11, 26:2, 26:3,
27:19, 27:23, 28:4, 29:13,
29:22, 33:24, 35:12, 35:15,
41:17, 41:20, 42:2, 43:1,
44:12, 48:19, 48:20, 49:19,
50:4, 50:14, 50:25, 51:23,
51:25, 52:6, 52:7, 53:14
cases [5] - 28:10, 50:13
catch [2] - 42:8, 46:11
cease [1] - 46:12
ceasing [1] - 48:18
central [1] - 9:19
certain [1] - 8:20
certainly [2] - 16:6, 21:13
challenge [1] - 20:23
championed [1] - 52:10
change [1] - 50:8
changes [2] - 19:23, 34:1
chapter [33] - 12:11, 12:12,
12:14, 12:17, 12:20, 12:21,
13:4, 13:5, 13:10, 13:12,
13:15, 13:17, 13:20, 14:2,
14:12, 14:18, 14:20, 30:3,
31:8, 31:10, 31:11, 31:14,
31:16, 31:19, 32:2, 32:3,
32:7, 32:17, 32:19, 32:20,
35:3, 35:5, 35:11, 35:13,
35:24, 52:16, 52:18, 52:20
Chapter [1] - 40:25
Chief [1] - 3:3
chief [1] - 17:9
CHIEF [15] - 3:5, 3:20, 3:24,
17:7, 17:10, 18:20, 18:24,
19:8, 19:14, 20:8, 26:23,
27:9, 27:11, 46:15, 53:12
children's [1] - 25:15
choose [1] - 27:22
chose [1] - 43:11
circumstance [1] - 32:12
circumstances [1] - 44:9
citation [2] - 41:21, 49:24
citations [3] - 28:10, 41:16,
41:19
cite [2] - 28:3, 38:9
cited [5] - 11:7, 23:2, 27:19,
49:12, 51:23
claims [2] - 4:25, 49:3

clarified [1] - 20:22
clarifies [1] - 7:2
clarify [3] - 19:7, 20:19,
53:4
clarity [1] - 48:21
clear [6] - 15:16, 24:16,
36:22, 39:5, 41:17, 48:7
clearly [1] - 41:1
CLERK [1] - 3:3
client [2] - 29:4, 44:15
client's [1] - 48:16
clients [1] - 51:6
co [16] - 23:11, 25:13, 26:6,
26:16, 26:17, 27:4, 27:5,
43:24, 48:9, 48:11, 48:12,
48:14, 48:16, 48:17, 48:19
co-trust [1] - 48:19
co-trustee [4] - 23:11,
25:13, 43:24, 48:12
co-trustees [11] - 26:6,
26:16, 26:17, 27:4, 27:5,
48:9, 48:11, 48:14, 48:16,
48:17, 48:19
code [3] - 40:25, 42:5,
49:16
coming [1] - 8:22
comma [1] - 10:1
comment [1] - 18:13
commonplace [1] - 47:9
community [1] - 44:18
companies [9] - 11:5, 11:8,
11:15, 45:19, 45:22, 46:2,
46:6, 46:10, 46:18
company [4] - 45:12, 45:16,
45:17, 45:20
company's [1] - 45:21
Comparative [1] - 31:18
comparative [1] - 32:25
compared [2] - 19:7, 20:13
completely [5] - 16:7,
21:14, 29:13, 46:9, 52:11
complied [1] - 7:10
components [2] - 6:12,
8:23
comprehend [1] - 21:14
concern [1] - 35:23
concerned [2] - 21:6, 33:24
concerns [2] - 31:15, 44:23
conclude [6] - 17:25, 18:1,
43:22, 44:7, 53:6, 53:9
concluded [1] - 53:16
conclusion [2] - 15:4, 25:4
conflated [2] - 23:23
conflict [4] - 39:14, 39:20,
40:7, 49:21
conflicting [1] - 39:12
conflicts [1] - 39:10
confusion [1] - 20:21
conjunction [2] - 8:2, 8:7
conjunctively [1] - 52:12

connect [1] - 45:13
connected [1] - 21:9
connecting [1] - 9:24
consciousness [1] - 43:2
consent [1] - 26:24
consider [6] - 18:4, 28:17, 28:18, 30:12, 41:22
consideration [1] - 42:7
considered [1] - 42:24
consistent [1] - 9:11
consistently [1] - 40:6
construe [1] - 31:24
construed [1] - 5:19
contain [1] - 6:19
contained [1] - 42:21
contains [1] - 30:1
contemplating [1] - 30:8
context [2] - 21:22, 24:25
continue [1] - 3:9
contrary [1] - 17:16
contrasting [1] - 24:11
contribution [1] - 49:8
control [31] - 18:14, 23:12, 23:13, 23:25, 24:2, 24:11, 24:14, 25:3, 25:19, 25:20, 25:22, 25:23, 26:2, 26:7, 26:12, 26:16, 26:18, 26:19, 40:17, 41:14, 48:22, 50:16, 50:20, 50:21, 50:22, 50:23, 51:2, 51:5, 51:10
controlled [1] - 26:21
controlling [11] - 16:5, 15:9, 16:4, 16:17, 26:5, 27:14, 27:15, 27:20, 41:24, 42:1, 42:8
controls [1] - 34:17
conveyance [1] - 4:17
conveyed [4] - 4:6, 4:17, 25:24
copy [2] - 18:12, 47:5
correct [6] - 20:10, 20:25, 21:5, 48:24, 50:3, 51:19
correspond [1] - 38:8
counsel [7] - 17:7, 27:2, 27:8, 48:23, 49:16, 49:25, 50:1
counseling [1] - 13:18
counsels' [1] - 3:17
counter [1] - 19:9
counties [2] - 17:5, 17:6
county [19] - 5:10, 5:20, 5:21, 5:24, 8:18, 9:3, 10:6, 10:9, 10:11, 10:18, 10:19, 10:21, 11:8, 11:17, 16:24, 30:10, 46:4, 46:22, 50:7
County [19] - 4:5, 4:13, 4:15, 4:18, 4:21, 4:22, 5:5, 5:11, 5:13, 11:11, 12:1, 30:5, 46:23, 52:24, 53:1
couple [2] - 3:7, 40:14
course [2] - 28:13, 50:21

court [40] - 5:9, 5:16, 5:22, 5:23, 5:9, 6:10, 9:14, 10:7, 10:11, 10:13, 10:20, 11:2, 11:9, 11:11, 16:23, 17:15, 19:25, 20:18, 21:10, 21:13, 21:15, 23:20, 23:23, 24:24, 25:20, 26:1, 34:7, 37:8, 37:9, 42:16, 43:3, 43:4, 43:6, 43:17, 45:1, 46:22, 47:18, 50:6, 52:9, 53:8
Court [51] - 4:2, 4:13, 4:21, 5:12, 5:18, 7:1, 7:14, 8:17, 9:9, 9:11, 13:7, 16:9, 16:11, 17:18, 18:5, 18:7, 20:5, 22:20, 22:23, 22:25, 24:21, 24:25, 26:21, 27:12, 30:12, 31:3, 31:23, 32:13, 35:23, 36:8, 37:2, 37:12, 37:18, 38:1, 39:6, 39:11, 40:11, 40:12, 41:10, 41:20, 41:22, 42:4, 43:12, 45:7, 48:24, 52:22, 52:24, 53:1, 53:4, 53:7, 53:15
court's [1] - 25:4
Court's [2] - 18:6, 20:11, 42:6
courts [2] - 10:15, 27:24
covers [1] - 3:16
create [7] - 5:7, 5:25, 7:16, 8:5, 10:21, 30:8, 39:12
created [3] - 22:15, 30:21, 53:2
creates [1] - 39:14
creation [1] - 4:4
credit [1] - 46:21
creditor [2] - 41:5, 49:5
creditors [1] - 5:8, 41:2, 49:4
criticism [1] - 19:15
criticisms [1] - 19:16
cumulative [9] - 9:13, 9:14, 15:11, 15:12, 15:24, 16:13, 20:6, 20:17, 37:22
curiosity [1] - 47:23
curious [2] - 22:17
cut [2] - 3:11, 48:5

D

d) [1] - 6:7
date [2] - 8:12, 8:23
dates [1] - 51:15
days [1] - 22:21
deal [1] - 25:12
dealing [4] - 34:5, 39:21, 40:22, 45:22, 46:25
death [4] - 19:16, 20:9, 44:10
death [7] - 48:14, 48:15
debtor [12] - 20:24, 22:2, 22:5, 22:6, 24:1, 24:9,

24:11, 25:12, 41:14, 42:15, 45:13, 51:2
debtor's [2] - 23:22, 44:12
decide [3] - 22:14, 36:24, 51:14
decided [3] - 15:9, 30:24, 43:8
decision [2] - 24:5, 29:14
decisions [1] - 50:18
decree [1] - 52:7
deed [22] - 47:16, 48:16
defendant [1] - 24:13
defenses [4] - 33:5, 33:21, 52:3, 52:8
defer [2] - 27:8, 28:16
defined [1] - 26:19
defines [2] - 24:7, 24:8
Del [10] - 4:5, 4:7, 4:9, 4:23, 24:17, 25:12, 43:22, 44:17, 45:3, 48:25
derive [4] - 38:7, 38:16, 38:17, 38:20
designation [1] - 6:12
designations [1] - 6:4
determine [1] - 40:23
developer [2] - 4:7, 4:17
Development [1] - 4:7
difference [1] - 26:18, 52:20
different [14] - 8:14, 8:22, 8:23, 10:15, 11:16, 16:7, 19:21, 19:22, 23:6, 32:9, 35:1, 38:3, 39:14, 39:21
differently [6] - 33:20, 37:2, 37:5
directly [3] - 4:7, 34:11, 41:25
disagree [2] - 16:16, 25:4
discussed [2] - 25:15, 29:24
discussing [1] - 9:22
discussion [2] - 45:11, 51:21
disjunctive [8] - 5:23, 15:10, 16:14, 38:10, 37:3, 38:15, 39:1
dispenses [1] - 51:23
dispositive [2] - 26:3, 40:25
dispute [1] - 5:10
disregard [1] - 42:1
disregarded [1] - 17:17
distinction [2] - 50:24, 51:9
distinguished [1] - 20:8
distinguishes [1] - 19:15
distribute [1] - 44:19
district [23] - 5:16, 5:22, 6:9, 17:15, 19:25, 20:18, 21:10, 21:13, 21:15, 23:20, 23:23, 25:4, 25:19, 26:1, 37:8, 42:16, 43:3, 43:4, 43:7, 43:17, 45:1, 52:9,

53:8
District [5] - 4:13, 4:20, 5:12, 52:24, 53:1
doctrine [1] - 32:21
document [5] - 25:21, 27:3, 27:6, 43:25, 48:17
domestic [2] - 12:9, 52:5, 52:13
domesticated [1] - 29:2
done [2] - 7:18, 28:10
down [2] - 44:11, 45:20
drafting [3] - 30:7, 30:9, 42:23
drafts [1] - 31:2
draw [3] - 15:4, 16:17, 35:3
drove [1] - 6:25
during [3] - 21:11, 22:5, 48:11
Durrant [2] - 3:4, 48:3
DURRANT [13] - 3:5, 3:20, 3:24, 17:7, 17:10, 18:20, 18:24, 19:8, 19:14, 20:8, 26:23, 27:9, 27:11, 46:15, 53:12

E

early [1] - 5:18
easy [1] - 8:21
effect [6] - 10:12, 11:20, 17:8, 22:12, 33:4, 34:25, 52:2, 52:7
effectuate [1] - 31:24
either [10] - 5:23, 5:24, 16:24, 30:16, 35:18, 35:19, 36:12, 42:17, 48:12, 50:11
embedded [1] - 24:9
emphasis [1] - 6:16
emphasizes [1] - 34:23
enacted [2] - 8:13, 8:24
end [2] - 3:12, 9:25
ended [1] - 27:7
ends [1] - 9:25
enforcement [6] - 29:19, 33:5, 33:21, 34:16, 52:3, 52:8
engage [1] - 42:13
engaged [1] - 42:16
engaging [2] - 34:3, 40:12
enlisted [1] - 36:5
enrolled [1] - 16:12
ensue [1] - 18:4
entered [7] - 4:23, 8:16, 10:9, 10:11, 10:13, 37:8
entering [1] - 11:1
entire [3] - 13:20, 16:6, 19:5
entities [3] - 46:25, 47:1
equal [1] - 24:2
equitable [1] - 25:17
erred [2] - 5:16, 23:20
erroneous [2] - 6:10, 42:6

erroneously (2) - 6:9, 6:12
especially (1) - 20:22
estate (1) - 45:25
et (6) - 12:13, 12:14, 14:2,
14:7, 14:21, 14:22
evidence (7) - 7:9, 10:4,
10:5, 12:21, 12:22, 25:22,
32:24
evolved (2) - 43:16, 44:4
exactly (3) - 5:18, 25:20,
44:5
example (3) - 8:4, 9:24,
24:12
exceed (1) - 49:6
excellent (1) - 53:13
except (2) - 12:25, 14:16
exclusive (6) - 26:7, 36:12,
36:19, 36:21, 43:23, 44:6
excuse (2) - 20:15, 48:19
executing (1) - 13:6
execution (13) - 4:20, 5:2,
21:8, 21:18, 23:24, 23:25,
24:10, 30:2, 44:14, 44:20,
45:4, 50:24, 53:8
exercised (1) - 25:23
exercising (1) - 26:12
existence (1) - 17:4
existences (1) - 47:2
expect (2) - 7:25, 8:6
experience (2) - 45:18,
46:18
explained (3) - 8:11, 8:14,
8:21
explicitly (1) - 30:18
explored (1) - 19:10
expound (1) - 38:22
expounded (1) - 39:6
expressly (6) - 15:15, 16:5,
16:10, 49:1, 52:14
extent (1) - 25:7
extra (1) - 3:11

## F

face (3) - 13:8, 25:11, 25:21
fact (19) - 6:17, 6:18, 6:24,
8:13, 9:16, 14:16, 15:4,
16:18, 25:17, 26:8, 27:16,
30:12, 35:4, 38:20, 43:4,
43:7, 50:15, 50:19, 51:18
facts (2) - 4:4, 26:4
factual (4) - 25:25, 26:13,
44:24, 45:5
factually (2) - 19:21, 19:22
fail (1) - 5:1
failed (2) - 5:13, 29:12
failing (1) - 52:9
fails (1) - 5:2
fair (1) - 14:23
fall (1) - 34:16
familiar (2) - 21:24, 29:13

Family (3) - 4:5, 4:6, 48:25
family (2) - 4:11, 4:15
favor (1) - 53:10
fell (1) - 42:22
felt (1) - 38:24
few (1) - 36:5
figure (2) - 30:25, 38:5
file (7) - 5:8, 5:23, 10:6,
16:23, 28:12, 29:4, 39:16
filed (12) - 4:12, 4:19, 5:12,
10:11, 11:11, 11:16, 18:21,
18:25, 34:24, 37:11, 52:1,
52:25
filing (2) - 22:21, 50:6,
52:23
financing (1) - 26:10
findable (1) - 11:12
findings (3) - 25:25, 44:24,
45:6
fingertips (3) - 28:4, 28:7,
28:11
first (11) - 5:4, 18:1, 24:3,
30:17, 37:4, 37:6, 37:12,
38:17, 42:7, 44:21, 48:2
fit (1) - 44:9
fits (1) - 44:5
five (1) - 24:21
focus (1) - 34:19, 32:16,
39:3
focused (3) - 38:3, 38:15,
39:1, 43:5, 43:6
follow (6) - 14:14, 16:2,
16:10, 28:15, 29:20, 33:15
follow-up (1) - 33:15
followed (3) - 5:17, 5:22,
6:9
footnote (14) - 8:25, 9:6,
9:7, 15:13, 15:15, 15:17,
15:19, 16:6, 21:9, 21:18,
24:23, 42:21, 43:1, 50:5
force (1) - 10:12
foreclose (1) - 4:21
Foreign (19) - 11:25, 12:3,
12:8, 12:12, 12:15, 28:25,
29:18, 30:13, 30:20, 31:7,
31:11, 31:21, 31:24, 32:3,
35:8, 35:25, 40:6, 51:22,
53:5
foreign (12) - 12:5, 30:2,
30:8, 30:16, 32:25, 33:4,
34:7, 34:24, 52:1, 52:5,
52:13
foremost (1) - 42:7
forget (2) - 5:18, 7:24
forth (5) - 5:17, 7:13, 18:13
franchising (1) - 24:21
free (1) - 32:6
front (2) - 50:17, 51:17
full (2) - 10:12, 42:24
fully (1) - 19:20
function (2) - 3:14, 11:2

functionally (1) - 11:20

## G

gander (1) - 50:12
Gardner (1) - 36:16
garnishment (2) - 24:12,
24:13
general (4) - 31:24, 33:15,
34:5, 34:13
generally (1) - 9:23
given (3) - 17:2, 44:2, 52:22
goose (1) - 50:12
govern (2) - 34:12, 50:14
governing (2) - 40:19,
40:20
governs (1) - 40:16
granted (1) - 30:3
ground (1) - 20:9
guess (6) - 16:2, 23:12,
24:18, 26:15, 38:5, 39:22
guessing (1) - 46:14

## H

Hagen (2) - 27:14, 49:25
HAGEN (57) - 6:15, 7:25,
9:5, 9:8, 9:15, 9:21, 11:22,
11:24, 15:3, 15:13, 15:18,
15:25, 16:15, 20:19, 21:2,
21:6, 22:9, 28:2, 28:8,
28:12, 29:8, 29:11, 29:17,
29:23, 33:3, 33:17, 33:25,
34:15, 34:19, 34:21, 42:12,
46:9, 46:13, 47:4, 47:9,
47:14, 47:22
half (1) - 49:9
hands (2) - 17:19, 18:1
harmonious (1) - 32:14
harmonized (1) - 7:10
harmony (4) - 30:14, 32:18,
35:20, 35:25
Hatch (2) - 18:21, 18:24
head (1) - 10:2
hear (2) - 18:23, 22:13
heavily (1) - 36:8
held (5) - 4:16, 45:24, 46:2
help (2) - 36:25, 38:16
helpful (3) - 36:23, 38:4,
39:19
helps (2) - 18:11, 39:25
highly (1) - 50:25
himself (2) - 25:14, 26:11
historical (1) - 7:13
history (9) - 16:12, 17:14,
18:4, 18:11, 19:9, 19:11,
20:5, 20:6, 28:20
hitting (1) - 43:9
hmm (1) - 39:24
hold (1) - 32:15
holding (2) - 19:17, 50:9

hole (1) - 48:5
home (1) - 8:25
honestly (5) - 18:15, 20:11,
27:1, 33:24, 38:2
Honor (4) - 3:18, 33:16,
41:9, 41:11
Honorable (1) - 3:3
Hooker (5) - 3:22, 3:24,
27:11, 46:15, 53:13
HOOKER (39) - 3:22, 27:12,
28:7, 28:9, 28:19, 28:24,
29:10, 29:21, 29:24, 31:9,
31:15, 32:11, 33:11, 33:23,
34:1, 34:16, 34:20, 35:6,
36:4, 36:14, 37:1, 38:10,
38:12, 38:19, 39:24, 40:2,
41:9, 42:18, 43:19, 44:9,
44:25, 45:18, 46:14
hypothetical (1) - 30:21

## I

idea (1) - 20:17
ignored (1) - 42:4
ignores (1) - 52:11
imagine (2) - 33:1, 46:8
implication (1) - 50:2
impliedly (1) - 16:9
important (7) - 23:19, 26:7,
30:11, 31:20, 35:12, 39:9,
51:10
imposed (1) - 8:20
inaudible (1) - 19:13
incentive (1) - 46:10
inclined (1) - 43:12
include (1) - 13:22
includes (2) - 6:23, 12:21
inclusive (2) - 36:12, 36:21
incorporate (4) - 31:6,
32:24, 35:14, 40:9
incorporated (1) - 31:1
incorrect (1) - 17:3
independent (1) - 33:22
indicated (1) - 31:21
indication (1) - 27:17
indicative (1) - 38:21
individual (2) - 46:5, 47:3
individually (2) - 4:9, 5:25
individuals (1) - 46:1
industry (1) - 11:21
infer (1) - 6:10
inference (2) - 16:18, 48:20
inform (1) - 39:25
information (7) - 9:2, 11:7,
19:19, 20:3, 37:10, 37:24,
46:6
instance (1) - 30:17
instead (3) - 14:10, 31:14,
37:23
instrument (1) - 25:8
intend (1) - 13:16

intended (4) - 7:16, 32:7, 36:20, 37:21
intent (4) - 17:19, 19:4, 28:21, 34:13
intentionally (1) - 52:19
interest (6) - 25:17, 43:22, 44:7, 44:13, 47:21, 49:7, 49:9, 51:8
interested (1) - 45:11
interesting (1) - 43:21
interpret (10) - 10:24, 13:21, 19:23, 27:18, 27:25, 35:25, 36:22, 39:15, 40:5, 40:23
interpretation (5) - 11:25, 27:23, 28:6, 29:3, 51:24
interpreted (2) - 31:12, 33:20, 35:20
interpreting (3) - 27:21, 30:12, 30:15
interprets (1) - 32:14
introduce (1) - 36:16
invalid (1) - 53:10
investigate (1) - 45:17
involved (1) - 40:20
irreconcilable (1) - 49:20
irrelevant (2) - 17:17, 19:11
irreparable (1) - 49:20
isolation (1) - 32:17
issue (32) - 4:18, 5:1, 9:8, 9:10, 19:20, 19:21, 20:4, 21:12, 21:14, 21:15, 23:6, 23:15, 27:7, 40:25, 41:12, 41:13, 41:16, 41:25, 43:2, 43:3, 43:4, 43:11, 43:13, 44:19, 44:24, 45:1, 45:7, 45:19, 46:12, 46:22, 49:15
issued (3) - 10:10, 51:3, 51:6
issues (6) - 12:22, 40:24, 41:19, 41:23, 43:10, 43:15
items (2) - 10:4, 29:19
itself (2) - 12:15, 26:20

## J

Jessup (3) - 24:20, 24:23, 25:5
joint (1) - 48:11
jointly (1) - 43:23
judge (1) - 19:14
judge's (1) - 19:16
judgment (95) - 4:9, 4:13, 4:14, 4:22, 4:25, 5:5, 5:7, 5:8, 5:9, 5:14, 5:25, 6:1, 6:5, 7:17, 8:5, 8:16, 9:2, 10:8, 10:9, 10:10, 10:11, 10:13, 10:16, 10:22, 11:1, 11:2, 11:6, 11:10, 11:17, 12:4, 12:5, 12:6, 12:9, 12:13, 13:6, 13:10, 14:4,

14:6, 14:16, 14:19, 15:11, 15:21, 19:19, 20:3, 20:24, 22:2, 22:4, 22:5, 22:6, 23:21, 23:22, 24:1, 24:2, 25:1, 25:12, 29:1, 29:4, 30:2, 33:4, 34:24, 37:8, 37:10, 37:24, 41:4, 41:14, 42:15, 42:20, 44:12, 45:13, 48:24, 49:10, 50:25, 51:1, 51:7, 51:9, 52:1, 52:5, 52:9, 52:13, 52:14, 52:23, 53:3, 53:5, 53:6, 53:8
Judgment (36) - 11:25, 12:3, 12:8, 12:13, 12:15, 14:1, 15:6, 16:19, 27:17, 28:1, 28:25, 29:18, 30:1, 30:11, 30:13, 30:14, 30:19, 30:20, 31:7, 31:11, 31:21, 31:24, 32:3, 33:8, 35:8, 35:14, 35:18, 35:20, 35:25, 36:1, 40:5, 40:6, 40:6, 51:22, 53:5
judgment's (1) - 30:4
judgments (11) - 11:5, 11:16, 17:5, 30:6, 30:16, 31:17, 33:1, 34:7, 46:5
Judgments (6) - 5:9, 9:3, 10:20, 29:5, 30:15, 37:16, 37:21, 53:1
July (2) - 7:12, 37:8
jump (1) - 3:25
June (1) - 4:19
jurisdiction (2) - 10:16, 21:10
jurisdictional (1) - 21:22
Justice (1) - 3:3
justice (6) - 10:3, 27:14, 37:9, 40:15, 48:2, 49:25
JUSTICE (97) - 3:5, 3:20, 3:24, 6:15, 7:4, 7:25, 9:5, 9:8, 9:15, 9:21, 10:23, 11:13, 11:22, 11:23, 11:24, 12:19, 13:1, 13:4, 13:13, 14:9, 14:23, 15:2, 15:3, 15:13, 15:18, 15:25, 16:15, 17:7, 17:8, 17:10, 17:11, 17:23, 18:17, 18:19, 18:20, 18:24, 19:6, 19:14, 20:8, 20:19, 21:2, 21:6, 22:9, 22:10, 23:4, 24:5, 26:4, 26:15, 26:23, 27:9, 27:11, 28:2, 28:6, 28:12, 28:15, 28:23, 29:8, 29:11, 29:16, 29:17, 29:23, 31:5, 31:12, 32:5, 33:3, 33:17, 33:25, 34:15, 34:19, 34:21, 34:22, 36:2, 36:7, 36:15, 38:5, 38:11, 38:13, 39:19, 39:25, 41:7, 42:12, 43:15, 43:20, 44:22, 45:9, 46:13, 46:15, 47:4, 47:9, 47:14, 47:22,

49:11, 50:15, 51:13, 51:17, 51:20, 53:12
justices (1) - 4:1

## K

KC (1) - 3:22
key (1) - 4:4
kind (10) - 10:23, 12:23, 23:16, 34:3, 34:12, 35:17, 36:17, 42:22, 43:21, 46:6
Kitchens (32) - 5:17, 5:22, 6:2, 6:10, 15:4, 15:8, 15:14, 15:16, 16:3, 16:6, 16:8, 16:10, 16:16, 16:19, 17:15, 18:22, 18:25, 27:14, 27:15, 28:1, 36:2, 36:4, 36:6, 36:7, 36:17, 37:2, 37:3, 38:2, 38:8, 49:25, 50:3
knows (1) - 35:4
Kristy (1) - 25:5

## L

laid (1) - 16:11
Lake (3) - 4:13, 4:21, 52:24
language (14) - 9:20, 25:8, 28:21, 32:13, 34:4, 37:13, 38:23, 39:13, 40:3, 40:11, 48:7, 51:11, 51:12, 51:25
large (1) - 15:22
last (4) - 7:19, 16:4, 16:17, 45:14
launches (1) - 6:9
law (25) - 15:5, 15:9, 16:4, 16:17, 22:13, 22:15, 22:18, 27:15, 27:19, 28:4, 40:16, 40:19, 40:20, 40:22, 41:17, 42:6, 42:7
laws (1) - 31:25
lead (1) - 42:5
leads (1) - 35:20
least (8) - 23:10, 23:12, 23:15, 24:6, 26:8, 28:16, 38:8, 39:5
left (1) - 40:14
legal (1) - 41:18
legislative (8) - 11:14, 17:14, 18:4, 18:10, 19:9, 19:11, 28:20, 28:21, 50:7
legislator (2) - 33:1, 39:11
legislator's (2) - 18:13, 19:4
legislators (1) - 35:10
legislature (40) - 7:9, 7:11, 7:16, 8:14, 8:19, 9:12, 10:14, 11:15, 12:20, 13:6, 13:9, 13:16, 14:3, 14:17, 14:19, 15:6, 16:18, 16:20, 16:25, 19:5, 27:16, 27:21,

28:1, 28:5, 30:7, 30:14, 30:22, 31:2, 31:10, 32:2, 32:7, 32:23, 34:23, 35:1, 35:13, 37:20, 39:12, 50:2, 50:8, 52:17, 52:19
legislature's (1) - 35:11
less (1) - 14:5
letter (2) - 6:4, 6:11, 41:8
letter-numbered (1) - 6:11
level (1) - 43:2
lien (31) - 5:1, 5:5, 5:7, 5:14, 5:25, 6:5, 7:17, 8:5, 8:17, 10:8, 10:22, 12:4, 12:8, 12:9, 12:10, 12:14, 13:10, 14:6, 14:16, 14:20, 15:11, 15:21, 20:23, 22:4, 23:21, 24:2, 30:2, 37:9, 37:14, 37:17, 38:23, 38:25, 39:4, 39:9, 39:13, 39:16, 42:20, 44:13, 45:4, 46:8, 50:22, 50:23, 51:7, 51:9, 53:3, 53:6, 53:8
Lien (2) - 14:1, 51:22
liens (10) - 11:6, 12:9, 30:8, 30:18, 30:22, 31:17, 34:9, 34:10, 34:15, 47:10
life (1) - 22:5
lifetimes (1) - 48:11
light (2) - 10:24, 50:9
likely (1) - 32:1
limit (1) - 43:9
limited (4) - 15:17
list (4) - 6:6, 6:7, 29:19, 33:22
listed (1) - 6:6
lists (1) - 37:10
LLC (1) - 3:23
located (5) - 5:10, 5:11, 5:21, 40:21, 40:22
look (24) - 11:13, 17:18, 20:12, 21:7, 22:13, 25:19, 29:25, 35:17, 35:24, 37:4, 37:5, 37:6, 37:19, 38:23, 40:5, 40:18, 41:11, 46:19, 48:21, 46:22, 46:23
looked (3) - 24:25, 37:13, 43:6
looking (7) - 22:18, 23:8, 33:14, 37:18, 44:6, 45:1, 47:16
looks (1) - 35:7

## M

main (1) - 39:3
map (3) - 7:14, 16:10, 16:11
March (1) - 4:8
matter (1) - 34:12
matters (1) - 23:14
Matthew (1) - 3:3
mean (37) - 3:12, 7:5, 7:6,

12:20, 12:22, 13:25, 14:14,
16:21, 17:18, 17:22, 21:13,
23:15, 25:18, 26:5, 26:8,
26:12, 31:13, 32:7, 33:21,
35:2, 36:11, 36:15, 39:19,
43:16, 44:1, 44:13, 45:15
meaning [12] - 31:5, 32:3,
33:1, 35:3, 35:14, 36:12,
38:6, 38:17, 38:20, 39:22
meaningful [1] - 34:25
means [5] - 29:19, 35:24
meant [7] - 12:20, 13:1,
14:21, 31:10, 32:3, 32:8,
32:23
meet [2] - 52:15, 52:25
mention [4] - 14:10, 32:21,
40:9
mentioned [4] - 21:21,
30:18, 31:18, 49:12
mentioning [1] - 30:25
mere [4] - 25:17
met [3] - 6:24, 10:21, 53:6
middle [1] - 52:11
might [4] - 23:16, 26:13,
44:22, 50:20
mind [1] - 28:9
minute [1] - 36:6
minutes [2] - 3:8, 40:14
miscellaneous [1] - 31:16
miss [1] - 46:7
modifier [3] - 33:12, 51:24,
52:10
moment [4] - 5:3, 9:22,
33:18, 33:19
money [3] - 26:11, 44:15,
44:16
month [1] - 51:6
morning [2] - 3:20, 4:1
most [2] - 48:7, 49:9
mow [1] - 19:15
MR [84] - 3:18, 3:22, 4:1,
6:21, 7:13, 8:4, 9:7, 9:10,
9:18, 10:2, 11:4, 11:18,
12:3, 12:25, 13:3, 13:7,
13:24, 14:16, 15:1, 15:8,
15:15, 15:19, 16:5, 16:20,
17:21, 18:5, 18:18, 18:23,
19:3, 19:10, 19:18, 20:11,
21:1, 21:5, 21:20, 22:19,
23:19, 24:20, 26:10, 26:17,
27:1, 27:10, 27:12, 28:7,
28:9, 28:19, 28:24, 29:10,
29:21, 29:24, 31:9, 31:15,
32:11, 33:11, 33:23, 34:1,
34:18, 34:20, 35:6, 35:4,
36:14, 37:1, 38:10, 38:12,
38:19, 39:24, 40:2, 41:9,
42:18, 43:19, 44:9, 44:25,
45:18, 46:14, 46:17, 47:8,
47:11, 47:15, 47:25, 49:14,
50:19, 51:16, 51:19, 51:21

Mulligan [1] - 3:5
Mulligans [6] - 3:19, 4:11,
4:18, 30:19, 45:12, 53:11
Mulligans' [2] - 4:22, 41:10
must [4] - 5:8, 17:17, 36:19,
53:6

## N

name [1] - 45:14
names [1] - 47:10
necessarily [1] - 3:15
necessary [1] - 45:6
need [14] - 6:6, 6:24, 7:2,
8:16, 10:16, 18:9, 24:15,
26:4, 40:8, 41:18, 47:11,
50:20, 51:14
needed [6] - 38:22, 38:24,
39:5, 50:11, 50:15
needs [4] - 32:14, 35:19,
37:11, 45:7
Negligence [1] - 31:18
negligence [1] - 32:25
never [6] - 4:23, 5:12,
11:10, 20:23, 22:2, 22:6,
27:6, 41:24, 53:2
new [6] - 7:12, 22:23, 38:7,
41:7, 41:11, 41:22
newer [1] - 50:13
none [1] - 47:22
normally [1] - 8:2
notably [2] - 9:1, 50:5
note [1] - 37:20
noted [1] - 42:18
notes [1] - 3:7
noteworthy [1] - 48:17
nothing [2] - 13:5, 19:25,
31:17
notice [3] - 22:14, 29:12,
44:2
notices [1] - 42:10
nuance [2] - 23:14, 23:19
number [6] - 6:3, 19:15,
34:23
numbered [5] - 6:11, 6:12,
7:19, 8:1, 8:3, 9:23, 9:24,
37:5
numerous [1] - 13:11

## O

obligations [3] - 47:2,
47:17, 49:18
obtained [2] - 4:8, 4:17
obviously [1] - 12:23
October [2] - 4:12, 4:14
odd [1] - 13:16
odder [1] - 14:3
office [7] - 4:15, 5:21, 9:4,
12:1, 30:4, 30:5, 46:24
one [29] - 3:13, 7:4, 10:18,

13:19, 14:12, 14:13, 14:24,
16:24, 18:13, 19:3, 19:4,
22:10, 23:4, 27:6, 33:17,
33:23, 34:11, 37:6, 39:22,
43:15, 43:20, 48:14, 48:15,
49:4, 49:9, 49:11, 50:3,
50:14, 52:21
one-half [1] - 49:9
open [1] - 27:7
open-ended [1] - 27:7
opening [1] - 29:25
operate [1] - 37:22
opinion [3] - 38:5, 39:4,
40:10
opposed [1] - 23:13
opposing [1] - 27:5
opposition [1] - 39:7
oral [3] - 21:12, 42:9, 53:13
order [9] - 5:6, 5:7, 10:20,
12:4, 14:6, 15:20, 47:12,
48:21, 53:6
original [1] - 21:16
ors [2] - 6:10, 36:11
Osborne [4] - 51:22, 51:25,
52:5, 52:6
otherwise [4] - 10:17,
21:23, 26:8, 50:8
ought [4] - 16:9, 16:11,
24:22, 53:4
outcome [2] - 34:2, 38:2
override [1] - 51:11
overrule [3] - 16:3, 16:6,
16:10
overruled [2] - 15:14, 16:9
own [16] - 10:16, 22:12,
23:9, 24:17, 25:16, 25:18,
35:19, 38:4, 45:23, 46:5,
46:20, 47:1, 47:2, 47:23,
owned [11] - 4:23, 20:24,
22:2, 22:5, 22:6, 23:22,
24:10, 42:14, 43:23, 51:5,
51:14
ownership [14] - 23:13,
24:15, 42:21, 43:15, 43:22,
44:7, 44:12, 44:24, 45:3,
50:16, 50:19, 51:10, 51:12
owns [1] - 24:13

## P

P.3d [1] - 24:21
page [3] - 23:9, 40:18, 43:9
paragraph [2] - 41:21, 48:4
parenthetically [1] - 50:24
part [21] - 13:2, 13:13,
13:14, 13:16, 14:2, 14:18,
14:20, 14:24, 25:10, 32:20,
34:24, 35:4, 35:8, 35:11,
35:24, 44:3, 52:1, 52:16,
52:20
particular [6] - 9:1, 13:19,

14:12, 21:8, 31:13, 49:6
particularly [2] - 40:5,
45:23
parties [2] - 42:2, 43:5
parts [2] - 14:13, 15:7
party [2] - 41:24, 50:11
patently [1] - 17:17
Patterson [2] - 41:20
PEARCE [10] - 7:4, 10:23,
11:13, 32:5, 34:22, 44:22,
50:15, 51:13, 51:17, 51:20
Pearce's [1] - 10:3
peer [1] - 13:18
people [6] - 22:15, 30:25,
45:22, 45:24, 47:12
percent [1] - 44:18
perfect [1] - 6:5
perhaps [1] - 17:24
period [1] - 9:25
person [2] - 46:20, 47:4
person's [3] - 46:21, 46:22,
46:23
personal [2] - 26:12, 49:18
personally [3] - 4:10, 4:23,
40:3
phonetic [2] - 36:16, 51:23
piece [1] - 10:5
place [2] - 11:9, 44:21
placed [1] - 11:16
places [2] - 11:16, 39:21
plain [3] - 18:14, 28:21,
32:13
planning [1] - 45:25
play [2] - 11:3, 26:9
plural [1] - 12:16
Pohlman [1] - 40:15
POHLMAN [56] - 11:23,
12:19, 13:1, 13:4, 13:13,
14:9, 14:23, 15:2, 17:8,
17:11, 17:23, 18:17, 18:19,
22:10, 23:4, 24:5, 26:4,
26:15, 28:15, 28:23, 29:16,
31:5, 31:12, 36:2, 36:7,
36:15, 38:5, 38:11, 38:13,
39:18, 39:25, 41:7, 43:15,
43:20, 49:11
point [10] - 8:25, 9:19, 9:21,
18:3, 18:6, 19:8, 19:14,
19:17, 21:24, 26:7, 34:11,
38:9, 40:15, 40:24, 41:20,
45:6, 48:23
pointing [1] - 4:3
points [1] - 49:16
portion [2] - 49:1, 49:7
position [6] - 23:17, 24:17,
27:15, 33:22, 33:23, 34:14
positive [3] - 33:12, 51:24,
52:10
possession [5] - 23:25,
24:2, 24:14, 51:2, 51:4
possible [1] - 48:12

post [3] - 33:12, 51:24, 52:10
post-positive [3] - 33:12, 51:24, 52:10
potential [3] - 11:6, 46:20, 50:23
potentially [4] - 17:13, 39:20, 42:5, 49:10
power [1] - 18:7
powers [1] - 48:9
practical [1] - 45:9
practically [1] - 47:24
pre-2002 [1] - 20:9
precise [1] - 25:8
preferable [1] - 16:1
prepared [1] - 26:22
preservation [4] - 41:12, 42:25, 43:10, 44:23
preserve [5] - 21:12, 21:19, 41:16, 41:19
preserved [3] - 41:23, 41:25, 43:13
presiding [1] - 3:4
presume [7] - 14:19, 17:1, 19:5, 31:3, 35:2, 39:11, 52:18
presumed [1] - 50:2
pretty [3] - 36:8, 41:1, 41:17
prevented [1] - 41:24
priorities [1] - 17:1
probate [1] - 49:16
problem [2] - 25:10, 29:10
procedure [1] - 12:21
Procedure [1] - 42:11
procedures [4] - 33:5, 33:21, 52:2, 52:8
proceedings [3] - 33:6, 52:3, 53:16
proceeds [1] - 44:20
proper [1] - 18:11
properly [2] - 41:23, 41:25
properties [3] - 45:23, 45:24
Properties [1] - 19:15
property [70] - 4:6, 4:16, 4:18, 4:22, 4:24, 5:1, 5:5, 5:8, 5:10, 5:11, 5:15, 5:21, 8:17, 10:8, 10:17, 11:6, 12:5, 20:24, 22:3, 22:4, 22:6, 22:12, 23:12, 23:16, 23:22, 23:25, 24:8, 24:10, 24:13, 24:17, 25:7, 25:13, 25:16, 25:17, 25:23, 26:22, 37:9, 40:20, 40:21, 40:22, 41:2, 41:15, 42:14, 43:23, 44:13, 44:15, 44:18, 44:21, 45:16, 46:1, 46:3, 46:8, 46:21, 47:5, 47:21, 48:22, 48:25, 49:2, 49:9, 49:17, 49:22, 51:1, 51:4, 51:8,

51:14, 53:7, 53:10
propose [1] - 24:20
proposed [1] - 45:12
provided [2] - 12:6, 30:5
provision [2] - 31:14, 36:20
provisions [3] - 31:1, 31:16, 34:10
public [1] - 13:18
pull [3] - 13:19, 14:12, 14:24
punch [1] - 48:5
purchaser [1] - 45:12
purely [1] - 45:9
purpose [7] - 10:25, 11:14, 11:19, 11:20, 31:25, 34:13
pursuant [1] - 29:2
put [4] - 6:16, 7:19, 7:21, 9:16
putting [2] - 7:22, 32:8

**Q**

questions [4] - 3:8, 3:11, 3:14, 50:16
quick [1] - 49:11
quickly [1] - 28:15
quiet [1] - 53:10
quote [3] - 9:11, 38:11, 38:20
quoted [1] - 39:6

**R**

radar [1] - 42:22
raise [1] - 42:3
raised [7] - 21:8, 22:20, 23:18, 41:13, 41:16, 48:1, 48:23
raising [3] - 41:24, 43:1
rather [1] - 7:11
reach [5] - 36:1, 40:11, 43:13, 49:6, 49:21
reached [1] - 49:10
reaches [1] - 35:16
read [9] - 6:2, 20:5, 20:6, 26:23, 31:9, 32:18, 36:15, 37:2, 38:1
reading [4] - 7:4, 18:14, 32:16, 38:6
reads [2] - 6:1, 17:3
real [10] - 5:1, 5:5, 5:8, 8:17, 10:8, 12:5, 22:4, 37:9, 40:20, 53:7
realize [4] - 26:3, 33:18, 44:22, 47:22
really [12] - 9:18, 12:20, 13:1, 13:5, 13:16, 13:21, 14:10, 32:2, 36:11, 36:23, 38:7, 47:23
Reality [1] - 29:14
reason [4] - 27:25, 42:9,

47:20, 48:11
reasonable [3] - 32:6, 32:23, 33:1
reasoning [1] - 20:12
reasons [4] - 5:2, 36:5, 45:25
rebuttal [1] - 3:12
receive [1] - 47:5
recently [1] - 53:20
recollection [1] - 27:2, 27:3, 27:5
reconcile [1] - 11:24
reconsider [3] - 27:22
record [16] - 5:24, 8:18, 10:6, 10:21, 14:7, 16:22, 16:23, 21:24, 26:14, 37:14, 40:8, 40:15, 40:18, 45:8, 46:22, 46:23, 47:23, 48:6, 51:17
recorded [7] - 4:14, 9:3, 11:10, 12:1, 30:4, 39:14, 39:16
recorder [4] - 5:24, 8:18, 11:17, 12:2
recorder's [6] - 4:15, 5:20, 9:4, 30:5, 46:23
recording [10] - 5:20, 10:25, 29:5, 30:10, 30:23, 37:17, 37:22, 50:6
records [1] - 11:8, 11:9, 45:21, 48:4, 47:18
red [1] - 23:10
redefine [1] - 32:5
reemphasize [1] - 14:11
refer [3] - 18:18, 41:19
reference [3] - 12:24, 13:12, 15:15, 30:10, 32:20
referred [3] - 18:12, 22:15, 31:13
referring [3] - 23:13, 33:9, 37:24
refers [2] - 12:1, 27:5
reflection [1] - 3:15
regard [1] - 20:18
regarding [1] - 51:11
regardless [1] - 40:10
registry [1] - 30:20, 30:24, 39:17
Registry [5] - 5:9, 9:3, 10:20, 29:5, 30:15, 37:16, 37:21, 52:25
regular [2] - 12:8, 12:13
related [1] - 32:15
relationship [1] - 48:8
relative [1] - 24:18
relevant [7] - 4:10, 28:17, 41:13, 41:16, 41:22, 50:22, 51:14
reliance [1] - 15:17
relied [1] - 6:16
rely [2] - 15:22, 36:8

remainder [2] - 9:12, 15:21
remains [1] - 13:12
remand [3] - 18:3, 44:23, 45:5
remember [2] - 31:20, 38:7
remove [1] - 25:6
reopening [3] - 33:9, 34:3, 52:4
repeatedly [1] - 27:4
replace [1] - 19:24
reply [6] - 20:22, 21:7, 21:11, 21:18, 42:22, 43:7
representing [2] - 3:18, 46:18
require [4] - 26:24, 33:8, 46:3, 50:19
required [6] - 8:15, 9:2, 19:12, 29:4, 37:25, 53:2
requirement [2] - 7:6, 8:11, 10:20, 13:14, 13:15, 17:4, 19:19, 19:25, 20:4, 22:3, 29:6, 30:10, 30:16, 30:20, 30:23, 30:24, 37:15, 37:21, 37:22, 52:25
requirements [21] - 5:13, 6:19, 7:7, 8:12, 8:20, 8:22, 9:13, 12:11, 12:16, 12:17, 13:5, 14:21, 15:11, 20:13, 30:1, 30:3, 32:24, 37:23, 50:6, 52:15, 53:5
requires [2] - 5:20, 51:18
requiring [1] - 51:12
research [1] - 46:4
resolution [1] - 42:2
resolve [2] - 18:17, 18:16
resolved [5] - 22:17, 22:19, 23:1, 24:22, 45:1
resource [1] - 11:4
respective [2] - 10:17, 48:9
respects [1] - 19:15
respond [3] - 3:9, 27:23, 48:2
responding [2] - 3:11, 28:13
response [9] - 14:1, 17:14, 18:21, 19:2, 19:3, 22:13, 28:6, 41:10, 49:23
result [6] - 3:13, 18:4, 35:16, 35:21, 36:1, 40:4, 40:10, 40:12
reverse [2] - 50:8, 53:7
review [2] - 21:19, 27:2
revocable [10] - 22:11, 22:16, 23:11, 25:2, 25:5, 25:9, 25:18, 26:21, 26:24, 41:1, 41:5, 49:3, 49:12, 49:13, 49:15
rewriting [2] - 32:9, 32:12
rights [2] - 23:16, 43:14
rise [1] - 50:23
Riverside [2] - 3:6, 3:23

road [3] - 7:14, 16:10, 16:11
Rock [11] - 3:6, 3:23, 4:8,
4:12, 4:14, 4:19, 4:25,
5:12, 51:7, 52:10, 52:23
Rock's [2] - 17:16, 51:24
routine [1] - 11:6
routinely [1] - 41:22
rule [6] - 7:12, 21:15, 23:24,
24:8, 43:4, 43:5, 45:7,
51:11
ruled [1] - 43:3
rules [2] - 24:7, 24:12
Rules [1] - 42:10
ruling [5] - 6:10, 26:1, 26:2,
42:6, 50:3
runs [1] - 3:9

**S**

safety [1] - 13:18
sale [1] - 44:20
Salt [3] - 4:13, 4:21, 52:24
satisfaction [3] - 33:5,
33:21, 52:3
satisfied [3] - 7:3, 12:12,
30:4
satisfy [6] - 12:7, 12:16,
12:17, 13:17, 13:20, 13:22,
14:11, 50:5
scenario [1] - 30:21
search [10] - 11:5, 11:8,
46:24, 46:25, 47:10, 47:17,
47:18, 47:19, 47:20, 47:21
seated [1] - 3:4
second [5] - 20:20, 20:22,
23:5, 24:4, 24:6
Second [2] - 5:12, 53:1
section [37] - 5:6, 10:7,
12:10, 12:14, 14:2, 21:22,
29:25, 30:5, 30:10, 30:19,
31:21, 31:23, 32:25, 33:14,
34:8, 34:9, 34:17, 35:8,
35:9, 35:13, 35:18, 37:4,
37:13, 37:18, 37:19, 39:9,
39:15, 40:9, 40:19, 40:24,
42:24, 48:7, 49:17, 51:21,
51:24, 52:12
sections [4] - 8:3, 9:23,
35:7, 38:8
see [11] - 7:25, 8:2, 8:6,
8:21, 23:8, 23:9, 36:19,
38:16, 44:23, 46:4, 47:6
seeking [1] - 4:21
seem [2] - 38:16, 38:17
sell [1] - 4:22
seller [1] - 46:3
sellers [1] - 46:5
selling [3] - 46:1, 46:21,
47:4
semicolon [1] - 10:1
send [1] - 33:18

sending [1] - 29:12
sense [2] - 13:21, 14:15,
14:17
separate [11] - 10:16, 11:4,
19:14, 21:14, 29:19, 46:24,
47:1, 47:2, 47:3
separately [2] - 5:25, 8:3
seq [5] - 12:13, 12:14, 14:2,
14:7, 14:22
series [2] - 33:13, 34:4
serve [1] - 11:20
session [1] - 17:2
sessions [1] - 50:7
set [2] - 5:17, 25:13
sets [1] - 7:13
setting [4] - 7:11, 7:12,
33:9, 52:4
settlor [6] - 23:11, 23:17,
25:3, 41:3, 41:5, 47:6,
49:4, 49:6, 49:19
settlor's [3] - 49:3, 49:6,
49:8
settlors [1] - 25:6
several [1] - 35:7
shall [2] - 48:12, 48:13
share [1] - 31:15
short [1] - 17:3
short-sighted [1] - 17:3
show [2] - 10:5, 25:22
showing [1] - 32:6
shows [1] - 41:8
side [2] - 3:8, 3:13
sighted [1] - 17:3
sign [4] - 27:6, 27:7, 47:15,
48:21
signals [1] - 10:14
signed [1] - 48:18
significance [2] - 8:21,
52:22
significant [3] - 9:20,
50:25, 52:17
similar [1] - 32:15
simply [1] - 25:5
situated [1] - 32:4
situation [2] - 30:6, 32:22
situs [1] - 40:21
six [1] - 4:3
slightly [1] - 23:5
so...[1] - 47:24
sole [2] - 48:13, 48:15
solely [1] - 42:2
someone [1] - 23:16
sometimes [1] - 10:24
somewhere [1] - 40:15
sorry [7] - 9:5, 11:22,
18:23, 21:17, 28:2, 29:23,
33:15
sort [5] - 4:25, 8:7, 22:1,
40:7, 50:16
space [1] - 43:11

speaking [1] - 42:19
speaks [2] - 34:9, 34:11
specific [12] - 8:25, 9:10,
11:18, 14:24, 16:2, 19:16,
20:4, 21:21, 34:8, 34:17
35:23, 40:13
specifically [14] - 8:24,
14:10, 15:19, 16:7, 21:25,
24:23, 30:7, 30:9, 30:23,
30:25, 34:9, 34:10, 37:5,
41:21
spoken [1] - 19:5
sponsor [1] - 18:24
spouse [1] - 26:14
stand [1] - 35:19
star [1] - 24:21
start [6] - 4:3, 27:13, 28:25,
29:3, 29:9, 46:17
started [2] - 9:17, 35:17
starting [1] - 38:9
starts [3] - 6:17, 8:10, 32:13
state [5] - 10:12, 10:16,
11:2, 15:5, 37:9
statement [7] - 9:2, 19:19,
20:3, 34:5, 34:13, 37:10,
37:24
states [3] - 31:22, 31:25,
41:1
stating [1] - 6:24
status [1] - 25:9
statute [45] - 5:6, 6:1, 7:18,
8:2, 8:4, 8:16, 8:19, 10:24
12:6, 12:9, 12:14, 12:23,
13:10, 13:11, 14:18, 14:20,
15:12, 15:22, 16:12, 16:21,
19:12, 20:6, 20:12, 20:16,
21:3, 21:16, 23:21, 27:18,
27:21, 27:22, 28:5, 28:18,
30:7, 30:9, 30:18, 32:9,
32:12, 32:25, 38:2, 38:10,
49:1, 49:12, 50:9, 52:1,
53:6
statute's [1] - 28:17
statutes [6] - 31:2, 32:14,
32:15, 32:19, 39:13, 49:21
statutory [6] - 21:21, 23:23,
29:3, 51:12, 52:25
stay [1] - 30:2
staying [1] - 33:10
sticky [1] - 43:10
still [3] - 3:8, 35:16, 40:4
stock [1] - 9:16
stop [2] - 23:4, 29:8
strange [1] - 12:24
strong [1] - 46:10
sub [1] - 6:11
sub-subsections [1] - 6:11
subject [7] - 4:6, 33:5,
34:11, 49:3, 49:17, 52:2,
52:8
submit [6] - 7:15, 14:2,

15:8, 16:21, 23:19, 50:14
submitted [1] - 17:13
subpart [2] - 13:14, 31:6
subpoena [1] - 45:20
subsection [49] - 5:14,
5:19, 6:3, 6:6, 6:7, 6:14,
6:17, 6:20, 6:22, 6:23,
6:25, 7:1, 7:6, 7:7, 7:8, 8:2,
8:5, 8:10, 8:11, 9:17, 9:25,
10:7, 10:10, 12:10, 14:7,
14:13, 16:23, 17:4, 20:14,
20:15, 23:2, 26:3, 34:5,
34:16, 36:9, 36:24, 37:4,
37:6, 37:7, 37:19, 38:18,
39:4, 40:3, 40:13, 41:11,
52:14
Subsection [1] - 7:5
subsections [10] - 5:19,
6:2, 6:4, 6:11, 6:13, 6:23,
7:20, 8:1, 52:21
substituted [1] - 31:14
sufficient [5] - 21:12, 26:3,
26:22, 37:15, 45:3
suggest [2] - 13:7, 18:6
summary [2] - 23:10, 25:1
Sunstone [1] - 29:14
supplemental [11] - 22:20,
22:22, 23:3, 23:5, 23:7,
24:25, 28:13, 41:8, 42:10,
50:10, 50:11
supply [1] - 14:21
support [2] - 26:1, 26:2,
28:4
supports [1] - 20:17
suppose [1] - 7:4
switched [1] - 29:15

**T**

T3 [26] - 6:15, 7:13, 7:15,
8:11, 8:15, 8:21, 9:6, 9:7,
9:14, 9:16, 9:19, 15:9,
15:12, 15:13, 15:17, 15:22,
15:24, 16:2, 16:5, 18:10,
19:15, 19:18, 20:5, 20:16,
50:4, 50:8, 50:13, 50:14
talks [3] - 16:12, 23:10,
27:4, 48:7, 48:14
ten [1] - 50:7
tenable [1] - 32:18
term [2] - 23:23, 23:24
terms [4] - 24:7, 25:19,
29:4, 35:1
textual [4] - 7:8, 10:4, 10:5,
18:14
textually [2] - 7:15, 17:3
THE [1] - 3:3
theme [1] - 22:1
theory [1] - 22:8
therefore [13] - 5:13, 5:14,
11:11, 14:20, 25:2, 25:4,

26:21, 36:19, 50:2, 52:15,
52:20, 52:24, 53:2, 53:7,
53:9
thinking [1] – 30:22
Third [3] – 4:13, 4:20, 52:24
Thomas [2] – 18:21, 18:24
thorough [1] – 46:12
three [2] – 30:1, 52:21
throughout [3] – 10:15,
22:2, 24:7
tied [2] – 17:19, 18:1
TILT [31] – 3:18, 4:1, 6:21,
7:13, 8:4, 9:7, 9:10, 9:18,
10:2, 11:4, 11:18, 12:3,
12:25, 13:3, 13:7, 13:24,
14:16, 15:1, 15:8, 15:15,
15:19, 16:5, 16:20, 17:21,
18:5, 18:18, 18:23, 19:3,
19:10, 19:18, 20:11, 21:1,
21:5, 21:20, 22:19, 23:16,
24:20, 26:10, 26:17, 27:1,
27:10, 46:17, 47:8, 47:11,
47:15, 47:25, 49:14, 50:19,
51:16, 51:19, 51:21
Till [5] – 3:18, 3:20, 27:9,
42:19, 46:16, 53:12
title [15] – 11:5, 11:7, 11:15,
45:11, 45:16, 45:17, 45:19,
45:20, 45:21, 45:22, 46:2,
46:10, 46:18, 47:13, 47:18
titling [1] – 53:10
today [3] – 10:5, 20:12,
28:22
together [1] – 37:22
ton [1] – 45:18
took [1] – 20:18
top [1] – 10:2
topic [1] – 42:13
transfer [1] – 46:22
trial [1] – 12:22
tricky [1] – 10:23
troubled [1] – 34:22
Trust [3] – 4:5, 4:8, 49:1
trust [36] – 4:11, 4:16,
22:11, 22:14, 23:11, 24:18,
25:2, 25:3, 25:7, 25:9,
25:11, 25:13, 25:18, 25:24,
25:25, 26:5, 26:20, 26:23,
40:16, 40:19, 40:23, 40:25,
41:1, 41:2, 41:5, 41:6,
42:5, 43:24, 45:2, 45:14,
45:16, 45:21, 45:24, 46:2,
46:3, 46:20, 47:5, 47:6,
47:11, 47:17, 47:18, 48:4,
48:7, 48:19, 49:3, 49:4,
49:7, 49:12, 49:13, 49:15,
49:17, 49:23, 51:5
trustee [11] – 23:11, 23:17,
25:13, 43:24, 47:6, 48:12,
48:13, 48:15, 49:18, 49:20,
49:22

trustees [11] – 26:6, 26:16,
26:17, 27:4, 27:5, 48:9,
48:11, 48:14, 48:16, 48:17,
48:19
trustor [2] – 48:12, 48:13
trustors [4] – 47:16, 48:10,
48:12, 48:18
trusts [5] – 22:17, 25:5,
25:15, 45:23, 46:5, 46:24
try [1] – 36:21
trying [7] – 11:13, 11:15,
36:23, 38:5, 38:7, 39:10,
39:12
turn [1] – 18:2
two [16] – 5:1, 5:2, 7:19, 8:1,
8:3, 11:16, 22:21, 26:15,
26:17, 32:17, 39:21, 40:7,
49:21, 50:13
typical [1] – 47:5

## U

ultimate [1] – 42:2
ultimately [1] – 39:23
unambiguous [2] – 17:16,
17:16
under [14] – 8:15, 12:5,
12:10, 12:13, 14:1, 21:3,
22:3, 22:16, 34:16, 34:24,
42:15, 48:4, 48:16, 49:2,
49:16, 52:1, 52:14, 52:15,
53:2, 53:14
undercurrent [1] – 22:7
understood [1] – 3:10
undisputed [1] – 41:4
unfettered [1] – 25:11
uniform [4] – 31:22, 31:25,
32:1
uniformity [1] – 34:6
unilaterally [2] – 25:6,
26:24
unless [2] – 51:7, 51:9
untimely [1] – 53:9
unwilling [1] – 42:1
up [11] – 21:22, 21:25, 23:8,
25:13, 28:15, 33:15, 41:8,
43:10, 43:21, 46:14, 49:16
uses [2] – 35:1, 35:3
UT [1] – 41:21
Utah [13] – 5:17, 22:16,
22:18, 24:21, 29:2, 30:17,
31:7, 34:7, 40:22, 42:5,
42:6

## V

vacating [2] – 33:9, 34:4,
52:4
vague [1] – 27:3
Valle [9] – 4:5, 4:8, 4:9,
4:23, 24:17, 25:12, 43:22,

45:3, 48:25
Valle's [1] – 44:17
value [1] – 13:8
variation [1] – 34:25
various [4] – 8:12, 25:15,
31:1, 33:6
venues [1] – 10:15
version [2] – 9:1, 20:9
versus [1] – 36:21
View [1] – 4:7
view [2] – 3:15, 19:13
virtue [2] – 8:13, 24:17
vis [2] – 23:16
vis-a-vis [1] – 23:16
void [1] – 51:8
vs [4] – 3:6, 24:21, 29:14,
41:20

## W

wants [2] – 35:4, 35:23
Weber [9] – 4:5, 4:15, 4:18,
4:22, 5:5, 5:11, 5:13,
11:11, 53:1
week [1] – 42:9
weight [3] – 7:1, 28:6
welcome [3] – 3:21, 3:24,
28:12
whatsoever [1] – 51:8
whole [1] – 14:12
wholly [1] – 51:8
wife [4] – 26:25, 43:24,
44:12, 44:17
wish [1] – 28:14
wondered [1] – 13:1
wondering [2] – 44:1, 44:3
word [3] – 9:14, 32:2, 32:10,
33:12, 37:23
words [7] – 12:7, 13:9,
15:12, 15:24, 32:17, 35:11,
52:19
works [1] – 45:15
worry [2] – 3:10, 14:7
worth [1] – 30:25
writ [20] – 4:20, 5:2, 15:22,
21:8, 21:18, 23:24, 24:12,
44:2, 44:14, 44:20, 45:4,
50:23, 50:24, 50:25, 51:1,
51:3, 51:4, 51:6, 51:8, 53:9
write [1] – 12:23
writs [2] – 24:10, 51:11
written [1] – 53:13
wrote [5] – 13:9, 13:10,
31:10

## Y

years [6] – 13:11, 15:5,
16:4, 16:17, 50:7

## Z

zero [1] – 25:21