# EXHIBIT 14
## (Opposition to Mtn to Supplement Complaint)

Benjamin D. Johnson (10275)
KC Hooker (18018)
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Telephone: (801) 438-2000
Email: ben.johnson@btjd.com;
kchooker@btjd.com
*Attorneys for Alum Rock Riverside LLC*

**SECOND JUDICIAL DISTRICT COURT**
**WEBER COUNTY, STATE OF UTAH**

| | |
|---|---|
| MOLLY J. MULLIGAN; and JOHN P. MULLIGAN,<br><br>Plaintiffs<br><br>v.<br><br>SINGLE BOX, L.P.; SB AB WEST LOOP, L.P.; BRETT H. DEL VALLE and TRACI M. DEL VALLE, as Co-Trustees of The Del Valle Family Trust dated October 30, 2002,<br><br>Defendants. | **OPPOSITION TO MOTION TO SUPPLEMENT COMPLAINT**<br><br>Case No. 210904774<br><br>Judge Noel Hyde |

Alum Rock Riverside LLC, ("***Alum Rock***"), through counsel and pursuant to Rules 7 and 15(b) of the Utah Rule of Civil Procedure, submits this Opposition to Molly J. Mulligan and John P. Mulligan's (the "***Mulligans***") Motion for Leave to File a Supplemental Complaint (the "***Motion to Amend***").

## STATEMENT OF RELIEF REQUESTED AND GROUNDS

Alum Rock and the Mulligans have been involved in a separate litigation for more than three years. Less than a week after the Utah Supreme Court determined that Alum

Rock has a valid lien against the Mulligans' property and may proceed with an execution sale, the Mulligans ask to file what they purport to be a "supplemental complaint." But in reality, the "supplemental complaint" is a full-blown amendment that seeks to bring claims the Mulligans have known about for years. This move appears to be nothing less than the Mulligans' attempt to drag out a separate dispute after Alum Rock prevailed at the Utah Supreme Court.

The Court should deny the Motion to Amend for three independent reasons. First, all of the Mulligans' claims are barred by claim preclusion, so an amendment would be futile. Second, the Mulligans' claims are an impermissible collateral attack on a final judgment entered in a separate proceeding. And third, even if the Mulligans' claims were not procedurally barred, the Mulligans' proposed amendment is unjustified, untimely, and prejudicial.

## RELEVANT FACTS

### *The Utah Supreme Court Confirms Alum Rock's Lien Rights*

1. Several years ago, Alum Rock sued Brett Del Valle ("***Del Valle***") in California Superior Court for various claims. Alum Rock prevailed in that suit, and in June 2020, the California court entered a multi-million-dollar judgment. (*See* Ruling and Order on Mulligans' Reply to Writ of Execution, attached as **Exhibit 1**; *Mulligan v. Alum Rock Riverside LLC*, 2024 UT 22, attached as **Exhibit 2**.[1]

[1] Unless otherwise noted, Alum Rock cites to Judge Mow's decision in Case No. 206927043 and the Utah Supreme Court's decision on appeal for the factual and procedural history between Alum Rock and the Mulligans.

2. Alum Rock domesticated the judgment in the Third District Court on October 23, 2020 and recorded it in the Weber County Recorder's office on November 16, 2020. *See id.*

3. Proceedings relating to the judgment are currently pending before Judge Mow in the Third District Court as Case No. 206927043 (the "***First Lawsuit***").

4. After Alum Rock recorded the judgment, Del Valle transferred property located at 1453 S. Basinview Road, Huntsville, Utah 84317 to the Mulligans (the "***Property***"). *See id.*

5. Alum Rock applied for and obtained a writ of execution for the Property in June 2021 (the "***Writ of Execution***"). *See id.*

6. A few weeks later, the Mulligans filed a reply to the Writ of Execution (the "***Reply***"). In that Reply, the Mulligans argued that (1) a writ was not available because Del Valle never owned the Property in his individual capacity and (2) Alum Rock had no judgment lien because it did not file the judgment in the registry of judgments. *See* Reply to Writ of Execution, attached as **Exhibit 3**.[2]

[2] Alum Rock's primary argument in this Motion is that the Mulligans' claims are barred by claim preclusion. While it is generally true that a court cannot consider matters outside the pleadings on a motion to dismiss (or in determining futility on a motion to amend), *see* Utah R. Civ. P. 12(b), an exception applies to a court's "own files and records." *See Johnson v. Spencer*, 950 F.3d 680, 705 (10th Cir. 2020) (noting that a court may "take judicial notice of its own files and records, as well as facts which are a matter of public record, without converting a motion to dismiss into a motion for summary judgment" (cleaned up)). The Tenth Circuit has noted that "courts frequently take judicial notice of prior judicial acts found in records and files when evaluating the merits of a purported claim-preclusion defense." *Id.* Because the claim preclusion doctrine is meant to prevent litigants from getting "a second bite at the apple," it makes sense for a court to consider public court filings on a motion to dismiss to quickly dispose of claims. *Daz Mgmt., LLC v. Honnen Equipment Co.*, 2022 UT 15, ¶ 66, 508 P.3d 84.

7. Importantly, the Reply contained a section where the Mulligans were required to list all reasons why "the Writ of Execution was issued improperly." *See id.*

8. In September 2021—two months after filing the Reply—the Mulligans filed this lawsuit against Defendants Single Box, L.P. and SB AB West Loop, L.P. (collectively, "***Single Box***"), claiming that Single Box's alleged lien is invalid because (1) Del Valle never owned the property in an individual capacity and (2) the Mulligans' interests were superior to Single Box's lien under the doctrines of equitable subordination/subrogation. *See generally* Complaint, Docket No. 1.

9. Nearly a year after filing this lawsuit and asserting claims against Single Box, Judge Mow asked Alum Rock and the Mulligans to file supplemental briefs on the validity of Alum Rock's lien and the Writ of Execution. *See* Minutes from Scheduling Conference, Docket No. 28 (Case No. 206927043).

10. In the Mulligans' supplemental brief, they added a new argument that the Third District Court did not have authority to issue a writ for property located outside the district. But despite the fact that the Mulligans knew about their equitable subrogation/subordination arguments at that time (because they had asserted those claims against Single Box a year earlier), the Mulligans chose not to raise them in their supplemental brief. *See* Mulligan's Supplemental Brief, attached as **Exhibit 4**.

11. After considering supplemental briefing, Judge Mow issued a 10-page order rejecting each of the Mulligans' arguments. Specifically, Judge Mow held that (1) Alum's Rock's "judgment is a valid lien on the Property" and (2) the "Property . . . was subject to execution under rule 64E." *See* Ruling and Order at 2, 10, Exhibit 1.

12. The Mulligans appealed, and the Utah Supreme Court retained the case. On July 17, 2024, the Utah Supreme Court issued an opinion and affirmed Judge Mow in all respects. *See* Exhibit 2.

13. Undeterred, on August 1, 2024, the Mulligans filed a petition for reconsideration that essentially reiterated the arguments the Utah Supreme Court had already rejected. The Court denied the petition for rehearing on August 21, without asking Alum Rock to respond. *See* Petition for Rehearing, attached as **Exhibit 5**.

***After Losing the Appeal, the Mulligans Attempt to Add Alum Rock to this Lawsuit***

14. On August 27—less than a week after the Utah Supreme Court denied the petition for rehearing—the Mulligans filed their Motion to Amend. *See* Docket No. 184.

15. In the Motion to Amend, the Mulligans ask this Court for permission to add Alum Rock as a party and assert six causes of action against it. *See* Declaration of Felcia Canfield (Exhibit 7), Docket No. 185.[3]

16. The Mulligans' first claim seeks a declaratory judgment that Alum Rock has no lien because Del Valle never owned the property individually, an argument the Utah

[3] The Mulligans also bring a stand-alone claim for an injunction barring Alum Rock from executing or foreclosing on the Property. But "an injunction is a remedy, not a claim." *See Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020); *Flor v. Bd. Of Regents of University of New Mexico*, 539 F.Supp.3d 1176, 1201 ("The Court agrees . . . that injunctive relief is a form of remedy, not a standalone claim."). Alum Rock will accordingly not discuss the Mulligans' request for an injunction independently of their substantive claims.

It is also important to note how problematic the Mulligans' requested injunction would be. Alum Rock has obtained a writ of execution against the Property that has been confirmed by the Utah Supreme Court. What the Mulligans are asking for is an injunction from a judge in the Second District prohibiting Alum Rock from following a lawful order of the Third District—an order that has been upheld by the definitive authority on Utah law. This Court should refrain from treading into such murky waters.

Supreme Court explicitly rejected. Alternatively, the Mulligans seek a declaration that Alum Rock's interest only attached to 50% of the Property. *See id.*

17.    The Mulligans' second and third claims are for equitable subordination and equitable subrogation. The general theory underlying these claims is that because the Mulligans paid off allegedly senior liens when they purchased the Property, their ownership interest should be superior to Alum Rock's lien. *See id.*

18.    The Mulligans' fourth claim is for a declaration that because they are bona fide purchasers, they somehow took the Property free from liens they did not know about. *See id.*

19.    The fifth claim seeks a declaration that Alum Rock's lien is ineffective against the Property because the Mulligans allegedly had no constructive notice of it. *See id.*

20.    The Mulligans' sixth claim is an alternative claim seeking a declaration as to whether Alum Rock's lien or Single Box's lien has priority. *See id.*

21.     None of these claims are based on any events that happened after September 9, 2021—the day the Mulligans filed their Complaint in this matter. Instead, these claims are simply new legal defenses the Mulligans chose not to assert during the First Lawsuit. The only new "event" that has transpired since September 9, 2021 is the Mulligans losing their appeal at the Utah Supreme Court.

22.    At this point, this case has been pending for more than three years, and the Court ruled on a dispositive motion more than ten months ago. *See* Memo Decision and Order, Docket No. 169 (11/17/2023).

# ARGUMENT

The Mulligans purport to bring a motion to "supplement" their complaint under Rule 15(d) of the Utah Rules of Civil Procedure, which says: "[o]n motion and reasonable notice, the court may, on just terms, permit a party to file a supplemental pleading setting out any transaction, occurrence, or event that happened *after the date of the pleading to be supplemented*" (emphasis added). But Rule 15(d), on its face, only applies when new events that occur after the date of the original complaint. *See* Wright and Miller, FEDERAL PRACTICE AND PROCEDURE § 1504 ("Amended and supplemental pleadings differ in two respects. The former relate to matters that occurred prior to the filing of the original pleading and entirely replace the earlier pleading; the latter deal with events subsequent to the pleading to be altered and represent additions to or continuations of the earlier pleadings."). Nothing in the Mulligans' proposed "Supplemental Complaint" alleges any event that occurred after September 9, 2021—the date the Mulligans filed this case. Instead, the "Supplemental Complaint" simply attempts to add Alum Rock as a party and allege new defenses to Alum Rock's lien that it chose not to argue in the First Lawsuit. Because the "Supplemental Complaint" is based entirely on events that occurred before this case started, it is really an amended complaint governed by Rule 15(b). The Mulligans did not even attempt to demonstrate that they are entitled to amend under Rule 15(b)'s standard, so the Court should summarily deny the Motion to Amend.

But even if the Court reaches the merits under Rule 15(b), it should still deny the Motion to Amend. After responsive pleadings are filed, a party may amend a pleading only "with the court's permission or the opposing party's written consent." Utah R. Civ. P.

15(a)(2). Although courts should "freely give permission [to amend] when justice requires," *id.*, Utah courts will deny motions to amend when "the amendments include untimely, unjustified, [or] prejudicial factors," *Dahl v. Dahl*, 2015 UT 79, ¶ 162, 459 P.3d 276 (quoting *Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶ 58, 221 P.3d 256). "Trial courts are not required to find all three factors to deny a motion to amend; a court's ruling on a motion to amend can be predicated on only one or two of the particular factors." *Daniels*, 2009 UT 66, ¶ 58 (cleaned up).

In addition to timeliness, justification, and prejudice, "[i]t is well settled that a court may deny a motion to amend as futile if the proposed amendment would not withstand a motion to dismiss." *Ostler v. Dept. of Public Safety*, 2022 UT App 6, ¶ 30, 505 P.3d 1119 (citation omitted). In other words, "[a]lthough leave to amend is freely given when justice so requires, justice does not require that leave be given if doing so would be futile." *Jensen v. IHC Hospitals, Inc.*, 2003 UT 51, ¶ 139, 82 P.3d 1076. Res judicata can render a claim futile for a motion to amend. *See Pride Stables v. Homestead Golf Club, Inc.*, 2003 UT App 411, ¶ 19, 82 P.3d 198 (holding that a district court properly denied a motion to amend when "the claims [the plaintiff] wanted to raise in its amendment were barred by res judicata").

## I.      Each of the Mulligans' Claims are Barred by Claim Preclusion.

"The doctrine of res judicata embraces two distinct branches: claim preclusion and issue preclusion. Claim preclusion corresponds to causes of action; issue preclusion corresponds to the facts and issues underlying causes of action." *Mack v. Utah State Dep't of Com., Div. of Sec.*, 2009 UT 47, ¶ 29, 221 P.3d 194 (cleaned up). An important purpose of claim preclusion is to "prevent litigants from getting a second bite at the apple." *Daz Mgmt.,*

*LLC v. Honnen Equip. Co.*, 2022 UT 15, ¶ 46, 508 P.3d 84. Claim preclusion has three elements: "[f]irst, both cases must involve the same parties or their privies. Second, the claim that is alleged to be barred must have been presented in the first suit or be one that could and should have been raised in the first action. Third, the first suit must have resulted in a final judgment on the merits." *Mack*, 2009 UT 47, ¶ 29 (quoting *Snyder v. Murray City Corp.*, 2003 UT 13, ¶ 34, 73 P.3d 325).

Because Alum Rock and the Mulligans were parties to, and participated fully in, the First Lawsuit, the first element is satisfied. And because the Mulligans could have have raised their new defenses in the First Lawsuit and ultimately litigated that case to a final judgment, their new claims are barred by claim preclusion.

*a.* *<u>The Mulligans Could Have and Should Have Raised Their Claims in the First Proceeding.</u>*

"The Utah Supreme Court has fully embraced the Restatement's transactional test for analyzing whether the claims in two cases are the same under the second requirement of the claim preclusion branch of res judicata." *Van Leeuwen v. Bank of Am. NA*, 2016 UT App 212, ¶ 9, 387 P.3d 521 (cleaned up). This same test also applies "[i]n determining whether a claim should have been brought in the first action." *Daz Mgmt.*, 2022 UT 15, ¶ 57. "Under the transactional test, the claims are the same if they arise from the same operative facts, or in other words from the same transaction." *Gillmor v. Fam. Link, LLC*, 2012 UT 38, ¶ 12, 284 P.3d 622 (cleaned up). "There are a variety of considerations in the transactional test because, rather than resting on the specific legal theory invoked, claim preclusion generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims." *Van Leeuwen*, 2016 UT App 212, ¶ 9 (cleaned up). These considerations include

"whether the facts are related in time, space, origin, or motivation." *Gillmor,* 2012 UT 38, ¶ 14.

In this case, the "underlying events" that gave rise to the First Lawsuit are (1) Alum Rock's judgment against Del Valle; (2) Alum Rock's domestication of that judgment in Utah; (3) Alum Rock's lien on the Property; (4) Del Valle's transfer of the Property to the Mulligans; and (5) Alum Rock's writ of execution. *See Van Leeuwen*, 2016 UT App 212, ¶ 9. These same events form the basis of the Mulligans' new claims and defenses, and it appears that the Mulligans are simply attempting to delay Alum Rock's right to execute on the Property. Alum Rock addresses each of the Mulligans' new claims in turn:

1. Declaratory Judgment that Alum Rock Has No Lien: This claim seeks a declaration that Alum Rock's lien is invalid because Del Valle did not own the Property individually—a claim the Utah Supreme Court explicitly rejected. The Mulligans also seek a declaration that Alum Rock's lien could only attach to a 50% interest in the Property. This claim arises from the same transaction as the First Lawsuit—Alum Rock's judgment lien and Del Valle's transfer of the Property to the Mulligans. The Mulligans could have and should have raised this claim in the First Lawsuit.

2. Equitable Subordination and Equitable Subrogation: The Mulligans claim that because they paid off allegedly senior liens when they purchased the Property, they can claim a priority position over Alum Rock's lien. Again, this claim is based on the same set of events as the First Lawsuit, i.e., the Mulligan's purchase of the Property from Del Valle and Alum Rock's judgment lien. There is no reason why the Mulligans could not have brought this defense in the First Lawsuit. What's more, by the time the parties engaged in

supplemental briefing in the First Lawsuit, the Mulligans had already asserted claims of equitable subordination and equitable subrogation against Single Box. The fact that the Mulligans had already asserted these claims against Single Box means that they were fully aware that they could have asserted the claims against Alum Rock as well. The Mulligans simply chose to withhold this defense and only assert it if they lost their appeal.

3. Bona Fide Purchasers: The Mulligans claims that because they were bona fide purchasers, they took the Property without any encumbrances they didn't know about. This claim is based on the same events as the First Lawsuit—Alum Rock's judgment lien and the Mulligans' purchase of the Property from Del Valle. If the Mulligans really are bona fide purchasers, they were as much so three years ago as they are now, and they could have brought this claim in the First Lawsuit.

4. No Constructive Notice: In this claim, the Mulligans seek a declaration that they are not subject to Alum Rock's lien because they purportedly had no constructive notice. The underlying events—the Mulligans' purchase of the Property and the title history for the Property—are precisely the events at issue in the First Lawsuit. The Mulligans could have and should have asserted this claim earlier, and they are barred from doing so now.

5. Lien Priority Between Single Box and Alum Rock: As a backstop position, the Mulligans seek a declaration as to whether Alum Rock or Single Box have lien priority. Again, this claim is based on the same events as the First Lawsuit, and the Mulligans have known about Single Box's alleged lien for years. If the Mulligans wanted a judicial declaration about the priority between Single Box and Alum Rock, they should have raised this claim years ago.

"Claim preclusion is premised on the principle that a controversy should be adjudicated only once." *Nelson v. Nelson*, 2023 UT App 38, ¶ 30, 529 P.3d 370 (cleaned up). The Mulligans are violating this rule by attempting to file successive, piecemeal lawsuits that endlessly drag out Alum Rock's right to execute on the Property. Because the Mulligans could have and should have brought each of their claims in the First Lawsuit, the claims are barred.

*b.* *The First Proceedings Resulted in a Final Judgment on the Merits.*

"A judgment is upon the merits when it amounts to a declaration of the law as to the respective rights and duties of the parties based on facts and evidence upon which the rights of recovery depend, irrespective of formal, technical, or dilatory objections or contentions." *Peterson v. Armstrong*, 2014 UT App 247, ¶ 14, 337 P.3d 1058 (cleaned up). "To be on the merits, a judgment does not have to proceed to trial. Rather, a judgment on the merits may be made at any stage of the litigation, so long as the judgment rendered is based upon a proper application of the relevant law to the facts of the case." *State v. Sommerville*, 2013 UT App 40, ¶ 32, 297 P.3d 665. Under the Utah Rules of Civil Procedure, the definition of "judgment" is broad and includes "a decree or order that adjudicates all claims and the rights and liabilities of all parties or any other order from which an appeal of right lies." Utah R. Civ. P. 54(a).

Applied here, the issue is (1) whether an order was entered "from which an appeal of right lies" and (2) whether the First Lawsuit resulted in a ruling based on the law and facts of the case. On the first issue, it is clear that Judge Mow's ruling on the writ of execution was an appealable order because the Mulligans appealed that decision to the Utah Supreme

Court. And on the second issue, the First Lawsuit was substantively resolved on the merits and resulted in a declaration that Alum's Rock's "judgment is a valid lien on the Property" and that the "Property . . . [is] subject to execution under rule 64E." *See* Ruling and Order at 2, 10, Exhibit 1. Accordingly, the First Lawsuit resulted in a final judgment on the merits and has preclusive effects.[4]

**II. The Mulligans' Are Attempting to Collaterally Attack the First Lawsuit.**

In addition to being barred by claim preclusion, the Mulligans' efforts to assert new defenses against Alum Rock constitute an impermissible collateral attack on the First Lawsuit. "With rare exception, when a court with proper jurisdiction enters a final judgment, that judgment can only be attacked on direct appeal." *Moss v. Parr Waddoups Brown Gee & Loveless*, 2010 UT App 170, ¶ 9, 237 P.3d 899 (cleaned up). In Utah, "[t]he general rule of law is that a judgment may not be drawn in question in a collateral proceeding." *Tolle v. Fenley*, 2006 UT App 78, ¶ 15, 132 P.3d 63. A proceeding is considered a collateral attack when "a judgment is attacked in other ways than by proceedings in the original action to have it vacated or revised or modified or by a proceeding in equity to prevent its enforcement." *Ostler v. Retirement Bd.*, 2017 UT App 96, ¶ 22, 400 P.3d 1099.

In this case, the purposes of the Mulligans' claims are to (1) attack the validity of Alum Rock's judgment lien and (2) prevent enforcement of Alum Rock's writ of execution

[4] What's more, many cases have held that res judicata can apply to supplemental proceedings like executions. *See Eckhaus v. Blauner*, No. 94 CIV. 5635(CSH), 1997 WL 362166, *5 (S.D.N.Y. June 26, 1997) ("There is authority for the proposition that supplemental proceedings may lay the foundation for application of res judicata."); *Leslie v. Laprade*, 726 A.2d 1228 (D.C. Ct. App. 1999) (finding that a party could not challenge a writ of execution in a separate action when the party moved to "strike the writ of execution," "was denied that relief," and "took no appeal").

against the Property. But Judge Mow determined that Alum Rock has a valid judgment lien and that the writ of execution is proper. What's more, these conclusions have been upheld by the Utah Supreme Court—the final and definitive arbiter of Utah law. The fact that the Mulligans filed their Motion to Amend a mere week after the Utah Supreme Court denied their petition for rehearing can only mean that the Mulligans are attempting to collaterally attack the outcome of the First Lawsuit. But because a judgment can only "attacked on direct appeal," the Mulligans are barred from directly or indirectly challenging Judge Mow's or the Utah Supreme Court's decision in a separate proceeding. *Moss*, 2010 UT App 170, ¶ 9.

**III. Even If the Mulligans' Claims Were Not Futile, The Court Should Deny an Amendment.**

Even if the Mulligans claims were not barred by the doctrines of claim preclusion and collateral attack, the Court should still exercise its discretion and deny the Motion to Amend because (1) the Mulligans are not justified in bringing additional claims; (2) the request is untimely; and (3) an amendment is prejudicial.

*a. The Motion to Amend is Unjustified.*

In considering whether the amendment is justified, courts look to several factors, including whether the moving party had prior knowledge of the proposed amendment, whether the moving party had a dilatory motive, or bad faith. *See Kelly*, 2004 UT App 44, ¶ 38. Here, the Mulligans cannot deny that they had prior knowledge of their claims. For example, the Mulligans had asserted claims for equitable subrogation and equitable subordination against Single Box in September 2021, a full year before Judge Mow ordered supplemental briefing on the validity of Alum Rock's writ of execution. There is no reason why the Mulligans could not have raised similar equitable arguments in the First Lawsuit.

And for the Mulligans remaining claims, these new defenses are not based on any new events, but appear to simply be new defenses the Mulligans have formulated over the past few years. In addition, the timing of the Motion to Amend, at best, demonstrates a "dilatory motive" and, at worst, demonstrates "bad faith." As explained above, the Utah Supreme Court denied the Mulligans' petition for rehearing on August 21, 2024. The Mulligans filed the Motion to Amend on August 27—only six days later. The fact that the Mulligans drafted the Motion to Amend in only six days strongly indicates that the Mulligans were already planning to pull Alum Rock into this lawsuit if they lost the appeal. The Court should not reward the Mulligans' attempt to drag out a dispute that has already been resolved by the Utah Supreme Court.

*b.* *The Motion to Amend is Untimely.*

Generally, motions to amend are untimely if "they are filed in the advanced procedural stages of the litigation process, such as after the completion of discovery, on the eve of a scheduled trial date, or after an order of dismissal has already been entered." *See Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶ 29, 87 P.3d 734. In *Daniels*, the trial court found a proposed amendment was untimely when the moving party had notice of its additional claim but "did not actually move to add [it] until eleven months later, during which time the period for fact discovery had expired." *Daniels*, 2009 UT 66, ¶ 60. The court also found that the amendment and reopening discovery would cause delay. *See id.* Accordingly, the trial court denied the motion to amend, and the appellate court affirmed the denial. *See id.* Here, this case has been pending for more than three years, and the Court already ruled on a dispositive motion. And similar to *Daniels*, the Mulligans had notice of

their new claims/defenses for years but did not actually move to amend until after they lost their appeal in the First Lawsuit. Accordingly, the Motion to Amend is untimely, and the Court should deny it.

*c. The Motion to Amend is Prejudicial.*

"Motions [to amend] are prejudicial when the nonmoving party would have little time to prepare a response before trial." *See Daniels*, 2009 UT 66, ¶ 59. "[T]he prejudice must be undue or substantial prejudice, since almost every amendment of a pleading will result in some practical prejudice to the opposing party." *See Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶ 31 (internal quotation marks omitted). A motion to amend is substantially prejudicial, for example, "when the nonmoving party would have little time to prepare a response before trial." *Evans v. B&E Pace Inv. LLC*, 2018 UT App 37, ¶ 18, 424 P.3d 963. As mentioned above, this case has been pending for more than three years and is in an advanced procedural stage. In addition, Alum Rock certainly stands to suffer undue and substantial prejudice if it is forced to spend additional years litigating defenses that the Mulligans chose not to bring in the First Lawsuit with no apparent justification (other than delay). The Court should deny the Motion.

**CONCLUSION**

The First Lawsuit was the Mulligans' opportunity to challenge Alum Rock's lien and writ of execution. But rather than assert all of their legal defenses in one proceeding, the Mulligans chose to hold back some of their defenses and engage in piecemeal litigation. Doing so was certainly the Mulligans' prerogative, but they did so at the peril of their claims being procedurally barred. The Court should deny the Motion to Amend.

DATED this 17th day of September, 2024.

BENNETT TUELLER JOHNSON & DEERE

/s/ *KC Hooker*
Benjamin Johnson
KC Hooker
*Attorneys for Alum Rock Riverside, LLC*

**CERTIFICATE OF SERVICE**

I certify that on this 17th day of September, 2024, I caused a true and correct copy of the foregoing **OPPOSITION TO MOTION TO SUPPLEMENT COMPLAINT** to be electronically filed with the Court's ECF system which served notification to all counsel of record by the method indicated below:

| | | |
|---|---|---|
| Bradley L. Tilt | ( ) | U.S. Mail, Postage Prepaid |
| FREEMAN LOVELL, PLLC | ( ) | Hand Delivered |
| 4568 South Highland Drive, Suite 290 | ( ) | Overnight Mail |
| Salt Lake City, Utah 84117 | ( ) | Facsimile |
| bradley.tilt@freemanlovell.com | (X) | E-Filed |
| *Attorney for Plaintiffs* | ( ) | E-Mailed |
| | | |
| Felicia B. Canfield | ( ) | U.S. Mail, Postage Prepaid |
| CANFIELD LAW LLC | ( ) | Hand Delivered |
| 2413 Newton Avenue | ( ) | Overnight Mail |
| Cody, WY 82414 | ( ) | Facsimile |
| canfieldlawllc@gmail.com | (X) | E-Filed |
| *Attorney for Plaintiffs* | ( ) | E-Mailed |
| | | |
| R. Jeremy Adamson | ( ) | U.S. Mail, Postage Prepaid |
| Chad S. Pehrson | ( ) | Hand Delivered |
| Kunzler Bean & Adamson, PC | ( ) | Overnight Mail |
| 50 West Broadway, 10th Floor | ( ) | Facsimile |
| Salt Lake City, UT 84101 | (X) | E-Filed |
| jadamson@kba.law | ( ) | E-Mailed |
| cpehrson@kba.law | | |
| *Attorneys for Single Box, L.P.* | | |
| *and SB AB West Loop, L.P.* | | |

*/s/ Mauri Kirschner*

# EXHIBIT 1

**IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT**
**IN AND FOR SALT LAKE COUNTY, STATE OF UTAH**

| | |
|---|---|
| **ALUM ROCK RIVERSIDE LLC**,<br><br>Plaintiff,<br><br>**vs.**<br><br>**PRP INVESTORS MADISON, LLC**, a California limited liability company; **BRETT DEL VALLE**, an individual; and **DOES 1 through 50** inclusive,<br><br>Defendants. | **RULING & ORDER ON MULLIGANS' REPLY TO WRIT OF EXECUTION**<br><br>**Case No. 206927043**<br><br>**Judge Adam T. Mow** |

The Utah Foreign Judgment Act provides that a foreign judgment entered in a district court becomes a lien if a stay of execution has not been granted, the requirements of the Act are satisfied, and the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located. Plaintiff Alum Rock Riverside LLC sued Brett Del Valle (and others) in California Superior Court for breach of a settlement agreement and breach of an indemnity agreement, among other claims. Alum Rock prevailed in that suit, and in June 2020, the California court issued a judgment for $4,338,964.45. On October 23, 2020, Alum Rock domesticated the California judgment in the Third District Court. On November 16, 2020, Alum Rock recorded the judgment with the Weber County Recorder. On May 11, 2021, the Del Valle Family Trust—a revocable trust controlled by Brett and Traci Del Valle as both the trustors and the trustees—conveyed property located at 1453 S. Basinview Road, Huntsville, Utah 84317 ("Property") to Molly and John Mulligan. On June 22, 2021, Alum Rock applied for a writ of execution against the Property, which this Court granted that same day. The Mulligans ask the Court to set aside the writ and find that Alum Rock does not have a lien on the Property. This

Court is asked to decide whether the domesticated judgment is a valid lien under Utah law. The Court is further asked to decide whether this Court has authority to issue a writ of execution for the Property, notwithstanding that the Property is in Weber County—outside the Third District. Because Alum Rock satisfied the requirements of both the Utah Foreign Judgment Act and the Judgment Lien Act, the domesticated judgment is a valid lien on the Property. And as the Utah Code of Judicial Administration authorizes this Court to issue all extraordinary writs and other writs necessary to carry into effect its orders, judgments, and decrees, the Court properly issued a writ of execution notwithstanding that the Property is located outside the Third District. The domesticated judgment is a valid lien on the Property and Alum Rock may proceed with the sale of the Property.

**DISCUSSION**

*A. Alum Rock's Lien on the Property*

The Mulligans first argue, in the Reply to Writ of Execution and Request for Hearing, that the Property "is not presently, and it never has been, owned by Brett Del Valle in his individual and personal capacity."[1] However, Utah Rule of Civil Procedure 64E provides "[a] writ of execution is available to seize property in the possession or under the control of the defendant following entry of a final judgment or order requiring the delivery of property or the payment of money."[2] Rule 64E does not contain any provision limiting its application to owners of property nor does it require the property be in the possession or under the control of the defendant at the time a judgment creditor files a writ of execution. Moreover, where a trust

[1] *See* Reply & Request for Hr'g 2, July 7, 2021.
[2] UTAH R. CIV. P. 64E(a).

agreement "identifies [an individual] as the trustor-trustee of [a] Trust during her lifetime . . . she retains considerable control over the Trust property."[3]

In this case, the Del Valle Family Trust designates Brett and Traci Del Valle as trustors of the Trust and appoints them both as co-trustees.[4] The Trust further provides:

> During the joint lifetimes of the Trustors, the community estate may be revoked in whole or in part by an instrument in writing signed by either Trustor, and any separate estate may be revoked in whole or in part by an instrument in writing signed by the Trustor who contributed that property to the trust.[5]

The Trust also provides that, except for the separate property interest of a Trustor in any life insurance policy, "the Trustors may at any time during their joint lifetimes amend any of the terms of this instrument by an instrument in writing signed by the Trustors and delivered to the Trustee."[6] Finally, the Trust provides:

> During the joint lifetimes of the Trustors, the Trustors acting jointly with respect to the community estate, or a Trustor acting individually with respect to such Trustor's separate estate, may at any time direct the Trustee in writing to transfer property or sums of money out of the trust estate to any other person or organization.[7]

These provisions, taken together, establish unambiguously that, just as the plaintiff in *Perez*, Brett Del Valle retained considerable control over the Property. Indeed, the Del Valles retained the ability to revoke the Trust, to amend it, and to transfer property from it. In essence, they retained all control regarding the Property they would have had if they had not transferred the Property to the Trust. As the Property was under the control of Brett Del Valle at the time the

---

[3] *See Perez v. Dep't of Health*, No. 20050895-CA, 2006 WL 1882279, at *1 (Utah Ct. App. July 7, 2006).
[4] *See* Opp'n to Mulligans' Reply Ex. 6, at 1, Sept. 16, 2022.
[5] *See id.* at 3.
[6] *See id.*
[7] *See id.* at 5.

judgment was entered in this action, the Property is properly subject to a writ of execution under rule 64E.

The Mulligans next argue that Alum Rock failed to comply with the statutory requirements for the creation of a judgment lien and therefore no lien attached to the Property. The Mulligans base their argument on section 78B-5-201, which provides "[o]n or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located."[8] Furthermore, "[o]n or after July 1, 2002 . . . a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located."[9] Finally, section 78B-5-202 provides:

> After July 1, 2002, a judgment entered by a district court or a justice court in the state becomes a lien upon real property if: (i) the judgment or an abstract of the judgment containing the information identifying the judgment debtor as described in Subsection 78B-5-201(4)(b) is recorded in the office of the county recorder; or (ii) the judgment or an abstract of the judgment and a separate information statement of the judgment creditor as described in Subsection 78B-5-201(5) is recorded in the office of the county recorder.[10]

The Mulligans further rely on section 78B-5-302 of the Utah Foreign Judgment Act, which provides "[a] foreign judgment filed under this part has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening,

[8] Utah Code Ann. § 78B-5-201(2).
[9] *Id.* § 78B-5-201(3)(a).
[10] *Id.* § 78B-5-202(7)(a)(i)-(ii).

vacating, setting aside, or staying a judgment of a district court of this state."[11] The Foreign Judgment Act further provides:

> A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if: (a) a stay of execution has not been granted; (b) the requirements of this chapter are satisfied; and (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202.[12]

Under the plain language of these provisions, a foreign judgment will not create a lien until the requirements in subsections 78B-5-201 and -202 have been satisfied.

The Court must therefore determine what section 78B-5-201 requires. In doing that, the Court must also examine subsection 78B-5-201(4), which provides "[i]n addition to the requirements of Subsections (2) and (3)(a), any judgment that is filed in the Registry of Judgments on or after September 1, 1998, or any judgment or abstract of judgment that is recorded in the office of a county recorder after July 1, 2002, shall include" a judgment information statement.[13] Moreover, subsection 78B-5-201(6) provides:

> Any judgment that requires payment of money and is entered in a district court on or after September 1, 1998, or any judgment or abstract of judgment recorded in the office of a county recorder after July 1, 2002, that does not include the debtor identifying information as required in Subsection (4) is not a lien until a separate information statement of the judgment creditor is recorded.[14]

In interpreting these provisions, as well as section 78B-5-202, the Utah Court of Appeals reasoned that "[h]ad the legislature intended that subsections (2) and (3) of section [78B-5-201] be read together, as separate requirements for the creation of a lien on real property, it could have

---

[11] *Id.* §78B-5-302(3).
[12] *Id.* § 78B-5-305(1)(a)-(c).
[13] *Id.* § 78B-5-201(4)(a)-(b).
[14] *Id.* § 78B-5-201(6)(a).

used the word 'and' instead of 'or' in sections [78B-5-201(4)] and [78B-5-201(6)]."[15] It further determined "that a proper reading of section [78B-5-201] requires subsections (2) and (3) to be read independently."[16] This "allows section [78B-5-202], which provides that a judgment becomes a lien upon real property if it is recorded in the office of the county recorder, to be read in harmony with section [78B-5-201]."[17] The Court of Appeals ultimately determined that "after July 1, 2002, a person seeking a lien on property need only file in the office of the county recorder."[18] This interpretation accords with the unambiguous language of section 78B-5-202 as well as subsections 78B-5-201(4) and (6), all of which are stated in the disjunctive—clarifying that a judgment creditor must either file a judgment in the Registry of Judgments or in the office of the county recorder.

Nevertheless, the Mulligans argue that *Kitches* was decided incorrectly, urging the Court to instead rely on other cases interpreting the Judgment Lien Act. However, the primary case on which the Mulligans rely for their assertion, *T3 Properties, LLC v. Persimmon Investments, Inc.*,[19] involved the interpretation of the pre-2002 version of the Act. Subsection 78B-5-201(3) had yet to be added to the statute. And, in *T3 Investments*, the judgment creditor had failed to record an information statement with the judgment.[20] The Utah Court of Appeals ultimately determined in that case that "the 2001 version of section [78B-5-201] of the judgment lien statute

---

[15] *See Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 2005 UT App 164, ¶13, 112 P.3d 1210. The Court notes section 78B-5-201 and -202 were renumbered in 2008. However, these provisions have not been substantively amended since *Kitches* was decided. Accordingly, the Court may properly rely on *Kitches* notwithstanding that it cites to the prior version of the statute.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] 2013 UT App 38, 299 P.3d 613.
[20] *See id.* at ¶17.

requires that a judgment be recorded in the Registry of Judgments with a separate information statement in order to create a judgment lien."[21] *T3 Investments* is distinguishable on this point—the Mulligans, in opposing the Writ, have not raised a failure to file a separate information sheet. Furthermore, *T3 Investments* involved the 2001 version of the Act and therefore provides no clarification regarding whether a judgment creditor must comply with both subsection (2) and subsection (3)—which was added to the statute in 2002—prior to converting a judgment to a lien. Accordingly, the Mulligans' argument on this issue is unavailing.

The Mulligans also argue that, if the Court were to adopt Alum Rock's interpretation of the statute, it would require less for a foreign judgment debtor to create a lien than is required for a domestic judgment debtor to do so. However, *Kitches* applies with equal weight to both foreign and domestic judgments. The decision addressed the requirements of the Judgment Lien Act, which apply, according to the plain language of the applicable statutes, to both foreign and domestic judgments.[22] To interpret the Foreign Judgment Act as requiring only the recording of a judgment in the office of the county recorder where the real property subject to the lien is located would not relieve foreign judgment creditors from any of the requirements in the Judgment Lien Act. Therefore, the Mulligans' arguments are unavailing, and the Court determines Alum Rock complied with sections 78B-5-201 and -202 when it recorded the judgment in Weber County on November 16, 2020.

Finally, the Mulligans argue that because they purchased the Property prior to the issuance of the writ of execution, they purchased the property prior to the attachment of any lien

---

[21] *See Id.* at ¶28.
[22] *See Kitches & Zorn*, 2005 UT App 164, at ¶13, 112 P.3d 1210.

related to the judgment.[23] The judgment lien attached on November 16, 2020, when Alum Rock recorded the judgment with the Weber County Recorder. Thus, the lien attached before the Mulligans' purchase of the Property on May 11, 2021. "The transfer of property subsequent to the attachment of [a] lien does not affect the lien for it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes *cum onere*."[24] And where liens attach before a purchaser receives legal title, the purchaser acquires title "subject to the previous encumbrances."[25] As the lien attached prior to the Mulligans' purchase of the Property, the Mulligans acquired title subject to the lien.

*B. The Writ of Execution*

The Mulligans also assert that the Court lacked jurisdiction to enter a writ of execution regarding the Property, which is located outside the Third District. In support, the Mulligans cite two cases, *Sherman v. Droubay*[26] and *Ashton-Jenkins Co. v. Bramel*.[27] This reliance is misplaced. *Sherman* involved a statute requiring actions for the foreclosure of all liens and mortgages on real property to be "tried in the county in which the subject of the action or some part thereof is situated."[28] Similarly, in *Ashton-Jenkins*, the Utah Supreme Court interpreted a statute requiring notice of a lis pendens to "be published in the county where the land lies."[29] No

---

[23] Again, the Mulligans have raised only Alum Rock's failure to file the judgment in the Registry of Judgments, they have not raised any issue with the sufficiency of the information statement included with the recorded judgment. So there is no need to further address the sufficiency of the judgment information statement.
[24] *See Utah Farm Prod. Credit Ass'n v. Wasatch Bank of Pleasant Grove*, 734 P.2d 904, 906 (Utah 1986).
[25] *F.D.I.C. v. Taylor*, 2011 UT App 416, ¶21, 267 P.3d 949.
[26] 74 P.348 (Utah 1903).
[27] 192 P. 375 (Utah 1920).
[28] *Sherman v. Droubay*, 74 P. 348, 348 (Utah 1903).
[29] *Ashton-Jenkins Co. v. Bramel*, 192 P. 375, 381 (Utah 1920).

such provision is found in rule 64E.[30] Thus, these cases are distinguishable and do not control this Court's determination.

The Mulligans also argue that the language of section 78B-5-302 should apply to limit the issuance of a writ of execution to the boundaries of the corresponding judicial district. However, Rule 64E provides "[a] writ of execution is available to seize property in the possession or under the control of the defendant following entry of a final judgment or order requiring the delivery of property or the payment of money."[31] Rule 64 provides, in turn, that "[i]f the writ directs the seizure of real property, the clerk of the court shall issue the writ to the sheriff of the county in which the real property is located."[32] In interpreting this provision, courts have determined that "Utah courts and clerks have no authority to direct sheriffs of other states' counties to seize property."[33] Implicit in this determination is the correlate—that Utah courts have authority to issue writs for the seizure of real property to sheriffs of Utah counties, regardless where the district court is located in the state. Supporting such determination is the Utah Code of Judicial Administration, which provides "[a] district court judge may issue all extraordinary writs and other writs necessary to carry into effect the district court judge's orders, judgments, and decrees."[34] "District courts are courts of general jurisdiction. As such, they maintain jurisdiction to consider all matters except as limited by statute or constitution . . . . Under this broad jurisdictional grant, district courts maintain a certain degree of inherent power

---

[30] *See generally* UTAH R. CIV. P. 64E.
[31] UTAH R. CIV. P. 64E(a).
[32] *Id.* R. 64(d)(1).
[33] *See Aequitas Enters., LLC v. Interstate Inv. Grp., LLC*, 2011 UT 82, ¶17, 267 P.3d 923.
[34] Utah Code Ann. § 78A-5-102(2).

to properly discharge their duties."[35] Accordingly, contrary to the Mulligans' assertion, the Court possessed the requisite authority to issue the Writ notwithstanding that the Property was located outside the Third District.

## CONCLUSION

Sections 78B-5-201 and -202, read in concert, require only that a judgment creditor file a judgment in the Registry of Judgments or that it file a judgment in the office of the county recorder of the county in which the property subject to the lien is located and file a separate information statement to convert a judgment to a lien. Alum Rock complied with these provisions, recording the judgment and a separate judgment information sheet in the Weber County Recorder's Office on November 16, 2020. As the Property was under the control of Mr. Del Valle at the time the judgment was domesticated in Utah, it was subject to execution under rule 64E. Finally, this Court is a court of general jurisdiction and may therefore issue writs, including the writ at issue in this case. The location of the Property outside the Third District does not invalidate the writ. The Court properly issued a writ of execution for the Property on June 22, 2021, and the Court declines to set aside that writ.

This is the Order of the Court, and no further writing is required.

DATED October 27, 2022.

Judge Adam T. Mow
Third Judicial District Court

STATE OF UTAH
THIRD DISTRICT COURT
SALT LAKE CITY

[35] *W. Water, LLC v. Olds*, 2008 UT 18, ¶42, 184 P.3d 578.

**CERTIFICATE OF NOTIFICATION**

I certify that a copy of the attached document was sent to the following people for case 206927043 by the method and on the date specified.

MAIL: PRP INVESTORS MADISON LLC 417 29TH STREET NEWPORT BEACH, CALIFORNIA 92663

MAIL: BDV INC 417 29TH STREET NEWPORT BEACH, CALIFORNIA 92663

MAIL: BDV LLC 417 29TH STREET NEWPORT BEACH, CALIFORNIA 92663

MANUAL EMAIL: BRADLEY TILT BRADLEY.TILT@FREEMANLOVELL.COM

MANUAL EMAIL: BENJAMIN JOHNSON BEN.JOHNSON@BTJD.COM

Date: 10/27/2022 /s/ TANNER FLINDERS

Signature

# EXHIBIT 2

*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 22**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

MOLLY J. MULLIGAN and JOHN P. MULLIGAN,
*Appellants,*

*v.*

ALUM ROCK RIVERSIDE, LLC,
*Appellee.*

No. 20221024
Heard April 10, 2024
Filed July 18, 2024

On Direct Appeal

Third District, Salt Lake County
The Honorable Adam T. Mow
No. 206927043

Attorneys:

Bradley L. Tilt, Salt Lake City, Felicia B. Canfield, Cody, Wyo., for appellants

Benjamin D. Johnson, KC Hooker, Salt Lake City, for appellee

JUSTICE HAGEN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, and JUSTICE POHLMAN joined.

JUSTICE HAGEN, opinion of the Court:

## INTRODUCTION

¶1 This case stems from a California judgment that Alum Rock Riverside, LLC obtained against Brett Del Valle. After domesticating the judgment in Utah and recording it with the county recorder, Alum Rock received a writ of execution allowing it to seize and sell a property in Weber County.

¶2 At the time Alum Rock recorded the judgment with the county recorder, the property was owned by a revocable trust that was established and administered by Brett and his wife. But the trust had sold the property by the time Alum Rock applied for the writ. And when the court issued the writ, the property's new owners—the Mulligans—objected, arguing that (1) Alum Rock failed to create a judgment lien because it did not record the judgment in the registry of judgments, (2) the writ was not available because the trust—not Brett—held title to the property when the judgment was domesticated in Utah, and (3) the district court lacked jurisdiction to issue the writ because the property was located in a different judicial district.

¶3 The district court upheld the writ over the Mulligans' objections, and we affirm. First, we hold that Alum Rock created a judgment lien when it recorded the judgment in the county recorder's office. As of July 1, 2002, a party seeking a judgment lien is not required to record the judgment in the registry of judgments. Second, we hold that the writ was available against the property, even though the title was held in the name of a revocable trust, because Brett retained all indicia of ownership over the property when the lien was created. And third, we hold that the Mulligans have not identified a relevant limitation on the district court's jurisdiction that would prevent it from issuing the writ.

**BACKGROUND**

¶4 Alum Rock Riverside, LLC sued Brett Del Valle in California state court for breach of contract and other claims. Alum Rock prevailed, and the court issued a judgment in its favor totaling more than $4 million. Soon after, Alum Rock domesticated the judgment in Utah's Third District Court. Because the Del Valle Family Trust owned property in Weber County, Utah, Alum Rock recorded the judgment in the Weber County Recorder's Office.

¶5 Brett and his wife, Traci, had formed the trust years earlier, naming themselves as trustees. Brett and Traci retained broad powers over the trust and its property, including the power to revoke the trust, amend it, and transfer property from it. In addition, the trust empowered Brett and Traci, as trustees, to hold, manage, control, lease, and encumber trust property. Several years after they created the trust, Brett and Traci, acting as trustees, acquired the Weber County property at issue in this case.

¶6 The trust continued to hold title to the property when Alum Rock recorded its judgment against Brett in the county

recorder's office. A few months after Alum Rock recorded the judgment, however, the trust conveyed the property to Molly and John Mulligan. And one month after that, Alum Rock applied for a writ of execution against the property, identifying Brett as the judgment debtor and asking the district court to "direct the sheriff to seize and sell" the property to satisfy the judgment.

¶7 When the court issued the writ as requested, the Mulligans challenged it. Acknowledging that their challenge "rises or falls" on whether a lien "was created and attached to the property," they asserted that Alum Rock did not do what the Judgment Act requires to create a judgment lien on real property.[1] Specifically, they claimed that Alum Rock did not fully comply with the following statutory requirements, found in Utah Code section 78B-5-201:

> (2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.
>
> (3)(a) On or after July 1, 2002, . . . a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021).

¶8 The Mulligans argued that because Alum Rock obtained its judgment against Brett in 2020—after both July 1, 1997, and July 1, 2002—Alum Rock needed to comply with the requirements of both subsections: filing the judgment in the registry of judgments and recording it with the county recorder. Because Alum Rock did not file the judgment in the registry of judgments, the Mulligans reasoned, a lien was not created.

---

[1] We refer to Utah Code, Title 78B, Chapter 5, Part 2 as the Judgment Act. Effective July 1, 2024, the Judgment Act was renumbered, and the legislature made minor stylistic changes. We cite the version in effect at the time the district court issued the writ.

¶9 The Mulligans also claimed that, under the Judgment Act and the Utah Rules of Civil Procedure, the writ was not "available" against the property. Under the Judgment Act, real property subject to a judgment lien "includes all the real property . . . owned or acquired at any time by the judgment debtor during the time the judgment is effective." *Id.* § 78B-5-202(7)(c)(ii) (2021). And under rule 64E of the Utah Rules of Civil Procedure, "[a] writ of execution is available to seize property in the possession or under the control of the defendant following entry of a final judgment." UTAH R. CIV. P. 64E(a). According to the Mulligans, the writ was "issued improperly" because (1) Brett never owned the property (the trust did), and (2) in any event, he did not possess or control the property at the relevant time (the Mulligans did).

¶10 Finally, the Mulligans questioned the district court's jurisdiction. In their view, the court lacked jurisdiction to issue the writ because the proceedings fall within reach of a venue statute that lists actions that "shall be tried in the county in which the [property] . . . is situated." *See* UTAH CODE § 78B-3-301(1) (2021).[2] The Mulligans also claimed that under Utah caselaw, actions in which the "main question . . . involves title to real property" may be heard only by the district court where the property is located. (Quoting *Calder v. Third Jud. Dist. Ct.*, 273 P.2d 168, 171 (Utah 1954).) Because the property here is outside the district court's geographic boundaries, the Mulligans maintained that the court lacked jurisdiction to issue the writ.

¶11 The district court upheld the writ against the Mulligans' challenge. It first concluded that the Judgment Act did not require Alum Rock to file its judgment in the registry of judgments, as the Mulligans had argued, and that Alum Rock's lien attached when the judgment was recorded with the county recorder. Next, the court determined that because the property was under Brett's control when Alum Rock domesticated the judgment, the property was subject to execution under rule 64E. Finally, the court rejected the Mulligans' challenge to its jurisdiction, explaining that it had the power to issue the writ even though the property is located outside the Third District.

[2] This venue statute has been renumbered and slightly altered, effective July 1, 2024. *See* UTAH CODE § 78B-3a-202(1). We cite the version in effect at the time the district court issued the writ.

¶12 The Mulligans appeal, and we have jurisdiction under Utah Code subsection 78A-3-102(3)(j).

**ISSUES AND STANDARDS OF REVIEW**

¶13 The parties dispute whether Alum Rock created a judgment lien on the property. "Judgment liens are creatures of statute . . . ." *Gildea v. Wells Fargo Bank, N.A.*, 2015 UT 11, ¶ 12, 347 P.3d 385. Accordingly, whether the property here is encumbered by Alum Rock's purported judgment lien raises a question of statutory interpretation, a legal question that we review for correctness. *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863.

¶14 The Mulligans also contest the district court's conclusions that the property is subject to the writ and that the court had jurisdiction to issue the writ. Because these determinations were premised on the court's interpretation of Utah law, they also present legal questions, which we review for correctness. *See Peak Alarm Co. v. Salt Lake City Corp.*, 2010 UT 22, ¶ 16, 243 P.3d 1221.

**ANALYSIS**

¶15 The Mulligans challenge three aspects of the district court's decision, each of which turns in part on statutory interpretation. "The aim of statutory interpretation is to ascertain the intent of the legislature, and the best evidence of the legislature's intent is the plain language of the statute itself." *SunStone Realty Partners X LLC v. Bodell Constr. Co.*, 2024 UT 9, ¶ 11, 545 P.3d 260 (cleaned up). But because "statutory text may not be plain when read in isolation," *State v. J.M.S. (In re J.M.S.)*, 2011 UT 75, ¶ 13, 280 P.3d 410 (cleaned up), "we determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)," *McKitrick v. Gibson*, 2021 UT 48, ¶ 19, 496 P.3d 147 (cleaned up).

¶16 We first address the Mulligans' contention that Alum Rock skipped a necessary step to create a lien on the property by not filing its judgment in the registry of judgments. We clarify that to create a lien from a foreign judgment, creditors must adhere to relevant requirements under the Judgment Act as well as the Foreign Judgment Act. But since July 1, 2002, creditors do not need to file judgments in the registry of judgments to create a lien. Thus, Alum Rock created a valid lien when it recorded its judgment in the county recorder's office.

¶17 Next, we assess whether Brett "owned" the property, allowing Alum Rock's lien to attach, even though the revocable trust that he and his wife created and administered held title to it. We conclude that he did.

¶18 Finally, we consider and reject the Mulligans' argument that limitations on the district court's jurisdiction prohibited the court from issuing the writ.

I. ALUM ROCK CREATED A VALID LIEN ON THE PROPERTY

¶19 To resolve this appeal, we must decide whether Alum Rock created a valid lien on the property before it was sold to the Mulligans. The answer to that question largely depends on the meaning of two provisions of the Judgment Act.

¶20 These provisions, subsections (2) and (3)(a) of Utah Code section 78B-5-201, set out actions that judgment creditors have needed to perform at different times to create a judgment lien on real property:

> (2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.
>
> (3)(a) On or after July 1, 2002, . . . a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021). The Mulligans argue that these requirements—the registry-of-judgments requirement and the county-recorder requirement—"work together, cumulatively." Under their reading, because the judgment was domesticated in 2020, which is "on or after" both July 1, 1997, and July 1, 2002, *see id.*, Alum Rock could not create a lien on the property unless it (1) filed its judgment in the registry of judgments and (2) recorded it with the county recorder.

¶21 Before interpreting these provisions, we address a threshold issue raised by Alum Rock: whether section 78B-5-201 of the Judgment Act even applies here, given that Alum Rock's

judgment is a foreign judgment. After explaining why the section applies, we interpret its provisions.

*A. Creditors Domesticating Foreign Judgments Must Adhere to the Judgment Act's Requirements for Creating a Lien*

¶22 Alum Rock argues that the Judgment Act's registry-of-judgments requirement is not implicated here because Alum Rock's judgment is governed by the Foreign Judgment Act, which makes no mention of the registry of judgments. We disagree.

¶23 As it relates to converting a foreign judgment into a lien, the Foreign Judgment Act provides:

> (1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:
>
> (a) a stay of execution has not been granted;
>
> (b) the requirements of this chapter are satisfied; and
>
> (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202 [of the Judgment Act].

UTAH CODE § 78B-5-305(1).

¶24 Alum Rock points out that this section of the Foreign Judgment Act mentions section 78B-5-202 of the Judgment Act but not section 78B-5-201. And, it adds, section 202 also does not mention section 201 or its registry-of-judgments requirement, on which the Mulligans' argument turns. *See id.* § 78B-5-202(7)(a) (2021) ("After July 1, 2002, a judgment . . . becomes a lien upon real property if . . . the judgment . . . is recorded in the office of the county recorder.").

¶25 These points are well taken. Still, the Foreign Judgment Act declares that foreign judgments are treated the same as domestic ones. Specifically, it provides that "[a] foreign judgment filed under [the Foreign Judgment Act] has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court of this state." *Id.* § 78B-5-302(3). Alum Rock argues that this language does not "incorporate[] the Judgment Act wholesale into the Foreign Judgment Act." Instead, Alum Rock urges us to parse this language and treat the phrase "for

reopening, vacating, setting aside, or staying" as modifying and limiting the entire preceding series—"procedures, defenses, enforcement, satisfaction, and proceedings."

¶26 To take one example, as Alum Rock sees it, foreign judgments are not generally "subject to the same procedures" as domestic judgments; they are merely "subject to the same procedures . . . *for reopening, vacating, setting aside, or staying*" as domestic judgments. Alum Rock thus argues that the Judgment Act applies to foreign judgments only when reopening, vacating, setting aside, or staying a foreign judgment, none of which Alum Rock seeks to do here.

¶27 But Alum Rock's argument is undercut by a decision that we issued after the briefing in this appeal was completed, *SunStone Realty Partners X LLC v. Bodell Construction Co.*, 2024 UT 9, 545 P.3d 260. There, the parties disputed whether, under the Foreign Judgment Act, Utah's or Hawaii's postjudgment interest rate applied to a Hawaii judgment that was domesticated in Utah. *Id.* ¶¶ 1–2. In resolving the dispute, we explained that the Foreign Judgment Act "mandates that foreign judgments domesticated using the [Foreign Judgment Act] are 'subject to the same procedures, defenses, enforcement, satisfaction, and proceedings . . . as a judgment of a district court of this state.'" *Id.* ¶ 13 (quoting UTAH CODE § 78B-5-302(3)). In line with this principle, we held that "[b]ecause postjudgment interest is an enforcement mechanism," Utah's postjudgment interest rate applied. *Id.* ¶ 21.

¶28 In *SunStone* we did not read the phrase "for reopening, vacating, setting aside, or staying" as modifying "enforcement." *See id.* ¶ 13; *see also* UTAH CODE § 78B-5-302(3). Indeed, it would be unreasonable to read the phrase to modify terms like "enforcement" and "satisfaction" because a judgment's enforcement or satisfaction would not be at issue in proceedings to reopen, vacate, set aside, or stay a judgment. This leads us to conclude that the phrase limits and modifies only the nearest item in the series to it—"proceedings."

¶29 We reject Alum Rock's reading for another reason as well. Under its reading, a creditor intending to create a lien based on a domestic judgment would be subject to all the Judgment Act's constraints, but a foreign-judgment creditor would not. This would result, counterintuitively, in a foreign judgment being *easier* to convert into a lien than a domestic one, which is contrary to an express purpose of the Foreign Judgment Act—to treat foreign

judgments the same as domestic ones in key respects. *See* UTAH CODE § 78B-5-302(2)–(3).

¶30 Like postjudgment interest, a lien is a means of enforcing a judgment. As such, a foreign judgment is subject to the same requirements for lien creation as domestic judgments. Thus, the Foreign Judgment Act incorporates the Judgment Act's requirements for creating a judgment lien, including those found in section 78B-5-201.

*B. Alum Rock Did Not Need to File Its Judgment in the Registry of Judgments to Create a Lien*

¶31 Having concluded that section 201 applies, we must interpret subsections (2) and (3)(a) and determine whether their requirements are cumulative (as the Mulligans argue) or sequential (as Alum Rock argues). We hold that they are sequential, not cumulative.

¶32 Although we have yet to decisively interpret these provisions, the court of appeals previously interpreted a substantively similar version of the statute under analogous circumstances and rejected the cumulative reading now advanced by the Mulligans. In *Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 2005 UT App 164, 112 P.3d 1210, judgment creditors recorded an abstract of their judgment in the county recorder's office and applied for a writ of execution permitting them to sell a property that was owned by the judgment debtor. *Id.* ¶¶ 2–3. But the judgment debtor deeded his interest in the property to his wife between the time the creditors recorded the judgment with the county recorder and the time they applied for the writ. *Id.* ¶ 2.

¶33 When the district court issued the writ, the judgment debtor objected, claiming that the creditors did not create a lien on the property before the debtor conveyed the property to his wife because they "had not . . . filed the Judgment in the Registry of Judgments." *Id.* ¶ 4. On appeal, the debtor argued that the registry-of-judgments and county-recorder provisions "must be read together, thereby creating a two-step process" that required post-2002 judgments to be filed "in both the Registry of Judgments and the office of the county recorder." *Id.* ¶ 12.

¶34 The *Kitches* court rejected this cumulative reading and held that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." *Id.* ¶ 13. We reach the same conclusion because it is supported by the structure of section

78B-5-201, other sections of the Utah Code from the Judgment Act and the Foreign Judgment Act, and the prior-construction canon of statutory interpretation.

¶35 The structure of section 201 itself signals that the registry-of-judgments and county-recorder requirements are to be read sequentially, creating independent requirements for successive time periods. For context, a district court's entry of judgment historically "create[d] a lien upon the real property of the judgment debtor" automatically. *See* UTAH CODE § 78B-5-202(2) (2021) ("Prior to July 1, 1997, . . . the entry of judgment by a district court creates a lien upon the real property of the judgment debtor . . . ."). But the legislature did away with this automatic-lien regime. As recognized by subsection (2) of section 78B-5-201, beginning July 1, 1997, a judgment lien does not arise automatically upon a district court's entry of judgment; such a judgment does not create a lien "unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located." *Id.* § 78B-5-201(2) (2021).

¶36 As with the automatic-lien regime, the legislature also phased out subsection (2)'s registry-of-judgments requirement. Subsection (3)(a) of section 201 marks this evolution in the law. Rather than allow a judgment to create a lien automatically (before July 1, 1997) or require judgment creditors to file the judgment in the registry of judgments (on or after July 1, 1997), beginning July 1, 2002, a judgment entered in the district court does not create a lien "unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located." *Id.* § 78B-5-201(3)(a) (2021).

¶37 This sequential reading makes sense when we zoom in on the grammatical structure of subsections (2) and (3)(a). The two subsections are separate, stand-alone provisions, each punctuated with a period. Their requirements are not joined with a conjunction such as "and" or "or." And subsection (3)(a) does not expressly incorporate subsection (2)'s registry-of-judgments requirement.

¶38 Contrast this with subsection (4) of the same section, which also imposes requirements on judgment creditors, requiring them to include certain information when filing or recording a judgment:

> (4) In addition to the requirements of Subsections (2) and (3)(a), any judgment that is filed in the Registry of Judgments on or after September 1, 1998, or any judgment or abstract of judgment that is

> recorded in the office of a county recorder after July 1, 2002, shall include:
>
> > (a) the information identifying the judgment debtor as required under Subsection (4)(b) on the judgment or abstract of judgment; or
> >
> > (b) a copy of the separate information statement of the judgment creditor that contains:
> >
> > > (i) the correct name and last-known address of each judgment debtor and the address at which each judgment debtor received service of process;
> > >
> > > (ii) the name and address of the judgment creditor;
> > >
> > > (iii) the amount of the judgment as filed in the Registry of Judgments;
> > >
> > > (iv) if known, the judgment debtor's Social Security number, date of birth, and driver's license number if a natural person; and
> > >
> > > (v) whether or not a stay of enforcement has been ordered by the court and the date the stay expires.

*Id.* § 78B-5-201(4) (2021). Unlike subsections (2) and (3)(a), subsection (4)'s requirements are unified, with the cumulative requirements indented, punctuated with semicolons, and joined with a conjunction. And with the opening phrase "in addition to," subsection (4) expressly incorporates the requirements of previous subsections.

¶39 As subsection (4) demonstrates, the legislature knows how to signal when it intends requirements to be cumulative. But unlike subsection (4), subsection (3) does not state that recording in the county recorder's office must be done "[i]n addition to" the registry-of-judgments requirement in subsection (2). And instead of listing both requirements as indented subsections separated by semicolons and a conjunction, the legislature listed the two requirements as stand-alone provisions triggered on different dates. That structure supports our reading that subsection (3)'s requirements supplant those in subsection (2) after July 1, 2002.

¶40 Reading the subsections sequentially also makes sense when we zoom out and look at related sections of the Utah Code.

We have a "duty to harmonize and reconcile statutory provisions." *Field v. Boyer Co.*, 952 P.2d 1078, 1081 (Utah 1998) (cleaned up). Reading section 201's requirements as being sequential harmonizes and reconciles them with section 78B-5-202 of the Judgment Act and section 78B-5-305 of the Foreign Judgment Act. Properly understood, all three statutes provide that, since July 1, 2002, a judgment becomes a lien on real property if it is recorded in the office of the county recorder. Utah Code section 78B-5-202 provides that, after July 1, 2002, a judgment becomes a lien on real property if it "is recorded in the office of the county recorder." UTAH CODE § 78B-5-202(7)(a) (2021). And Utah Code section 78B-5-305, part of the Foreign Judgment Act, provides:

> (1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:
>
> (a) a stay of execution has not been granted;
>
> (b) the requirements of this chapter are satisfied; and
>
> (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202.

*Id.* § 78B-5-305(1).

¶41 Notice that these sections do not refer to the registry of judgments. If, as the Mulligans suggest, the legislature intended judgment creditors to continue filing in both the registry of judgments and the county recorder's office, this absence would be hard to reconcile. For example, consider how the text of section 202 squares with the Mulligans' reading of section 201. Section 202 provides, "After July 1, 2002, a judgment . . . becomes a lien upon real property if . . . the judgment . . . is recorded in the office of the county recorder." *Id.* § 78B-5-202(7)(a) (2021). But under the Mulligans' reading of section 201, after July 1, 2002, a judgment *does not* become a lien on real property if the judgment is recorded in the office of the county recorder; the judgment must also be filed in the registry of judgments.

¶42 Historical context helps explain why sections 202 and 305 mention the county-recorder requirement but not the registry-of-judgments requirement. In 2001, the legislature passed a bill that amended the Judgment Act and the Foreign Judgment Act in

significant ways. *See* Judgment Lien Amendments, H.B. 305, 2001 Leg., Gen. Sess. (Utah 2001) (available at https://le.utah.gov/~2001/bills/hbillenr/HB0305.htm). The bill—which ushered in the county-recorder regime for judgment-lien creation—provided that the statutory overhaul was to take effect July 1, 2002. *See id.* Before that date, the sections that are now codified as sections 202 and 305 did not specify the manner of recording a judgment lien. *See* UTAH CODE §§ 78-22-1, 78-22a-5 (2001). As of July 1, 2002, however, the sections recognized and reflected the incoming county-recorder requirement. *See id.* §§ 78-22-1, 78-22a-5 (July 2002). Each section was amended to specify that for a judgment to create a lien, the judgment must be "recorded in the office of the county recorder." *See id.* §§ 78B-5-202(7)(a), -305(1)(c). But the legislature did not add similar language referring to the registry-of-judgments requirement. That omission further supports our conclusion that the outdated registry-of-judgments requirement was entirely supplanted by the county-recorder regime as of July 1, 2002.

¶43 The prior-construction canon of statutory interpretation also reinforces our reading of section 201. Under that canon, if a word or phrase has been uniformly interpreted in caselaw, "a later version of that act perpetuating the wording is presumed to carry forward that interpretation." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322 (2012). In other words, "where a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent." *Christensen v. Indus. Comm'n*, 642 P.2d 755, 756 (Utah 1982).

¶44 In *Kitches*, the court of appeals interpreted the section that is now codified as section 201 to mean that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." 2005 UT App 164, ¶ 13. That decision has stood as controlling law in this jurisdiction for nearly two decades, and during that time judgment creditors have presumably relied on it as such. The legislature has amended the Judgment Act—including section 201—several times since *Kitches* was decided, yet

it has not modified the language to abrogate the case's holding.[3] We presume that by amending the statute but leaving the portions relevant here unamended, the legislature was satisfied with *Kitches*' reading.

¶45 The Mulligans maintain that *Kitches* has not been the controlling law in Utah since 2013 because it was overtaken by the court of appeals' decision in *T3 Properties, LLC v. Persimmon Investments, Inc.*, 2013 UT App 38, 299 P.3d 613. There, a creditor obtained a court judgment in 2001, at which time the judgment debtor owned property in Salt Lake County. *Id.* ¶¶ 2–3. Not long after, however, the debtor conveyed his interest in the property to a third party. *Id.* ¶ 3. And not until years later did the creditor begin efforts to execute the judgment by having the property sold. *Id.* ¶ 4.

¶46 Between the time the court entered the judgment and the time the debtor transferred the property, the creditor recorded the judgment in the registry of judgments but did not file an information statement with the judgment.[4] *Id.* ¶¶ 16–17. The issue was whether the judgment creditor created a lien on the property before the debtor conveyed it away. *Id.* ¶ 17. To answer that question, the court interpreted the 2001 version of the Judgment Act, *id.* ¶¶ 16–28, which, like the current version, provided that "[o]n or after July 1, 1997, a judgment . . . does not create a lien upon or affect the title to real property unless the judgment is recorded in the Registry of Judgments," *see id.* ¶ 15 (quoting UTAH CODE § 78-22-1.5(2) (2001)). The next subsection provided, "In addition to the requirement of [the previous subsection], any judgment that is recorded in the Registry of Judgments on or after September 1,

[3] For examples of how section 201 has been amended over the years, see H.B. 46, 2011 Leg., Gen. Sess. (Utah 2011) (available at https://le.utah.gov/~2011/bills/static/HB0046.html); H.B. 315, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/hbillenr/hb0315.htm); H.B. 16, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/static/hb0016.html); H.B. 251, 2023 Leg., Gen. Sess. (Utah 2023) (available at https://le.utah.gov/~2023/bills/static/HB0251.html).

[4] There was some uncertainty about whether the judgment was recorded in the registry of judgments, but the court assumed that it was. *See T3 Pros., LLC v. Persimmon Invs., Inc.*, 2013 UT App 38, ¶¶ 16, 28, 299 P.3d 613.

1998, shall include a separate information statement of the judgment creditor." *Id.* (quoting UTAH CODE § 78-22-1.5(3) (2001)).

¶47 The *T3* court concluded that under the 2001 version of the Judgment Act, "both requirements"—the registry-of-judgments and information-statement requirements—"must be satisfied to create a judgment lien." *Id.* ¶ 19. To support this conclusion, the court analyzed the relevant text by noting that (1) the legislature's "[u]se of the word 'shall' . . . indicates that filing an information statement is mandatory," and (2) the information-statement requirement "must be completed 'in addition' to" the registry-of-judgments requirement. *Id.* (cleaned up); *see also id.* ¶ 21. Even though the court's decision was based on the language of the 2001 version of the Judgment Act and turned on the information-statement requirement, the court added a footnote stating that "the 2002 version [of the Judgment Act] required that the judgment and the information statement be recorded in both the Registry of Judgments and in the county recorder's office." *Id.* ¶ 14 n.5.

¶48 According to the Mulligans, *T3* overtook *Kitches* as controlling law interpreting the Judgment Act. We disagree. Although the *T3* court included a footnote suggesting that the registry-of-judgments and county-recorder requirements of the 2002 Judgment Act are cumulative, *see id.*, that statement was dicta because it was "unnecessary to the decision in the case and therefore not precedential," *see Obiter Dictum*, BLACK'S LAW DICTIONARY (12th ed. 2024). A separate panel of the court, squarely presented with the issue, had held that those requirements are sequential and that judgments no longer need to be filed in the registry of judgments for a lien to attach. *See supra* ¶¶ 32–34. The *T3* court did not even mention *Kitches*, much less purport to overrule it. *Kitches* remained controlling law on the sequential nature of the recording requirements despite the footnote dicta in *T3*. We therefore presume that when the legislature amended section 201 post-*Kitches*, it saw no need to amend the recording requirements because it was satisfied with the prior judicial interpretation of those requirements in *Kitches*.

¶49 The Mulligans also argue that the court's analysis in *T3* favors a cumulative reading of the registry-of-judgments and county-recorder requirements. They maintain that *T3* "involved a deep analysis" of section 201 and "laid out a roadmap for how courts should analyze [the Judgment Act's] cumulative amendments over time." Although we are not bound to follow

court of appeals decisions, we often look to those decisions for their persuasive value. *Eaton Kenway, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 906 P.2d 882, 885 (Utah 1995). But we see little persuasive value in *T3* relative to the issue in the present case.

¶50 The court in *T3* interpreted a different provision in the 2001 version of the Judgment Act, which did not contain the county-recorder requirement. *See* 2013 UT App 38, ¶ 15. The question before the court was whether the registry-of-judgments and information-statement requirements were cumulative. *See id.* ¶ 28. Unlike the county-recorder requirement at issue here, the information-statement requirement specified that it was "[i]n addition to" the registry-of-judgments requirement found in section 201(2). *Id.* ¶ 12 (quoting Utah Code § 78-22-1.5(3) (2001)). This additional language, which expressly made the registry-of-judgments and the information-statement requirements cumulative, easily distinguishes *T3* from both *Kitches* and the present case.

¶51 We endorse *Kitches*' holding that, since July 1, 2002, a lien on real property is created by recording the judgment, along with other required information, with the county recorder where the real property is located. Alum Rock therefore did not need to record the judgment in the registry of judgments, and it created a lien by recording the judgment in the county recorder's office.

## II. BRETT OWNED THE PROPERTY FOR PURPOSES OF ALUM ROCK'S LIEN ATTACHING

¶52 The Mulligans argue that, under the Judgment Act, "[t]here is no basis for any judgment lien against the Property" because the trust, not Brett, held title to the property. Before explaining why we disagree, we pause to address the Mulligans' criticism of the district court's analysis.

¶53 The Mulligans criticize the district court for relying on rule 64E of the Utah Rules of Civil Procedure, rather than the Judgment Act, in concluding that the property is "subject to the execution." Rule 64E allows writs of execution to be issued against property that is "*in the possession or under the control of* the defendant." UTAH R. CIV. P. 64E(a) (emphasis added). The Judgment Act, in contrast, sets the conditions under which a judgment lien attaches in the first instance, providing that real property subject to a judgment lien "includes all the real property . . . *owned or acquired* at any time by the judgment debtor during the time the judgment is effective." UTAH CODE § 78B-5-202(7)(c)(ii) (2021) (emphasis added).

¶54 The Mulligans argue that the district court should have focused its analysis on the Judgment Act, rather than on rule 64E, which they contend "has nothing whatsoever to do with whether the Foreign Judgment against Brett personally could become a lien against Property he never owned." But because they principally relied on rule 64E, not the Judgment Act, before the district court, the court's reliance on rule 64E was understandable. In their principal filing below, the Mulligans cited rule 64E and quoted, with emphasis, the rule's language regarding possession and control. In contrast, they mentioned the Judgment Act's "owned or acquired" language only in passing in a footnote.

¶55 It is true that the Mulligans argued to the district court that the property was "never . . . *owned* by Brett Del Valle in his individual and personal capacity." (Emphasis added.) Yet they never tied that argument to the language of the Judgment Act, and the thrust of their argument below was that the writ "was not properly available under the express terms" of the "governing Utah Rules of Civil Procedure." In its decision, the court rejected that rule-based argument because rule 64E "does not contain any provision limiting its application to owners of property."

¶56 On appeal, the Mulligans distance themselves from their prior reliance on rule 64E and embrace the Judgment Act's "owned or acquired" language.[5] Under the Judgment Act, real property subject to a judgment lien "includes all the real property. . . owned or acquired at any time by the judgment debtor during the time the judgment is effective."[6] *Id.* To the Mulligans, holding title is the essence of ownership. Because Brett "was never in title," they maintain that "he never owned the Property" and the lien never attached to it.

¶57 When the judgment was entered against Brett, the property was held by the Del Valle Family Trust, which is a revocable trust that Brett formed with his wife, Traci. "A trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of the beneficiaries." *Cont'l Bank & Tr. Co. v. Country Club Mobile Ests., Ltd.*, 632 P.2d 869, 872 (Utah 1981). A revocable trust is "[a] trust in which the settlor" (the person who creates the trust)

[5] Alum Rock has not challenged this issue as unpreserved.

[6] The Utah Code defines "[r]eal property" as "any right, title, estate, or interest in land." UTAH CODE § 57-1-1(3).

"reserves the right to terminate the trust and recover the trust property and any undistributed income." *Revocable Trust*, BLACK'S LAW DICTIONARY (12th ed. 2024). One standard estate-planning practice is to form "[a] revocable trust in which the settlor[s] . . . are also the trustees and manage the trust for their own benefit during their lifetimes." *West v. West (In re Est. of West)*, 948 P.2d 351, 355 (Utah 1997). When done properly, this strategy serves to "avoid probate of the assets while allowing the settlor to retain control of the trust property during his or her own lifetime." *See id.*

¶58 Under the terms of the Del Valle Family Trust, either Brett or Traci, as co-settlors, may revoke the "community estate" (community property held in trust), wholly or partially. Upon revocation, this property would be delivered to Brett and/or Traci and would continue to be their community property. Similarly, the "separate estate" (separate property and quasi-community property held in trust) may be revoked unilaterally by Brett or Traci, whichever of them contributed the property to the trust; and upon revocation, the property would be delivered to the contributor.

¶59 Brett and Traci may also amend the trust and transfer property from it. While they are both living, Brett and Traci may amend "any of the terms of [the trust] by an instrument in writing signed by [Brett and Traci] and delivered to the Trustee." And they may—acting jointly for community property, or individually for separate and quasi-community property—"transfer property . . . out of the trust estate to any other person or organization." In addition, as trustees, Brett and Traci may hold, manage, control, lease, and encumber trust property. With this backdrop, the question is whether, for purposes of the Judgment Act, Brett "owned" the property when the judgment was entered against him, even though the trust held title to it. *See* UTAH CODE § 78B-5-202(7)(c)(ii) (2021).

¶60 Because "the settlor of a revocable trust necessarily retains the functional equivalent of ownership of the trust assets," 6 AUSTIN WAKEMAN SCOTT ET AL., SCOTT AND ASCHER ON TRUSTS § 15.4.2 (6th ed. 2024), "[i]n . . . substantive respects (such as creditors' rights), the property held in a revocable trust is ordinarily to be treated as if it were property of the settlor," RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. a. (AM. L. INST. 2003). Thus, in certain situations—"by reason of a power of revocation, appointment, or withdrawal"—a person may have "the equivalent of ownership of

the trust property, even though the legal title to the property is held by the trustee." *See id.* § 74 cmt. a (AM. L. INST. 2007).

¶61 In effect, the Mulligans argue that the trust shielded the property from Brett's judgment creditor, Alum Rock. But under Utah law, "[d]uring the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors." UTAH CODE § 75-7-505(1). That approach is consistent with the general rule that "property held in [a revocable] trust is subject to the claims of creditors of the settlor . . . if the same property belonging to the settlor . . . would be subject to the claims of the creditors." RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. e (AM. L. INST. 2003). And other courts "generally have concluded that the assets of a revocable trust are properly subject to the claims of the settlor's creditors." *Pandy v. Indep. Bank*, 372 P.3d 1047, 1050 (Colo. 2016) (en banc) (collecting cases).

¶62 In short, because settlors of revocable trusts can access the full bundle of property-rights sticks, they cannot keep those sticks from their creditors. Here, as co-settlor and co-trustee, Brett retained the hallmarks of ownership over the property. As the district court noted, Brett and Traci could, at any time, "revoke the Trust, . . . amend it, . . . [or] transfer property from it." Under these circumstances, we hold that, for purposes of the Judgment Act, Brett owned the property at the time the judgment was entered against him.[7] Accordingly, Alum Rock's lien attached to the property when Alum Rock recorded the lien with the county recorder.

## III. THE MULLIGANS HAVE NOT IDENTIFIED A LIMITATION ON THE DISTRICT COURT'S AUTHORITY TO ISSUE A WRIT OF EXECUTION ON PROPERTY LOCATED IN A COUNTY OUTSIDE THE THIRD DISTRICT

¶63 The Mulligans contend that the Third District Court "lacked authority and jurisdiction" to issue the writ because the property sits in Weber County, which is outside the court's geographic boundaries. Because they have not identified a relevant limitation on the district court's jurisdiction to issue the writ, we reject that argument.

---

[7] Neither side has addressed whether Traci's joint ownership of the property has any effect on the judgment lien. For that reason, we express no opinion on the matter.

¶64 This matter arose when Alum Rock filed a notice of judgment with the Third District Court. There is no question that this was proper, because under the Foreign Judgment Act a foreign judgment like Alum Rock's California judgment "may be filed with the clerk of any district court in Utah." UTAH CODE § 78B-5-302(2). Once Alum Rock domesticated the judgment, the judgment inherited "the same effect . . . as a judgment" of a Utah district court. *Id.* § 78B-5-302(3). Such a judgment may be enforced through a writ of execution. *Id.* § 78A-5-102 ("A district court judge may issue all extraordinary writs and other writs necessary to carry into effect the district court judge's orders, judgments, and decrees.").

¶65 The Mulligans have not identified any relevant law that would limit a district court's authority to issue a writ of execution to be effectuated in a county outside that court's judicial district. They first cite a venue statute, which provides that "[a]ctions" for certain "causes involving real property shall be tried in the county in which the subject of the action . . . is situated." *Id.* § 78B-3-301(1) (2021). Those "causes" are

> for the recovery of real property, or of an estate or interest in the property; . . . for the determination . . . of the right or interest in the property; . . . for injuries to real property; . . . for the partition of real property; and . . . for the foreclosure of all liens and mortgages on real property.

*Id.*

¶66 But the Mulligans' reliance on this statute is misguided because no "[a]ction[] . . . involving real property" is at issue here. *See id.* Indeed, no cause of action is at issue at all. The causes of action that gave rise to Alum Rock's judgment against Brett (for breach of contract) were brought in California and, from what we can tell, had nothing to do with the Weber County property. Simply put, this proceeding to enforce that judgment through a writ of execution is not an action involving real property governed by the venue statute.[8]

---

[8] For the same reason, the caselaw that the Mulligans cite regarding "action[s]" that "involve[] title to real property" misses the mark. *See Calder v. Third Jud. Dist. Ct.*, 273 P.2d 168, 171 (Utah 1954).

¶67 The Mulligans also cite rule 64 of the Utah Rules of Civil Procedure as an additional limitation on the district court's authority. According to them, a distinction in word choice between two sentences in rule 64(d)(1) "precludes courts in one county from ordering seizure of real property located in a different county." Rule 64(d)(1) explains how court clerks are to issue writs for real and personal property:

> If the writ directs the seizure of real property, the court clerk will issue the writ to the sheriff of the county in which the real property is located. If the writ directs the seizure of personal property, the court may issue the writ to an officer of any county.

UTAH R. CIV. P. 64(d)(1). From this language, the Mulligans glean that "the rule expressly authorizes any court in any county in Utah to direct the seizure . . . of *personal property* located in any county in Utah" but does not do the same for *real property*.

¶68 Although the Mulligans are correct that the rule distinguishes between writs of execution for personal property versus real property and requires that the latter be directed to the "sheriff of the county in which the real property is located," *see id.*, the rule says nothing about which court may issue the writ. Rule 64(d)(1) contains no requirement that the district court issuing the writ be in the same county as the real property. If anything, by specifying that writs involving real property must be "issue[d] . . . to the sheriff of the county in which the real property is located," *see id.*, the rule seems to presuppose that the issuing court may be located elsewhere.

¶69 The Mulligans have not established that the district court exceeded its authority by issuing the writ. Neither the venue statute nor rule 64(d)(1) prohibits a district court from issuing a writ of execution for real property located in another Utah judicial district.

## CONCLUSION

¶70 Although Alum Rock needed to comply with the Judgment Act's requirements for creating a lien, filing in the registry of judgments was not one of those requirements. The lien attached to the property once Alum Rock recorded the judgment with the Weber County Recorder's Office. When the judgment was recorded, Brett owned the property for purposes of the Judgment Act because the property's title was held in a revocable trust settled by Brett and his wife. And the Mulligans have not shown that the

MULLIGAN *v.* ALUM ROCK RIVERSIDE
Opinion of the Court

district court lacked authority to issue the writ. Accordingly, we affirm.

---

22

# EXHIBIT 3

Bradley L. Tilt (07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
office: 385-355-4826
bradley.tilt@freemanlovell.com
*Attorneys for Molly J. Mulligan and John P. Mulligan*

I am the
☐ Plaintiff/Petitioner
☐ Defendant/Respondent
☐ Person claiming a property interest
☒ Attorney for the
- ☐ Plaintiff/Petitioner
- ☐ Defendant/Respondent
- X Person claiming a property interest and my Utah Bar number is 7649

IN THE THIRD JUDICIAL DISTRICT COURT
IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| ALUM ROCK RIVERSIDE LLC,<br><br>Plaintiff,<br><br>v.<br><br>PRP INVESTORS MADISON, LLC, a California limited liability company; BRETT DEL VALLE, an individual; and DOES 1 through 50 inclusive,<br><br>Defendants. | **REPLY AND REQUEST FOR HEARING**<br><br>Case No. 206927043<br><br>Judge Adam Mow |
|---|---|

***(1)*** ***X*** I have read the Notice of Execution and Exemptions form. I understand that, by filing this form, I cannot object to the judgment that I owe money to the creditor. I am filing this form because ***I believe that the creditor has improperly seized my clients' property to pay the judgment.***

***(2)*** ***X*** ***My clients request that this matter be scheduled for a hearing***.

***(3) X Statements in the Application for Writ of Execution are inaccurate because:***

Paragraph 1 of the *Application for Writ of Execution* appears to **correctly state** that the underlying judgment which Plaintiff seeks to collect is "a judgment against debtor Brett Del Valle" in his individual and personal capacity. *See also e.g.*, the underlying foreign judgment, which Plaintiff filed in this above-named Utah court on October 13, 2020 (identifying "Brett Del Valle, an individual" as a defendant in its caption, and entering judgment for various amounts against "Brett Del Valle"); the Plaintiff's *Judgment Information Statement* also filed herein on October 13, 2020 (stating at paragraph 5: "Judgment Debtor Brett Del Valle is a natural person").

But the Plaintiff's *Application for Writ of Execution* then goes on to **incorrectly state** that the real property located at and commonly known as 1453 S. Basinview Road, Huntsville, Utah 84137, and more particularly described (in part) as Lot 7, Basinview Estates Cluster Subdivision 1st Amendment, and which bears Parcel No. 20-119-0007 (which real property is referred to hereinafter as the "**Property**"), is "the judgment debtor's property"; the *Application for Writ of Execution* then **incorrectly requests** that a Writ of Execution be issued to direct the Sheriff to seize and sell the Property purportedly as if it was "the debtor's … real property." ¶¶ 4 and 6 of the Plaintiff's *Application for Writ of Execution*.

Those statements and requests in Plaintiff's *Application for Writ of Execution* are **incorrect, inaccurate, and improper, because** the Property is not presently – and it never has been – the judgment debtor's real property; the Property is not presently – and it never has been – owned by Brett Del Valle in his individual and personal capacity.

The relevant chain of title to the Property is as follows. In the year 2007, the Property was conveyed from Basinview Development, LC to "Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of The Del Valle Family Trust dated October 30, 2002" (the "**Trust**"). Also in 2007, the Property was conveyed from the Trust to itself. The Trust continued to own the Property at all times from 2007 until May 11, 2021, when the Trust then conveyed the Property to the Mulligans. The Property has never been owned by "Brett Del Valle, an individual," as was **incorrectly and inaccurately** claimed in the Plaintiff's *Application for Writ of Execution*, and certainly not at any time since the foreign judgment was entered by the foreign court and/or filed with this Utah Court, both of which were in the year 2020.[1]

---

[1] Plaintiff's above-referenced *Judgment Information Statement* filed herein on October 13, 2020, also appears to identify the above-named Defendant PRP Investors Madison, LLC also as a judgment debtor on the foreign judgment that was filed with this above-named Utah Court. The underlying foreign judgment, which Plaintiff filed in this above-named Utah court on October 13, 2020, as referenced in the main text above, appears to name PRP Investors Madison, LLC among the defendants in the caption, and at page two also appears to identify "PRP Investors" as one of the parties against whom judgment was entered in that foreign court. But neither PRP Investors Madison, LLC, nor "PRP Investors" has at any time ever owned the Property, either; the Property is not presently, and never has been, that judgment debtor's property, either.

***(4) X The Writ of Execution was issued improperly because:***

Rule 64E(a) of the Utah Rules of Civil Procedure states (with emphasis added): "A writ of execution is available to seize property in the possession or under the control of the defendant following entry of a final judgment". Rule 64(a)(2) states that for purposes of Rule 64E (among other rules): "'Defendant' means the party against whom a claim is filed or against whom judgment has been entered." Rule 64(a)(1) further states: "'Claim' means a claim, counterclaim, cross claim, third party claim or any other claim."

As applied to the case at bar, those governing rules state, provide, and mean that a Writ of Execution is available only to seize property in the possession or under the control of the judgment debtor "Brett Del Valle, an individual" after the entry of the judgment at issue. However, as shown under item (3) hereinabove, and by this reference incorporated here, "Brett Del Valle, an individual" does not own the Property presently, has not owned it following the entry of the judgment at issue, and indeed he has never owned the Property. Further, ever since their purchase of it in May of 2021, the Property has been in the possession and under the control of the Mulligans exclusively, and not in the possession or under the control of "Brett Del Valle, an individual". A Writ of Execution as to the Property, therefore, was not properly available under the express terms of those governing Utah Rules of Civil Procedure. Accordingly, the Writ of Execution in this case was issued improperly.[2]

Additionally, the Writ of Execution also was issued improperly because the foreign judgment domesticated to this above-named Court in Salt Lake County, Utah, is not, and as a matter of law it cannot be, any lien or encumbrance upon nor can it otherwise affect the Property which is located in Weber County, Utah. Utah statutory law clearly, expressly, and unequivocally provides that a judgment "does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located." Utah Code § 78B-5-201(2) (emphases added). It further expressly provides that even then, "a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located." *Id.* § -201(3)(a) (emphases added). It further and provides and confirms that a judgment can become a lien upon real property only if the above-referenced filings and recordings are made in the county in which the property is located, and that the property affected by the judgment is only the property that is located "in the county in which the recording … occurs." *Id.* § -202(7)(c)(i).[3] Likewise, Utah's Foreign Judgment Act also and

[2] Even if the Writ of Attachment in this case was issued purportedly as against apparent judgment debtor PRP Investors Madison, LLC, or "PRP Investors", it still would be improperly issued for all of the same reasons as set forth in items (4) and (3) of the main text above, and in footnote 1 above, all of which are by this reference incorporated as if fully set forth here, showing neither of those entities own, nor ever owned, the Property, either, nor is it under the possession or control of either of them.

[3] That same Utah Code Section 78B-5-202(7)(c) & (c)(ii) also and further confirm that even if all of those requirements are met, the judgment then affects only real property in that county "of the judgment debtor" and specifically such property "owned or acquired at any time by the judgment debtor during the time the judgment is effective." (Emphases added). As shown above and throughout this Reply, and incorporated

further provides that even if a foreign judgment like the one at issue in this case is otherwise properly domesticated to Utah, nevertheless it still "is subject to the same procedures, defenses … as a judgment of a district court of this state," including particularly but without limitation that it becomes a lien upon real property only if (among other things) the foreign judgment "is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202." Utah Code § 78B-5-302(3) & -305(1)(c).

Because real property can be encumbered or otherwise affected by a judgment only if (i) the judgment (foreign or otherwise) is filed in the court in the county in which the property is located; and (ii) the judgment and certain additional documents also are recorded in the office of the county recorder in which the real property is located – and because neither of those two things occurred in this case – the Writ of Execution purportedly to execute upon a judgment was issued improperly.

***(5) X All [or this part: $10,000] of the property is exempt because:***

Even if the Mulligans' Property could properly be subjected to the Writ of Execution issued in this case (which it cannot be), the Mulligans would be entitled to a homestead exemption in and to the Property under and pursuant to Utah Code § 78B-5-503(2)(b)(i).

***(6) X My clients are not the judgment debtor, and they claim the following ownership in all or part of the property. (Explain.)***

By this reference Mulligans incorporate as if fully set forth here all of the contents and discussion set forth above in this Reply, including in particular, but without limitation, the response to and under paragraph (3) hereinabove. As set forth more fully above, the Property that is the subject of the Writ of Execution is owned by Mulligans, in its entirety, and exclusively.

***(7) X I have attached documents that support my client's claims.***

I have not included any non-public information in this document.

Dated July 7, 2021.

FREEMAN LOVELL, PLLC

*/s/ Bradley L. Tilt*
Bradley L. Tilt
*Attorneys for Molly J. Mulligan and John P. Mulligan*

here by this reference, the Property that is the subject of the Writ of Execution issued in this case is not owned by any of the subject judgment debtors, and never has been.

# CERTIFICATE OF SERVICE

I certify that on July 7, 2021, I caused true and correct copies of this **REPLY AND REQUEST FOR HEARING, together with all attachments hereto,** to be served in the manner indicated below to the following-listed parties at their respective addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson<br>Bennett Tueller Johnson & Deere<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, Utah 84121<br>ben.johnson@btjd.com<br>*Attorneys for Plaintiff* | ______Hand Delivery<br>______First Class, United States Mail, Postage Prepaid<br>__X__E-filing via GreenFiling<br>______E-filing via CM/ECF<br>______Email<br>______Other:____________________ |

*/s/ Bradley L. Tilt*__________

*W2261271*

E# 2261271 PG 1 OF 1
ERNEST D ROWLEY, WEBER COUNTY RECORDER
03-MAY-07 346 PM FEE $10.00 DEP VD
REC FOR: LINCOLN TITLE INSURANCE AGENCY
ELECTRONICALLY RECORDED

File No. 014551
**When recorded return to:**
Lincoln Title Insurance Agency
4723 Harrison Boulevard, Suite 201
Ogden, UT 84403

**Mail tax notice to:**
Grantee
1201 Estelle Lane
Newport Beach, CA 92660

---

# SPECIAL WARRANTY DEED

**Basinview Development, LC,** "Grantor",

hereby CONVEYS and WARRANTS against all claiming by, through, or under it to:

**Brett H. Del Valle and Traci M. Del Valle, Trustees of The Del Valle Family Trust Dated October 30, 2002,** "Grantees",

for the sum of TEN DOLLARS and other good and valuable consideration the following described tract of land in Weber County, State of Utah:

**ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, WEBER COUNTY, UTAH, ACCORDING TO THE OFFICIAL PLAT THEREOF.**

**20-108-0007** nx

SUBJECT TO: County and/or City taxes not delinquent; Bonds and/or Special Assessments not delinquent and Covenants, Conditions, Restrictions, Rights-of-Way, Easements, and Reservations now of Record or enforceable in law or equity.

WITNESS, the hand of said grantor, this 27 day of April, A.D. 2007.

**Basinview Development, LC**
**By:** [signature]
**Mark A. Bates, Managing Member**

STATE OF UTAH )
)ss.
COUNTY OF Weber )

On the 27 day of April, 2007, personally appeared before me, Mark A. Bates, who did say that he is a Managing Member of Basinview Development, LC, that the foregoing instrument was signed on behalf of said Limited Liability Company by authority of Basinview Development, LC and that he duly acknowledged to me that said Limited Liability Company executed the same.

Denise W Page
**Notary Public**

My Commission Expires:

Residing at:

DENISE W PAGE
NOTARY PUBLIC • STATE OF UTAH
4723 HARRISON BLVD
OGDEN, UT 84403
COMM. EXP. 11-05-2009

*W2293650*

E# 2293650 PG 1 OF 2
ERNEST D ROWLEY, WEBER COUNTY RECORDER
24-SEP-07 1146 AM FEE $12.00 DEP VD
REC FOR: LINCOLN TITLE INSURANCE AGENCY
ELECTRONICALLY RECORDED

**File No. 014551**
**When recorded return to:**
**Lincoln Title Insurance Agency**
**4723 Harrison Boulevard, Suite 201**
**Ogden, UT 84403**

**Mail tax notice to:**
**Grantees**
**1201 Estelle Lane**
**Newport Beach, CA 92660**

# WARRANTY DEED

**Brett H. Del Valle and Traci M. Del Valle, Trustees of The Del Valle Family Trust Dated October 30, 2002,** "Grantors",

hereby CONVEY and WARRANT to:

**Brett H. Del Valle and Traci M. Del Valle, Trustees of The Del Valle Family Trust Dated October 30, 2002,** as "Grantees",

for the sum of TEN DOLLARS and other good and valuable consideration the following described tract of land in Weber County, State of Utah:

**ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1st AMENDMENT, WEBER COUNTY, UTAH, ACCORDING TO THE OFFICIAL PLAT THEREOF.**

20-119-0007

SUBJECT TO: County and/or City taxes not delinquent; Bonds and/or Special Assessments not delinquent and Covenants, Conditions, Restrictions, Rights-of-Way, Easements, and Reservations now of Record or enforceable in law or equity.

WITNESS, the hand of said grantor, this 18 day of September, A.D. 2007.

**Brett H. Del Valle, Trustee**

**Traci M. Del Valle, Trustee**

2D

# CALIFORNIA ALL-PURPOSE CERTIFICATE OF ACKNOWLEDGMENT

State of California )

County of Orange )

On Sept 18, 2007 before me, Deborah Fauerbach, Notary Public
(here insert name and title of the officer)

personally appeared Brett H. Del Valle and Traci M. Del Valle

~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature of Notary Public

DEBORAH FAUERBACH
COMM. #1698508
Notary Public - California
Orange County
My Comm. Expires Oct. 10, 2010

(Seal)

## ADDITIONAL OPTIONAL INFORMATION

**DESCRIPTION OF THE ATTACHED DOCUMENT**

(Title or description of attached document)

(Title or description of attached document continued)

Number of Pages ______ Document Date ________

(Additional information)

**CAPACITY CLAIMED BY THE SIGNER**

- ☐ Individual (s)
- ☐ Corporate Officer

(Title)

- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other ________

**INSTRUCTIONS FOR COMPLETING THIS FORM**

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - Indicate title or type of attached document, number of pages and date.
  - Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

CAPA v12.10.05 © by Association of Professional Notaries & CSA 800-873-9865 www.notaryclasses.com



*W3151874*

Mail Tax notice to:
Grantee
51 Chestnut Avenue
Clarendon Hills, IL 60514
MNT File No.: 49967
Tax ID No.: 20-119-0007

E# 3151874 PG 1 OF 3
Leann H. Kilts, WEBER COUNTY RECORDER
11-May-21 1215 PM FEE $40.00 DEP DA(
REC FOR: METRO NATIONAL TITLE
ELECTRONICALLY RECORDED

# WARRANTY DEED

Brett H. Del Valle and Traci M. Del Valle, as Co-Trustees of the Del Valle Family Trust dated October 30, 2002

**GRANTOR** of Newport Beach, State of California, hereby CONVEYS and WARRANTS TO:

Molly J. Mulligan and John P. Mulligan, wife and husband, as joint tenants

**GRANTEE** of 51 Chestnut Avenue, Clarendon Hills, IL 60514 for the sum of TEN AND 00/100'S DOLLARS AND OTHER GOOD AND VALUABLE CONSIDERATION, the following described tract of land in Weber County, State of Utah:

Lot 7, BASINVIEW ESTATES CLUSTER SUBDIVISION 1ST AMENDMENT, according to the official plat thereof on file and of record in the office of the Weber County Recorder.

Together with a right of use for an easement for ingress and egress over and across Basinview Road (a private road), as shown on the official dedicated plat, to and from said Lot to a physically open and legally dedicated public street.

**SUBJECT TO:** County and/or City Taxes not delinquent; Bonds and/or Special Assessments not delinquent and Covenants, Conditions, Restrictions, Rights-of-Way, Easements, Leases and Reservations now of Record.

**WITNESS**, the hand(s) of said grantor(s), May 10 2021.

Brett H. Del Valle, Co-Trustee of the Del Valle Family Trust dated October 30, 2002

Traci M. Del Valle, Co-Trustee of the Del Valle Family Trust dated October 30, 2002

State of CALIFORNIA, County of ORANGE )ss:

On MAY 10th, 2021 personally appeared before me Brett H. Del Valle and Traci M. Del Valle, who upon being duly sworn (or affirmed) upon oath that they did sign the foregoing instrument with authority as granted in the capacity as Co-Trustees of the Del Valle Family Trust dated October 30, 2002, and that the said Brett H. Del Valle and Traci M. Del Valle, duly acknowledged to me that they executed the same.

- Please See Attached -

Notary Public

E# 3151874 PG 3 OF 3

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of ORANGE )

On MAY 10th 2021 before me, Chavon Kane, Notary Public,
*Date* *Here Insert Name and Title of the Officer*

personally appeared BRETT H. DEL VALLE AND TRACI M. DEL VALLE,
*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature]
*Signature of Notary Public*

CHAVON KANE
COMM...2213310
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. October 5, 2021

*Place Notary Seal Above*

***OPTIONAL***

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: WARRANTY DEED Document Date: ________
Number of Pages: 2 Signer(s) Other Than Named Above: NONE

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ________
☐ Corporate Officer — Title(s): ________
☐ Partner — ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ________
Signer Is Representing: ________

Signer's Name: ________
☐ Corporate Officer — Title(s): ________
☐ Partner — ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ________
Signer Is Representing: ________

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827) Item #5907



Weber County Government
Property Information System

# WEBER COUNTY RECORDER

## ABSTRACT OF TITLE

**05/11/2021**

**PARCEL NUMBER: 20-119-0007**

**Prior Parcel Numbers:**

20-108-0007

**OWNER: DEL VALLE FAMILY TRUST** | **ADDRESS: 1201 ESTELLE LN NEWPORT BEACH CA 92660** | **TAX UNIT 520**

**LEGAL DESCRIPTION: 2007 ORIG** **ACRES: 1.52**

ALL OF LOT 7, BASINVIEW ESTATES CLUSTER SUBDIVISION, 1ST AMENDMENT, WEBER COUNTY, UTAH.

| Grantor/<br>Grantee | Kind of Document<br>Consideration | Time Period<br>Entry # | Book-Page<br>Doc Date | Record Date | Time<br>Release | Abstract Date<br>Entry Ref |
|---|---|---|---|---|---|---|
| ZIONS FIRST NATL BANK<br>CRAIG, E D | RECON<br>$0.00 | 821408 | 1367-1567<br>10/03/1980 | 06-OCT-1980 | 04:08<br>1343- 477 | |
| CRAIG, E D<br>ZIONS FIRST NATL BK | TRUST DD<br>$35,000.00 | 821409 | 1367-1568<br>10/03/1980 | 06-OCT-1980 | 04:09<br>- | |
| ZIONS FIRST NATIONAL BANK TR<br>WEBBER, JOHN U & WF | PT RECONVEYANCE<br>$0.00 | 825575 | 1372- 532<br>12/03/1980 | 03-DEC-1980 | 02:56<br>1323- 52 | |
| ZIONS FIRST NATL BANK TR<br>WEBBER, JOHN U & WF | RECON<br>$0.00 | 825576 | 1372- 533<br>11/07/1980 | 03-DEC-1980 | 02:57<br>1273- 286 | |
| FACKRELL, ANN SWENSON<br>WEBBER, JOHN U & RUTH M | RELEASE<br>$0.00 | 831722 | 1378-0065<br>03/11/1981 | 11-MAR-1981 | 03:36<br>1003-0732 | |
| WILLOUGHBY, DAVID R<br>BROWN DISTRIBUTING CO ETAL | TRUST DD<br>$15,000.00 | 838323 | 1384-0437<br>02/23/1981 | 22-JUN-1981 | 12:39<br>- | |
| WEBBER, JOHN U<br>WADMAN, V JAY | WD<br>$10.00 | 844791 | 1390-1262<br>09/18/1981 | 01-OCT-1981 | 02:34<br>- | |
| WEBBER, JOHN U & WF<br>JOHN U WEBBER CO | WD<br>$10.00 | 844792 | 1380-1264<br>09/18/1981 | 01-OCT-1981 | 02:35<br>- | |
| WADMAN, V JAY ETAL<br>SUMMERHAWKS LTD ETAL | WD<br>$10.00 | 844793 | 1390-1265<br>09/18/1981 | 01-OCT-1981 | 02:36<br>- | |
| SUMMERHAWKS LTD<br>JOHN U WEBBER CO ETAL | DEED OF TRST<br>$408,000.00 | 844794 | 1390-1268<br>09/18/1981 | 01-OCT-1981 | 02:37<br>- | |
| BOARD OF COUNTY COMMISSIONER<br>WHOM IT MAY CONCERN | ORDNCE<br>$0.00 | 849262 | 1394-1772<br>12/21/1981 | 22-DEC-1981 | 11:57<br>- | |
| AHLBERG, WILLIAM D<br>WEBBER, JOHN U & WF | RELEASE<br>$0.00 | 849304 | 1395-0054<br>12/19/1981 | 23-DEC-1981 | 09:56<br>- | |
| WILLOUGHBY, DAVID R & JEAN G<br>BROWN DISTRIBUTING | QCD<br>$10.00 | 853531 | 1399-0363<br>10/00/1981 | 09-MAR-1982 | 03:53<br>- | |
| WEBBER, JOHN U & WF<br>ADAMS, ALFRED W & WF | RELEASE<br>$0.00 | 856371 | 1401-1669<br>04/27/1982 | 28-APR-1982 | 10:19<br>1003-0733 | |
| ZIONS FIRST NATL BANK TR<br>WEBBER, JOHN U & RUTH M | RECON<br>$0.00 | 856503 | 1402-0074<br>04/26/1982 | 29-APR-1982 | 01:52<br>1323-0052 | |
| WEBER BASIN WTR CONSERV DIST V<br>SUMMERHAWKS LTD WTR | WATER CONTRACT<br>$0.00 | 860593 | 1405-1501<br>06/14/1982 | 13-JUL-1982 | 01:17<br>- | |
| ZIONS FIRST NATIONAL BANK<br>CRAIG, E D | RECON<br>$0.00 | 868216 | 1413-0821<br>11/18/1982 | 22-NOV-1982 | 04:13<br>1367-1568 | |
| WEBBER, JOHN U & WF<br>BROWN DISTRIBUTING CO | WD<br>$10.00 | 890715 | 1432-1327<br>09/20/1983 | 21-SEP-1983 | 02:42<br>- | |

| | | | | | |
|---|---|---|---|---|---|
| WEBBER, JOHN U & RUTH M ETAL | TRUST DD | | [illegible] | | 03:20 |
| BANK OF UTAH | $80,000.00 | 898298 | 12/27/1983 | 28-DEC-1983 | - |
| BANK OF UTAH | RELEASE | | 1439-1244 | | 11:07 |
| WEBBER, JOHN U & WF | $0.00 | 899767 | 01/17/1984 | 18-JAN-1984 | 1235-0810 |
| CARDON LAND TITLE CO TR | PT RECONVEYANCE | | 1467-1692 | | 11:12 |
| SUMMERHAWKS LTD ETAL | $0.00 | 937356 | 05/10/1985 | 15-MAY-1985 | 1390-1268 |
| KEITER, JOHN E TR | WD | | 1467-1756 | | 01:10 |
| SUMMERS, CLARKE C & WF | $10.00 | 937370 | 05/15/1985 | 15-MAY-1985 | - |
| SUMMERHAWKS LTD | WD | | 1467-1759 | | 01:11 |
| SUMMERS, CLARKE C & WF | $10.00 | 937371 | 05/15/1985 | 15-MAY-1985 | - |
| SUMMERS, CLARKE C & WF | DEED TRST | | 1469-0329 | | 03:03 |
| DESERET FEDERAL SV & LN ASSN | $168,750.00 | 939126 | 06/06/1985 | 06-JUN-1985 | - |
| WEBER BASIN WTR CONSERV DIST V | ORDER ON PETN | | 1471-1851 | | 04:37 |
| SUMMERS, CLARKE C & WF WTR | $99.66 | 942577 | 06/28/1985 | 18-JUL-1985 | - |
| WEBBER, JOHN U | TRUST DD | | 1480-0360 | | 01:14 |
| ZIONS FIRST NATIONAL BANK | $111,000.00 | 953779 | 10/01/1985 | 22-NOV-1985 | - |
| WEBBER, JOHN U | ASSIGN OF CONTRT | | 1480-0365 | | 01:15 |
| ZIONS FIRST NATIONAL BANK | $10.00 | 953780 | 10/01/1985 | 22-NOV-1985 | - |
| SUMMERS, CLARKE C & MARCIA H | NTC OF LIEN | | 1483-1787 | | 08:13 |
| HUGHES, BILL | $7,923.50 | 958462 | // | 22-JAN-1986 | - |
| SUMMERS, CLARKE C & MARCIA H | NTC OF LIEN | | 1486-2134 | | 12:25 |
| URE, BERT | $5,000.00 | 963036 | // | 14-MAR-1986 | - |
| CARDON LAND TITLE CO TR | PT RECONVEYANCE | | 1495-2518 | | 09:16 |
| SUMMERHAWKS LTD ETAL | $0.00 | 977430 | 06/06/1986 | 04-AUG-1986 | 1380-1268 |
| URE, BERT | REL OF LIEN | | 1497-0815 | | 03:10 |
| WHOM IT MAY CONCERN | $5,000.00 | 979676 | 08/22/1986 | 22-AUG-1986 | 1486-2134 |
| KITCHEN STUDIO | REL OF LIEN | | 1505-1673 | | 11:40 |
| WHOM IT MAY CONCERN | $7,927.50 | 992691 | 09/02/1986 | 17-DEC-1986 | 1483-1787 |
| ZIONS FIRST NATIONAL BANK | PT RECONVEYANCE | | 1505-1676 | | 11:41 |
| WEBBER, JOHN U | $0.00 | 992692 | 09/11/1986 | 17-DEC-1986 | 1480-0360 |
| ZIONS FIRST NATL BANK | PT RELEASE | | 1505-1678 | | 11:42 |
| WEBBER, JOHN U | $0.00 | 992693 | 09/11/1986 | 17-DEC-1986 | 1480-0365 |
| SUMMERHAWKS LTD | WD | | 1505-1681 | | 11:42 |
| SUMMERS, CLARKE C & WF | $10.00 | 992694 | 06/11/1986 | 17-DEC-1986 | - |
| KEITER, JOHN E TR | WD | | 1505-1681 | | 11:43 |
| SUMMERS, CLARKE C & WF | $10.00 | 992695 | 06/11/1986 | 17-DEC-1986 | - |
| SUMMERS, CLARKE C & WF | DEED OF TRST | | 1505-1682 | | 11:43 |
| MOORE FINANCIAL SERVICES INC E | $147,550.00 | 992696 | 12/11/1986 | 17-DEC-1986 | - |
| SUMMERS, CLARKE C ETAL | TRUST DD | | 1505-1687 | | 11:46 |
| CONTINENTAL BANK & TRUST CO | $30,000.00 | 992697 | 12/11/1986 | 17-DEC-1986 | - |
| CLAYSON, CRAIG D | ASGNMT | | 1506-0954 | | 03:08 |
| CITICORP HOMEOWNERS INC | $0.00 | 993964 | 12/18/1986 | 29-DEC-1986 | 1505-1682 |
| MORGAN, TERRILYN B | REQ FOR NTC | | 1509-1280 | | 12:58 |
| WHOM IT MAY CONCERN | $0.00 | 998977 | // | 11-FEB-1987 | 1505-1682 |
| DESERET FED SV & LN ASSN TR | RECON | | 1523-2253 | | 03:37 |
| SUMMERS, CLARKE C & WF | $0.00 | 1021465 | 07/17/1987 | 11-AUG-1987 | 1469-0329 |
| CITICORP MTG INC FKA | ASGNMT | | 1539-2706 | | 09:05 |
| LOMAS & NETTLETON CO | $0.00 | 1046898 | 01/29/1988 | 20-MAY-1988 | 1505-1682 |
| ZIONS FIRST NATL BK | PT RELEASE ASSIGN | | 1551-2861 | | 10:04 |
| WEBBER, JOHN U | $0.00 | 1064975 | 12/02/1988 | 07-DEC-1988 | 1480-0365 |
| ZIONS FIRST NATL BK | PT RECONVEYANCE | | 1551-2863 | | 10:05 |
| WEBBER, JOHN U | $0.00 | 1064976 | 12/02/1988 | 07-DEC-1988 | 1480-0360 |
| WEBBER, JOHN U | ASSIGN INTEREST | | 1557-2264 | | 03:20 |

| | | | | | |
|---|---|---|---|---|---|
| WEBBER, JOHN U | ROW WARRANTY DEED | | 1557-2275 | | 03:24 |
| WADMAN, V JAY | $10.00 | 1073781 | 09/21/1978 | 27-MAR-1989 | - |
| WEBBER, JOHN U | WD | | 1557-2276 | | 03:29 |
| WADMAN, V JAY | $0.00 | 1073782 | 09/21/1978 | 27-MAR-1989 | - |
| SUMMERHAWKS LTD | WD | | 1565-2145 | | 11:40 |
| WADMAN, V JAY ETAL | $10.00 | 1085860 | 07/20/1989 | 10-AUG-1989 | - |
| WADMAN, V JAY ETAL | WD | | 1565-2148 | | 11:44 |
| SUMMERS, CLARKE C TR ETAL | $10.00 | 1085861 | 07/20/1989 | 10-AUG-1989 | - |
| SUMMERS, CLARKE C ETAL | TRUST DD | | 1576-0695 | | 03:49 |
| WEST ONE BK UT | $19,529.84 | 1101910 | 02/12/1990 | 21-FEB-1990 | - |
| SUMMERS, CLARKE C & WF | NON ASSUMP AGRMT | | 1576-0699 | | 03:50 |
| WEST ONE BK UT | $0.00 | 1101911 | 02/12/1990 | 21-FEB-1990 | - |
| ZIONS FIRST NATL BANK TR | RECON | | 1578-0869 | | 08:05 |
| WEBBER, JOHN U | $0.00 | 1105213 | 03/26/1990 | 03-APR-1990 | 1480-0360 |
| JOHN U WEBBER CO | ASGNMT | | 1588-1262 | | 01:30 |
| PETERSEN, JERRY TR ETAL | $0.00 | 1121698 | 10/19/1990 | 19-OCT-1990 | 1390-1268 |
| JOHN U WEBBER CO ETAL | TRUST DD | | 1590-2497 | | 04:31 |
| AMERICA FIRST CR UN ETAL | $100,000.00 | 1125426 | 11/28/1990 | 28-NOV-1990 | - |
| ZIONS FIRST NATL BK | REL | | 1592-1918 | | 02:29 |
| WEBBER, JOHN U | $0.00 | 1128555 | 12/27/1990 | 07-JAN-1991 | 1480-0365 |
| WEBBER, JOHN U | WD | | 1593-0599 | | 01:36 |
| WADMAN, V JAY | $10.00 | 1129569 | 01/18/1991 | 22-JAN-1991 | - |
| WADMAN, V JAY | WD | | 1593-0601 | | 01:38 |
| WADMAN INVESTMENT | $10.00 | 1129570 | 01/18/1991 | 22-JAN-1991 | - |
| WADMAN, V JAY | WD | | 1606-0582 | | 12:26 |
| WADMAN INV | $10.00 | 1149606 | 08/21/1991 | 21-AUG-1991 | - |
| WADMAN, V JAY | WD | | 1606-0585 | | 12:27 |
| WADMAN INV | $10.00 | 1149607 | 08/21/1991 | 21-AUG-1991 | - |
| WEST ONE BK TR | RECON | | 1610-0855 | | 08:15 |
| SUMMERS, CLARKE C & WF | $0.00 | 1155526 | 10/17/1991 | 22-OCT-1991 | 1576-0695 |
| SUMMERS, CLARKE C TR | QCD | | 1610-1011 | | 11:50 |
| SUMMERS, CLARKE C & WF | $10.00 | 1155615 | 10/21/1991 | 22-OCT-1991 | - |
| KEITER, JOHN E TR | QCD | | 1610-1012 | | 11:51 |
| SUMMERS, CLARKE C & WF | $10.00 | 1155616 | 10/22/1991 | 22-OCT-1991 | - |
| SUMMERS, CLARKE C & WF | TRUST DD | | 1610-1013 | | 11:52 |
| WEST ONE BK UT | $135,000.00 | 1155617 | 10/10/1991 | 22-OCT-1991 | - |
| WEST ONE BK UT | REQ FOR NTC | | 1610-1018 | | 11:53 |
| WHOM IT MAY CONCERN | $0.00 | 1155618 | // | 22-OCT-1991 | 1505-1682 |
| SUMMERS, CLARKE C & WF | NON ASSUMP AGRMNT | | 1610-1020 | | 11:54 |
| WEST ONE BK UT | $135,000.00 | 1155619 | 10/10/1991 | 22-OCT-1991 | - |
| WEST ONE BK TR | RECON | | 1610-2995 | | 08:15 |
| SUMMERS, CLARKE C & WF | $0.00 | 1156485 | 10/17/1991 | 31-OCT-1991 | 1576-0695 |
| WEST ONE BK TR | RECON | | 1611-0787 | | 08:29 |
| SUMMERS, CLARKE C ETAL | $0.00 | 1156884 | 10/30/1991 | 05-NOV-1991 | 1505-1687 |
| SUMMERS, CLARKE C ETAL | QCD | | 1628-0660 | | 08:52 |
| KEITER, JOHN E TR | $10.00 | 1179922 | 05/29/1992 | 01-JUN-1992 | - |
| CROWTHER, MARVIN | NTC ASSMNT | | 1639-2597 | | 02:34 |
| WHOM IT MAY CONCERN | $0.00 | 1195168 | // | 01-OCT-1992 | - |
| PETERSEN, JERRY TR ETAL | SUB TR | | 1640-1080 | | 09:59 |
| ASSOCIATED TITLE CO | $0.00 | 1195772 | 05/14/1992 | 07-OCT-1992 | 1588-1262 |
| ASSOCIATED TITLE CO TR | RECON | | 1640-1082 | | 10:01 |
| KEITER, JOHN E TR ETAL | $0.00 | 1195773 | 09/25/1992 | 07-OCT-1992 | 1390-1268 |

| | | | | | | |
|---|---|---|---|---|---|---|
| SUMMERS, CLARKE C ETAL | QCD | | 1691-0519 | | [illegible] | |
| SUMMERS, CLARKE C | $10.00 | 1259804 | 11/11/1993 | 29-NOV-1993 | - | |
| SUMMERS, CLARKE C | DEED OF TRST | | 1691-0522 | | 11:20 | |
| WEST ONE BK UT ETAL | $202,300.00 | 1259805 | 11/23/1993 | 29-NOV-1993 | - | |
| WEST ONE BK UT | SUBORD AGRMT | | 1691-0530 | | 11:22 | |
| WEST ONE BK | $0.00 | 1259806 | 11/23/1993 | 29-NOV-1993 | 1691-0522 | |
| SUMMERS, CLARKE C ETAL | QCD | | 1696-1793 | | 01:20 | |
| CLARKE C SUMMERS PN & PR SH PLI | $10.00 | 1266242 | 10/00/1993 | 30-DEC-1993 | - | |
| WEST ONE BK UT | ASGNMT | | 1700-2557 | | 12:29 | |
| MORTGAGE AUTHORITY INC | $0.00 | 1271860 | 01/03/1994 | 31-JAN-1994 | 1691-0530 | |
| MORTGAGE AUTHORITY INC | ASGNMT | | 1732-1543 | | 10:02 | |
| SOURCE ONE MTG SERV CORP | $1.00 | 1314006 | 01/17/1994 | 29-SEP-1994 | 1691-0522 | |
| WEBER COUNTY | RESOL #18-96 | | 1801-0295 | | 10:42 | |
| WHOM IT MAY CONCERN | $0.00 | 1399404 | 04/03/1996 | 12-APR-1996 | - | |
| WEBER COUNTY | RESOL #25-96 | | 1811-2786 | | 09:23 | |
| WHOM IT MAY CONCERN | $0.00 | 1413086 | 05/15/1996 | 18-JUN-1996 | - | |
| SOURCE ONE MTG SERV CORP | ASGNMT | | 1930-2820 | | 09:12 | |
| CAPSTEAD INC | $0.00 | 1547548 | 02/01/1997 | 27-MAY-1998 | 1691-522 | |
| CAPSTEAD INC | ASGNMT | | 2007-2124 | | 08:24 | |
| GMAC MTG CORP | $0.00 | 1631210 | 02/01/1999 | 28-APR-1999 | 1691-522 | |
| US BK NATL ASSOC TR FKA ETAL | RECON | | 2316-0181 | | 09:29 | |
| SUMMERS, CLARKE C ETAL | $0.00 | 1911178 | 01/16/2003 | 06-FEB-2003 | 1610-1013 | 1155617 |
| GMAC MTG CORP | SUB TR | | 2373-1436 | | 08:13 | |
| RIVERS, ROD | $0.00 | 1941533 | // | 27-MAY-2003 | 1691-522 | 1259805 |
| RIVERS, ROD TR | RECON | | 2373-1438 | | 08:13 | |
| SUMMERS, CLARKE C | $0.00 | 1941534 | // | 27-MAY-2003 | 1691-522 | 1259805 |
| WEBER BASIN CONSERV DIST | ORDR ON PETN | | 2389-0252 | | 09:35 | |
| SUMMERS, CLARKE C | $0.00 | 1949479 | 04/25/2003 | 20-JUN-2003 | - | |
| WEBER BASIN WTR CONSERV DIST | ORD ON PETN | | - | | 08:45 | |
| CLARKE C SUMMERS PENSION & PR( | $0.00 | 2017007 | 01/30/2004 | 11-MAR-2004 | - | |
| WEBER BASIN WTR CONSERV DIST | ORDR ON PETN | | - | | 08:45 | |
| CLARKE C SUMMERS PEN & PROF | $0.00 | 2017008 | 01/30/2004 | 11-MAR-2004 | - | |
| CLARKE C SUMMERS PROFIT SHARI | QCD | | - | | 04:28 | |
| SUMMERS, CLARKE C ETAL | $400,000.00 | 2098267 | 04/21/2005 | 21-APR-2005 | - | |
| WEBER COUNTY | RESOL 23-2005 | | - | | 02:31 | |
| WHOM IT MAY CONCERN | $0.00 | 2156401 | 07/12/2005 | 24-JAN-2006 | - | |
| CLARK C SUMMERS PNSN PRFT PLN | ASGNMT | | - | | 09:17 | |
| BASIN VIEW EST HOMEOWNERS ASS | $0.00 | 2193577 | 04/07/2006 | 14-JUL-2006 | 2389-252 | 2017007 |
| SUMMERS, CLARKE C ETAL | SP WD | | - | | 12:11 | |
| BASINVIEW DEV LC | $10.00 | 2193657 | 07/07/2006 | 14-JUL-2006 | - | |
| BASINVIEW DEV LC | DEED OF TRST | | - | | 12:11 | |
| SUMMERS, CLARKE C & WF ETAL | $2,990,517.95 | 2193658 | 07/07/2006 | 14-JUL-2006 | - | |
| BASINVIEW DEVL LC | DED PLAT | | - | | 02:26 | |
| WHOM IT MAY CONCERN | $0.00 | 2202617 | 08/04/2006 | 22-AUG-2006 | 64-55 | |
| BASINVIEW DEV LC ETAL | AGRMT | | - | | 02:28 | 27-JAN-2010 |
| WHOM IT MAY CONCERN | $0.00 | 2202618 | 08/04/2006 | 22-AUG-2006 | - | |
| BASINVIEW DEV LLC | AGRMT | | - | | 02:31 | |
| WHOM IT MAY CONCERN | $0.00 | 2202619 | 08/04/2006 | 22-AUG-2006 | - | |
| BASINVIEW DEV LC | DECL COV REST | | - | | 03:45 | |
| WHOM IT MAY CONCERN | $0.00 | 2203027 | 08/22/2006 | 23-AUG-2006 | - | |
| WEBER COUNTY ETAL | AMD AGRMT | | - | | 11:04 | 27-JAN-2010 |
| WHOM IT MAY CONCERN | $0.00 | 2204634 | 08/28/2006 | 30-AUG-2006 | - | |
| BASINVIEW DEVL LLC | AGRMT | | - | | 03:23 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| WHOM IT MAY CONCERN | [illegible] | [illegible] | [illegible] | [illegible] | | |
| BASINVIEW DEV LC | SP WD | | - | | 03:46 | |
| DEL VALLE FAMLY TRST | $10.00 | 2261271 | 04/27/2007 | 03-MAY-2007 | - | |
| DEL VALLE FAMLY TRST | DEED OF TRST | | - | | 03:46 | |
| WELLS FARGO BK ETAL | $500,000.00 | 2261272 | 04/25/2007 | 03-MAY-2007 | - | |
| LINCOLN TTL INS TR | PT RECON | | - | | 09:05 | |
| BASINVIEW DEV LC | $0.00 | 2264396 | 05/16/2007 | 17-MAY-2007 | - | 2193658 |
| WEBER COUNTY | ORDNCE 2007-24 | | - | | 03:56 | |
| WHOM IT MAY CONCERN | $0.00 | 2290050 | 09/04/2007 | 05-SEP-2007 | - | |
| DEL VALLE FAMILY TRUST ETAL | DED PLAT | | 66-87 | | 03:58 | |
| WHOM IT MAY CONCERN | $0.00 | 2290051 | 08/13/2007 | 05-SEP-2007 | - | |
| BASINVIEW DEV LC ETAL | NTC | | - | | 04:00 | |
| WHOM IT MAY CONCERN | $0.00 | 2290052 | 08/31/2007 | 05-SEP-2007 | - | |
| VEL VALLE FMLY TRST | WD | | - | | 11:46 | |
| DEL VALLE FMLY TRST | $10.00 | 2293650 | 09/18/2007 | 24-SEP-2007 | - | |
| DEL VALLE TRST | DEED OF TRST | | - | | 12:16 | |
| CALIFORNIA NATL BK ETAL | $1,750,000.00 | 2313274 | 12/12/2007 | 31-DEC-2007 | - | |
| DEL VALLE TRST | ASGNMT | | - | | 12:16 | |
| CALIFORNIA NATL BK | $0.00 | 2313275 | 12/21/2007 | 31-DEC-2007 | - | |
| WELLS FARGO BK NW TR | RECON | | - | | 08:57 | |
| DEL VALLE TRST | $0.00 | 2319710 | 01/15/2008 | 05-FEB-2008 | - | 2261272 |
| DEL VALLE, BRETT H | NTC COMP | | - | | 10:47 | |
| WHOM IT MAY CONCERN | $0.00 | 2350137 | 06/23/2008 | 25-JUN-2008 | - | |
| CALIFORNIA NATL BK | MOD AGRMT | | - | | 12:08 | |
| DEL VALLE FAMILY TRUST | $0.00 | 2432420 | 07/01/2009 | 31-AUG-2009 | - | 2313274 |
| US BANK NATL ASSN ETAL | MOD AGRMT | | - | | 10:26 | |
| WHOM IT MAY CONCERN | $1,750,000.00 | 2453101 | 10/01/2009 | 07-JAN-2010 | - | 2313274 |
| FDIC | ASGNMT | | - | | 08:22 | 10-AUG-2010 |
| US BK NATL ASSOC | $0.00 | 2485659 | 10/30/2009 | 10-AUG-2010 | - | |
| SCHIMMELPFENNIG, TODD | REQ FOR NTC | | - | | 08:20 | 18-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527425 | 05/04/2011 | 18-MAY-2011 | - | 2261272 |
| SCHIMMELPHENNIG, TODD | REQ FOR NTC | | - | | 08:20 | 18-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527426 | // | 18-MAY-2011 | - | 2313274 |
| DEL VALLE FMLY TRST ETAL | MOD AGRMT | | - | | 08:06 | 19-MAY-2011 |
| WHOM IT MAY CONCERN | $0.00 | 2527547 | 04/26/2011 | 19-MAY-2011 | - | 2313274 |
| US BANK NATL ASSN | SUB TR | | - | | 03:06 | 29-JUN-2012 |
| WALKER, RUSSELL S | $0.00 | 2583677 | 06/27/2012 | 29-JUN-2012 | - | 2313274 |
| WALKER, RUSSELL S | NTC OF DFLT | | - | | 03:06 | 29-JUN-2012 |
| DEL VALLE FAMILY TRUST | $0.00 | 2583678 | 06/29/2012 | 29-JUN-2012 | - | 2313274 |
| CHASE BK FKA ETAL | SUB TR/RECON | | - | | 09:49 | 04-FEB-2014 |
| JPMORGAN CHASE BANK ETAL | $0.00 | 2601884 | 10/04/2012 | 23-OCT-2012 | - | 2067446 |
| WEBER COUNTY | RESOL #27-2012 | | - | | 10:38 | |
| WHOM IT MAY CONCERN | $0.00 | 2610456 | 12/11/2012 | 13-DEC-2012 | - | |
| DEL VALLE, BRETT | DEED OF TRST | | - | | 03:01 | 03-MAR-2014 |
| PRP INVESTORS FONTANA LLC ETAL | $360,009.12 | 2677120 | 12/19/2013 | 03-MAR-2014 | - | |
| US BANK | SUB TR | | - | | 01:10 | 05-JUN-2014 |
| HALLIDAY JR, PAUL M | $0.00 | 2689333 | 05/29/2014 | 05-JUN-2014 | - | 2527547 |
| HALLIDAY JR, PAUL M TR | NTC OF DFLT | | - | | 03:02 | 15-JUL-2014 |
| DEL VALLE, BRETT H ETAL | $214,000.00 | 2692310 | 06/27/2014 | 27-JUN-2014 | - | |
| STATE OF UTAH | CERT OF CREATION | | - | | 01:50 | 20-JAN-2015 |
| WHOM IT MAY CONCERN | $0.00 | 2718461 | 12/01/2014 | 20-JAN-2015 | - | |
| WEBER COUNTY | AFFT | | - | | 09:38 | |
| WHOM IT MAY CONCERN | $0.00 | 2725109 | 03/09/2015 | 09-MAR-2015 | - | |

| | | | | | | |
|---|---|---|---|---|---|---|
| HALLIDAY JR, PAUL M TR | NTC OF DFLT | | | | | 11-MAR-2016 |
| DEL VALLE FAMILY TRUST | $0.00 | 2782340 | 03/11/2016 | 11-MAR-2016 | - | 2453101 |
| STATE OF UTAH | CERT DISSOLUTION | | - | | 11:23 | 15-JUN-2016 |
| WHOM IT MAY CONCERN | $0.00 | 2795066 | // | 25-MAY-2016 | - | |
| WEBER COUNTY | RESOL #12-2016 | | - | | 11:24 | 13-JUN-2016 |
| WHOM IT MAY CONCERN | $0.00 | 2795067 | 05/10/2016 | 25-MAY-2016 | - | |
| US BANK ETAL | SUB TR/RECON | | - | | 12:10 | 03-JUL-2017 |
| US BANK TRUST CO ETAL | $0.00 | 2866077 | 06/22/2017 | 03-JUL-2017 | - | 2313274 |
| DEL VALLE FAMILY TRUST | DEED OF TRST | | - | | 09:37 | 20-SEP-2017 |
| BOFI FED BANK ETAL | $750,000.00 | 2879566 | 09/13/2017 | 20-SEP-2017 | - | |
| OGDEN VALLEY PARKS SERVICE AR | ANNEX PLAT | | - | | 12:58 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897531 | // | 28-DEC-2017 | - | |
| STATE OF UTAH | CERT ANEX | | - | | 12:58 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897532 | 12/27/2017 | 28-DEC-2017 | - | |
| OGDEN VALLEY PARKS SERVICE AR | NTC BNDRY ADJUST | | - | | 12:59 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897533 | 12/20/2017 | 28-DEC-2017 | - | |
| WEBER COUNTY | RESOL 43-2017 | | - | | 12:59 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897534 | 10/17/2017 | 28-DEC-2017 | - | |
| OGDEN VALLEY PARKS SERVICES AI | RESOL BNDRY ADJUST | | - | | 01:00 | 10-JAN-2018 |
| WHOM IT MAY CONCERN | $0.00 | 2897535 | 12/28/2017 | 28-DEC-2017 | - | |
| PRP INVESTORS FONATNA LLC ETAI | SUB TR/RECON | | - | | 04:20 | 17-JUL-2018 |
| PRP INVESTORS FONTANA LLC ETAI | $0.00 | 2931280 | 07/16/2018 | 17-JUL-2018 | - | 2677120 |
| DE VALLE FAMILY TRUST | TRUST DD | | - | | 04:20 | 17-JUL-2018 |
| SINGLE BOX CALI LP ETAL | $9,558,800.00 | 2931281 | 07/16/2018 | 17-JUL-2018 | - | |
| BASINVIEW ESTATES HOA INC | AMD DECL COV | | - | | 12:53 | 10-JUL-2019 |
| WHOM IT MAY CONCERN | $0.00 | 2990355 | 04/16/2019 | 10-JUL-2019 | - | 2203027 |
| LINCOLN TTL INS AGENCY TR | NTC OF DFLT | | - | | 10:55 | 18-JUL-2019 |
| DEL VALLE FAMILY TRUST | $0.00 | 2991776 | 07/18/2019 | 18-JUL-2019 | - | 2931281 |
| SINGLE BOX CALI LP | ASGNMT OF TRST DD | | - | | 10:06 | 19-JUL-2019 |
| SB FB HOUSTON LP | $0.00 | 2991983 | 07/18/2019 | 19-JUL-2019 | - | 2931281 |
| SB FB HOUSTON LP | SUB TR | | - | | 10:06 | 19-JUL-2019 |
| LINCOLN TTL INS AGENCY | $0.00 | 2991984 | 07/18/2019 | 19-JUL-2019 | - | 2931281 |
| FOUNDERS TTL CO | AFFT | | - | | 04:04 | 30-SEP-2019 |
| WHOM IT MAY CONCERN | $0.00 | 3006790 | 09/27/2019 | 30-SEP-2019 | - | |
| LINCOLN TTL INS AGENCY TR | RECON | | - | | 09:24 | 22-NOV-2019 |
| DEL VALLE FAMILY TRUST | $0.00 | 3018148 | 11/22/2019 | 22-NOV-2019 | - | 2931281 |
| DEL VALLE, BRETT H ETAL | DEED OF TRST | | - | | 03:52 | 06-JUL-2020 |
| TSS ENTERPRISES INC ETAL | $0.00 | 3066407 | 05/08/2019 | 06-JUL-2020 | - | |
| SCHIMMELPFENNING, TODD | REQ FOR NTC | | - | | 03:03 | 10-MAR-2021 |
| WHOM IT MAY CONCERN | $0.00 | 3133579 | 02/25/2021 | 10-MAR-2021 | - | 2879566 |

*04-07-2021 ABSTRACTED THROUGH*

***** RUN DATE: May 11, 2021, 11:23 an ***** ***** END OF ABSTRACT *****

# EXHIBIT 4

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Office: (385) 355-4826
bradley.tilt@freemanlovell.com
*Attorney for Plaintiffs*

**IN THE THIRD JUDICIAL DISTRICT COURT**
**SALT LAKE COUNTY, STATE OF UTAH**

| | |
|---|---|
| ALUM ROCK RIVERSIDE LLC,<br><br>Plaintiff<br><br>v.<br><br>PRP INVESTORS MADISON, LLC, a California limited liability company, and BRETT DEL VALLE, an individual, and DOES 1 through 50 inclusive,<br><br>Defendants. | **REPLY MEMORANDUM IN SUPPORT OF MULLIGANS' REPLY AND REQUEST FOR HEARING**<br><br>Civil No. 206927043<br><br>Judge Adam Mow |

Molly J. Mulligan and John P. Mulligan (collectively the "**Mulligans**") respectfully submit this reply memorandum in support of their *Reply and Request for Hearing*, dated July 7, 2021 (the "**Reply**")[1].

**CONCISE STATEMENT REGARDING**
**NEW MATTERS RAISED IN OPPOSITION TO MULLIGANS' REPLY**

Plaintiff filed its *Opposition to Mulligans' Reply and Request for Hearing* (the "**Opposition**") on the basis that the claimed $4.5 million dollar California judgment it filed with this Court (the "**Judgment**") constitutes and is a valid lien on the Mulligans' Property, even

[1] The Mulligans incorporate by reference herein the definitions set forth in their Reply and Request for Hearing.

though Plaintiff failed to comply with the statutory requirements for creating any lien. It further argues that the issued Writ is valid for execution on the Mulligans' Property, notwithstanding Plaintiff's failure to acquire a judgment lien in the first instance, or that the Third Judicial District Court does not have *in rem* jurisdiction over property located in the Fourth Judicial District.

Plaintiff bases its statutory arguments on a tortured and incoherent reading of Utah's Foreign Judgments Act and the Judgment Lien Statute (collectively the "**Statutes**"), by referencing related sections divorced from the consistent meaning of other provisions of each Statute and both Statutes together. The reading of related statutes and neighboring subparts as part of a whole is required by the "canon of consistent meaning" as adopted by the Utah Supreme Court.

Finally, Plaintiff erroneously asserts that this Court has jurisdiction to issue the Writ pursuant to Utah R. Civ. P. 64(d)(1). But Plaintiff's shallow reading of Rule 64(d)(1) erroneously assumes that if a court clerk must issue the writ in the county where the real property is located, then it follows that the same court clerk could issue a writ in a county located in a <u>different judicial district court</u>. Plaintiff is wrong. Its specious argument presupposes that a Utah judicial district court has *in rem* jurisdiction to enforce a money judgment in a county located in a *different* judicial district. Indeed, judicial district court judges preside over a number of counties within in their own judicial district but that does not mean a judge from one judicial district can enforce a money judgment on property located in a county in *another* judicial district.

All of Plaintiff's arguments fail as a matter of law, and Plaintiff does not have a lien on the Mulligans' Property.

**RESPONSES TO PLAINTIFF'S STATEMENT OF RELEVANT FACTS**

The so-called "Statement of Relevant Facts" section in Plaintiff's Opposition ("**Plaintiff's Fact Statement**") is flawed because it is replete with legal conclusions, not facts, such as it "domesticated" and "created a lien" on the Mulligans' Property. The Mulligans' therefore object to any and all of Plaintiff's asserted facts to the extent they raise/are actually legal issues before this Court. Based Plaintiff's Fact Statement and Exhibits, the following facts are relevant for this Reply to the Opposition filed by Plaintiff.[2]

1. A California court entered a money judgment in favor of Plaintiff on March 18, 2020 in the total amount of $4,338,964.45 (the "**California Judgment**") [3]. *See* Ex. 1 Opposition.
2. Plaintiff filed a "Notice of Judgment" for the California Judgment on October 13, 2020 in Utah's Third Judicial District Court, Salt Lake County (the "**Claimed Judgment**"). *See* Ex. 2 Opposition.
3. On November 16, 2020, Plaintiff recorded the Notice of Judgment and Information Statement in Weber County. *Id.*
4. On May 11, 2021, the Trust conveyed the Property located in Weber County to the Mulligans'. *See* Ex. 5 Opposition.
5. On June 22, 2021 Plaintiff submitted its Application for and Writ of Execution to the Third Judicial District Court, Salt Lake County, which was entered the same day (the "**Claimed Writ**").

---

[2] The Mulligans further incorporate by reference herein each of the facts set forth in its Reply and Request for Hearing.

3 Plaintiff claims in its Opposition the California Judgment is "nearly $4.5 million dollar[s]".

## ARGUMENT

Plaintiff is not entitled to the request it seeks, and the Claimed Judgment and Claimed Writ should each be set aside. Plaintiff ignored the interplay between the Utah Foreign Judgment Act and the Judgment Lien Statute and failed to comply with their requirements. Furthermore, Plaintiff also failed to file and register the California Judgment in the Fourth Judicial District Court, which has the requisite *in rem* jurisdiction for the purpose of enforcing a money judgment. In short, Plaintiff did not create any lien on the Mulligans' Property.

### I. THE CLAIMED JUDGMENT NEVER ATTACHED TO THE PROPERTY AND DID NOT CREATE ANY LIEN BECAUSE PLAINTIFF FAILED TO COMPLY WITH THE MANDATORY STATUTORY REQUIREMENTS

#### A. Plaintiff's Interpretation of Utah's Foreign Judgment Act and the Judgment Lien Statute is Incorrect, Disjointed, and Creates an Absurd Result

It is well known that liens are creatures of statute and that compliance with the relevant statute(s) is mandatory to create a lien. Judgment creditors know this. Plaintiff knows this. Yet contrary to the statutory requirements of §78B-5-201(2)(stating that a judgment "*does not create a lien…unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located*"), Plaintiff admittedly did not file the Claimed Judgment in any Registry of Judgments and therefore failed to create a lien.

Plaintiff attempts to parse, pick, and choose, in Utah's Judicial Code Chapter 5 Foreign Judgment Act and the Judgment Lien Statute to justify why it did not comply with the requirements of each. It claims that pursuant §78B-5-305 ("Lien") of the Foreign Judgment Act, it only needs to enter a foreign judgment in a district court and record it in the county recorder where the property is located to create a lien, and that because the Act does not refer to "Registry

of Judgments", like §78B-5-201 of the Judgment Lien Statute does, such filing simply isn't required of them.

But Plaintiff relies solely on §78B-5-305 of the Foreign Judgment Act and its reference to compliance with the provisions of §78B-5-202, in the Judgment Lien Statute, while utterly ignoring a prior subjection of the Act, §78B-5-302(3) ("Definition – Filing and Status of Foreign Judgments"), which unequivocally states that "*[a] foreign judgment filed under this part has the same effect* *<u>and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court of this state</u>*" (emphasis added).

Thus, under its plain language, the Foreign Judgment Act expressly mandates that <u>in addition</u> to recording a foreign judgment with a county recorder as set forth in its subsection -305, *<u>and as a preliminary matter</u>*, a foreign judgment is subject to Utah's statutory requirements for creating a lien in the first instance under subsection -302, *i.e.,* by way of the Judgment Lien Statute[4]. Utah courts have held this is so. *See e.g., Osborne v. Osborne*, 2011 UT App 150, ¶3 (explaining that pursuant to §78B-5-302 a foreign judgment is bound by the statutory provisions relating to the enforcement of a Utah judgment)(*citing Bankler v. Bankler*, 963 P.2d 797, 799-

[4] Plaintiff's own actions contradict its claimed position that it need only comply with Sections 78B-3-305 and 78B-5-202 pursuant to the Foreign Judgment Act to create a lien, because it did, in some respects, also comply with the Judgment Lien Statute by including with the Claimed Judgment an Information Statement as required by §78B-5-201(4). On the one hand Plaintiff argues that Section 78B-5-202 only requires recording and information identifying the judgment debtor, but on the other hand it asserts that it does not need to file its Claimed Judgment in the Registry of Judgments because that requirement is set forth in Section 78B-5-201 not -202. Opposition, p.6. This conclusion results from a disjointed reading of the Statutes and their subparts. *See e.g., Irving Place Associates v. 628 Park Avenue, LLC*, 2015 UT 91a at ¶21 ("[t]he canon of consistent meaning is at its strongest when it is applied to a term used in neighboring subparts of the same statutory provision"), further discussed below.

801 (Utah Ct. App 1998)( "[o]nce a foreign judgment is filed, it is 'subject to the same

procedures to attack or enforce as a Utah judgment'").

It makes no sense that a judgment creditor seeking to create a lien in Utah by way of a

foreign judgment has fewer steps and hurdles to create the lien than a judgment creditor seeking

to enforce and create a lien pursuant to a Utah judgment.  Plaintiff's isolated interpretation of the

Utah Foreign Judgment Act creates an absurd result and dooms its Claimed Lien.  *Utley v. Mill

Man Steel, Inc.*, 2015 UT 75, ¶37, 357 P.3d 992 ("we do not interpret the terms of statutory

provisions in isolation.  We read them in context.  The relevant context, moreover, must include

an understanding of the structure and purpose of the statute."); *Id.*, ¶46 (requiring construction of

statute "that avoids absurd consequences").  Plaintiff must also comply with each of the

provisions of the Utah Judgment Lien Statute, which it admittedly did not do.  Plaintiff therefore

failed to create a lien merely by recording the Claimed Judgment in the Weber County recorder's

office.

        B.   Plaintiff's Reliance on *Kitches* to Justify its Interpretation of Utah's Foreign
             Judgment Act and the Judgment Lien Statute is Misplaced and Unavailing

Plaintiff relies on *Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 112 P.3d 1210 (Utah Ct.

App. 2005) to support its disjointed argument that filing its Claimed Judgment in the Registry of

Judgments was not required.  But *Kitches* at best is distinguishable and at worst was wrongly

decided.

The *Kitches* court considered the issue of whether a March 17, 2003 judgment that

plaintiffs had recorded created a lien on the debtor's real property, and whether its lien had

priority over the debtor's conveyance of the subject property to his wife two months later on

May 12, 2003.  Applying an earlier version of Utah's Judgment Lien Statute, the *Kitches* court

held that Sections 78-22-1 and 78-22-1.5 should be read in the disjunctive, such that the plaintiff need only file its judgment in the county recorder's office to create a lien on the debtor's real property which, therefore, had priority over the May 12, 2003 deed.

The debtor had argued "that subsections (2) and (3) of §78-22-1.5 should be read together, thereby creating a two-step process for establishing a lien on real property after July 1, 2002". *Id.* at ¶ 12. The *Kitches* court disagreed and focused its analysis on the language in Section 78-22-1 ("a judgment 'becomes a lien upon real property' if it is recorded in the office of the county recorder") and various subsections of Section 78-22-1.5 that include additional requirements for recording with the judgment with debtor information and methods of recording, "in the disjunctive". *Id.* In support of its logic the *Kitches* court pointed out that "Section 78-22-1.5(4) provides that 'any judgment that is filed in the Registry of Judgments on or after September 1, 1998, *or* any judgment or abstract of judgment that is recorded in the office of a county recorder after July 1, 2002, shall include' particular additional information" (emphasis original). Had the legislature intended the two subsections to be read together, the *Kitches* court said, "[the legislature] could have used the word "and" instead of "or". *Id.* at ¶ 13.

The problem with this logic, and the *Kitches* decision, is that it violates the requirements of the current Judgment Lien Statute wherein Sections 78B-5-201*et seq.* enumerates in its subsections a number of requirements that a judgment creditor must follow to create a judgment lien (including, for example, the requirement to file its judgment in the Registry of Judgments as set forth in subsection -201(2)). Further, a judgment creditor is required to comply with <u>all</u> of the subsection requirements in Section 75B-5-201, not just the ones it <u>wants</u> to. *See e.g., T3 Properties, LLC v. Persimmon Inves., Inc.*, 2013 UT App 38 (judgment creditor failed to comply

with the statutory requirements under both Sections 78-22-1 and -1.5 (current versions are Sections 78B-5-202 and -201); the judgment therefore never became a lien on the Property).

Additionally, contrary to Plaintiff's assertion, compliance with some or all of the provisions of Section 78B-5-202 does not mean that a judgment creditor does not have to also comply with the requirements set forth in neighboring subsection Section 78B-5-201. Dissecting the statute in this way would frustrate the purposes of the Judgment Lien Statute as a whole.

The Utah Supreme Court case of *Irving Place Assoc.*, cited in footnote 4 above, is instructive and dispositive. In that case, the court considered the interplay between creating a lien pursuant to Section 78B-5-201(4)(recording the judgment with the debtor's information in the county recorder's office) or 78B-5-201(5)(recording a separate information statement). At issue in particular, was whether the judgment needed to be a final judgment to create a lien (it does under Section 78B-5-202(7)) and whether the judgment creditor provided the debtor information required by Section 78B-5-202(7)(a)(i) (it didn't). The *Irving* court found the relevant statutory provisions ambiguous because Section 78B-5-201(4) does not specify a "final" judgment[5]. But after further analysis of a number of relevant statutory provisions that expressly or impliedly referenced "final judgments" in their application, it held that "*the canon of consistent meaning tells us that the 'judgment[s]' subject to a lien under a neighboring statute – section 202(7) – are also the final kind.*"[6] *Id.* at ¶21.

[5] The Mulligans maintain that the statutory provisions at issue in this case are not ambiguous. Plaintiff's selective reading of them, by contrast, would create ambiguity for judgment creditors and debtors alike.

[6] For example, the *Irving* court stated that a "closely proximate subsection" of the lien provisions at issue, Section 78B-5-202(1), imposes an eight-year limitation on judgments, which can only mean final judgments. *Id.* at ¶20.

Applying the lengthy statutory analysis and guidance set forth in *Irving*, there can only be one result: Sections 78B-5-201, 202, and their subparts, and the Judgment Lien Statute as a whole, must all be interpreted together as a whole, cohesively, and in harmony, resulting in the failure of Plaintiff to create a judgment lien on the Mulligans' Property.

## II. THIS COURT DOES NOT HAVE *IN REM* JURISDICTION TO ISSUE THE WRIT OR OTHERWISE ENFORCE THE CLAIMED JUDGMENT TO BE EXECUTED IN A COUNTY OUTSIDE OF ITS JUDICIAL DISTRICT

Plaintiff was statutorily required to file its Claimed Judgment in the Registry of Judgments with the Fourth Judicial District Court in Weber County because the Property at issue is located in Weber County.[7] Section 78B-5-201(2) expressly provides that:

> On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect title to real property unless the judgment is filed in the Registry of Judgments in the office of the clerk **of the district court of the county in which the property is located**.

(Emphasis added). Instead, Plaintiff filed its Claimed Judgment in the Third Judicial District Court in Salt Lake County on October 13, 2020, in violation of the above provision and established case law. Because this action is *in rem* – solely to execute a money judgment and create a lien or interest in real property – jurisdiction to do so can only lie with the Fourth Judicial District Court.

The Utah Supreme Court in *Calder v. Third Jud. Dist. Ct. In & For Salt Lake Cnty*, 2 Utah 2nd 309, 314-315, 273 P.2d 168, 171-172 (1954), explained it like this:

---

[7] The Mulligans do not concede the issue raised in their Reply and Request for Hearing – that the Claimed Judgment was against debtor Brett Del Valle, an individual, and other debtors, none of whom ever owned the Property.

> [I]f the main question in action involves title to real property, it is a local action and must be brought within the county where the land is situated, but this is not so where the question of title or interest in real property is only incidental to the main controversy.

(Emphasis added) (holding that because the plaintiff sought recission of a contract and not a determination of an interest in real property, the district court did not err in refusing to grant a change of venue on that ground)(citing numerous cases in which courts distinguished between a "transitory action" involving, for example, recission of a contract for sale, fraud that vitiates the contract, or other such allegations, that could be brought in a district court where the alleged actions occurred, versus a "local action", or *in rem* jurisdiction, involving an interest in real property which must be brought within the county where the land is situated). *See e.g., Sherman v. Droubay*, 27 Utah 47, 74 P. 348, 350 (1903)("…the action at bar should have been commenced, as the statute directed, in the county of Tooele, where the real property securing the debt was situate") (citing *Fields v. Daisy Min. Co.*, 26 Utah, 373, 73 Pac. 521); *see also Ashton-Jenkins Co. v. Bramel*, 56 Utah 587, 192 P. 375, 377-378 (citing a similar Minnesota case for the proposition that "[I]t is now the settled doctrine of this court that the district courts of this state may be clothed with full power to inquire into and conclusively adjudicate the state of the title of all land within their respective jurisdictions" (emphasis added)).

While the statutes and cases make clear that *in rem*, or "local action", jurisdiction belongs in the county where the judgment debtor's property is located, a judgment debtor's failure to object waives any jurisdictional challenge. *See Snyder v. Pike*, 30 Utah 102, 83 P. 692, 693-94 (1905)(a defendant failing challenge the jurisdiction of the court on the ground that the suit was not brought in the property county, waives the objection)(distinguishing *Fields v. Daisy* and others on the grounds that plaintiff did not object to jurisdiction of the Forth Judicial District

Court when it entered a decree directing a sale of the mortgaged premises for the payment of the indebtedness to the Sheriff of Emery County, where the property was located).

In the instant case the Mulligans have, and do, object the lack of jurisdiction of this Third Judicial District Court over property located in the Fourth Judicial District; Mulligans have, and do, object to the entry of the Claimed Judgment and issuance of the Claimed Writ by the Third Judicial District Court. Furthermore, this Court is authorized to set aside the Claimed Writ pursuant to Utah Rule of Civil Procedure 54(b) the Mulligans request that it do so. *See Jordan Construction, Inc. v. Federal National Mortgage Association*, 2017 UT 28, ¶¶27-38.

**CONCLUSION**

Plaintiff is a judgment creditor, and as such, it is Plaintiff's responsibility to diligently protect its interests by complying with the statutes that allow the creation of a lien on real property. Plaintiff failed to do so. Plaintiff's failure should not, and cannot, be foisted on the Mulligans. Plaintiff cannot pick and choose which subsections of the Statutes to follow or ignore depending on the result it wants. It's analysis and arguments are wholly ineffective to breathe life into the Claimed Judgment lien that was never created and never attached to the Mulligans' Property. Furthermore, Plaintiff failed to file its Claimed Judgment and Writ Application in the correct judicial district court; another reason Plaintiff failed to create a lien on the Property.

For all of the foregoing reasons the Mulligans respectfully request this court to set aside the Claimed Judgment and Claimed Writ, finding that Plaintiff does not have a lien on the Mulligans' Property. The Mulligans also request a hearing to present oral argument on its Reply and Request for Hearing.

DATED September 30, 2022

FREEMAN LOVELL, PLLC

*/s/ Bradley L. Tilt*
Bradley L. Tilt
*Attorneys for Molly J. Mulligan and John P. Muligan*

**SERVICE CERTIFICATE**

I certify that on September 30, 2022, I caused true and correct copies of this **REPLY MEMORANDUM IN SUPPORT OF MULLIGANS' REPLY AND REQUEST FOR HEARING** to be served in the manner indicated below to the following-listed parties at their respective addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson<br>Bennett Tueller Johnson & Deere<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, Utah 84121<br>ben.johnson@btjd.com<br>*Attorneys for Plaintiff* | ______Hand Delivery<br>______First Class, United States Mail, Postage Prepaid<br>__X__E-filing via GreenFiling<br>______E-filing via CM/ECF<br>______Email<br>______Other:____________________ |

*/s/ Bradley L. Tilt*
*Bradley L. Tilt*

# EXHIBIT 5

**IN THE SUPREME COURT OF THE STATE OF UTAH**

| | |
|---|---|
| MOLLY J. MULLIGAN and<br>JOHN P. MULLIGAN,<br><br>Appellants<br><br>vs.<br><br>ALUM ROCK RIVERSIDE, LLC,<br><br>Appellee. | Appellate Case No. 20221024-SC |

**APPELLANTS' PETITION FOR REHEARING**

Appeal from the Third District Court
In and For Salt Lake County, State of Utah, Case No. 206927043
The Honorable Adam T. Mow, Presiding

Benjamin D. Johnson
KC Hooker
Bennett Tueller Johnson & Deere
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
ben.johnson@btjd.com
kchooker@btjd.com
*Attorneys for Appellee*

Bradley L. Tilt (Utah Bar No. 07649)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
bradley.tilt@freemanlovell.com
*Attorney for Appellants*

Felicia B. Canfield (Utah Bar No. 09686)
CANFIELD LAW LLC
2413 Newton Avenue
Cody, Wyoming 82414
canfieldlawllc@gmail.com
*Attorney for Appellants*

Appellants Molly J. and John P. Mulligan ("**Mulligans**") respectfully submit this petition for rehearing of this Court's Opinion issued on July 18, 2024, which was reported at 2024 UT 22 (the "**Opinion**"), a copy of which is attached as Addendum 1.

## ARGUMENT

The Mulligans respectfully submit that the Court has misapprehended the facts and law relating the creation of a lien and issuance of the Writ of Execution against their Weber County property based upon a California Foreign Judgment that Appellee Alum Rock Riverside, LLC ("**Alum Rock**") obtained against its debtor, Brett Del Valle (who never owned the property), which Alum Rock attempted to domesticate by filing its Notice of Judgment in the Third Judicial District Court in Salt Lake County, but failed to file its Notice of Judgment in the Registry of Judgments with the Fourth Judicial District Court in Weber County, all in violation of several Utah statutes *which are in harmony with each other*: § 78B-5-302(3)[1]; § 78B-5-305(1)[2]; § 78B-5-201(2)[3], § 78B-5-202(7)(c)[4],

[1] "A foreign judgment filed under this part [the Utah Foreign Judgment Act] has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court of this state" (emphases added).

[2] "A foreign judgment entered in a district court under this part becomes a lien as provided in 78B-5-202 *if*: (a) a stay of execution has not been granted; (b) the requirements of this chapter [Procedure and Evidence] are satisfied; and (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202" (emphases added).

[3] "On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located" (emphases added).

[4] "The real property subject to the lien includes all the real property of the judgment debtor…(ii) owned or acquired at any time by the judgment debtor during the time the judgment is effective" (emphases added).

and §78B-3-301(1)[5], Utah Code Ann. Those misapprehensions resulted in this Court erroneously concluding that Alum Rock created a lien on real property in Weber County and that the Writ of Execution was validly issued, which was the principal basis for denying the Mulligans' appeal; the Court therefore should revisit and revise its Opinion.

## I. TEXTUAL EVIDENCE THAT CREDITORS *MUST* FILE THEIR JUDGMENTS IN THE REGISTRY OF JUDGMENTS IS ABUNDANT; AND THIS COURT HAS ALREADY HELD THAT IT APPLIES.

Much of the focus of the briefing and arguments in this appeal, at oral argument held on April 10, 2024, and in the Opinion, was on the threshold issue of whether Alum Rock created a lien on the Mulligans' property in the first instance such that any writ could be issued, whether by the District Court in Salt Lake County or by a court in Weber County. The Mulligans respectfully submit that the Court, after holding that under Utah's Foreign Judgment Act (§ 78B-5-301 *et seq.*) creditors of foreign judgments must also comply with the Judgment Lien Statute (§ 78B-5-201 *et seq.*), erroneously ruled that § 78B-5-201(2) of the Judgment Lien Statute no longer applies to any judgments entered after July 1, 2002. This ruling, however, misapprehends the language of the statute and the textual evidence therein, *i.e.,* that both "**lien creation**" subsections (2) and (3)(a) are still required of all creditors if they wish to create a lien on real property, including as evidenced internally in the "**shall include**" subsection (4), *which expressly incorporates the Registry of Judgments requirement* *in **two places** in that subsection*. It states:

---

[5] "Actions for the following causes involving real property shall be tried in the county in which the subject of the action, or some part, is situated: (e) for the foreclosure of all liens and mortgages on real property" (emphases added).

§ 78B-5-201. Definitions – Judgment recorded in Registry of Judgments

(1) For purposes of this part, "Registry of Judgments" means the index where a judgment is filed and searchable by the name of the judgment debtor through electronic means or by tangible documents.

(2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.

(3)(a) On or after July 1, 2002, except as provided in Subsection (3)(b), a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of the judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

…

(4) ***In addition to*** the requirements of Subsections (2) ***and*** (3)(a), any judgment that is filed in the Registry of Judgments on or after September 1, 1998, or any judgment or abstract of judgment that is recorded in the office of a county recorder after July 1, 2002, shall include[6]:

(a) the information identifying the judgment debtor as required under Subsection (4)(b) on the judgment or abstract of judgment; or

(b) a copy of the separate information statement of the judgment creditor that contains:

…

(iii) the amount of the judgment ***as filed in the Registry of Judgments***

Utah law is clear that a judgment must be accompanied by information about the judgment debtor, whether in the judgment itself or attached separately as an information statement – and in either case, pursuant § 78B-5-201(4)(b)(iii), that information must include "the amount of the judgment ***as filed in the Registry of Judgments***" thereby

[6] Here, given other textual evidence, statutory and case law discussed below, "or" should be read to mean that the subsection (4) "shall include" requirements apply to both (2) and (3)(a), not that (2) and (3)(a) are mutually exclusive.

expressly incorporating both lien creation subsections (2) and (3)(a) – *i.e.*, cumulative requirements added over time. *See e.g., Irving Place Assocs. v. 628 Park Ave, LLC*, 2015 UT 91, ¶ 24, 362 P.3d 1246; and, *T3 Properties*, 2013 UT App 38, ¶ 21, 299 P.3d at 618[7].

Furthermore, in 2017 ***this Court already held that*** the "judgment registry statute" (§ 78B-5-201) "applies only to judgment creditors who wish to create a lien on the judgment debtor's property[8]". *2DP Blanding, LLC v. Palmer*, 2017 UT 62, ¶ 31, 423 P.3d 1247, 1253. In *2DP Blanding* this Court dealt with whether the "judgment registry statute" applied to First National's Foreclosure order and decided that it did not because the order "does not create that kind of [judgment creditor] relationship…[T]he order instead established the relative priority of First National's trust deed against Palmer's deed and authorized the bank to foreclose on the properties against a separate debtor. The

[7] "…the reason the information statement requirement is set out in a separate subsection is not difficult to ascertain. Subsection (2) was included in section 1.5 when it was enacted in 1997, and by its terms, applies "[o]n or after July 1, 1997." Subsection (3), however was not added to section 1.5 until 1998 and by its terms, only applies to judgments that were recorded "on or after September 1, 1998." The information statement requirement is separate from subsection (2) because it took effect a year later. Thus, separate subsections do not mean that the information statement is not essential to the creation of a judgement lien; rather these requirements are set forth in different subsections due to the different dates of application. So, in order for "a judgment rendered or recorded" "[o]n or after July 1, 1997," to create a judgment lien it must be recorded ***in the Registry of Judgments***. But effective a year later, "**in addition to**" the recording requirement of subsection (2) a judgment must "include a separate information statement of the judgment creditor" in order to create a lien on real property" (emphases added).

[8] Mulligans expressly further reserve their arguments below and on appeal that the Mulligans' Property is not, and never has been, property owned by Alum Rock's debtor, including as discussed further below.

judgment registry statute consequently did not govern the recording of First National's foreclosure order." In so holding, this Court expressly referenced the "judgment registry statute" saying it "impos[es] duties on judgment creditor to obtain a lien on judgment debtor's real property" and "require[es] the judgment to include 'the amount of the judgment ***as filed in the Registry of Judgments***." *Id.* at ¶ 31 and fn. 8 (emphases added).

In addition, the Mulligans respectfully submit that this Court misapplied *Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 2005 UT App 164, 112 P.3d 1210, and misapprehended legislative history of the Judgment Lien Statute in paragraphs 31-39 of its Opinion when it erroneously **equated** the ***removal*** in 1997 of "automatic-lien regime" language in § 78B-5-202(2) (adding the requirement that as of July 1, 1997 "…a judgment does not create a lien 'unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located'") **with the further *addition*** in 2002 of subsection (3)(a) ("a judgment entered in the district court does not create a lien 'unless the judgment or an abstract of the judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.'"). The Court's conclusion that the ***addition*** of subsection (3)(a) is evidence that "legislature also **phased out** subsection (2)'s registry-of-judgments requirement" is, respectfully, illogical, and not supported by the textual evidence in the statute itself, nor this Court's analysis in *2DP Blanding*, nor by other cases and rules discussed below.

Also, in parsing the statutory language of § 78B-5-201, the Court erroneously contrasted the ***external*** grammatical structure and punctuation of the two "lien creation" subsections (2) and (3)(a), which are not separated by an "or" or "but" conjunction, with

the ***internal*** punctuation of subsection (4) that lists out the "shall include" disclosure requirements for a judgment, and in doing so, ignored that (4) begins with the phrase "*In addition to* the requirements of Subsections (2) ***and*** (3)(a)…" and proceeds to, in that same enumerated list, require disclosure of "the amount of the judgment ***as filed in the Registry of Judgments***". Opinion ¶¶ 35-40. The Court concludes that reading subsection (2) out of the lien creation requirements brings two statutes into harmony because although the Foreign Judgment Act expressly refers creditors to the requirements of the Judgment Lien Statute, it does not itself reference the Registry of Judgments. But respectfully, if this Court maintains that reading out § 78B-5-202(2) brings the Judgment Statute in harmony with the Foreign Judgment Act, it does so to the peril of harmony *within* the Judgment Lien Statute itself and settled law and practice[9].

Furthermore, the Court's assertion in paragraph 44 of the Opinion that *Kitches* has stood as "controlling law in this jurisdiction for nearly two decades, and during that time judgment creditors have presumably relied on it as such" is unsupported by any evidence including, for example, by creditors, debtors, lenders, or title companies whose job it is to search out liens in court records and county records, and is further belied by textual evidence in the statute itself as shown above, and by *2DP Blanding, T3* (supra), and other cases decided **after** *Kitches,* such as, for example, *Charlton v. Charlton*, 2007 UT App 198, in which the Utah Court of Appeals assumed without deciding that judgments must

[9] The Mulligans also submit that the Judgment Lien Statute and the Foreign Judgment Act are *already* in harmony with each other because foreign judgments creditors are specifically directed to look to Utah's Judgment Lien Statute to create a lien on real property in Utah – as are domestic creditors, who do not rely on the Act at all.

be filed in the registry of judgments but that "the date that the judgment is filed in the 'registry of judgments'," is not the date from which an appeal runs (*citing Glacier Land Co. v. Klawe*, 2006 UT App 209, ¶ 3, 138 P.3d 109 (observing that a "stamp on the Judgment states it was 'entered in the registry of judgments' on March 14, 2005," but holding that is not the date from which an appeal runs)); *Wilden Family Dental, Inc. v. Dannon*, 2007 UT App 404, ¶ 1 (observing that "[t]he judgment also contains a stamp stating that it was entered in the registry of judgments on August 7, 2007," but holding that is not the date from which an appeal runs) (citing *Glacier Land Co.*)).

Indeed, the Mulligans respectfully submit that the presumption and reliance by creditors, lenders, title companies and others has been in the *other direction* – that creditors *are* required to file their judgments in the Registry of Judgments to create a lien on real property. **<u>This requirement is not trivial</u>**; it serves the important public purpose of docketing judgments <u>in a searchable court database in the county where real property is located</u> so that judgments (whether recorded yet or not) and liens (whether choate or inchoate) that affect or may affect real property can be discovered. Prospective buyers, sellers, lenders, and title companies, among others, all have a vested interest in being able to locate docketed judgments, including ones that purport to create a lien (especially if not yet recorded). And title companies, in particular, as discussed during oral argument, routinely and regularly search court records for judgments that may or do affect real property or the sellers and buyers thereof[10]. It is their legislative imposed duty to do so.

---

[10] *See* § 31A-20-110. Underwriting rules for title insurance, states, *inter alia*: "(1) A title insurance policy may not be written until the title insurer or its individual title insurance

The legislature has expressly recognized this important role of searching for judgments in court records and provided for it by enacting a number of court rules designed to provide access to court records designated as public. For example, Rule 4-202. Purpose, Utah Rules of Judicial Administration, provides in relevant part:

> Intent: To recognize the delicate balance of interests served by open and closed court records.
> …
> Statement of the Rule:
> (1) This list of interests served by public court records is not exhaustive but is meant to illustrate the important objectives of open government:
>
> (F) to give notice of important claims, rights and obligations…

Rule 4-202.02. Records Classification, provides in relevant part[11]:

> (2) Public Court Records. Public court records include but are not limited to:
> (L) indexes approved by the Management Committee of the Judicial Council, including the following, in courts other than the juvenile court; an index may contain any other index information:
> (viii) civil judgment…

Rule 4-205. Security of Court Records, provides in relevant part:

> Intent: …To assure that authorized personnel have access to court records when appropriate

---

producer or agency title insurance producer has conducted a reasonable examination of the title and has made a determination of insurability of title under sound underwriting principles. Evidence of this examination and reasonable determination shall be retained in the files of the title insurer…for not less than 15 years after the policy has been issued…" *Accord Chapman v. Uintah County*, 2003 UT App 383, 81 P.3d 761; *Culp Constr. Co. v. Buildmart Mal*l, 795 P.3d 650 (Utah 1990); *Johnson and Allphin v. First American Title Ins. Co*., 2016 WL 6459579.

[11] *See also State v. Allgier*, 2011 UT 47, ¶¶ 10-11, 258 P.3d 589 (holding that under the plain language of the UCJA there is a 'presumptive right of public access to court records…including "to give notice of important claims, rights and obligations'"); *accord Supernova Media, Inc. v. Pia Anderson Dorius Reynard & Moss*, LLC 2013 UT 7, 297 P.3d 599.

(3) The clerk of the court may authorize, in writing, abstractors, credit bureau representatives, **title company representatives *and others who regularly research court records*** to have direct access to public court records…

Taken together with the textual evidence, caselaw and rules discussed herein,[12] and the harmony that exists between them, it appears to the Mulligans that the legislature has mandated that to create a lien on real property after July 1, 2002, a creditor must both file it in the requisite Registry of Judgments and record it with the county recorder – and that *T3*, decided in 2013,which extensively analyzed and explained the evolution of the Judgment Lien Statute over time, is on point and controlling, while *Kitches*, decided in 2005, if not wrongly decided, is at least distinguishable, including since its "starting point for establishing a judgment lien on real property [was] section 78-22-1 [§ 78B-5-202

---

[12] At oral argument the Court allowed Alum Rock to raise a new argument under § 75-7-505, Utah Trust Code, which had never been referenced, briefed or argued by the parties below or on appeal (Transcript pp. 23, 49) and further invited counsel for Alum Rock to submit supplemental authority on the question of whether "when the legislature does not amend a statute in response to an interpretation, that we give that some weight?" (Transcript p. 28) (a copy of the oral argument Transcript is attached to this petition as Addendum 2). In the spirit of assisting this Court to rule on the Mulligans' petition, they offer supplemental authority consistent with this Court's guidance in *Patterson v. Patterson*, 2011 UT 68, ¶ 18, 266 P.3d 828, 833, wherein it stated: "[b]ut we routinely consider new authority relevant to issues that have been properly preserved, and we have never prevented a party from raising a controlling authority that directly bears upon a properly preserved issue. Further, we are unwilling to disregard controlling authority that bears upon the ultimate resolution of a case solely because the parties did not raise it below." And the Mulligans expressly preserved for appeal questions relating to whether Alum Rock validly created a lien on their property, including pursuant to the Foreign Judgment Act and the Judgment Lien Statute.

Additionally, at oral argument the Court specifically asked about title companies and how they investigate judgments against judgment debtors, which counsel for Mulligans, who has practiced title insurance law for more than 25 years, addressed and discussed (Transcript pp. 45-47).

today]" rather than today's § 78B-5-201 [78-22-1.5 in the time of *Kitches*]. *Kitches,* ¶ 10 (emphases added))[13].

Further, following *Kitches* reads out of existence § 78B-5-202(3), which provides: "[a]n abstract of judgment issued by the court in which the judgment is entered may be filed in any court of this state and shall have the same force and effect as a judgment entered in that court" and the language in § 78B-5-201(4) that states "or abstract of judgment that is recorded in the office of a county recorder after July 1, 2002". If a creditor does not need to file its judgment or an abstract in the court where the real property upon which it seeks to create a lien is located, then there is no need for these provisions.

[13] Additionally, in ¶ 46 in the Opinion the Court acknowledges that the core issue in *T3* is the same issue in this case, *i.e.,* "[t]he issue [in *T3*] was whether the judgment creditor created a lien on the property before the debtor conveyed it away". Therefore, its dismissal in ¶¶ 47-48 of the *T3* statement that a judgment must be filed in the registry of judgments as mere dicta ignores that this conclusion was expressly made in this context: "These cumulative amendments were in effect until July 1, 2002 and are part of what we have designated as the 2001 version of the judgment lien statute. The statute was significantly revised again, effective July 1, 2002 (the 2002 version) …Notably, the 2002 version required that the judgment and the information statement be recorded in both the Registry of Judgments and in the county recorder's office." (*T3* at ¶ 15 and fn 5.) (emphasis added). Thus, the *T3* footnote was an extension of the court's in-depth analysis of the statue, even beyond the information statement at issue, not just a side note.

Confusingly, in ¶ 48, while discussing *T3*, the Court stated that "[a] separate panel of the court, squarely presented with the issue, had held those requirements are sequential and that judgments no longer need to be filed in the registry of judgments for a lien to attach" but *T3* held no such thing.

And, respectfully, the analysis in ¶ 43 in which the Court discusses that "where a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent" leads to a "cumulative" conclusion not the sequential conclusion which the Court adopted.

## II. IN DECIDING THAT ALUM ROCK'S DEBTOR "OWNED" THE PROPERTY THIS COURT LEAP-FROGGED OVER FACT FINDING AND EVIDENTIARY HEARINGS.

The Mulligans respectfully submit that in its Opinion, this Court prematurely decided that Alum Rock's debtor, Brett Del Valle, "owned" the Property, such that Alum Rock's lien could attach and that the Writ was therefore properly issued, on the facial basis that the Del Valle Family Trust is revocable[14] – but without the parties having conducted any fact-finding discovery and without any evidentiary hearings to probe the extent, control, contribution, and ownership interest that Brett may have had as a settlor and trustor. In doing so, the Court relied on general principles about creditors rights, trusts, and on § 75-7-505(1). Opinion. ¶¶ 57-62[15]. But section 75-7-505(1) provides: "During the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors. <u>If a revocable trust has more than one settlor, the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust ***attributable to that settlor's contribution***</u>"[16] (emphases

---

[14] As a practical matter the Mulligans would have no way of knowing that the <u>grantor</u>, the "Del Valle Family Trust", is a *revocable* trust nor that any judgment against an individual named Brett Del Valle (which judgment would not show up in a <u>grantor</u> search of the Weber County public court records) could somehow create a lien on the subject property.
[15] *But see Hillam v. Hillam* 2024 Ut App 102, ¶ 37 (finding unpreserved a "distinct legal theory" because "[w]e see no place in Tara's pleadings or in the court's analysis where anyone invoked Utah Code section 75-7-505(2)(a), which provides the analytical foundation for the issue Tara is presenting on appeal".
[16] In footnote 2 of their appellate Reply Brief, the Mulligans called out and reserved the issue that: "*Brett Del Valle's wife is not Alum Rock's judgment debtor, so even if it could somehow execute against his prior co-trustee interest in the Property, it could not do so against hers*", although the Court erroneously stated in its footnote 7 that "[n]either side has addressed whether Traci's joint ownership of the property has any effect on the judgment lien. For that reason, we express no opinion on the matter."

added). At the Scheduling Conference held on August 17, 2022, counsel for Alum Rock expressly requested the District Court to allow it to conduct fact discovery followed by an evidentiary hearing:

> MR. JOHNSON: …I would like to talk to Brett Del Valle about this trust he set up, So my – my request would be a short period for some very limited discovery as to talk to the parties about the trust, and just to make sure this is also, a, you know, a legitimate transfer of assets. This is a multi-million-dollar judgment that we're trying to collect on. So there's a fair amount at stake.
>
> So my ask would be some basic discovery, just two or three quick depositions. If we could have an evidentiary hearing in maybe 90 to 120 days. I do think we need to brief the legal issues, in particular did this judgment attach to the property, and there's kind of a couple issues related to that.
>
> …
>
> MR. JOHNSON: I probably want to talk to the Mulligans briefly just to inquire into the nature of their relationship with this Del Valle character… It would be a brief deposition just to confirm that this –that they are BFP's, that they don't know Brett Del Valle and the nature of that. I don't anticipate that it would be a very long deposition, but if I'm allowed to talk to Brett Del Valle about this trust and the nature of this trust; is it a revocable trust; is it a irrevocable trust; was the trust really – was the property really treated as (inaudible) in the trust, things along those lines…"

R000299-302. After some discussion, the District Court decided to set "oral argument on the legal issues, and then my goal is to be able to give you a decision at that hearing so that we can discuss, you know, do we need to set it for further evidentiary issues of discovery or hearing or what have you, or if that's the end of my involvement in the case. I think that's a good way to handle that threshold issue."[17]

Additionally, the Mulligans respectfully submit that they *did* argue, and *did* preserve below, the question of whether § 78B-5-202(7)(c) governs to preclude

---

[17] The trust provides that co-settlors are tenants in common; therefore, if this Court holds that Alum Rock's lien attached, evidence on what Brett's interest was is needed.

attachment of Alum Rock's lien because a judgment lien can only attach to "real property of the judgment debtor". In their *Reply and Request for Hearing*, the Mulligans expressly argued this legal theory, including by tying it to §78B-5-202(7)(c), *even though* they were replying to a Writ of Execution issued under Rule 64E:

> (3) But the Plaintiff's *Application for Writ of Execution* then goes on to **incorrectly state** that the real property located at and commonly known as 1453 S. Basinview Road, Huntsville, Utah 84137, and more particularly described (in part) as Lot 7, Basinview Estates Cluster Subdivision 1st Amendment, and which bears Parcel No. 20-119-0007 (which real property is referred to hereinafter as the "**Property**"), ***is "the judgment debtor's property***"; the *Application for Writ of Execution* then **incorrectly requests** that a Writ of Execution be issued to direct the Sheriff to seize and sell the Property ***purportedly as if it was "the debtor's … real property.***" ¶¶ 4 and 6 of the Plaintiff's *Application for Writ of Execution*. Those statements and requests in Plaintiff's *Application for Writ of Execution* are **incorrect, inaccurate, and improper,** ***because the Property is not presently – and it never has been – the judgment debtor's real property***; ***the Property is not presently – and it never has been – owned by Brett Del Valle in his individual and personal capacity***
>
> (4) It further and provides and confirms that a judgment can become a lien upon real property only if the above-referenced filings and recordings are made in the county in which the property is located…
>
> **And** in footnote 3: '***That same Utah Code Section 78B-5-202(7)(***c) & (c)(ii) also and further confirm that even if all of those requirements are met, the judgment then ***affects only real property in that county "of the judgment debtor***" and specifically such property "owned or acquired at any time **by the judgment debtor during the time the judgment is effective**."

R000049 (some emphases added). And in additional filings below, they continued to assert the argument that even if Alum Rock had created a valid lien pursuant to Utah's Judgment Lien Statute, Alum Rock's Writ was improper and invalid because it was issued against real property ***not owned by its judgment debtor***. Thus, this Court's harsh treatment and criticism of the Mulligans in ¶¶ 54-56 seems unfair and inaccurate.

Therefore, to the extent this Court upholds its ruling that Alum Rock created a lien, the Mulligans respectfully submit that it should withhold any decision relative to whether its debtor's status as a settlor of the trust *a fortiori* means that he "owned" the property such that its lien *automatically* attached, including under § 78B-5-202(7), and remand the case to the District Court for further fact finding and proceedings on that question.

## III. A LIEN FORECLOSURE IS AN *IN REM* ACTION AND MUST BE BROUGHT WHERE THE REAL PROPERTY IS LOCATED.

The Mulligans respectfully submit that this Court also misapprehended the meaning of Section 78B-3-301, Actions involving real property, when it decided that the Salt Lake County District Court had jurisdiction to issue the Writ. § 78B-3-301 provides:

> (1) Actions for the following causes involving real property ***shall*** be tried in the county in which the subject of the action, or some part***, is situated***:
>
> (e) for the foreclosure of ***all liens*** and mortgages on real property.

The Court opined in ¶ 63 of its Opinion that the Mulligans "*have not identified a relevant limitation on the district court's jurisdiction to issue the wr*it" but the Mulligans argued on pages 3, 6, 11, and 30 of their Principal Brief, and on page 14 of their Reply, that § 78B-3-301 applies to limit the District Court's jurisdiction because this is a solely *in rem* action – *i.e.,* the California contract dispute resulted in a judgment and the Utah action pertains only to execution and foreclosure of Alum Rock's purported lien *on real property*. But this Court did not address *in rem* principles at all, which the Mulligans expressly raised and argued in pages 3-4, 6, 11, 30, 32 of their Principal Brief and in pages 13-15 of their Reply. Notably, however, Alum Rock filed and recorded a *Lis*

*Pendens* on the Mulligans' Property, pursuant to § 78B-6-1303[18], giving notice:

> …of an action pending in the Third Judicial District Court of Salt Lake County, Case No. 206927043 (the "Action"). In the Action, Alum Rock claims a judgment lien against the below described property and, pursuant to its judgment in the Action, has obtained a writ of execution against the below described property…"

Thus, the Court's determination that "***no [a]ction[]…involving real property' is at issue…Indeed, no cause of action is at issue at all***" is erroneous and should be corrected. *See also Derma Pen, LLC v. 4EverYoung Ltd.*, No. 2:13-CV-00729-DN-EJF, 2015 WL 791595 (D. Utah) (Application for Writ of Execution is an *in rem* or *quasi in rem* proceeding: "[i]n determining whether a court has assumed jurisdiction over the property in question, a court must look to the judgment sought…[w]here, however, the judgment sought requires 'that the court or its officers have possession or control of the property which is the subject of the suit in order to proceed with the cause and grant the relief sought,' then the proceeding is considered *in rem* or *quasi in rem*)[19].

---

[18] 78B-6-1303, Lis pendens – Notice, provides:"(1)(a) Any party to an action filed in … a district court of this state…that affects the title to, or the right of possession of, real property may file a notice of pendency of action…(3) From the time of filing the notice, a purchaser, an encumbrancer of the property, or any other party in interest that may be affected by the action is considered to have constructive notice of the pendency of action."

[19] *See also SMS Fin., LLC v. CBC Fin. Corp.*, 2017 UT 90, ¶ 5, 417 P.3d 70, 72 (assuming that filing for a writ of execution was an "action" to foreclose its judgment lien); *see also e.g., Carmack v. Park Cities Healthcare, LLC*, No. 3:16-CV-3500-D, 2021 WL 4133494, at *7 (N.D. Tex. Sept. 10, 2021) ("attachment proceedings are essentially *in rem* actions because they result in control of the property. This logic applies as well to writs of execution. Much like writs of attachment, writs of execution "result in actual or constructive control over the res itself, rather than simply adjudicating personal rights to the subject property," meaning they are also essentially *in rem* actions) (citing *GM Gold & Diamonds LP v. Fabrege Co.,* 489 F. Supp. 2d 725, 727 (S.D. Tex. 2007)).

RESPECTFULLY SUBMITTED this 1st day of August, 2024.

*/s/Felicia B. Canfield*
Felicia B. Canfield
CANFIELD LAW LLC
*Attorneys for Appellants*

**CERTIFICATION PURSUANT TO RULE 35(a)(3) OF THE UTAH RULES OF APPELLATE PROCEDURE**

I certify that the above Appellants' Petition for Rehearing is presented in good faith and not for delay.

*/s/Felicia B. Canfield*
Felicia B. Canfield
CANFIELD LAW LLC
*Attorney for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2024, I caused a true and correct copy of the foregoing **APPELLANTS' PETITION FOR REHEARING** to be served in the manner indicated to the following parties at the addresses listed below:

| | |
|---|---|
| Benjamin D. Johnson (10275)<br>KC Hooker (18018)<br>BENNETT TUELLER JOHNSON & DEERE<br>3165 East Millrock Drive, Suite 500<br>Salt Lake City, Utah 84121<br>Telephone: (801) 438-2000<br>Ben.johnson@btjd.com<br>kchooker@btjd.com<br>*Attorneys for Alum Rock Riverside LLC* | ______Hand Delivery<br>______First Class, United States Mail, Postage Prepaid<br>__X__E-filing via Appellate e-filing system<br>__X__Email<br>______Other:____________________ |
| Bradley L. Tilt (Utah Bar No. 07649)<br>FREEMAN LOVELL, PLLC<br>4568 S Highland Drive, Suite 290<br>Salt Lake City, Utah 84117<br>Office:(385) 355-4826<br>bradley.tilt@freemanlovell.com<br>*Attorneys for Molly J. Mulliglan and John P. Mulligan* | ______Hand Delivery<br>______First Class, United States Mail, Postage Prepaid<br>__X__E-filing via Appellate e-filing system<br>__X__Email<br>_Other:______________________ |

*/s/Felicia B. Canfield*
Felicia B. Canfield
CANFIELD LAW LLC
*Attorney for Appellants*

# **ADDENDUM 1**

2024 UT 22

*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 22**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

MOLLY J. MULLIGAN and JOHN P. MULLIGAN,
*Appellants,*

*v.*

ALUM ROCK RIVERSIDE, LLC,
*Appellee.*

No. 20221024
Heard April 10, 2024
Filed July 18, 2024

On Direct Appeal

Third District, Salt Lake County
The Honorable Adam T. Mow
No. 206927043

Attorneys:

Bradley L. Tilt, Salt Lake City, Felicia B. Canfield, Cody, Wyo., for appellants

Benjamin D. Johnson, KC Hooker, Salt Lake City, for appellee

JUSTICE HAGEN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, and JUSTICE POHLMAN joined.

JUSTICE HAGEN, opinion of the Court:

## INTRODUCTION

¶1 This case stems from a California judgment that Alum Rock Riverside, LLC obtained against Brett Del Valle. After domesticating the judgment in Utah and recording it with the county recorder, Alum Rock received a writ of execution allowing it to seize and sell a property in Weber County.

¶2 At the time Alum Rock recorded the judgment with the county recorder, the property was owned by a revocable trust that was established and administered by Brett and his wife. But the trust had sold the property by the time Alum Rock applied for the writ. And when the court issued the writ, the property's new owners—the Mulligans—objected, arguing that (1) Alum Rock failed to create a judgment lien because it did not record the judgment in the registry of judgments, (2) the writ was not available because the trust—not Brett—held title to the property when the judgment was domesticated in Utah, and (3) the district court lacked jurisdiction to issue the writ because the property was located in a different judicial district.

¶3 The district court upheld the writ over the Mulligans' objections, and we affirm. First, we hold that Alum Rock created a judgment lien when it recorded the judgment in the county recorder's office. As of July 1, 2002, a party seeking a judgment lien is not required to record the judgment in the registry of judgments. Second, we hold that the writ was available against the property, even though the title was held in the name of a revocable trust, because Brett retained all indicia of ownership over the property when the lien was created. And third, we hold that the Mulligans have not identified a relevant limitation on the district court's jurisdiction that would prevent it from issuing the writ.

## BACKGROUND

¶4 Alum Rock Riverside, LLC sued Brett Del Valle in California state court for breach of contract and other claims. Alum Rock prevailed, and the court issued a judgment in its favor totaling more than $4 million. Soon after, Alum Rock domesticated the judgment in Utah's Third District Court. Because the Del Valle Family Trust owned property in Weber County, Utah, Alum Rock recorded the judgment in the Weber County Recorder's Office.

¶5 Brett and his wife, Traci, had formed the trust years earlier, naming themselves as trustees. Brett and Traci retained broad powers over the trust and its property, including the power to revoke the trust, amend it, and transfer property from it. In addition, the trust empowered Brett and Traci, as trustees, to hold, manage, control, lease, and encumber trust property. Several years after they created the trust, Brett and Traci, acting as trustees, acquired the Weber County property at issue in this case.

¶6 The trust continued to hold title to the property when Alum Rock recorded its judgment against Brett in the county

recorder's office. A few months after Alum Rock recorded the judgment, however, the trust conveyed the property to Molly and John Mulligan. And one month after that, Alum Rock applied for a writ of execution against the property, identifying Brett as the judgment debtor and asking the district court to "direct the sheriff to seize and sell" the property to satisfy the judgment.

¶7 When the court issued the writ as requested, the Mulligans challenged it. Acknowledging that their challenge "rises or falls" on whether a lien "was created and attached to the property," they asserted that Alum Rock did not do what the Judgment Act requires to create a judgment lien on real property.[1] Specifically, they claimed that Alum Rock did not fully comply with the following statutory requirements, found in Utah Code section 78B-5-201:

> (2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.
>
> (3)(a) On or after July 1, 2002, . . . a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021).

¶8 The Mulligans argued that because Alum Rock obtained its judgment against Brett in 2020—after both July 1, 1997, and July 1, 2002—Alum Rock needed to comply with the requirements of both subsections: filing the judgment in the registry of judgments and recording it with the county recorder. Because Alum Rock did not file the judgment in the registry of judgments, the Mulligans reasoned, a lien was not created.

---

[1] We refer to Utah Code, Title 78B, Chapter 5, Part 2 as the Judgment Act. Effective July 1, 2024, the Judgment Act was renumbered, and the legislature made minor stylistic changes. We cite the version in effect at the time the district court issued the writ.

¶9 The Mulligans also claimed that, under the Judgment Act and the Utah Rules of Civil Procedure, the writ was not "available" against the property. Under the Judgment Act, real property subject to a judgment lien "includes all the real property . . . owned or acquired at any time by the judgment debtor during the time the judgment is effective." *Id.* § 78B-5-202(7)(c)(ii) (2021). And under rule 64E of the Utah Rules of Civil Procedure, "[a] writ of execution is available to seize property in the possession or under the control of the defendant following entry of a final judgment." UTAH R. CIV. P. 64E(a). According to the Mulligans, the writ was "issued improperly" because (1) Brett never owned the property (the trust did), and (2) in any event, he did not possess or control the property at the relevant time (the Mulligans did).

¶10 Finally, the Mulligans questioned the district court's jurisdiction. In their view, the court lacked jurisdiction to issue the writ because the proceedings fall within reach of a venue statute that lists actions that "shall be tried in the county in which the [property] . . . is situated." *See* UTAH CODE § 78B-3-301(1) (2021).[2] The Mulligans also claimed that under Utah caselaw, actions in which the "main question . . . involves title to real property" may be heard only by the district court where the property is located. (Quoting *Calder v. Third Jud. Dist. Ct.*, 273 P.2d 168, 171 (Utah 1954).) Because the property here is outside the district court's geographic boundaries, the Mulligans maintained that the court lacked jurisdiction to issue the writ.

¶11 The district court upheld the writ against the Mulligans' challenge. It first concluded that the Judgment Act did not require Alum Rock to file its judgment in the registry of judgments, as the Mulligans had argued, and that Alum Rock's lien attached when the judgment was recorded with the county recorder. Next, the court determined that because the property was under Brett's control when Alum Rock domesticated the judgment, the property was subject to execution under rule 64E. Finally, the court rejected the Mulligans' challenge to its jurisdiction, explaining that it had the power to issue the writ even though the property is located outside the Third District.

[2] This venue statute has been renumbered and slightly altered, effective July 1, 2024. *See* UTAH CODE § 78B-3a-202(1). We cite the version in effect at the time the district court issued the writ.

¶12 The Mulligans appeal, and we have jurisdiction under Utah Code subsection 78A-3-102(3)(j).

**ISSUES AND STANDARDS OF REVIEW**

¶13 The parties dispute whether Alum Rock created a judgment lien on the property. "Judgment liens are creatures of statute . . . ." *Gildea v. Wells Fargo Bank, N.A.*, 2015 UT 11, ¶ 12, 347 P.3d 385. Accordingly, whether the property here is encumbered by Alum Rock's purported judgment lien raises a question of statutory interpretation, a legal question that we review for correctness. *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863.

¶14 The Mulligans also contest the district court's conclusions that the property is subject to the writ and that the court had jurisdiction to issue the writ. Because these determinations were premised on the court's interpretation of Utah law, they also present legal questions, which we review for correctness. *See Peak Alarm Co. v. Salt Lake City Corp.*, 2010 UT 22, ¶ 16, 243 P.3d 1221.

**ANALYSIS**

¶15 The Mulligans challenge three aspects of the district court's decision, each of which turns in part on statutory interpretation. "The aim of statutory interpretation is to ascertain the intent of the legislature, and the best evidence of the legislature's intent is the plain language of the statute itself." *SunStone Realty Partners X LLC v. Bodell Constr. Co.*, 2024 UT 9, ¶ 11, 545 P.3d 260 (cleaned up). But because "statutory text may not be plain when read in isolation," *State v. J.M.S. (In re J.M.S.)*, 2011 UT 75, ¶ 13, 280 P.3d 410 (cleaned up), "we determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)," *McKitrick v. Gibson*, 2021 UT 48, ¶ 19, 496 P.3d 147 (cleaned up).

¶16 We first address the Mulligans' contention that Alum Rock skipped a necessary step to create a lien on the property by not filing its judgment in the registry of judgments. We clarify that to create a lien from a foreign judgment, creditors must adhere to relevant requirements under the Judgment Act as well as the Foreign Judgment Act. But since July 1, 2002, creditors do not need to file judgments in the registry of judgments to create a lien. Thus, Alum Rock created a valid lien when it recorded its judgment in the county recorder's office.

¶17 Next, we assess whether Brett "owned" the property, allowing Alum Rock's lien to attach, even though the revocable trust that he and his wife created and administered held title to it. We conclude that he did.

¶18 Finally, we consider and reject the Mulligans' argument that limitations on the district court's jurisdiction prohibited the court from issuing the writ.

I. ALUM ROCK CREATED A VALID LIEN ON THE PROPERTY

¶19 To resolve this appeal, we must decide whether Alum Rock created a valid lien on the property before it was sold to the Mulligans. The answer to that question largely depends on the meaning of two provisions of the Judgment Act.

¶20 These provisions, subsections (2) and (3)(a) of Utah Code section 78B-5-201, set out actions that judgment creditors have needed to perform at different times to create a judgment lien on real property:

> (2) On or after July 1, 1997, a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located.
>
> (3)(a) On or after July 1, 2002, . . . a judgment entered in a district court does not create a lien upon or affect the title to real property unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located.

UTAH CODE § 78B-5-201(2)–(3)(a) (2021). The Mulligans argue that these requirements—the registry-of-judgments requirement and the county-recorder requirement—"work together, cumulatively." Under their reading, because the judgment was domesticated in 2020, which is "on or after" both July 1, 1997, and July 1, 2002, *see id.*, Alum Rock could not create a lien on the property unless it (1) filed its judgment in the registry of judgments and (2) recorded it with the county recorder.

¶21 Before interpreting these provisions, we address a threshold issue raised by Alum Rock: whether section 78B-5-201 of the Judgment Act even applies here, given that Alum Rock's

judgment is a foreign judgment. After explaining why the section applies, we interpret its provisions.

*A. Creditors Domesticating Foreign Judgments Must Adhere to the Judgment Act's Requirements for Creating a Lien*

¶22 Alum Rock argues that the Judgment Act's registry-of-judgments requirement is not implicated here because Alum Rock's judgment is governed by the Foreign Judgment Act, which makes no mention of the registry of judgments. We disagree.

¶23 As it relates to converting a foreign judgment into a lien, the Foreign Judgment Act provides:

> (1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:
>
> (a) a stay of execution has not been granted;
>
> (b) the requirements of this chapter are satisfied; and
>
> (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202 [of the Judgment Act].

UTAH CODE § 78B-5-305(1).

¶24 Alum Rock points out that this section of the Foreign Judgment Act mentions section 78B-5-202 of the Judgment Act but not section 78B-5-201. And, it adds, section 202 also does not mention section 201 or its registry-of-judgments requirement, on which the Mulligans' argument turns. *See id.* § 78B-5-202(7)(a) (2021) ("After July 1, 2002, a judgment . . . becomes a lien upon real property if . . . the judgment . . . is recorded in the office of the county recorder.").

¶25 These points are well taken. Still, the Foreign Judgment Act declares that foreign judgments are treated the same as domestic ones. Specifically, it provides that "[a] foreign judgment filed under [the Foreign Judgment Act] has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, setting aside, or staying as a judgment of a district court of this state." *Id.* § 78B-5-302(3). Alum Rock argues that this language does not "incorporate[] the Judgment Act wholesale into the Foreign Judgment Act." Instead, Alum Rock urges us to parse this language and treat the phrase "for

reopening, vacating, setting aside, or staying" as modifying and limiting the entire preceding series—"procedures, defenses, enforcement, satisfaction, and proceedings."

¶26 To take one example, as Alum Rock sees it, foreign judgments are not generally "subject to the same procedures" as domestic judgments; they are merely "subject to the same procedures . . . *for reopening, vacating, setting aside, or staying*" as domestic judgments. Alum Rock thus argues that the Judgment Act applies to foreign judgments only when reopening, vacating, setting aside, or staying a foreign judgment, none of which Alum Rock seeks to do here.

¶27 But Alum Rock's argument is undercut by a decision that we issued after the briefing in this appeal was completed, *SunStone Realty Partners X LLC v. Bodell Construction Co.*, 2024 UT 9, 545 P.3d 260. There, the parties disputed whether, under the Foreign Judgment Act, Utah's or Hawaii's postjudgment interest rate applied to a Hawaii judgment that was domesticated in Utah. *Id.* ¶¶ 1–2. In resolving the dispute, we explained that the Foreign Judgment Act "mandates that foreign judgments domesticated using the [Foreign Judgment Act] are 'subject to the same procedures, defenses, enforcement, satisfaction, and proceedings . . . as a judgment of a district court of this state.'" *Id.* ¶ 13 (quoting UTAH CODE § 78B-5-302(3)). In line with this principle, we held that "[b]ecause postjudgment interest is an enforcement mechanism," Utah's postjudgment interest rate applied. *Id.* ¶ 21.

¶28 In *SunStone* we did not read the phrase "for reopening, vacating, setting aside, or staying" as modifying "enforcement." *See id.* ¶ 13; *see also* UTAH CODE § 78B-5-302(3). Indeed, it would be unreasonable to read the phrase to modify terms like "enforcement" and "satisfaction" because a judgment's enforcement or satisfaction would not be at issue in proceedings to reopen, vacate, set aside, or stay a judgment. This leads us to conclude that the phrase limits and modifies only the nearest item in the series to it—"proceedings."

¶29 We reject Alum Rock's reading for another reason as well. Under its reading, a creditor intending to create a lien based on a domestic judgment would be subject to all the Judgment Act's constraints, but a foreign-judgment creditor would not. This would result, counterintuitively, in a foreign judgment being *easier* to convert into a lien than a domestic one, which is contrary to an express purpose of the Foreign Judgment Act—to treat foreign

judgments the same as domestic ones in key respects. *See* UTAH CODE § 78B-5-302(2)–(3).

¶30 Like postjudgment interest, a lien is a means of enforcing a judgment. As such, a foreign judgment is subject to the same requirements for lien creation as domestic judgments. Thus, the Foreign Judgment Act incorporates the Judgment Act's requirements for creating a judgment lien, including those found in section 78B-5-201.

*B. Alum Rock Did Not Need to File Its Judgment in the Registry of Judgments to Create a Lien*

¶31 Having concluded that section 201 applies, we must interpret subsections (2) and (3)(a) and determine whether their requirements are cumulative (as the Mulligans argue) or sequential (as Alum Rock argues). We hold that they are sequential, not cumulative.

¶32 Although we have yet to decisively interpret these provisions, the court of appeals previously interpreted a substantively similar version of the statute under analogous circumstances and rejected the cumulative reading now advanced by the Mulligans. In *Kitches & Zorn, L.L.C. v. Yong Woo Kim*, 2005 UT App 164, 112 P.3d 1210, judgment creditors recorded an abstract of their judgment in the county recorder's office and applied for a writ of execution permitting them to sell a property that was owned by the judgment debtor. *Id.* ¶¶ 2–3. But the judgment debtor deeded his interest in the property to his wife between the time the creditors recorded the judgment with the county recorder and the time they applied for the writ. *Id.* ¶ 2.

¶33 When the district court issued the writ, the judgment debtor objected, claiming that the creditors did not create a lien on the property before the debtor conveyed the property to his wife because they "had not . . . filed the Judgment in the Registry of Judgments." *Id.* ¶ 4. On appeal, the debtor argued that the registry-of-judgments and county-recorder provisions "must be read together, thereby creating a two-step process" that required post-2002 judgments to be filed "in both the Registry of Judgments and the office of the county recorder." *Id.* ¶ 12.

¶34 The *Kitches* court rejected this cumulative reading and held that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." *Id.* ¶ 13. We reach the same conclusion because it is supported by the structure of section

78B-5-201, other sections of the Utah Code from the Judgment Act and the Foreign Judgment Act, and the prior-construction canon of statutory interpretation.

¶35 The structure of section 201 itself signals that the registry-of-judgments and county-recorder requirements are to be read sequentially, creating independent requirements for successive time periods. For context, a district court's entry of judgment historically "create[d] a lien upon the real property of the judgment debtor" automatically. *See* UTAH CODE § 78B-5-202(2) (2021) ("Prior to July 1, 1997, . . . the entry of judgment by a district court creates a lien upon the real property of the judgment debtor . . . ."). But the legislature did away with this automatic-lien regime. As recognized by subsection (2) of section 78B-5-201, beginning July 1, 1997, a judgment lien does not arise automatically upon a district court's entry of judgment; such a judgment does not create a lien "unless the judgment is filed in the Registry of Judgments of the office of the clerk of the district court of the county in which the property is located." *Id.* § 78B-5-201(2) (2021).

¶36 As with the automatic-lien regime, the legislature also phased out subsection (2)'s registry-of-judgments requirement. Subsection (3)(a) of section 201 marks this evolution in the law. Rather than allow a judgment to create a lien automatically (before July 1, 1997) or require judgment creditors to file the judgment in the registry of judgments (on or after July 1, 1997), beginning July 1, 2002, a judgment entered in the district court does not create a lien "unless the judgment or an abstract of judgment is recorded in the office of the county recorder in which the real property of the judgment debtor is located." *Id.* § 78B-5-201(3)(a) (2021).

¶37 This sequential reading makes sense when we zoom in on the grammatical structure of subsections (2) and (3)(a). The two subsections are separate, stand-alone provisions, each punctuated with a period. Their requirements are not joined with a conjunction such as "and" or "or." And subsection (3)(a) does not expressly incorporate subsection (2)'s registry-of-judgments requirement.

¶38 Contrast this with subsection (4) of the same section, which also imposes requirements on judgment creditors, requiring them to include certain information when filing or recording a judgment:

> (4) In addition to the requirements of Subsections (2) and (3)(a), any judgment that is filed in the Registry of Judgments on or after September 1, 1998, or any judgment or abstract of judgment that is

> recorded in the office of a county recorder after July 1, 2002, shall include:
>
> > (a) the information identifying the judgment debtor as required under Subsection (4)(b) on the judgment or abstract of judgment; or
> >
> > (b) a copy of the separate information statement of the judgment creditor that contains:
> >
> > > (i) the correct name and last-known address of each judgment debtor and the address at which each judgment debtor received service of process;
> > >
> > > (ii) the name and address of the judgment creditor;
> > >
> > > (iii) the amount of the judgment as filed in the Registry of Judgments;
> > >
> > > (iv) if known, the judgment debtor's Social Security number, date of birth, and driver's license number if a natural person; and
> > >
> > > (v) whether or not a stay of enforcement has been ordered by the court and the date the stay expires.

*Id.* § 78B-5-201(4) (2021). Unlike subsections (2) and (3)(a), subsection (4)'s requirements are unified, with the cumulative requirements indented, punctuated with semicolons, and joined with a conjunction. And with the opening phrase "in addition to," subsection (4) expressly incorporates the requirements of previous subsections.

¶39 As subsection (4) demonstrates, the legislature knows how to signal when it intends requirements to be cumulative. But unlike subsection (4), subsection (3) does not state that recording in the county recorder's office must be done "[i]n addition to" the registry-of-judgments requirement in subsection (2). And instead of listing both requirements as indented subsections separated by semicolons and a conjunction, the legislature listed the two requirements as stand-alone provisions triggered on different dates. That structure supports our reading that subsection (3)'s requirements supplant those in subsection (2) after July 1, 2002.

¶40 Reading the subsections sequentially also makes sense when we zoom out and look at related sections of the Utah Code.

We have a "duty to harmonize and reconcile statutory provisions." *Field v. Boyer Co.*, 952 P.2d 1078, 1081 (Utah 1998) (cleaned up). Reading section 201's requirements as being sequential harmonizes and reconciles them with section 78B-5-202 of the Judgment Act and section 78B-5-305 of the Foreign Judgment Act. Properly understood, all three statutes provide that, since July 1, 2002, a judgment becomes a lien on real property if it is recorded in the office of the county recorder. Utah Code section 78B-5-202 provides that, after July 1, 2002, a judgment becomes a lien on real property if it "is recorded in the office of the county recorder." UTAH CODE § 78B-5-202(7)(a) (2021). And Utah Code section 78B-5-305, part of the Foreign Judgment Act, provides:

> (1) A foreign judgment entered in a district court under this part becomes a lien as provided in Section 78B-5-202 if:
>
> (a) a stay of execution has not been granted;
>
> (b) the requirements of this chapter are satisfied; and
>
> (c) the judgment is recorded in the office of the county recorder where the property of the judgment debtor is located, as provided in Section 78B-5-202.

*Id.* § 78B-5-305(1).

¶41 Notice that these sections do not refer to the registry of judgments. If, as the Mulligans suggest, the legislature intended judgment creditors to continue filing in both the registry of judgments and the county recorder's office, this absence would be hard to reconcile. For example, consider how the text of section 202 squares with the Mulligans' reading of section 201. Section 202 provides, "After July 1, 2002, a judgment . . . becomes a lien upon real property if . . . the judgment . . . is recorded in the office of the county recorder." *Id.* § 78B-5-202(7)(a) (2021). But under the Mulligans' reading of section 201, after July 1, 2002, a judgment *does not* become a lien on real property if the judgment is recorded in the office of the county recorder; the judgment must also be filed in the registry of judgments.

¶42 Historical context helps explain why sections 202 and 305 mention the county-recorder requirement but not the registry-of-judgments requirement. In 2001, the legislature passed a bill that amended the Judgment Act and the Foreign Judgment Act in

significant ways. *See* Judgment Lien Amendments, H.B. 305, 2001 Leg., Gen. Sess. (Utah 2001) (available at https://le.utah.gov/~2001/bills/hbillenr/HB0305.htm). The bill—which ushered in the county-recorder regime for judgment-lien creation—provided that the statutory overhaul was to take effect July 1, 2002. *See id.* Before that date, the sections that are now codified as sections 202 and 305 did not specify the manner of recording a judgment lien. *See* UTAH CODE §§ 78-22-1, 78-22a-5 (2001). As of July 1, 2002, however, the sections recognized and reflected the incoming county-recorder requirement. *See id.* §§ 78-22-1, 78-22a-5 (July 2002). Each section was amended to specify that for a judgment to create a lien, the judgment must be "recorded in the office of the county recorder." *See id.* §§ 78B-5-202(7)(a), -305(1)(c). But the legislature did not add similar language referring to the registry-of-judgments requirement. That omission further supports our conclusion that the outdated registry-of-judgments requirement was entirely supplanted by the county-recorder regime as of July 1, 2002.

¶43 The prior-construction canon of statutory interpretation also reinforces our reading of section 201. Under that canon, if a word or phrase has been uniformly interpreted in caselaw, "a later version of that act perpetuating the wording is presumed to carry forward that interpretation." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322 (2012). In other words, "where a legislature amends a portion of a statute but leaves other portions unamended, or re-enacts them without change, the legislature is presumed to have been satisfied with prior judicial constructions of the unchanged portions of the statute and to have adopted them as consistent with its own intent." *Christensen v. Indus. Comm'n*, 642 P.2d 755, 756 (Utah 1982).

¶44 In *Kitches*, the court of appeals interpreted the section that is now codified as section 201 to mean that "after July 1, 2002, a person seeking a lien on real property need only file in the office of the county recorder." 2005 UT App 164, ¶ 13. That decision has stood as controlling law in this jurisdiction for nearly two decades, and during that time judgment creditors have presumably relied on it as such. The legislature has amended the Judgment Act—including section 201—several times since *Kitches* was decided, yet

it has not modified the language to abrogate the case's holding.[3] We presume that by amending the statute but leaving the portions relevant here unamended, the legislature was satisfied with *Kitches*' reading.

¶45 The Mulligans maintain that *Kitches* has not been the controlling law in Utah since 2013 because it was overtaken by the court of appeals' decision in *T3 Properties, LLC v. Persimmon Investments, Inc.*, 2013 UT App 38, 299 P.3d 613. There, a creditor obtained a court judgment in 2001, at which time the judgment debtor owned property in Salt Lake County. *Id.* ¶¶ 2–3. Not long after, however, the debtor conveyed his interest in the property to a third party. *Id.* ¶ 3. And not until years later did the creditor begin efforts to execute the judgment by having the property sold. *Id.* ¶ 4.

¶46 Between the time the court entered the judgment and the time the debtor transferred the property, the creditor recorded the judgment in the registry of judgments but did not file an information statement with the judgment.[4] *Id.* ¶¶ 16–17. The issue was whether the judgment creditor created a lien on the property before the debtor conveyed it away. *Id.* ¶ 17. To answer that question, the court interpreted the 2001 version of the Judgment Act, *id.* ¶¶ 16–28, which, like the current version, provided that "[o]n or after July 1, 1997, a judgment . . . does not create a lien upon or affect the title to real property unless the judgment is recorded in the Registry of Judgments," *see id.* ¶ 15 (quoting UTAH CODE § 78-22-1.5(2) (2001)). The next subsection provided, "In addition to the requirement of [the previous subsection], any judgment that is recorded in the Registry of Judgments on or after September 1,

[3] For examples of how section 201 has been amended over the years, see H.B. 46, 2011 Leg., Gen. Sess. (Utah 2011) (available at https://le.utah.gov/~2011/bills/static/HB0046.html); H.B. 315, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/hbillenr/hb0315.htm); H.B. 16, 2014 Leg., Gen. Sess. (Utah 2014) (available at https://le.utah.gov/~2014/bills/static/hb0016.html); H.B. 251, 2023 Leg., Gen. Sess. (Utah 2023) (available at https://le.utah.gov/~2023/bills/static/HB0251.html).

[4] There was some uncertainty about whether the judgment was recorded in the registry of judgments, but the court assumed that it was. *See T3 Pros., LLC v. Persimmon Invs., Inc.*, 2013 UT App 38, ¶¶ 16, 28, 299 P.3d 613.

1998, shall include a separate information statement of the judgment creditor." *Id.* (quoting UTAH CODE § 78-22-1.5(3) (2001)).

¶47 The *T3* court concluded that under the 2001 version of the Judgment Act, "both requirements"—the registry-of-judgments and information-statement requirements—"must be satisfied to create a judgment lien." *Id.* ¶ 19. To support this conclusion, the court analyzed the relevant text by noting that (1) the legislature's "[u]se of the word 'shall' . . . indicates that filing an information statement is mandatory," and (2) the information-statement requirement "must be completed 'in addition' to" the registry-of-judgments requirement. *Id.* (cleaned up); *see also id.* ¶ 21. Even though the court's decision was based on the language of the 2001 version of the Judgment Act and turned on the information-statement requirement, the court added a footnote stating that "the 2002 version [of the Judgment Act] required that the judgment and the information statement be recorded in both the Registry of Judgments and in the county recorder's office." *Id.* ¶ 14 n.5.

¶48 According to the Mulligans, *T3* overtook *Kitches* as controlling law interpreting the Judgment Act. We disagree. Although the *T3* court included a footnote suggesting that the registry-of-judgments and county-recorder requirements of the 2002 Judgment Act are cumulative, *see id.*, that statement was dicta because it was "unnecessary to the decision in the case and therefore not precedential," *see Obiter Dictum*, BLACK'S LAW DICTIONARY (12th ed. 2024). A separate panel of the court, squarely presented with the issue, had held that those requirements are sequential and that judgments no longer need to be filed in the registry of judgments for a lien to attach. *See supra* ¶¶ 32–34. The *T3* court did not even mention *Kitches*, much less purport to overrule it. *Kitches* remained controlling law on the sequential nature of the recording requirements despite the footnote dicta in *T3*. We therefore presume that when the legislature amended section 201 post-*Kitches*, it saw no need to amend the recording requirements because it was satisfied with the prior judicial interpretation of those requirements in *Kitches*.

¶49 The Mulligans also argue that the court's analysis in *T3* favors a cumulative reading of the registry-of-judgments and county-recorder requirements. They maintain that *T3* "involved a deep analysis" of section 201 and "laid out a roadmap for how courts should analyze [the Judgment Act's] cumulative amendments over time." Although we are not bound to follow

court of appeals decisions, we often look to those decisions for their persuasive value. *Eaton Kenway, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 906 P.2d 882, 885 (Utah 1995). But we see little persuasive value in *T3* relative to the issue in the present case.

¶50 The court in *T3* interpreted a different provision in the 2001 version of the Judgment Act, which did not contain the county-recorder requirement. *See* 2013 UT App 38, ¶ 15. The question before the court was whether the registry-of-judgments and information-statement requirements were cumulative. *See id.* ¶ 28. Unlike the county-recorder requirement at issue here, the information-statement requirement specified that it was "[i]n addition to" the registry-of-judgments requirement found in section 201(2). *Id.* ¶ 12 (quoting Utah Code § 78-22-1.5(3) (2001)). This additional language, which expressly made the registry-of-judgments and the information-statement requirements cumulative, easily distinguishes *T3* from both *Kitches* and the present case.

¶51 We endorse *Kitches*' holding that, since July 1, 2002, a lien on real property is created by recording the judgment, along with other required information, with the county recorder where the real property is located. Alum Rock therefore did not need to record the judgment in the registry of judgments, and it created a lien by recording the judgment in the county recorder's office.

## II. BRETT OWNED THE PROPERTY FOR PURPOSES OF ALUM ROCK'S LIEN ATTACHING

¶52 The Mulligans argue that, under the Judgment Act, "[t]here is no basis for any judgment lien against the Property" because the trust, not Brett, held title to the property. Before explaining why we disagree, we pause to address the Mulligans' criticism of the district court's analysis.

¶53 The Mulligans criticize the district court for relying on rule 64E of the Utah Rules of Civil Procedure, rather than the Judgment Act, in concluding that the property is "subject to the execution." Rule 64E allows writs of execution to be issued against property that is "*in the possession or under the control of* the defendant." UTAH R. CIV. P. 64E(a) (emphasis added). The Judgment Act, in contrast, sets the conditions under which a judgment lien attaches in the first instance, providing that real property subject to a judgment lien "includes all the real property . . . *owned or acquired* at any time by the judgment debtor during the time the judgment is effective." UTAH CODE § 78B-5-202(7)(c)(ii) (2021) (emphasis added).

¶54 The Mulligans argue that the district court should have focused its analysis on the Judgment Act, rather than on rule 64E, which they contend "has nothing whatsoever to do with whether the Foreign Judgment against Brett personally could become a lien against Property he never owned." But because they principally relied on rule 64E, not the Judgment Act, before the district court, the court's reliance on rule 64E was understandable. In their principal filing below, the Mulligans cited rule 64E and quoted, with emphasis, the rule's language regarding possession and control. In contrast, they mentioned the Judgment Act's "owned or acquired" language only in passing in a footnote.

¶55 It is true that the Mulligans argued to the district court that the property was "never . . . *owned* by Brett Del Valle in his individual and personal capacity." (Emphasis added.) Yet they never tied that argument to the language of the Judgment Act, and the thrust of their argument below was that the writ "was not properly available under the express terms" of the "governing Utah Rules of Civil Procedure." In its decision, the court rejected that rule-based argument because rule 64E "does not contain any provision limiting its application to owners of property."

¶56 On appeal, the Mulligans distance themselves from their prior reliance on rule 64E and embrace the Judgment Act's "owned or acquired" language.[5] Under the Judgment Act, real property subject to a judgment lien "includes all the real property. . . owned or acquired at any time by the judgment debtor during the time the judgment is effective."[6] *Id.* To the Mulligans, holding title is the essence of ownership. Because Brett "was never in title," they maintain that "he never owned the Property" and the lien never attached to it.

¶57 When the judgment was entered against Brett, the property was held by the Del Valle Family Trust, which is a revocable trust that Brett formed with his wife, Traci. "A trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of the beneficiaries." *Cont'l Bank & Tr. Co. v. Country Club Mobile Ests., Ltd.*, 632 P.2d 869, 872 (Utah 1981). A revocable trust is "[a] trust in which the settlor" (the person who creates the trust)

---

[5] Alum Rock has not challenged this issue as unpreserved.

[6] The Utah Code defines "[r]eal property" as "any right, title, estate, or interest in land." UTAH CODE § 57-1-1(3).

"reserves the right to terminate the trust and recover the trust property and any undistributed income." *Revocable Trust*, BLACK'S LAW DICTIONARY (12th ed. 2024). One standard estate-planning practice is to form "[a] revocable trust in which the settlor[s] . . . are also the trustees and manage the trust for their own benefit during their lifetimes." *West v. West (In re Est. of West)*, 948 P.2d 351, 355 (Utah 1997). When done properly, this strategy serves to "avoid probate of the assets while allowing the settlor to retain control of the trust property during his or her own lifetime." *See id.*

¶58 Under the terms of the Del Valle Family Trust, either Brett or Traci, as co-settlors, may revoke the "community estate" (community property held in trust), wholly or partially. Upon revocation, this property would be delivered to Brett and/or Traci and would continue to be their community property. Similarly, the "separate estate" (separate property and quasi-community property held in trust) may be revoked unilaterally by Brett or Traci, whichever of them contributed the property to the trust; and upon revocation, the property would be delivered to the contributor.

¶59 Brett and Traci may also amend the trust and transfer property from it. While they are both living, Brett and Traci may amend "any of the terms of [the trust] by an instrument in writing signed by [Brett and Traci] and delivered to the Trustee." And they may—acting jointly for community property, or individually for separate and quasi-community property—"transfer property . . . out of the trust estate to any other person or organization." In addition, as trustees, Brett and Traci may hold, manage, control, lease, and encumber trust property. With this backdrop, the question is whether, for purposes of the Judgment Act, Brett "owned" the property when the judgment was entered against him, even though the trust held title to it. *See* UTAH CODE § 78B-5-202(7)(c)(ii) (2021).

¶60 Because "the settlor of a revocable trust necessarily retains the functional equivalent of ownership of the trust assets," 6 AUSTIN WAKEMAN SCOTT ET AL., SCOTT AND ASCHER ON TRUSTS § 15.4.2 (6th ed. 2024), "[i]n . . . substantive respects (such as creditors' rights), the property held in a revocable trust is ordinarily to be treated as if it were property of the settlor," RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. a. (AM. L. INST. 2003). Thus, in certain situations—"by reason of a power of revocation, appointment, or withdrawal"—a person may have "the equivalent of ownership of

the trust property, even though the legal title to the property is held by the trustee." *See id.* § 74 cmt. a (AM. L. INST. 2007).

¶61 In effect, the Mulligans argue that the trust shielded the property from Brett's judgment creditor, Alum Rock. But under Utah law, "[d]uring the lifetime of the settlor, the property of a revocable trust is subject to the claims of the settlor's creditors." UTAH CODE § 75-7-505(1). That approach is consistent with the general rule that "property held in [a revocable] trust is subject to the claims of creditors of the settlor . . . if the same property belonging to the settlor . . . would be subject to the claims of the creditors." RESTATEMENT (THIRD) OF TRUSTS § 25 cmt. e (AM. L. INST. 2003). And other courts "generally have concluded that the assets of a revocable trust are properly subject to the claims of the settlor's creditors." *Pandy v. Indep. Bank*, 372 P.3d 1047, 1050 (Colo. 2016) (en banc) (collecting cases).

¶62 In short, because settlors of revocable trusts can access the full bundle of property-rights sticks, they cannot keep those sticks from their creditors. Here, as co-settlor and co-trustee, Brett retained the hallmarks of ownership over the property. As the district court noted, Brett and Traci could, at any time, "revoke the Trust, . . . amend it, . . . [or] transfer property from it." Under these circumstances, we hold that, for purposes of the Judgment Act, Brett owned the property at the time the judgment was entered against him.[7] Accordingly, Alum Rock's lien attached to the property when Alum Rock recorded the lien with the county recorder.

## III. THE MULLIGANS HAVE NOT IDENTIFIED A LIMITATION ON THE DISTRICT COURT'S AUTHORITY TO ISSUE A WRIT OF EXECUTION ON PROPERTY LOCATED IN A COUNTY OUTSIDE THE THIRD DISTRICT

¶63 The Mulligans contend that the Third District Court "lacked authority and jurisdiction" to issue the writ because the property sits in Weber County, which is outside the court's geographic boundaries. Because they have not identified a relevant limitation on the district court's jurisdiction to issue the writ, we reject that argument.

---

[7] Neither side has addressed whether Traci's joint ownership of the property has any effect on the judgment lien. For that reason, we express no opinion on the matter.

¶64 This matter arose when Alum Rock filed a notice of judgment with the Third District Court. There is no question that this was proper, because under the Foreign Judgment Act a foreign judgment like Alum Rock's California judgment "may be filed with the clerk of any district court in Utah." UTAH CODE § 78B-5-302(2). Once Alum Rock domesticated the judgment, the judgment inherited "the same effect . . . as a judgment" of a Utah district court. *Id.* § 78B-5-302(3). Such a judgment may be enforced through a writ of execution. *Id.* § 78A-5-102 ("A district court judge may issue all extraordinary writs and other writs necessary to carry into effect the district court judge's orders, judgments, and decrees.").

¶65 The Mulligans have not identified any relevant law that would limit a district court's authority to issue a writ of execution to be effectuated in a county outside that court's judicial district. They first cite a venue statute, which provides that "[a]ctions" for certain "causes involving real property shall be tried in the county in which the subject of the action . . . is situated." *Id.* § 78B-3-301(1) (2021). Those "causes" are

> for the recovery of real property, or of an estate or interest in the property; . . . for the determination . . . of the right or interest in the property; . . . for injuries to real property; . . . for the partition of real property; and . . . for the foreclosure of all liens and mortgages on real property.

*Id.*

¶66 But the Mulligans' reliance on this statute is misguided because no "[a]ction[] . . . involving real property" is at issue here. *See id.* Indeed, no cause of action is at issue at all. The causes of action that gave rise to Alum Rock's judgment against Brett (for breach of contract) were brought in California and, from what we can tell, had nothing to do with the Weber County property. Simply put, this proceeding to enforce that judgment through a writ of execution is not an action involving real property governed by the venue statute.[8]

---

[8] For the same reason, the caselaw that the Mulligans cite regarding "action[s]" that "involve[] title to real property" misses the mark. *See Calder v. Third Jud. Dist. Ct.*, 273 P.2d 168, 171 (Utah 1954).

¶67 The Mulligans also cite rule 64 of the Utah Rules of Civil Procedure as an additional limitation on the district court's authority. According to them, a distinction in word choice between two sentences in rule 64(d)(1) "precludes courts in one county from ordering seizure of real property located in a different county." Rule 64(d)(1) explains how court clerks are to issue writs for real and personal property:

> If the writ directs the seizure of real property, the court clerk will issue the writ to the sheriff of the county in which the real property is located. If the writ directs the seizure of personal property, the court may issue the writ to an officer of any county.

UTAH R. CIV. P. 64(d)(1). From this language, the Mulligans glean that "the rule expressly authorizes any court in any county in Utah to direct the seizure . . . of *personal property* located in any county in Utah" but does not do the same for *real property*.

¶68 Although the Mulligans are correct that the rule distinguishes between writs of execution for personal property versus real property and requires that the latter be directed to the "sheriff of the county in which the real property is located," *see id.*, the rule says nothing about which court may issue the writ. Rule 64(d)(1) contains no requirement that the district court issuing the writ be in the same county as the real property. If anything, by specifying that writs involving real property must be "issue[d] . . . to the sheriff of the county in which the real property is located," *see id.*, the rule seems to presuppose that the issuing court may be located elsewhere.

¶69 The Mulligans have not established that the district court exceeded its authority by issuing the writ. Neither the venue statute nor rule 64(d)(1) prohibits a district court from issuing a writ of execution for real property located in another Utah judicial district.

**CONCLUSION**

¶70 Although Alum Rock needed to comply with the Judgment Act's requirements for creating a lien, filing in the registry of judgments was not one of those requirements. The lien attached to the property once Alum Rock recorded the judgment with the Weber County Recorder's Office. When the judgment was recorded, Brett owned the property for purposes of the Judgment Act because the property's title was held in a revocable trust settled by Brett and his wife. And the Mulligans have not shown that the

MULLIGAN *v.* ALUM ROCK RIVERSIDE

Opinion of the Court

district court lacked authority to issue the writ. Accordingly, we affirm.

---

22

# ADDENDUM 2

Oral Argument Transcript



UTAH SUPREME COURT

| | | |
|---|---|---|
| MOLLY J. MULLIGAN and JOHN P. MULLIGAN, | ) | Case No. 206927043 |
| Appellants, | ) | |
| v. | ) | TRANSCRIPT OF: ORAL ARGUMENT |
| ALUM ROCK RIVERSIDE, LLC, | ) | |
| Appellee. | ) | |

BEFORE THE HONORABLE CHIEF JUSTICE MATTHEW B. DURRANT

UTAH SUPREME COURT
450 SOUTH STATE STREET
SALT LAKE CITY, UT 84114

APRIL 10, 2024

A P P E A R A N C E S

For the Appellants:

Bradley L. Tilt
FREEMAN LOVELL, PLLC
4568 South Highland Drive
Suite 290
Salt Lake City, UT 84117

For the Appellee:

KC Hooker
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive
Suite 500
Salt Lake City, UT 84121

-ooOoo-

April 10, 2024

**P R O C E E D I N G S**

THE CLERK: The Honorable Chief Justice Matthew B. Durrant presiding. Please be seated.

CHIEF JUSTICE DURRANT: This is the case of Mulligan vs. Alum Rock Riverside.

A couple of notes before we begin. While we have allocated 20 minutes to a side, if we're still asking questions when your time runs out, please continue to respond. And don't worry about asking for additional time. That's understood. And any such extra time responding to questions will not cut into rebuttal time. It may mean that at the end of the day, one side has more time than the other. Not the best result, but it's just a function of how many questions we have of your case, not necessarily a reflection on how we view your case.

Okay. I think that's covers things, so let's begin with counsels' appearances.

MR. TILT: Bradley Tilt, your Honor, representing the appellants, the Mulligans.

CHIEF JUSTICE DURRANT: Mr. Tilt, good morning and welcome.

MR. HOOKER: KC Hooker on behalf of Appellee Alum Rock Riverside LLC.

CHIEF JUSTICE DURRANT: Mr. Hooker, welcome.

Okay. Let's jump into things.

MR. TILT: Good morning, Justices, and may it please the Court.

I want to just start by bullet-pointing six of the key facts in this case, which are: In 2002, the creation of the Del Valle Family Trust. In 2007, the Weber County property, which is the subject of this case, was conveyed from the developer, Basin View Development, directly to the Del Valle Family Trust. In March of 2020, Alum Rock obtained a judgment in California against Brett Del Valle individually and personally, among others that are not relevant to this case, but not against the Mulligans, not against the family trust.

In October of 2020, Alum Rock filed its California judgment in the Third District Court in Salt Lake County. Also in October of 2020, Alum Rock recorded its judgment in the Weber County Recorder's Office. In May of 2021, the family trust, which had held the property at all times since 2007 when it obtained the conveyance from the developer, conveyed the Weber County property at issue in this case to the Mulligans.

It was in June of 2021 when Alum Rock then filed an application for a writ of execution with the Third District Court in Salt Lake County, seeking to foreclose upon and to sell the Mulligans' property in Weber County for a judgment entered against Brett Del Valle personally, who never owned the property.

The claims of Alum Rock for any sort of a judgment

lien upon the real property at issue in this case fail for two reasons. And the writ of execution fails also for two reasons that I'll get to in just a moment.

So first of all, as to whether there could be any judgment lien upon this Weber County real property, there cannot. By statute, Section 78B-5-201(2), a -- in order to have a judgment lien -- in order to create a judgment lien on real property on or after 1997, judgment creditors must file their judgment in the Registry of Judgments in the court in the county where the property is located. And there is no dispute that Weber County is where the property was located, but that Alum Rock never filed anything with the Second District Court in Weber County. It therefore failed the requirements of Subsection 201(2) and therefore cannot have a judgment lien on that property.

The district court in this case erred because it followed the analysis set forth in the Kitches case by the Utah Court of Appeals from -- I forget exactly -- early 2000s, which construed the Subsections 201(2) and then the other Subsection 201(3)(a), which requires recording it in the county recorder's office of the county where the property is located. The district court followed Kitches and said that those are disjunctive. You can either file something with the court or you can record something with the county recorder. And either of those individually, separately, will create a judgment lien.

That is not, however, how the judgment statute reads. Kitches read some of the subsections within 201, like Subsection 201-4, 201-5, and 201(6). Each had a number of further subsections with letter designations on them, and it said, you know, if you -- to perfect your judgment lien, you need to do this in Subsection (5), and then it would list (a), (b), (c), or (d). And Subsection (6) would list (a), (b), or (c).

The district court in this case erroneously followed the erroneous ruling of the Kitches court to infer those "ors" between sub-subsections, letter-numbered subsections, erroneously applied the "or" designation between the numbered subsections, (2), (3), (4), (5), (6). There is no "or" between (2), (3), (4), (5), and (6) of the -- of Subsection 201.

JUSTICE HAGEN: Let me ask you this question. The T3 case that you relied on, it seems to have put a lot of emphasis on the fact that Subsection (4) starts with "In addition to." What do -- what should we, if anything, make of the fact that (3) does not contain "in addition to" the requirements of Subsection (2)?

MR. TILT: No significance should be attributed to that, because what Subsection (4) does say is "In addition to Subsections (2) and (3)." So Subsection (4) already includes stating that (2) and (3) both need to be met. And so the fact that Subsection (3) doesn't say "in addition to (2)" should not

carry any weight with this Court, because Subsection (4) clarifies that (2) and (3) both apply and both need to be satisfied.

JUSTICE PEARCE: I suppose that's one way of reading Subsection (4). I mean, the other is in addition to the requirement of Subsection (2), if Subsection (2) applies, in addition to the requirements of Subsection (3)(a), if Subsection (3)(a) applies. I mean, what is the best textual evidence that the legislature wanted (2) and (3) to be harmonized and to have both of those have to be complied with rather than setting -- what the legislature was doing is setting a new rule on or after 2000 -- or July 1, 2002?

MR. TILT: Well, T3 sets forth the historical analysis and the road map for how this Court should also get there. Textually, I would submit, in addition to what T3 says, is that if the legislature intended that you could create a judgment lien by doing (2) or (3) or (4) or (5), then it would have done what it does in every statute where that's the case, and it would have put an "or" between the last two numbered subsections. I'm not sure if it's (6) and (7) or whether it's (8) and (9). It would have put "or" there.

But by not putting "or" there, what it said is these -- (1), (2), (3), (4) -- whether it be to (7) or (9), I forget now, but --

JUSTICE HAGEN: I think we would expect to see an

"or" or an "and" between two numbered subsections within a subsection. But do we normally in statute see a conjunction between two separately numbered sections?

MR. TILT: Yes. For example, if the statute said -- if Subsection 201 said, "You create a judgment lien by:" and then it listed all of those things, you would expect to see some sort of a conjunction there to let you know whether it was "and" or "or."

In this case, though, it just launches right in, and it just starts with "Subsection (1), this; Subsection (2), this; Subsection (3), this requirement." And as T3 explained, those requirements have various date components attached to them only by virtue of the fact that they were enacted at different times. And so what the legislature did, as explained in T3, is said, "Prior to 1997, all that was required under the statute was a judgment be entered, and the judgment entered became a lien on real property." In '97, the Court said, "No. We need to have you also record with the county recorder." In 2002, I think it was, the legislature amended the statute again, and it imposed certain additional requirements.

And T3 explained that it's very easy to see why we had these different requirements coming in over time and why they have different date components to them, because that's when they were enacted. But what it said was -- specifically at Footnote 5, it drove the point home specific to this

particular case, where it said, "Notably, the 2000 version required that the judgment and information statement be recorded in both the Registry of Judgments and in the county recorder's office."

JUSTICE HAGEN: And is that the -- I'm sorry. Was that the footnote in T3?

MR. TILT: Footnote 5 of T3, yes.

JUSTICE HAGEN: And that was -- that issue was not before the Court?

MR. TILT: That specific issue was not before the Court, but that analysis, that quote, is consistent with the remainder of its analysis, which says, "When the legislature adds requirements over time, they are cumulative." And that is a word that the T3 court also used: They are cumulative.

JUSTICE HAGEN: Although, don't you think -- wouldn't you agree that T3 put a lot of stock in the fact that Subsection (4) started with "In addition to"?

MR. TILT: I really don't think that that was the central point of T3, but I do think that the "in addition to" language is significant.

JUSTICE HAGEN: And going back to the other point we were just discussing a moment ago about whether these Arabic-numbered sections generally have an "or" or an "and" connecting them. Can you give me an example numbered subsection like that that doesn't end in a period, that ends in

like a comma or a semicolon and an "and" or an "or"?

MR. TILT: Off the top of my head, candidly, I cannot. But I do want to get back to Justice Pearce's question about textual evidence. Among the other items I've talked about here today, another piece of textual evidence to show that you have to record in the county and also file in the court is Section 78B-5-202. At Subsection (2), it says, again, prior to 1997, "A judgment becomes a lien on real property in the county in which the judgment is entered." And then Subsection (3) says "An abstract of the judgment issued by a county in which a judgment is entered may be filed by any court in this state and may have the same full force and effect as any judgment entered in that court."

That, to me, signals that the legislature understands that the different venues, the different courts throughout the state, each have their own separate jurisdiction over the property within their respective boundaries. And otherwise, there would be no need to abstract a judgment from one county to another county. And so you have to have that abstracted in the court in order for the Registry of Judgments requirement to be met and also then record with the county to create a judgment lien.

JUSTICE PEARCE: I know it can be kind of tricky business to sometimes interpret a statute in light of its purpose, but what do you understand the purpose of recording

the abstractive judgment -- or entering the abstractive judgment in the court of any state? What -- what function does that play?

MR. TILT: That is a separate and additional resource that title companies use to search for -- for judgments and potential judgment liens on a property. It is routine -- and we cited some information in the brief on that -- for title companies to search not only the county records, but also the court records, because that's another place where you could find a judgment. And this judgment never was recorded in that -- or filed in that court in Weber County; and, therefore, it was not findable.

JUSTICE PEARCE: And so if you were trying to look at the legislative purpose of this, it's -- you would say the legislature is trying to benefit title companies by having judgments placed in two different places, both filed with the county recorder and in the abstractive judgment?

MR. TILT: I can't say that was their specific intent, no, but I do think that is a purpose of it, and it does serve a purpose functionally and -- in effect in the actual industry.

JUSTICE HAGEN: How do you -- oh, I'm sorry.

JUSTICE POHLMAN: Go ahead, please.

JUSTICE HAGEN: How do you reconcile your interpretation of what's now 201 with the Foreign Judgment Act

that only refers to being recorded in the Office of the County Recorder?

MR. TILT: Well, it would be -- the Foreign Judgment Act actually says that in order to become a judgment lien on real property, under 78B-5-305(1), "A foreign judgment becomes a lien as provided in 78B-5-202," the judgment statute. In other words, you have to -- you have to satisfy both, whatever is said in the Foreign Judgment Act and also the regular judgment lien statute for domestic judgment liens. So it becomes a lien under Section 202 if -- and then Subsection (b) of 305(1) says "If the requirements of this chapter are satisfied." And the chapter is Chapter 5. 78B-5. The Foreign Judgment Act under B-5-301 et seq, and the regular judgment lien statute is also in Chapter 5, Section 201 et seq.

So the -- the Foreign Judgment Act itself says you have to satisfy the requirements, plural. It doesn't say "some of." You have to satisfy the requirements of this chapter. All.

JUSTICE POHLMAN: Do you think the -- do you think the legislature really meant "chapter" there? I mean, the chapter is procedure and evidence, and it includes things for issues in trial, evidence, affidavits. I mean, I've -- obviously you didn't write the statute, but I find it kind of a strange reference there --

MR. TILT: Except for if --

JUSTICE POHLMAN: -- and wondered if it really meant to say "this part."

MR. TILT: I don't --

JUSTICE POHLMAN: Because "chapter," there's so many requirements in this chapter that really have nothing to do with executing on a judgment.

MR. TILT: And I would suggest that the Court can only take the legislature as face value. It has to apply the words that the legislature wrote, and what the legislature wrote was "chapter." And that statute, like the judgment lien statute, has been amended numerous times over the years. And that "chapter" reference remains. And --

JUSTICE POHLMAN: And why would they then have Part (3)? Because Part (3) is a requirement -- or Subpart (3) is a requirement of Part (2) of the chapter. So it just seems a little odd to me that the legislature would really intend to say, "You've got to satisfy all of Chapter 5," which, by the way, is talking about public safety peer counseling -- right? -- "but then also we're going to pull out one particular thing from that entire chapter that you have to satisfy."

And so does it really make sense for us to interpret it as saying you have to include -- you have to satisfy everything?

MR. TILT: I think it does. I don't know that the other things -- I mean, maybe they just don't apply, and so

maybe that's the response. But the Judgment Lien Act under Section 201 et seq. is a part of Chapter 5. And I would submit that it would be even odder for the legislature to say, "Okay. You get your judgment in California, and you bring it here and you have to do less than somebody would have to do if they got their judgment here in order to get a judgment lien. You don't have to worry about Subsection 201 et seq. You can just record and not have to do anything else."

JUSTICE POHLMAN: Why do you think they then specifically mention 202 instead of 201 and 202 if they really wanted to make sure, "Let's reemphasize you have to satisfy the whole chapter, but we're going to pull out one particular subsection from one of the parts and -- but, yeah, just make sure you follow everything else"? I mean, does that make much sense?

MR. TILT: Except for the fact that that's what the legislature did, I'd have to say, yes, that does make sense. Part of the judgment lien statute is part of Chapter 5. We have to presume that the legislature knew that the judgment lien statute was part of Chapter 5 and, therefore, that what it meant was you have to supply all the requirements of 201 et seq. as well as 301 et seq.

JUSTICE POHLMAN: Okay. So, fair. But then why add a Part (3)? Why pull out one specific thing? What do we take from that?

MR. TILT: I don't have any answer for that.

JUSTICE POHLMAN: Okay.

JUSTICE HAGEN: Can I ask you? What do -- what conclusion, if any, should we draw from the fact that Kitches has been controlling law in this state for 19 years, and, yet, the legislature has not amended the Judgment Act, even though they actually have amended other parts of it?

MR. TILT: Well, I would submit that Kitches has not been controlling law since 2013 when T3 was decided and it said, "No, it's not disjunctive. It's not 'or.' They are cumulative. All of the requirements of the judgment lien statute are cumulative in the words of T3."

JUSTICE HAGEN: So you think that that footnote in T3 overruled Kitches?

MR. TILT: The footnote does not expressly reference Kitches. And I'm -- I don't even think that -- to be clear, my -- my reliance on T3 is not limited to Footnote 5.

JUSTICE HAGEN: I understand.

MR. TILT: It's just that Footnote 5 specifically does call out that you have to do both of those things in order to get a judgment lien. But the remainder of the analysis of T3 writ large is what I rely on to say, as the statute gets amended over time and things are added to it, you have to -- those are cumulative, was, again, the words of T3.

JUSTICE HAGEN: And I understand that you're saying

that that analysis is preferable and that you would like us to follow that, but I guess my specific question is did T3 overrule Kitches? Because you're saying that Kitches has not been controlling law for the last 19 years. Why?

MR. TILT: Because -- again, T3 does not expressly say, "We overrule Kitches," but its entire basis of analysis is completely different, and it did specifically call out in Footnote 5 that you've got to do both of those things. And so it impliedly overruled Kitches, and now this Court ought to expressly overrule Kitches and follow the T3 road map. That's how this Court ought to -- it is a well laid out road map. It talks about the history of the statute over time, how things were added to it, and how those additions are cumulative; they are not disjunctive.

JUSTICE HAGEN: Okay. Let me ask you this question. Let's say that we disagree and we find that Kitches has been controlling law for the last 19 years. Do we draw any inference from the fact that the legislature has not amended the Judgment Act to -- to basically abrogate Kitches?

MR. TILT: I would say no, because the legislature, I would submit, has already -- it's -- I mean, the statute says what it says. It says in 78B-5-201(2) you've got to record -- or file with the court. In Subsection (3), you have to record with the county. It doesn't say you can do either one of those things. I can't account for why the legislature would not have

addressed that. I can only presume they had other priorities in any given session. But I do think the analysis is short-sighted and just textually incorrect. And it reads out of existence the Subsection 202(3) requirement of abstracting judgments to other counties if you want to have them have effect in other counties.

CHIEF JUSTICE DURRANT: Counsel?

JUSTICE POHLMAN: Can I ask you -- oh, go ahead, Chief.

CHIEF JUSTICE DURRANT: No. You go ahead.

JUSTICE POHLMAN: You sure? Okay.

Let me ask you about this argument about 201 potentially being ambiguous. So they submitted some legislative history, right? And you say in response to that that "The district court found it unambiguous. Kitches found it unambiguous. So Alum Rock's arguments to the contrary are patently irrelevant and must be disregarded."

Does that mean this Court, if we were to look at 201 and find it ambiguous, our hands are tied? We can't find it ambiguous?

MR. TILT: No. But it's just not ambiguous. I mean --

JUSTICE POHLMAN: No. I understand your argument. There's not an "and." There's not an "or." Perhaps it's a bit ambiguous. I'm just -- I'm asking if we were to conclude it

was. First of all, are our hands tied? Can we conclude it is if that's what we find? And if so, what do we turn to, then, at that point? Or what do we do? Do we remand it? Do we consider the legislative history? What result would ensue?

MR. TILT: If this Court were to find it ambiguous -- and I certainly don't suggest that it's beyond this Court's power to find it to be ambiguous. But if this Court were to find it to be ambiguous, then at that point, I think we would need to -- boy, if it's ambiguous, I think we need to -- I don't know. I don't think the -- I don't think the legislative history helps anything. Again, it's not the proper -- it's not the actual enrolled copy of the bill that they referred to and so forth. And one legislator's comment here or there I don't think should control the day over a plain textual reading. I don't think it's ambiguous, but if you find it is, I honestly don't know what you would --

JUSTICE POHLMAN: How we resolve it?

MR. TILT: -- refer to to resolve that.

JUSTICE POHLMAN: Okay. Thank you.

CHIEF JUSTICE DURRANT: If it's ambiguous, what would be your response to the Thomas Hatch affidavit filed in the Kitches case?

MR. TILT: I'm sorry. I couldn't hear you.

CHIEF JUSTICE DURRANT: Thomas Hatch was the sponsor, and he filed an affidavit in the Kitches case. So that -- we

only get to that if it's ambiguous. What would be your response?

MR. TILT: My response would be that, again, one legislator's affidavit and one legislator's intent, he can't presume to have spoken for the entire legislature. And I'm sure he didn't. And so I just don't think that that would clarify anything as compared to --

CHIEF JUSTICE DURRANT: Would you point to other aspects of the legislative history to counter that?

MR. TILT: We have not -- we have not explored the legislative history because we think it's irrelevant. The statute is not ambiguous, and so that's not a required (inaudible) in our view.

CHIEF JUSTICE DURRANT: On a separate point, Judge Mow distinguishes T3 Properties in a number of respects. What are your specific criticism -- criticisms of that judge's holding on that point?

MR. TILT: Well, he talked about that T3 dealt with the judgment information statement requirement, which is not at issue in this case. And we fully acknowledge that. It's not what's at issue in the case. It is factually different. Every case is factually different. But the analysis -- this case is all about how do you interpret these changes over time? And does the 2000 -- does the 2002 amendment replace or does it add to the 1997 requirement? Nothing that the district court

analyzed in this case even addressed that. It addressed the wrong thing.

So, yes, the judgment information statement requirement wasn't the specific issue in this case like it was in T3, but the history and how the Court should read that history and read those additions to the statute as cumulative is the appropriate approach.

CHIEF JUSTICE DURRANT: He also distinguished it I think on the ground that it dealt with the pre-2002 version of the act, correct?

MR. TILT: Honestly, I don't understand the Court's reasoning on that, because when we look at the statute today as compared to what it was at that time, the requirements of 2000 -- of Subsection (2) in 1997 and then the addition in 2000 -- excuse me -- the Subsection (2) added in 1997, that was there at the time of the T3 statute. It's there now. That, to me, supports the idea that it's cumulative and that the district court took the wrong approach in that regard.

JUSTICE HAGEN: I'd like to clarify something about your second argument if I could. I think that there was some confusion in the briefing about it. As I understand it, and especially as clarified by your reply brief, your second argument is a challenge that the lien never attached because it was not -- the property was not owned by the judgment debtor. Is that correct?

MR. TILT: Yes.

JUSTICE HAGEN: And that's why it's not an argument under 64(e). It's an argument under the statute, under 202; is that right?

MR. TILT: Correct.

JUSTICE HAGEN: I have -- I'm a little bit concerned about that only because when I look back at the reply to the writ of execution, that particular argument was raised in a footnote that was connected to your argument on whether the district court had jurisdiction. And then it wasn't addressed again in the -- in your reply, and it wasn't addressed during oral argument. Was that sufficient to preserve that issue? I mean, it certainly seems like the district court did not completely comprehend that as a separate issue since the district court addressed the 64 -- the rule issue and not the statute.

So, sorry. That's a long way of saying is the footnote in your original reply to the writ of execution enough to preserve that argument for us to review?

MR. TILT: I think it is. It is in the briefing, as you mentioned, and I don't know whether the specific statutory section and -- whether it came up in a jurisdictional context or otherwise, I candidly can't recall. And you would be more familiar with the record than I am at this point, probably.

Whether that specifically came up and was argued

again -- but that has been sort of a theme of our case throughout this, is the judgment debtor, Brett, never owned the property. And that is a requirement under 202 for the -- for any judgment lien. It can only attach to real property of the judgment debtor, owned during the life of the judgment. And since this judgment debtor never owned the property, it cannot have attached. That's been an undercurrent of everything in our theory of the case.

JUSTICE HAGEN: Thank you.

JUSTICE POHLMAN: Let me ask you. One of the arguments that's made is that because it's a revocable trust, he does, in effect, own the property. I would like to just hear your response to that. And also, what law do we look at to decide whether that's the case? I notice that this trust was created under California law. The law people have referred to in the briefing seems to be what Utah says about revocable trusts. I'm just curious if you think that curious is resolved by looking at Utah law or California law.

MR. TILT: I think that question cannot be resolved by this Court because it was not raised until a supplemental authority filing two days ago. And it wasn't in the briefs; it wasn't in the arguments. It's not a supplemental authority. It's a brand new argument. So I don't think this Court can address that at all.

But if the Court were to address that, the way it

should be resolved is that -- to say that we've got subsection -- we've got 75-7-505, which is what was cited to in the supplemental authority --

JUSTICE POHLMAN: Well, let me just stop you for one second, because I think the supplemental authority gets to a slightly different issue. Because this issue is something I thought about before supplemental authority came in, so I'm just looking back at the briefing to see if I had just come up with it on my own. But I see on page 15, which is just the summary of the argument in the red brief, but it at least talks there about how a settlor co-trustee of a revocable trust has at least control of the property. So I guess maybe if they're referring to it as control as opposed to ownership, I'm not sure if that nuance matters.

But, anyway. I mean, at least this issue of what kind of rights someone might have in the property vis-a-vis their position as a trustee and settlor was something that was raised in the briefing to us.

MR. TILT: That nuance, I submit, is very important. That's another way this district court erred in this case, is, again, the judgment lien statute says you can only have a lien on the judgment debtor's property that is owned. That's the statutory term. And the district court in this case conflated that with the Rule 64 execution term that you can have a writ of execution on property that is in the possession or control

of the judgment debtor.

Possession and control do not equal a judgment lien. That's the first way that that argument is addressed. And the second is --

JUSTICE POHLMAN: But let me talk about his decision for just a second, because at least Rule 64 -- if you go to 64(a), it defines the terms that are used throughout the rules of 64, right? And it defines property as property of the debtor. So I think it's already embedded there, that we're talking about writs of execution of property owned by the debtor that's also within their control, contrasting it with garnishment rules, for example, where you get a writ of garnishment about a property the defendant owns but isn't in its control and possession.

So I think ownership, you need to have ownership. I think that's clear, right? So then the question is does Mr. Del Valle own this property by virtue of his position relative to the trust or not? And so I guess that's the question I want to focus on.

MR. TILT: I would propose that the case of Jessup vs. Five Star Franchising, 515 P.3d 466 -- it's a Utah Court of Appeals case from 2022 -- is how that ought to be resolved. And specifically, at Footnote 10 of that case, the Jessup court -- and this is not in the briefing because it was only looked at in the context of the supplemental brief -- the Court

there said that it could not affirm a summary judgment in that case on the basis that the trust was revocable and, therefore, the settlor had control of the trust, because it said, "We therefore disagree with the district court's conclusion that simply because the trusts were revocable, Jessup and Kristy as settlors could act unilaterally in their capacities to remove the property from the trust. The extent of authority will depend on the precise language of the instrument and not just on the status of the trust as revocable."

And that's part of the problem that we have in this case, is the trust on its face does not give unfettered authority to the judgment debtor, Brett Del Valle, to deal with the property. He is a co-trustee only, and the trust is set up for himself as a beneficiary, but also for his spouse, and there are various children's trusts that are discussed in there. It is the beneficiaries that own the property, the equitable interest in the property. And the mere fact that this trust is revocable does not on its own mean that he had control of it. You have to look further than this district court did as to exactly what control he had.

And beyond the face of the document, there was zero evidence taken to show that Brett actually had any control, that he actually exercised any control. This property was conveyed to the trust in 2007, and it was conveyed out of the trust in 2020 -- '21. So we have no factual findings to

support the ruling of this district court in this -- or to support any ruling in this case that there was control sufficient for Subsection 505 to be dispositive in this case.

JUSTICE POHLMAN: What facts would you need beyond the trust agreement? I mean, like who else is controlling it if not the co-trustees? And I understand you may not have exclusive control. I think that may be an important point, but at least how would -- I mean, what fact would otherwise come into play here?

MR. TILT: Well, if he was, you know, financing it and taking the money himself somehow, then he would be exercising personal control. Or if he -- I mean, I don't know what -- what there might be because we don't have any factual record on that, but...

JUSTICE POHLMAN: I guess who else other than the two co-trustees would have control?

MR. TILT: Well, the two -- the two co-trustees would have control, but the difference -- the question is what control do they have? And that has to be defined by the terms of the trust itself, and there was no analysis of that. The Court just said, "It's revocable; and, therefore, he controlled the property." That's not sufficient.

CHIEF JUSTICE DURRANT: As you read the trust, is it unilaterally revocable by him? Or does it require the consent of his wife?

MR. TILT: I honestly do not -- I -- you know, my recollection is -- and I'll review it while counsel has his say -- but my recollection is that the document is vague as to that. It talks about them as co-trustees. It repeatedly refers to them as co-trustees. But to my recollection, the document never calls out one or the other of them can sign or both of them can sign. It just is open-ended on that issue.

All right. I'll defer to opposing counsel.

CHIEF JUSTICE DURRANT: Thank you, Mr. Tilt.

MR. TILT: Thank you.

CHIEF JUSTICE DURRANT: Mr. Hooker.

MR. HOOKER: Thank you. May it please the Court.

I'd like to start out addressing a question that Justice Hagen had asked about if Kitches was controlling, which is our position that Kitches has been the controlling law since 2005, would the fact that the legislature has not amended the Judgment Act since then have any indication of how we interpret the statute?

I think it does, and we haven't cited this case law in our brief, but I believe that when there is controlling authority interpreting a statute, the legislature is aware of it, and they reconsider that statute at a later time and choose not to respond to that case, it is affirming the interpretation from the courts.

I think that that is another reason to interpret the

Judgment Act the way that Kitches did here. The legislature --

JUSTICE HAGEN: Do you happen -- I'm sorry. And I realize you didn't cite it in your brief, but I'm asking. Do you have case law at your fingertips to support that? That when we -- when the legislature does not amend a statute in response to an interpretation, that we give that some weight?

MR. HOOKER: I do not at my fingertips.

JUSTICE HAGEN: Okay.

MR. HOOKER: It's something that is in my mind from other cases I've done, but the citations are not at my fingertips.

JUSTICE HAGEN: Well, you are welcome to file, of course, supplemental authority responding to that question if you wish.

JUSTICE POHLMAN: And can I follow up just quickly on that? Is that something that we would defer to or at least consider relevant if the statute's ambiguous only? Or do we consider that even if we don't find ambiguity in the statute?

MR. HOOKER: That is a question where I'm not -- I'm not sure whether or not that's an aspect of legislative history or whether that is a legislative intent, plain language. That's something that I'm not prepared to answer today.

JUSTICE POHLMAN: Okay. Thanks.

MR. HOOKER: But I think it is a good question.

I would like to start with the Foreign Judgment Act.

Because we have a California judgment here that's been domesticated in Utah pursuant to that act, I think that the -- the statutory interpretation question should start there in terms of whether my client was required to file its judgment in the Registry of Judgments in addition to the recording requirement.

As has been --

JUSTICE HAGEN: Let me just stop you right before you start. I apologize.

MR. HOOKER: No problem.

JUSTICE HAGEN: Do you -- and I -- I actually thought about sending out a notice on this, and I failed to do so. So if you're not familiar with this case, I completely understand. But have you seen our decision in Sunstone Realty vs. Bodell? Or is it is switched?

JUSTICE POHLMAN: I think you got it.

JUSTICE HAGEN: Have you seen that, where we basically talk about the Foreign Judgment Act and assume that enforcement means something separate than the list of items that follow?

MR. HOOKER: No. I have not. I have not seen that case.

JUSTICE HAGEN: Okay. Sorry. Go ahead. Please.

MR. HOOKER: So as we -- you know, it was discussed in the opening argument, when you look at Section 305 of the

Judgment Act, you know, it contains three requirements for a foreign judgment becoming a lien. We have a stay of execution that hasn't been granted, the requirements of this chapter being satisfied, and that the judgment's recorded in the office of the County Recorder's Office, as provided in Section 202.

You know, we have here a situation where the legislature is drafting a statute and specifically contemplating how you create liens from foreign judgments. And when they are drafting that statute, they specifically call out the county recording requirement, and they reference Section 202 in the Judgment Act. I think that this is an important fact for the Court to consider, both in interpreting the Foreign Judgment Act and interpreting that act with the Judgment Act in harmony, that the legislature, if it had wanted -- if it thought that the Registry of Judgments requirement applied to either foreign judgments or judgments that come from Utah in the first instance, they would have mentioned that explicitly in the statute about liens. And the only way that the Mulligans can get Section 201 of the Judgment Act and the registry requirement into the Foreign Judgment Act is by basically created a hypothetical scenario where the legislature was thinking of liens; they wanted to call out specifically the recording requirement; they wanted to have the registry requirement in there as well; but decided it wasn't worth mentioning specifically, and that people would figure out

that it had been incorporated through various other provisions. I don't think the legislature drafts statutes that way, and I think that this Court shouldn't presume that that is what happened.

JUSTICE POHLMAN: So what meaning do you give to Subpart (b), where it seems to incorporate not only everything from the Utah Foreign Judgment Act but also the Judgment Act and everything else that's within the chapter?

MR. HOOKER: Yeah. The way that I read that, I think that when the legislature wrote this chapter, they meant the Foreign Judgment Act, not everything in Chapter 5.

JUSTICE POHLMAN: That is how interpreted it below, right? I mean, he -- when he referred to this particular provision, he substituted in there "act" instead of "chapter."

MR. HOOKER: Yeah. And I share your concerns that Chapter 5 has a lot of miscellaneous provisions that have nothing to do with judgments liens, some that you had mentioned, others. The Comparative Negligence Act is also in Chapter 5.

I think that it's also important to remember -- and this is indicated in Section 307 of the Foreign Judgment Act. This is a uniform act. It's an act that many states have applied. And in Section 307, it says that the Court should construe the Foreign Judgment Act to effectuate the general purpose and make uniform -- laws uniform on the states.

I think that, you know, the uniform act likely used the word "chapter," and the legislature adopted that, really meaning it meant the Foreign Judgment Act, not the chapter in which that act is situated.

JUSTICE PEARCE: Are we free to redefine it that way, though, absent some showing of absurdity, that no reasonable legislature could have intended it to mean chapter? Are we in the business of saying, "This is what they meant," and putting in -- you know, just rewriting the statute using a different word?

MR. HOOKER: I don't think that it would be a rewriting of the statute in this circumstance. I think, you know, when we -- the Court starts at the plain language when it interprets statutes, but it also needs to make a harmonious hold with similar related statutes.

And so if you, you know, focus on the -- this -- to these two words, "this chapter," in isolation, that could be a tenable reading. But when you read it in harmony with the other statutes in this -- in this chapter, I think that, you know, it would be a reference to the part and not this chapter.

You do mention the absurdity doctrine. I do think this could be a situation where that would apply, because I don't think that any reasonable legislature would have meant to incorporate requirements for affidavits and evidence and the comparative negligence statute into a section on foreign

judgments. I can't imagine a reasonable legislator meaning to do that.

JUSTICE HAGEN: Apart from 305(1)(c), though, we have 302(3), which says that a foreign judgment has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and then proceedings for various things.

Now, as I understand your argument, you're saying that that doesn't require us to apply the Judgment Act, because that is only referring to reopening, vacating, setting aside, or staying; is that right?

MR. HOOKER: Yes. That is what we had argued in our brief, that after the word "for," it's a post-positive modifier that applies to everything in the series before it.

And, you know, even looking at this section in general -- and I'm -- and I'm sorry. Did you have a follow-up question, your Honor, on that?

JUSTICE HAGEN: Yes. Let me just ask you one thing. Let's assume for a moment -- and I realize we didn't send out anything about this, but let's assume for a moment that in -- that we've recently interpreted that differently, that procedures, defenses, enforcement, and satisfaction mean -- are independent of that list. What would be your position then?

MR. HOOKER: My position with that one -- it's -- I'm honestly not very concerned if that is the case.

JUSTICE HAGEN: Okay.

MR. HOOKER: Because I don't think that it changes the outcome here. Because what you have is -- you know, without engaging in kind of which -- whether the reopening and vacating language applies to everything else in the series, I think that the Subsection (3) is just a general statement that there should be uniformity between how you go about dealing with foreign judgments and judgments out of a Utah court.

But this specific section does not say anything specifically about liens. It is Section 305 that speaks specifically to liens. And when you have provisions where you have one that's directly on point and speaks to the subject matter, that is what should govern the analysis over kind of a more general intent and purpose statement. So that would be my position on that.

JUSTICE HAGEN: Even if we were to say that liens fall within enforcement under that Subsection (3), you're saying that the more specific section controls?

MR. HOOKER: I would.

JUSTICE HAGEN: Okay.

MR. HOOKER: That would be my argument, yes.

JUSTICE HAGEN: Okay. Thank you.

JUSTICE PEARCE: Are you at all troubled by the number of times in 302 that the legislature emphasizes "as used in this part" or "a foreign judgment filed under this part has the same effect"? We do have a cannon of meaningful variation,

and that when the legislature uses different terms, we usually presume they mean it.

So when it uses "chapter," should we draw any meaning from the fact that it knows when it wants to use "part" apparently and use "chapter"?

MR. HOOKER: This is a question I haven't thought of before, but you are right. It looks like in several sections of the Foreign Judgment Act, it does say "this part." Section 301, it says "In Section 302 as well."

I think that if the legislators used -- the legislature's using the words "part" and "chapter," that that is something that is important, and it could be the case, then, that when the legislature says "this chapter" in Section 305, it was meaning to incorporate the Judgment Act.

I think that even if that is the case, you know, we have -- I think it still reaches the same result. And I -- I know that we kind of started off our brief with, "Don't look at the Judgment Act." We think that either way, this Section 305 either can stand on its own or it's something that needs to be interpreted in harmony with the Judgment Act. And it leads to the same result.

And so I think that, you know, to get to your specific concern, if this Court wants to avoid the question of what this chapter means, what this part means, we can look to the Judgment Act and interpret it in harmony with the Foreign

Judgment Act to reach the same result.

JUSTICE POHLMAN: And that's by adopting the Kitches analysis?

MR. HOOKER: And that's by adopting the Kitches analysis and a few other reasons as well that were enlisted in Kitches.

JUSTICE POHLMAN: Okay. Let me ask you about Kitches for a minute. The Court seems to rely pretty heavily there on the "or" that's used in Subsection (4), finding it's disjunctive. To me, whether or not the "or" is disjunctive isn't really the answer to the question. I mean, "ors" can be either inclusive or exclusive, meaning '"or' or both" or '"or' but not both," right?

MR. HOOKER: Yes.

JUSTICE POHLMAN: And so -- I mean, if you read Gardner [phonetic], he says, '"Ors' almost always introduce some ambiguity." So I feel like Kitches kind of just acknowledges something. "Oh, there's an 'or' here, so it therefore must be exclusive." And I'm not sure I see anything else in that provision that tells me that was intended to be exclusive versus inclusive. And if I'm using (4) to try to interpret 201 -- (4) isn't clear to me. If (4) has some ambiguity, I'm not sure how it really is helpful in trying to decide whether both Subsection (1) and Subsection (2) apply. Can you help me with that?

MR. HOOKER: Yes. The way that -- I think that I read Kitches a little bit differently. They -- the Court of Appeals in Kitches, before getting to the disjunctive "or" in Subsection (4), they first look at Section 202, which back then was numbered -- numbered differently. They look specifically at Subsection (7) in 204. This is the first one that they look at. And in Subsection (7)(a), it says "After 2000 -- after July 1st, 2002, a judgment entered by a district court or a justice court in this state becomes a lien upon real property if," and then it lists some judgment information statement that needs to be filed.

So I think that the Court of Appeals, they first looked at that section and said, "Well, we have language here that says that when you record, it becomes a lien." And that seems as though it's a sufficient requirement. If you had to do something else like the Registry of Judgments, it couldn't become a lien just by recording.

And then after looking at that section, the Court of Appeals goes back to Section 201 and they look at Subsection (4), and they say -- and they note, "Well, if the legislature had intended the Registry of Judgments requirement and the recording requirement to operate together as cumulative requirements, then they could have used the word 'and' instead of 'or' when referring to this judgment information statement required for both."

So I think the way the Court of Appeals read the statute in Kitches was -- I honestly don't know if the outcome would have been different if they had only focused on that "or." I agree with you that "or" on its own is not helpful.

JUSTICE POHLMAN: I guess I'm just trying to figure out, just reading their opinion anyway, what meaning they really derive from -- and I'm trying to remember how these new sections correspond, but 78-22-1, at least in Kitches. Because they do cite it. They say that's the starting point.

MR. HOOKER: Yes.

JUSTICE POHLMAN: But all they do it quote it.

MR. HOOKER: Uh-huh.

JUSTICE POHLMAN: And then they go on to talk about 1.5 and 2 and 3, and then they talk about 4. And then their analysis seems to be focused on the disjunctive "or" in 4. And they seem to derive a lot from that. Just help me see maybe where they seem to derive meaning from just that first subsection, which I think is now 202 for us.

MR. HOOKER: Yeah. I would say that where they derive that meaning -- and the fact that they just quote it -- is I think indicative to them where they didn't feel like there was anything else they needed to expound upon. It's like, "Look at this language. It says it becomes a lien." And that's what it says. I don't think that they felt they needed to say "And it becomes a lien," blah blah blah, and then they

focused on the disjunctive.

So I agree with you that more of the analysis is on the "or," but I actually think that the main focus of their opinion is on that becoming a lien subsection and that it was at least clear enough for them that it just needed to be quoted. It could have been expounded upon. We -- we do so in our -- in our opposition brief.

But I think that, for the Court of Appeals, that that becoming a lien section is very important to them, because they're trying to avoid conflicts in the statute, which is what this Court should do. You presume that the legislator doesn't -- legislature is not trying to create conflicting statutes. And if you have language that says it becomes a lien if it's recorded, it creates a conflict if you have a different section where you interpret it saying, well, it doesn't become a lien if it's recorded. You also have to file it in the registry.

I don't know if that answers the question.

JUSTICE POHLMAN: No, that's helpful. I mean, I do think you are right that there's potentially a conflict here where we're dealing with it in two different places. And so which one do we give meaning to? I guess I'm just not sure I ultimately agree with their analysis about 1.5.

MR. HOOKER: Mm-hmm.

JUSTICE POHLMAN: I don't know that that helps inform

much.

MR. HOOKER: I -- and I think that even if that -- personally, if that Subsection (4) and the "or" language wasn't in there, I still think that the result would be the same, particularly when you look -- when you interpret the Judgment Act consistently with the Foreign Judgment Act. We don't want there to be any sort of conflict between those two. And the Judgment Act just says that you need to record in -- incorporate Section 202, it doesn't mention Section 201.

So in my opinion, the result is the same regardless of this "or" language. And I think this Court could reach that result without even engaging in the Court of Appeals analysis of that specific subsection.

With the couple minutes left of my time, I wanted to point you to somewhere in the record. Justice Pohlman, you had asked a question about what law governs with the trust and control.

If you look at the record on page 143, there's a governing law section of the trust, and it says that when there's real property involved, the governing law is the law of situs where the property is located. And so I think because we're dealing with property located in Utah, Utah law would apply to determine how to interpret that trust and the trust issues. And then on that point, I think that Section 505 of Chapter 7 in the trust code is dispositive of this issue, where

it pretty clearly states that if you have a revocable trust, the creditors can go after a property in that trust against the settlor.

And I think here, it is undisputed that the judgment creditor was a settlor of the trust and that it was a revocable trust.

JUSTICE POHLMAN: And is that the new argument that shows up in the supplemental letter?

MR. HOOKER: It is, your Honor. And I would -- in response to their -- to the Mulligans' argument that this Court should not look at that new subsection, your Honor, I don't think there's any preservation issue here. This is -- this authority is relevant to an issue that they raised in their brief of whether or not the judgment debtor had control over the property.

So it's relevant to an issue they raised, and there's also pretty clear case law that says that appellants do not need to preserve citations to legal authority. You preserve issues. You don't have to preserve citations. I would refer the Court to the Patterson vs. Patterson case on that point. The citation is 2011 UT 68, specifically paragraph 18, where the Court said, "We routinely consider new authority relevant to issues that have been properly -- been preserved, and we've never prevented a party from raising controlling authority that directly bears upon a properly preserved issue. Further, we

are unwilling to disregard controlling authority that bears on the ultimate resolution of the case solely because the parties did not raise it below."

I think that would apply here. If this Court ignored the Utah Trust Code, then it could potentially lead to an erroneous ruling of Utah law and this Court's -- you know, the consideration first and foremost is to get the law right even if the controlling authority is something that we didn't catch until the week before oral argument. And that's the reason why notices of supplemental authority are in the Rules of Appellate Procedure.

JUSTICE HAGEN: Can I ask you a question on this same topic? In your -- in your brief here on appeal, you engage with their argument that the property wasn't owned by the judgment debtor under 202(7)(c). But I don't believe you engaged with that below, and I don't think the district court did either. What -- do you know why that is?

MR. HOOKER: Yes. So we -- as you have noted before when you were speaking with Mr. Tilt, the argument about whether or not a judgment lien could attach based on the ownership, arguments like that was contained in a footnote in their reply, and it kind of fell off the radar there.

And I -- when we were drafting our brief, we had considered whether or not to have a full section on preservation, and I think that, you know, there is some -- I

think that it could be the case that raising it in a footnote would not have brought the issue to the level of consciousness for the district court to have -- to have ruled on that issue. And, in fact, the district court did not rule on that issue; it only focused on Rule 64(e), because that's what the parties had focused on.

But the fact that it was in the reply, the district court could have looked at it. We decided that since we had -- we were already hitting the page limit, that -- as you all know, preservation issues get sticky and take up a lot of briefing space. And so we chose not to brief that issue.

I do think that if this Court was inclined to not reach that issue, finding that it wasn't preserved, I think that you would be well within your rights to do so.

JUSTICE POHLMAN: One of the issues on this ownership question -- I mean, the arguments on it have evolved a little bit -- right? -- from when they were in the district court and even on the appellate briefing.

MR. HOOKER: Yes.

JUSTICE POHLMAN: And one of the things that's come up that I think is kind of interesting is even if we were to conclude that Mr. Del Valle has ownership interest in this property, it's not exclusive, right? It's jointly owned with -- or his wife is a co-trustee according to the trust document anyway.

And so I'm just wondering -- I mean, it doesn't appear that she was given notice of the writ. And so I'm just wondering, what do we do with that? And, again, part of it is because this has evolved a little bit from the arguments that were made, so I'm just not exactly sure how that fits into what we should be looking at right now. Because I'm -- even if we conclude he has ownership interest, I'm not sure it's exclusive.

MR. HOOKER: I think that the -- where that may fit into this analysis would be something that would be dealt with on -- when we go back down below and not here, because if it is the case that the judgment debtor's wife also had an ownership interest in the property, that doesn't mean that a lien could not attach or that a writ of execution couldn't go to the property. It's just how much of the money goes to my client and how much of the money -- because if -- you know, if Mr. Del Valle's wife does have, you know, say, 50 -- say it was community property and she would get 50 percent of it. That's how -- that would be an issue of how do you distribute the proceeds after the sale? Not whether or not an execution writ could go to the property in the first place.

JUSTICE PEARCE: I realize that there might be preservation concerns, but do you see any advantage to a remand back for some factual findings on the ownership issue?

MR. HOOKER: I don't. I think that, like the

district court, the -- the issue can be resolved by looking at the trust. And I think that the trust answers the question of whether or not Mr. Del Valle had ownership sufficient for a lien to attach or for writ of execution.

So I -- I don't think that a remand for factual findings would be necessary on this point. I think that everything that this Court needs to rule on that issue is -- is here in the record.

JUSTICE HAGEN: And this is a purely practical question, and I don't know if you'll know the answer to this, but I was interested in the discussion of whether a title company or proposed purchaser like the Mulligans would be able to connect the judgment here against the judgment debtor to the actual trust that just bore his last name. Do you know how that works? I mean, what happens if someone's going to buy a property from a trust? Does the title company -- how does the title company investigate that?

MR. HOOKER: I -- I don't have a ton of experience with title companies, but I can tell you that we did issue a subpoena to the title company down below, and this is -- and we did get the trust from the title company's records. I believe that title companies -- when they're dealing with people who own properties and particularly when trusts own properties -- you know, there are so many properties held in trust. People do so for estate planning reasons. When you're dealing with

individuals selling property to you and you know the property is held in trust, I would assume that the title companies would require the seller to give them a property of their trust so they can research the county records to see if there are any judgments for the sellers individual, for their trusts, for companies that they own, that kind of information, so that they can make sure that there's not something that they miss and that there's not a lien against the property. I imagine that's how it goes in these circumstances. I don't know completely, but, you know, title companies have a very strong incentive to make sure they catch everything. So I assume that they would be as thorough as possible on that issue.

JUSTICE HAGEN: Thank you.

MR. HOOKER: I'm guessing my time is up.

CHIEF JUSTICE DURRANT: Thank you, Mr. Hooker.

Mr. Tilt?

MR. TILT: I'd like to start right there, and I will say I do have a lot of experience representing title companies, and that's not what they do. They don't look at every potential trust that you own. If there's a -- if a person is selling property, they will look at that person's credit. They will look at that person's court record in the county at issue. They will look at that person's record in the County Recorder's Office. They won't search trusts, because those are separate entities. They won't search businesses, because those are

separate entities. Those separate entities all have their own separate obligations and their own separate existences, separate and apart from the individual.

JUSTICE HAGEN: But if the person selling the property is a trust, is it typical that they receive a copy of the trust so they can see who the settlor is or who the trustee is?

MR. TILT: Yes.

JUSTICE HAGEN: And then would it be commonplace for them to then search those names for liens?

MR. TILT: No. They just need to have the trust in order to know, okay, these are the people that do have the title --

JUSTICE HAGEN: Authority?

MR. TILT: -- they have the authority to sign the deed. But they're not looking for the trustors or the -- or any obligations of anybody but the trust. They'll search the title on the trust, they'll search court records on the trust, but they're not going to go and search Brett, because they would have no reason to search Brett. He doesn't have an interest in the property. Why would we search Brett?

JUSTICE HAGEN: And I realize that none of this is in the record. This was just really my own curiosity about how this worked practically. So...

MR. TILT: Sure. No. I understand.

And I do want to get to a question that you raised earlier, but I first want to respond to what I told Justice Durrant I would get to him.

The trust under paragraph 1.1 -- and this is Bates No. -- I don't know because my hole punch cut it off. 000127 in the record. It's Addendum 2, I believe, to our brief. Section 1.1 of the trust talks -- is the most clear language that I have found in there as to what the relationship of the co-trustees is and what their respective powers are.

It says "The trustors have been appointed as co-trustees. If for any reason during the joint lifetimes of the trustors either trustor shall cease to act as co-trustee, the other trustor shall act as sole trustee." And then it talks about "Upon the death of one of the co-trustees, then they act as sole trustee." But absent a death or one of the co-trustees ceasing to act as such, they are, under this document, co-trustees. And it is noteworthy there for -- that the deed to my client's was signed by both trustors in this case, both of the co-trust -- co-trustees -- excuse me -- in this case, which -- all of which gives an inference, if not clarity, that they both have to sign something and -- in order to transfer the property or to control the property.

That gets to a point that counsel raised. And he is correct that if -- if the Court finds that this judgment against Brett attached to property of the Del Valle Family

Trust, it can only attach to his portion expressly by statute under 75-7-505(1). After talking about how property of a revocable trust is subject to claims of the settlor's creditors, it says "If a trust has more than one settlor, the amount and the -- the amount the creditor or assignee of a particular settlor may reach may not exceed the settlor's interest in the portion of the trust attributable to that settlor's contribution."

So at most, a one-half interest in the property could potentially be reached by -- by this judgment.

JUSTICE POHLMAN: Can I just ask one quick question? That statute you cited mentioned a revocable trust. Do you agree that this is a revocable trust?

MR. TILT: Yeah. I don't think there's any question this is a revocable trust. But the other issue that comes up under that -- under the probate code that counsel points to is Section 75-7-507, which says "Trust property is not subject to personal obligations of a trustee."

Now, in this case, Brett is a settlor, but he's also a trustee. So I think there's an irreparable -- irreconcilable conflict between those two statutes. 507 says you can't reach this property because -- just because he's the trustee of a trust. So that's another response we would have to the belated citation to 505.

Justice Hagen asked counsel about Kitches and that

there had been no amendment, and counsel argued, yes, the implication therefore has to be that the legislature presumed that the Kitches ruling was the correct one. That same analysis, though, has to apply as well to the T3 case where it said in Footnote 5, "Notably, you have to satisfy both of the requirements, filing with the court and recording with the county." We also have ten years of legislative sessions since T3, and the legislature did not reverse or otherwise change the statute in light of that holding.

So to -- I don't think any supplemental authority is needed or supplemental briefing from either party on that, because what's good for the goose is good for the gander. That applies to both cases. T3 being the newer of the two, I would submit that the T3 case is the one that would govern.

JUSTICE PEARCE: Is there any fact finding needed to sort out questions of ownership and control? Or do we have everything in front of us that would allow us to make those decisions?

MR. TILT: Ownership does not require any fact finding. Control, I -- I think there might need to be something further on control. Now, control of course is not relevant to whether there is a lien. Control alone will not give rise to a lien. Control will only allow a potential writ of execution. And the writ parenthetically -- the distinction between judgment and writ is highly significant in this case,

because a writ can only attach to property of the judgment debtor in their possession or control. But by the time this writ was issued, by the time the application was made for this writ, the property was already out of the possession and control of the trust or Brett or anybody else. It was owned for a month by my clients before the writ was issued.

So unless they have a judgment lien, Alum Rock has no interest in this property whatsoever. The writ is wholly void unless they have a judgment lien. And so that distinction between ownership and control is important, because the control language of the -- of the rule regarding writs cannot override the statutory language requiring ownership.

JUSTICE PEARCE: And you believe that everything we would need to decide who owned the property on the relevant dates --

MR. TILT: Yes.

JUSTICE PEARCE: -- is in the record in front of us and requires no fact finding?

MR. TILT: Correct.

JUSTICE PEARCE: Okay.

MR. TILT: There was some discussion about Section 302 and -- of the Foreign Judgment Lien Act. And the Osborne [phonetic] case that was cited in the briefing dispenses with Alum Rock's post-positive modifier interpretation of Section 302. What the Osborne case said is that the -- the language of

the statute that says "A foreign judgment filed under this part has the same effect and is subject to the same procedures, defenses, enforcement, satisfaction, and proceedings for reopening, vacating, and setting aside will apply the same to a foreign judgment as to a domestic judgment" -- Osborne says, yeah, that all applies. It talked about -- the Osborne case said the decree in that case had the same effect and was subject to the same procedures, defenses, and enforcement as the judgment of the district court. The failing of the post-positive modifier analysis that is championed by Alum Rock is it completely ignores the "and" that's right in the middle of that section. All of those things conjunctively are the same for a foreign judgment as a domestic judgment. A foreign judgment expressly, under Subsection (5) and under -- even under 302, has to therefore meet all of the requirements of Chapter 5.

And it is significant that the legislature used "part" in 302, but "chapter" in 305. We have to presume that the legislature used each of its words intentionally. And therefore, the difference between "part" and "chapter" appearing within three subsections of one another has to be given significance by this Court.

Because the Alum Rock judgment filing was made in the Third District Court in Salt Lake County, it therefore did not meet the statutory requirement of being filed in the Registry

of Judgments in the Second District Court in Weber County, as is required under 78B-5-201(2). It therefore never created a judgment lien. It couldn't. It doesn't have a judgment lien.

This Court ought to clarify that all of the requirements of both the Foreign Judgment Act and the judgment lien statute must be met in order to have a judgment lien on real property. This Court therefore should reverse the district court, conclude that there is no judgment lien, conclude therefore that the writ of execution is untimely an invalid, and quiet titling the property in favor of the Mulligans. Thank you.

CHIEF JUSTICE DURRANT: Thank you, Mr. Tilt, Mr. Hooker. We appreciate the excellent oral and written arguments in this case. And we will take it under advisement.

Court is adjourned.

(Proceedings concluded.)

STATE OF UTAH )
)
COUNTY OF SALT LAKE )

I, PHOEBE S. MOORHEAD, Certified Shorthand Reporter for the State of Utah, certify:

That I received the audio recording and transcribed it to the best of my ability into typewriting; that a full, true, and correct transcription of said audio recording so recorded and transcribed is set forth in the foregoing pages.

I FURTHER CERTIFY that I am neither counsel for nor related to any party to said action nor in anywise interested in the outcome thereof.

Certified and dated this 29th day of July, 2024.

Phoebe Moorhead

PHOEBE S. MOORHEAD, RPR, CRR
Certified Shorthand Reporter
for the State of Utah

**'**

**"'or'** [2] - 36:12
**"'ors'** [1] - 36:16
**'21** [1] - 25:25
**'97** [1] - 8:17
**'and'** [1] - 37:23
**'or** [1] - 15:10
**'or'** [2] - 36:18, 37:24

**0**

**000127** [1] - 48:5

**1**

**1** [4] - 7:12, 7:23, 8:10, 36:24
**1.1** [2] - 48:4, 48:7
**1.5** [2] - 38:14, 39:23
**10** [2] - 3:1, 24:23
**143** [1] - 40:18
**15** [1] - 23:9
**18** [1] - 41:21
**19** [3] - 15:5, 16:4, 16:17
**1997** [5] - 5:8, 8:15, 10:8, 19:25, 20:14, 20:15
**1st** [1] - 37:8

**2**

**2** [20] - 6:13, 6:14, 6:20, 6:23, 6:24, 6:25, 7:2, 7:6, 7:9, 7:17, 7:23, 8:10, 10:7, 13:15, 20:14, 20:15, 36:24, 38:14, 48:6
**20** [1] - 3:8
**2000** [6] - 7:12, 9:1, 19:24, 20:14, 20:15, 37:7
**2000s** [1] - 5:18
**2002** [5] - 4:4, 7:12, 8:19, 19:24, 37:8
**2005** [1] - 27:16
**2007** [3] - 4:5, 4:16, 25:24
**201** [15] - 6:2, 6:14, 8:5, 11:25, 12:14, 14:2, 14:7, 14:10, 14:21, 17:12, 17:18, 30:19, 36:22, 37:19, 40:9
**201(2** [2] - 5:14, 5:19
**201(3)(a** [1] - 5:20
**201(6)** [1] - 6:3
**201-4** [1] - 6:3
**201-5** [1] - 6:3
**2011** [1] - 41:21
**2013** [1] - 15:9
**202** [10] - 12:10, 14:10, 21:3, 22:3, 30:5, 30:11, 37:4, 38:18, 40:9
**202(3** [1] - 17:4
**202(7)(c)** [1] - 42:15
**2020** [4] - 4:8, 4:12, 4:14,
25:25
**2021** [2] - 4:15, 4:19
**2022** [1] - 24:22
**2024** [1] - 3:1
**204** [1] - 37:6

**3**

**3** [19] - 6:13, 6:14, 6:19, 6:24, 6:25, 7:2, 7:9, 7:17, 7:23, 8:11, 10:10, 13:14, 14:24, 16:23, 34:5, 34:16, 38:14
**3)** [1] - 6:23
**3)(a** [2] - 7:7, 7:8
**301** [2] - 14:22, 35:9
**302** [6] - 34:23, 35:9, 51:22, 51:25, 52:15, 52:18
**302(3** [1] - 33:4
**305** [5] - 29:25, 34:9, 35:13, 35:18, 52:18
**305(1** [1] - 12:11
**305(1)(c** [1] - 33:3
**307** [2] - 31:21, 31:22

**4**

**4** [14] - 6:13, 6:14, 6:17, 6:22, 6:23, 7:1, 7:17, 7:23, 9:17, 36:9, 36:21, 36:22, 37:4, 37:20, 38:14, 38:15, 40:3
**4)** [1] - 7:5
**466** [1] - 24:21

**5**

**5** [21] - 6:6, 6:13, 6:14, 7:17, 8:25, 9:7, 12:12, 12:14, 13:17, 14:2, 14:18, 14:20, 15:17, 15:19, 16:8, 31:11, 31:16, 31:19, 50:5, 52:14, 52:16
**50** [2] - 44:17, 44:18
**505** [3] - 26:3, 40:24, 49:24
**507** [1] - 49:21
**515** [1] - 24:21

**6**

**6** [3] - 6:7, 6:14, 7:20
**6)** [1] - 6:13
**64** [4] - 21:15, 23:24, 24:6, 24:8
**64(a** [1] - 24:7
**64(e** [1] - 43:5
**64(e)** [1] - 21:3
**68** [1] - 41:21

**7**

**7** [4] - 7:20, 7:23, 37:6, 40:25
**7)(a** [1] - 37:7
**75-7-505** [1] - 23:2
**75-7-505(1)** [1] - 49:2
**75-7-507** [1] - 49:17
**78-22-1** [1] - 38:8
**78B-5** [1] - 12:12
**78B-5-201(2** [2] - 5:6, 16:22
**78B-5-201(2)** [1] - 53:2
**78B-5-202** [2] - 10:7, 12:6
**78B-5-305(1** [1] - 12:5

**8**

**8** [1] - 7:21

**9**

**9** [1] - 7:23
**9)** [1] - 7:21

**A**

**able** [1] - 45:12
**abrogate** [1] - 16:19
**absent** [2] - 32:6, 48:15
**abstract** [2] - 10:10, 10:18
**abstracted** [1] - 10:19
**abstracting** [1] - 17:4
**abstractive** [2] - 11:1, 11:17
**absurdity** [2] - 32:6, 32:21
**according** [1] - 43:24
**account** [1] - 16:25
**acknowledge** [1] - 19:20
**acknowledges** [1] - 36:18
**act** [13] - 20:10, 25:6, 29:2, 30:13, 31:14, 31:22, 32:1, 32:4, 48:12, 48:13, 48:15, 48:16
**Act** [37] - 11:25, 12:4, 12:8, 12:13, 12:15, 14:1, 15:6, 16:19, 27:17, 28:1, 28:25, 29:18, 30:1, 30:11, 30:13, 30:14, 30:20, 31:7, 31:11, 31:18, 31:21, 31:24, 32:3, 33:8, 35:8, 35:14, 35:18, 35:20, 35:25, 36:1, 40:6, 40:8, 51:22, 53:5
**actual** [3] - 11:20, 18:12, 45:14
**add** [2] - 14:23, 19:24
**added** [3] - 15:23, 16:13, 20:15
**addendum** [1] - 48:6
**addition** [11] - 6:17, 6:19, 6:22, 6:25, 7:5, 7:7, 7:15, 9:17, 9:19, 20:14, 29:5
**additional** [3] - 3:10, 8:20, 11:4
**additions** [2] - 16:13, 20:8
**address** [2] - 22:24, 22:25
**addressed** [7] - 17:1, 20:1, 21:10, 21:11, 21:15, 24:3
**addressing** [1] - 27:13
**adds** [1] - 9:13
**adjourned** [1] - 53:15
**adopted** [1] - 32:2
**adopting** [2] - 36:2, 36:4
**advantage** [1] - 44:23
**advisement** [1] - 53:14
**affidavit** [3] - 18:21, 18:25, 19:4
**affidavits** [2] - 12:22, 32:24
**affirm** [1] - 25:1
**affirming** [1] - 27:23
**ago** [2] - 9:22, 22:21
**agree** [5] - 9:16, 38:4, 39:2, 39:23, 40:13
**agreement** [1] - 26:5
**ahead** [4] - 11:23, 17:8, 17:10, 29:23
**allocated** [1] - 3:8
**allow** [2] - 50:17, 50:23
**almost** [1] - 36:16
**alone** [1] - 50:22
**Alum** [13] - 3:6, 3:22, 4:8, 4:12, 4:14, 4:19, 4:25, 5:12, 17:16, 51:7, 51:24, 52:10, 52:23
**ambiguity** [3] - 28:18, 36:17, 36:23
**ambiguous** [14] - 17:13, 17:19, 17:20, 17:21, 17:25, 18:5, 18:7, 18:8, 18:9, 18:15, 18:20, 19:1, 19:12, 28:17
**amend** [1] - 28:5
**amended** [7] - 8:19, 13:11, 15:6, 15:7, 15:23, 16:18, 27:16
**amendment** [2] - 19:24, 50:1
**amount** [2] - 49:5
**analysis** [20] - 5:17, 7:14, 9:11, 9:12, 15:21, 16:1, 16:6, 17:2, 19:22, 26:20, 34:12, 36:3, 36:5, 38:15, 39:2, 39:23, 40:12, 44:10, 50:4, 52:10
**analyzed** [1] - 20:1
**answer** [4] - 15:1, 28:22, 36:11, 45:10
**answers** [2] - 39:18, 45:2
**anyway** [3] - 23:15, 38:6, 43:25
**apart** [2] - 33:3, 47:3
**apologize** [1] - 29:9
**appeal** [1] - 42:13

**Appeals** [8] - 5:18, 24:22, 37:3, 37:12, 37:19, 38:1, 39:8, 40:12
**appear** [1] - 44:2
**appearances** [1] - 3:17
**appearing** [1] - 52:21
**appellants** [2] - 3:19, 41:17
**Appellate** [1] - 42:10
**appellate** [1] - 43:18
**Appellee** [1] - 3:22
**application** [2] - 4:20, 51:3
**applied** [3] - 6:12, 30:16, 31:23
**applies** [6] - 7:6, 7:8, 33:12, 34:4, 50:13, 52:8
**apply** [10] - 7:2, 13:8, 13:25, 32:22, 33:8, 36:24, 40:23, 42:4, 50:4, 52:4
**appointed** [1] - 48:10
**appreciate** [1] - 53:13
**approach** [2] - 20:7, 20:16
**appropriate** [1] - 20:7
**April** [1] - 3:1
**Arabic** [1] - 9:23
**Arabic-numbered** [1] - 9:23
**argued** [3] - 21:25, 33:11, 50:1
**argument** [21] - 17:12, 17:23, 20:20, 20:23, 21:2, 21:3, 21:8, 21:9, 21:12, 21:19, 22:23, 23:10, 24:3, 29:25, 33:7, 34:20, 41:7, 41:10, 42:9, 42:14, 42:19
**arguments** [7] - 17:16, 22:11, 22:22, 42:21, 43:16, 44:4, 53:14
**aside** [2] - 33:9, 52:4
**aspect** [1] - 28:20
**aspects** [1] - 19:9
**assignee** [1] - 49:5
**assume** [5] - 29:16, 33:18, 33:19, 46:2, 46:11
**attach** [6] - 22:4, 42:20, 44:14, 45:4, 49:1, 51:1
**attached** [4] - 8:12, 20:23, 22:7, 48:25
**attributable** [1] - 49:7
**attributed** [1] - 6:21
**authority** [18] - 22:21, 22:22, 23:3, 23:5, 23:7, 25:7, 25:12, 27:21, 28:13, 41:13, 41:16, 41:22, 41:24, 42:1, 42:6, 42:10, 47:14, 47:15, 50:10
**avoid** [2] - 35:23, 39:10
**aware** [1] - 27:21

B

**B-6-301** [1] - 12:13
**based** [1] - 42:20
**Basin** [1] - 4:7
**basis** [2] - 16:6, 25:2
**Bates** [1] - 48:4
**bears** [2] - 41:25, 42:1
**became** [1] - 8:17
**become** [3] - 12:4, 37:17, 39:15
**becomes** [8] - 10:6, 12:5, 12:10, 37:9, 37:14, 38:23, 38:25, 39:13
**becoming** [3] - 30:2, 39:4, 39:9
**begin** [2] - 3:7, 3:16
**behalf** [1] - 3:22
**belated** [1] - 49:23
**below** [5] - 31:12, 42:3, 42:16, 44:11, 45:20
**beneficiaries** [1] - 25:16
**beneficiary** [1] - 25:14
**benefit** [1] - 11:15
**best** [2] - 3:13, 7:8
**between** [12] - 6:11, 6:12, 6:13, 7:19, 8:1, 8:3, 34:6, 40:7, 49:21, 50:25, 51:10, 52:20
**beyond** [3] - 18:6, 25:21, 26:4
**bill** [1] - 18:12
**bit** [5] - 17:24, 21:6, 37:2, 43:17, 44:4
**blah** [3] - 30:25
**Bodell** [1] - 29:14
**bore** [1] - 45:14
**boundaries** [1] - 10:17
**boy** [1] - 18:9
**Bradley** [1] - 3:18
**brand** [1] - 22:23
**Brett** [11] - 4:9, 4:23, 22:2, 25:12, 25:22, 47:19, 47:20, 47:21, 48:25, 49:19, 51:5
**brief** [14] - 11:7, 20:22, 23:10, 24:25, 27:20, 28:3, 33:12, 35:17, 39:7, 41:14, 42:13, 42:23, 43:11, 48:6
**briefing** [10] - 20:21, 21:20, 22:16, 23:6, 23:18, 24:24, 43:11, 43:18, 50:11, 51:23
**briefs** [1] - 22:21
**bring** [1] - 14:4
**brought** [1] - 43:2
**bullet** [1] - 4:3
**bullet-pointing** [1] - 4:3
**business** [2] - 10:24, 32:8
**businesses** [1] - 46:25
**but..** [1] - 26:14
**buy** [1] - 45:15

C

**c)** [1] - 6:8
**California** [6] - 4:9, 4:12, 14:4, 22:15, 22:18, 29:1
**candidly** [2] - 10:2, 21:23
**cannon** [1] - 34:25
**cannot** [6] - 5:6, 5:14, 10:3, 22:6, 22:19, 51:11
**capacities** [1] - 25:6
**carry** [1] - 7:1
**case** [59] - 3:5, 3:15, 4:4, 4:6, 4:10, 4:18, 5:1, 5:16, 5:17, 6:9, 6:16, 7:18, 8:9, 9:1, 18:22, 18:25, 19:20, 19:21, 19:22, 20:1, 20:4, 22:1, 22:8, 22:14, 23:20, 23:23, 24:20, 24:22, 24:23, 25:2, 25:11, 26:2, 26:3, 27:19, 27:23, 28:4, 29:13, 29:22, 33:24, 35:12, 35:15, 41:17, 41:20, 42:2, 43:1, 44:12, 48:19, 48:20, 49:19, 50:4, 50:14, 50:25, 51:23, 51:25, 52:6, 52:7, 53:14
**cases** [2] - 28:10, 50:13
**catch** [2] - 42:8, 46:11
**cease** [1] - 48:12
**ceasing** [1] - 48:15
**central** [1] - 9:19
**certain** [1] - 8:20
**certainly** [2] - 18:6, 21:13
**challenge** [1] - 20:23
**championed** [1] - 52:10
**change** [1] - 50:8
**changes** [2] - 19:23, 34:1
**chapter** [38] - 12:11, 12:12, 12:14, 12:17, 12:20, 12:21, 13:4, 13:5, 13:10, 13:12, 13:15, 13:17, 13:20, 14:2, 14:12, 14:18, 14:20, 30:3, 31:8, 31:10, 31:11, 31:14, 31:16, 31:19, 32:2, 32:3, 32:7, 32:17, 32:19, 32:20, 35:3, 35:5, 35:11, 35:13, 35:24, 52:16, 52:18, 52:20
**Chapter** [1] - 40:25
**Chief** [1] - 3:3
**chief** [1] - 17:9
**CHIEF** [15] - 3:5, 3:20, 3:24, 17:7, 17:10, 18:20, 18:24, 19:8, 19:14, 20:8, 26:23, 27:9, 27:11, 46:15, 53:12
**children's** [1] - 25:15
**choose** [1] - 27:22
**chose** [1] - 43:11
**circumstance** [1] - 32:12
**circumstances** [1] - 46:9
**citation** [2] - 41:21, 49:24
**citations** [3] - 28:10, 41:16, 41:19
**cite** [2] - 28:3, 38:9
**cited** [5] - 11:7, 23:2, 27:19, 49:12, 51:23
**claims** [2] - 4:25, 49:3
**clarified** [1] - 20:22
**clarifies** [1] - 7:2
**clarify** [3] - 19:7, 20:19, 53:4
**clarity** [1] - 48:21
**clear** [6] - 15:16, 24:16, 36:22, 39:5, 41:17, 48:7
**clearly** [1] - 41:1
**CLERK** [1] - 3:3
**client** [2] - 29:4, 44:15
**client's** [1] - 48:18
**clients** [1] - 51:6
**co** [16] - 23:11, 25:13, 26:6, 26:16, 26:17, 27:4, 27:5, 43:24, 48:9, 48:11, 48:12, 48:14, 48:16, 48:17, 48:19
**co-trust** [1] - 48:19
**co-trustee** [4] - 23:11, 25:13, 43:24, 48:12
**co-trustees** [11] - 26:6, 26:16, 26:17, 27:4, 27:5, 48:9, 48:11, 48:14, 48:16, 48:17, 48:19
**code** [3] - 40:25, 42:5, 49:16
**coming** [1] - 8:22
**comma** [1] - 10:1
**comment** [1] - 18:13
**commonplace** [1] - 47:9
**community** [1] - 44:18
**companies** [9] - 11:5, 11:8, 11:15, 45:19, 45:22, 46:2, 46:6, 46:10, 46:18
**company** [4] - 45:12, 45:16, 45:17, 45:20
**company's** [1] - 45:21
**Comparative** [1] - 31:18
**comparative** [1] - 32:25
**compared** [2] - 19:7, 20:13
**completely** [5] - 16:7, 21:14, 29:13, 46:9, 52:11
**complied** [1] - 7:10
**components** [2] - 6:12, 8:23
**comprehend** [1] - 21:14
**concern** [1] - 35:23
**concerned** [2] - 21:6, 33:24
**concerns** [2] - 31:15, 44:23
**conclude** [6] - 17:25, 18:1, 43:22, 44:7, 53:8, 53:9
**concluded** [1] - 53:16
**conclusion** [2] - 15:4, 25:4
**conflated** [1] - 23:23
**conflict** [4] - 39:14, 39:20, 40:7, 49:21
**conflicting** [1] - 39:12
**conflicts** [1] - 39:10
**confusion** [1] - 20:21
**conjunction** [2] - 8:2, 8:7
**conjunctively** [1] - 52:12

connect [1] - 45:13
connected [1] - 21:9
connecting [1] - 9:24
consciousness [1] - 43:2
consent [1] - 26:24
consider [5] - 18:4, 28:17, 28:18, 30:12, 41:22
consideration [1] - 42:7
considered [1] - 42:24
consistent [1] - 9:11
consistently [1] - 40:6
construe [1] - 31:24
construed [1] - 5:19
contain [1] - 6:19
contained [1] - 42:21
contains [1] - 30:1
contemplating [1] - 30:8
context [2] - 21:22, 24:25
continue [1] - 3:9
contrary [1] - 17:16
contrasting [1] - 24:11
contribution [1] - 49:8
control [31] - 18:14, 23:12, 23:13, 23:25, 24:2, 24:11, 24:14, 25:3, 25:19, 25:20, 25:22, 25:23, 26:2, 26:7, 26:12, 26:16, 26:18, 26:19, 40:17, 41:14, 48:22, 50:16, 50:20, 50:21, 50:22, 50:23, 51:2, 51:5, 51:10
controlled [1] - 26:21
controlling [11] - 15:5, 15:9, 16:4, 16:17, 26:5, 27:14, 27:15, 27:20, 41:24, 42:1, 42:8
controls [1] - 34:17
conveyance [1] - 4:17
conveyed [4] - 4:6, 4:17, 25:24
copy [2] - 18:12, 47:5
correct [6] - 20:10, 20:25, 21:5, 48:24, 50:3, 51:19
correspond [1] - 38:8
counsel [7] - 17:7, 27:2, 27:8, 48:23, 49:16, 49:25, 50:1
counseling [1] - 13:18
counsels' [1] - 3:17
counter [1] - 19:9
counties [2] - 17:5, 17:6
county [19] - 5:10, 5:20, 5:21, 5:24, 8:18, 9:3, 10:6, 10:9, 10:11, 10:18, 10:19, 10:21, 11:8, 11:17, 16:24, 30:10, 46:4, 46:22, 50:7
County [15] - 4:5, 4:13, 4:15, 4:18, 4:21, 4:22, 5:5, 5:11, 5:13, 11:11, 12:1, 30:5, 46:23, 52:24, 53:1
couple [2] - 3:7, 40:14
course [2] - 28:13, 50:21
court [40] - 5:9, 5:16, 5:22, 5:23, 6:9, 6:10, 9:14, 10:7, 10:11, 10:13, 10:20, 11:2, 11:9, 11:11, 16:23, 17:15, 19:25, 20:18, 21:10, 21:13, 21:15, 23:20, 23:23, 24:24, 25:20, 26:1, 34:7, 37:8, 37:9, 42:16, 43:3, 43:4, 43:6, 43:17, 45:1, 46:22, 47:18, 50:6, 52:9, 53:8
Court [51] - 4:2, 4:13, 4:21, 5:12, 5:18, 7:1, 7:14, 8:17, 9:9, 9:11, 13:7, 16:9, 16:11, 17:18, 18:5, 18:7, 20:5, 22:20, 22:23, 22:25, 24:21, 24:25, 26:21, 27:12, 30:12, 31:3, 31:23, 32:13, 35:23, 36:8, 37:2, 37:12, 37:16, 38:1, 39:6, 39:11, 40:11, 40:12, 41:10, 41:20, 41:22, 42:4, 43:12, 45:7, 48:24, 52:22, 52:24, 53:1, 53:4, 53:7, 53:15
court's [1] - 25:4
Court's [3] - 18:6, 20:11, 42:6
courts [2] - 10:15, 27:24
covers [1] - 3:16
create [7] - 5:7, 5:25, 7:18, 8:5, 10:21, 30:8, 39:12
created [3] - 22:15, 30:21, 53:2
creates [1] - 39:14
creation [1] - 4:4
credit [1] - 46:21
creditor [2] - 41:5, 49:5
creditors [3] - 5:8, 41:2, 49:4
criticism [1] - 19:15
criticisms [1] - 19:16
cumulative [9] - 9:13, 9:14, 15:11, 15:12, 15:24, 16:13, 20:6, 20:17, 37:22
curiosity [1] - 47:23
curious [2] - 22:17
cut [2] - 3:11, 48:5


D


d) [1] - 6:7
date [2] - 8:12, 8:23
dates [1] - 51:15
days [1] - 22:21
deal [1] - 25:12
dealing [5] - 34:5, 39:21, 40:22, 45:22, 45:25
dealt [3] - 19:18, 20:9, 44:10
death [2] - 48:14, 48:15
debtor [12] - 20:24, 22:2, 22:5, 22:6, 24:1, 24:9, 24:11, 25:12, 41:14, 42:15, 45:13, 51:2
debtor's [2] - 23:22, 44:12
decide [3] - 22:14, 36:24, 51:14
decided [3] - 15:9, 30:24, 43:8
decision [2] - 24:5, 29:14
decisions [1] - 50:18
decree [1] - 52:7
deed [2] - 47:16, 48:18
defendant [1] - 24:13
defenses [4] - 33:5, 33:21, 52:3, 52:8
defer [2] - 27:8, 28:16
defined [1] - 26:19
defines [2] - 24:7, 24:8
Del [10] - 4:5, 4:7, 4:9, 4:23, 24:17, 25:12, 43:22, 44:17, 45:3, 46:25
derive [4] - 38:7, 38:16, 38:17, 38:20
designation [1] - 6:12
designations [1] - 6:4
determine [1] - 40:23
developer [2] - 4:7, 4:17
Development [1] - 4:7
difference [2] - 26:18, 52:20
different [15] - 8:14, 8:22, 8:23, 10:15, 11:16, 16:7, 19:21, 19:22, 23:6, 32:9, 36:1, 38:3, 39:14, 39:21
differently [3] - 33:20, 37:2, 37:5
directly [3] - 4:7, 34:11, 41:25
disagree [2] - 16:16, 25:4
discussed [2] - 25:15, 29:24
discussing [1] - 9:22
discussion [2] - 45:11, 51:21
disjunctive [8] - 5:23, 15:10, 16:14, 36:10, 37:3, 38:15, 39:1
dispenses [1] - 51:23
dispositive [2] - 26:3, 40:25
dispute [1] - 5:10
disregard [1] - 42:1
disregarded [1] - 17:17
distinction [2] - 50:24, 51:9
distinguished [1] - 20:6
distinguishes [1] - 19:15
distribute [1] - 44:19
district [23] - 5:16, 5:22, 6:9, 17:15, 19:25, 20:18, 21:10, 21:13, 21:15, 23:20, 23:23, 25:4, 25:19, 26:1, 37:8, 42:16, 43:3, 43:4, 43:7, 43:17, 45:1, 52:9, 53:8
District [5] - 4:13, 4:20, 5:12, 52:24, 53:1
doctrine [1] - 32:21
document [5] - 25:21, 27:3, 27:6, 43:25, 46:17
domestic [3] - 12:9, 52:5, 52:13
domesticated [1] - 29:2
done [2] - 7:18, 28:10
down [2] - 44:11, 45:20
drafting [3] - 30:7, 30:9, 42:23
drafts [1] - 31:2
draw [3] - 15:4, 16:17, 35:3
drove [1] - 8:25
during [3] - 21:11, 22:5, 48:11
Durrant [2] - 3:4, 48:3
DURRANT [15] - 3:5, 3:20, 3:24, 17:7, 17:10, 18:20, 18:24, 19:8, 19:14, 20:8, 26:23, 27:9, 27:11, 46:15, 53:12


E


early [1] - 5:18
easy [1] - 8:21
effect [8] - 10:12, 11:20, 17:8, 22:12, 33:4, 34:25, 52:2, 52:7
effectuate [1] - 31:24
either [10] - 5:23, 5:24, 16:24, 30:16, 35:18, 35:19, 36:12, 42:17, 48:12, 50:11
embedded [1] - 24:9
emphasis [1] - 6:16
emphasizes [1] - 34:23
enacted [2] - 8:13, 8:24
end [2] - 3:12, 9:25
ended [1] - 27:7
ends [1] - 9:25
enforcement [6] - 29:19, 33:5, 33:21, 34:16, 52:3, 52:8
engage [1] - 42:13
engaged [1] - 42:16
engaging [2] - 34:3, 40:12
enlisted [1] - 36:5
enrolled [1] - 16:12
ensue [1] - 18:4
entered [7] - 4:23, 8:16, 10:9, 10:11, 10:13, 37:8
entering [1] - 11:1
entire [3] - 13:20, 16:6, 19:5
entities [2] - 46:25, 47:1
equal [1] - 24:2
equitable [1] - 25:17
erred [2] - 5:16, 23:20
erroneous [2] - 6:10, 42:6

**erroneously** [2] - 6:9, 6:12
**especially** [1] - 20:22
**estate** [1] - 45:25
**et** [6] - 12:13, 12:14, 14:2, 14:7, 14:21, 14:22
**evidence** [7] - 7:9, 10:4, 10:5, 12:21, 12:22, 25:22, 32:24
**evolved** [2] - 43:16, 44:4
**exactly** [3] - 5:18, 25:20, 44:5
**example** [3] - 8:4, 9:24, 24:12
**exceed** [1] - 49:6
**excellent** [1] - 53:13
**except** [2] - 12:25, 14:16
**exclusive** [6] - 26:7, 36:12, 36:19, 36:21, 43:23, 44:8
**excuse** [2] - 20:15, 48:19
**executing** [1] - 13:6
**execution** [13] - 4:20, 5:2, 21:8, 21:18, 23:24, 23:25, 24:10, 30:2, 44:14, 44:20, 45:4, 50:24, 53:8
**exercised** [1] - 26:23
**exercising** [1] - 26:12
**existence** [1] - 17:4
**existences** [1] - 47:2
**expect** [2] - 7:25, 8:8
**experience** [2] - 45:18, 46:18
**explained** [3] - 8:11, 8:14, 8:21
**explicitly** [1] - 30:18
**explored** [1] - 19:10
**expound** [1] - 38:22
**expounded** [1] - 39:6
**expressly** [5] - 15:15, 16:5, 16:10, 49:1, 52:14
**extent** [1] - 25:7
**extra** [1] - 3:11

F

**face** [3] - 13:8, 25:11, 25:21
**fact** [19] - 6:17, 6:18, 6:24, 8:13, 9:16, 14:16, 15:4, 16:18, 25:17, 26:8, 27:16, 30:12, 35:4, 38:20, 43:4, 43:7, 50:15, 50:19, 51:18
**facts** [2] - 4:4, 26:4
**factual** [4] - 25:25, 26:13, 44:24, 45:5
**factually** [2] - 19:21, 19:22
**fail** [1] - 5:1
**failed** [2] - 5:13, 29:12
**failing** [1] - 52:9
**fails** [1] - 5:2
**fair** [1] - 14:23
**fall** [1] - 34:16
**familiar** [2] - 21:24, 29:13
**Family** [3] - 4:5, 4:8, 48:25
**family** [2] - 4:11, 4:15
**favor** [1] - 53:10
**fell** [1] - 42:22
**felt** [1] - 38:24
**few** [1] - 36:5
**figure** [2] - 30:25, 38:5
**file** [7] - 5:8, 5:23, 10:6, 16:23, 28:12, 28:4, 39:16
**filed** [12] - 4:12, 4:19, 5:12, 10:11, 11:11, 11:16, 18:21, 18:25, 34:24, 37:11, 52:1, 52:25
**filing** [3] - 22:21, 50:6, 52:23
**financing** [1] - 26:10
**findable** [1] - 11:12
**findings** [3] - 25:25, 44:24, 45:6
**fingertips** [3] - 28:4, 28:7, 28:11
**first** [11] - 6:4, 18:1, 24:3, 30:17, 37:4, 37:6, 37:12, 38:17, 42:7, 44:21, 48:2
**fit** [1] - 44:9
**fits** [1] - 44:5
**five** [1] - 24:21
**focus** [3] - 24:19, 32:16, 39:3
**focused** [5] - 38:3, 38:15, 39:1, 43:5, 43:6
**follow** [6] - 14:14, 16:2, 16:10, 26:15, 29:20, 33:15
**follow-up** [1] - 33:15
**followed** [3] - 5:17, 5:22, 6:9
**footnote** [14] - 8:25, 9:6, 9:7, 15:13, 15:15, 15:17, 15:19, 16:6, 21:9, 21:18, 24:23, 42:21, 43:1, 50:5
**force** [1] - 10:12
**foreclose** [1] - 4:21
**Foreign** [19] - 11:25, 12:3, 12:8, 12:12, 12:15, 28:25, 29:18, 30:13, 30:20, 31:7, 31:11, 31:21, 31:24, 32:3, 35:8, 35:25, 40:6, 51:22, 53:5
**foreign** [12] - 12:5, 30:2, 30:8, 30:16, 32:25, 33:4, 34:7, 34:24, 52:1, 52:5, 52:13
**foremost** [1] - 42:7
**forget** [2] - 5:18, 7:24
**forth** [3] - 5:17, 7:13, 18:13
**franchising** [1] - 24:21
**free** [1] - 32:5
**front** [2] - 50:17, 51:17
**full** [2] - 10:12, 42:24
**fully** [1] - 19:20
**function** [2] - 3:14, 11:2
**functionally** [1] - 11:20

G

**gander** [1] - 50:12
**Gardner** [1] - 36:16
**garnishment** [2] - 24:12, 24:13
**general** [4] - 31:24, 33:15, 34:5, 34:13
**generally** [1] - 9:23
**given** [3] - 17:2, 44:2, 52:22
**goose** [1] - 50:12
**govern** [2] - 34:12, 50:14
**governing** [2] - 40:19, 40:20
**governs** [1] - 40:16
**granted** [1] - 30:3
**ground** [1] - 20:9
**guess** [6] - 16:2, 23:12, 24:18, 26:15, 38:5, 39:22
**guessing** [1] - 46:14

H

**Hagen** [2] - 27:14, 49:25
**HAGEN** [37] - 6:15, 7:25, 9:5, 9:8, 9:15, 9:21, 11:22, 11:24, 15:3, 15:13, 15:16, 15:25, 16:15, 20:19, 21:2, 21:6, 22:9, 28:2, 28:8, 28:12, 29:8, 29:11, 29:17, 29:23, 33:3, 33:17, 33:25, 34:15, 34:19, 34:21, 42:12, 45:9, 46:13, 47:4, 47:9, 47:14, 47:22
**half** [1] - 49:9
**hands** [2] - 17:19, 18:1
**harmonious** [1] - 32:14
**harmonized** [1] - 7:10
**harmony** [4] - 30:14, 32:18, 35:20, 35:25
**Hatch** [2] - 18:21, 18:24
**head** [1] - 10:2
**hear** [2] - 18:23, 22:13
**heavily** [1] - 36:8
**held** [3] - 4:16, 45:24, 46:2
**help** [2] - 36:25, 38:16
**helpful** [3] - 36:23, 38:4, 39:19
**helps** [2] - 18:11, 39:25
**highly** [1] - 50:25
**himself** [2] - 25:14, 26:11
**historical** [1] - 7:13
**history** [6] - 16:12, 17:14, 18:4, 18:11, 19:9, 19:11, 20:5, 20:6, 28:20
**hitting** [1] - 43:9
**hmm** [1] - 39:24
**hold** [1] - 32:15
**holding** [2] - 19:17, 50:9
**hole** [1] - 48:5
**home** [1] - 8:25
**honestly** [5] - 18:15, 20:11, 27:1, 33:24, 38:2
**Honor** [4] - 3:18, 33:16, 41:9, 41:11
**Honorable** [1] - 3:3
**Hooker** [5] - 3:22, 3:24, 27:11, 46:15, 53:13
**HOOKER** [30] - 3:22, 27:12, 28:7, 28:9, 28:19, 28:24, 29:10, 29:21, 29:24, 31:9, 31:15, 32:11, 33:11, 33:23, 34:1, 34:18, 34:20, 35:6, 36:4, 36:14, 37:1, 38:10, 38:12, 38:19, 39:24, 40:2, 41:9, 42:18, 43:19, 44:9, 44:25, 45:18, 46:14
**hypothetical** [1] - 30:21

I

**idea** [1] - 20:17
**ignored** [1] - 42:4
**ignores** [1] - 52:11
**imagine** [2] - 33:1, 46:8
**implication** [1] - 50:2
**impliedly** [1] - 16:9
**important** [7] - 23:19, 26:7, 30:11, 31:20, 35:12, 39:9, 51:10
**imposed** [1] - 8:20
**inaudible** [1] - 19:13
**incentive** [1] - 46:10
**inclined** [1] - 43:12
**include** [1] - 13:22
**includes** [2] - 6:23, 12:21
**inclusive** [2] - 36:12, 36:21
**incorporate** [4] - 31:6, 32:24, 35:14, 40:9
**incorporated** [1] - 31:1
**incorrect** [1] - 17:3
**independent** [1] - 33:22
**indicated** [1] - 31:21
**indication** [1] - 27:17
**indicative** [1] - 38:21
**individual** [2] - 46:5, 47:3
**individually** [2] - 4:9, 5:25
**individuals** [1] - 46:1
**industry** [1] - 11:21
**infer** [1] - 6:10
**inference** [2] - 16:18, 48:20
**inform** [1] - 39:25
**information** [7] - 9:2, 11:7, 19:19, 20:3, 37:10, 37:24, 46:6
**instance** [1] - 30:17
**instead** [3] - 14:10, 31:14, 37:23
**instrument** [1] - 25:8
**intend** [1] - 13:16

**intended** [4] - 7:16, 32:7, 36:20, 37:21
**intent** [4] - 11:19, 19:4, 28:21, 34:13
**intentionally** [1] - 52:19
**interest** [8] - 25:17, 43:22, 44:7, 44:13, 47:21, 49:7, 49:9, 51:8
**interested** [1] - 45:11
**interesting** [1] - 43:21
**interpret** [10] - 10:24, 13:21, 19:23, 27:18, 27:25, 35:25, 36:22, 39:15, 40:5, 40:23
**interpretation** [5] - 11:25, 27:23, 28:6, 29:3, 51:24
**interpreted** [3] - 31:12, 33:20, 35:20
**interpreting** [3] - 27:21, 30:12, 30:13
**interprets** [1] - 32:14
**introduce** [1] - 36:16
**invalid** [1] - 53:10
**investigate** [1] - 45:17
**involved** [1] - 40:20
**irreconcilable** [1] - 49:20
**irrelevant** [2] - 17:17, 19:11
**irreparable** [1] - 49:20
**isolation** [1] - 32:17
**issue** [32] - 4:18, 5:1, 9:8, 9:10, 19:20, 19:21, 20:4, 21:12, 21:14, 21:15, 23:6, 23:15, 27:7, 40:25, 41:12, 41:13, 41:16, 41:25, 43:2, 43:3, 43:4, 43:11, 43:13, 44:19, 44:24, 45:1, 45:7, 45:19, 46:12, 46:22, 49:15
**issued** [3] - 10:10, 51:3, 51:6
**issues** [6] - 12:22, 40:24, 41:19, 41:23, 43:10, 43:15
**items** [2] - 10:4, 29:19
**itself** [2] - 12:15, 26:20

## J

**Jessup** [3] - 24:20, 24:23, 25:5
**joint** [1] - 48:11
**jointly** [1] - 43:23
**judge** [1] - 19:14
**judge's** [1] - 19:16
**judgment** [96] - 4:9, 4:13, 4:14, 4:22, 4:25, 5:5, 5:7, 5:8, 5:9, 5:14, 5:25, 6:1, 6:5, 7:17, 8:5, 8:16, 9:2, 10:8, 10:9, 10:10, 10:11, 10:13, 10:16, 10:22, 11:1, 11:2, 11:6, 11:10, 11:17, 12:4, 12:5, 12:6, 12:9, 12:13, 13:6, 13:10, 14:4, 14:6, 14:16, 14:19, 15:11, 15:21, 19:19, 20:3, 20:24, 22:2, 22:4, 22:5, 22:6, 23:21, 23:22, 24:1, 24:2, 25:1, 25:12, 29:1, 29:4, 30:2, 33:4, 34:24, 37:8, 37:10, 37:24, 41:4, 41:14, 42:15, 42:20, 44:12, 45:13, 48:24, 49:10, 50:25, 51:1, 51:7, 51:9, 52:1, 52:5, 52:9, 52:13, 52:14, 52:23, 53:3, 53:5, 53:6, 53:8
**Judgment** [38] - 11:25, 12:3, 12:8, 12:13, 12:15, 14:1, 15:6, 16:19, 27:17, 28:1, 28:25, 29:18, 30:1, 30:11, 30:13, 30:14, 30:19, 30:20, 31:7, 31:11, 31:21, 31:24, 32:3, 33:8, 35:8, 35:14, 35:18, 35:20, 35:25, 36:1, 40:5, 40:6, 40:8, 51:22, 53:5
**judgment's** [1] - 30:4
**judgments** [11] - 11:5, 11:16, 17:5, 30:8, 30:16, 31:17, 33:1, 34:7, 46:5
**Judgments** [8] - 5:9, 9:3, 10:20, 29:5, 30:15, 37:16, 37:21, 53:1
**July** [2] - 7:12, 37:8
**jump** [1] - 3:25
**June** [1] - 4:19
**jurisdiction** [2] - 10:16, 21:10
**jurisdictional** [1] - 21:22
**Justice** [1] - 3:3
**justice** [6] - 10:3, 27:14, 37:9, 40:15, 48:2, 49:25
**JUSTICE** [97] - 3:5, 3:20, 3:24, 6:15, 7:4, 7:25, 9:5, 9:8, 9:15, 9:21, 10:23, 11:13, 11:22, 11:23, 11:24, 12:19, 13:1, 13:4, 13:13, 14:9, 14:23, 15:2, 15:3, 15:13, 15:18, 15:25, 16:15, 17:7, 17:8, 17:10, 17:11, 17:23, 18:17, 18:19, 18:20, 18:24, 19:8, 19:14, 20:8, 20:19, 21:2, 21:6, 22:9, 22:10, 23:4, 24:5, 26:4, 26:15, 26:23, 27:9, 27:11, 28:2, 28:8, 28:12, 28:15, 28:23, 29:8, 29:11, 29:16, 29:17, 29:23, 31:5, 31:12, 32:5, 33:3, 33:17, 33:25, 34:15, 34:19, 34:21, 34:22, 36:2, 36:7, 36:15, 38:5, 38:11, 38:13, 39:19, 39:25, 41:7, 42:12, 43:15, 43:20, 44:22, 45:9, 46:13, 46:15, 47:4, 47:9, 47:14, 47:22, 49:11, 50:15, 51:13, 51:17, 51:20, 53:12
**justices** [1] - 4:1

## K

**KC** [1] - 3:22
**key** [1] - 4:4
**kind** [10] - 10:23, 12:23, 23:16, 34:3, 34:12, 35:17, 36:17, 42:22, 43:21, 46:8
**Kitches** [32] - 5:17, 5:22, 6:2, 6:10, 15:4, 15:8, 15:14, 15:16, 16:3, 16:6, 16:9, 16:10, 16:16, 16:19, 17:15, 18:22, 18:25, 27:14, 27:15, 28:1, 36:2, 36:4, 36:6, 36:7, 36:17, 37:2, 37:3, 38:2, 38:8, 49:25, 50:3
**knows** [1] - 35:4
**Kristy** [1] - 25:5

## L

**laid** [1] - 16:11
**Lake** [3] - 4:13, 4:21, 52:24
**language** [16] - 9:20, 25:8, 28:21, 32:13, 34:4, 37:13, 38:23, 39:13, 40:3, 40:11, 48:7, 51:11, 51:12, 51:25
**large** [1] - 15:22
**last** [4] - 7:19, 16:4, 16:17, 45:14
**launches** [1] - 8:9
**law** [20] - 15:5, 15:9, 16:4, 16:17, 22:13, 22:15, 22:18, 27:15, 27:19, 28:4, 40:16, 40:19, 40:20, 40:22, 41:17, 42:6, 42:7
**laws** [1] - 31:25
**lead** [1] - 42:5
**leads** [1] - 35:20
**least** [7] - 23:10, 23:12, 23:15, 24:6, 26:8, 28:16, 38:8, 39:5
**left** [1] - 40:14
**legal** [1] - 41:18
**legislative** [9] - 11:14, 17:14, 18:4, 18:10, 19:9, 19:11, 28:20, 28:21, 50:7
**legislator** [2] - 33:1, 39:11
**legislator's** [3] - 18:13, 19:4
**legislators** [1] - 35:10
**legislature** [40] - 7:9, 7:11, 7:16, 8:14, 8:19, 9:12, 10:14, 11:15, 12:20, 13:6, 13:9, 13:16, 14:3, 14:17, 14:19, 15:6, 16:18, 16:20, 16:25, 19:5, 27:16, 27:21, 28:1, 28:5, 30:7, 30:14, 30:22, 31:2, 31:10, 32:2, 32:7, 32:23, 34:23, 35:1, 35:13, 37:20, 39:12, 50:2, 50:8, 52:17, 52:19
**legislature's** [1] - 35:11
**less** [1] - 14:5
**letter** [3] - 6:4, 6:11, 41:8
**letter-numbered** [1] - 6:11
**level** [1] - 43:2
**lien** [51] - 5:1, 5:5, 5:7, 5:14, 5:25, 6:5, 7:17, 8:5, 8:17, 10:8, 10:22, 12:4, 12:6, 12:9, 12:10, 12:14, 13:10, 14:6, 14:16, 14:20, 15:11, 15:21, 20:23, 22:4, 23:21, 24:2, 30:2, 37:9, 37:14, 37:17, 38:23, 38:25, 39:4, 39:9, 39:13, 39:16, 42:20, 44:13, 45:4, 46:8, 50:22, 50:23, 51:7, 51:9, 53:3, 53:6, 53:8
**Lien** [2] - 14:1, 51:22
**liens** [10] - 11:6, 12:9, 30:8, 30:18, 30:22, 31:17, 34:9, 34:10, 34:15, 47:10
**life** [1] - 22:5
**lifetimes** [1] - 48:11
**light** [2] - 10:24, 50:9
**likely** [1] - 32:1
**limit** [1] - 43:9
**limited** [1] - 15:17
**list** [4] - 6:6, 6:7, 29:19, 33:22
**listed** [1] - 6:6
**lists** [1] - 37:10
**LLC** [1] - 3:23
**located** [5] - 5:10, 5:11, 5:21, 40:21, 40:22
**look** [21] - 11:13, 17:18, 20:12, 21:7, 22:13, 25:19, 29:25, 35:17, 35:24, 37:4, 37:5, 37:6, 37:19, 38:23, 40:5, 40:18, 41:11, 46:19, 46:21, 46:22, 46:23
**looked** [3] - 24:25, 37:13, 43:6
**looking** [7] - 22:18, 23:8, 33:14, 37:18, 44:6, 45:1, 47:16
**looks** [1] - 35:7

## M

**main** [1] - 39:3
**map** [3] - 7:14, 16:10, 16:11
**March** [1] - 4:8
**matter** [1] - 34:12
**matters** [1] - 23:14
**Matthew** [1] - 3:3
**mean** [27] - 3:12, 7:5, 7:8,

12:20, 12:22, 13:25, 14:14, 16:21, 17:18, 17:22, 21:13, 23:15, 25:18, 26:5, 26:8, 26:12, 31:13, 32:7, 33:21, 35:2, 36:11, 36:15, 39:19, 43:16, 44:1, 44:13, 45:15
meaning [10] - 31:5, 32:3, 33:1, 35:3, 35:14, 36:12, 38:6, 38:17, 38:20, 39:22
meaningful [1] - 34:25
means [2] - 29:19, 35:24
meant [7] - 12:20, 13:1, 14:21, 31:10, 32:3, 32:8, 32:23
meet [2] - 52:15, 52:25
mention [3] - 14:10, 32:21, 40:9
mentioned [4] - 21:21, 30:18, 31:18, 49:12
mentioning [1] - 30:25
mere [1] - 25:17
met [3] - 6:24, 10:21, 53:6
middle [1] - 52:11
might [4] - 23:16, 26:13, 44:22, 50:20
mind [1] - 28:9
minute [1] - 36:8
minutes [2] - 3:8, 40:14
miscellaneous [1] - 31:16
miss [1] - 46:7
modifier [3] - 33:12, 51:24, 52:10
moment [4] - 5:3, 9:22, 33:18, 33:19
money [3] - 26:11, 44:15, 44:16
month [1] - 51:6
morning [2] - 3:20, 4:1
most [2] - 48:7, 49:9
mow [1] - 19:15
MR [84] - 3:18, 3:22, 4:1, 6:21, 7:13, 8:4, 8:7, 9:10, 9:18, 10:2, 11:4, 11:18, 12:3, 12:25, 13:3, 13:7, 13:24, 14:16, 15:1, 15:8, 15:15, 15:19, 16:5, 16:20, 17:21, 18:5, 18:18, 18:23, 19:3, 19:10, 19:18, 20:11, 21:1, 21:5, 21:20, 22:19, 23:19, 24:20, 26:10, 26:17, 27:1, 27:10, 27:12, 28:7, 28:9, 28:19, 28:24, 29:10, 29:21, 29:24, 31:9, 31:15, 32:11, 33:11, 33:23, 34:1, 34:18, 34:20, 35:6, 36:4, 36:14, 37:1, 38:10, 38:12, 38:19, 39:24, 40:2, 41:9, 42:18, 43:19, 44:9, 44:25, 45:18, 46:14, 46:17, 47:8, 47:11, 47:15, 47:25, 49:14, 50:19, 51:16, 51:19, 51:21
Mulligan [1] - 3:5
Mulligans [6] - 3:19, 4:11, 4:18, 30:19, 45:12, 53:11
Mulligans' [2] - 4:22, 41:10
must [4] - 5:8, 17:17, 36:19, 53:6

## N

name [1] - 45:14
names [1] - 47:10
necessarily [1] - 3:15
necessary [1] - 45:6
need [14] - 6:6, 6:24, 7:2, 8:18, 10:18, 18:9, 24:15, 26:4, 40:8, 41:18, 47:11, 50:20, 51:14
needed [5] - 38:22, 38:24, 39:5, 50:11, 50:15
needs [4] - 32:14, 35:19, 37:11, 45:7
Negligence [1] - 31:18
negligence [1] - 32:25
never [9] - 4:23, 5:12, 11:10, 20:23, 22:2, 22:6, 27:6, 41:24, 53:2
new [6] - 7:12, 22:23, 38:7, 41:7, 41:11, 41:22
newer [1] - 50:13
none [1] - 47:22
normally [1] - 8:2
notably [2] - 9:1, 50:5
note [1] - 37:20
noted [1] - 42:18
notes [1] - 3:7
noteworthy [1] - 48:17
nothing [3] - 13:5, 19:25, 31:17
notice [3] - 22:14, 29:12, 44:2
notices [1] - 42:10
nuance [2] - 23:14, 23:19
number [3] - 6:3, 19:15, 34:23
numbered [9] - 6:11, 6:12, 7:19, 8:1, 8:3, 9:23, 9:24, 37:5
numerous [1] - 13:11

## O

obligations [3] - 47:2, 47:17, 49:18
obtained [2] - 4:8, 4:17
obviously [1] - 12:23
October [2] - 4:12, 4:14
odd [1] - 13:16
odder [1] - 14:3
office [7] - 4:15, 5:21, 9:4, 12:1, 30:4, 30:5, 46:24
one [28] - 3:13, 7:4, 10:18, 13:19, 14:12, 14:13, 14:24, 16:24, 18:13, 19:3, 19:4, 22:10, 23:4, 27:6, 33:17, 33:23, 34:11, 37:6, 39:22, 43:15, 43:20, 48:14, 48:15, 49:4, 49:9, 49:11, 50:3, 50:14, 52:21
one-half [1] - 49:9
open [1] - 27:7
open-ended [1] - 27:7
opening [1] - 29:25
operate [1] - 37:22
opinion [3] - 38:6, 39:4, 40:10
opposed [1] - 23:13
opposing [1] - 27:8
opposition [1] - 39:7
oral [3] - 21:12, 42:9, 53:13
order [9] - 5:6, 5:7, 10:20, 12:4, 14:6, 15:20, 47:12, 48:21, 53:6
original [1] - 21:18
ors [2] - 6:10, 36:11
Osborne [4] - 51:22, 51:25, 52:5, 52:6
otherwise [4] - 10:17, 21:23, 26:8, 50:8
ought [4] - 16:9, 16:11, 24:22, 53:4
outcome [2] - 34:2, 38:2
override [1] - 51:11
overrule [3] - 16:3, 16:6, 16:10
overruled [2] - 15:14, 16:9
own [15] - 10:16, 22:12, 23:9, 24:17, 25:16, 25:18, 35:19, 38:4, 45:23, 46:6, 46:20, 47:1, 47:2, 47:23
owned [11] - 4:23, 20:24, 22:2, 22:5, 22:6, 23:22, 24:10, 42:14, 43:23, 51:5, 51:14
ownership [14] - 23:13, 24:15, 42:21, 43:15, 43:22, 44:7, 44:12, 44:24, 45:3, 50:16, 50:19, 51:10, 51:12
owns [1] - 24:13

## P

P.3d [1] - 24:21
page [3] - 23:9, 40:18, 43:9
paragraph [2] - 41:21, 48:4
parenthetically [1] - 50:24
part [21] - 13:2, 13:13, 13:14, 13:15, 14:2, 14:18, 14:20, 14:24, 25:10, 32:20, 34:24, 35:4, 35:8, 35:11, 35:24, 44:3, 52:1, 52:18, 52:20
particular [6] - 9:1, 13:19, 14:12, 21:8, 31:13, 49:6
particularly [2] - 40:5, 45:23
parties [2] - 42:2, 43:5
parts [2] - 14:13, 15:7
party [2] - 41:24, 50:11
patently [1] - 17:17
Patterson [2] - 41:20
PEARCE [10] - 7:4, 10:23, 11:13, 32:5, 34:22, 44:22, 50:15, 51:13, 51:17, 51:20
Pearce's [1] - 10:3
peer [1] - 13:18
people [5] - 22:15, 30:25, 45:22, 45:24, 47:12
percent [1] - 44:18
perfect [1] - 6:5
perhaps [1] - 17:24
period [1] - 9:25
person [2] - 46:20, 47:4
person's [3] - 46:21, 46:22, 46:23
personal [2] - 26:12, 49:18
personally [3] - 4:10, 4:23, 40:3
phonetic [2] - 36:16, 51:23
piece [1] - 10:5
place [2] - 11:9, 44:21
placed [1] - 11:15
places [2] - 11:16, 39:21
plain [3] - 18:14, 28:21, 32:13
planning [1] - 45:25
play [2] - 11:3, 26:9
plural [1] - 12:16
Pohlman [1] - 40:15
POHLMAN [36] - 11:23, 12:19, 13:1, 13:4, 13:13, 14:9, 14:23, 15:2, 17:8, 17:11, 17:23, 18:17, 18:19, 22:10, 23:4, 24:5, 26:4, 26:15, 28:15, 28:23, 29:16, 31:5, 31:12, 36:2, 36:7, 36:15, 38:5, 38:11, 38:13, 39:18, 39:25, 41:7, 43:15, 43:20, 49:11
point [17] - 8:25, 9:19, 9:21, 18:3, 18:8, 19:8, 19:14, 19:17, 21:24, 26:7, 34:11, 38:9, 40:15, 40:24, 41:20, 45:6, 48:23
pointing [1] - 4:3
points [1] - 49:16
portion [2] - 49:1, 49:7
position [6] - 23:17, 24:17, 27:15, 33:22, 33:23, 34:14
positive [3] - 33:12, 51:24, 52:10
possession [5] - 23:25, 24:2, 24:14, 51:2, 51:4
possible [1] - 46:12

**post** [3] - 33:12, 51:24, 52:10
**post-positive** [3] - 33:12, 51:24, 52:10
**potential** [3] - 11:6, 46:20, 50:23
**potentially** [4] - 17:13, 39:20, 42:5, 49:10
**power** [1] - 18:7
**powers** [1] - 46:9
**practical** [1] - 45:9
**practically** [1] - 47:24
**pre-2002** [1] - 20:9
**precise** [1] - 25:8
**preferable** [1] - 16:1
**prepared** [1] - 26:22
**preservation** [4] - 41:12, 42:25, 43:10, 44:23
**preserve** [4] - 21:12, 21:19, 41:18, 41:19
**preserved** [3] - 41:23, 41:25, 43:13
**presiding** [1] - 3:4
**presume** [7] - 14:19, 17:1, 19:5, 31:3, 35:2, 39:11, 52:18
**presumed** [1] - 50:2
**pretty** [3] - 36:8, 41:1, 41:17
**prevented** [1] - 41:24
**priorities** [1] - 17:1
**probate** [1] - 49:16
**problem** [2] - 25:10, 29:10
**procedure** [1] - 12:21
**Procedure** [1] - 42:11
**procedures** [4] - 33:5, 33:21, 52:2, 52:8
**proceedings** [3] - 33:6, 52:3, 53:15
**proceeds** [1] - 44:20
**proper** [1] - 18:11
**properly** [2] - 41:23, 41:25
**properties** [2] - 45:23, 45:24
**Properties** [1] - 19:15
**property** [70] - 4:6, 4:16, 4:18, 4:22, 4:24, 5:1, 5:5, 5:8, 5:10, 5:11, 5:15, 5:21, 8:17, 10:8, 10:17, 11:6, 12:5, 20:24, 22:3, 22:4, 22:6, 22:12, 23:12, 23:16, 23:22, 23:25, 24:8, 24:10, 24:13, 24:17, 25:7, 25:13, 25:16, 25:17, 25:23, 26:22, 37:9, 40:20, 40:21, 40:22, 41:2, 41:15, 42:14, 43:23, 44:13, 44:15, 44:18, 44:21, 45:16, 46:1, 46:3, 46:8, 46:21, 47:5, 47:21, 48:22, 48:25, 49:2, 49:9, 49:17, 49:22, 51:1, 51:4, 51:8, 51:14, 53:7, 53:10
**propose** [1] - 24:20
**proposed** [1] - 45:12
**provided** [2] - 12:6, 30:5
**provision** [2] - 31:14, 36:20
**provisions** [3] - 31:1, 31:16, 34:10
**public** [1] - 13:18
**pull** [3] - 13:19, 14:12, 14:24
**punch** [1] - 48:5
**purchaser** [1] - 45:12
**purely** [1] - 45:9
**purpose** [7] - 10:25, 11:14, 11:19, 11:20, 31:25, 34:13
**pursuant** [1] - 29:2
**put** [4] - 6:16, 7:19, 7:21, 9:16
**putting** [2] - 7:22, 32:8

**Q**

**questions** [4] - 3:8, 3:11, 3:14, 50:16
**quick** [1] - 49:11
**quickly** [1] - 28:15
**quiet** [1] - 53:10
**quote** [3] - 9:11, 38:11, 38:20
**quoted** [1] - 39:6

**R**

**radar** [1] - 42:22
**raise** [1] - 42:3
**raised** [7] - 21:8, 22:20, 23:18, 41:13, 41:16, 48:1, 48:23
**raising** [2] - 41:24, 43:1
**rather** [1] - 7:11
**reach** [5] - 36:1, 40:11, 43:13, 49:6, 49:21
**reached** [1] - 49:10
**reaches** [1] - 35:16
**read** [9] - 6:2, 20:5, 20:6, 26:23, 31:9, 32:18, 36:15, 37:2, 38:1
**reading** [4] - 7:4, 18:14, 32:16, 38:6
**reads** [2] - 6:1, 17:3
**real** [10] - 5:1, 5:5, 5:8, 8:17, 10:8, 12:5, 22:4, 37:9, 40:20, 53:7
**realize** [4] - 26:3, 33:18, 44:22, 47:22
**really** [12] - 9:18, 12:20, 13:1, 13:5, 13:16, 13:21, 14:10, 32:2, 36:11, 36:23, 38:7, 47:23
**Realty** [1] - 29:14
**reason** [4] - 27:25, 42:9, 47:20, 48:11
**reasonable** [3] - 32:6, 32:23, 33:1
**reasoning** [1] - 20:12
**reasons** [4] - 5:2, 36:5, 45:25
**rebuttal** [1] - 3:12
**receive** [1] - 47:6
**recently** [1] - 33:20
**recollection** [3] - 27:2, 27:3, 27:5
**reconcile** [1] - 11:24
**reconsider** [1] - 27:22
**record** [19] - 5:24, 8:18, 10:6, 10:21, 14:7, 16:22, 16:23, 21:24, 26:14, 37:14, 40:8, 40:15, 40:18, 45:8, 46:22, 46:23, 47:23, 48:6, 51:17
**recorded** [7] - 4:14, 9:3, 11:10, 12:1, 30:4, 39:14, 39:16
**recorder** [4] - 5:24, 8:18, 11:17, 12:2
**recorder's** [6] - 4:15, 5:20, 9:4, 30:5, 46:23
**recording** [8] - 5:20, 10:25, 29:5, 30:10, 30:23, 37:17, 37:22, 50:6
**records** [5] - 11:8, 11:9, 45:21, 46:4, 47:18
**red** [1] - 23:10
**redefine** [1] - 32:5
**reemphasize** [1] - 14:11
**refer** [2] - 18:18, 41:19
**reference** [5] - 12:24, 13:12, 15:15, 30:10, 32:20
**referred** [3] - 18:12, 22:15, 31:13
**referring** [3] - 23:13, 33:9, 37:24
**refers** [2] - 12:1, 27:5
**reflection** [1] - 3:15
**regard** [1] - 20:18
**regarding** [1] - 51:11
**regardless** [1] - 40:10
**registry** [3] - 30:20, 30:24, 39:17
**Registry** [8] - 5:9, 9:3, 10:20, 29:5, 30:15, 37:16, 37:21, 52:25
**regular** [2] - 12:8, 12:13
**related** [1] - 32:15
**relationship** [1] - 48:8
**relative** [1] - 24:18
**relevant** [7] - 4:10, 28:17, 41:13, 41:16, 41:22, 50:22, 51:14
**reliance** [1] - 15:17
**relied** [1] - 6:16
**rely** [2] - 15:22, 36:8
**remainder** [2] - 9:12, 15:21
**remains** [1] - 13:12
**remand** [3] - 18:3, 44:23, 45:5
**remember** [2] - 31:20, 38:7
**remove** [1] - 25:6
**reopening** [3] - 33:9, 34:3, 52:4
**repeatedly** [1] - 27:4
**replace** [1] - 19:24
**reply** [6] - 20:22, 21:7, 21:11, 21:18, 42:22, 43:7
**representing** [2] - 3:18, 46:18
**require** [4] - 26:24, 33:8, 46:3, 50:19
**required** [6] - 8:15, 9:2, 19:12, 29:4, 37:25, 53:2
**requirement** [20] - 7:6, 8:11, 10:20, 13:14, 13:15, 17:4, 19:19, 19:25, 20:4, 22:3, 29:6, 30:10, 30:16, 30:20, 30:23, 30:24, 37:15, 37:21, 37:22, 52:25
**requirements** [21] - 5:13, 6:19, 7:7, 8:12, 8:20, 8:22, 9:13, 12:11, 12:16, 12:17, 13:5, 14:21, 15:11, 20:13, 30:1, 30:3, 32:24, 37:23, 50:6, 52:15, 53:5
**requires** [2] - 5:20, 51:18
**requiring** [1] - 51:12
**research** [1] - 46:4
**resolution** [1] - 42:2
**resolve** [2] - 18:17, 18:18
**resolved** [5] - 22:17, 22:19, 23:1, 24:22, 45:1
**resource** [1] - 11:4
**respective** [2] - 10:17, 48:9
**respects** [1] - 19:15
**respond** [3] - 3:9, 27:23, 48:2
**responding** [2] - 3:11, 28:13
**response** [9] - 14:1, 17:14, 18:21, 19:2, 19:3, 22:13, 28:6, 41:10, 49:23
**result** [8] - 3:13, 18:4, 35:16, 35:21, 36:1, 40:4, 40:10, 40:12
**reverse** [2] - 50:8, 53:7
**review** [2] - 21:19, 27:2
**revocable** [15] - 22:11, 22:16, 23:11, 25:2, 25:5, 25:9, 25:18, 26:21, 26:24, 41:1, 41:5, 49:3, 49:12, 49:13, 49:15
**rewriting** [2] - 32:9, 32:12
**rights** [2] - 23:16, 43:14
**rise** [1] - 50:23
**Riverside** [2] - 3:6, 3:23

**road** [3] - 7:14, 16:10, 16:11
**Rock** [11] - 3:6, 3:23, 4:8, 4:12, 4:14, 4:19, 4:25, 5:12, 51:7, 52:10, 52:23
**Rock's** [2] - 17:16, 51:24
**routine** [1] - 11:6
**routinely** [1] - 41:22
**rule** [8] - 7:12, 21:15, 23:24, 24:6, 43:4, 43:5, 45:7, 51:11
**ruled** [1] - 43:3
**rules** [2] - 24:7, 24:12
**Rules** [1] - 42:10
**ruling** [5] - 6:10, 26:1, 26:2, 42:6, 50:3
**runs** [1] - 3:9

## S

**safety** [1] - 13:18
**sale** [1] - 44:20
**Salt** [3] - 4:13, 4:21, 52:24
**satisfaction** [3] - 33:5, 33:21, 52:3
**satisfied** [3] - 7:3, 12:12, 30:4
**satisfy** [8] - 12:7, 12:16, 12:17, 13:17, 13:20, 13:22, 14:11, 50:5
**scenario** [1] - 30:21
**search** [10] - 11:5, 11:8, 46:24, 46:25, 47:10, 47:17, 47:18, 47:19, 47:20, 47:21
**seated** [1] - 3:4
**second** [6] - 20:20, 20:22, 23:5, 24:4, 24:6
**Second** [2] - 5:12, 53:1
**section** [37] - 5:6, 10:7, 12:10, 12:14, 14:2, 21:22, 29:25, 30:5, 30:10, 30:19, 31:21, 31:23, 32:25, 33:14, 34:8, 34:9, 34:17, 35:8, 35:9, 35:13, 35:18, 37:4, 37:13, 37:18, 37:19, 39:9, 39:15, 40:9, 40:19, 40:24, 42:24, 48:7, 49:17, 51:21, 51:24, 52:12
**sections** [4] - 8:3, 9:23, 35:7, 38:8
**see** [11] - 7:25, 8:2, 8:6, 8:21, 23:8, 23:9, 36:19, 38:16, 44:23, 46:4, 47:6
**seeking** [1] - 4:21
**seem** [2] - 38:16, 38:17
**sell** [1] - 4:22
**seller** [1] - 46:3
**sellers** [1] - 46:5
**selling** [3] - 46:1, 46:21, 47:4
**semicolon** [1] - 10:1
**send** [1] - 33:18
**sending** [1] - 29:12
**sense** [3] - 13:21, 14:15, 14:17
**separate** [11] - 10:16, 11:4, 19:14, 21:14, 29:19, 46:24, 47:1, 47:2, 47:3
**separately** [2] - 5:25, 8:3
**seq** [5] - 12:13, 12:14, 14:2, 14:7, 14:22
**series** [2] - 33:13, 34:4
**serve** [1] - 11:20
**session** [1] - 17:2
**sessions** [1] - 50:7
**set** [2] - 5:17, 25:13
**sets** [1] - 7:13
**setting** [4] - 7:11, 7:12, 33:9, 52:4
**settlor** [9] - 23:11, 23:17, 25:3, 41:3, 41:5, 47:6, 49:4, 49:6, 49:19
**settlor's** [3] - 49:3, 49:6, 49:8
**settlors** [1] - 25:6
**several** [1] - 35:7
**shall** [2] - 48:12, 48:13
**share** [1] - 31:15
**short** [1] - 17:3
**short-sighted** [1] - 17:3
**show** [2] - 10:5, 25:22
**showing** [1] - 32:6
**shows** [1] - 41:8
**side** [2] - 3:8, 3:13
**sighted** [1] - 17:3
**sign** [4] - 27:6, 27:7, 47:15, 48:21
**signals** [1] - 10:14
**signed** [1] - 48:18
**significance** [2] - 8:21, 52:22
**significant** [3] - 9:20, 50:25, 52:17
**similar** [1] - 32:15
**simply** [1] - 25:5
**situated** [1] - 32:4
**situation** [2] - 30:6, 32:22
**situs** [1] - 40:21
**six** [1] - 4:3
**slightly** [1] - 23:6
**so..** [1] - 47:24
**sole** [2] - 48:13, 48:15
**solely** [1] - 42:2
**someone** [1] - 23:16
**sometimes** [1] - 10:24
**somewhere** [1] - 40:15
**sorry** [7] - 9:5, 11:22, 18:23, 21:17, 28:2, 29:23, 33:15
**sort** [5] - 4:25, 8:7, 22:1, 40:7, 50:16
**space** [1] - 43:11
**speaking** [1] - 42:19
**speaks** [2] - 34:9, 34:11
**specific** [12] - 8:25, 9:10, 11:18, 14:24, 16:2, 19:16, 20:4, 21:21, 34:8, 34:17, 35:23, 40:13
**specifically** [14] - 8:24, 14:10, 15:19, 16:7, 21:25, 24:23, 30:7, 30:9, 30:23, 30:25, 34:9, 34:10, 37:5, 41:21
**spoken** [1] - 19:5
**sponsor** [1] - 18:24
**spouse** [1] - 25:14
**stand** [1] - 35:19
**star** [1] - 24:21
**start** [6] - 4:3, 27:13, 28:25, 29:3, 29:9, 46:17
**started** [2] - 9:17, 35:17
**starting** [1] - 38:9
**starts** [3] - 6:17, 8:10, 32:13
**state** [5] - 10:12, 10:16, 11:2, 15:5, 37:9
**statement** [7] - 9:2, 19:19, 20:3, 34:5, 34:13, 37:10, 37:24
**states** [3] - 31:22, 31:25, 41:1
**stating** [1] - 6:24
**status** [1] - 25:9
**statute** [46] - 5:6, 6:1, 7:18, 8:2, 8:4, 8:16, 8:19, 10:24, 12:6, 12:9, 12:14, 12:23, 13:10, 13:11, 14:18, 14:20, 15:12, 15:22, 16:12, 16:21, 19:12, 20:6, 20:12, 20:16, 21:3, 21:16, 23:21, 27:18, 27:21, 27:22, 28:5, 28:18, 30:7, 30:9, 30:18, 32:9, 32:12, 32:25, 38:2, 39:10, 49:1, 49:12, 50:9, 52:1, 53:6
**statute's** [1] - 28:17
**statutes** [6] - 31:2, 32:14, 32:15, 32:19, 39:13, 49:21
**statutory** [5] - 21:21, 23:23, 29:3, 51:12, 52:25
**stay** [1] - 30:2
**staying** [1] - 33:10
**sticky** [1] - 43:10
**still** [3] - 3:8, 35:16, 40:4
**stock** [1] - 9:16
**stop** [2] - 23:4, 29:8
**strange** [1] - 12:24
**strong** [1] - 46:10
**sub** [1] - 6:11
**sub-subsections** [1] - 6:11
**subject** [7] - 4:6, 33:5, 34:11, 49:3, 49:17, 52:2, 52:8
**submit** [6] - 7:15, 14:2, 15:8, 16:21, 23:19, 50:14
**submitted** [1] - 17:13
**subpart** [2] - 13:14, 31:6
**subpoena** [1] - 45:20
**subsection** [48] - 5:14, 5:19, 6:3, 6:6, 6:7, 6:14, 6:17, 6:20, 6:22, 6:23, 6:25, 7:1, 7:6, 7:7, 7:8, 8:2, 8:5, 8:10, 8:11, 9:17, 9:25, 10:7, 10:10, 12:10, 14:7, 14:13, 16:23, 17:4, 20:14, 20:15, 23:2, 26:3, 34:5, 34:16, 36:9, 36:24, 37:4, 37:6, 37:7, 37:19, 38:18, 39:4, 40:3, 40:13, 41:11, 52:14
**Subsection** [1] - 7:5
**subsections** [10] - 5:19, 6:2, 6:4, 6:11, 6:13, 6:23, 7:20, 8:1, 52:21
**substituted** [1] - 31:14
**sufficient** [5] - 21:12, 26:3, 26:22, 37:15, 45:3
**suggest** [2] - 13:7, 18:6
**summary** [2] - 23:10, 25:1
**Sunstone** [1] - 29:14
**supplemental** [11] - 22:20, 22:22, 23:3, 23:5, 23:7, 24:25, 28:13, 41:6, 42:10, 50:10, 50:11
**supply** [1] - 14:21
**support** [3] - 26:1, 26:2, 28:4
**supports** [1] - 20:17
**suppose** [1] - 7:4
**switched** [1] - 29:15

## T

**T3** [28] - 6:15, 7:13, 7:15, 8:11, 8:15, 8:21, 9:6, 9:7, 9:14, 9:16, 9:19, 15:9, 15:12, 15:13, 15:17, 15:22, 15:24, 16:2, 16:5, 16:10, 19:15, 19:18, 20:5, 20:16, 50:4, 50:8, 50:13, 50:14
**talks** [5] - 16:12, 23:10, 27:4, 48:7, 48:14
**ten** [1] - 50:7
**tenable** [1] - 32:18
**term** [2] - 23:23, 23:24
**terms** [4] - 24:7, 26:19, 29:4, 35:1
**textual** [4] - 7:8, 10:4, 10:5, 18:14
**textually** [2] - 7:15, 17:3
**THE** [1] - 3:3
**theme** [1] - 22:1
**theory** [1] - 22:8
**therefore** [15] - 5:13, 5:14, 11:11, 14:20, 25:2, 25:4,

26:21, 36:19, 50:2, 52:15, 52:20, 52:24, 53:2, 53:7, 53:9
thinking [1] - 30:22
Third [3] - 4:13, 4:20, 52:24
Thomas [2] - 18:21, 18:24
thorough [1] - 46:12
three [2] - 30:1, 52:21
throughout [3] - 10:15, 22:2, 24:7
tied [2] - 17:19, 18:1
TILT [51] - 3:18, 4:1, 6:21, 7:13, 8:4, 9:7, 9:10, 9:18, 10:2, 11:4, 11:18, 12:3, 12:25, 13:3, 13:7, 13:24, 14:16, 15:1, 15:8, 15:15, 15:19, 16:5, 16:20, 17:21, 18:5, 18:18, 18:23, 19:3, 19:10, 19:18, 20:11, 21:1, 21:5, 21:20, 22:19, 23:19, 24:20, 26:10, 26:17, 27:1, 27:10, 46:17, 47:8, 47:11, 47:15, 47:25, 49:14, 50:19, 51:16, 51:19, 51:21
Tilt [8] - 3:18, 3:20, 27:9, 42:19, 46:16, 53:12
title [16] - 11:5, 11:7, 11:15, 45:11, 45:16, 45:17, 45:19, 45:20, 45:21, 45:22, 46:2, 46:10, 46:18, 47:13, 47:18
titling [1] - 53:10
today [3] - 10:5, 20:12, 28:22
together [1] - 37:22
ton [1] - 45:18
took [1] - 20:18
top [1] - 10:2
topic [1] - 42:13
transfer [1] - 48:22
trial [1] - 12:22
tricky [1] - 10:23
troubled [1] - 34:22
Trust [3] - 4:5, 4:8, 49:1
trust [88] - 4:11, 4:16, 22:11, 22:14, 23:11, 24:18, 25:2, 25:3, 25:7, 25:9, 25:11, 25:13, 25:18, 25:24, 25:25, 26:5, 26:20, 26:23, 40:16, 40:19, 40:23, 40:25, 41:1, 41:2, 41:5, 41:6, 42:5, 43:24, 45:2, 45:14, 45:16, 45:21, 45:24, 46:2, 46:3, 46:20, 47:5, 47:6, 47:11, 47:17, 47:18, 48:4, 48:7, 48:19, 49:3, 49:4, 49:7, 49:12, 49:13, 49:15, 49:17, 49:23, 51:5
trustee [11] - 23:11, 23:17, 25:13, 43:24, 47:6, 48:12, 48:13, 48:15, 49:18, 49:20, 49:22
trustees [11] - 26:6, 26:16, 26:17, 27:4, 27:5, 48:9, 48:11, 48:14, 48:16, 48:17, 48:19
trustor [2] - 48:12, 48:13
trustors [4] - 47:16, 48:10, 48:12, 48:18
trusts [6] - 22:17, 25:5, 25:15, 45:23, 46:5, 46:24
try [1] - 36:21
trying [7] - 11:13, 11:15, 36:23, 38:5, 38:7, 39:10, 39:12
turn [1] - 18:2
two [15] - 5:1, 5:2, 7:19, 8:1, 8:3, 11:16, 22:21, 26:15, 26:17, 32:17, 39:21, 40:7, 49:21, 50:13
typical [1] - 47:5

U

ultimate [1] - 42:2
ultimately [1] - 39:23
unambiguous [2] - 17:15, 17:16
under [24] - 8:15, 12:5, 12:10, 12:13, 14:1, 21:3, 22:3, 22:16, 34:16, 34:24, 42:15, 48:4, 48:16, 49:2, 49:16, 52:1, 52:14, 52:15, 53:2, 53:14
undercurrent [1] - 22:7
understood [1] - 3:10
undisputed [1] - 41:4
unfettered [1] - 25:11
uniform [4] - 31:22, 31:25, 32:1
uniformity [1] - 34:6
unilaterally [2] - 25:6, 26:24
unless [2] - 51:7, 51:9
untimely [1] - 53:9
unwilling [1] - 42:1
up [11] - 21:22, 21:25, 23:8, 25:13, 28:15, 33:15, 41:8, 43:10, 43:21, 48:14, 49:15
uses [2] - 35:1, 35:3
UT [1] - 41:21
Utah [12] - 5:17, 22:16, 22:18, 24:21, 29:2, 30:17, 31:7, 34:7, 40:22, 42:5, 42:6

V

vacating [3] - 33:9, 34:4, 52:4
vague [1] - 27:3
Valle [9] - 4:5, 4:8, 4:9, 4:23, 24:17, 25:12, 43:22, 45:3, 48:25
Valle's [1] - 44:17
value [1] - 13:8
variation [1] - 34:25
various [4] - 8:12, 25:15, 31:1, 33:6
venues [1] - 10:15
version [2] - 9:1, 20:9
versus [1] - 36:21
View [1] - 4:7
view [2] - 3:15, 19:13
virtue [2] - 8:13, 24:17
vis [2] - 23:16
vis-a-vis [1] - 23:16
void [1] - 51:8
vs [4] - 3:6, 24:21, 29:14, 41:20

W

wants [2] - 35:4, 35:23
Weber [9] - 4:5, 4:15, 4:18, 4:22, 5:5, 5:11, 5:13, 11:11, 53:1
week [1] - 42:9
weight [3] - 7:1, 28:6
welcome [3] - 3:21, 3:24, 28:12
whatsoever [1] - 51:8
whole [1] - 14:12
wholly [1] - 51:8
wife [4] - 26:25, 43:24, 44:12, 44:17
wish [1] - 28:14
wondered [1] - 13:1
wondering [2] - 44:1, 44:3
word [5] - 9:14, 32:2, 32:10, 33:12, 37:23
words [7] - 12:7, 13:9, 15:12, 15:24, 32:17, 35:11, 52:19
works [1] - 45:15
worry [2] - 3:10, 14:7
worth [1] - 30:25
writ [20] - 4:20, 5:2, 15:22, 21:8, 21:18, 23:24, 24:12, 44:2, 44:14, 44:20, 45:4, 50:23, 50:24, 50:25, 51:1, 51:3, 51:4, 51:6, 51:8, 53:9
write [1] - 12:23
writs [2] - 24:10, 51:11
written [1] - 53:13
wrote [3] - 13:9, 13:10, 31:10

Y

years [6] - 13:11, 15:5, 16:4, 16:17, 50:7

Z

zero [1] - 25:21